IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

UNITED STATES OF AMERICA                              PLAINTIFF

           v.        Criminal No. 96-60022-001

JEFFERY WILLIAM PAUL                                  DEFENDANT

## ORDER

NOW on this $\underline{17}$ day of September, 1998, comes on for
consideration defendant's motion for new trial (document #244)
filed on September 15, 1997, and the government's response thereto
filed on September 24, 1997, and the Court, having reviewed a
complete trial transcript prior to rendering this decision, finds
and orders as follows:

1.    On September 24, 1996, a two (2) count indictment was
filed against the defendant, Jeffery William Paul ("Paul"),
charging that on June 22, 1995, while aiding and abetting another,
Paul killed Sherman Williams in the perpetration of a robbery in
violation of 18 U.S.C. § 1111(a) and § 2.    Paul was also charged
with the knowing use of a firearm during and in relation to a
crime of violence in violation of 18 U.S.C. §§ 924(c), 924(i)(1)
and § 2, as a firearm caused the death of Mr. Williams.[1]    On the

---

[1] The Court notes that the government filed a two (2) count superceding indictment
against Paul on December 4, 1996.

AO 72A
(Rev.8/82)

same date, Trinity Edward Ingle ("Ingle") was identically charged in a two (2) count indictment; the accuseds were not, however, charged as co-defendants and accordingly, the matters were set for separate trials.

2.     On January 27, 1997 and pursuant to 18 U.S.C. § 3593(a), the government filed its Notice of Intent to Seek the Death Penalty against both Paul and Ingle.

3.     The case of *United States of America v. Trinity Edward Ingle*, Criminal No. 96-60023-001, proceeded to trial on May 27, 1997 and continued through June 6, 1997.  Ingle was found guilty by the jury on both counts and by way of special verdict form, the jury unanimously found, beyond a reasonable doubt, that Ingle intentionally aided and abetted in the killing of Mr. Williams; the jury also found that numerous aggravating and mitigating factors existed.  The jury then unanimously declined to recommend that Ingle be sentenced to death, instead recommending a sentence of life imprisonment without possibility of release.  On June 6, 1997, pursuant to the jury's findings, the Court sentenced Ingle to life imprisonment without possibility of release.

4.     The case against Paul proceeded to trial on June 18, 1997, and on June 23rd, Paul was found guilty on both counts -- first degree murder and use of a firearm during and in relation to

-2-

AO 72A
(Rev.8/82)

a crime of violence. The sentencing proceedings then continued through June 25, 1997, at which time -- by way of special verdict form -- the jury unanimously found, beyond a reasonable doubt, that Paul intentionally aided and abetted in the killing of Mr. Williams. As in Ingle, the jury found that numerous aggravating and mitigating factors existed. The jury then unanimously recommended that Paul be sentenced to death. Pursuant to the jury's findings and recommendation, the Court sentenced Paul to death by lethal injection on both counts.

5. After requesting and obtaining an extension of time on June 26, 1997, Paul filed a F.R.Crim.P. 33 motion for new sentencing and/or trial on September 15, 1997, challenging the jury's negative response in the special verdict form to the following question: "Do you find from a preponderance of the evidence, any of the following . . . (5) That another defendant, Trinity Edward Ingle -- equally culpable -- will not be punished by death." Paul argues that, considering (a) the substantial amount of evidence introduced which established Ingle's equal culpability and (b) the failure of the government to introduce evidence that Paul was any *more* culpable than Ingle, it would be a serious miscarriage of justice to permit the sentence of death to stand. Paul contends that, given the alleged complete lack of

-3-

evidence to support the jury's finding on this one (1) mitigating factor, a new sentencing proceeding and/or trial must be conducted.[2]

6. The government responds that Paul was not a victim of a miscarriage of justice as there was ample evidence for the jury to conclude that Paul was, in fact, more culpable than Ingle. The government further argues that this single mitigating factor -- that an allegedly equally culpable defendant was sentenced to life in prison rather than death - is simply one of many mitigating factors that the jury was permitted to consider during the sentencing phase. The government says the jury's 12-0 conclusion that there was not an equally culpable defendant escaping the death penalty is supported by the proof and that Paul is not entitled to a new sentencing hearing or new trial on that account.

7. Federal Rule of Criminal Procedure 33 provides, *inter alia*, that "[t]he court on motion of a defendant may grant a new trial to that defendant if required in the interest of justice." The parties note a lack of guidance for the Court's review of

---

[2] The Court notes that Paul has not challenged the sufficiency of the evidence presented against him during the guilt phase of his trial. The Court has reviewed the entire transcript of the guilt phase, noting and recalling that following the government's presentation of twenty-six (26) or more witnesses over several days, Paul rested without the presentation of any defense witnesses. The government requested that the jury be permitted to consider all of this evidence during the penalty phase and the Court granted the request and so instructed the jury.

-4-

Paul's challenge since it relates only to the sentencing phase of his two-part trial. Generally, when faced with a F.R.Crim.P. 33 motion for new trial, the Court reviews the evidence, making credibility determinations as necessary, and may grant the motion if "the evidence preponderated heavily against the verdict that a serious miscarriage of justice may have occurred. . . ." *United States v. Lincoln*, 630 F.2d 1313, 1318 98th Cir. 1980); *see also United States v. Davis*, 103 F.3d 660 (8th Cir. 1996).

8. The United States Supreme Court has had occasion to consider the death penalty frequently over the years. In its landmark decision in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the Court ruled that the imposition and carrying out of the death penalty in Georgia and Texas prior to 1972 constituted cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. Later, in *Gregg v. Georgia*, 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976), it was determined that the punishment of death for the crime of murder does not always and necessarily violate the Amendments. Since that time,

> [i]ndividual justices have continued to struggle with attempts to articulate their views about the imperatives of a valid procedure in the many subsequent decisions approving and disapproving variations in state laws governing the extreme punishment of death. They have

-5-

been more clear in stating what is prohibited that what
is required. Thus, the penalty of death may not be
ordered automatically, arbitrarily, irregularly,
randomly, capriciously, wantonly, freakishly,
disproportionately or under any procedure that permits
discrimination by race, religion, wealth, social
position or economic class.

See *United States v. McVeigh*, 944 F. Supp. 1478, 1487 (D.Colo.
1996).

More recent cases, echoing *Gregg*, have held that a capital

sentencing scheme must "genuinely narrow the class of persons

eligible for the death penalty and must reasonably justify the

imposition of a more severe sentence on the defendant compared to

others found guilty of murder." *Zant v. Stephens*, 462 U.S. 862,

877, 103 S.Ct. 2733, 77 L.Ed.2d 235 (1983); *McCleskey v. Kemp*, 481

U.S. 279, 303, 107 S.Ct. 1756, 95 L.Ed.2d 262 (1987). Thus, to be

valid,

the procedure must protect against a decision motivated
by passion and prejudice. It must guide the jurors to
an individualized consideration of each defendant. The
aggravating factors considered must be objectively
provable and rationally related to the criminal conduct
in the offenses proven at trial. There can be no
limitation on the ability of individual jurors to
consider mitigating factors. The jurors must be
unanimous if their finding is that death is justified,
and the jury must articulate the reasons in a manner
enabling meaningful appellate review. What must be
clear in the end is that the jury has performed its task
of acting as the conscience of the community in making
a moral judgment about the worth of a specific life

-6-

balanced against the societal value of a deserved
punishment for a particular crime.

*Id.* (citations omitted).

The Supreme Court has clarified that the required narrowing

function may be accomplished in either of two (2) ways:

The legislature may itself narrow the definition of
capital offenses . . . so that the jury finding of guilt
responds to this concern, or the legislature may more
broadly define capital offenses and provide for a
narrowing by jury findings of aggravating factors at the
penalty phase.

*Lowenfield v. Phelps*, 484 U.S. 231, 246, 108 S.Ct. 546, 98 L.Ed.2d

568 (1988).

Congress has attempted to meet these "narrowing" requirements

in the Federal Death Penalty Act, requiring a separate penalty

phase to consider aggravating factors previously identified by the

government in a pretrial notice, and such mitigating factors as

the defendant may desire to introduce at the hearing. The

sentencing procedure is specifically and sequentially set forth by

statute. 18 U.S.C. § 3591-3598. If there is a conviction, the

jury first determines whether the government has proved one of the

four intentions described in 18 U.S.C. § 3591(a)(2)(A) through

(D). If the jurors are not unanimous in finding that one of these

intentions existed, their task is complete and the Court sentences

-7-

the defendant according to the Sentencing Guidelines. *See* 18 U.S.C. § 3594.

If one or more intention is found, the jury will then consider whether they are unanimously agreed that at least one of the statutory aggravating factors identified in the government's notice has been proved beyond a reasonable doubt. 18 U.S.C. § 3592(c). If such a factor is found, the jury may then consider any other aggravating factors submitted to them, if also proved beyond a reasonable doubt. *Id.* The aggravating factors function to focus the jury's attention on the particular facts and circumstances pertinent to the particular defendant found guilty of an offense punishable by death in the context of any mitigating factors unique to him as an individual human being. *United States v. McVeigh*, 944 F. Supp. at 1488.

Each juror then weighs the aggravating factors so proven against such mitigating factors as each individual juror may find exist by a preponderance of the information presented at the hearing. 18 U.S.C. §§ 3592(a), 3593(d) and 3593(e). Unanimous specific findings must be made as to aggravating factors and the jury may not return a recommendation of death unless the jurors are unanimously agreed that such aggravating factor or factors sufficiently outweigh all the mitigating factors found to exist to

-8-

justify a sentence of death. *Id.* In effect, a sentence of death may not be imposed for anything other than an intentional killing as defined in 18 U.S.C. § 3591 (a)(2), and then only after a careful consideration of aggravating and mitigating factors particularized as to each defendant. 18 U.S.C.§ 3593. As such, aggravating and mitigating factors serve to assist the jury in distinguishing "those who deserve capital punishment from those who do not . . . ." *Arave v. Creech*, 507 U.S. 463, 474, 113 S.Ct. 1534, 1542, 123 L.Ed.2d 188 (1993); *see also Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994). And the jury is instructed that they are never required to recommend death, regardless of their findings with respect to aggravating/mitigating factors.

9.     While the Eighth Amendment requires a heightened reliability standard in capital sentencing proceedings, the jury must receive sufficient information regarding the defendant and the offense in order to make the required individual sentencing determination. *United States v. Jones*, 132 F.3d 232, 241 (5th Cir. 1991), citing *Lowenfield v. Phelps*, 484 U.S. 231, 238-239, 108 S.Ct. 546, 551-552, 98 L.Ed.2d 568 (1988). Given this standard, the Court feels it incumbent to provide a brief review of the information presented at sentencing as part of this Court's

-9-

consideration of Paul's motion.

10. After jurors returned their verdict against Paul in the guilt phase of trial, the Court informed the jury that the penalty phase of trial would begin with more instructions on the law and opening arguments from counsel. At that time, the jury learned from the Court that the evidentiary rules technically did not apply in sentencing proceedings and that it would be hearing "information" believed to be necessary for their consideration of Paul's penalty -- options which would include a sentence of death. During the Court's penalty phase instructions, jurors were given the statutory framework of the aggravating factors which must be proven by the government -- beyond a reasonable doubt -- and the mitigating factors that Paul would be required to prove by a preponderance of the evidence or information. Then, in opening arguments counsel for the government and the defense set forth the information which would be presented for the jury's consideration.

The government then called Mary Ann McKuin, daughter of the deceased, Sherman Williams, to provide victim impact testimony. As she did during the guilt phase, Mrs. McKuin testified about her relationship and friendship with her father and the effect his violent death had upon her and her family. Mrs. McKuin's testimony was followed by that of her sister, Carol Lynn Sherman,

-10-

who likewise testified for a second time about learning of her father's disappearance and then death and the subsequent loss her family experienced as the result of his violent murder.

Lawrence McCollough, a long time employee of the U.S.D.A. Rural Development, formerly the Farmers Home Administration, then testified of Sherman Williams' longstanding role as his supervisor and mentor -- as well as friend -- while working with the FmHA, stating that "Mr. Williams was really the best employee that our agency has had . . . in my 26 years." McCollough also described Mr. Williams' record of outstanding involvement in his family, workplace, community and within the state of Arkansas.

The government then stated that it intended to rely upon all of the evidence which was introduced during the guilt phase in satisfying its burden of proving the statutory and non-statutory aggravating factors.[3]  A brief synopsis of portions of that testimony follows:

Alan Ritchey, a visitor and hiker at the Hot Springs National Park found the body of Sherman Williams off a hiking trail on or

---

[3]  The Court will not attempt to summarize all of the testimony presented during the guilt phase of the Paul trial, noting that the government presented testimony through Mary Ann McKuin, Marie Bosson, Alan Ritchey, Irene Ethridge, Bill Cooley, James O'Donnell, Tom Ross, Roger Purtee, Jim Heavin, Billy Bars, Dr. Frank Peretti, Berwin Monroe, Dick Reem, Sam Maples, Floyd Hays, Jr., Rebecca Pingle, Suzie Arbuckle, Kris Rogers, Tom Turner, Mark Gregory, Christine LaPaglia, Cindy Wallace, Dan Coughlin, Ruby Ross, Jason Paul and John La Voie.

-11-

about June 26, 1995. Noticing that the body was "bound and tied up" and had "been dead for a little while," Ritchey notified the Hot Springs Police Department. Sergeant Bill Colley testified that he responded to the location, noting that the body was approximately one-half mile up a hiking trail on the side of Hot Springs Mountain, near the Honeysuckle and Floral Trails. James O'Donnell, a ranger at the Hot Springs National Park then met with Sergeant Cooley, Special FBI Agent Tom Ross and Roger Purtee, the Deputy Coroner for Garland County, Arkansas.

The testimony of these witnesses was essentially the same. Mr. Williams' body -- later identified with dental records by the Arkansas State Crime Lab -- was found under logs and rocks a short distance off the trail. His hands and ankles had been tightly bound with duct tape and a piece of tape was found in the neck area, presumed to have been originally placed around Mr. Williams' mouth. The Deputy Coroner testified that Mr. Williams' head was nearly detached from his spine and that the body had a large open wound at the right temple above the jaw. Dr. Frank Joseph Peretti, an Associate Medical Examiner for the State of Arkansas testified that the body had shotgun wounds to the head and chest; Dr. Peretti testified that the cause of Mr. Williams' death was homicide. Numerous other witnesses from the Arkansas State Crime

-12-

Lab corroborated the testimony concerning the condition of Mr. Williams' body and the cause of his death.

There was then testimony from FBI agents that Mr. Williams' wallet had been found the following day in the park only a short distance from his body and that four (4) to five (5) days later, his vehicle was located in a remote area of Hot Springs approximately 150 feet down in a pit. Steve Colley, a detective with the Hot Springs Police Department and Ruby Ross, with the Arkansas State Crime Lab, testified that a latent fingerprint belonging to Trinity Ingle was recovered from inside Mr. Williams' vehicle.

Chris Rogers, a friend of Jeffery Paul, then testified that on or about June 22, 1995, Jeffery Paul, his brother Jason Paul, and Trinity Ingle had driven to Rogers' place of work in a new car that he had not seen before; Rogers was asked to go "hang out" but he testified that he could not go because he had to work. On the following day, Rogers testified that he saw Jeffery Paul who complained that his "foot hurt." Then, on June 24, 1995, Rogers stated that he picked up Jeffery Paul and that they began drinking beer. Rogers testified that Paul told him about an "old man" that he and Trinity Ingle had "murdered." By Rogers' account, Paul told him that he and Ingle had followed an old man who "looked

-13-

AO 72A
(Rev.8/82)

like and easy target" onto the mountain in order to rob him.  Paul told Rogers that the two confronted the old man; that the old mane would not give up "his goods" and so they knocked him down and started kicking him.  Paul told Rogers that he kicked the old man in the head so hard that he made "his eye come out and broke his neck to the side and a bone come (sic) out of the skin."  Paul told Rogers that he "never kicked no motherfucker that hard before."  Paul then stated to Rogers that he bound the body with duct tape and because the old man was not dead, he shot him first and then made Ingle shoot the old man as both he and Ingle had a gun.  The two then drug the body into the woods and covered it up.

Rogers also testified that earlier in June -- near June 8, 1995 -- Paul had given Rogers a loaded .38 handgun wrapped in a jacket to keep for him.  Rogers stated that Paul picked the gun up approximately one (1) week later, stating that he intended to use the gun to rob the Tri-States Liquor Store.  Finally, Rogers testified that after reading a newspaper account of the murder in the park, he called Paul who "just laughed" about it.

Christine Lapaglia, a former girlfriend of Paul, offered a similar version of events which had originated from Paul.  She stated that near the time of murder, Paul -- who was upset -- had called her from the Fountain Motel in Hot Springs, asking her to

-14-

come see him and telling her that he had "killed someone" when he "kicked him" and "broke his neck." He also told her that his mother was upset because she had found some of Paul's clothes and shoes covered with blood; he stated in the conversation that he was going to join the "French Foreign Legion."

Consistent testimony was offered by Cindy Wallace, a girl with whom Paul lived in Key West, Florida after fleeing Arkansas. Wallace testified that Paul told her he was having a recurring dream about following an old man, taking his money, and beating him up. Paul told Wallace that the old man "begged for his life" and that he had beaten the man so severely that one of his eyes came out of its socket. He told Wallace that the old man said he would not "talk" but that he did not believe him so he shot him in the head. He later told Wallace that he "couldn't feel anything about the murder."

Dan Coughlin, another Florida acquaintance of Paul, testified that Paul told him that he and another man in Arkansas had robbed an old man for his vehicle and then shot and killed the old man. Coughlin, a former member of the United States Coast Guard, testified that he gave Paul his birth certificate so that Paul could get a new Florida driver's license and identification.

Jason Paul -- Jeffery Paul's brother -- then testified that

-15-

AO 72A
(Rev.8/82)

on or about June 22, 1995, his brother and Trinity Ingle had asked him to drop them off downtown. He stated that he later saw the two in a newer model gold car that he had not seen before and that Ingle changed white t-shirts. The three then went to the Tastee Freez and ate Frito pies. Later that day, Jason Paul rented his brother and Ingle a room at the Fountain Motel with money given to him by Ingle "so they could have a party." Later that evening, Jason Paul returned to the motel and bought some beer for them to drink.

And finally, Special FBI Agent John La Voie offered testimony that when arrested on August 26, 1996, in Water Valley, Mississippi, Jeffery Paul offered the following version of events with respect to the murder of Sherman Williams:

> He told me that on that on June twenty-second, 1995, he and [Ingle] walked to the residence of his mother and upon arriving at that residence, convinced his brother Jason Paul to drive him and [Ingle] to the downtown area of Hot Springs National [Park]. Upon arriving in the downtown area, [Paul] and [Ingle] began to walk towards the Hot Springs National Park. As they approached the Hot Springs National Park, they observed a white, elderly male exiting a 1994 or 1995, four door, champagne colored Oldsmobile 88. This white male was wearing a hat, jogging shorts and red striped knee high socks and grey velcro type tennis shoes. Upon seeing the elderly white male, [Ingle] stated to [Paul]: "Let's roll this fool." Prior to seeing the white male, [Paul] and [Ingle] had discussed taking someone off. I asked [Paul] what that meant and he said to rob someone. They then followed the elderly white male into the Hot

-16-

Springs National Park. Once on one of the trails, they then approached the white male [and] asked for the time. As the white male provided the time, [Ingle] then pulled a .38 caliber revolver and demanded money from the white male. The white male told them he had no money. At that time, [Ingle] stated "Don't fucking say that to me." The white male then provided his wallet and his car keys to [Paul] and [Paul] withdrew ninety-eight dollars in United States currency and gave the currency and keys to [Ingle]. [Paul] kept the wallet. At that point in time, [Ingle] handed [Paul] a roll of duct tape which [Paul] used to duct tape the white male's legs and hands. At some point in time, [Ingle] struck the white male with the butt of the revolver, knocking the white male to the ground. [Ingle] then kicked the white male twice in the head, and [Paul] kicked the white male once in the chest. they began to walk away . . . and then turned and walked back to the white male at which time [Ingle] shot the white male once in the head with a hollow point round and shot the white male a second time in the shoulder with a rat shot round. At that point in time, [Paul] and [Ingle] then pulled the white male approximately thirty feet off of the trail. [Paul] and [Ingle] then began to walk back towards the Oldsmobile 88 and prior to reaching the vehicle, [Paul] advised that he hid the wallet under several rocks near a spring of water. Upon reaching the vehicle, [Paul] entered the passenger side of the vehicle and [Ingle] entered the driver's side of the vehicle and they drove away from the Hot Springs National Park. . . . his only recollection of the rest of that evening was that they drove to a Tastee Freez in Hot Springs, Arkansas area.

Following LaVoie's testimony, the government rested its case for the penalty phase.

The defense then presented testimony through Paula Paul, who provided a background of Paul's childhood and family life. The Court will not attempt to summarize all of Mrs. Paul's testimony

-17-

but acknowledges that she described an early childhood with numerous encounters with law enforcement, frequent moves between homes and school districts, poor grades, poverty, insecurity, dysfunctional relationships with parents, family members and peers, and emotional instability. Violence was also present as Mrs. Paul described a shooting Paul witnessed at the age of twelve (12) where a child his age was killed when he "head was blown off" only six to eight feet away from Paul; his mother stated that Paul had bad nightmares and a long period of insecurity which culminated in Paul's sleeping with his mother until age seventeen (17). Mrs. Paul offered other instances of violence, describing a knife throwing incident involving Paul's father and brother in which Paul's injuries required almost two hundred (200) stitches in his face. She further described a repeating pattern of criminal activity, destructive behaviors of biting knuckles and attempting suicide, which culminated on two (2) occasions in Paul's admission to Rivendale, a psychiatric residential home. Paul later dropped out of school and spent time in jail and later in the Arkansas Department of Corrections("ADC"). After his release from ADC, Mrs. Paul testified that Paul again came home to live -- with one brief exception -- until he fled for Florida after the murder of Sherman Williams.

-18-

Following Mrs. Paul's testimony, the defense played a portion of a tape-recorded conversation which occurred in the Crawford County Detention Center between Jonah Jones, Derrick Bell and Trinity Ingles. In this conversation, Ingles describes, over and over, and in so many words, an incident in which an "old dude," who looked "like he got money," was robbed, tied up and then shot in "the dome" in the Hot Springs National Park by two people sporadically referred to by Ingle as "Andy and Bob" but more frequently referred to in the first person, "I", "we", etc. On the tape, Ingles not only incriminates himself but another unidentified ("Andy") person. After the tape was played for the jury, the defense rested and the government declined to present rebuttal testimony.

The Court then instructed the jury on the applicable law and procedure governing their consideration of Paul's sentence. The jurors were given more specific instructions regarding the only aggravating factors which they were permitted to consider, provided they unanimously agreed that the factors have been proven beyond a reasonable doubt. They were similarly instructed that any mitigating factor could be considered by any juror who concluded that the factor had been proven by a preponderance of the evidence or information and were told to utilize a weighing

-19-

process to determine whether a sentence of death was justified. Jurors were specifically reminded that regardless of their findings with respect to aggravating/mitigating factors, they "were never required to recommend a death sentence." Furthermore, they were instructed that any recommendation of death or of life imprisonment without possibility of release must be unanimous.

11. Following counsels' closing arguments and deliberation, the jury returned its recommendation that Paul be sentenced to death. In so concluding, the jurors unanimously found, beyond a reasonable doubt,

\* that Paul was eighteen years or older at the time he committed the offenses;

\* that Paul intentionally aided and abetted in the killing of Sherman Williams;

\* that Paul committed the offenses in an especially heinous, cruel or depraved manner in that the offenses involved torture or serious physical abuse to Sherman Williams;

\* that Paul committed the offenses in the expectation of the receipt of something of pecuniary value;

\* that Sherman Williams was particularly vulnerable due to old age;

\* that Paul is likely to commit criminal acts of violence

-20-

in the future which would be a continuing and serious threat to society;

\* that Paul attempted to commit another act of violence, to wit, attempted an armed robbery at the Tri-States Liquor Store, Hot Springs, Arkansas on or about June 8, 1995;

\* that Paul successfully eluded capture by the Federal Bureau of Investigation until his arrest in Mississippi on August 22, 1996;

\* that Paul had demonstrated a lack of remorse for the capital offenses he committed, including but not limited to, stating that he did not feel bad about the murder, stating that Mr. Williams begged for his life, and referring to Mr. Williams in vulgar terms;

\* that Sherman Williams was killed to prevent Paul from being identified as a participant in the robbery of Mr. Williams;

\* that Sherman Williams had personal characteristics, including but not limited to, being a father, grandfather, college graduate, retired State Director of the FmHA, avid fisherman, photographer and jogger, and a United States Army veteran;  and

\* that the family of Sherman Williams suffered injury and loss as a result of his death, including but not limited to, disruption of order, reality of violence, stunning, troubling

-21-

experience, and indescribable feeling of loss.

The jury made the further finding by a preponderance of the evidence or information presented:

\*    3 jurors found that factors in Paul's background or character mitigated against imposition of the death penalty;

\*    12 jurors found that Paul had experienced parental neglect, abandonment and corruptive influence;

\*    12 jurors found that Paul experienced parental abdication as to holding him accountable for his behavior;

\*    12 jurors found that Paul experienced chaotic family instability;

\*    8 jurors found that Paul experienced modeled parental irresponsibility;

\*    12 jurors found that Paul identified with criminally convicted peers;

\*    6 jurors found that Paul was youthful at the time of the offense; and

\*    6 jurors wrote in the finding that Paul had witnessed a shooting in the mall.

None of the jurors, however, found the following:

\*    that Paul's participation in the offense was minor;

\*    that Paul had an insignificant prior history of other

-22-

Case 6:96-cr-60022-TLB Document 248 Filed 09/17/98 Page 23 of 27 PageID #: 1549

criminal conduct;

\*    that Paul committed the offense while experiencing emotional disturbance;

\*    that another defendant, Trinity Edward Ingle -- equally culpable -- will not be punished by death; or

\*    that Paul reversed parental roles with his mother.

Based on the jury's recommendation of death, the Court then sentenced Paul to die by lethal injection on both counts on which he was convicted.

12.   Defendant asserts the following argument in support of his contention that his sentencing was flawed and that he should receive a new trial: Since not one (1) of the twelve (12) jurors found, as a mitigating factor, "that another defendant, Trinity Edward Ingle -- equally culpable -- will not be punished by death," the jury's resulting recommendation of the death penalty and the Court's imposition of it are both contrary to the evidence and, if permitted to stand, will amount to a miscarriage of justice.

This argument -- on its face -- is a bit confusing to follow.   As the Court understands the argument, it seems that defendant believes (a) the evidence that Ingle was equally culpable was so overwhelming that no reasonable juror could have

-23-

AO 72A
(Rev.8/82)

failed to so find, and therefore, in light of (b) the undisputed fact that Ingle did *not* receive the death penalty, a unanimous finding on this mitigating factor was mandated. Defendant seems to then be arguing that this unanimous finding would then compel the recommendation that Paul too should receive a sentence of life imprisonment rather than death.

The Court would first point out that its recollection of the proof -- underpinned by its recent review of the complete record in this matter -- persuades the Court that there was not overwhelming proof establishing that Ingle and Paul were equally culpable. To the contrary, the Court believes there was sufficient evidence presented during the guilt and penalty phases to support the jury's unanimous determination that the two were not *equally* culpable. For example, the Court believes there was compelling evidence of culpability presented through the jail-house tape recording and the testimonies of witnesses Chris Rogers, Christine Lapaglia, Jason Paul and others which was sufficient to warrant a finding that Paul had a more culpable role in the offense. The Court also notes that other findings made by the jury -- as well as some findings which were not made -- are consistent with the notion that Paul was more culpable than Ingle. For example, the jury did not believe that Paul's role in the

-24-

offense was minor or that he suffered from emotional disturbance at the time of the crime.

The Court would also note that, in its view, the proof in the Ingle case -- which this Court likewise heard -- was similarly sufficient to support a recommendation of the death penalty for Ingle.    Nevertheless,  the  Court  does  not  believe  that  it *necessarily* follows that Paul and Ingle were *equally* culpable for the heinous crime they were convicted of committing and the Court cannot say that the evidence overwhelmingly supported any such conclusion.

The Court further perceives no reason whatsoever to infer from this record that the jury neglected to consider the fact that Ingle was not sentenced to death.   To the contrary, the Court finds that jurors were told several times during the trial that Ingle -- who had been tried, convicted, and sentenced prior to the beginning of Paul's trial -- would not receive the death penalty for commission of this crime.   The jury was reminded of this uncontroverted fact again in defense's closing argument in the penalty phase:

> I introduced . . . [and] take that back with you, the fact that Trinity Edward Ingle, just as culpable, just as guilty every bit as Jeff Paul, received life without the possibility of release.   They . . . Trinity Ingle and Jeff Paul, they took [Sherman's] keys and they took

-25-

his wallet. They know what happened, they struck him
down, they duct taped him, they were concerned about
being identified. They shot Sherman Williams, they,
Jeff Paul and Trinity Ingle and they were caught and
they were tried and they were found guilty. You tell me
the justice of a decision to give death to Jeff Paul
when Trinity Ingle is given life without the possibility
of release . . . . Because you are going to have to
live with that decision. You have to be able to look at
your friends, your relatives and decide here is my
reason, here is my rational to treat these two people
differently.

Accordingly, the Court believes that the jurors were reasonable in

their rejection of this mitigating factor on the basis of the

evidence placed before them and defendant's arguments to the

contrary are unpersuasive and unavailing.

The Court also rejects defendant's arguments that had the

jury believed Ingle and Paul to be equally culpable, the fact that

Ingle was not sentenced to death would mandate a recommendation of

life imprisonment for Paul. To the contrary, the Court believes

that even if the *Paul* jury had believed that Ingle and Paul were

equally culpable, their consideration of this mitigating factor

might have still been outweighed by aggravating factors which

justified imposition of the death penalty. Said another way, the

Court finds no legal authority for the defendant's proposition

that jurors would have been required to recommend a life sentence

for Paul had they determined that Paul and Ingle were equally

-26-

culpable.

It follows from what has been said that the Court believes that jurors were properly instructed; permissibly considered all of the individualized facts and circumstances relating to Paul; and made findings consistent with the proof in the record. Accordingly, the Court does not believe that there was any "miscarriage of justice" in either the guilt phase or penalty phase of the trial which would necessitate a new sentencing proceeding for Paul and thus, the motion for new trial will be denied.

IT IS THEREFORE ORDERED AND ADJUDGED, for the reasons set forth hereinabove, that the defendant's motion for new trial be, and it hereby is, denied.

IT IS SO ORDERED.

_____

JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE

U. S. DISTRICT COURT
WESTERN DIST. ARKANSAS
F I L E D

SEP 17 1998

CHRIS R. JOHNSON, Cler.
By _____
Deputy Clerk

This document entered on docket in compliance with Rule 58 (b) (1) and Rule 55 FRCrP

on 9-17-98 by ms

-27-