U.S. DISTRICT COURT WESTERN DISTRICT ARKANSAS FILED DEC ORIGINAL CHRIS R. JOHNSON, CLERK BY DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. 96-60022-001 |
| | § | |
| JEFFERY WILLIAM PAUL | § | |
| | § | |
| | § | |

**MOTION FOR A NEW TRIAL AND TO VACATE, SET ASIDE AND CORRECT CONVICTION AND DEATH SENTENCE, AND FOR RELIEF FROM JUDGMENT, MADE PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

Petitioner Jeffery Paul, by counsel, pursuant to 28 U.S.C. § 2255, and the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution and the provisions of Rule 33 of the Federal Rules of Criminal Procedure, as well as all other applicable statutes and case law interpreting those statutes and the above-cited laws and constitutional provisions, requests this Court to grant him a new trial and to vacate, set aside and correct his conviction and death sentence. In support of same, Mr. Paul provides the following:

1. Jeffery Paul was convicted and sentenced to death for the crime of murder on federal land, and the use of a firearm in relation to a crime of violence. *See* 18 U.S.C. §§1111, 924. Mr. Paul was an eighteen year old youth at the time

271

of the offense, T. 978, DE 1[1] (birth certificate of Jeffery Paul), and thus just eligible for the death penalty under federal law. 18 U.S.C. §3591(a).

2. The government charged and tried both Mr. Paul's case, and that of his co-defendant, Trinity Ingle, on a theory of aiding and abetting, 18 U.S.C. §2, although in each trial, the government contradictorily argued that the defendant on trial had actually shot the victim. *See* United States v. Paul, 217 F.3d 989, 998-99 (8th Cir. 2000). Mr. Ingle received a life sentence for the same offenses less than three weeks before Mr. Paul received a death sentence. Mr. Ingle's case was affirmed by the U.S. Court of Appeals for the Eighth Circuit. *See* U.S. v. Ingle, 157 F.3d 1147 (8th Cir. 1998).

3. Mr. Paul was arrested on August 22, 1997, App. 1, pursuant to an arrest

---

[1] Citations to the record in this case will be as follows: for the convenience of the Court, Mr. Paul has provided the Court a two volume set of Appendices containing selected portions of the trial record for easy access in reviewing certain trial facts and some of the claims set forth herein. Citations to the Appendices are denoted "App." followed by the page number(s). Those items from the trial Docket not contained in the Appendices will be cited as "Docket" or "ROA" followed by the item number. Those portions of the trial transcript not included in the Appendices, but part of the trial court record in the case, will be cited as "T." followed by the page number(s). References to transcripts of pre-trial hearings which are part of the Record on Appeal shall be cited as "T. [date of pre-trial hearing]" followed by the page number(s). Selected portions of the trial record of co-defendant Trinity Ingle which are germane to the issues in this case are found in Volume Two of the Appendices, and cited as noted above. Other portions of Ingle's trial record are cited herein as "T.I." followed by the page number.

warrant issued in March, 1996. The grand jury returned a superceding indictment on December 4, 1996, charging him with violations of 18 U.S.C. §§2, 1111, & 924. App. 6. On January 27, 1997, the government filed its notice of intent to seek the death penalty. App. 18.

4. At sentencing in Mr. Paul's trial the government relied upon extensive so-called "victim impact" testimony. T. 934-62. The defense presented one witness, Mr. Paul's mother, who described her son's chaotic childhood in which he was moved repeatedly throughout his life, T. 971-1050, and who testified that Mr. Paul's father was a "pathological liar" who never kept a steady job and would often leave the family for periods of time without explanation. T. 981-83, 1041-43. Mrs. Paul also testified that her son Jeff suffered from mental impairments as a child for which he received treatment at a local psychiatric hospital. T. 1017, 1021.

5. For a death penalty case the trial from beginning to end was remarkably brief. Voir dire lasted slightly more than one day. *See* T. 212. The entire guilt-innocence phase evidentiary presentation also lasted a little over one day. *Id.* After a weekend break, instructions and closing arguments were presented, the jury began deliberations, and returned a guilty verdict by 2:40 PM that same day. *Id.* Without any break, the sentencing phase of trial began, and the government's

presentation was concluded by the end of the day. *Id.* The defense sentencing presentation began the next morning, consisting of one witness and the submission of an audio-tape confession of co-defendant Trinity Ingle, and was concluded before noon the same day. *Id.* The jury began sentencing phase deliberations at 3:40 PM that afternoon, and returned a sentence of death the following day. *Id.*

6. As to the underlying facts of the offense, on June 26, 1995, the body of the deceased was discovered by a tourist walking in Hot Springs National Park. T. 516. It was later determined that the deceased had died of a gunshot wound to the head. T. 597. The body was identified as that of Sherman Williams, his wallet having been found elsewhere in the Park. T. 535. The victim's car was found at the bottom of a pit in an abandoned mine, and co-defendant Ingle's fingerprint was lifted from the ashtray of the car. T. 777-80.

7. Mr. Paul was arrested approximately one year later in Mississippi. T. 807. He gave a statement implicating himself in the robbery of Mr. Williams but implicating Trinity Ingle in the actual murder. T. 810-12. Mr. Paul was indicted for murder on federal land and the use of a firearm in relation to a crime of violence, *see* 18 U.S.C. §§1111, 924, and convicted on both counts. T. 913.

8. As noted, the government's case against Mr. Paul was as an aider and abettor to §1111 murder. This resulted from the lack of any direct evidence

establishing more precisely Mr. Paul's actual role in the offense. Just as it had done less than three weeks earlier in its prosecution of co-defendant Trinity Ingle, so too in Mr. Paul's case, the government relied heavily upon a theory of aiding and abetting to establish Mr. Paul's guilt of the underlying murder.

9. The government's evidence against Mr. Paul was irresistibly vague in one critical respect: it deflected any serious effort to distinguish the role Mr. Paul played from the role Mr. Ingle played in the murder of Sherman Williams. The government embraced this ambiguity and relied upon it in fashioning its theory of the case at both phases of both trials, repeatedly arguing that it did not matter whether Mr. Paul actually participated in the murder directly, so long as he contributed in some way as an aider and abettor. The evidence indicated that both co-defendants confessed some involvement in the offense. Both gave conflicting statements about his own role and the role of the other – each at times saying or suggesting that the other was the shooter, each at times saying or suggesting that he was the shooter. The jury – like the government – had no rational basis upon which to distinguish the comparative roles of Mr. Paul and Mr. Ingle. The physical evidence failed to provide any basis, and there was no other evidence upon which the jury could have done so. Thus the government expressly conceded that the evidence did not establish the contours of Mr. Paul's actions and

mental state during the offense, and affirmatively argued that it was not required to under the aiding and abetting theory propounded by the government and instructed upon by the court at *both* phases of trial.

10. The government's primary case against Mr. Paul came from the testimony of four witnesses who were friends or acquaintances of the defendant, and who testified that he made statements to them regarding his involvement in the murder of an elderly man in Hot Springs National Park. The testimony regarding Mr. Paul's alleged statements was inconsistent, contradictory and vague in numerous respects. *Compare* T. 664-69, 684-89, *with* T. 705-715, *and* T. 29-45, *and* T. 755. Thus at times the testimony indicated Mr. Paul claimed greater involvement in the actual murder, and at times, virtually no role at all save as perhaps an aider and abettor. *Id.* Moreover, testimony about some of Mr. Paul's statements allegedly professing an active role in the murder was directly contradicted by the physical evidence. *Compare* T. 597-600 (Medical Examiner testified that victim died of gunshot wound; no other signs of trauma to head or neck area) *with* T. 472, 708, 715, 811 (testimony that Mr. Paul allegedly claimed either he or co-defendant Ingle had kicked the victim in the head with substantial force).

11. To be contrasted to this hearsay testimony, the jury also heard a *tape-*

*recorded* statement[2] from co-defendant Ingle in which he admitted personally firing the fatal shots. T. 1058-1110. It is significant not only for its contents, described more fully below, but also for its heightened reliability as to the veracity and accuracy of the statements. Whereas *all* of the evidence regarding Mr. Paul's statements was subject to mis-quoting, mis-interpretation, elaboration, or worse, coming as it did solely from the memory of persons with questionable motives of their own, Ingle's *tape-recorded* statement was a live, verbatim rendition.

12. Generally speaking, Ingle's recorded statement can only be fairly described as the vulgar, street talking bravado of an obvious thug. Ingle's descriptions of his role, the victim, and the offense that he repeatedly admits to having committed, is filled with vulgarity, cursing and slang.[3] Ingle laid out the facts of the crime, the planning beforehand, the manner in which it was carried out, and the motive for the actual killing. Several times during the recorded statement, Ingle admitted to having actually shot and killed the victim himself.

---

[2] Trinity Ingle's statement was taken by means of a concealed recording device provided by the FBI and placed on an inmate in the Crawford County Jail where Ingle was being held pre-trial. T. 1056. That inmate, Jonah Jones, and another inmate, Derrick Bell, were recorded while engaged in a conversation with Ingle about the murder charge on which he was being held.

[3] Rather than quote Ingle's actual language, counsel will use "_ _ _ _ _" to denote curse words in this petition.

See e.g. T. 1084 ("the dude I done shot, he dead."); T. 1103 (when asked who shot him first, Ingle replies, "BOB did", and acknowledged "BOB" referred to himself).[4] To confirm, inmate Jones followed up this statement with some advice to Ingle: "Well, Dog, let me tell ya somethin'. Uh, uh, if you shot him 'cause he seen ya, that's legit. But, but, since your buddy's free, maybe he should've shot him first. You know what I'm sayin'. Instead of you shootin' him first because you in jail and, if somethin' was to happen out there, uh, "INGLE shot him first." Know what I'm sayin'?" T. 1104-05. When discussing where they put the body, the question was asked, "Not too far from where you popped him, huh?," to which Ingle replied, "Yeah, yeah, yeah." T. 1107. Ingle even described the feeling he had when he pulled the trigger: "You know yourself, when you boom, man, and when you hit that thing, you just, then you're rushin' rushin'...." T. 1087. Ingle admitted to having gotten rid of the gun himself: "I told it to 'em like this. 'If I use it, I'm gonna get rid of it.'" T. 1085.

13. Other evidence contradicted any suggestion of a more direct role in the

---

[4] Ingle explained elsewhere in the statement that in order to protect himself he would refer to he and his partner in the crime as ANDY and TOM. T. 1061. Apparently unable to remember his choice of names, he later changed them to BOB and ANDY. T. 1063; 1069-1070. Although he is often unclear whether one name is paired with one person in real life, at the point in the recording referenced here in text, he explicitly acknowledged that BOB refers to himself. T. 1103. (At the Ingle trial, Jonah Jones verified that "BOB" referred to Mr. Ingle. T.I. 1011).

actual murder by Mr. Paul. For example, as noted, while the government contended that Mr. Paul said he had kicked the victim in the head, T. 472, other evidence belied this fact. As noted, the government's medical examiner testified that there was no evidence of any other trauma to the victim's head or neck other than the single gunshot wound. T. 598-99. In fact all trauma to the victim's head was associated with and caused by "exit wounding," namely, wounding caused as the bullet left the victim's skull. T. 600. FBI Agent Tom Ross testified, and the government's serologist confirmed, that the Reebok shoes (GE 27, T. 608) which Mr. Paul was supposedly wearing at the time of the offense had no trace of blood on them. T. 567-68, 608. Finally, the government presented contradictory evidence through their own witnesses concerning these Reebok tennis shoes the government claimed were involved in the murder. Some government witnesses claimed to have seen blood on the shoes shortly after the crime; others denied having seen any such blood. T. 670, 683, 801. Indeed, one government witness testified that co-defendant Ingle had borrowed the Reebok tennis shoes and was seen wearing them around the time in question. T. 670.[5]

---

[5] The government's evidence in the case of co-defendant Trinity Ingle confirms that the case against Mr. Paul was largely as an aider and abettor. At Mr. Paul's trial the prosecutor argued: "'then, depending on which version you believe, Jeff Paul either shot first, they both shot him, or Trint Ingle shot him." At (continued...)

14. Furthermore, as noted above, evidence presented at both trials established Ingle as the perpetrator of and ringleader in the crimes:

»Ingle said he struck the victim, T.I. 978;

»Ingle said he taped the victim's hands and feet, T.I. 981;

»Ingle chose to shoot the victim because he peeked at them, T.I. 981-82;

»Ingle said he shot the victim himself in the head and chest, T.I. 982;

»Ingle drove the car, T. 683, T.I. 562;

»Ingle paid for food and motel afterwards, T.I. 562;

---

[5](...continued)
Ingle's trial, however, government witnesses testified that Ingle had repeatedly admitted having personally shot the victim, *see* T.I. 974-75, 982-84, 1009, 1010, personally struck the victim, T.I. 571, 978, and personally bound him with duck tape, T.I. 980-81. He also admitted being the motivating force in deciding to take the victim's life. T.I.982. The government also presented evidence at Ingle's trial demonstrating that the Reebok shoes which, in Paul's trial it alleged were used by Paul during the offense to kick the victim, were in fact recovered from Ingle shortly after the offense, and that Ingle had borrowed them from Mr. Paul and had been wearing them himself. T.I. 1171. The government also presented substantial testimony at Mr. Ingle's trial demonstrating that shortly before the murder Ingle had acted irrationally and violently while using a gun to threaten innocent bystanders. T.I. 591-622 (witnesses describing how Ingle pulled gun and threatened people in angry confrontation at convenience store, during which witnesses thought he was going to shoot, and then chased them in his car). Ingle pled guilty to a felony firearms charge in relation to that incident. T.I. 1235. Additionally, in an expanded version of his recorded statement, which the government played for the jury during Ingle's sentencing trial, he discussed numerous other crimes involving shooting people and committing additional robberies. T.I. 1398-1422.

»Ingle got rid of the gun, T. 1085, 1107; and,

»Ingle got rid of the car, T.I. 983.

Confirming Ingle's role as the driver, the only item of direct, physical evidence in the entire case linking someone directly to the offense was the fingerprint of co-defendant Trinity Ingle, found on the ashtray of the victim's car. T. 777-780.

15. The primary prosecution theme in argument throughout the trial was to deflect attention away from Jeff Paul's personal role, actions, or mental state during the offenses, repeatedly referring to the crime in general terms, discussing what "they" (i.e. both co-defendants) had done, or arguing in the passive voice as to what "had happened," avoiding implicating Mr. Paul personally.

16. In argument, the government expressly embraced the aiding and abetting theory upon which the court instructed the jury at the guilt-innocence phase of trial. The government repeatedly argued that it did matter who shot the victim under an aiding and abetting theory of liability. T. 901-04. The government emphasized that Mr. Paul "was just as guilty for helping as if he pulled the trigger." T. 875.

17. In sum, the evidence in this case, and the prosecution's summation of that evidence before the jury in opening and closing arguments throughout the trial leads to only one fair conclusion: according to the government, the evidence only

showed that Jeffery Paul was involved in the robbery, but did not establish with any reasonable degree of certainty the facts as to his role in, or state of mind with respect to, the actual murder itself.

## CLAIMS FOR RELIEF

**Introductory Statement**

18. Undersigned counsel has worked diligently since his appointment in late January of this year, to fully investigate, develop and present in this motion all legal claims currently known to him. He has operated, however, within a number of constraints imposed by lack of access to information that is within the possession of the federal government and its agents and assigns, no right to pre-petition discovery, and this Court's refusal to grant much-needed assistance from second appointed counsel. Within those constraints, he has diligently attempted to identify, raise, and support all the substantial grounds for relief that might be raised on Mr. Paul's behalf. Counsel has set forth in this motion all such claims that he has been able to uncover, subject to the aforementioned constraints, at this time.

19. However, due to these constraints and other factors identified for the Court in the accompanying request for discovery, incorporated herein by express reference, and in the motion for the appointment of second counsel, incorporated herein by express reference, development of Mr. Paul's claims for relief remains incomplete. He has thus far been denied access to substantial critical evidence and information relevant to the claims asserted herein; such evidence and information

may, of course, give rise to other claims not yet asserted. Mr. Paul does not waive any claims for relief which have not been identified or fully presented as a consequence of such limitations on his appointed counsel's efforts to date, and he reserves the right to amend this motion up until the point when the required information, evidence, and access to witnesses have been provided and a reasonable time thereafter considering Mr. Paul has only a single attorney representing him at this time.

20. Some of the claims set forth herein were raised and rejected on appeal before the U.S. Court of Appeals for the Eighth Circuit. They are being raised again herein in order to provide Mr. Paul the opportunity, if he chooses to exercise it, to assert such claims before the U.S. Supreme Court on certiorari. In addition, in some instances, Mr. Paul believes the law has changed in the intervening period, and therefore the claims should be revisited in light of intervening changes in the law that have been or should be made retroactive in his case.

**I. Upon Information and Belief The Government's Reliance Upon Inconsistent Theories Between The Trial of Jeffery Paul and His Co-Defendant Violated Mr. Paul's Right To A Fundamentally Fair Trial and To Due Process, As Guaranteed Under the Fifth, Sixth, Eighth and Fourteenth Amendments**

21. Upon information and belief, the government's reliance upon inconsistent theories between the trial of Jeffery Paul and his co-defendant Trinity Ingle violated Mr. Paul's right to a fundamentally fair trial and to due process, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

22. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

23. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

24. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

25. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

26. The government pursued inconsistent theories of the facts at the co-defendants' trials, claiming in each that the defendant on trial had shot the victim, Sherman Williams. At the trial of co-defendant Trinity Ingle, the government argued to the jury that Mr. Ingle shot the victim in the head: "Trinity Ingle put the barrel of a .38 behind Mr. Williams' left ear and he pulled the trigger." App. at 256. The government also argued repeatedly throughout Mr. Ingle's trial that the evidence indicated Ingle had in fact hit the victim and shot him in the head. App. 269, 452, 461-62.

27. Less than three weeks thereafter, at Mr. Paul's trial, the government urged the jury to find otherwise: "And ladies and gentlemen, when you go back into that jury room and you fit all the pieces together, what you're going to find in this case is that the defendant, Jeff Paul, was standing there right over Mr.

Williams, bound, gagged, hands tied behind his back and unable to protect himself, and then he pulled the trigger." App. 174. As in the Ingle trial, the government also argued that Mr. Paul's statements indicated that he had in fact both kicked and shot Mr. Williams in the head. App. 143, 150-164, 168.

28. "The state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for truth." Drake v. Kemp, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring), *cert. denied* 478 U.S. 1020 (1986) . As one federal judge has observed, "[Ingle] and [Paul] cannot both be guilty of firing the same bullet because physics will not permit it." Nichols v. Collins, 802 F.Supp. 66, 74 (S.D.Tex. 1992), *aff'd in part and rev'd in part*, 69 F.3d 1255 (5th Cir. 1993), *cert denied* Nichols v. Johnson, 518 U.S. 1022 (1996). Yet this is precisely what the government argued in these two cases. This Court should condemn the prosecution's actions as a clear violation of fundamental fairness, and grant Mr. Paul a new trial.

29. Courts have considered the question whether, in a capital case, the prosecution's reliance upon inconsistent theories between two co-defendants' trials violates due process. In Thompson v. Calderon, 120 F.3d 1045, 1058 (9th Cir. 1997) (en banc), *rev'd on other grounds*, 523 U.S. 538 (1998), the Court held:

"[I]t is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts regarding the same crime." The Second Circuit has held that when a prosecutor's relies upon an inconsistent theory between criminal trials, the defense is permitted to present evidence of the inconsistency. U. S. v. Salerno, 937 F.2d 797, 811 (2nd Cir.1991), *rev'd on other grounds*, 505 U.S. 317 (1992).

30. Lower federal courts have reached similar conclusions. For example, in Nichols, *supra*, the court held: "This Court determines that the due process boundary upon prosecutorial conduct and the appearance of basic fairness derived from that boundary command a determination that in a criminal prosecution, the State is constitutionally estopped from obtaining a fact finding in one trial and seeking and obtaining an inconsistent fact finding in another trial." 802 F.Supp. at 74.

31. Finally, although the Supreme Court has not ruled on this precise issue, it has held in a related context that while the government may proceed in a single prosecution on inconsistent theories, the Double Jeopardy Clause's prohibition against successive prosecutions prevents the government from retrying a defendant on a theory inconsistent with an earlier judgment of conviction or

acquittal. *See* Dowling v. United States, 493 U.S. 342, 347- 49 (1990). For all of these reasons, this Court should reverse Mr. Paul's conviction, obtained as it was based at least in part on a theory completely at odds with that pursued in the co-defendant's trial, and grant him a new trial.

## II. Upon Information and Belief The FDPA's Authorization for Government Creation Of, and Reliance Upon Non-Statutory Aggravating Factors, Constituted An Improper Delegation of Powers In Violation of Mr. Paul's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments

32. Upon information and belief, the FDPA's authorization for government creation of, and reliance upon non-statutory aggravating factors, constituted an improper delegation of powers, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

33. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

34. The claim set forth herein is made in part based upon information and

belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

35. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

36. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended §2255 motion, after he has been provided additional counsel, and/or once he has

been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

37. Under the provisions of 18 U.S.C. 3592(c), in determining whether a sentence of death is justified under Section 3591(a)(2), the jury is authorized to consider whether any "other" aggravating factor for which notice has been given exists. Thus, while Congress enumerated some sixteen "statutory" aggravating factors as a part of the FDPA, the jury is also required to consider any additional "nonstatutory" aggravating factors which the prosecution unilaterally decides may justify a sentence of death:

> The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

18 U.S.C. §3592(c)-(e). The FDPA provides no guidance for the government's choice, creation or definition of, or reliance upon these nonstatutory aggravating factors. Using whatever creativity they wish, the prosecution is free to make up as many aggravators as they choose. The jury is required to consider such factors

found to exist, and to weigh them in the balance in determining whether a person deserves to live or die. 18 U.S.C. §3593(c). In effect then, the prosecution is allowed to define the circumstances under which a defendant can be sentenced to death. *See* U.S. v. Davis, 904 F.Supp. 554, 558 (E.D. La. 1995)(because FDPA is weighing statute and because statutory and nonstatutory aggravators are to be equally considered in that balancing, Congress has delegated legislative authority to prosecution).

38. Such a sentencing scheme is unconstitutional. It delegates to the executive branch unbridled discretion to create and rely upon nonstatutory aggravating factors in favor of death, without setting forth any intelligible principle to guide that discretion. It amounts to an improper delegation of authority to the prosecution, and, it makes meaningful review of a death sentence impossible.[6]

39. The delegation doctrine is rooted in the principle of separation of

---

[6] While the U.S. Supreme Court has suggested that states may use nonstatutory aggravating factors in some situations, *see* Barclay v. Florida, 463 U.S. 939 (1983), Zant v. Stephens, 462 U.S. 862 (1983), it has never condoned their use in the context of the constitutionally mandated federal separation of powers. Moreover, as the Court pointed out in Davis, *supra*, unlike in Stephens, under the FDPA the government-defined nonstatutory aggravators are given equal status to statutory aggravators in the final weighing of aggravating and mitigating factors that comprises the ultimate selection decision. 904 F.Supp. at 558.

powers that underlies our tripartite system of government. "'The integrity and maintenance of the system of government is ordained by the Constitution's mandate that Congress generally cannot delegate its legislative power to another branch." Mistretta v. U. S., 488 U.S. 361, 371-72 (1989), quoting Field v. Clark, 143 U.S. 649, 692 (1892). While Congress may obtain assistance from its coordinate branches through delegations of substantial enforcement and policymaking authority, Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." Mistretta, 488 U.S. at 372 (citation omitted). In Touby v. U.S., 500 U.S. 160, 164-65 (1991), the Court undertook a thorough review of the "delegation" doctrine, developing further the "intelligible principle" facet of this doctrine. Under these principles, the authority delegated by Congress to local prosecutors to delineate "non-statutory aggravating factors" fails to meet this "intelligible principle" threshold. Congress has provided no guidance whatsoever to the Attorney General in the selection of such factors, and the government apparently has *unlimited discretion* pursuant to 18 U.S.C. §3592(c) to devise, define and utilize these "non-statutory aggravating factors" in support of a death sentence.

40. Furthermore, in a weighing statute such as the FDPA, the submission of

aggravating factors to the jury clearly plays a role in defining that class of murderers who will receive the death penalty, because only information categorized as an aggravating factor may be considered and weighed by the jury in favor of a death sentence during the sentencing determination. Davis, *supra*. The definition of what constitutes criminal conduct and the setting of appropriate sanctions for that conduct, however, is a quintessentially legislative determination. *See* Whalen v. U. S., 445 U.S. 684, 689 (1980) ("[S]pecifying the circumstances under which someone may be put to death must . . . be a function of the elected representatives of the people."); U.S. v. Harper, 729 F.2d 1216, 1225-26 (9th Cir. 1984).

41. The infirmities in the delegation here are evident when contrasted to the delegation of discretion to formulate sentencing guidelines held constitutional in Mistretta. There, the Court emphasized that Congress had clearly delineated the goals to be achieved, the policy behind the goals, and the boundaries of the authority delegated. For example, Congress specified mandatory ratios among sentences for related crimes, listed specific guidelines the commission was to consider in categorizing offenses, and directed the commission to use current average sentences as a starting point for its discussions. 488 U.S. at 374-77. Here, however, except by negative inference, Congress has provided no guidance

whatsoever to prosecutors in their selection of potential aggravating factors. The government is free to highlight any aspects of the crime or defendant or victim that it believes will increase the likelihood that the jury will impose death.

42. In this case, for example, as argued elsewhere in this motion, incorporated herein by express reference, the prosecution introduced and relied upon evidence of alleged unadjudicated "bad acts" of the defendant in support of two separate aggravating factors, and in doing so arguably circumvented the careful limitations Congress placed upon the jury's consideration of prior crimes. *See* 18 U.S.C. §3592(c). Additionally, the government relied *in toto* at the sentencing phase upon its lengthy presentation of detailed information about the victim, his life history, his work career from beginning to end, and his family. Then, in creating nonstatutory aggravating factors for this body of evidence, the government was allowed to devise *two separate aggravating factors*, each *with six and four separate sub-parts* respectively, containing a compendium of detailed information about the victim, his life, and his family and their tragic struggle with his death. App. 88-89. In essence, then, because the statute failed to proscribe it, and because the Court refused to disallow it, the government was allowed to devise ten separate aggravating reasons in support of a death sentence, which the jury was required to consider, from this so-called "victim impact" evidence.

Surely Congress did not intend for this result. Yet this was the result of the unlawful delegation of its authority.

43. In Davis, *supra*, the lower court rejected a similar claim, but held that only those nonstatutory aggravating factors which were "consistent with the type and severity of the statutory factors" should be allowed, in order to conclude that Congress' delegation of legislative authority was circumscribed by an "intelligible principle." 904 F.Supp. at 558; *see also* U.S. v. Davis, 912 F.Supp. at 943 ("[t]o carefully define the statutory aggravating factors, but then allow wholesale introduction of nonstatutory aggravating information, would defeat the goal of guided and measurable jury discretion...."). In Davis, the lower court carefully scrutinized each of the challenged nonstatutory aggravators, and held some completely invalid, while with others the court ruled inadmissible much of the evidence upon which the government sought to rely in support of the proposed factor. 912 F.Supp. at 944-47. Here, no such limiting principles or scrutiny was applied.

44. The unbridled use of nonstatutory aggravating factors permitted the kind of arbitrary and capricious determination about who should live or die forbidden by the Eighth Amendment. Under such a framework, juries presented with different lists of aggravating factors will make different decisions about

which crimes or defendants warrant death,[7] undermining one of the central teachings of Furman – that death penalty statutes, to be constitutional, must focus jury discretion in a consistent and rational manner. 408 U.S. at 256 (Douglas, J., concurring), 309-10 (Stewart, J., concurring), 313-14 (White, J., concurring).

45. To be sure, the Supreme Court has indicated that *states* are free to experiment with a variety of capital sentencing schemes, so long as they do not violate the federal constitution. Blystone v. Pennsylvania, 494 U.S. 299 (1990). The *federal* government, however, is constrained by additional constitutional principles inapplicable to the states, namely, Article 1, Section 1 of the United States Constitution, which provides: "[a]ll legislative Powers here granted shall be vested in a Congress of the United States." As noted above, the non-delegation arising from this constitutional provision prohibits the kind of un-checked delegation of authority found in the FDPA.

46. Here the government asked the jury to sentence Mr. Paul to death in reliance upon multiple non-statutory aggravating factors which they devised. Because the executive branch received no valid delegation of the power to identify

---

[7] Although proportionality review is not required in all capital sentencing schemes, Pulley v. Harris, 465 U.S. 37, 50-51 (1984), the increased likelihood of arbitrary and inconsistent results created by the FDPA's provision for nonstatutory aggravating factors may constitutionally mandate such review.

such factors, the sentence imposed on cannot stand.

**III. Upon Information and Belief The Court Committed Error In Numerous Respects Throughout Voir Dire, Beginning With the Refusal to Allow Individual Sequestered Voir Dire, Continuing Through The Manner In Which the Court Handled Voir Dire and The Court's Rulings On Challenges For Cause, In Violation of Mr. Paul's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments**

47. Upon information and belief, the Court committed error in numerous respects throughout voir dire, beginning with the refusal to allow individual sequestered voir dire, continuing through the manner in which the Court handled voir dire and the Court's rulings on challenges for cause, in violation of Mr. Paul's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

48. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any

time in the future.

49. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

50. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

51. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul

reserves the right to amend this claim, and/or add additional claims in an amended §2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

52. Voir dire plays a critical role in protecting a criminal defendant's Sixth Amendment right to an impartial jury. Rosales-Lopez v. U.S., 451 U.S. 182, 188 (1981); *see* Morford v. U. S., 339 U.S. 258 (1950); U.S. v. Bear Runner, 502 F.2d 908, 911 (8th Cir. 1974). "Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Rosales-Lopez, 451 U.S. at 188. Thus *voir dire* must include "questions that permit the intelligent exercise of challenges by counsel." U.S. v. Blount, 479 F.2d 650, 651 (6th Cir. 1973); *see* Patton v. Yount, 467 U.S. 1025, 1034-35 & n. 10 (1984). While trial courts exercise wide discretion over *voir dire*, this discretion is "subject to the essential demands of fairness," and "[a]t a minimum, when

requested by counsel, inquiry must be made into matters where the likelihood of prejudice is so great that not to inquire would risk failure in assembling an impartial jury." Aldridge v. U.S., 283 U.S. 308, 310 (1931). This is especially true in a capital case.

53. In the modern era, the process of probing jurors' punishment views, particularly about the death penalty, is unfamiliar terrain to federal courts. Yet experience from the trial of capital cases in state courts teaches that extracting reliable information on these sensitive issues is critical to choosing an impartial jury. "Given the important, delicate and complex nature of the death qualification process, there can be *no substitute for thorough and searching inquiry* . . . ." State v. Williams, 113 N.J. 393, 413 (1988) (emphasis added).

54. Capital cases present particularly difficult challenges for trial courts and attorneys, given the complex body of law governing for-cause challenges based on prospective jurors attitudes about the death penalty. Jurors who are "substantially impaired" by virtue of anti-capital punishment views must be identified and, if necessary, struck for cause, Wainwright v. Witt, 469 U.S. 412, 423-25 (1985). Similarly, jurors who are "substantially impaired" by virtue of *pro*-capital punishment views must likewise be identified, and removed if necessary. Morgan v. Illinois, 504 U.S. 719, 729 (1992). These latter jurors must be excused for

cause if their views impair their ability to fully consider lawful mitigating evidence. "Presumably, under today's decision a juror who thinks a 'bad childhood' is never mitigating must also be excluded." Morgan, *id.* (Scalia, J., dissenting). *Accord* State v. Williams, *supra.*

55. Adding to the complexities of capital voir dire is the well established fact that, with many jurors, initial responses to death-qualifying questions cannot be taken at face value. *See* Gray v. Mississippi, 481 U.S. 648, 662-663 (1987) ("[D]espite their initial responses, the venire members might have clarified their positions upon further questioning and revealed that their concerns about the death penalty were weaker or stronger than they originally stated. It might have become clear that they could set aside their scruples and serve as jurors or that they could not."); *accord*, Witt, 469 U.S. at 425. Indeed, in this case numerous members of the venire responded initially one way to a question on a written inquiry regarding their views on capital punishment, and then responded quite differently during voir dire. *See e.g.*, T. 301.

56. Finally, over and above the need for specific and detailed questioning arising from capital punishment jurisprudence, all defendants have a right to intelligently exercise peremptory challenges based on inquiries into potential areas of bias, including the depth of prospective jurors' feelings regarding capital

punishment, knowledge of the case and exposure to local press regarding the case. Peremptory challenges remain one of the most important rights of the accused. Swain v. Alabama, 380 U.S. 202 (1965). Voir dire is the only means by which a defendant may gain the information necessary to do so. Rosales-Lopez, 451 U.S. at 188; *see also* Ham v. South Carolina, 409 U.S. 524 (1973).

57. In the present case, the Court made it clear from the outset that he did not intend to spend much time in the voir dire stage of the trial. In the final pre-trial hearing before the opening day of trial, the defense sought individual sequestered voir dire, T. Pre-Trial Hearing, June 11, 1997, at 50-51, 55, and the Court rejected it out of concern for "time and expense." *Id.* During that same hearing, the Court informed the attorneys that he planned for all of voir dire to be completed in one day. *Id.* at 68. The Court's expectations were surely colored by the fact that, as noted above, federal courts in the modern era are relatively unaccustomed to conducting voir dire in a death penalty case. Throughout jury selection the Court voiced his frustration with how long the process was taking. *See e.g.*, T. 314. This is so despite the fact that, though unable to reach his initial goal, the Court did manage to complete all of voir dire in Mr. Paul's capital case by noon on the second day of trial. T. 432. The Court even informed the entire venire that his decision not to allow individual sequestered voir dire was based on

his desire to save time. T. 56.

58. Concerned as the Court was with saving time, the truncated process utilized during voir dire was wholly inadequate to ensure veracity and reliability in the selection of Mr. Paul's jury. The Court ordered the parties to submit a joint questionnaire, which they did. The Court then modified the questionnaire, shortening it substantially. Most of the areas covered during voir dire were raised before the entire venire of over 100 persons. They were generally questioned about every subject allowed by the Court, including exposure to pre-trial publicity, T. 113-127, knowledge of witnesses or parties, T. 129-132, views on capital punishment, T. 53-55, victimization by past crimes, T. 178-88, and all other areas of bias. In most cases, jurors were allowed to respond to questions in the presence of the entire venire, creating separate issues of jury contamination.

59. For example, many of the jurors were aware of the facts of the case from the local media, or from general knowledge in the community, and made reference to these facts in front of the entire venire. T. 113-127. Some jurors who had been victimized by prior crimes were allowed to discuss the facts in the presence of the venire. T. 178-88. Some of these incidents included crimes of violence, such as murders (of family members), robberies and burglaries. *Id.* When the government questioned the entire venire about the concept of reasonable

doubt, one juror began to discuss her own personal view of the matter (contrary to the law) before the Court could stop her from contaminating the jury. T. 196-97. Many jurors were friends or acquaintances of witnesses, the parties, or the attorneys involved in the case. T. 132-56. Here too, the jurors were allowed to speak about their relationships while the entire venire was listening. *See e.g.*, T. 145; 149. Indeed, one member of the venire even expressed his particular respect for a government witness, vouching for his integrity and credibility, and the entire venire was allowed to hear this colloquy. T. 146. As a result of this open voir dire process, prospective jurors learned what the court wanted to hear from them by listening to each other's answers. The Court even made reference to that fact. T. 150.

60. With regard to the issue of death qualification, only when jurors requested to speak with the Court and the parties in private, or when the Court felt the need to do so based on a juror's initial response, were jurors removed from the general venire and questioned individually in chambers.[8] As a result, the record reflects that the defense (and the Court and government) *never heard a word* from

[8] Even here the record reflects confusion about whether all jurors with pro-death penalty attitudes who raised their hands in general voir dire were in fact questioned individually. *Compare* T. 55 (bailiff indicating four persons responding to Morgan inquiry) *with* T. 100-102 (only two such jurors questioned individually).

*any* of the jurors who actually served as to their views on the death penalty. *Compare* T. 447-48 (list of jurors actually picked) *with* T. 57-112, 317-447 (jurors individually questioned). These actual jurors never opened their mouths on the subject.

61. Yet there was ample evidence before the Court that the chosen general voir dire process was failing to encourage open and direct juror responses. Several jurors told the judge that it was asking too much of them to respond to such sensitive kinds of questions before an audience of over 100 people. *See e.g.*, T. 245, 260, 275 ("I didn't want to talk about this in front of everybody"; "I avoided speaking up because I didn't think I would have to speak in front of all these people."). Defense counsel expressed concerns to the Court about the incongruity between jurors' answers on the questionnaire and their responses in open court. T. 301. In the face of mounting evidence that it was a mistake to have denied individual voir dire in the case, rather than acknowledge that its choice of voir dire procedures was inappropriate (at least with respect to the issues surrounding death qualification and juror knowledge of facts and witnesses), the Court continued with general voir dire, and allowed only those jurors who self-selected to speak privately, or whom defense counsel could identify as problematic from the questionnaire responses, to be individually voir dired in chambers.

62. The in-chambers voir dire of selected jurors served to confirm that the Court's chosen process was not working. Jurors who stated their views in one way on the questionnaire changed them, sometimes dramatically, during the discussions that ensued in private. *See* T. T. 102, 318-319, 336, 340, 344, 349, 353-55, 384, 391, 398; 410, 416-17, 419-21, 422, 426. Other prospective jurors who failed to respond in the general voir dire later indicated that they had in fact learned about the case from local media attention. *See e.g.* T. 416, 425. Irrespective of the Court's rulings with respect to challenges for cause on individual jurors, the information learned during the brief individualized voir dire which was allowed should have been sufficient to convince the Court that the only fair approach was to grant the defense motion for individual sequestered voir dire. Failing to have done so, it cannot be fairly said that the jury selection process in this case provided the level of accuracy and reliability needed to guarantee to Mr. Paul his right to a fair and impartial jury.

63. The Court's voir dire procedure likewise thus impaired the defense's informed exercise of the right to peremptory challenge. *See* U. S. v. Harris, 542 F.2d 1283, 1294 (7th Cir.), *cert. denied*, 430 U.S. 934 (1976) ("the defendants must be permitted sufficient inquiry into the backgrounds and attitudes of prospective jurors to enable them to exercise intelligently their peremptory challenges"); U.S.

v. Ledee, 549 F.2d 990, 993 (5th Cir.), *cert. denied*, 434 U.S. 902 (1977) ("peremptory challenges are worthless if trial counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes."); *see also* In Re Hitchings, 6 Cal. 4th 97, 860 P.2d 466 (1993) ("The denial of the right to reasonably exercise a peremptory challenge is . . . the deprivation of an absolute and substantial right historically designed as one of the chief safeguards of a defendant against an unlawful conviction.").

64. The Court also erroneously ruled on several for-cause challenges that were made. Three jurors should have been excused because their views in support of the death penalty were sufficiently strong that they were "substantially impaired" in their ability to consider a life sentence in Mr. Paul's case, Morgan v. Illinois, 504 U.S. 719, 729 (1992). *See* T. 353 (Juror Stevens); 397 (Juror Roberson); 410 (Juror Rogers). Two other jurors should not have been excused for cause because they indicated that, although with some difficulty, they could set aside their views against capital punishment and follow the law, Witt, *supra*. *See* T. 66-86 (Jurors Poole and Kreiger); 102 (Juror Mills).[9]

---

[9] Confirming that the general voir dire itself was a wholly inadequate means of obtaining accurate information about prospective jurors' death penalty attitudes, Juror Mills had responded affirmatively in the presence of the entire venire to the Morgan question, namely whether she was so pro-death penalty that (continued...)

65. For all of these reasons, the jury selection process denied Mr. Paul his constitutional rights to a fair and reliable voir dire and to an impartial jury on both the issue of his guilt or innocence and the issue of what punishment he deserved.

---

[9](...continued)
she could not consider the alternatives. T. 55. However, after individual questioning, she was actually excluded as a Witt juror, because she testified she was *against* capital punishment.

**IV. Upon Information and Belief The Prosecution's Reliance Upon Unadjudicated Offense Evidence at Both Phases of Trial Violated Mr. Paul's Rights Under the FDPA, the Federal Rules of Evidence, and the Fifth, Sixth, Eighth and Fourteenth Amendments**

66. Upon information and belief, the prosecution's reliance upon unadjudicated offense evidence at both phases of trial violated Mr. Paul's rights guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

67. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

68. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through

the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

69. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

70. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended §2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or

evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

71. The government relied upon unadjudicated "bad act" evidence during both phases of Mr. Paul's capital trial. This evidence was the focus of several pre-trial motions. The defense initially sought discovery of such pursuant to Fed.R.Evid. 404(b). App. 2. When the government responded that it intended to rely upon certain evidence regarding statements Mr. Paul had made about a robbery, App. 4, the defense moved to suppress. App. 8. The magistrate recommended denial of the motion, App. 22, and the Court adopted the recommendation. App. 70. With respect to the government's reliance upon such evidence at sentencing, the defense filed several pre-trial motions aimed at preventing precisely the type of error noted here. Thus motions were filed and re-urged requesting that the Court hold a hearing prior to the start of the sentencing phase to assess and screen the government's aggravating evidence to ensure its reliability. App. 31; T. Pre-trial Hearing June 11, 1997 at 18-24; T. 916-17. The court denied all such motions. *Id.* at 27, 33, 42; T. 917.

72. The government presented all of its 404(b) evidence at the guilt-innocence phase of trial through government witness Rogers, a short time acquaintance of Mr. Paul. T. 676. He testified that on June 8, 1995, more than two weeks before the murder in question, Mr. Paul and co-defendant Trinity Ingle came to his workplace, and left a gun with him. T. 656. Both Ingle and Paul were carrying guns, but only Paul left his with Rogers. T. 676. The following weekend Mr. Paul came to his house and retrieved the gun. According to Rogers, Mr. Paul told him he and Ingle planned to rob Tri-Lakes Liquor Store by killing the owners and taking the money. T. 658. Rogers did not take Mr. Paul seriously, T. 680, nor should he have, because the government never presented any evidence that a robbery or attempted robbery ever occurred at Tri-Lakes or any other local liquor store or any other business in the area during the relevant time period. Indeed, *the government neither produced nor attempted to introduce any other evidence of this alleged robbery plan.*

73. The government argued for a guilty verdict in part based upon this "bad act" evidence, referencing it repeatedly throughout closing argument. App. 144, 148-49, 162, 171. The government also relied upon this evidence in arguing for a death sentence. App. 178, 204-05.

74. The Court erred in allowing the government to present and argue at the

guilt-innocence phase of trial evidence of Mr. Paul's alleged statements about a never-proven aborted robbery attempt. The mere description of the evidence itself suggests its tenuous basis in fact. Indeed, judging from hindsight, the jury found that the government had failed to prove the underlying facts regarding this alleged robbery. *See* App. 86.

75. The Eighth Circuit has held:

> To be admissible as Rule 404(b) evidence, the evidence must be '(1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the crime charged.'

U.S. v. Shoffner, 71 F.3d 1429, 1432 (8th Cir. 1995) (citations omitted). The Court has held that it is reversible error "when it is clear that the evidence has no bearing on the case." U.S. v. Williams, 895 F.2d 1202, 1205 (8th Cir.1990). "[T]he standard for admission of 'other acts' evidence is whether the jury could reasonably find by a preponderance of the evidence that the act occurred and that the defendant was the actor." *Id.*

76. The evidence submitted in this case fails several of these tests. First, the evidence itself was so tenuous that no reasonable jury could have found by any standard of proof that the act occurred. The evidence amounted to an uncorroborated confession which itself would have been insufficient to convict

had Mr. Paul been charged with the crime of attempted robbery. *See* Wong Sun, 371 U.S. 471, 488-89 (1963) ("It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused..."), *citing* Smith v. U.S., 348 U.S. 147 (1954). Indeed, as the defense argued with respect to the alleged "attempted robbery," there was no "act" other than the alleged statement of the defendant. The insufficiency of the evidence is confirmed in the unusual circumstances here, where the jury's sentencing verdict denied the factual underpinning of the 404(b) allegation in rejecting the separate "bad act" aggravator. App. 86.

77. Second, any probative value in this evidence was outweighed by its prejudicial effect. The fact that Mr. Paul may have made some comment to another person about robbing a local liquor store is irrelevant to the offense in chief. The factual differences between the two scenarios are clear. One involved a classic convenience store robbery in a business area; the other involved an unusual robbery of an elderly man taking a walk on a secluded mountainous nature trail. One was allegedly planned for night-time; the other, for daytime. The only similarity between the two offenses is that they both involved robberies with guns. However, this is an insufficient basis for admission of 404(b) evidence. Such

scant probative value was outweighed by its obvious prejudice to the defense, painting as it did a picture of a young kid just looking to commit a robbery in whatever manner he could.

78. The prosecutor's reliance upon, and the jury's consideration of this unadjudicated "bad act" evidence at the sentencing phase of Mr. Paul's capital trial was neither authorized nor contemplated by the FDPA. It is also a violation of Mr. Paul's constitutional rights.

> Because a death sentence is qualitatively different from a sentence of imprisonment, the Supreme Court has determined that any proceeding which results in a death sentence must comport with the highest standards of reliability. Woodson v. North Carolina, 428 U.S. 280, 304-05 (1976). In U.S. v. Mergerson, 4 F.3d 337, 344-45 (5th Cir. 1993) *cert. denied*, 510 U.S. 1198 (1994), a non-capital case, the Fifth Circuit "recognize[d] a growing number of cases decided by courts in other circuits in which a higher standard of proof has been suggested or required when a finding of a particular fact relevant to sentencing dramatically increases the sentencing options of the court to the disadvantage of the defendant." *Id.* at 343. The Mergerson court also observed that "numerous lower courts have required that sentencing facts must be found beyond a reasonable doubt in the capital sentencing context." Mergerson, 4 F.3d at 344-45; *see also*, *e.g.*, People v. Heishman, 753 P.2d 629 (Cal.), *cert. denied* 488 U.S. 948 (1988) (requiring specific reasonable doubt instruction); State v. Taylor, 818 P.2d 1030 (Utah 1990), *cert. denied* 503 U.S. 966 (1992) (same); Stephen P. Smith, Note, Unreliable and Prejudicial: The Use of Extraneous Unadjudicated Offenses in the Penalty Phase of Capital Trials, 63 Colum. L. Rev. 1249 (1993). As one Circuit Judge has noted: Assertions by the State at a capital sentencing hearing that the defendant committed crimes for which he has not been convicted are inherently suspect. ... On the other hand, the State has an important interest in

> presenting to the sentencing jury all relevant evidence regarding the defendant's character. ... The American justice system typically balances these competing concerns by requiring the State to present evidence sufficient to satisfy an applicable standard of proof and the court to instruct the jury as to that standard. ... Just as it is necessary to instruct the jury as to the standard by which the State must prove the elements of the primary crime [i.e., by proof beyond a reasonable doubt] in order to guarantee a fundamentally fair guilt-innocence proceeding, so too the jury must be instructed as to the standard by which a State must prove unadjudicated criminal conduct to be used as a[n] ... aggravating circumstance in order to guarantee a fundamentally fair sentencing proceeding.

Devier v. Zant, 3 F.3d 1445, 1467 (11th Cir. 1993) (Kravitch, J., concurring, joined by Clark, S.J.), *cert. denied*, 513 U.S. 1161 (1995).

79. The Supreme Court has also recognized the problem. In McMillian v. Pennsylvania, 477 U.S. 79 (1986), the Court held that, in certain situations, a sentencing fact found during a punishment phase of a criminal trial could be a "tail which wags the dog of the substantive offense" in the sense that criminal punishment drastically increases upon finding of such a pivotal sentencing fact. McMillian, 477 U.S. at 87-88. In such cases, the Court held, requiring the finding of the fact beyond a reasonable doubt may be necessary to satisfy due process. *Id.* As has been cogently put, the use of evidence of unadjudicated crimes becomes a ploy that "allows the state to secure a conviction on a strong murder case, then seek the death penalty by providing a weak case before a jury which is undeniably

prejudiced. This opens the door to death penalty recommendations upon a level of proof lower than proof beyond a reasonable doubt." State v. McCormick, 272 Ind. 272, 397 N.E.2d 276, 280 (1979).

80. Notably here, the jury was instructed to find the statutory and non-statutory aggravating factors beyond a reasonable doubt, but were not instructed that they must find the unadjudicated crimes alleged in support of these factors to be found beyond a reasonable doubt. Thus, the jury was not properly instructed as to how to consider alleged unadjudicated criminal conduct that was the evidence in support of a non-statutory aggravating factor.

81. Recent Supreme Court jurisprudence confirms that this failure further compounded the constitutional violations. *See* Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 2362-63 (2000) (holding that jury cannot constitutionally be relieved of its duty to find, beyond a reasonable doubt, all facts which "increase[] the penalty for a crime beyond the prescribed statutory maximum"); Ring v. Arizona, ___ U.S. ___, 122 S.Ct. 2428 (2002).

82. Many state courts have held such evidence inadmissible. For example, the Supreme Court of Pennsylvania has concluded:

> In a capital case where a man's life is at stake, it is imperative that the death penalty be imposed only on the most reliable evidence. Prior convictions of record, and constitutionally valid admissions and

> confessions of other crimes meet this standard of reliability; piecemeal testimony about other crimes for which [the capital defendant] has not yet been tried or convicted can never satisfy this standard.

Commonwealth v. Hoss, 445 Pa. 98, 118, 283 A.2d 58, 69 (1981). The majority of subsequent state court decisions to consider the issue have refused to allow the use of unadjudicated crimes in capital sentencing.[10] *Cf.* State v. Debler, 856 S.W.2d 641 (Mo. 1993) (en banc) (reversing death sentence where state relied upon un-charged offense evidence and failed to give notice to defense). Other state courts that have reached a contrary decision require that the unadjudicated crime be proven either "beyond a reasonable doubt" or by "clear and convincing evidence."[11] In Mr. Paul's case, whether or not the use of unadjudicated offense evidence was a *per se* violation of statutory or constitutional rights, its use here without any burden of proof as to the underlying facts, violated the Eighth

---

[10] State v. Bobo, 727 S.W.2d 945, 952-53 (Tenn.), *cert. denied*, 484 U.S. 872 (1987); State v. Bartholomew, 101 Wash.2d 631, 633-40, 683 P.2d 1079, 1082-85 (Wash. 1984); Scott v. State, 297 Md. 235, 245-47, 465 A.2d 1126, 1135-36 (Md. 1983); State v. McCormick, 272 Ind. 272, 279-80, 397 N.E.2d 276, 279-81 (Ind. 1979); Cook v. State, 369 So.2d 1251, 1257 (Ala. 1979); Prevence v. State, 377 So.2d 783, 786 (Fla. 1976).

[11] *See* State v. Brooks, 541 So.2d 801 (La. 1989) (clear and convincing evidence); People v. Balderas, 41 Cal.3d 144, 204-05, 222 Cal.App. 184, 219-20, 711 P.2d 480, 515-16 (Cal. 1985) (beyond a reasonable doubt).

Amendment.[12]

[12] The Fifth Circuit's conclusion to the contrary in U.S. v. Hall, *supra*. is, respectfully, in error. First, the Court noted that Hall had "offered no legal support" for this proposition. *Id.* at 404. Whatever was offered in Hall, the above demonstrates not only some legal support, but abundant authority for the proposition that such evidence has no place in a capital sentencing trial under the FDPA or, at the very least, it requires exacting standards of proof. The Court in Hall cited three prior, non-federal capital cases from the Fifth Circuit, each of which ultimately relies upon the first such case, Milton v. Procunier, 744 F.2d 1091, 1097 (5th Cir. 1984) *cert. denied* 471 U.S. 1030 (1985) . Milton held as a general matter that evidence of unadjudicated extraneous offenses was admissible during a Texas capital sentencing hearing. The Court in Milton implicitly suggested, however, that limiting instructions should be required. The Court first noted that "there remains a long-held reservation about the use of wrongdoing not then being tried. These concerns express our acceptance that a jury suffers the human weakness of blending wrongs – a result inconsistent with our fundamental commitment to charge specificity." *Id.* at 1097. The Court then held that "these concerns are addressed by properly applied standards of relevance *and sufficiency of proof*." *Id.* (emphasis added). The Court in Hall fails to note this critical language in Milton, which Mr. Paul asserts here *supports* his argument for some limiting instruction on the use of unadjudicated offense evidence in a capital trial.

**V. Upon Information and Belief The Prosecutor's Closing Argument at Both Phases of Trial Mis-Stated the Law on Reasonable Doubt, Commented Upon Mr. Paul's Exercise of His Right to Remain Silent, Diminished the Jury's Sense of Responsibility for Their Sentencing Verdict, and Mis-Stated the Law With Respect to the Jury's Duty to Consider Mitigating Evidence, in Violation of Mr. Paul's Rights Under the FDPA and Under the Fifth, Sixth, Eighth and Fourteenth Amendments**

83. Upon information and belief, the prosecutor's closing argument at both phases of trial mis-stated the law on reasonable doubt, commented upon Mr. Paul's exercise of his right to remain silent, diminished the jury's sense of responsibility for their sentencing verdict, and mis-stated the law with respect to the jury's duty to consider mitigating evidence, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

84. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal

case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

85. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

86. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

87. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the

relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended §2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

88. The prosecutor committed several errors during his closing arguments at both phases of trial, which resulted in a violation of Mr. Paul's constitutional rights. First, during the guilt-innocence phase rebuttal closing argument, the prosecutor told the jury that a finding of reasonable doubt did not require the elimination of a hesitation to convict. App. 172. The prosecutor erroneously defined "beyond a reasonable doubt" by describing a hypothetical shopping situation directed at the jurors, where the juror has "a little bit of hesitation. But you go ahead and make that decision and you know it's the right decision after you've done it and you feel good about it – Then you've covered reasonable doubt in that respect." *Id.* As with many of the government's instances of misconduct in

this case, the prosecutor relied upon mis-statements of the law during voir dire to set the stage for this error during closing argument. T. 194 (giving venire similarly erroneous, and overly lenient definition of reasonable doubt).

89. Condemnation of any attempt to define "reasonable doubt" is almost universal, "because often the definition engenders more confusion than does the term itself." U. S. v. Martin-Trigona, 684 F.2d 485, 493 (7th Cir. 1982); *see also* Monk v. Zelez, 901 F.2d 885, 889-890 (10th Cir. 1990); U. S. v. Moss, 756 F.2d 329, 333 (4th Cir. 1985); U. S. v. Indorato, 628 F.2d 711, 720-721 (1st Cir.), *cert. denied*, 449 U.S. 1016 (1980); U. S. v. Byrd, 352 F.2d 570, 575 (2nd Cir. 1965). Here, contrary to the Court's instruction and the law, the prosecutor erroneously informed the jury that it was proper and lawful to find Mr. Paul guilty, even if there was some hesitation to do so. This is clearly erroneous under applicable law. *See* Cage v. Louisiana, 498 U.S. 39, 41 (1990)(reasonable doubt instruction requiring "substantial doubt" or finding of guilt only to "moral certainty" violates Due Process Clause). It also was contrary to the Court's instruction to the jury regarding reasonable doubt. App. 127-28 ("reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act."). As such, the prosecutor's mis-statements of the law violated Mr. Paul's rights to fundamental fairness and due process. *See* Darden v. Wainwright, 477 U.S. 168, 181 (1986); U.S. v. Netz,

758 F.2d 1308, 1311 (8th Cir. 1985)(*per curiam*) (prosecutorial argument on reasonable doubt erroneous, but corrected by curative instructions).

90. Second, during the sentencing phase closing argument, in support of the government's "lack of remorse" non-statutory aggravator, the prosecution relied upon evidence indicating that Mr. Paul had allegedly stated that he did not feel bad about what had happened during the offense. App. 206. First, the prosecution mis-characterized this evidence. In fact, the government's evidence indicated that Mr. Paul had allegedly stated that he had not felt "anything" about the incident, and was very concerned about that fact. T. 736. In this same testimony, the witness stated that while Mr. Paul was describing this dream, he was upset and "freaked out." T. 742. In fact, the government's evidence regarding Mr. Paul's feelings after the crime are more accurately described as concerned and upset than as lacking in remorse. *See e.g.*, T. 689 (Paul was "upset" about incident when he first spoke with Kris Rogers); T. 705-707, 714 (immediately after incident, Ingle called Chris LaPaglia to say Paul was "upset and needed to see her"; later that evening, Paul called her and said he was "upset").

91. Regardless of how the evidence is characterized, the prosecution's closing argument transformed Mr. Paul's alleged past expressions into a present time state of mind: "the defendant has stated *he doesn't feel bad about the*

*murder.*" App. 206 (emphasis added). The present tense comments upon Mr. Paul's current mental state as he sat before the jury in the courtroom: "he doesn't feel bad." Mr. Paul had not testified at either phase of trial. By referencing Mr. Paul's current emotional state, the government effectively commented upon the fact that Mr. Paul had not shared with the jury anything at all about the crime, because he had not testified. This comment thus violated Mr. Paul's constitutional rights. *See* Griffin v. California, 380 U.S. 609, 614 (1965) (condemning such attempts to penalize defendant's for "exercising a constitutional privilege"); Donnelly v. DeChristoforo, 416 U.S. at 643 ("[w]hen specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them."). Courts have held that even indirect comments on a defendant's failure to testify may be reversible error. *See* Sidebottom v. Delo, 46 F.3d 744, 759 (8th Cir.), *cert. denied* 516 U.S. 849 (1995) ("[i]ndirect references to a defendant's failure to testify are also prohibited if they either '(1) manifest the prosecutor's intention to call attention to the defendant's failure to testify, or (2) are such that the jury would naturally have understood them as a comment on defendant's failure to testify.'"

(citations omitted).[13]

92. Third, in the sentencing phase closing argument, the prosecutor urged the jury not to follow the law, by encouraging them to refuse to consider what was clearly mitigating evidence in the case. In the guise of "reminding" the jury of assurances they had made during voir dire, the prosecutor told the jury not to consider the fact that Mr. Paul was young, being eighteen years old at the time of the offense, and that his co-defendant had received a life sentence for the same offense. App. 211. This argument mis-stated the facts from voir dire. With respect to the co-defendant's life sentence, the government had indeed attempted to secure a promise from the jury during general voir dire not to consider the co-defendant's sentence in mitigation of punishment, and the defense objected. The Court then re-phrased the government's question to correct the record, without ever ruling upon the defense objection. T. 232-34. With respect to the youth factor, the government had sought an assurance from the entire venire that Mr. Paul's youth would not "make a difference" in their sentencing deliberations. T. 285. In this latter incident there was neither a defense objection, nor did the Court

---

[13] As noted elsewhere in this motion, incorporated herein by express reference, at least one lower federal court has disallowed altogether a "lack of remorse" nonstatutory aggravator under the FDPA precisely because it "encroaches dangerously on an offender's constitutional right" to remain silent. U.S. v. Davis, 912 F.Supp. at 945.

*sua sponte* correct the mis-statement of law as it had done previously.

93. As discussed thoroughly throughout this brief, the prosecutor's attempt to persuade Mr. Paul's capital sentencing jury to refuse even to consider recognized, constitutionally protected mitigating evidence such as youth and co-defendant lesser sentence, flies in the face of a wealth of Supreme Court authority requiring a capital sentencer to at least consider whatever mitigating evidence the defendant offers. *See* Woodson v. North Carolina, 428 U.S. 280, 304 (1976); Lockett v. Ohio, 438 U.S. 586, 604 (1978); Eddings v. Oklahoma, 455 U.S. 104, 113-116 (1982). The government's invocation to the jury to refuse to consider this relevant mitigating evidence thus runs completely contrary to Mr. Paul's well-settled Eighth Amendment rights, as well as the statutory requirement that the sentencer "shall consider" all relevant mitigating evidence. 18 U.S.C. §3592(a). Such material mis-statements of the law, especially concerning this crucial function of the sentencing jury in a capital case, require reversal of Mr. Paul's sentence of death. *Cf.* Lesko v. Lehman, 925 F.2d 1527, 1545 (3rd Cir.) *cert. denied* 112 S.Ct. 273 (1990) (prosecutor's erroneous suggestion in capital case that jury had legal "duty" to sentence to death reversible error).

94. Finally, at the end of the government's rebuttal sentencing phase closing argument, the prosecutor stated:

> You know, in closing, there is a – I think most of you know, have heard of *Judge Isaac Parker*, who was a federal judge in Fort Smith for a number of years. He made the statement that, "*I never hang anyone. The law hangs them.*"

App. 214 (emphasis added). This reference to Judge Parker was made in isolation, without any further background or explanation either before or after the comment. As such, its obvious intent, and effect, was to diminish the jury's sense of responsibility for a decision in favor of a sentence of death.

95. In Caldwell v. Mississippi, 472 U.S. 320, 332-33 (1985), the Supreme Court condemned prosecutorial argument at the sentencing phase of a capital trial which informed the jury that their sentencing decision would be reviewed on appeal. Decrying this "delegation of sentencing responsibility," *id.* at 320, the Court held that the prosecution's attempt to "minimize the jury's sense of responsibility" violated the Eighth Amendment. 472 U.S. at 341. "Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires." *Id.*

96. Here, the prosecutor's argument was designed to distance the jury from a choice for death by providing two degrees of separation between them and their decision for death. First, he told the jury that responsibility for Mr. Paul's death would not be on their shoulders; instead, "it is the law that hangs him." Second,

by quoting a notable federal judge, the prosecutor gave legal imprimatur and authority to the first point: "do not worry about voting for death; federal Judge Parker says it is okay." This diminution in the jury's sense of gravity and duty with regard to the life/death decision violated Mr. Paul's rights under Caldwell.

97. Indeed, courts have interpreted Caldwell to hold that "diminution of the jury's sense of responsibility undermines the Eighth Amendment's heightened need for 'the responsible and reliable exercise of sentencing discretion in capital cases.'" Antwine v. Delo, 54 F.3d 1357, 1363 (8th Cir.1995) 516 U.S. 1067 (1996), *quoting* Caldwell at 329; *see also* Shurn v. Delo, 177 F.3d 662 1999 WL 288371 at *5 (8th Cir. May 10, 1999). As the Eighth Circuit held in Driscoll v. Delo, 71 F.3d 701 (8th Cir. 1995), *cert. denied* 519 U.S. 910 (1996), the analysis here should be "controlled by Caldwell v. Mississippi, in which the Supreme Court held it constitutionally impermissible to rest a death sentence on a determination made by a jury that has been led to believe that the responsibility for determining the appropriateness of the death sentence rests elsewhere." *Id.* at 712 (citations omitted). Caldwell "condemns state-induced comments that 'mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" Gilmore v. Armontrout, 861 F.2d 1061, 1066 (8th Cir.), *cert. denied* 490 U.S. 1114 (1989) (citations

omitted).

98. In Antwine, the court applied Caldwell to a different prosecutorial argument than the one found in Caldwell. There, the prosecutor had argued that the defendant's execution in the gas chamber would be a quick and easy death. "The danger is that the jurors, faced with a very difficult and uncomfortable choice, will minimize the burden of sentencing someone to death by comforting themselves" with the thought that the defendant's death by execution would be painless and easy. 54 F.3d at 1363. The argument thus diminished the jurors' sense of responsibility for imposing the death penalty, and thereby undermined the Eighth Amendment's heightened need for "'the responsible and reliable exercise of sentencing discretion' in capital cases." *Id.*, *quoting* Caldwell, 472 U.S. at 329. So too here, the prosecutor's argument that put blame for a death decision on Judge Isaac Parker and "the law" minimized the jury's burden by "comforting" them with the thought that a federal judge had already determined that a death sentence was proper. Because this Court cannot say that the prosecutor's argument "had no effect on the sentencing decision," Caldwell, this Court must reverse Mr. Paul's sentence of death.

### VI. Upon Information and Belief Mr. Paul's Death Sentence Resulted From The Influence of Passion And Arbitrariness, in Violation of His Rights Under The FDPA And Under The Fifth, Sixth, Eighth And Fourteenth Amendments

99. Upon information and belief, Mr. Paul's death sentence resulted from the influence of passion and arbitrariness, in violation of his rights under the FDPA and in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

100. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

101. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through

the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

102. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

103. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended §2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or

evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

104. The errors presented in this motion, considered singly or as cumulative error, *see e.g.* Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992), *cert. denied* 506 U.S. 951 (1993) reflect clear arbitrariness.

105. The sentencing phase of Mr. Paul's trial was so replete with error as noted throughout this motion (and incorporated into this claim by reference) that it can only be fairly said that his death sentence was the result of arbitrariness. Of obvious import in this regard is the looming fact that his co-defendant, for whom the evidence in both trials established that he was more culpable than Mr. Paul, received a life sentence. Moreover, Mr. Paul's jury refused to consider that fact, as well as his 18 year old youthfulness, in determining his sentence. Of additional importance here are the numerous clear errors committed by the Court and the government in the implementation of the FDPA and the use of aggravating factors in Mr. Paul's case. While some of these errors may by subjected to harmless error or re-weighing, *see* Stringer *supra*, Mr. Paul urges the Court to utilize section

3595(c)(1) to conclude that Mr. Paul's sentencing proceeding was cobbled by so many such errors that re-weighing would be inappropriate, and that instead, either a life sentence be imposed, or at the very least Mr. Paul be given a new sentencing trial.

**VII. Upon Information and Belief The Admission Of Victim Impact Evidence at Guilt-Innocence Violated Fed. Rule Evid. 403 And Rendered The Guilt Determination Constitutionally Unreliable, in Violation of Mr. Paul's Rights Under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments**

106. Upon information and belief, the admission of victim impact evidence at guilt-innocence violated Fed. Rule Evid. 403 and rendered the guilt determination constitutionally unreliable, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

107. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

108. The claim set forth herein is made in part based upon information and

belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

109. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

110. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended §2255 motion, after he has been provided additional counsel, and/or once he has

been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

111. The government's use of victim impact evidence and argument also tainted the guilt-innocence phase of trial. The first words of the government's opening statement at the outset of the trial described who the victim was, his work history, and his hobbies and interests. App. 99. Evidentiary presentation during the guilt innocence phase of trial *began* with the testimony of the victim's daughter, Mary McKuin. As at sentencing, the government used Ms. McKuin to describe her father's work history in at FHA, and how he had made his way to the director position within the Administration prior to his retirement. T. 510. She gave a detailed description of his physical condition and attributes. T. 511. She even discussed his hobbies and interests. *Id.* The government elicited similar testimony from other witnesses early on during the guilt-innocence phase of trial. For example, the government asked a waiter at a local pancake shop, where Mr. Williams was a regular customer, to describe "what type of man was Mr.

Williams." She responded by talking about how he was a "very, very nice person, very considerate." T. 523. She testified that he was always clean, and that he dressed very neatly. *Id.* She also described his conversational style, speaking a lot at times, other times keeping more to himself. *Id.* Finally, the first words from the government's mouth during closing argument at the guilt-innocence phase of trial referred to the personal characteristics of the victim. "[This case] is important because it involves the murder of an individual who lived in your community; who until June 22, 1995, Sherman Williams was an 82 year old man who enjoyed hiking, fishing, and his retirement from the Farmers Home Administration." App. 142. As noted, all defense efforts prior to trial to prohibit introduction of such evidence were rebuffed by the Court. *See* App. 13, 25, 68; T. Pre-Trial Hearing, June 11, 1997 at 7.

112. Fed. Rule Evid. 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice" in this context "speaks to the capacity of some admittedly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S.

172, 180 (1997). That ground is "'commonly, though not necessarily, an emotional one.'" *Id.* (quoting Advisory Committee's Notes on Fed. Rule Evid. 403, 28 U.S.C. App., p. 860).

113. The admission of evidence in the guilt phase of a trial concerning a crime victims' personal qualities and experiences, and the family's suffering and loss as a result of the crime, is of particular concern under these principles. In a mail fraud case in which the victim's were funeral directors, for example, the Third Circuit held that introduction of evidence of the victims' financial losses and other victim impact evidence violated Rule 403. U.S. v. Copple, 24 F.3d 535, 545-546 (3rd Cir.), *cert. denied*, 513 U.S. 989 (1994). Copple speaks eloquently to the risk that such evidence can divert the jury from considering the facts of guilt to the need to compensate victims (or their survivors):

> The [victim impact] testimony was designed to generate feelings of sympathy for the victims and outrage toward Copple for reasons not relevant to the charges Copple faced. It arguably created a significant risk that the jury would be swayed to convict Copple as a way of compensating these victims wholly without regard to evidence of Copple's guilt.

*Id.* at 546. The risks associated with such evidence led the Florida Supreme Court many years ago to prohibit a family member or friend from even identifying a murder victim. *See* Jones v. State, 569 So.2d 1234, 1239 (Fla. 1990) (citing

cases). As the court explained,

> A verdict is an intellectual task to be performed on the basis of the applicable law and facts. It is difficult to remain unmoved by the understandable emotions of the victim's family and friends, even where the testimony is limited to identifying the victim. Thus, the law insulates jurors from the emotional distraction which might result in a verdict based on sympathy and not on the evidence....

114. The objectionable testimony here was "designed to generate feelings of sympathy for the victims and outrage toward [him] for reasons not relevant to the charges [he] faced." Copple, *supra*, 24 F.3d at 546. There was no reasonable basis upon which to admit it in light of its obvious potential to contribute to a verdict based on sympathy rather than evidence of Mr. Paul's involvement in the crime.

115. In some cases, evidence that shows the impact of the crime on the victim may also tend to show that the accused committed the crime or that he acted with the requisite intent. *See, e.g.*, Copple v. United States, 24 F.3d at 545 (evidence that victims had to pay their losses out of their own pockets helped establish the defendant's fraudulent intent); Miller-El v. State, 782 S.W.2d 892, 895 (Tex.Crim.App. 1990) ("bare fact" of victim's injury was probative of defendant's intent to kill deceased victims). Without some specific connection to one of the elements of the crime, however, victim impact evidence has no place in

the guilt phase of a trial. *See, e.g.*, Sager v. Maass, 907 F.Supp. 1412, 1420 (D.Or. 1995) ("evidence of a crime's effect on the victim is generally not admissible during the guilt phase of trial"); People v. Hobley, 159 Ill.2d 272, 315 (Ill.), *cert. denied*, 513 U.S. 1015 (1994) (same); Armstrong v. State, 826 P.2d 1106, 1116 (Wy. 1992) (same).

116. Here, there was no connection to specific issues of guilt. The fact that Sherman Williams was a retired Director of the FHA, that he was in good shape and enjoyed fishing and jogging, and that he was a clean and considerate person who dressed neatly and was a good conversationalist, had absolutely no relevance to the issue of whether Jeffery Paul was guilty of robbing and killing him.

117. Admittedly, there is theoretical support in the law for the view that some such evidence may be admissible. As the Tenth Circuit explained in U.S. v. Kimball, 73 F.3d 269, 272 (10th Cir. 1995), "[e]vidence ... should not be suppressed when those facts come in as *res gestae* – 'as part and parcel of the proof of the offense[] charged in the indictment.'" (citations omitted); see also U.S. v. Masters, 622 F.2d 83, 86 (4th Cir. 1980) (evidence is admissible when it provides the context for the crime, "is necessary to a 'full presentation' of the case," or is "appropriate in order 'to complete the story of the crime on trial by proving its immediate context or the res gestae'"). Further, the prosecution's right

"to prove its case free from any defendant's option to stipulate the evidence away," Old Chief v. United States, 519 U.S. at 188-89, rests on a similar basis. As the Court explained in Old Chief, *id.* at 188, "the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault."

118. However, neither *res gestae* nor the prosecution's right to "tell a story of guiltiness" stands above Rule 403's rule of exclusion. "The district court must still consider carefully whether the prejudicial impact of the res gestae evidence substantially outweighs its probative value...." U. S. v. Brewer, 1 F.3d 1430, 1436 (4th Cir. 1993). Accord Old Chief, 519 U.S. at 188-92; U. S. v. Rivera-Gomez, 67 F.3d 993, 996 (1st Cir. 1995); U.S. v. Petary, 857 F.2d 458, 462 (8th Cir. 1988); U.S. v. Naranjo, 710 F.2d 1465, 1468-1469 (10th Cir. 1983).

119. The evidence about which Mr. Paul complains is evidence "of scant or cumulative probative force, dragged in by the heels for the sake of its prejudicial effect." Naranjo, 710 F.2d at 1469 . Its primary mission was to create sympathy for the elderly victim in this case, Sherman Williams, and outrage at the person accused of his murder, Jeffery Paul.

120. The Supreme Court of Illinois has observed that "[e]vidence concerning the background or family of a murder victim constitutes reversible error when it appears to have been presented by the prosecution in such a way as is calculated to give the jury the impression that it is relevant and material evidence on the question of the defendant's guilt or innocence." People v. Hobley, *supra*, 159 Ill.2d at 315. No clearer signal could emerge of the prosecution's intent with respect to the use of this evidence at the guilt-innocence phase of Mr. Paul's trial, than the fact that the government's *lead* opening argument, the government's *lead* guilt-innocence phase witness, and the government's *lead* argument in closing, all focused on the personal characteristics and qualities of Sherman Williams. As the Illinois Court held such tactics improper, this Court should also so hold, especially in a capital case, where the need for "heightened reliability" is significantly greater. Woodson, *supra*. at 305.

**VIII. Upon Information and Belief, Mr. Paul Is Innocent of the Crime of §1111 Murder and of §2 Aiding and Abetting Therein; His Conviction and Sentence of Death Must Be Reversed to Avoid Violating His Rights as Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

121. Upon information and belief, Jeffery Paul is innocent of the murder of Sherman Williams. He is also innocent of aiding and abetting in Mr. Williams' murder. For this reason, his conviction and sentence of death must be vacated as violative of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

122. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

123. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

124. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

125. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

126. Mr. Paul did not kill, attempt to kill, or intend to kill or inflict serious bodily injury upon the deceased in this case, Sherman Williams. He also did not intend to aid and/or abet the co-defendant in this case, Trinity Ingle, in the commission of any crime of violence against Mr. Williams, including the crime of murder, nor did he in fact aid and/or abet Mr. Ingle in such crime.

127. The co-defendant in this case, Trinity Ingle, is solely responsible for the killing of Mr. Williams. Jeffery Paul had no criminal responsibility whatsoever for the killing of Sherman Williams.

128. In fact, Mr. Paul attempted to stop Trinity Ingle from shooting and killing Sherman Williams. When he did so, however, Ingle threatened to kill Mr. Paul if he (Mr. Paul) made further attempts to prevent Ingle from killing Mr. Williams.

129. Mr. Paul is able to present conclusive evidence on this claim, including, but not limited to, evidence indicating that Mr. Ingle, who was the sole perpetrator of the murder of Sherman Williams, and who was thus an eyewitness to Mr. Williams' murder, confessed to the above facts, and thus is solely responsible for the death of Sherman Williams.

130. Such a confession, when viewed in the light of: a) the existing weaknesses of the government's case against Mr. Paul at trial; b) shown now to be weaker still by further evidence set forth herein demonstrating that the government's case against Mr. Paul rested largely on the testimony of witnesses who either lied and/or were paid for the testimony, or both; c) the known physical evidence which in no way implicated Mr. Paul; provides substantial evidence that Jeffery Paul did not, in fact, kill or take part in the killing of Sherman Williams.

131. It is now clear that the government's case at trial, which consisted largely of the testimony of witnesses claiming to have overheard statements made by Mr. Paul, was based upon testimony that was false and/or was bought and paid for by the federal government, facts about which the jury was not apprised. Further, these statements were known by the government to be wholly inconsistent with the physical and forensic evidence in the case, and yet the jury was never made fully aware of these facts. Moreover, other physical evidence contradicted

these alleged statements and confirmed that Mr. Paul did not participate in the murder of Sherman Williams, including physical evidence in the possession of the government which demonstrated that a person other than Mr. Paul was responsible for taping the hands and feet of Mr. Williams. This evidence further supports Mr. Paul's claim that the government relied on false testimony in pursuit of their conviction of and death sentence for Mr. Paul. This evidence shows that, as claimed in this motion, government witnesses did in fact lie about Mr. Paul's guilt in the murder for which he was convicted.

132. In Herrera v. Collins, 506 U.S. 390, 113 S.Ct. 853 (1993), the United States Supreme Court considered the issue of whether the conviction and death sentence of an innocent person would violate the Eighth Amendment. The Court determined that in that case the evidence of innocence was insufficiently strong to warrant such a ruling. However, in reaching that conclusion, the Court assumed for the sake of argument that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief..." *Id.* at 856. The Court in Herrera did not ultimately set forth an actual innocence standard, because it determined that the evidence was insufficiently persuasive under any reasonable standard.

133. Then in Schlup v. Delo, 513 U.S. 298, 115 S.Ct. 851 (1995), the Court returned to the issue of innocence in the context of determining whether the petitioner had satisfied procedural obstacles which required some showing of factual innocence. In that case, the Court held that "if a petitioner ... presents evidence of innocence so strong that a court cannot have confidence in the outcome of the trial...", then he is entitled to a full consideration of his claims regardless of the procedural posture in which they are raised. *Id.* at 861.

134. Most recently, in United States v. Quinones, 205 F.Supp.2d 256 (S.D.N.Y. 2002), Judge Rakoff found the FDPA unconstitutional due to the unacceptable risk that innocent persons would be executed. Mr. Paul herein asserts, in reliance upon the holding and reasoning of Quinones, that his death sentence must be reversed for that reason alone.

135. The Second Circuit, however, just reversed Judge Rakoff's decision this week, noting that the defendants in that case had no arguable claim of innocence. U.S. v. Quinones et al., Case No. 02-1403(L), 02-1405 (2nd Circuit 2002). Of course the above facts make Mr. Paul's case quite different indeed, and serve to underscore and highlight Judge Rakoff's concerns, whether or not they become constitutional law.

136. Whatever the appropriate standard, and regardless of the general

concerns raised by Judge Rakoff in the Quinones case, the facts set forth above in *this* case, and to be developed once discovery is completed, undermine confidence in the outcome of Mr. Paul's trial. Mr. Paul hereby seeks access to further evidence and information, as well as formal discovery, by means of which he can further demonstrate his actual innocence. Once he has been given access to all information requested in the accompanying discovery motion and any succeeding discovery requests, he hereby requests that he be given a full and fair opportunity to present his evidence of factual innocence to this Court.

137. Once considered, Mr. Paul is confident this Court will conclude, for all of these reasons and those to be further demonstrated after access to the appropriate information has been provided, that his conviction and sentence of death must be vacated, as violative of his right to due process, a fair trial, effective representation, and to be free from cruel and unusual punishment, as guaranteed to him under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

**IX. Upon Information and Belief, The Government Improperly Exercised Its Discretion Whether to Seek a Death Sentence Against Mr. Paul, Both in the Initial Decision to Certify His Case for Death, and Once His Co-Defendant Trinity Ingle Had Been Sentenced to Life, In Violation of Mr. Paul's Rights As Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

138. Upon information and belief, the government improperly exercised its discretion whether to seek a death sentence against Mr. Paul, both in the initial decision to certify his case for death, and thereafter again once his co-defendant Trinity Ingle had been sentenced to life and government re-visited the death certification issue, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

139. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal

case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

140. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

141. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

142. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the

relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended §2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

143. In the first place, the local U.S. Attorney's office, in an over-zealous effort to obtain DOJ approval for death certification of what was in fact a weak case for federal death sentencing, *see* Little, R. Why a Federal Death Penalty Moratorium?, 33 Conn. L.Rev. 791, 805-813 (2001), presented false information about the alleged heinousness of the crime to the death certification committee and to the Attorney General in Washington. *See* Little, R., The Federal Death Penalty: History and Some Thoughts about the Department of Justice's Role, 26 Fordham Urban L. J. 347, 499-500 (1999); *compare* T. 598-600 (medical examiner's confirms there was no sign of trauma to the victim's head or neck other than the single gunshot wound that caused death); *see also* Little, R. Why a Federal Death

Penalty Moratorium?, 33 Conn. L.Rev. 791, 805-813 (2001); *compare* T. 598-600 (deceased's cause of death was due to gunshot, not beating).

144. Secondly, Mr. Paul's case was certified for death by the DOJ in Washington because of the color of his skin. A recent study conducted by the Department of Justice confirms that the Department of Justice has authorized the United States Attorney to seek the death penalty for a substantially disproportionate number of white defendants who are charged with capital-eligible offenses, when compared to individuals of other races. The study ("DOJ Study") was made public on September 12, 2000.[14] The concerns it raised about racial and geographic discrepancies were sufficiently serious that, on December 7, 2000, President Clinton granted a six month reprieve to Juan Garza, one of the first federal inmates facing execution, while DOJ completes a further study of these issues.

145. The DOJ Study reviews all individuals that have been charged with capital offenses from 1988 until the close of the study period, July 20, 2000. A demarcation is utilized for cases from 1988 until the end of 1994 and those cases

[14] The primary text of the study is presented in a 43 page "Introduction"; however, the study also has several hundred pages of Tables that follow. The entire document can also be downloaded from the Internet at: http://www.usdoj.gov/dag/pubdoc/dpsurvey.html/

between January 27, 1995 until July 20, 2000. On January 27, 1995, the Department of Justice adopted its current procedure wherein United States Attorneys are required to submit for review all cases in which a defendant is charged with a capital-eligible offenses. As noted elsewhere in this motion, incorporated herein by express reference, the procedure is often referred to as the "death penalty protocol." Under the protocol, when an indictment is filed or unsealed charging a defendant with a capital-eligible offense, or before the United States Attorney decides to request approval to seek the death penalty, whichever occurs first, the United States Attorney is directed to give counsel for the defendant a reasonable opportunity "to present any facts, including any mitigation factors, to the United States Attorney for consideration."[15] Only after providing defense counsel the opportunity to present this evidence should the United States Attorney make a request to seek the death penalty and notify defense counsel of the same.

146. Under the protocol, the United States Attorney makes a request/recommendation in the form of a submission to the Department of Justice stating whether he desires to pursue the death penalty. This submission is then

[15] *See* the Department of Justice Manual, Volume 7, 9-10.000 – Federal Prosecutions in which the death penalty may be sought.

sent to the Attorney General's Review Committee on Capital Cases, which then makes a recommendation to the Attorney General. Only the Attorney General can ultimately authorize the United States Attorney to seek the death penalty.

147. During the time period from January 27, 1995 until the close of the study period, a total of 682 defendants were reviewed by the Department of Justice utilizing the current death penalty protocol.[16] Of these individuals charged with capital-eligible offenses, 134 defendants were white, 324 were black, 195 were Hispanic and 29 were classified as "other." A review of the statistics concerning rates at which the U.S. Attorneys' offices, the Review Commission and the Attorney General recommended/authorized seeking the death penalty as to these individuals reveals a startlingly higher percentage of white defendants who were recommended/authorized for pursuit of the death penalty than black or Hispanic defendants. The specific results for each of these groups can be summarized as follows:

**A. United States Attorneys.**

A review of the numbers provided shows that the United States Attorneys' percentage rate for a recommendation to seek the death penalty for white defendants is almost one and one-half times higher (a factor of 1.44) than

[16]Department of Justice Study, pg. 9.

the rate for seeking the death penalty for black defendants. Even more startling is that the United States Attorneys' percentage rate for a recommendation to seek the death penalty for white defendants is almost twice as high (a factor of 1.8) as the rate for Hispanic defendants.

White Defendants:

Total Number of White Capital-Eligible Defendants Reviewed: 134
Total Number of Defendants Recommended for Death: 48
Percent of White Defendants Recommended for Death: 36%

Black Defendants:

Total Number of Black Capital-Eligible Defendants Reviewed: 324
Total Number of Defendants Recommended for Death: 81
Percent of Black Defendants Recommended for Death: 25%

Hispanic Defendants:[17]

Total Number of Hispanic Capital-Eligible Defendants Reviewed: 195
Total Number of Defendants Recommended for Death: 39
Percent of Hispanic Defendants Recommended for Death: 20%

Comparison of White versus Black Defendants

36% recommended for death for white defendants divided by 25% recommended for death for black defendants equals a 1.44 factor increase.

Comparison of White versus Hispanic Defendants

[17] The Study also considered those classified as "other" for race; however, this is not addressed in this motion as this group only accounted for 4% of the total defendants considered.

36% recommended for death for white defendants divided by 20% recommended for death for Hispanic defendants equals a 1.8 factor increase.

**B. Capital Case Review Committee.**

An analysis of the data for the Department of Justice Capital Case Review Committee is equally disturbing. Of the 682 defendants submitted for review, 49 were withdrawn and 15 were still under review at the close of the study period. Consequently, the DOJ study reviewed the remaining 618 cases. In this case, as shown in the charts below, once again the Review Committee's percentage rate for a recommendation to seek the death penalty for white defendants is one and one-half times higher (a factor of 1.48) than the rate to seek the death penalty for black defendants. Similarly, the Review Committee's percentage rate for a recommendation to seek the death penalty for white defendants is more than one and one-half times higher (a factor of 1.6) than the rate to seek the death penalty for Hispanic defendants.

White Defendants:

Total Number of White Capital-Eligible Defendants Reviewed: 120
Total Number of Defendants Recommended for Death: 47
Percent of White Defendants Recommended for Death: 40%

Black Defendants:

Total Number of Black Capital-Eligible Defendants Reviewed: 300
Total Number of Defendants Recommended for Death: 80
Percent of Black Defendants Recommended for Death: 27%

Hispanic Defendants:[18]

Total Number of Hispanic Capital-Eligible Defendants Reviewed: 172
Total Number of Defendants Recommended for Death: 43
Percent of Hispanic Defendants Recommended for Death: 25%

Comparison of White versus Black Defendants

40% recommended for death for white defendants divided by 27% recommended for death for black defendants equals a 1.48 factor increase.

Comparison of White versus Hispanic Defendants

40% recommended for death for white defendants divided by 25% recommended for death for Hispanic defendants equals a 1.6 factor increase.

**C. Attorney General.**

As discussed above, the final decision to authorize the United States Attorney to seek the death penalty can only be made by the Attorney General. Once again, an obvious pattern of unequal treatment is apparent. The Attorney General completed the review of 588 defendants during the protocol study period. The charts below show that the Attorney General's

[18] The Study also considered those classified as "other" as race; however, this is not addressed in this motion as this group only accounted for 4% of the total defendants considered.

final figures reflect a worse scenario than those of the review committee. The Attorney General's percentage rate for authorization to seek the death penalty for white defendants is slightly *over* one and one-half times higher (a factor of 1.52) than the rate to seek the death penalty for black defendants. Moreover, the Attorney General's percentage rate for authorization for white defendants is nearly twice (a factor of 1.9) the rate for Hispanic defendants.

<u>White Defendants</u>:

Total Number of White Capital-Eligible Defendants Reviewed: 115
Total Number of Defendants Authorized for Death: 44
Percent of White Defendants Authorized for Death: 38%

<u>Black Defendants</u>:

Total Number of Black Capital-Eligible Defendants Reviewed: 287
Total Number of Defendants Authorized for Death: 71
Percent of Black Defendants Authorized for Death: 25%

<u>Hispanic Defendants</u>:[19]

Total Number of Hispanic Capital-Eligible Defendants Reviewed: 160
Total Number of Defendants Authorized for Death: 32
Percent of Hispanic Defendants Authorized for Death: 20%

<u>Comparison of White versus Black Defendants</u>

---

[19] The Study also considered those classified as "other" as race; however, this is not addressed in this motion as this group only accounted for 4% of the total defendants considered.

38% authorized for death for white defendants divided by 25% authorized for death for black defendants equals a 1.52 factor increase.

Comparison of White versus Hispanic Defendants

38% authorized for death for white defendants divided by 20% authorized for death for hispanic defendants equals a 1.9 factor increase.

148. A racially disproportionate pattern of capital charging – even one of this magnitude – does not, on its own, *prove* that the government has engaged in intentional discrimination in violation of the due process clause of the Fifth Amendment, or that it has sought the death penalty in an arbitrary and capricious manner, in violation of the cruel and unusual punishments clause of the Eighth Amendment. This showing, however, is sufficient to demonstrate a *prima facie* case of discrimination, and to shift the burden to the government to produce a credible nondiscriminatory explanation for its practice of disproportionately seeking death sentences for white defendants. *See* Batson v. Kentucky, 476 U.S. 79, 93-94 (1986).

149. The capital charging practices of the Department of Justice have been primarily questioned with regards to the possible discrimination against African-American defendants. The argument as been made that the disproportionately higher number of black defendants charged with capital-eligible offenses (and authorized by the Attorney General) suggests discrimination by the government.

However, the statistics presented above, which come from the government's own study, actually suggest a pattern of discrimination against *white* defendants. The most obvious explanation for that pattern is that, because of the glaring disparity between the gross number of capital eligible minority and white defendants, and on the federal death row, which has created an obvious incentive for the government to decrease that disparity by authorizing a disproportionate number of white defendants. Needless to say, discrimination against white defendants in order to counter-act the perception, or reality, of discrimination against minority defendants would be both inappropriate and unconstitutional.

150. In the past century, no judicial responsibility has laid greater claim on the moral and intellectual energies of the federal courts than "the prevention of official conduct discriminating on the basis of race." Washington v. Davis, 426 U.S. 229, 239 (1976). The Supreme Court has strived to eliminate all forms of state-sanctioned discrimination, "whether accomplished ingeniously or ingenuously." Smith v. Texas, 311 U.S. 128, 132 (1940). The Court has forbidden discrimination required by statute, *see, e.g.*, Brown v. Board of Education, 347 U.S. 483 (1954); Nixon v. Herndon, 273 U.S. 536 (1927), and it has not hesitated to "look beyond the face of . . . [a] statute . . . where the procedures implementing a neutral statute operate [on] racial grounds." Batson v.

Kentucky, 476 U.S. 79, 88 (1986); *see also* Turner v. Fouche, 396 U.S. 346 (1970); Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886).

151. The Supreme Court has emphasized that "the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." Hunter v. Erickson, 393 U.S. 385, 391 (1969).[20] In the area of criminal justice, where racial discrimination "strikes at the fundamental values of our judicial system and our society as a whole," Rose v. Mitchell, 443 U.S. 545, 556 (1979), the Supreme Court has "consistently" articulated a "strong policy . . . of combating racial discrimination." *Id.* at 558.

152. The most obvious and destructive form that such discrimination can take is systematically unequal treatment of criminal defendants based upon their race. *See* McLaughlin v. Florida, 379 U.S. 184, 190 n.8 (1964) (*citing* Strauder v. West Virginia, 100 U.S. 303, 306-08 (1880) and Ho Ah Kow v. Nunan, 12 F. Cas. 252 (C.C.D. Cal. 1879)). The Supreme Court has insisted "that racial classification, especially suspect in criminal statutes, be subjected to the 'most

---

[20] This case, as a federal prosecution, is not subject to the Equal Protection Clause of the Fourteenth Amendment, but the Due Process Clause of the Fifth Amendment, which has long been held to embody this requirement by implication. *See* Bolling v. Sharpe, 347 U.S. 497, 499 (1954); *see also* Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment.").

rigid scrutiny' and, if they are ever to be upheld, . . . be shown necessary to the accomplishment of some permissible state objective, independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate." Loving v. Virginia, 388 U.S. 1, 11 (1967). *See* Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 272 (1979); McLaughlin, 379 U.S. at 198 (Stewart, J., concurring). ("I cannot conceive of a valid legislative purpose under our Constitution for a state law which makes the color of a person's skin the test of whether his conduct is a criminal offense.")

153. The statistics discussed above do not, by themselves, prove that the government has engaged in intentional discrimination in violation of the due process clause of the Fifth Amendment, or that it has sought the death penalty in an arbitrary and capricious manner in violation of the cruel and unusual punishments clause of the Eighth Amendment. This showing, however, is sufficient to demonstrate some evidence of discrimination and shift the burden to the government to produce a credible, nondiscriminatory explanation for its practice of disproportionately seeking death sentences for white defendants. *See* Batson, 476 U.S. at 93-94. The rate of authorization to seek the death penalty for white defendants is over one and one-half times higher than the rate for both black and Hispanic defendants. The burden is, thus, on the government to explain this

glaring disparity, if it can.

154. Mr. Paul's claim is grounded in settled Supreme Court Eighth Amendment jurisprudence as well. In Furman v. Georgia, 408 U.S. 238 (1972), the Supreme Court invalidated all existing death sentences in the United States. The decision in Furman has been consistently interpreted as a condemnation of the "arbitrary and capricious" use of the death penalty. *See* Gregg v. Georgia, 428 U.S. 153, 188 (1976); Godfrey v. Georgia, 446 U.S. 420, 428 (1980); Zant v. Stephens, 456 U.S. 410, 413 (1982) (*per curiam*); Woodson v. North Carolina, 428 U.S. 280 (1976) and Roberts v. Louisiana, 428 U.S. 325 (1976) (mandatory *death* sentences – but not other mandatory sentences – are unconstitutional); Lockett v. Ohio, 438 U.S. 586 (1978) (sentencer must be free to give "independent mitigating weight" to any fact about the defendant or the offence in a capital case); Bullington v. Missouri, 451 U.S. 430 (1981) (imposition of death sentence after reversal of a sentence of life imprisonment is unconstitutional, though there is no general ban on harsher sentencing on retrial); Turner v. Murray, 476 U.S. 28 (1986) (capital defendants in interracial murders – but not noncapital defendants – are automatically entitled to have potential jurors questioned about the effects of possible racial biases).

155. Condemnation of racial discrimination is apparent from the opinions

of the Justices in the majority and those in dissent alike. For example, Justice Douglas concluded in Furman that the capital statutes before the Court were "pregnant with discrimination," 408 U.S. at 257, and thus ran directly counter to "the desire for equality . . . reflected in the ban against 'cruel and unusual punishments' contained in the Eighth Amendment." *Id.* at 255. Similarly, Justice Stewart lamented that "if any basis can be discerned for the selection of these few sentenced to die, it is the constitutionally impermissible basis of race." *See id.* at 364-66 (Marshall, J., concurring); *id.* at 389 n.12 (Burger, C.J., dissenting); *id.* at 449-50 (Powell, J., dissenting). Thus, in Zant, 462 U.S. at 885, the Court explained that Furman would be violated if a state based its capital sentencing on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such as . . . the race . . . of the defendant."

156. Taken together, these two points can be summarized as follows: The Cruel and Unusual Punishment Clause of the Eighth Amendment imposes a constitutional prohibition against racial discrimination in the use of the death penalty that is at least as strict as the general proscription of racial discrimination in the Fifth and Fourteenth Amendments.

157. Both the denial of equal protection and the prohibition against cruel and unusual punishment provided the basis for the claim raised in McCleskey v.

Kemp. In McCleskey the petitioner presented detailed evidence of racial disparities in capital charging and sentencing in Georgia, based primarily on the race of the victim. Despite that evidence, the Court rejected McCleskey's constitutional claims. This case, however, presents an entirely different factual context than did McCleskey, in two critical respects:

(1) *The nature of the discrimination*: McCleskey's claim was that the state of Georgia had discriminated against some capital murder defendants because of the race of their victims. McCleskey's evidence demonstrated that the killers of whites, regardless of their own race, were far more likely to be sentenced to death than killers of African Americans. *See* McCleskey, 481 U.S. at 287. Thus, his claim of discrimination was predicated on an application of the State's death penalty statute, which had created an improper "classification." *See id.* at 29, n. 8.

Needless to say, it is one thing for a criminal defendant to complain that he is the subject of *irrational* government classification, and quite another for him to claim that he is the actual victim of systemic racial discrimination. In the context of the irrational-classification claim, the Supreme Court was willing to accept the racial discrepancies in the Georgia capital sentencing system as an acceptable cost of the "discretion that is fundamental to our

criminal justice process." *Id.* at 313. Indeed, the Court went so far as to say that the race-of-victim discrepancy that McCleskey demonstrated is "a far cry from the major systematic defects identified in Furman." *Id.* at 313, (*citing* Pulley v. Harris, 465 U.S. 37, 54 (1984)). But the Supreme Court did not suggest that a gross disparity in the likelihood of a capital prosecution because of the *defendant's own race* would be a minor or acceptable defect. To do so would be to renounce decades of steadfast commitment to color-blind criminal justice. Such an extreme racial pattern is exactly what is presented here.

(2) *The identity of the governmental decision makers:* The charging process of Georgia at issue in McCleskey differed fundamentally from the charging process that produced Mr. Paul's capital indictment and prosecution. A single person, the Attorney General of the United States, made the decision to seek the death penalty not only against Mr. Paul, but in *all other federal capital eligible prosecutions*. In McCleskey, the Court was unwilling to rely on the types of statistical proof the courts habitually use in jury discrimination and Title VII cases. ("Most importantly, each particular decision to impose the death penalty is made by a petit jury selected from a properly constituted venire. Each jury is unique in its composition, and the

Constitution requires that its decision rest on consideration or innumerable factors that very according to the characteristics of the individual defendant and the facts of the particular capital offense. Thus, the application of an inference drawn from the general statistics to a specific decision in a trial and sentencing simply is not comparable to the application of an inference drawn from general statistics to a specific venire-selection or Title VII case. In those cases, the statistics relate to fewer entities..."). 481 U.S. at 294-95. At the same time, however, the Court was careful to preserve the significant place statistics might have where the decisions of multiple decisionmakers were attributable to a single entity. *Id.* at 295 n.15. "Requiring a prosecutor to rebut a study that analyzes the past conduct of scores of prosecutors is quite different from requiring a prosecutor to rebut a contemporaneous challenge to his own acts." *Id.* at 296, n.17 (citation omitted). It is the latter scenario, of course, which is applicable here. To justify DOJ's actions, the Attorney General need only account for the conduct of herself and her subordinates. Thus, it is a task which the Supreme Court fully contemplated would be imposed on a prosecutor where, as here, it was justified by the evidence.

158. Subsection (f) of 18 U.S.C.§ 3593 provides that in any capital

sentencing proceeding:

> [T]he court . . . shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race . . . of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race . . . of the defendant or of any victim may be.

Moreover, each juror is required to sign a certificate "that consideration of the race . . . of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation . . . no matter what the race . . . of the defendant or any victim may be." *Id.* The explicit provisions of 18 U.S.C. § 3593 deal with jury instructions and jury decision making, but the purpose of this subsection is broader. Section 3593 was derived from a provision of the first post-Furman federal death penalty statute, 21 U.S.C. §848(o), which is entitled "Right of the defendant to justice without discrimination." It reflects extreme sensitivity on the part of Congress to the danger of racial discrimination in capital prosecutions, and a commitment to eradicate any such discrimination.

159. This Court also has the authority to grant relief from such charging discrimination in the exercise of its supervisory powers over the administration of federal criminal justice:

> "[G]uided by considerations of justice," McNabb v. United States, 318 U.S. 332, 341 (1943), and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress. The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights [citations omitted]; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury [citation omitted]; and finally, as a remedy designed to deter illegal conduct [citations omitted].

United States v. Hasting, 461 U.S. 499, 505 (1983).

160. With this claim, as with many set forth herein, discovery is absolutely essential to the proving and substantiation of such a claim. In Mr. Paul's request for discovery he seeks the information necessary to determine how the Attorney General chose which defendants to charge capitally, in general, and in Mr. Paul's case in particular. This is not a small request, and it is not made lightly. But the issue is grave, and the consequences to Mr. Paul are extreme. The existence or absence of racial discrimination cannot be determined without information on the government's capital charging practices, information that is within the government's exclusive control.

161. As noted, the issues raised here overlap those litigated in McCleskey v. Kemp, in which the Supreme Court rejected a claim that the State of Georgia had engaged in racial discrimination in capital charging and sentencing, in violation of the Eighth and Fourteenth Amendments. While the McCleskey

opinion is relevant to this claim and the accompanying discovery motion, it is important to note that Mr. Paul's claims are not the same as McCleskey's, and that his claims cannot be rejected merely by reference to the outcome of that case, for several reasons:

(1) McCleskey was a decision on the merits after the facts were fully developed. Obviously, it does not preclude Mr. Paul's discovery motion, which is necessary to enable him to make the sort of showing that remains viable after McCleskey. Indeed, McCleskey supports Mr. Paul's claim and discovery motion, since it demonstrates that a claim such as this can fairly be presented only with the benefit of discovery. *See* 481 U.S. at 361 n.13 (referring to depositions of prosecutors);

(2) The racial discrimination at issue in this case is different in kind from that alleged in McCleskey, and the charging process that produced the discrimination here is entirely different from that in the Georgia state courts. By its own terms, the McCleskey opinion does not apply in this context;

(3) The capital sentencing structure under which Mr. Paul was charged includes subsection (f) of 18 U.S.C. §3593, which is entitled "special precaution to ensure against discrimination." This subsection provides a

separate statutory basis for Mr. Paul's claim and accompanying discovery motion, which was not available to McCleskey in federal habeas corpus.

(4) 18 U.S.C. §3593(f) requires each juror to certify that he or she "would recommend a sentence of death for the crime in question no matter what the race . . . of the defendant or any victim may be." This section provides an independent basis for this discovery request, since the information would have been critical at trial in order to allow Mr. Paul to present evidence and argument to the jury that any sentence of death *would* necessarily have been influenced by the defendant's race.

(5) This is a post-conviction motion in a federal case, not post-conviction review of a state proceedings in federal habeas corpus. Therefore, the considerations of comity and federalism that limit federal judges in cases such as McCleskey do not apply here. Morever, in this case the Court may act under its own supervisory power over the administration of criminal justice, independent of the constitutional and statutory bases identified above.

**X. Upon Information and Belief The FDPA is Unconstitutional Because It Permitted the Government to Violate A Number of Applicable Constitutional Amendments In Its Sentencing Phase Presentation and Argument to the Jury, in Violation of Mr. Paul's Rights As Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

162. Upon information and belief, Mr. Paul's capital conviction and sentence of death must be vacated because the statute pursuant to which such were sought and obtained, the FDPA, is unconstitutional on its face and as applied in this case, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

163. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

164. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

165. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

166. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

167. The precise holding in Ring v. Arizona, ___ U.S. ___, 122 S.Ct. 2428 (2002) – that juries, not judges, must decide on the existence or not of aggravating factors of the sentence in a death-penalty scheme – obviously has no direct "all fours" impact on the FDPA, since that is the procedure set forth in the statute. 18 U.S.C. § 3593. In order to get to its holding in Ring, however, the Supreme Court reached a predicate conclusion that does have enormous impact on the FDPA, *i.e.*, that aggravating factors are not mere sentencing factors but, instead, function as elements of an offense.[21] From this predicate flow two conclusions: first, that in the federal system where the Fifth Amendment's Grand Jury Clause applies, all

---

[21] The name by which these circumstances are referred to is of no great moment. As pointed out by Justice Scalia in *Ring*, it matters not a bit "whether the statute calls them elements of the offense, sentencing factors or Mary Jane," 122 S.Ct. at 2444, the issue is one of function.

elements of an offense must be alleged by indictment (the claims arising from that fact are set forth elsewhere in this motion, incorporated herein by express reference; and, second, the predicate determination that aggravating factors are elements of an offense brings into play important and fundamental issues concerning the applicability of other constitutional protections and guarantees in the sentencing phase of a capital trial.

168. In United States v. Fell, 2002 *U.S. Dist. LEXIS* 17932 (D.Vt. 2002), Judge Sessions concluded that Ring's declaration that aggravating factors serve as elements of capital murder, combined with the Constitution's requirement for heightened reliability in capital cases, rendered the FDPA unconstitutional since the FDPA's "direction to ignore the rules of evidence when considering information relevant to death penalty eligibility is a violation of the Due Process Clause of the Fifth Amendment and the rights of confrontation and cross-examination guaranteed by the Sixth Amendment." *Id.* at *1.[22] As noted in the Fell opinion, this result followed from the Supreme Court's Ring decision since, were the Government's perspective to prevail, exposure to the death penalty would

---

[22] Judge Sessions also noted that there may be legal merit to the view of the Court in United States v. Quinones, 205 F.Supp.2d 256 (S.D.N.Y. 2002) that the FDPA is invalid because of the constitutionally unacceptable risk of executing the innocent. Fell, at *5.

become, "the federal criminal justice system's sole exception to the practice of requiring that offense elements be proven by admissible evidence comporting with due process and fair trial guarantees." *Id.* at *50. "This," concluded Judge Sessions, "makes no sense," and declared the FDPA unconstitutional for this reason. *Id.*

169. The issue of evidentiary standards at a penalty phase is a complex one. Obviously Congress cannot suspend the Confrontation Clause of the Sixth Amendment. Moreover, the Supreme Court has held that a state's rules of evidence cannot serve as a bar to the introduction of otherwise reliable mitigating evidence on the part of a defendant in the penalty phase of a capital case. Green v. Georgia, 442 U.S. 95 (1979). Thus, a constitutional rule could be distilled that only the Government is constrained by the rules of evidence at a penalty proceeding.

170. Further complications abound. Under a post-Apprendi/Ring formulation, do the rules of evidence apply only to the "eligibility" factors, *i.e.*, state of mind and statutory aggravating factors, while victim-impact and non-statutory aggravating factors may be proven without resort to the rules of evidence? How Congress resolves that issue once given a full opportunity to weigh and consider the rule's advantages, disadvantages, and ultimate

constitutionality, is something obviously left to Congress. It is surely not a matter for judicial construction.

171. Mr. Paul urges this Court to follow Judge Sessions' lead on this issue, and reverse his sentence of death as unconstitutional.

### XI. Upon Information and Belief The Jury's Failure to Unanimously Find, and Consider, Relevant Mitigating Evidence that His Co-Defendant Received a Life Sentence Violated Mr. Paul's Rights Under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments

172. Upon information and belief, the jury's failure to unanimously find, and consider, relevant mitigating evidence that his co-defendant received a life sentence, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

173. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

174. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

175. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

176. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

177. The evidence before the jury in this case was irresistibly vague in one critical respect: it deflected any serious effort to distinguish the role Mr. Paul played from the role Mr. Ingle played in the murder of Sherman Williams. The two defendants were, like the poor departed soul and the lizard in *The Inferno*, "'fused like hot wax ... until neither wretch nor monster appeared what he had been when he began....'"[23] The evidence indicated that both confessed some involvement in some part of the criminal transaction. The jury – like the government – had no rational basis upon which to distinguish the comparative culpability of Mr. Paul and Mr. Ingle. The physical evidence failed to provide any

---

[23] "... I saw a lizard come darting forward on six great taloned feet and fasten itself to a [fellow soul] .... They fused like hot wax, and their colors ran together until neither wretch nor monster appeared what he had been when he began...." Dante, *The Inferno*, Canto XXV, Circle 8, Bolgia 7, lines 46-48, 58-60 (J. Ciardi, transl.), cited in U.S. v. Romanello, 726 F.2d 173, 174 (5th Cir. 1984).

basis, and there was no other evidence upon which the jury could have done so. The most compelling proof of this inscrutable ambiguity was the prosecution's closing argument in the penalty phase of Mr. Paul's trial. The prosecution did not even attempt to rebut the defense argument that Mr. Paul was no more culpable than Mr. Ingle. Instead, it sought to deflect the jury's consideration of this matter by arguing that what another jury decided in Mr. Ingle's case was not, and should not be, determinative of what the proper punishment was for Mr. Paul. Thus, only by urging the jury to ignore entirely the matter of equal culpability could the prosecution hope to avoid the ineluctable conclusion that Mr. Paul could not be fairly put to death if Mr. Ingle was not going to be. The jury heeded the prosecutor's call, and in failing to find the equal culpability mitigating factor, failed to consider mitigating evidence that as a matter of law the Eighth Amendment and the capital sentencing statute required it to consider.

178. The record in Mr. Paul's case establishes by more than a preponderance of the evidence that Trinity Ingle, who received a life sentence, was not less, and indeed more culpable than Jeffery Paul in the death of Sherman Williams. The evidence is sufficiently compelling in this regard, that no rational trier of fact should have concluded otherwise. For this reason, this Court should

hold that the jury was in error in refusing to find the "co-defendant life sentence" mitigator, and on that basis reverse Mr. Paul's sentence of death.

179. In the presentation that follows, Mr. Paul sets forth the evidence and argument from his trial that establishes the existence of the "co-defendant life sentence" mitigator. He also sets forth evidence and argument from the trial of Trinity Ingle[24] which provides further support for the view that their relative culpability was indistinguishable at best.[25]

180. The Supreme Court has steadfastly held that a capital sentencing statute must permit consideration of the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976). The Court has never wavered from the principle that the Eighth Amendment requires full consideration of all relevant

---

[24] The government's arguments at Ingle's trial regarding the issue of relative culpability are relevant here because they provide direct insight into what the government believed about whether a rational trier of fact could have reasonably rejected the "co-defendant life sentence" mitigator in Mr. Paul's case. This Court should therefore scrutinize the government's arguments at both trials in deciding the issues here.

[25] While portions of the *Ingle* trial transcript are found in the Appendices, a copy of the entire record is contained in his case file. *See* U.S. v. Ingle, 157 F.3d 1147 (8th Circuit Case No. 97-3443) (1998).

facts which a capital defendant proffers in mitigation at the sentencing phase of a capital trial. In Lockett v. Ohio, 438 U.S. 586 (1978), the Court held that under the Eighth Amendment, a capital defendant may not be precluded from presenting to his sentencer, as a mitigating factor, "any aspect of [his] character or record and any of the circumstances of the offenses that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604.

181. Critically here, expounding upon the Lockett principle, in Eddings v. Oklahoma, 455 U.S. 104, 115-116 (1982), the Court held that it was Eighth Amendment error for a capital sentencer to refuse to consider relevant mitigating evidence in the sentencing determination. As the Court put it, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.... The sentencer ... may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." 455 U.S. at 113-114 (emphasis in original). *See also* Hitchcock v. Florida, 481 U.S. 393, 399 (1987).

182. Congress incorporated these principles into the FDPA. Section 3592 of the Act declares that at the sentencing phase of a capital trial held pursuant to the Act:

> [T]he finder of fact *shall consider* any mitigating factor, including...:
>
> [listing seven specific statutory mitigating factors, and] ...
>
> (8) Other factors. – Other factors in the defendant's background, record or character or any other circumstances of the offense that mitigate against imposition of the death sentence.

18 U.S.C. §3592(a) (emphasis added). One of the statutory mitigating factors enumerated in §3592(a) is:

> 4) Equally culpable defendants. -- Another defendant or defendants, equally culpable in the crime, will not be punished by death.

Congress also established a lower burden of proof for a defendant's mitigating evidence than that mandated for aggravating factors. *Compare* 18 U.S.C. §3593(c) (government must prove aggravating factor "beyond a reasonable doubt") *with id.* (defense must prove mitigating factor "by a preponderance of the information.").

183. In the present case, the defense submitted for the jury's consideration the statutory mitigating factor defined in §3592(a)(4) set forth above. The court instructed the jury, in accordance with §3593(c), that this factor should be considered by the jury if the defense established it by a preponderance of the evidence. App. 191-92. The court also instructed, contrary to the FDPA and Supreme Court precedent, *see* Claim III, that only those members of the jury who actually found the existence of a mitigating factor could consider it in their

determination of the appropriate punishment. App. 194; *see also* App. 90. Thus, "*as a matter of law*" pursuant to the court's instruction, if no member of the jury found the existence of a mitigating factor, then no member of the jury considered that factor in determining whether Mr. Paul should live or die.

184. In Mr. Paul's case, the jury unanimously rejected the (a)(4) mitigating factor concerning the fact that Trinity Ingle, Mr. Paul's co-defendant, received a life sentence. App. 92. Thus, under the court's instruction, no member of the jury even considered, let alone gave weight to, the fact that Trinity Ingle, Mr. Paul's co-defendant, had just days before Mr. Paul's trial, received a life sentence for his conviction for the same offense.

185. This is so despite the fact that it was undisputed Ingle had received a life sentence. This is also true despite the fact that, under any reasonable view of the evidence, Mr. Paul's comparative culpability in the case was no greater than, and clearly less than that of Trinity Ingle.

186. The record demonstrates that, under any rational view of the evidence, Mr. Paul carried his burden of proving by a preponderance of the evidence this (a)(4) mitigating factor. The jury's failure to so find violated Edding's requirement that the sentencer consider such evidence; in addition, this failure

violated §3592's mandate that the sentencer "shall consider" all mitigating evidence proven by a preponderance of the evidence.

187. Although the Court failed to define "equal culpability" for the jury, its common meaning connotes both the sense that the two co-defendants were actively involved in the commission of the offense, as well the more general point that, taking into account all other evidence regarding Mr. Paul's character and background, he was no more "morally culpable" than his co-defendant. *Cf.* Penry v. Lynaugh, 492 U.S. 302 (1989) (capital sentencer must be allowed to take into account all aspects of character and background of defendant and give "reasoned moral response" thereto in death sentencing decision) . In this case, the evidence as to these factors established by more than a preponderance of the evidence that Mr. Paul was no more culpable than his co-defendant, and no reasonable juror could have found differently. In the sections that follow, Mr. Paul reviews the relevant evidence as to his "culpability" so defined.

188. The government's case in chief was primarily based upon the testimony of four witnesses who claimed Mr. Paul had made statements to them which, in some manner and to varying degrees, inculpated him in the offense. Kristopher (Kris) Rogers, a convicted felon, T. 653, who had known Mr. Paul for less than three months, T. 676, testified that on June 24, 1995, two days after the

offense, he, Mr. Paul and several friends socialized together at the home of his girlfriend, Crystal Davis. T. 664. He testified that they were drinking but were not doing any drugs. T. 684. Rogers claimed that Mr. Paul pulled him aside from the others and proceeded to tell him about an old man that "they" (Mr. Paul and Trinity Ingle) had murdered. T. 666. Rogers testified that the plan, as related to him by Mr. Paul, had been to rob the victim, but that they shot him after knocking him down and kicking him. T. 667-69. Rogers also testified that he saw what appeared to be blood on Mr. Paul's shoe that evening, although he had not seen any blood when he saw him two days earlier, the day of the offense. T. 670, 683. He also testified that Trint Ingle had been wearing Mr. Paul's shoes that summer, because Ingle could not wear his own sandals to work. T. 670. He acknowledged that on June 24th, shortly after his alleged conversation with Mr. Paul, he and his girlfriend got into a fight, and he was arrested for battering her. T. 687-88. Rogers admitted to knowing about a possible reward for his testimony, but when denying a financial motive for testifying against Mr. Paul, he inferred that he was still waiting for his money: "It's been a nightmare for two years. I still ain't seen – you know." T. 692.

189. Chris LaPaglia, Mr. Paul's former girlfriend, testified Ingle called her on June 22, 1995, asking her to come to the motel where they were because Mr.

Paul was upset and needed her there. T. 705. She testified that Mr. Paul later called her himself, and told her that he was upset because he had killed someone. T. 707. She also testified, however, that Mr. Paul had never mentioned shooting anyone, only that he had kicked someone. T. 715. According to LaPaglia, the next day Mr. Paul told her his mother was upset because he came home with blood on him, and that he had kicked someone and "broke his neck." T. 708. Mr. Paul's mother testified, however, that she had not seen any blood on her son's clothes or shoes on June 22, 1995, nor had Kris Roger. T. 670, 683, 1040. The medical examiner confirmed that there was no sign of trauma to the victim's head or neck other than the single gunshot wound that caused death. T. 598-600.

190. Cindy Wallace, Mr. Paul's girlfriend in Key West, Florida during the period after the crime but before his arrest, testified that Mr. Paul told her about a dream he had in which he and a person he referred to as his "OG-original gangster" followed a man up a mountain to rob him, and shot him. T. 729-30. Wallace testified that at times Mr. Paul said his "OG" forced him to shoot the man, at times he said they both shot him, and at times he said the "OG" shot the victim. T. 736, 739, 743. At one point Mr. Paul told her he had not shot the victim at all. T. 743. Wallace testified that Paul had lied to her before and that she did not believe him when he told her about this incident. T. 744-45.

191. Daniel Coughlin, a friend of Mr. Paul's while in Key West, testified that Mr. Paul told him he and another man had robbed a man for his car, and then shot and killed him. T. 755.

192. Government witness John LaVoie, the FBI agent who arrested Mr. Paul in Water Valley, Mississippi on August 22, 1996, testified that Mr. Paul confessed to having been a part of the robbery of Sherman Williams, but expressly denied any direct involvement in the actual murder. According to Agent LaVoie, Mr. Paul said Ingle pulled a gun on the victim when he refused to turn over his money, T. 811; that while Mr. Paul had helped tape the victim's hands, Ingle had struck him with the butt of the revolver and kicked him twice in the head, *id.*; and, while first walking away from the victim, Ingle, a five time convicted felon, said he was not going to do more [prison] time for robbing the victim, and he turned around and shot the victim, once in the head, and once in the shoulder. *Id.* Agent LaVoie said Mr. Paul had been cooperative and candid during the interview, T. 814, and he appeared confused about why he was being prosecuted for murder. *Id.*

193. Unlike the statements of Mr. Paul, the only evidence of which was the hearsay testimony of witnesses, the jury also heard a *recorded* statement from co-

defendant Ingle. T. 1058-1110.[26] It is significant not only for its contents, described more fully below, but also for its heightened reliability as to the veracity and accuracy of the statements. Whereas *all* of the evidence regarding Mr. Paul's statements was subject to mis-quoting, mis-interpretation, elaboration, or worse, coming as it did solely from the memory of persons with questionable motives of their own, Ingle's recorded statement was a live, verbatim rendition. Thus added weight must be given to the truth of its contents as compared with Mr. Paul's statements.

194. Ingle's statement was taken by means of a concealed recording device provided by the FBI and placed on an inmate in the Crawford County Jail where Ingle was being held pre-trial. T. 1056. That inmate, Jonah Jones, and another inmate, Derrick Bell, were recorded while engaged in a conversation with Ingle about the murder charge on which he was being held. Generally speaking, Ingle's recorded statement can only be fairly described as the vulgar, street talking bravado of an obvious thug. Ingle's descriptions of his role, the victim, and the offense that he repeatedly admits to having committed, is filled with vulgarity,

[26] The defense also introduced into evidence certified copies of the indictment, judgement and order of (life) sentence in the Ingle case. T. 1110 (DE 21 & 21).

cursing and slang[27], and is otherwise wholly inconsiderate of basic human decency. To adequately assess Mr. Paul's claim here that no reasonable juror could have believed him to be any more culpable in the offense than Ingle, counsel urges the Court to read Ingle's recorded statement in its entirety.

195. Specifically, Ingle's recorded statement lays out the facts of the crime, the planning beforehand, the manner in which it was carried out, and the motive for the actual killing. At each step, Ingle describes himself as either the leader in the action, or at least an active co-participant. Several times during the recorded statement, Ingle admits to having actually shot and killed the victim himself. *See e.g.* T. 1084 ("the dude I done shot, he dead."); T. 1103 (when asked who shot him first, Ingle replies, "BOB did", and acknowledged "BOB" referred to himself).[28] Ingle even described the feeling he had when he pulled the trigger: "You know yourself, when you boom, man, and when you hit that thing, you just, then you're

---

[27] Rather than quote Ingle's actual language, counsel will use "_ _ _ _ _" to denote curse words in this Brief.

[28] Ingle explained elsewhere in the statement that in order to protect himself he would refer to he and his partner in the crime as ANDY and TOM. T. 1061. Apparently unable to remember his choice of names, he later changed them to BOB and ANDY. T. 1063; 1069-1070. Although he is often unclear whether one name is paired with one person in real life, at the point in the recording referenced here in text, he explicitly acknowledges that BOB refers to himself. T. 1103. At the Ingle trial, Jonah Jones verified that "BOB" referred to Mr. Ingle. App. 349.

rushin' rushin'...." T. 1087. Ingle admits to having gotten rid of the gun himself: "I told it to 'em like this. 'If I use it, I'm gonna get rid of it.'" T. 1085.

196. Thus the arguably most reliable evidence regarding each co-defendant's role in the case, namely, Ingle's recorded statement, depicts Mr. Paul as, at most, an equal co-participant, and more likely less active in the crimes than Ingle. A comparison of their respective statements demonstrates that no rational trier of fact could have concluded that Jeffrey Paul was any more culpable or involved in the murder of Sherman Williams than Trinity Ingle.

197. While the government contended that Mr. Paul said he had kicked the victim in the head, T. 472, other evidence belied this fact. First, FBI Agent Tom Ross testified, and the government's serologist confirmed, that the Reebok shoes, GE 27 (T. 608), which Mr. Paul was supposedly wearing at the time of the offense had no trace of blood on them. T. 567-68, 608. Second, as noted, the government's medical examiner testified that there was no evidence of any other trauma to the victim's head or neck other than the single gunshot wound. T. 598-99. In fact all trauma to the victim's head was associated with and caused by "exit wounding," namely, wounding caused as the bullet left the victim's skull. T. 600. Third, government witness Jason Paul, Mr. Paul's brother, was with Mr. Paul and Ingle shortly before and after the offense. While government witness Rebecca

Pingle, an acquaintance of Mr. Paul's, said she saw Paul limping on June 22, 1995, T. 639, both Kris Rogers, and Mr. Paul's brother testified that he was not limping that day. T. 683, 804.

198. The government also contended that Mr. Paul had blood on his shoes and/or clothes on the day of the offense. However, two government witnesses who saw him that day did not see any blood whatsoever on Mr. Paul. T. 670, 683, 801. As noted, Mr. Paul's mother confirmed that she had not seen blood on her son's clothes or shoes on June 22, 1995. T. 1040. Finally, Kris Rogers testified it was Ingle who had borrowed, and was wearing Mr. Paul's Reebok shoes (which the government alleged were used in the offense) around the time in question. T. 670.

199. Finally, the government presented evidence that Mr. Paul was seen in the victim's car on the day of the offense. T. 660. Importantly here, however, this same witness testified that Ingle was also in the car and was driving. T. 683.

200. The government's evidence of Ingle's primary role in the offense was more substantial than that presented or argued by the government during Mr. Paul's trial. At Ingle's trial, government witness Derrick Bell testified that Ingle had repeatedly told him, at least five times, that he personally had hit and shot

Sherman Williams, in the head and chest. App. 312-13, 320.[29] Ingle told Bell he was the one who struck the victim immediately after they first confronted him and asked for the time. App. 316. Ingle said it was he who bound the man up with duck tape, App. 318-19, it was he who had exclaimed "[t]his mother f_ _ _ _r is trying to resist," and he who had then "pulled out his gun and shot him." App. 320. Bell testified Ingle told him he shot the victim in the "dome" [head] and then he shot him in the chest. *Id.* Bell testified that Ingle "would laugh when he said he shot the guy in the dome." App. 322.

201. Government witness Jonah Jones confirmed Bell's testimony, stating at Ingle's trial that Ingle had told him he had glanced back at the victim and noticed him peeking, and so then decided to go back and kill him. App. 347. When they went back, according to Jones, Ingle "told me that he [Ingle] shot him." App. 348. Jones said Ingle confirmed that he had shot the victim "in the chest area and in the head," *id.*, and that he used the word "dome" for head. *Id.*

202. With respect to the battery of Sherman Williams, at Ingle's trial the government presented evidence and argued that Mr. Ingle hit the victim to the ground. *See e.g.*, App. 267, 316 (testimony that Ingle struck victim; argument that

[29] It is noteworthy here that the victim suffered only two gunshot wounds, one to the head, and one to the chest. T. 596-600. Thus if Ingle's confession is true, he would have been the only person to have shot Sherman Williams.

he "hit" him). Alternatively, the government also presented evidence and argued at Ingle's trial that *both* Ingle and Paul had kicked the victim. *See* App. 345-46 (witness said Ingle said "they" kicked victim); App. 445 (government argument that "they" kicked victim). The government also presented evidence at Ingle's trial demonstrating that the Reebok shoes which, in Paul's trial, they alleged were used by Paul during the offense to kick the victim, were in fact recovered from Ingle shortly after the offense, and that Ingle had borrowed them from Mr. Paul and had been wearing them himself. App. 426.

203. Additional evidence offered by both the government and the defense confirms Mr. Paul's lesser culpability for these crimes. His youth, his lesser criminal history, and evidence that he was the follower and not the leader in the offense, all point to this lesser culpability.

204. As discussed elsewhere in this motion, Paul was only eighteen years old at the time, and was thus younger than Ingle. T. 978, DE 1 (birth certificate of Jeffery Paul); App. 501, 514 (Ingle nineteen years old at time of offense).

205. Importantly here, Jeffery Paul's prior criminal history was far less substantial than that of Trinity Ingle. While Paul had a relatively minor criminal history, Ingle had five prior felony convictions, including two burglary convictions and two firearms convictions. T. 567; App. 472-73. The government

also presented substantial testimony at Mr. Ingle's trial demonstrating that shortly before the murder Ingle had acted irrationally and violently while using a gun to threaten innocent bystanders. App. 273-304 (witnesses describing how Ingle pulled gun and threatened people in angry confrontation at convenience store, during which witnesses thought he was going to shoot). Ingle then chased them in his car. App. 292. Ingle pled guilty to a felony firearms charge in relation to that incident. App. 439. Additionally, in an expanded version of his recorded statement, which the government played for the jury during Ingle's sentencing trial, he discussed numerous other crimes (unadjudicated) involving shooting people and committing additional robberies. App. 475-499. Finally, while the government highlighted the fact that Mr. Paul had eluded capture, indeed using it as a non-statutory aggravating factor at sentencing, Ingle also initially eluded capture. T. 569.

206. Importantly for this issue, although the prosecution argued at Mr. Paul's trial that his statements indicated he personally kicked and shot Sherman Williams, *see* App. 153-156, the government made these same arguments with respect to Mr. Ingle at his trial. *See* App. 256 ("And Trinity Ingle put the barrel of a .38 behind Mr. Williams' left ear and he pulled the trigger."); App. 451, 461-62, 501-02 (characterizing Ingle's statements as confession that he shot victim); App.

269 ("Ingle shot the old man first"); App. 267, 448-49 (Ingle kicked victim and Ingle knocked victim down); App. 452 (Ingle said he shot victim first); App. 462 (arguing with respect to malice, Ingle's individual participation satisfied requirements).

207. Indeed, at Ingle's trial, the prosecution painted a picture of him as the leader, arguing how it was Ingle who checked to see if the victim was looking at them, App. 255, 446, Ingle who drove the car after the offense, App. 258, and paid for the food and motel room, *Id.*, and Ingle who made the decisions about who to see and where to go after the offense. *Id.*

208. In sum, the prosecution's arguments in openings and closings throughout both trials leads to only one fair conclusion: according to the government, the only fair reading of the evidence established that, at most, Mr. Paul's culpability was equal to that of his co-defendant, Trinity Ingle, and probably less. These arguments, and the evidence supporting them, establish this fact beyond any reasonable doubt, and certainly, at the very least, by a preponderance of the evidence.

209. The defense was only required to prove by a preponderance of the evidence the mitigating factor that an equally culpable co-defendant received a life sentence. 18 U.S.C. §3593(c). The jury was so instructed. App. 183, 192

(instruction); App. 89 (special verdict form). The evidence from Mr. Paul's trial leaves no doubt that Mr. Paul carried his burden of proving this factor, and that no rational juror could have concluded otherwise. Failure to consider mitigating evidence which has been thus established in accordance with the requisite level of proof violates the Eighth Amendment. *See* Eddings, Hitchcock, *supra*. Many other courts have so held.

210. In Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990), the Florida Supreme Court reversed a death sentence and remanded for imposition of a life sentence where the trial judge erroneously rejected mitigating evidence which the reviewing court concluded had been sufficiently proven:

> [W]hen a reasonable quantum of evidence of a mitigating circumstance is presented, the trial court must find that the mitigating circumstance has been proved.

*Id.* Similarly, in Evans v. State, 598 N.E.2d 516, 519 (Ind. 1992), the Indiana Supreme Court remanded for the imposition of a life sentence on the ground that the Court erroneously rejected non-statutory mitigating factors. The court observed that the sentencer's rejection of sufficiently proven mitigating evidence of parental neglect, abnormal behavior, psychiatric disorder and of the defendant's immediate surrender to authorities demonstrated that "the trial court's conclusion that the death penalty is appropriate was arrived at without the required discrete

and individualized consideration of the character of the offender." *Id. See also* Magwood v. Smith, 791 F.2d 1438, 1449-50 (11th Cir. 1986)(habeas relief granted on ground that trial judge's rejection of mitigating circumstances was not fairly supported by record); Gray v. Lucas, 710 F.2d 1048, 1055 n. 5 (5th Cir.), *cert. denied* 463 U.S. 1237(1983) (observing that had evidence of defendant's mental illness been presented at the penalty phase, he "would most probably now be entitled to a peremptory instruction to consider a mitigating circumstance that his capacity to conform his conduct to the requirements of law was substantially impaired...."); *cf.* Sanders v. State, 585 A.2d 117, 134 (Del. 1990)(requiring jury instruction that finding of "guilty but mentally ill" mitigates as matter of law).

211. Just as a jury's consideration of an improper aggravating factor skews its weighing process in assessing punishment and renders the sentence unreliable under the Eighth Amendment, *see* Stringer v. Black, 503 U.S. 222, 232 (1992), the erroneous failure to find and weigh relevant mitigation that is supported by the evidence infects the process of deciding whether death is the appropriate punishment. Here, the jury erred in failing to find that Mr. Paul's co-defendant, whom the evidence demonstrated was equally, if not more culpable than Mr. Paul, had received a life sentence. The jury's resulting failure to give any weight to this mitigating evidence renders the death sentence that was imposed unreliable.

212. Admittedly, this Court should not treat lightly the reversal of a jury's finding regarding a mitigating factor in a capital case. Indeed, given the evidence noted above, and given the jury's willingness to find other mitigating factors, the question arises as to how to explain the fact that no juror found this mitigating factor. The answer likely lies in a prosecutorial tactic addressed as a separate misconduct issue in this motion.

213. The prosecution employed a two-step strategy, begun during voir dire, and returned to in final summation at sentencing, designed to keep the jury from giving any consideration to otherwise self-evident mitigating factors. Referencing Ingle's life sentence, the government asked the general venire: "do you feel that you would be able to consider all of the evidence presented that is relevant to the sentencing issue and not focus on the fact that Trint Ingle got life without possibility of release? That is, that you could consider the evidence in this case and not take into consideration that one factor in making your decision?" T. 232. The defense objected to the obvious mis-statement of the law. This Court did not rule. Instead, as it had done elsewhere during voir dire, the Court took over the questioning and re-phrased the government's inquiry so as to avoid the obvious error. T. 232-34.

214. Notwithstanding this Court's actions, the prosecution returned to this theme in final closing argument at sentencing. In the only reference to the co-defendant life sentence mitigating factor, the prosecution did not even suggest that the defense had not met their burden of proof. (That alone is relevant to this Court' s assessment of whether the defense proved its case on this factor). Instead, the government told the jury *not to consider* this evidence at all in mitigation of punishment, and did so by reference to their original, objectionable statements during voir dire:

> Now ladies and gentlemen, if you recall on the second day of our voir dire, I got up and I asked one question ... I asked if this would be a problem because of the fact that this defendant would be considered for the death penalty while Trint Ingle had already received life in prison without parole. And all of you said that no, *that wouldn't_make a difference* and you'd consider this case on its facts and its circumstances, its merits. Don't be concerned about what happened in some other case, some other jury concern...

T. 1153-54. While this is what the prosecution had initially (and erroneously) asked of the jury during voir dire, the argument ran roughshod over this Court's corrective interjection during voir dire.

215. Irrespective of the gravity of this separate argument error, this prosecutorial strategy provides perhaps the best and only explanation for why the jury unanimously rejected this factor during sentencing: the jury's vote may fairly

be interpreted as an acquiescence in the government's entreaty (unlawful though it was) to refuse to consider this factor, an invocation began during voir dire, and concluded during the final words spoken to the jury prior to their sentencing deliberations.

216. Whatever the reason, the jury could not, consistent with the evidence and the law, have reasonably failed to find that Jeffery Paul was at most an equal co-participant in the offense. For this reason, this Court should reverse Mr. Paul's sentence of death and order that a life sentence be imposed.

**XII. Upon Information and Belief The Jury's Failure to Find Unanimously and Consider Defendant's Youth as a Mitigating Factor Violated His Rights Under the FDPA and His Fifth, Sixth, Eighth and Fourteenth Amendment Rights Requiring a Capital Sentencer to At Least Consider Any Evidence in Mitigation Offered by the Defendant**

217. Upon information and belief, the jury's failure to find unanimously and consider Jeffery Paul's youth as a mitigating factor violated his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

218. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

219. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through

the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

220. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

221. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended §2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or

evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

222. At the sentencing phase of trial, the defense introduced Mr. Paul's birth certificate, indicating that he was born on September 2, 1976. T. 978, DE 1. Thus at the time of the offense, on June 22, 1995, Mr. Paul was eighteen years old.

223. Under applicable law, this was the *youngest* age that a person could be and still be eligible for the death penalty. Section 3591(a)(2) declares that "no person may be sentenced to death who was less than 18 years of age at the time of the offense." 18 U.S.C. §3591(a)(2).

224. In Mr. Paul's case, the defense submitted as a mitigating factor at sentencing the fact that "the defendant was youthful at the time of the offense." App. 193. Only six jurors found this factor. App. 92 (verdict form indicating vote). Because of this Court's instruction (also repeated on the special verdict form) allowing only those jurors who found a mitigating factor to consider it in the overall balance of aggravating and mitigating factors, App. 194 (court's instruction); App. 90 (special verdict form), only six jurors considered Mr. Paul's

youthfulness during sentencing deliberations. The remaining six were, as a matter of law, prohibited from considering Mr. Paul's youth in their sentencing deliberations.

225. As noted above, the Supreme Court has steadfastly held that a capital sentencer must permit consideration of the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976); *see also* Lockett v. Ohio, 438 U.S. 586, 604 (1978). Historically, the condition of youth has been consistently recognized as a special factor worthy of particular attention in *any* sentencing scheme, and especially in *capital* sentencing proceedings. "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." Eddings, *supra*, 455 U.S. at 115-116. For this reason, the Court has recognized youth as a mitigating factor to be considered in a decision whether a person should be sentenced to death.

226. Furthermore, as noted in the preceding claim, in Eddings the Court held it was Eighth Amendment error for a capital sentencer to refuse to consider relevant mitigating evidence such as youth in the sentencing determination. ("The sentencer ... may determine the weight to be given relevant mitigating evidence.

But they may not give it no weight by excluding such evidence from their consideration."). 455 U.S. at 113-114; Hitchcock, *supra*.

227. In concert with these principles, section 3592(a) of the FDPA declares:

> [T]he finder of fact shall consider any mitigating factor, including...:
>
> (8) Other factors. -- Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

Both constitutional and statutory mandates were violated in Mr. Paul's case.

228. It is indisputable that Mr. Paul established beyond all doubt that he was "youthful" under any meaningful definition of that term. He was only eighteen years old. No reasonable person could rationally determine that, at that age, Jeffrey Paul was not "young" as that term is commonly used. This fact finds ample support in both the statute and in Supreme Court authority.

229. Congress itself, by implication, legislatively determined Mr. Paul's youthfulness. This follows directly from the dictates of the FDPA. As noted, under the Act Jeffery Paul was the *youngest* a person could be and still be eligible for the death penalty. 18 U.S.C. §3591(a)(2). There is no suggestion in the Act that Congress intended to eviscerate entirely youth as a mitigating factor by adopting an 18 year old age-eligibility criterion in sub-section (a)(2). Thus if any

person could be a candidate for having youthfulness considered as a mitigating factor under the FDPA, Jeffery Paul was that person. He could be no younger and still be eligible for the death penalty.

230. Moreover, the U.S. Supreme Court has found by implication that Jeffery Paul's eighteen year old status was "youthful" and therefore required mitigating consideration by his capital sentencer. In Johnson v. Texas, 509 U.S. 350 (1993), the Court characterized a *nineteen* year old defendant as "youthful" for purposes of Eighth Amendment jurisprudence, and therefore found that his age and youthfulness were constitutionally protected mitigating factors requiring capital sentencer consideration. The Court reiterated the importance of youth as a mitigating factor in capital sentencing:

> There is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury if a death sentence is to meet the requirements of Lockett and Eddings. ... A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions. A sentencer in a capital case must be allowed to consider the mitigating qualities of youth in the course of its deliberations over the appropriate sentence.

509 U.S. at 367 (citations omitted).

231. Yet in this case, one half of the jury did not consider Mr. Paul's young age as a mitigating factor in determining the appropriate sentence. This fact must

be assumed from the language of the court's instruction, as well as that on the verdict form, noted above. In short, any juror who did not find the existence of a mitigating factor, and in this case there were six who failed to find Mr. Paul's youth as a mitigating factor, App. 90, were instructed *as a matter of law* not to consider it in mitigation of punishment. This result violates Eddings: "*[A]s a matter of law* ... [they gave] it no weight by excluding such evidence from their consideration." 455 U.S. at 113-114 (emphasis in original). Moreover, because no reasonable juror could have failed to find Mr. Paul youthful, this result also violated the mandate of the statute that the finder of fact "shall consider" factors such as youthfulness in mitigation. 18 U.S.C. §3592(a). For this reason, Mr. Paul's statutory and Eighth Amendment rights were violated, entitling him to a new sentencing trial.

232. As with the co-defendant life sentence factor, the jury's seemingly inexplicable vote here can perhaps be explained once again by the prosecution's two-step tactic at voir dire and during closing argument. During the general voir dire, the government propounded the following to the entire venire: "Would any of you have great difficulty in sentencing someone to death because of that individual's age? Okay. I take it by your silence that that would not be a problem. If someone was young would that make a difference?" No jurors responded to this

second question. T. 285. Those statements themselves are an erroneous statement of constitutional law, inviting the jury, as they did, to remove entirely from sentencer consideration the fact of Mr. Paul's youth.

233. The seed having thus been planted, the prosecutor sought to reap the harvest during final closing argument at sentencing, "reminding" the jury of their "assurances" given during voir dire: "Now the other factor is youth, and that's the question I asked you about on the second day [of voir dire], was would that make a factor [sic] with you? And all of you assured me that you could [sic] not." App. 211. This argument was a mis-statement of both the facts and the constitutional law governing the jury's sentencing determination. On the facts, the jury made no such "assurance" during voir dire. Yet the prosecution's clever characterization of the voir dire colloquy was intended to make jurors feel as if they could not consider Mr. Paul's youth without breaking a "promise" made to the prosecution during voir dire. On the law, this argument runs directly afoul of Eddings and the statutory requirement that jurors "shall consider" mitigating evidence such as youth. Here, rather than simply allowing the jury to find what was an obvious mitigating factor in the case, the government told the jury to keep their "promise" and refuse even to consider it in mitigation of punishment. As such it amounted to a direct invitation to the jury to refuse to follow the law. Apparently it worked, at

least with one half of the jury, who did indeed fail to consider Mr. Paul's youthfulness at all during their sentencing decision.

234. Whatever the explanation, the record is clear that the jury did not consider a relevant, constitutionally protected mitigating factor in their decision as to whether Jeffery Paul should live or die. No rational trier of fact could have found that Jeffery Paul was not youthful. Eddings, Johnson, Hitchcock, and the FDPA, required the sentencer to consider his youthfulness as a mitigating factor to weigh in the balance, and prohibited them from giving it no weight at all. The verdict form, however, coupled with the court's instructions, demonstrates that six members of the jury did just that. For these reasons, Mr. Paul's sentence of death must be reversed. Hitchcock, *supra*.

## XIII. Upon Information and Belief, The Trial Judge Was Biased Against the Defendant in this Case, Depriving Mr. Paul of His Rights As Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution

235. Upon information and belief, the trial judge in this case, the Honorable Jimm Larry Hendren, was biased against Mr. Paul, rendering his trial fundamentally unfair and depriving Mr. Paul of his right to due process and effective representation, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

236. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

237. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

238. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

239. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

240. The Federal Death Penalty Act of 1994 sets forth procedures for the prosecution of federal capital cases. 18 U.S.C. §3591(a) *et seq.* After passage of the Act, Attorney General Janet Reno promulgated a death penalty protocol, which can be found in §9-10.000 *et seq.* of the United States Attorney's Manual [the "Manual"]. That protocol provides for centralized review of any death penalty case decisions made by local U.S. Attorneys' offices, requiring such offices to seek and obtain approval by the Attorney General in order to have a case in which the indictment charges a capital count actually certified as a death penalty case.

241. As a part of the Attorney General's review process, the protocol establishes a "Review Committee on Capital Cases" [the "committee"], *see* Manual at §9-10.040, which has been variably comprised of several senior officials within the Department of Justice. After the Committee reviews a

particular case and makes a recommendation to the Attorney General, the Attorney General then decides whether the government may seek the death penalty. Any local federal prosecutor who wishes to withdraw a previously approved death notice must, under the protocol, notify the Department, seek a recommendation from the committee, and obtain approval from the Attorney General.

242. Mr. Paul and his co-defendant, Trinity Ingle, were both charged by indictment with §1111 murder for the crime of killing and/or aiding and abetting in the killing of Sherman Williams, a capital offense. Both cases were initially certified by the Attorney General for prosecution as death cases, apparently in accordance with the above procedures (although Mr. Paul has alleged elsewhere in this motion, incorporated herein by express reference, that the government committed misconduct during these procedures).

243. Mr. Paul's co-defendant, Trinity Ingle, was tried first, beginning in May, 1997, also in the Hot Springs Division of the U.S. District Court for the Western District of Arkansas, and also with the Honorable Jimm Larry Hendren, presiding. Within two weeks of the commencement of Mr. Paul's trial, Mr. Ingle received a sentence of life in prison from the jury.

244. Shortly after the jury returned a life sentence in the Ingle case, the committee unanimously voted to de-certify Mr. Paul's case as a death case,

presumably due to the fact that co-defendant Ingle had received a life sentence. *See e.g.*, 18 U.S. C. §3592(a)(4) (providing as a statutory mitigating factor that "another defendant or defendants, equally culpable in the crime, will not be punished by death.").

245. During the intervening two week period, however, the trial judge in this case, the Honorable Jimm Larry Hendren, expressed his concerns about the fact that the committee had de-certified Mr. Paul's case for death. He voiced these concerns in the presence of trial counsel, and in the presence of counsel for Mr. Ingle, and in the presence of other individuals. In once such instance Judge Hendren expressed these concerns during a conference with counsel in the Paul case; such conference, however, was either not reported or, if it was, a transcript of the proceeding was not a part of the official court record made available to undersigned counsel. Of particular concern to Judge Hendren was his understanding that the committee did not have the authority to de-certify the case, and that only he, Judge Hendren, had such authority once the case had originally been certified as a death case. He voiced with clear disgruntlement his concern that the committee had voted to de-certify the death notice in Mr. Paul's case.

246. Shortly thereafter, again within the two week period intervening the two trials, Attorney General Janet Reno overrode the unanimous committee

recommendation to de-certify the case. At that point in time, and possibly throughout her tenure as Attorney General for the United States, Ms. Reno had never overridden a unanimous recommendation of the committee. The record contains no explanation, however, for Ms. Reno's decision to override the unanimous committee recommendation in this case.

247. The above facts, and facts that may be developed after discovery has been authorized as requested in the accompanying motion for discovery, incorporated herein by express reference, demonstrate that the Honorable Jimm Larry Hendren was biased against Mr. Paul and had a personal point of view regarding whether Jeff Paul should face the death penalty for whatever role, if any, he played in the crimes committed against Sherman Williams. Such bias rendered Mr. Paul's trial unfair and denied to him due process.

248. A long line of Supreme Court cases reflect the general principle that the appearance of justice is critical to the functioning of our justice system, and that due process is violated whether or not actual bias is shown, when merely the appearance of such is raised by the evidence. Thus in Tumey v. Ohio, 273 U.S. 510, 532 (1927) the Court held that "[e]very procedure which would offer a possible temptation to the average man as a judge ... not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of

law." As a starting point, "[f]airness of course requires the absence of actual bias in the trial of a case." In re Murchison, 349 U.S. 133, 136 (1955).

249. Critically, for this reason, due process is violated "by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties...." even if it merely appears that such bias is possible: "to perform its high function in the best way, 'justice must satisfy the appearance of justice.'" *Id.* at 136; *see also* Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986) ("The Due Process Clause may sometimes bar trial by judges who have no actual bias.... But to perform its high function in the best way, justice must satisfy the appearance of justice." (Internal quotation marks and citations omitted.)).

250. As the Supreme Court explained in Aetna, determining whether a judge's participation in a case violated the litigants' due process rights does not require determining whether the judge was in fact influenced against a party. Aetna, 475 U.S. at 825. Rather, sometimes the appearance of bias is sufficiently strong that a judge must be disqualified without any showing that he was in fact biased.[30]

---

[30] The Supreme Court has repeatedly referred to this "appearance of justice" standard as the benchmark for determining cases of judicial bias. *See, e.g.,*

(continued...)

251. In Murchison, *supra*, the Court held that the judge's combination of prosecutorial and adjudicatory functions in the same case violated due process. In that case, a state court judge acted as a "one-man grand jury" investigating police corruption. Two witnesses before the judge in his role as grand juror answered questions in such a way as to convince the judge that those witnesses had committed contempt. The judge charged the two witnesses with contempt and subsequently tried and convicted them. 349 U.S. at 134-35. The Supreme Court held that the trial before the same judge who brought the contempt charges violated the defendants' right to due process. "Having been part of [the accusatory process] a judge cannot be, in the very nature of things, wholly disinterested in the

[30](...continued)
Concrete Pipe and Products of California, Inc. v. Construction Laborers Pension Trust for Southern California, 508 U.S. 602 (1993); Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847, 865 n. 12; Aetna Life Insurance Co. v. Lavoie, 475 U.S. 813, 825 (1986); Schweiker v. McClure, 456 U.S. 188 (1982); Marshall v. Jerrico, Inc., 446 U.S. 238 (1980); Mayberry v. Pennsylvania, 400 U.S. 455, 465 (1971); In re Murchison, 349 U.S. 133, 136 (1955); Offutt v. United States, 348 U.S. 11, 14 (1954); *cf.* J.E.B. v. Alabama, 511 U.S. 127 (1994) (Scalia, J., dissenting, joined by Rehnquist, C.J., and Thomas, J.) ("Wise observers have long understood that the appearance of justice is as important as its reality."); Taylor v. Hayes, 418 U.S. 488, 501 (1974); (at issue was whether the judge was able to "'hold the balance nice, clear and true between the State and the accused....' In making this ultimate judgment, the inquiry must be not only whether there was actual bias on respondent's part.... 'Such a stringent rule may sometimes bar trial by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties,' but due process of law requires no less.") (citations omitted.).

conviction or acquittal of those accused." *Id.* at 137; *cf.* Fed. R. Crim.Pro. 11(e) (prohibiting court from participating in any pre-trial negotiations between the parties concerning sentence and plea agreements).

252. In Mayberry v. Pennsylvania, 400 U.S. 455 (1971), during the course of his trial the defendant referred to the trial judge using epithets and charged the trial judge with running a "Spanish Inquisition," telling the judge to "Go to hell." *Id.* at 466. The Court in that case held that the trial judge to whom these remarks were made could not sit as the trial judge in a subsequent contempt proceeding in the face of this abuse. The litigant's insults were "apt to strike 'at the most vulnerable and human qualities of a judge's temperament.'" *Id.* (*quoting* Bloom v. Illinois, 391 U.S. 194, 204 (1968)). *See also* Taylor v. Hayes, 418 U.S. 488 (1974) (judge who had become embroiled in a "running controversy" with an attorney that resulted in "marked personal feelings ... on both sides," and during which the judge had displayed an "unfavorable personal attitude" toward the attorney, could not try the attorney for contempt).[31]

---

[31] Although not directly relevant to this claim, the Mayberry decision at least raises a question whether the Court should act as the arbiter of Mr. Paul's §2255 motion. As noted elsewhere in this motion, incorporated herein by express reference, at trial Mr. Paul engaged in behaviors and actions which were hostile, disruptive, and even at times offensive. At times he directed these behaviors toward the Court. Thus under the reasoning in Mayberry, which required a (continued...)

253. All of the above apply with force in a capital case where a person's life is at stake. In such circumstances, where the consequences of error are so grave, courts must be especially vigilant in protecting the defendant's constitutional rights. "Because the death penalty is qualitatively and morally different from any other penalty, 'it is of vital importance to the defendant and to the community that any decision to impose the death sentence be, and appear to be, the consequence of scrupulously fair procedures." Sawyer v. Whitley, (Stevens, J., concurring), *quoting* Smith v. Murray, 477 U.S. 527, 545-546 (Stevens, J., dissenting)).

---

[31](...continued)
different judge to sit in post-trial judgment of the defendant who had insulted the trial judge, a similar result may be appropriate here in light of these behaviors and the remaining facts set forth in this claim, this motion, and the accompanying motion for discovery, all of which are incorporated herein by express reference. *Cf.* Withrow v. Larkin, 421 U.S. 35, 39-41 (1975)(explaining the Murchison facts as violative of due process "not only because the judge in effect became part of the prosecution and assumed an adversary position, but also because as a judge, passing on guilt or innocence, he very likely relied on 'his own personal knowledge and impression of what had occurred in the grand jury room' an impression that 'could not be tested by adequate cross- examination.'" 421 U.S. at 53 (*quoting* Murchison, 349 U.S. at 138)).

**XIV. Upon Information and Belief This Court's Sentencing Phase Instruction Allowing Only Those Jurors Who Found the Existence of A Mitigating Factor to Consider It Violated Mr. Paul's Rights As Guaranteed Under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments**

254. Upon information and belief, this Court's sentencing phase instruction allowing only those jurors who found the existence of a mitigating factor to consider it violated Mr. Paul's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

255. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

256. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

257. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

258. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

259. This Court instructed the jury at sentencing as follows:

> All of you must weigh any aggravating factors that you unanimously found to exist, whether statutory or non-statutory, and *each of you must weigh any mitigating factors that you individually find to exist.*

T. 1129 (emphasis added). This instruction violated the FDPA, and precluded full jury consideration of all mitigating evidence, in violation of Mr. Paul's constitutional rights.

260. The FDPA specifically provides that a single juror may make a *finding* as to the existence of a mitigating factor. *See* 18 U.S.C. §3593(d). The statute then provides: "...the jury, or if there is no jury, the Court, shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist ..." 18 U.S.C. §3593(e) (emphasis added). Reading these sections together, the statute appears to require that "the

[entire] jury" consider any mitigating factors found by any of its members. The Supreme Court's recent interpretation erases any ambiguity.

261. In Jones v. U.S., 119 S.Ct. 2090, 1999 WL 401258 (U.S.) (June 21, 1999), the Court faced its first case brought under the FDPA. In deciding the issues before it, the Court reviewed the structure of the capital sentencing scheme set forth in the Act. Summarizing the content of the two sections noted above, the Court stated: "the jury may consider a mitigating factor in its weighing process so long as one juror finds that the defendant established its existence by a preponderance of the evidence." *Id.* at *3, *citing* §3593(c), (d). While disagreeing with the majority's resolution of other issues in the case, the dissenting justices were in accord on this aspect of the statute: "[A] mitigating factor may be considered in the jury's weighing process if any one juror finds the factor proved by a 'preponderance of the evidence.'" Jones, *supra*, at *18, *citing* §3593(d). Thus, contrary to the instruction given in Mr. Paul's case, the Supreme Court unanimously read the pertinent sections of the FDPA to require full jury consideration of any mitigators found by one or more jurors. This Court's instructions violated Jones.

262. In this case, the error was not harmless. The jury that sentenced Mr. Paul to die found four mitigating factors by less than a unanimous vote. *See* App.

91-92 (verdict form indicating: statutory factor (4) regarding defendant's background – 3 votes; nonstatutory factor (4) regarding parental irresponsibility – 8 votes; nonstatutory factor (7) regarding defendant's youth – 6 votes; additional factor found by jury regarding defendant witnessing shooting in mall – 6 votes). Under the Court's instruction, these four factors were not considered by all members of the jury during the weighing of aggravating and mitigating factors; instead, only those jurors who to find such factors were allowed to consider them in the balance.

263. Such a disharmonious sentencing deliberation, with some jurors considering some mitigating factors, and others jurors considering other mitigating factors, was surely not the result Congress intended. The FDPA reflects a clear commitment to a unanimous jury process at sentencing. It requires a unanimous jury vote for a life sentence, and a unanimous vote for a death sentence. 18 U.S.C. §3593(e). Absent unanimity, the judge is required to impose the appropriate sentence. 18 U.S.C. §3593(d). Congress obviously placed a premium upon jury agreement.

264. In allowing different jurors to consider different facts about the defendant in determining sentence, the instructions here produced the opposite result. Under these instructions, the possibility exists that twelve different jurors

could completely disagree as to the mitigating evidence, and thus, while deliberating, be considering twelve different mitigating portraits of the defendant in determining the appropriate sentence. Indeed, in Mr. Paul's case, one can only imagine the discussion during jury deliberations, with some jurors arguing for a life sentence based upon facts about Jeff Paul's young age, or disadvantaged background, while at the same time others refusing even to listen to such arguments "*as a matter of law*," Eddings. One is reminded of two proverbial scenarios: (1) the image of ships passing one another at night unaware of the other; and, (2) an elephant being described by several non-seeing persons in completely different ways depending upon which part each is touching. Such a process, if legitimated by this Court, will likely lead to hung juries more often than not, which is precisely what Congress meant to avoid. Reading the statute as a whole, it cannot be fairly said that Congress intended to permit such a cacophonous consideration of the defendant's character and background. For this reason, this Court should hold the instructions invalid under the FDPA, and grant Mr. Paul a new sentencing trial before a properly instructed jury.

**XV. Upon Information and Belief The Government's Reliance Upon Vague, Overbroad, and Otherwise Improper Aggravators at Sentencing Violated Mr. Paul's Rights Under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments**

265. Upon information and belief, the government's reliance upon vague, overbroad, and otherwise improper aggravators at sentencing in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

266. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

267. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through

the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

268. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

269. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended §2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or

evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

270. At sentencing the government relied upon several aggravating factors which were arguably vague and overbroad, and otherwise improper. The relevant Eighth Amendment principles in this context are well settled. As the FDPA is a "weighing" statute, *see* U.S. v. Jones, 132 F.3d 232, 250 (5th Cir. 1998), *cert. granted and aff'd on other grounds*, 119 S.Ct. 2090, (U.S.) June 21, 1999, the sentencing jury was required to balance aggravating and mitigating factors found to exist. A death sentence is permitted only if the jury unanimously finds that the aggravating factors sufficiently outweigh the mitigating factors to justify such sentence. 18 U.S.C. §3593(e).

271. Aggravating factors utilized in capital sentencing schemes cannot be "of vague or imprecise content" such that they fail to channel the sentencer's discretion. Stringer v. Black, 503 U.S. 222, 237 (1992). "[A] statutory aggravating factor is unconstitutionally vague if it fails to furnish principled guidance for the choice between death and a lesser penalty," Richmond v. Lewis,

506 U.S. 40, 46 (1992) (citations omitted), and "fails adequately to inform juries what they must find to impose the death penalty." Maynard v. Cartwright, 486 U.S. 356, 361-62 (1988). "An aggravating circumstance is invalid . . . if its description is so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor." Espinosa v. Florida, 505 U.S. 1079, 1081 (1992). Additionally, if the sentencer "could fairly conclude that an aggravating circumstance applies to *every* defendant eligible for the death penalty, the circumstance is constitutionally infirm." Arave v. Creech, 507 U.S. 463, 474 (1993) (emphasis in original).

272. The defense sought to prohibit the government from reliance upon vague aggravating factors prior to trial. App. 51. The Court denied the defense motion in all respects but one (refusing to allow use of "low rehabilitation potential" as a separate factor apart from future dangerousness factor). T. Pre-Trial Hearing, June 11, 1997 at 25-27.

273. In this case, several aggravating factors relied upon by the government were either vague and/or overbroad. The Court's instructions regarding the "heinous, cruel or depraved" (c)(6) aggravating factor, *see* App. 186-88, were confusing and contradictory. The Court defined each of the three operative terms, "heinous," "cruel" and "depraved," in terms of torture. *Id.* at 1122. The Court

then defined torture in terms of "mental as well as physical abuse" of the victim, and instructed that the victim must have been conscious of the abuse at the time inflicted. *Id.* The Court also instructed that with respect to such abuse, the defendant must have specifically intended to inflict serious mental or physical pain upon the victim. *Id.* Finally, the Court instructed that serious physical abuse may be inflicted either before of after death, and that it *does not* require the victim to be conscious. App. 188.

274. This lengthy and convoluted definition contradicts itself in a way that renders it meaningless and, as such, intolerably vague. Initially it instructs the jury that the victim must have been conscious of the torture being inflicted upon him to satisfy the (c)(6) factor. Then the instruction indicates that the victim need not be conscious of the torture to satisfy this factor. It cannot be both. Any reasonable juror would have had no idea as to the requisite findings. This level of confusion and vagueness in a statutory aggravator does not pass constitutional muster. Espinosa, *supra.*; *cf.* Newlon v. Armontrout, 885 F.2d 1328, 1333-1335 (8th Cir. 1989) *cert. denied* 497 U.S. 1038 (1990) ; Battle v. Delo, 19 F.3d 1547, 1562 (8th Cir.1994), *opinion adhered to as modified* 64 F.3d 347 (1995), *cert. denied* 517 U.S. 1235 (1996); *see also* Mathenia v. Delo, 975 F.2d 444, 449 (8th Cir.1992), *cert. denied*, 507 U.S. 995 (1993).

275. The Court also instructed on the non-statutory aggravating circumstance regarding Mr. Paul's alleged lack of remorse. App. 189-90. Here the government sought Mr. Paul's execution in part based on evidence that the "victim begged for his life." *Id.* This alleged fact (the only evidence of which came from statements he allegedly made to acquaintances) does not relate to the concept of remorse and thus renders it meaningless. Remorse commonly refers to regret for a wrong committed in the past. What the victim may have said at the time of the offense is not relevant to whether Mr. Paul was later remorseful for his involvement in the crime. At least one federal district court has disallowed "lack of remorse" as a non-statutory aggravator due in part to its ambiguousness. *See* U.S. v. Davis, 912 F. Supp. 938, 945 (E.D.La. 1996) *aff'd*, 132 F.3d 1454 (5th Cir. 1997), *cert. denied*, 118 S.Ct. 1331 (1998). This Court should follow the court's lead in Davis and invalidate this factor as used here.

276. Here too, the evidence was itself ambiguous with respect to Mr. Paul's state of remorse after the offense. Government witness Rogers testified that when Mr. Paul allegedly told him about the offense two nights after it had happened, he was very upset about it. T. 689. Government witness LaPaglia testified that when Ingle called her the night of the offense, he said Mr. Paul was upset. T. 705. She confirmed this fact when Paul later called himself and said he was upset. T. 707.

In such a situation, the better course would have been to avoid any such ambiguity, especially because "[l]ack of remorse is a subjective state of mind, difficult to gauge objectively since behavior and words don't necessarily correlate with internal feelings." Davis, *supra*, at 945.

277. In addition, the government also sought and obtained a jury finding on an aggravating factor that the defendant had successfully eluded capture by the FBI until his arrest in August, 1996. App. 86 (jury verdict form). This factor, to the extent it had any relevance beyond the scope of the future dangerousness factor noted above, was an improper factor for use in aggravation of punishment. While the fact might relate to considerations regarding whether he would be a threat to society in the future, its relevance to any issue beyond that fact is either non-existent, or worse yet, wholly inappropriate as a separate basis on which to sentence a person to death. The only reasonable relevance this factor may have had apart from future dangerousness highlights the government's inability to track down, capture, and successfully arrest Mr. Paul. Such governmental reliance upon their own failings as a basis for concluding that Mr. Paul is more deserving of death than someone whom the government is able to arrest more quickly "fails to furnish principled guidance for the choice between death and a lesser penalty," Richmond, *supra* at 46.

278. Finally, the government's particular utilization of two factors, the statutory vulnerability of victim factor, *see* §3592(c)(11), and the non-statutory victim impact factor, resulted in another vagueness and overbreadth problem. Here the government sought to portray the victim as "helpless" and "vulnerable" due to his old age, while at the same time healthy, in good shape, and having years of life left *despite* his age. In its presentation of sentencing phase evidence, in closing argument, and in the drafting of the non-statutory victim impact factor, the government portrayed Mr. Williams as a man who, though elderly, was strong, in good health, and had many years of life left in him. T. 939 (victim's daughter describes Mr. Williams as avid runner and fisherman, thin, fit, ate well and ran for health); T. 944 (daughter noting how loss of healthy, active parent harder than if infirm due to old age); App. 204 (prosecutorial argument that victim "still had a lot of years left in his life to enjoy"); App. 88 (verdict form on victim impact factor includes "avid jogger"). Nevertheless, the government specifically relied upon, and argued the fact that, because of his age, he was particularly vulnerable. Thus the government relied upon contradictory factors and evidence to stack the balance against Mr. Paul at sentencing.

279. Each of these factors were "so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor."

Richmond, *supra*. The vagueness problem was exacerbated in some instances by the fact that the jury was given no clear and consistent definition of the operative terms. *See* Walton v. Arizona, 497 U.S. 639, 653 (1990) ("it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face.").

280. The Supreme Court has identified several constitutional concerns arising from the government's reliance upon vague or ill-defined aggravating factors. First, use of such factors in the weighing process "creates the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be by relying upon the existence of an illusory circumstance." Stringer, 503 U.S. at 237. Reliance upon vague aggravating factors also creates the "possibility . . . of randomness," *id.*, by providing no definitions, or worse yet, confusing and contradictory definitions of the operative terms, and permitting the jury to find factors without any common understanding of their meaning. Finally, use of such vague factors placed a "thumb [on] death's side of the scale," creating a bias in favor of the death penalty. Stringer, *supra*.

281. These errors were not harmless in this case. Taken singly, or together, the invalidation of any of these factors would have upset the balance

between aggravating and mitigating evidence in this case. By placing a "thumb on death's side of the scale," Stringer, *supra*, these vagueness errors resulted in an unconstitutional sentence of death. Mr. Paul also urges this Court to avoid any attempt to re-weigh the sentencing phase factors in this case once it is determined that the above were invalid. Because of the extent of the errors in the jury's consideration of *both* aggravating and mitigating evidence set forth throughout this Brief, Mr. Paul suggests the prudent course is to either remand for the imposition of a life sentence, or for a new sentencing proceeding conducted free of the variety of errors that plagued Mr. Paul's trial.

**XVI. Upon Information and Belief The Prosecution's Reliance Upon Aggravating Factors Which Were Duplicative Of One Another And Relied Upon The Same Operative Facts Violated Mr. Paul's Rights Under the FDPA and the Fifth, Sixth, Eighth And Fourteenth Amendments**

282. Upon information and belief, the prosecution's reliance upon aggravating factors which were duplicative of one another and relied upon the same operative facts violated Mr. Paul's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

283. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

284. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

285. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

286. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

287. The prosecutor relied upon, and the Court instructed the jury regarding, the statutory "heinous, cruel and depraved" (c)(6) instruction, *see* App. 83, 186-88, and the statutory "vulnerability of victim" (c)(11) aggravator, *see* App. 83, 186. Because of the Court's definitions of operative terms in the (c)(6) instruction, there is a reasonable likelihood the jury understood the instructions to allow the finding of two separate factors from identical facts. Boyd v. California, 494 U.S. 370, 380 (1990).

288. The Court's instruction on the (c)(6) aggravator first defined each of the three terms, "heinous," "cruel" and "depraved." App. 187. The Court noted that they were stated in the disjunctive, meaning that a finding of any one of them was sufficient for the jury to find the existence of the (c)(6) aggravator. App. 186-87. The Court then instructed that, as a general matter, "pertinent factors" in

determining whether any one of the three terms existed included the "helplessness of the victim." App. 187-88. In effect, therefore, the jury was instructed as a matter of law that it could find the (c)(6) aggravating factor so long as it found that the victim was helpless.

289. With respect to the (c)(11) "vulnerability of the victim" factor, the verdict form only indicated that the victim's vulnerability was due to "old age." App. 84. Although the Court's instruction failed to define either "vulnerable" or "helpless," in everyday usage these terms readily connote common ideas. *Cf.* Arave v. Creech, 507 U.S. 463, 472 (1993) ("We assume that legislators use words in their ordinary, everyday senses... resort to dictionaries for the common meaning" of words is acceptable practice) . This is of course especially true as applied to the facts of this case. That is, the victim, an elderly man, would have been seen as particularly helpless in large part due to his old age.

290. The improper doubling here was as much a product of the government's argumentative use of these factors as it was of the Court's instructions. Well aware of the connection between the concept of helplessness under (c)(6) and the concept of vulnerability under the (c)(11) factor, the prosecutor capitalized on this commonality by repeatedly referring to the victim's old age in support of each factor. With respect to the (c)(6) factor, he expressly

noted that the "helplessness of the victim" was to be considered, and then immediately noted that the victim was "an 82 year old man." App. 203. He continued to comment upon the victim's age and his status as a grandfather in discussing the (c)(6) factor. App. 203-04. When discussing the victim vulnerability factor, he immediately noted that the victim was "an 82 year old man." App. 204. Thus the government sought a finding of two aggravating factors based upon the same evidence, namely, that the victim was elderly.

291. As note elsewhere, the defense filed several pre-trial motions aimed at preventing precisely the type of error noted here. The defense sought, at the very least, a hearing prior to the start of the sentencing phase to assess and screen the government's aggravating evidence to ensure its reliability, and re-urged the request at the start of the sentencing phase. App. 31; T. Pre-trial Hearing June 11, 1997 at 18-24, T. 916-17. Nevertheless, the Court denied all such motions. *Id.* at 27, 33, 42 & T. 916-17.

292. The Supreme Court faced a similar issue recently in Jones v. U.S., 119 S.Ct. 2090, 1999 WL 401258 (U.S.) June 21, 1999. There the Court addressed the contention that the jury was allowed to find two separate nonstatutory aggravating factors based on similar sets of facts. *Id.* at *12-*17. A majority of the Court failed to agree on the proper resolution of the question whether the aggravating

factors there were unconstitutionally overbroad, vague, or duplicative. *See id.* at*1, *17, *25 (only four justices concur in section III-A of opinion, in which Court addresses noted arguments; Scalia, J., fails to join that section of opinion). The Court nevertheless affirmed the Fifth Circuit's affirmance of the death sentence, because a majority did agree that, whether or not there was error, it was harmless under the facts of that case. *Id.* at *16-*17 (part III-B of opinion, in which five justices concurred). Furthermore, although commenting upon the Tenth Circuit's decision in U.S.. v. McCullah, 76 F.3d 1087, 1111 (10th Cir. 1996), *cert. denied* 520 U.S. 1213 (1997) (finding reversible error with this type of double-counting of aggravators), and the Fifth Circuit's decision in Jones, (finding that constitutional error could result from such double-counting error), the four-justice plurality opinion in Jones did not reverse either the McCullah case or that aspect of the Fifth Circuit decision finding that such error was possible in the right case. Jones, *supra*. at *13-*14. Indeed, the plurality simply noted: "We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the 'double counting' theory that the Tenth Circuit advanced in McCullah and the Fifth Circuit appears to have followed here." *Id.* at *14. The Court then accepted "for the sake of argument,

Mr. Paul's 'double counting' theory", and found that it did not render Jones' sentence unconstitutional under the facts of that case. *Id.*

293. The doubling between the heinousness factor and the vulnerability of the victim factor here violated the letter and spirit of the Jones plurality. Unlike in Jones, here the Court effectively instructed the jury that both factors could be found based upon the same piece of evidence, namely, the helplessness of the victim due to his old age. The prosecutor's argument repeated this view. In Jones, the aggravators in question referred to distinct aspects of the victim: one referred to the personal characteristics of the victim which the family would miss, while the other referred to characteristics about her vulnerability, i.e., her size, young age, etc. 1999 WL 401258 at *14. Here, the same aspect of the victim, namely his old age, was allowed to be the basis for a finding of two aggravating factors.

294. In Jones the Court also relied upon the fact that the government's closing arguments separated the distinct facts and aggravators. *Id.* at *14 ("to the extent that there was any ambiguity arising from how the factors were drafted, the Government's argument to the jury made clear that [the two factors in question] went to entirely different areas of aggravation...."). By contrast here, the prosecution specifically argued that the victim's age was an important fact in the jury's consideration of both the (c)(6) and the (c)(11) statutory aggravators.

295. Mr. Paul's view here is supported by the Tenth Circuit's decision in McCullah. There the Court found that where one aggravating factor "substantially overlaps" another, constitutional error results. 76 F.3d at 1111. Indeed, in commenting upon the denial of rehearing en banc, the Court held that the issue arose because the factors "were predicated upon the same acts" by the defendant. U.S. v. McCullah, 87 F.3d 1136, 1138 (10th Cir. 1996) (denying rehearing en banc). This was true even though one factor was broader than the other; so long as one factor was "subsumed by" the other, the doubling was invalid. In similar circumstances, numerous state court have held that reliance upon the same piece of evidence to support more than one aggravating factor in a capital sentencing scheme is unconstitutional. *See e.g.*, Enberg v. Meyer, 820 P.2d 70, 89 (Wyo. 1991); Kennedy v. State, 455 So.2d 351, 354 (Fla. 1984), *cert. denied* 469 U.S. 1197 (1985).

296. The error was not harmless in this case. "[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." Stringer v. Black, 503 U.S. 222, 230-36 (1992). As noted elsewhere in this brief, the FDPA is a *weighing* statute, 18 U.S.C. § 3593(e), and therefore the jury's finding of improper aggravating factors skewed the weighing

process by "creat[ing] ... bias in favor of the death penalty...." Stringer v. Black, 503 U.S. 222, 236 (1992).

297. Mr. Paul urges the Court not to attempt a re-weighing of whatever aggravating and mitigating factors survive and/or arise from the challenges set forth elsewhere in this motion, incorporated herein by express reference. In part this is due to the fact that the sentencing phase was replete with error, making re-weighing inappropriate. In part this is due to the fact that, with respect to the current issue, the victim's age was a central element of the government's case for death; such centrality of the underlying facts in support of these aggravators makes re-weighing an impossible task.

298. Even if re-weighing were employed, Mr. Paul must prevail. Mr. Williams' age and helplessness as an older man was of critical importance to the prosecution's sentencing phase case for death. The government relied heavily in their sentencing presentation, and in argument, upon the fact that Mr. Williams was a particularly vulnerable victim, and his murder especially heinous, because he was a helpless senior citizen. Both of these factors were statutory aggravators, at least one of which was required to be found in order for Mr. Paul to be eligible for the death sentence. 18 U.S.C. §3593(c). Given the pivotal role Mr. Williams' age played in the government's case for death, there can be no question that the

jury's finding of these two statutory aggravators was given substantial weight in the balance. Absent these factors, it is highly likely that the jury in this case would have returned a life sentence. For all of these reasons, Mr. Paul respectfully urges the Court to grant a new sentencing trial.

**XVII. Upon Information and Belief The Victim Impact Evidence Introduced At the Sentencing Phase of Mr. Paul's Trial Produced A Death Sentence Based Upon Emotion Rather Than Reason, In Violation Of the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments**

299. Upon information and belief, the victim impact evidence introduced at the sentencing phase of Mr. Paul's trial produced a death sentence based upon emotion rather than reason, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

300. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

301. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

302. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

303. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

304. Before the beginning of the penalty phase of Mr. Paul's trial, he filed a motion *in limine* to exclude all victim impact evidence, asserting that under the decision in Payne v. Tennessee, 501 U.S. 808 (1991), admission of such testimony would inevitably lead to a violation of his Eighth Amendment rights. App. 13. The Court rejected this motion categorically, without proscribing any limitations upon the government's presentation of, or reliance upon, such evidence at the sentencing phase of trial. App. 25; 68; T. Pre-trial Hearing June 11, 1997 at 7. Mr. Paul then requested prior to trial that the court hold a pre-trial evidentiary hearing to determine the scope and admissibility of the government's evidence in support of the non-statutory aggravating factors. App. 31; T. Pre-trial Hearing June 11, 1997 at 18-24; T. 916-17. The Court denied all such requests. *Id.* at 27; T. 917.

305. Pursuant to these rulings, the government presented the testimony of three witnesses, two daughters of the victim, and one long-term co-worker. *See* T. 934-962. Taken together, the evidence presented by these witnesses interjected a constitutionally intolerable level of emotion into the sentencing proceeding and created a corresponding risk that Mr. Paul's sentence was the product of emotion overwhelming reason. Mr. Paul's sentence "[was not], and [does not] appear to be, based on reason rather than caprice or emotion." Gardner v. Florida, 430 U.S. 349, 358 (1977).

306. In Payne v. Tennessee, the Supreme Court overturned Booth v. Maryland, 482 U.S. 496 (1987) and South Carolina v. Gathers, 490 U.S. 805 (1989), to hold that the Eighth Amendment does not prohibit admission of victim impact evidence at the penalty phase of a capital trial. In banning victim impact evidence, the Booth Court had concluded that the introduction of such evidence violated two Eighth Amendment requirements for capital sentencing proceedings: the need for "heightened reliability," and the need for an "individualized determination" based on the "character of the [defendant] and the circumstances of the crime." Booth, 482 U.S. at 502, citing Zant v. Stephens, 462 U.S. 862 (1983). Victim impact evidence, the Court reasoned in Booth, is irrelevant to the individualized consideration of the defendant's guilt, and "its admission creates a

constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.*

307. The Payne Court disagreed, finding that Booth "unfairly weighted the scales in a capital trial," 501 U.S. at 822:

> [W]hile virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering 'a glimpse of the life' which a defendant 'chose to extinguish,' or demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide.

*Id.*, *citing* Mills v. Maryland, 486 U.S. 367, 397 (1988) (Rehnquist, J., dissenting). On this basis, the Court held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." *Id.* at 827. The Court dismissed Booth's concerns that victim impact evidence would invite arbitrary and capricious, emotion-driven sentencing, noting that "in the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825. *See also id.* at 836 (Souter, J., concurring) ("there is a traditional guard against the inflammatory risk [of victim impact testimony], in the trial judge's authority and responsibility to control the proceedings consistently with due process, on which ground defendants may object and, if necessary, appeal").

308. In permitting the introduction of limited victim impact evidence – which "offer[s] *'a glimpse of the life'* which a defendant 'chose to extinguish,' or demonstrat[es] the *loss to the victim's family and to society* which has resulted from the defendant's homicide," Payne, 501 U.S. at 822 (emphasis supplied) – the Court did not intend to eviscerate the capital defendant's Eighth Amendment right to a reliable, individualized sentencing determination. Nor did it intend for a capital sentencing proceeding to become a contest between the worth of the victim and that of the defendant.[32] It sought instead to strike a balance between victim impact evidence and the defendant's Eighth Amendment rights. Such a balance is to be safeguarded by the trial court's "authority and responsibility to control the proceedings consistently with due process," 501 U.S. at 836, to restrict the

---

[32] In responding to Payne's concern that the comparative worth between victim and defendant should not be a relevant capital sentencing factor, the Court stated:

> As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind – for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead each victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be.

501 U.S. at 823-24.

presentation of victim impact evidence sufficiently that the emotion inherently associated with such evidence does not overwhelm the jury's responsibility to make a reliable, individualized sentencing determination based on a full and fair consideration of the mitigating and other aggravating circumstances.

309. Notwithstanding the dramatic shift in the law occasioned by its holding, Payne provided virtually no guidance for determining the scope of appropriate victim impact evidence, and even less for determining when that evidence is unduly prejudicial. Nor can guidance be found in other lower federal court decisions, for before Mr. Paul's case, the federal courts had few opportunities to address these issues in the context of a trial and direct appeal under the FDPA. For these reasons, Mr. Paul urged the Court to provide some level of guidance (which is lacking in the FDPA) with respect to the proper scope of such evidence. Instead, the Court denied the defense motion outright without any stated restrictions or limitations.

310. Other jurisdictions have had more time to wrestle with implementing Payne's allowance for some victim impact testimony while simultaneously protecting the defendant's right to individualized sentencing and the avoidance of arbitrariness and emotion. For example, in State v. Bernard, 608 So.2d 966 (La. 1992), the court fashioned a cautionary principle which, if adhered to closely,

might prevent the victim impact evidence from overwhelming the sentencing process:

> [I]ntroduction of detailed descriptions of the good qualities of the victim or particularized narrations of the . . . sufferings of the victim's survivors, which go beyond the purpose of showing the victim's individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury's sentencing decision.

608 So.2d at 972. Other courts have adopted a similarly cautious approach. *See, e.g.*, State v. Muhammad, 145 N.J. 23, 45-48 (1996); Cargle v. State, 909 P.2d 806, 830 (Okla.Crim.App. 1995), *cert. denied*, 519 U.S. 831 (1996).

311. Mr. Paul's request for a pre-trial evidentiary hearing on the government's proposed non-statutory aggravating evidence, which would have included victim impact evidence (a non-statutory aggravating factor), was the approach adopted by the court in Davis, *supra*, as well as that taken in state courts across the country. There, pre-trial hearings are held to hear and determine the admissibility of victim impact evidence. *See* State v. Muhammad, 145 N.J. at 45-48, 678 A.2d at, 175-177; Cargle v. State, 909 P.2d at 828; State v. Bernard, 608 So.2d at 672. Such hearings might have allowed the Court to eliminate certain areas of testimony or certain questions which were likely to elicit emotional testimony, or which delved in far too much detail into the victim's life story and

his specific interests, habits, daily routines, and other facets of his life that ultimately provided significantly more than "a brief glimpse" into his life.

312. To illustrate Mr. Paul's concern, the record of the government's presentation at sentencing must be closely evaluated. At the outset it bears noting that the government's *entire* evidentiary presentation at sentencing focused on the victim – Sherman Williams, his personal characteristics, and a detailed re-telling of his complete life story. Indeed, *all* of the evidence offered by the prosecution in support of a sentence of death during the second phase of trial was about the victim, providing an elaborate recitation from two daughters (Mary McKuin and Carole Sherman) and one life-long co-worker (Lawrence McCollough) describing Mr. Williams' life history starting with childhood, his habits, hobbies, personality, interests, work career, and many other facets of his life.

313. Ms. McKuin described her father's life, in great detail, from childhood until shortly before his death. She talked of her father's family, the number of siblings he had, where they lived, and their modest means. T. 935. She talked about her father's parents, how they were teachers in the rural community in which he was raised. *Id.* Ms. McKuin described how her father was the first in his family to attend college, how he graduated in three years, and how his sister had supported him financially through school. T. 935-36. She explained how he

experienced tough times during those years, working while not in school, first at an ice cream plant, later on farms, sometimes living in the barns he worked at to support himself. *Id.* She described when she and her sister were born, and how his father's feelings of indebtedness to his sister put a strain on their family in the early years. T. 937. Ms. McKuin told of how her father joined the army during World War II, became a sergeant, and was later recalled into service during the Korean War. *Id.*

314. Ms. McKuin also talked at length about Mr. Williams' lifetime career with the Farmers Home Administration ["FHA"] of Arkansas, how he started in the lower ranks in 1939, and worked his way to the top, retiring as Director in 1979. T. 936-38. She also talked about her father's special love for rural parts of the state, traveling as he did all across the State of Arkansas for job-related reasons. She told of her father's accomplishments while at the FHA, how he brought water and sewer systems to many rural areas throughout the State. T. 938. She described how, through his work, her father picked up some skills in kitchen design, and often while working with farming families would assist housewives in building more convenient kitchen facilities. T. 939. She said that he loved his job, and that work was his primary "hobby." *Id.* She described how he developed

skills in photography through the FHA, as he was required to photograph the places and projects he oversaw. *Id.*

315. Ms. McKuin related a number of personal attributes about her father. She described how he enjoyed taking pictures of the same places in different seasons. T. 939. She talked about how he loved to fish, taking his fishing gear with him in the trunk of his car on work trips. *Id.* She described his love of walking and jogging, and how he was a very thin, fit, tall man. She said he ate well and ran for his health, describing him as a man ahead of his time. *Id.*

316. Ms. McKuin told how her father came to live in the retirement community on the lake in Hot Springs, how he thought carefully about where he wanted to retire, and eventually bought a condominium. She said he kept a boat in his dock, and that he did more fishing in retirement. T. 940.

317. Ms. McKuin also discussed her father's personality, describing him as a quiet man in private, although outgoing and congenial in public. T. 941. She described him as a wonderful conversationalist, easy to talk with, great company, and how he kept up with current events reading newspapers and watching television. *Id.* She said Mr. Williams was particularly fond of educational television. *Id.* Her father was well-informed, and there were not too many subjects that he was unable to talk about with some level of knowledge. *Id.*

318. Ms. McKuin then discussed the later years of her relationship with her father. Having left the state with her husband for some period of time, she returned to Arkansas in 1993, and was determined to spend as much time as possible with her father. T. 941. In fact, he would take many one or two night trips around the state as he had done with the FHA, and Ms. McKuin would often accompany him. T. 942. She said this time together was wonderful, that her father knew so much about most areas of the State, "every tree, every rock", and that he would talk about what he had done to help whatever area they were in. *Id.*

319. Ms. McKuin ended her testimony by discussing the impact of her father's death on her, describing it as a great loss. Noting how he was a big sports fan, especially a Razorback fan, T. 942, she said that whenever she is watching one of the games and a big play is made, she turns to share it, and he is not there. *Id.* She said her father came to her home often to watch televised games. He would have dinner, spend the night, and then return home. She said they met in Little Rock frequently when he would come there to go to the dentist or take care of other business. *Id.* She talked about the last time she saw her father, the week before he was killed, how she had gone to lunch in Little Rock with him and her sister. T. 943. She experienced his death as a loss of a great friend and traveling

companion, and said that when you lose a parent who was otherwise healthy and active, the feeling of loss defies description. T. 944.

320. Carole Sherman, Mr. Williams' other daughter, also testified for the government at the sentencing phase. She repeated much of what Ms. McKuin had said. She noted that she lived in Little Rock, and worked with her husband, who was an attorney in Little Rock. T. 945. She described Mr. Williams as a good conversationalist, a good walking companion, and a good listener. *Id.* She spoke of her father as very forward looking yet proud of his accomplishments. T. 946. She said he was intentional about staying in contact with her and her sister, calling regularly, and getting together for lunch whenever he was in town. *Id.* She also described the long lunch she had with her sister and father the week before he died. *Id.*

321. Ms. Sherman then talked about what she went through when she first learned that her father was missing. She said a ranger had called to say they had found her father's wallet. She then began leaving messages for Ms. McKuin in Hot Springs. T. 947. She also started calling the Hot Springs police, and the local weather service to see when it had last rained, because the wallet had been found wet. T. 948. She described how she called all of the area hospitals, and when there was no word of his whereabouts, she got in the car with her husband and

drove to Hot Springs. *Id.* She said that when she arrived at his condominium, there were a number of people there, including FBI agents, rangers, and friends and family. T. 949. She noted how the TV Guide in his apartment was open to June 22nd, the day of his death. *Id.*

322. Like Ms. McKuin, Ms. Sherman testified about the impact of his death on her personally. She said she was stunned, that she had had no preparation, and that it was hard to find peace about the incident due to his injuries. T. 949. She also talked about how they were nevertheless able to celebrate his life. She described the leftover feelings from his death as a "lack of order" in her life. *Id.* She also spoke of the burial, and how they had him cremated (even though that had not been done in their family before) due to his injuries. T. 949. She said it was a private service because her father was such a private person. T. 950.

323. Lawrence McCollough then testified for the government. Mr. McCollough was a director of single family housing with the U.S.D.A. Rural Development, which he noted was formerly the FHA. T. 950. He had been with U.S.D.A./FHA for twenty six years, and when he first started, Mr. Williams was his supervisor. T. 951.

324. Mr. McCollough, who is African-American, described in great detail how Mr. Williams assisted him personally in dealing with his adjustment to living

and working in a predominantly white community, because he had grown up in a very segregated community. *Id.* Mr. McCollough stated that "one of the best things that ever happened to me" was to begin his career working for Mr. Williams. T. 952. Mr. McCollough explained that Mr. Williams was attuned to the racial issues he was facing, and that he helped him learn how to project himself in a manner that would avoid conflict. T. 953.

325. Mr. McCollough explained in detail how Mr. Williams used, and taught him to use, the coffee break as a means of interacting, blending, and getting to know his co-workers as well as people in the surrounding community. *Id.* He explained how coffee breaks were an important part of Mr. Williams work day, how he organized his day around them, using the relaxed atmosphere to get much accomplished. T. 956. In fact, before he met Mr. Williams, he did not drink coffee, but Mr. Williams convinced him that it was essential to do so to grow in his career. T. 955. He noted how he still drinks coffee today, and uses coffee breaks the way Mr. Williams taught him. T. 956.

326. Mr. McCollough also described Mr. Williams as an innovative person in his work life. *Id.* He repeated prior testimony regarding how Mr. Williams loved to travel, and how he was good at photography and used it in his work. *Id.* Noting how he also used photography in his work as a result of Mr. Williams'

example, Mr. McCollough claimed that a lot of the things he does today are a result of things he learned from Mr. Williams. *Id.*

327. Mr. McCollough testified extensively about Mr. Williams leadership at the FHA, and about his personal relationship with him. He testified that Mr. Williams' motto was always, "be first," so that whenever any bureaucratic changes came into the office from the central administration, Mr. Williams encouraged his staff not only to incorporate the changes, but to do so as quickly as possible. T. 954. Mr. McCollough described Mr. Williams' leadership as "inspirational," as he wanted to help everybody. T. 953. Mr. Williams was a greater source of inspiration to him than anyone else he has ever worked with. T. 954. He said that Mr. Williams had helped him to grow and progress and be flexible in his work environment. T. 956. He described Mr. Williams as a father figure, talking to him about his personal struggles and correcting him when he was wrong. T. 957. Mr. McCollough stated that he became a member of the Jaycees because of Mr. Williams. T. 959. He credited Mr. Williams with the fact that he carries no animosity towards others, and that he has no hang-ups when it comes to racial issues. T. 960. Mr. McCollough testified that in his twenty six years with the USDA/FHA, Mr. Williams was the best employee the agency ever had. T. 957.

328. The testimony described above leaves one feeling terribly sad at the immense loss of such a wonderful and decent life as that of Sherman Williams. This overwhelming feeling was, of course, by design and effect, precisely what the prosecution intended in presenting this testimony. The Court should have, but did not, limit or restrict this presentation, despite defense counsel's requests. Without limitation, the prosecution was left free to tell the victim's entire life story in as much detail as they chose, and that is what they did. While it is clearly understandable that the close friends and/or family members of a murder victim will feel the need to express to others the admirable qualities of the deceased and details about his or her life, it is the duty of the court to prevent the sentencing phase of a capital trial from crossing the line. As some courts have begun to recognize, overly "detailed descriptions of the good qualities of the victim" risk interjection of emotion, *see* Bernard v. State, 608 S.2d at 972. They risk becoming eulogies. That is precisely what occurred in this case.

329. In analyzing the Court's unwillingness to draw any line on the government's victim impact presentation, it is important to note that immediately after the prosecution rested at sentencing, when the defense sought to present *their* story, the court *sua sponte* interrupted defense questioning of *the only witness* they called, and inquired *in the presence of the jury* if so much detail as to the

defendant's story was necessary. T. 1042. The Court then instructed defense counsel, again in the presence of the jury, to move along in the testimony. *Id.* This action by the Court, especially in light of no similar court action in response to clearly repetitious testimony by prosecution sentencing witnesses, sent a clear message to the jury (the verbal equivalent of a symbolic gesture of tapping on one's watch): in the court's view, the details of the victim's story, no matter how often repeated, were more important than those of the defendant, *despite* no repetition. In effect, the Court told the jury that they were to take as much time as they wanted reflecting on the entirety of the victim's life, but when it came time to considering the defendant's story, they needed to "move along."

330. Neither Payne nor other longstanding Eighth Amendment principles condone such a message. With respect to the victim, Payne contemplates "a brief glimpse" into his or her life and character. With respect to the defendant, on the other hand, Lockett v. Ohio, 438 U.S. 586 (1978) and its progeny, untouched by the Court's decision in Payne, hold that *any evidence* a capital defendant proffers regarding his character, background, or his involvement in the offense, is relevant, important, constitutionally protected evidence which the sentencer must be allowed to hear, Skipper v. South Carolina, 476 U.S. 1 (1986), and which the sentencer must consider, Eddings v. Oklahoma, 455 U.S. 104 (1982), in

determining whether a person should die for their crime. The Court's actions in refusing to control or limit the prosecution presentation of victim impact evidence, while at the same time effectively communicating to the jury that the defendant's story (constitutionally protected) was "slowing down the wheels of justice," completely undermined Mr. Paul's Eighth Amendment rights.

331. The very nature of this case, entailing as it did the tragic loss of a highly respected senior citizen, Sherman Williams, who possessed a wealth of obviously admirable and noteworthy qualities, only highlighted the need for the Court to exercise some control and restraint upon the prosecution's parade of victim impact evidence at the sentencing phase of Mr. Paul's trial. Instead, the only restraints exerted by the Court during sentencing were upon the defense's otherwise legitimate presentation of mitigating evidence, with no effort to limit the prosecution's presentation. This eviscerated entirely Mr. Paul's rights and vindicated only the view of those who think a capital trial is, primarily, the place to have the qualities of the victims, and the suffering of their survivors, aired. That is not what was contemplated in Payne, and in those Eighth Amendment cases which Payne left unaltered, and for that reason, Mr. Paul must be granted a new sentencing proceeding.

**XVIII. Upon Information and Belief The Jury Was Not Required To Make the Requisite Finding of Intent At Either Phase of Trial, In Violation of Mr. Paul's Rights Under the FDPA and the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments**

332. Upon information and belief, the sentencing jury in this case was relieved of its constitutional obligation to determine and find, beyond a reasonable doubt, all facts which "increase[] the penalty for a crime beyond the prescribed statutory maximum," *see* Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348, 2362-63 (2000),in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

333. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

334. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

335. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

336. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

337. Two sets of instructions are germane to the issues presented here: the aiding and abetting instruction given at the guilt-innocence phase of trial, and the intent instruction given at the sentencing phase of trial. With respect to the first, and in accordance with the prosecution's express theme throughout trial, the Court instructed the jury during the guilt-innocence phase of trial as follows with respect to Mr. Paul's potential liability for §1111 murder as an aider and abettor:

> A person may be found guilty of any crime even if he only aided and abetted the commission of that crime. In order to have aided and abetted the commission of a crime, a person must before or at the time the crime was committed,
>
> One: Have known the crime was being committed or going to be committed, and;
>
> Two: Have knowingly acted in some way for the purpose of causing, encouraging, or aiding in the commission of such crime.
>
> For you to find the defendant guilty of any crime by reason of aiding and abetting, the Government must prove beyond a reasonable doubt that all of the essential elements of the crime were committed by

> some person or persons and that the defendant aided and abetted the commission of that crime.

T. 848-49. So instructed, the jury could have found Mr. Paul guilty of the crime of murder without ever focusing upon, or making findings regarding, his personal mental state during the commission of the offense, or without ever having determined that he committed any acts "and the victim died as a direct result of those acts." Under this guilt-innocence phase instruction, so long as "some person or persons" committed the acts that resulted in death, and so long as Mr. Paul aided or abetted that person as defined above, Mr. Paul's intent, and the extent of his actions with respect to the actual murder, were irrelevant to whether the jury found him guilty of either or both offenses.

338. Then during the sentencing phase of trial, the Court instructed the jury with respect to its threshold obligation to make specific findings of fact as a precondition to consideration of a possible sentence of death:

> Before you may consider the imposition of the death penalty, you must first unanimously find beyond a reasonable doubt that the defendant *intentionally aided and abetted* in the killing of Sherman Williams.

App. 185[33] (emphasis added). Although given presumably in an attempt to satisfy the requirements of §3591(a)(2) set forth above, it clearly did not comply with the

---

[33] The verdict form sent back with the jury during sentencing deliberations contained the identical language. ROA 238.

statutory requirement, and the government has conceded both that this is so, and that this critical discrepancy was plain error.

339. By contrast to the sentencing instruction actually given here, the federal capital sentencing statute under which Mr. Paul was sentenced to death disallows even *consideration* of a death sentence *unless* the sentencer makes an express finding of one of the following facts with respect to the defendant's state of mind and actions at the time of offense:

> (a) ... the defendant, as determined beyond a reasonable doubt at the hearing under [18 U.S.C.]section 3593 –
>
> (A) intentionally killed the victim;
>
> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
>
> (C) intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
>
> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act ....

18 U.S.C. §3591(a)(2). In other words, §3591(a)(2) requires the sentencing jury to make certain factual findings that the defendant either committed the murder (or serious bodily injury) with intent, or that he intentionally engaged in some other

act "and the victim died as a direct result of the act." Critically here, each of the four alternative intent findings include the necessity of finding that the defendant engaged in some act "and the victim died" as a result thereof. The Supreme Court has characterized such finding as a death "eligibility" or "gateway" finding, because the statute mandates its determination as a necessary pre-condition to jury consideration of a possible death sentence. *See e.g.*, Jones v. United States, 527 U.S. 373, 376-77 (1999); *see also* United States v. Webster,162 F.3d 308, 323 (5th Cir. 1998).

340. Unlike the aiding and abetting instruction given during the guilt-innocence phase and incorporated into the purported intent-gateway instruction given at sentencing, §3591(a)(2) requires the jury to find either that the defendant personally engaged in intentional acts to kill or inflict serious injury on the victim, *see* sub-sections (A) and (B), or that the defendant participated in some other intentional act "and the victim died as a direct result of the act....," *see* sub-sections (C) and (D). Mere aiding and abetting, requiring only that the defendant have "knowingly acted in some way for the purpose of causing, encouraging, or aiding in the commission of" the crime, does not equate with any of these four possible intent "gateway" findings. The first two alternatives require personal participation in the actual murder or injury to the victim; aiding and abetting does

not. The latter two require that the defendant engage in some death-causing act; again, aiding and abetting does not. This is true even though the Court added the element of "intent" to the aiding and abetting instruction at sentencing: still, none of the four gateway elements are met by a finding of "intentional" aiding and abetting.

341. After this issue was decided against Mr. Paul by a divided court on direct appeal, but well before his case became final, the U.S. Supreme Court decided the case of Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), holding that factfindings which increase a defendant's sentence beyond the otherwise available maximum punishment must, consistent with the constitution, be made by a jury and must be found to exist beyond a reasonable doubt. The Court of Appeals never addressed Mr. Paul's claim that, in light of Apprendi, his death sentence was unconstitutional because the jury was not required to make the specific gateway intent finding which Congress mandated as a necessary prerequisite to death sentence consideration.

342. This Court's erroneous instructions, coupled with the Court of Appeals' majority decision, inescapably lead to the conclusion that the §3591 "gateway" finding is satisfied by mere conviction as an aider and abettor. Therefore, under the Court of Appeals' interpretation of the statute, §3591(a)(2) is

satisfied in every case in which the defendant has been convicted of first degree murder or any other capital-eligible federal crime. This effectively nullifies §3591(a)(2), in which Congress made a deliberate choice (presumably in response to, and expanding upon, this Court's Eighth Amendment prescriptions set forth in the line of cases beginning with Enmund v. Florida, 458 U.S. 782 (1982)), to narrow the scope of the federal death penalty to persons who kill or whose actions "direct[ly] result" in death, which is certainly a far more narrow class than that defined by the aiding and abetting statute under which petitioner's jury was instructed at the guilt-innocence phase of trial. While it may be a "gateway" finding according to the Supreme Court, under the instructions and ruling in this case it is nothing less than a *flood*gate, and one which Congress clearly never intended.

343. The Court of Appeals' opinion thus vastly expands the scope of the federal death penalty, sweeping into it all aiders and abettors of capital crimes. Such an expansion is inconsistent with the language of the statute, and basic principles of statutory construction, as well as decisions regarding the statute in other circuits. Given the large number of potentially capital federal crimes which involve co-defendants or co-conspirators, this has serious implications for the management of the federal death penalty statute, warranting this Court's attention.

344. Section 3591(a)(2) mandates a finding by the sentencer *as a pre-condition to consideration of a death sentence* that the individual defendant on trial engaged in intentional conduct and that "the victim died as a direct result of the [defendant's intentional] act." 18 U.S.C. §3591(a)(2). Congress was unequivocal in mandating that this factfinding be made prior to jury consideration of a death sentence in any federal capital case. Jones, *supra*. The Court failed to instruct the jury in accordance with §3591(a)(2), instead essentially repeating the instruction already given at the guilt-innocence phase of trial that the jury need only find Mr. Paul guilty of aiding and abetting in the murder of the victim. According to this instruction, so long as Mr. Paul "acted in some way for the purpose of causing, encouraging, or aiding in the commission of" the crime of murder, the jury was free to find him guilty of murder *and* sentence him to death. The government even conceded this was plain error in this case. United States v. Paul, 217 F.3d 989, 996 (8th Cir. 2000).

345. The Court of Appeals' majority opinion nevertheless condones the ultimate death sentence here by means of a flawed holding that this Court's guilt-innocence phase aiding and abetting instructions required essentially the same factual findings as those necessitated under §3591(a)(2). 217 F.3d at 997-98. The dissent correctly recognizes the flaw, noting how those instructions, even if the

jury was allowed to apply them during sentencing,[34] do not require a finding as required in §3591(a)(2), namely, that Mr. Paul either himself intentionally killed or inflicted bodily injury upon the victim, or committed some other intentional act "and the victim died as a direct result of the act." §3591(a)(2)(C) & (D). 217 F.3d at 1005-06 (Heaney, Judge, dissenting). Instead, this Court's guilt-innocence charge allowed a jury finding of guilt irrespective of any determination as to Mr. Paul's personal intentionality in causing the death itself and irrespective of whether he committed any acts which directly caused Mr. Williams' death. T. 848-49. As the dissent rightfully notes, under the aiding and abetting instruction, so long as "some person or persons" had the requisite mental state and engaged in the acts that caused the victim's death, Mr. Paul's individual mental state, as well as his personal acts in causing the death, if any, were not a part of the necessary factual findings required to convict. This is a far cry from the "close causal nexus" between the defendant's acts and the victim's death required at sentencing under §3591(a)(2). <u>See</u> 217 F.3d at 1006 (Heaney, J., dissenting).

---

[34] The panel majority points to a statement by this Court that the jury had these instructions before them during the sentencing phase deliberations. *See* 217 F.3d at 996 n. 3. The record reflects that while this Court left the guilt-innocence phase instructions in the "jury instruction booklet" provided to the jury at sentencing, never does this Court instruct the jury that these guilt-innocence phase instructions are to be applied by the jury at sentencing.

346. This issue was important under the facts of this case. That is, as noted throughout this motion, Mr. Paul's case is precisely one in which Congress' statutory requirement that the sentencer in a federal capital case focus on the individual defendant and his actions was critical. The underlying evidence (as to Mr. Paul's state of mind and actual role in the death of Mr. Williams) was uncertain on just those factual issues Congress intended for the jury to address and resolve *prior to* consideration of a sentence of death. While the evidence established that Mr. Paul may have participated in some of the actions leading up to and immediately following the offenses, it failed to establish with any degree of reliability the contours of his role or whether his actions actually resulted in the victim's death. Some of Mr. Paul's alleged statements implicated a greater personal role in the offenses, but many did not, while still others only referred to actions "they" [Ingle and Paul] had taken on the day of the offense, without specifying who had done what. The only consistent picture emerging from Mr. Paul's alleged statements was that he admitted some involvement in robbing the victim; beyond that, his personal role was unclear on the face of the trial court record.

347. The government was fully aware of these factual weaknesses in the case against Mr. Paul. Conceding that it could not prove whether Mr. Paul

actually engaged in conduct causing Mr. Williams' death, the government instead took the position (a correct one at the guilt-innocence phase of trial) that Mr. Paul's individual state of mind and/or personal acts linked to the death of the victim were not important to a decision whether he could (or should) be found guilty of §1111 murder. The government largely avoided direct focus on Mr. Paul's individual acts or his state of mind, instead relying upon the view, confirmed by the court's guilt-innocence aiding and abetting charge, that regardless of who actually killed Mr. Williams, Mr. Paul was a participant in the overall scheme and was therefore liable as an aider and abettor. This theory was embedded in the government's case from beginning to end, starting with the charging instrument and ending with the government's closing arguments at both phases of trial. It is particularly noticeable in the government's arguments and summations to the jury.

348. For example, the government argued "it really doesn't matter at this point which version is correct because it's aiding and abetting." T. 904. "Depending on which version you believe, Jeff Paul either shot first, they both shot him, or Trint Ingle shot him." *Id.* "[I]t doesn't matter which one pulled the trigger because they were both there, they were both involved in the robbery, and the decision was made." *Id.* "[U]nder the aiding and abetting theory, no matter

which way you do it, Jeff Paul is guilty of first degree murder." *Id.*; *see also* T. 860 ("under the law ... he's just as guilty as if he pulled the trigger."). Thus the government capitalized on the guilt-innocence phase aiding and abetting instruction precisely to avoid forcing the jury to deliberate upon or consider Mr. Paul's personal role in the offense. This theory, while perhaps satisfactory as a guilt-innocence phase approach to the evidence as presented under the applicable law of aiding and abetting, was wholly insufficient as a matter of law to satisfy §3591(a)(2)'s requirement during the second phase of trial that the sentencer find certain facts with respect to the *individual mental state and actions of the defendant himself.*

349. In short, this is a case in which the evidence was at least equivocal, and in fact admittedly ambiguous by the government's own account, as to the defendant's personal role in the offense. It is a case, therefore, to which the requirements of §3591(a)(2) speak with a voice of measured skepticism.

350. Indeed, the whole point of §3591(a)(2) is to prevent precisely what happened here: a jury finding of death eligibility without *any* requirement that the jury focus on the defendant's individual acts and state of mind. In section 3591(a)(2), Congress expressly prohibited sentencer consideration of the death penalty for one who merely aids and abets in an otherwise death-eligible crime.

Yet that is what occurred in this case: this Court told the jury it could consider a death sentence so long as it found that Jeffery Paul aided and abetted in the crime. By contrast, §3591(a)(2) sets forth four possible scenarios of personal liability clearly beyond a mere finding of aiding and abetting, requiring the jury additionally to find at least one such scenario as a matter of fact and beyond a reasonable doubt, *before* any consideration of a possible death sentence.

351. The Court's admittedly erroneous instructions thus relieved the jury of its duty to struggle with, focus upon, and resolve beyond a reasonable doubt, Mr. Paul's personal role and mental state in connection with Mr. Williams' death. Instead, the jury was told that, just as in the first phase of trial, it could refer to and rely upon the actions and intentions of "some person or persons" other than Mr. Paul in deciding petitioner's death eligibility. This is precisely what Congress forbade in the statute.[35]

---

[35] Another court has addressed a different issue in a manner that implicitly supports petitioner's argument. In United States v. Hall, 152 F.3d 381 (5th Cir. 1998), cert. denied 119 S.Ct. 1767 (1999), the court considered Hall's contention that the statutory aggravating factor that death occurred during the commission of another offense, namely, kidnaping, was unconstitutional because it duplicated an element of the underlying §1201offense (kidnaping resulting in death of victim). Hall argued that this doubling violated the Eighth Amendment's requirement that capital sentencing schemes genuinely narrow the class of death-eligible murders. The Fifth Circuit agreed with Hall that the §1201 offense itself did not render him death eligible because it supported a finding of guilt "regardless of the mental state

(continued...)

352. The panel majority erroneously concluded that under the court's guilt-innocence aiding and abetting instruction, at least one of the four conditional factfindings set forth in §3591(a)(2) would have been made. A jury finding (at guilt-innocence) that Mr. Paul "kn[ew] the crime was being committed or going to be committed, and ... knowingly acted in some way for the purpose of causing, encouraging, or aiding in the commission of such crime," T. 848-49, does not square with any of §3591(a)(2)'s alternatives. The first two describe a far more culpable mental state than that found in the court's aiding and abetting instructions. (Indeed, the panel did not attempt to suggest that either of these

---

[35](...continued)
of the defendant with respect to the death." 152 F.3d at 416-17. The Court nevertheless held that sufficient narrowing had occurred at sentencing *precisely because* the trial court had properly instructed the jury as to the requisite intent element in the language set forth in §3591(a)(2). Thus, even though no Eighth Amendment narrowing had occurred at phase one or by virtue of the kidnaping aggravator, constitutional narrowing *did* occur by virtue of the jury's "gateway" finding of the requisite intent under §3591(a)(2). 152 F.3d at 416-17.

The reasoning in Hall contradicts the panel majority in the Court of Appeals. As in Hall, the §1111 offense here did not render Mr. Paul death eligible. That is, just as in Hall, under the aiding and abetting charge given in this case, Mr. Paul could be found guilty "regardless of the mental state of the defendant with respect to the death." 152 F.3d at 416-17. Critically here, however, unlike in Hall, the Court failed to give a charge requiring the intent findings in §3591(a)(2) at the sentencing phase of trial. Thus, unlike in Hall, in this case the jury was wholly relieved of its statutory duty to find that Jeffery Paul personally engaged in acts which directly led to the death of Sherman Williams, and thus was erroneously allowed to consider a death sentence absent the requisite statutory findings.

alternatives squared with the aiding and abetting instruction). Alternatives (C) and (D), the first of which the panel embraced in affirming, are similarly unavailing. Both require that the defendant possess a certain mind-state *and* perform an act "*and the victim died as a direct result of the act*." 18 U.S.C. §3591(a)(2) (emphasis added). The dissent aptly describes the latter as requiring "a close causal nexus between the defendant's act and the victim's death." 217 F.3d at 1006 (Heaney, C.J., dissenting). As the dissent correctly notes, the trial court's aiding and abetting instruction fails to require such a nexus, authorizing a finding of guilt irrespective of any finding as to whether Jeffery Paul engaged in an intentional act of which the victim died "as direct result." *Id.* For this reason, the dissent aptly urges:

> Where a life hangs in the balance, this court should not permit a district court to improvise its own standard for imposing the death penalty. The ultimate punishment requires more than an instruction that "closely tracks" the standard set forth by Congress. Rather, that the jury must grapple with the propriety of the death penalty for Paul according to the precise criteria set forth in §3591. Because that has not yet happened in this case, Paul is entitled to be resentenced.

217 F.3d at 1006 (Heaney, J., dissenting).

353. By directly violating the express will of Congress that a capital sentencing jury determine critical facts as a necessary pre-condition to consideration of a death sentence, the Court also violated petitioner's right to due

process under the Fifth Amendment. In effect, the lower court substituted its own death sentencing factors for those mandated by Congress in §3591, withdrawing from the jury's consideration at all those factors which Congress mandated that a jury determine beyond a reasonable doubt before any consideration of a possible sentence greater than life imprisonment. *Cf.* Jones v. United States, 526 U.S. 227 (1999); Castillo v. United States, 530 U.S. 120 (2000).

354. For similar reasons, this Court's instructional interpretation of §3591(a)(2) also violated petitioner's Eighth Amendment rights. By including within its ambit all §1111 murderers, including those convicted as principals and those convicted as aiders and abettors under 18 U.S.C. §2, the lower court's reading and application of §3591(a)(2) in the context of the facts and other instructions in this case results in an interpretation of the federal death sentencing scheme which undermines any constitutionally required narrowing and otherwise usurps the legislative role of Congress in specifying the appropriate sentencing factors in a federal capital case. *See* Woodson v. North Carolina, 428 U.S. 280 (1976).

355. Finally, the Court also violated the dictates of intervening Supreme Court authority. On its face the §3591 finding is surely an "element" of federal *capital* murder as Apprendi and its progeny view that term. *See* Ring v. Arizona,

___ U.S. ___, 122 S.Ct. 2428 (2002). Indeed, as noted elsewhere in this motion, the key finding in Ring is that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of *an element of a greater offense*'. . . ." Ring, 122 S.Ct. at 2443, *quoting* Apprendi, 530 U.S. at 494 n.19 (2000) (emphasis added).

356. The Court had previously held in Jones v. United States, 526 U.S. 227, 251-52 (1999), that the Fifth Amendment requires that all elements of a federal offense be "charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." As the Court has made clear since Jones, an "element" for purposes of constitutional analysis is any "fact[] necessary to impose the maximum [punishment]." Harris v. United States, ___ U.S. ___, 122 S. Ct. 2406, 2419 (2002). It is a condition precedent to consideration of the death sentence, and has been specifically delegated to the jury by Congress.

357. Here, the jury was required to make the §3591 finding by proof beyond a reasonable doubt. The fact involved is a classic one regarding *mens rea* and *actus reas* of the offense. It therefore has all the hallmarks of an element as to which the defendant has a constitutional right to trial by jury.

358. The Court of Appeals gave the question no constitutional dimension at all. It simply affirmed on the basis of its own determination that the denial of a jury trial on this issue affected no substantial rights. The dissent rightly said this

was reversible error, even before the Supreme Court had decided Apprendi and Ring, and in addition to the dissenting judge, four other judges of the Court of Appeals dissented from denial of rehearing. A brief discussion of Apprendi is warranted here.

359. In Apprendi v. New Jersey, 530 U.S. 466, 120 S.Ct. 2348 (2000), the Supreme Court held that when a specified factual finding may enhance a sentence beyond the otherwise prescribed maximum, that finding must be made by a jury and must be found to exist beyond a reasonable doubt. Thus here, if Mr. Paul is correct that the jury's guilt-innocence finding that Mr. Paul aided and abetted in the crime of murder did not itself necessitate a finding of one of the four gateway intent findings, then because that gateway determination is a factual finding that *must be made* and without which the maximum possible sentence is life imprisonment, Apprendi's requirements have been violated. If it is true that the jury was never required to make the factual findings set forth in §3591(a)(2), then there has been no jury finding beyond a reasonable doubt as to the existence of a fact which enhanced the punishment beyond the otherwise maximum sentence, in violation of Apprendi.

360. In Apprendi, a state criminal firearms possession case, the Supreme Court reviewed the constitutionality of a New Jersey statute providing for an

enhanced punishment so long as a judge found by a preponderance of the evidence that the defendant committed the underlying offense with a purpose to intimidate others because of race, color, etc. 120 S.Ct. at 2351. Interpreting the Due Process Clause, the Court held that the factual determination (that the crime was committed with the unlawful racial purpose) authorizing an increase in the maximum punishment must be made by a jury: "[A]ny fact," the Court held, "that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 2362-63. The Court declared that it was unconstitutional to remove from a jury's determination the existence of a fact which, "if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone." *Id.* at 2359.

361. In reaching that conclusion, the Court noted that "New Jersey threatened Apprendi with certain pains if he unlawfully possessed a weapon and with additional pains if he selected his victims with a purpose to intimidate them because of their race." *Id.* at 2355. Labeling the latter as mere "sentence enhancement" did not address the underlying due process concerns arising from the distinct and additional punitive consequences flowing from a finding thereof. Responding to arguments made by the State of New Jersey that the enhancement

provision merely inquired into "motive," a traditional "sentencing factor," the Court rejected the conclusion that it therefore did not require a jury determination:

> It makes no difference in identifying the nature of this finding that Apprendi was also required, in order to receive the sentence he did for [the underlying] weapons possession, to have possessed the weapon with a "purpose to use [the weapon] unlawfully against the person or property of another." A second mens rea requirement hardly defeats the reality that the enhancement statute imposes of its own force an intent requirement necessary for the imposition of sentence.... The defendant's intent in committing a crime is perhaps as close as one might hope to come to a core criminal offense "element."

*Id.* at 2364. As such, like any element of an offense, even if applied to enhance the maximum punishment, the Court held the enhancement intent factor must be found to exist by a jury and beyond a reasonable doubt.

362. Each of these principles apply directly to what the Supreme Court has labeled as the statutory "gateway" finding regarding the defendant's actions and state of mind at the time of offense at issue here. Jones, *supra*. First, the requisite finding of intent coupled with a causal connection to the death of the victim set forth in §18 U.S.C. §3591 is one "that increases the penalty for a crime beyond the prescribed statutory maximum." Apprendi, *supra*. The statute is expressly clear on this point, and it has been so interpreted by the Supreme Court. That is, the intent finding set forth in the statute is a necessary pre-condition even to jury consideration, let alone infliction, of a death sentence. This is what Congress

prescribed in the statute itself, and this is what the Court meant in describing this finding as a "gateway" finding. *See* Jones v. U.S., 527 U.S. 373, 376 (1999) (intent finding must be made as an initial matter prior to jury consideration of aggravating and mitigating factors). Absent such a finding, the maximum available sentence is life imprisonment.[36]

363. Second, the jury was relieved of any responsibility for making this gateway factual finding in this case. This Court's erroneous sentencing instruction (coupled with the aiding and abetting instruction provided at the guilt-innocence phase) wholly relieved the jury of its duty to determine Jeff Paul's personal intent and individual actions at the time of the offense.

---

[36] Admittedly, the federal murder statute under which Mr. Paul was convicted, 18 U.S.C. §1111, does provide for a maximum sentence of life *or* death. *Id.* Nevertheless, the federal statute governing actual sentencing as a capital offense makes clear that death is not an available sentence absent the necessary factfindings found in §3591(a)(2), findings which petitioner's jury was never required to make. At the very least it is an open question whether §3591(a)(2)'s findings are "elements" of the sort contemplated in Apprendi. Because this case is a federal capital case on direct review before this Court, and because no federal court has yet assessed the issue here in light of the obvious potential relevance of Apprendi, the case is worthy of review here on certiorari. Furthermore, irrespective of whether Apprendi itself is directly germane (i.e. assuming the §3591(a)(2) findings are not an "element" as defined in Apprendi), Congress' specific requirement of a jury finding on the subject created a due process right that gives this case additional constitutional dimensions.

364. Third, under Apprendi, a post-trial, judicial (*i.e.* non-jury) determination of the facts cannot cure the error here. Apprendi turns on the very fact that a judge, not a jury, was allowed to make an evidentiary determination about critical sentence-determinative facts regarding the defendant's intentionality. The Court in Apprendi and Ring expressly held that such judge-determination of these facts was unconstitutional. So too here, the jury was precluded by the trial court's erroneous instruction from determining sentence-enhancing facts regarding the defendant's personal intent and/or his participation, if any, in death-causing acts. Under Apprendi, judicial determination of such facts, even on appeal, is impermissible.

**XIX. Upon Information and Belief, Mr. Paul was Deprived of His Absolute Right to Testify in His Own Behalf, at Either or Both Phases of Trial, in Violation of Rights Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

365. Upon information and belief Mr. Paul was deprived of his right to testify on his own behalf at either or both phases of trial, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

366. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

367. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

368. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

369. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

370. Mr. Paul wished to testify in his defense at both phases of trial. At both phases of trial he wished to explain to the jury that he did not kill Sherman Williams, that he did not intend that Sherman Williams be killed, nor did he attempt to kill Mr. Williams, nor did he intentionally aid and/or abet in the killing of Sherman Williams, nor did he in fact aid and/or abet in the killing of Sherman Williams. Mr. Paul also wished to provide for the jury substantial mitigating evidence concerning his character, background, and the circumstances of the offense, in favor of a sentence less than death. Mr. Paul, however, was prohibited from doing so by his attorneys.

371. Mr. Paul attempted on several occasions to inform the Court that he wished to testify. On at least one such occasion, during an un-reported (or at least heretofore un-transcribed) conference, the Court interrupted Mr. Paul and ordered

him to refrain from speaking any further. Mr. Paul complied with the Court order, but was thereby prevented from explaining to the Court that he wished to testify but that his attorneys would not allow him to do so. At the end of trial he again attempted to explain this fact to the Court, but was again interrupted, this time on the record, by the Court. While the official transcript does not report the Mr. Paul's complete statement (apparently due to the Court's interruption), eyewitness accounts of the exchange with the Court make clear that Mr. Paul was once again attempting to inform the Court that his attorneys were prohibiting him from testifying in his own behalf.

372. In Rock v. Arkansas, 483 U.S. 44 (1987), the U.S. Supreme Court held that a defendant had a constitutional right "to testify on one's behalf at a criminal trial." That right was violated where, as here, Mr. Paul was prohibited from testifying on his own behalf despite his clear desire to do so, which he expressed to his attorneys and attempted to express to the Court on several occasions throughout the trial.

**XX. Upon Information and Belief The Prosecution's Reliance Upon Aggravating Factors Which Were Duplicative of Elements of the Offense Violated Mr. Paul's Rights Under the FDPA and the Sixth, Eighth and Fourteenth Amendment**

373. Upon information and belief, the prosecution's reliance upon aggravating factors which were duplicative of elements of the offense violated Mr. Paul's rights under the FDPA and as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

374. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

375. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through

the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

376. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

377. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended §2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or

evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

378. Two of the "aggravating factors" considered and weighed by the jury in the selection phase of the sentencing trial duplicated elements of the underlying offense. These were the intent finding. App. 82, 185 (which, as argued in the preceding claim, should not have been included as an "aggravating factor" to be weighed during the selection phase), and the pecuniary gain factor, App. 84, 196. The Court's instruction on intent essentially repeated the aiding and abetting instruction given to the jury at the guilt-innocence phase of trial. *Compare* App. 134 *with* App. 185. The pecuniary gain factor effectively reiterated an element of the offense of robbery, which was also charged at the guilt-innocence phase as a part of the felony murder theory as to both counts in the indictment. *Compare* App. 128, 130-33 *with* App. 196. Indeed, the Court specifically instructed the jury that these two "aggravating factors" were "duplicative" of elements of the offense already found by the jury. App. 195-96.

379. The defense filed several pre-trial motions aimed at preventing precisely the type of error noted here. Thus, motions were filed to prevent government reliance upon the intent and pecuniary gain factors due to the noted doubling with elements of the offense, App. 38-58. Motions were filed and re-urged requesting that the Court hold a hearing prior to the start of the sentencing phase to assess and screen the government's aggravating evidence to ensure its reliability. App. 31; T. Pre-trial Hearing June 11, 1997 at 18-24. The Court denied these motions. *Id.* at 27, 33, 42. The defense re-urged its request for an evidentiary hearing at the outset of the government's case at sentencing. T. 916-17, and the Court again denied the motion. *Id.*

380. This double counting violated Mr. Paul's right to a capital sentencing scheme which genuinely narrows the class of persons eligible for the death penalty. Zant v. Stephens, 462 U.S. 862, 877 (1983). Arguments with respect to the intent finding are set forth elsewhere in this motion, incorporated herein by express reference.

381. With respect to the pecuniary gain factor, the analysis begins with the observation made previously that no constitutional narrowing occurred during the guilt-innocence phase of Mr. Paul's trial for §1111 felony murder. The charging instrument and the court's instructions at guilt-innocence provided for a

conviction of felony murder under a theory of aiding and abetting. Basic premeditated murder and felony murder were both encompassed within the crime of murder at common law. *See* Schad v. Arizona, 501 U.S. 624, 640 (1991) ("At common law, murder was defined as the unlawful killing of another human being with 'malice aforethought.' The intent to kill and the intent to commit a felony were alternative aspects of the single concept of 'malice aforethought.'" *citing* 3 J. Stephen, History of the Criminal Law of England 21-22 (1883)); U.S. v. Downs, 56 F.3d 973, 974 (8th Cir. 1995) (noting section 1111 imports common law definitions of first and second degree murder). Thus during the first phase of trial, Mr. Paul was convicted of a crime that is the essential equivalent to common law murder.

382. The Supreme Court's Eighth Amendment jurisprudence can be fairly read to hold that a capital sentencing scheme must narrow the jury's discretion beyond a finding of guilt as to common law murder. *See* Stephens, *supra*. The Court effectively so held in Arave v. Creech, 507 U.S. 463, 475 (1993). There the Court considered whether Idaho's aggravator involving the "cold-blooded" nature of the crime was constitutional in the context of that state's capital punishment scheme. As in Mr. Paul's case, the Court first noted that "[t]he class of murderers eligible for capital punishment under Idaho law is defined broadly to include all

first-degree murderers...." The Court nevertheless upheld Idaho's capital scheme because it found that the aggravator in question "identified a subclass of defendants" convicted of the broad crime of first degree murder. "By doing so, it has narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed." *Id.*

383. Similar observations have been made about the lack of narrowing in other federal crimes for which the death penalty has been sought. Thus in U.S. v. Hall, 152 F.3d 381, 416-17 (5th Cir. 1998), *cert. denied* 119 S.Ct. 1767 (1999), the Fifth Circuit reached the same conclusion with respect to 18 U.S.C. §1201, involving the crime of kidnaping during which a murder occurs. 152 F3d at 416-17. If §1201 murder fails to provide sufficient narrowing during guilt-innocence, then §1111 common law felony murder must surely also fail, especially where §2 aiding and abetting is applied as it was here.

384. To be constitutional, therefore, the FDPA as applied to Mr. Paul's case was required to achieve genuine narrowing by means of the aggravating factors at sentencing. Lowenfield v. Phelps, 484 U.S. 231 (1988) (constitutional narrowing must occur during at least one phase of trial; if not at guilt-innocence by legislative definition of crime, then at sentencing); Hall, *supra*. (lack of guilt-innocence phase narrowing requires sentencing phase narrowing under

Lowenfield); *cf.* U.S. v. McCullah, 76 F.3d 1087, 1108, 1110 (10th Cir. 1996), *cert. denied* 520 U.S. 1213 (1997) ("[u]nder Lowenfield, an aggravating factor that does not add anything above and beyond the offense is constitutionally permissible *provided that the statute itself narrows the class of death-eligible defendants*"; otherwise, "a broad capital punishment statute necessitates that the narrowing function be performed by the aggravating factors") (emphasis added) citing Arave, *supra*.

385. The pecuniary gain factor, however, did not provide *any* narrowing beyond the elements of the offense. In convicting Mr. Paul of robbery-murder, the jury necessarily found that the offense was motivated by pecuniary gain. Indeed, as noted above, the Court so instructed the jury: "you may note that the aggravating factor concerning pecuniary gain duplicates one of the elements of the offense." App. 196. Yet that finding in no way distinguished Mr. Paul from any one else convicted of felony murder. This case thus presents the very issue left open in Lowenfield but which, by implication from that decision, as well as the Court's decision in Arave, the Fifth Circuit's decision in Hall and the Tenth Circuit's decision in McCullah, requires reversal here: where constitutional narrowing does not occur at the guilt-innocence phase of trial, is an aggravator

which merely repeats an element of the offense constitutionally valid? The answer, as discussed in the authorities cited, must necessarily be, no.

386. In fact, other courts reviewing the issue have held that such aggravators are invalid. *See* State v. Middlebrooks, 840 S.W.2d 317 (Tn. 1992), *cert. dismissed*, 510 U.S. 124 (1993); State v. Cherry, 257 S.E.2d 551 (N.C. 1979), *cert. denied*, 446 U.S. 941 (1980) (finding double counting between guilt-innocence and sentencing phases of trial violative of defendant's constitutional rights). This Court should similarly so hold.

387. The double counting between crime element and aggravator was not harmless. "[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." Stringer v. Black, 503 U.S. 222, 230-36 (1992). Because the FDPA is a *weighing* statute, 18 U.S.C. § 3593(e), the jury's finding of improper aggravating factors skewed the weighing process by "creat[ing] ... bias in favor of the death penalty...." Stringer v. Black, 503 U.S. 222, 236 (1992).

388. Mr. Paul urges the Court not to attempt a re-weighing of whatever aggravating and mitigating factors survive and/or arise from the claims set forth in

this motion. The sentencing phase was so marked with error that such a re-weighing would not be appropriate.

389. However, even if the Court chooses to re-weigh, the pecuniary gain factor was a *statutory* aggravator, at least one of which the government was required to prove before Mr. Paul could be *eligible* for the death penalty. It was also weighed in the balance with other factors, many of which were equally problematic, as noted elsewhere in this motion. If this invalid doubling between elements of the offense and the aggravating factor had been removed from "death's side of the scale," especially in view of both the Court's instruction that it had already been found, as well as the wealth of mitigating evidence presented and considered by the jury, there is a reasonable likelihood Mr. Paul would not have been sentenced to death.

**XXI. Upon Information and Belief, Mr. Paul was Incompetent Before and During Trial, Rendering All Phases of His Trial Unconstitutional in Violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

390. Upon information and belief, Mr. Paul was incompetent to stand trial before and during trial, and/or at least during critical periods of his trial, and as a result he was denied his rights to due process, effective representation, and a fair trial, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

391. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

392. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

393. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

394. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

395. The facts which support this claim span the time from when Mr. Paul was a child, continuing through the time he was incarcerated pre-trial and during the trial. Other relevant facts involve a variety of mental health evaluations and reports which aid in establishing that Mr. Paul was incompetent during the trial in this case.

396. The most visible contemporaneous evidence raising doubt about Mr. Paul's mental competency at trial was his continuous and uncontrolled disruptive, rude, threatening, menacing, and hostile behavior during the course of the trial, the severity of which increased as the trial proceeded. However, there was more evidence giving rise to the same doubt. As the Court is at least partially aware, Mr. Paul dealt with his lawyers in the same manner as he did the court and jury. And as the Court also knows, prior to trial, expert opinion concerning Mr. Paul's

competence to stand trial was at best divided as to his present incompetence, and not divided at all about the possibility that the stress of trial might well undermine Mr. Paul's competence whether or not he was incompetent prior to trial. And in fact the experience at trial confirmed the un-contested prediction of the expert whose opinion was that Mr. Paul was not competent to be tried, and that, in any event, was likely to become incompetent during the trial proceedings. All of this evidence points to but one reasonable conclusion: that, whether or not Mr. Paul was competent to stand trial *prior to* the trial proceedings, he became incompetent, at least once the sentencing phase began, and therefore he is entitled to a new trial or, at the very least, a new sentencing proceeding.

397. The most dramatic evidence suggesting doubt about Mr. Paul's competency was his demeanor and irrational behavior at trial. Throughout the trial proceedings, Mr. Paul engaged in distracting, disruptive, threatening, and hostile outbursts and behaviors. Mr. Paul frequently talked in a loud, distracting tone of voice, sometimes with defense counsel, and sometimes just in open court, and made a point of passing notes to counsel with obvious displeasure. He made angry gestures and had angry facial expressions during much of the testimony. He mouthed such words as "mother-f_ _ _er," when jurors were watching him. He frequently held his head in his hands and made noises. After the guilt-phase

verdict was announced, and as the jurors were leaving the courtroom for a recess, Mr. Paul yelled at one of the prosecutors, "you're a b _ _ch."

398. At the beginning of the penalty phase, when Mr. Paul was brought into the courtroom, he was completely disheveled, without the coat and tie he had worn throughout the trial, and with his shirt hanging out of his pants. He was unkempt, having failed to bathe or take care of his personal hygiene.

399. At this point in the trial Mr. Paul's courtroom presence became so disruptive that his attorneys chose to forego presentation of most of the mitigating evidence they had developed due to the perceived danger of exposing the jury to more of Mr. Paul's escalating and deteriorating mental condition. Things became so unwieldy that, prior to the penalty phase closing arguments, one of his attorneys admonished him severely, out of the presence of the jury but loud enough to be reported by the local media.

400. Then, at the final sentencing, Mr. Paul unleashed a barrage of epithets at the Court in an outburst which was so uncontrolled that even the Court attempted to interrupt him and warn him of the dangers of such for future appellate proceedings. T. 1171-74.

401. Outside the courtroom, Mr. Paul's behavior was equally irrational and self-destructive. Mr. Paul's mental condition was a significant factor in his

ongoing communications with his attorneys, both before and during trial. Their relationship was fraught with yelling and screaming back and forth, and frequently counsel were unable to communicate rationally with Mr. Paul due to his uncontrolled outbursts. For example, he flew into a rage when his attorneys approached him with a government plea offer for life without parole in exchange for a guilty plea. When members of his family tried to encourage him to consider the plea offer, his rage increased dramatically and, in the view of Dr. Anthony Semone, the neuropsychologist consulted by the defense, Mr. Paul regressed to the level of a 9 or 10 year old child.

402. Throughout the pre-trial and trial proceedings Mr. Paul was unable to appreciate the depth of his problems with the federal criminal justice system: he could neither understand nor accept that even if the jury merely believed he personally participated in the robbery only, they might still convict him and sentence him to death if he assisted Trinity Ingle in the commission of the killing of Sherman Williams.

403. Expert opinion concerning Mr. Paul's competence to stand trial confirmed that such problems existed. Early on, the Court ordered an evaluation of Mr. Paul at the federal forensic facility at FCI-Butner (North Carolina). Although the evaluation there concluded he was competent to stand trial at that

time, the results of the psychological testing that informed this conclusion indicated an underlying severe mental illness, complete with thought disorder, of a sort that could likely render him incompetent under the stress of a trial, a fact which the Butner report did not mention.

404. Thereafter Dr. Semone conducted an extensive clinical psychological evaluation, which included interviews, a variety of psychological and neuropsychological testing (some of which was designed to follow up on the results obtained from the Butner testing), and a consideration of a broad ranging psycho-social history. Dr. Semone found that Mr. Paul had been treated for Attention Deficit Disorder as a child, that he suffered the effects of severe family dysfunction in which he was regularly scapegoated and abused, and that he was profoundly self-destructive. Psychological testing revealed that he was prone to experiencing acute psychotic episodes. Dr. Semone also noted that the intake of sugar (through candy bars) seemed to have an unusual calming effect on Mr. Paul, which was suggestive of a metabolic and/or neurochemical disorder underlying and contributing to his impulsivity and frequently poor judgment, as well as to his tendency toward self-destruction. Dr. Semone found that Mr. Paul likely suffered from organic brain damage as well. Dr. Semone concluded that Mr. Paul's marked tendency toward uncontrollable self-destructive actions and behaviors was the

result of a variety of severe mental disorders and that, if left untreated, he was either incompetent to stand trial at the time or, at the very least, he was likely to become incompetent under the stress of the trial proceeding itself.

405. Because of Dr. Semone's concerns regarding the threat of a deteriorating mental condition, and the corresponding need for possible medication during trial, the Court authorized the defense to retain the services of a local psychiatrist, Dr. Irving Kuo. Dr. Kuo determined that Mr. Paul was not incompetent *at that time*. Importantly, however, Dr. Kuo failed to address the possibility, expressly found by Dr. Semone, that Mr. Paul might decompensate under the stress of trial and become incompetent during the trial proceedings. Additionally, Dr. Kuo failed properly to recognize and diagnose Mr. Paul's mental disorders – reaching the same conclusion that the staff at FCI-Butner had reached – without even attempting to explain what could have produced psychological test results (which were not only conducted by Dr. Semone, but also by personnel at Butner) showing a tendency toward acute psychotic episodes. Dr. Kuo also failed to conduct any investigation of the possible underlying neurochemical disorder associated with Mr. Paul's unusual reaction to sugar intake, as well as the clear and unrefuted evidence of his organic brain impairment, all of which directly refute any finding of a personality disorder of the sort found by Dr. Kuo.

406. Then at trial, as predicted by Dr. Semone, Mr. Paul's mental condition deteriorated severely. As noted above, Mr. Paul's behaviors became so uncontrolled and disruptive, and his mental functioning deteriorated so badly, that his trial counsel determined not to present virtually any of the mitigating case for life they had developed prior to trial, for fear that Mr. Paul's outbursts and actions would further alienate the jury. That is, Mr. Paul's behaviors became so out of control that his attorneys unilaterally elected to shut down the sentencing phase of his case after presenting the testimony of only one witness, Mr. Paul's mother, despite the existence of numerous additional witnesses who would have testified about a broad range of mitigating factors in support of a life sentence.

407. This evidence of Mr. Paul's mental incompetence, and that to be produced and developed once the Court has resolved the accompanying motion for discovery, incorporated herein by express reference, raises a reasonable doubt about Mr. Paul's competency to stand trial, at least once the case had proceeded to the sentencing phase of trial.

408. Because these facts and those to be developed in the evidentiary record in this case establish that Mr. Paul was in fact incompetent during his trial, his constitutional rights were violated. *See* Medina v. California, 505 U.S. 437

(1992) ("the criminal trial of an incompetent defendant violates due process"); *see also* Pate v. Robinson, 383 U.S. 375 (1966).

409. The U.S. Supreme Court has held that the test for mental competency is whether the defendant has a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, at 402 (1960). A criminal defendant's right not to be tried while incompetent is so fundamental that the claim cannot be waived by either the defendant or his counsel, and may be presented to and litigated in a collateral attack on the conviction and sentence in federal court. *See e.g.*, Enriquez v. Procunier, 752 F.2d 111, 114 (5th Cir. 1984); Zapata v. Estelle, 588 F.2d 1017 (5th Cir. 1979). As the Supreme Court has more recently articulated, "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial... The importance of these rights and decisions demonstrates that an erroneous determination of competence threatens a 'fundamental component of our criminal justice system' -- the basic fairness of the trial itself." Cooper v. Oklahoma, 517 U.S. 348 (1996) (citations and footnotes omitted).

410. To make out a claim of substantive mental incompetency, a defendant/petitioner must present facts which are sufficient to "create a real, substantial, and legitimate doubt as to [his] mental capacity... to meaningfully participate and cooperate with counsel." Adams v. Wainwright, 764 F.2d 1356, 1360 (11th Cir. 1985), *quoting* Bruce v. Estelle, 483 F.2d 1031, 1043 (5th Cir. 1973); Lee v. Alabama, 386 F.2d 97, 105 (5th Cir. 1967) (*en banc*). The record in this case shows that Mr. Paul was incompetent in fact.

411. As the Eighth Circuit taught in Lindhorst v. United States, 658 F.2d 598, 607 (8th Cir. 1981):

> Once there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence. The function of the trial court in applying Pate's substantial evidence test is not to determine the ultimate issue: Is the defendant competent to stand trial? Its sole function is to decide whether there is any evidence which, assuming its truth, raises a reasonable doubt about the defendant's competency.

412. On the evidence set forth herein and to be developed in these proceedings, there is reasonable doubt. The Court is as aware as anyone else of the offensive and self-destructive manner in which Mr. Paul behaved in the courtroom. The Court is aware, from the pretrial filings expressing concerns about Mr. Paul's competency, that the behavior it saw in the courtroom was replicated every day and in every contact defense counsel had with Mr. Paul. The question

raised by this evidence is this: was Mr. Paul's behavior the uncontrollable product of some underlying emotional, organic or neurochemical disorder or combination of disorders, or was it simply poor choices by a person who has the capacity to make better choices and control his behavior as he wishes? On the basis of what is now known about Mr. Paul, there can only be one right answer, and this Court must grant relevant discovery and thereafter hold a hearing on this issue to allow Mr. Paul to present his evidence on this claim.

413. While there is no template to be derived from other cases that can settle this matter, some guidance can be drawn from them. The cases in which disruptive, bizarre, self-destructive, or otherwise irrational courtroom behavior has been a critical factor in finding a defendant incompetent have all at the very least required hearings when the combination of factors has been similar to the combination set forth here. Thus, where the defendant has engaged in extremely bizarre, hostile, threatening, or disruptive behavior through the course of trial, and where expert opinion concerning competency has been divided, the courts have uniformly held that hearings are required under Pate and Drope. *See, e.g.*, Reynolds v. Norris, 86 F.3d at 801-802; United States v. Williams, 113 F.3d 1155, 1160-1161 (10th Cir. 1997); Tillery v. Eyman, 492 F.2d 1056 (9th Cir. 1974). Where, however, such behavior has been fully taken into account by mental health

experts and uniformly determined not to be the product of underlying disorders, hearings have not been required. *See, e.g.*, Speedy v. Wrick, 748 F.2d 481, 485-486 (8th Cir. 1984) (after remand); United States v. Lebron, 76 F.3d 29, 32-33 (1st Cir. 1996); United States v. Prince, 938 F.2d 1092, 1095-1096 (10th Cir. 1991).

414. Finally, there can be no question that if Mr. Paul's observed behaviors were the product of underlying disorders, he was not competent to stand trial. His inability to consider a plea offer for a sentence less than death reflects a less than rational understanding of the proceedings against him. *See* United States v. Dusky, 362 U.S. at 402 (proper assistance in the defense requires an understanding that is "rational as well as factual"). Moreover, courtroom demeanor and rational consultation with counsel at trial is a critical way in which a criminal defendant must be able to assist in his defense. *See* United States v. Williams, 113 F.3d at 1160; United States v. Hems, 901 F.2d 293, 295 (2nd Cir. 1990). As Justice Kennedy explained in a different context, involving the forcible use of medication to assure a defendant's competence in a capital prosecution, but equally applicable here:

> It is a fundamental assumption of the adversary system that the trier of fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table... At all stages of the proceedings, the defendant's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall

> impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial...
> [This is particularly true] during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, and his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies.

Riggins v. Nevada, 504 U.S. 127, 142-143 (1992) (Kennedy, J., concurring).

415. Jeffery Paul should not go to his death because of his courtroom behavior where that behavior was the product of serious mental disorder over which he had no control and which substantially undermined his ability both to consult with his counsel and rationally understand and respond to the proceedings against him.

**XXII. Upon Information and Belief, After a <u>Bona Fide</u> Doubt Was Raised about the Defendant's Mental Competency to Stand Trial, the Court Failed to Hold an Adequate Hearing to Address and Adequately Resolve the Issue of Competence to Stand Trial, in Violation of Mr. Paul's Rights to Due Process, a Fair Trial, and the Effective Assistance of Counsel, as Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

416. Upon information and belief, Mr. Paul was deprived of his right to a full and fair hearing on the issue of whether he was competent to stand trial in this case, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

417. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

418. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

419. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

420. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

421. The facts regarding Mr. Paul's mental competency in fact, which underlie the claim presented here, are fully set forth elsewhere in this motion in Mr. Paul's claim that he was in fact incompetent to stand trial, and are incorporated herein by express reference. In short, however, as noted above, there was and is significant evidence that Mr. Paul was incompetent, and/or became incompetent as the trial progressed, and this Court was aware of that evidence during both the pre-trial and the trial proceedings. Upon information and belief, in addition to the above facts, the Court was sufficiently concerned about Mr. Paul's mental state during the trial proceedings that it consulted with the U.S. Marshal's service concerning his behavior and deteriorating mental condition.

422. For these reasons, at several points in the trial the Court should at the very least have stopped the proceedings and made inquiries into Mr. Paul's mental

state and possible incompetence to proceed further. The Court's failure to do so violated Mr. Paul's right to a full hearing on the issue once a doubt as to his competency had been raised by all of the evidence, including the mounting evidence of Mr. Paul's deterioration during the trial.

423. The law is clear that the failure to conduct hearing in this case alone warrants a new trial or at least a new sentencing proceeding. In Drope v. Missouri, 420 U.S. 162, 179 (1975), the Supreme Court held that the trial judge committed constitutional error warranting a new trial when it failed to hold a full competency hearing in the face of evidence that the defendant may have been incompetent. The Court also held that a retrospective hearing would not have been adequate to make the determination of competency. *See* Pate v. Robinson, 383 U.S. 375 (1966). Critically here, the Court's duty to conduct a hearing exists whether or not defense counsel make a full and adequate request for such a hearing. *Id.*

424. The Court's failure to conduct the proper inquiry before trial was compounded by the events of trial as they unfolded within full view of the Court. As noted above, several times throughout the trial itself, the Court received further information that should have warranted the follow-up testing and evaluation contemplated by the court expert from the beginning.

425. In Pate v. Robinson, 383 U.S. 375 (1966), the Supreme Court first recognized that a criminal defendant has a right, protected by due process, to an evidentiary hearing on his competence to be tried whenever there is substantial doubt about his competency. Thereafter, in Drope v. Missouri, 420 U.S. 162 (1975), the Court further explained the contours of this procedural due process protection and made clear that the trial court must hold a hearing, *sua sponte*, if the evidence known to it gives rise to a reasonable doubt about the defendant's competency.

426. There was, and still is, enough doubt about Mr. Paul's competence to stand trial that the Court was obliged under Pate and Drope to hold a hearing into Mr. Paul's competency. In these circumstances, the law is quite clear: the Court's failure to hold a hearing concerning Mr. Paul's competence to stand trial deprived him of a fair trial.

427. In Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996), the Eighth Circuit reviewed the due process requirements set forth in Pate and Drope. The Court first noted the foundational safeguard that "'the Due Process Clause... prohibits the criminal prosecution of a defendant who is not competent to stand trial.'" *Id.* at 799-800 (*quoting* Medina v. California, 505 U.S. 437, 439 (1992)). The Court

then set forth the criteria for competency, alternatively articulated by the Supreme Court in Drope, 420 U.S. at 171:

> to be competent to stand trial, one must have 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense[.]'

and in Dusky v. United States, 362 U.S. 402 (1960):

> [a] defendant is competent to stand trial if 'he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and [if] he has a rational as well as factual understanding of the proceedings against him.'

86 F.3d at 800.

428. The Court in Reynolds then explained that "[t]o safeguard this due process guarantee, the Supreme Court has established a separate procedural due process right to a competency hearing." *Id.* (*citing* Drope v. Missouri, 420 U.S. at 172; and Griffin v. Lockhart, 936 F.2d 926, 929 (8th Cir. 1991)). "Due process requires the trial court to hold a competency hearing, either on motion or *sua sponte*, whenever evidence raises a 'sufficient doubt' about the accused's mental competency to stand trial." *Id.* (*citing* Branscomb v. Norris, 47 F.3d 258, 261 (8th Cir.), *cert denied,* 115 S.Ct. 2260 (1995); and United States v. Day, 949 F.2d 973, 981 (8th Cir. 1991)). The Court emphasized that this duty arises "any time" evidence suggesting doubt about competency emerges in trial court proceedings.

*Id.* (*citing* Speedy v. Wrick, 702 F.2d 723, 727 (8th Cir. 1983), in which, notwithstanding pretrial psychiatric examinations concluding that defendant was competent, subsequent evidence of the defendant's irrational behavior immediately before and during trial suggested a post-evaluation deterioration and possible incompetency, mandating a competency hearing.) The Reynolds panel emphasized this duty by referring to the Supreme Court's cautionary note in Drope v. Missouri, 420 U.S. at 181:

> [e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.

*Id.* at 800.

429. Finally, the Reynolds panel explained that the determination of whether there is "sufficient doubt" to require a competency hearing rests upon several factors:

> While the Supreme Court has not described the precise quantum of proof necessary to establish sufficient doubt, it has indicated that the trial court should consider (1) evidence of irrational behavior by the accused, (2) the accused's demeanor at trial, and (3) any prior medical opinion as to the mental competency of the accused to stand trial.

*Id.* (*citing* Branscomb v. Norris, 47 F.3d at 261; Griffin v. Lockhart, 925 F.2d at 930; and Speedy v. Wrick, 702 F.2d at 727). "Additionally, the trial court may

consider an express doubt by the accused's attorney, although such doubt alone is not enough to establish sufficient doubt." *Id.* (*citing* Branscomb, 47 F.3d at 261; Griffin, 935 F.2d at 930).

430. In determining whether there is sufficient doubt of a defendant's competency to hold a hearing, the Supreme Court has taught "that even one of these factors standing alone may, in some circumstances, be sufficient." Drope v. Missouri, 420 U.S. at 180. *See* Griffin v. Lockhart, 935 F.2d at 930; Speedy v. Wrick, 702 F.2d at 726. To provide additional guidance to the trial courts in determining whether there is sufficient doubt, the Eighth Circuit adopted, in Lindhorst v. United States, 658 F.2d 598, 607 (8th Cir. 1981), an explanation from Moore v. United States, 464 F.2d 663, 666 (9th Cir. 1972) (*per curiam*), of the kind of doubt that calls for a hearing:

> Under the rule of Pate v. Robinson, ... a due process evidentiary hearing is constitutionally compelled at any time that there is 'substantial evidence' that the defendant may be mentally incompetent to stand trial. 'Substantial evidence' is a term of art. 'Evidence' encompasses all information properly before the court, whether it is in the form of medical reports or other kinds of reports that have been filed with the court. Evidence is 'substantial' if it raises a reasonable doubt that cannot be dispelled by resort to conflicting evidence. The function of the trial court in applying Pate's substantial evidence test is not to determine the ultimate issue: Is the defendant competent to stand trial? Its sole function is to decide whether there is any evidence which, assuming its truth, raises a reasonable doubt about the defendant's

competency. At any time that such evidence appears, the trial court *sua sponte* must order an evidentiary hearing on the competency issue.

431. Before considering the application of these principles to Mr. Paul's case, this Court should be assured that the procedural posture in which the need for a hearing concerning Mr. Paul's competence to stand trial is first raised - in the present §2255 motion for a new trial – presents no barrier to the claim.

432. In Pate v. Robinson, the Supreme Court rejected the argument that Robinson's failure to request a competency hearing at trial amounted to a waiver of the claim that due process entitled him to such a hearing. 383 U.S. at 384. Citing an Eighth Circuit opinion reaching the same conclusion, Taylor v. United States, 282 F.2d 16, 23 (8th Cir. 1960), the Court explained, "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." 383 U.S. at 384. This rationale explains why the due process right recognized in Pate must be protected by the Court *sua sponte*. Reynolds v. Norris, 86 F.3d at 800.

433. In addition, it is clear that the right recognized in Pate may rest upon evidence known to the trial judge as a result of any trial *or post-trial* proceedings in the case. *See* Collins v. Housewright, 664 F.2d 181, 183 n.6 (8th Cir. 1981) ("[a] Pate violation is a procedural error by the trial court and it may occur only in

the time frame encompassed by the trial itself and immediately related proceedings"); Acosta v. Turner, 666 F.2d 949, 955-956 (5th Cir. Unit B 1982) (finding a Pate violation, in part, on the basis of evidence emerging from post-trial psychiatric evaluations).

## XXIII. Upon Information and Belief The Court's Instructions Erroneously Required the Jury to Weigh the Intent "Eligibility" Finding As a Statutory Aggravator During the "Selection" Stage of Sentencing Deliberations, In Violation of The FDPA and the Sixth, Eighth and Fourteenth Amendments

434. Upon information and belief, the Court's instructions erroneously required the jury to weigh the intent "eligibility" finding as a statutory aggravator during the "selection" stage of sentencing deliberations, in violation of Mr. Paul's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

435. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

436. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

437. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

438. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

439. The Court's instruction on intent not only violated Enmund; it also erroneously characterized the intent finding as a statutory aggravator to be weighed in the selection phase of the jury's sentencing determination. These instructions undermined the reliability and validity of Mr. Paul's sentencing trial.

440. After instructing the jury on intent as noted, App. 185, the Court then instructed the jury at sentencing to consider this intent factor during the selection phase as a part of the weighing of aggravating and mitigating factors. Thus in discussing the weighing process, the Court specifically referred to the intent finding as an statutory aggravating factor to be weighed in the balance:

> The process of weighing aggravating and mitigating factors against each other or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment is not a mechanical process.... In this regard, you may note that *the statutory aggravating factor concerning the defendant's intent* duplicates the intent element of

> the offense. Further, you may note that *the_aggravating factor concerning pecuniary gain* duplicates one of the elements of the offense of robbery.

App. 195-96 (emphasis added). Sandwiched between the reference to "weighing aggravating and mitigating factors" and the reference to the pecuniary gain factor as an "aggravating factor" (which it legitimately is), the intent instruction indisputably required the jury to weigh the intent finding as a "statutory aggravating factor." The prosecution compounded the error by also describing the intent eligibility finding as a "statutory aggravating factor" during the opening and closing arguments at sentencing. *See* App. 177 ("the first statutory aggravating factor that we have to prove beyond a reasonable doubt is intentional killing....") App. 200 (same). Thus the Court's instructions, especially when coupled with the prosecution's argument, were clearly erroneous, both as a matter of statutory and constitutional law, and require reversal of Mr. Paul's death sentence.

441. The Supreme Court has distinguished between that part of the capital sentencing process known as the "eligibility" determination and that known as the "selection" determination. *See* Jones v. U.S., 119 S.Ct. 2090, 1999 WL 401258 (U.S.) (June 21, 1999) at *5. In the first, the sentencer is required to make findings that are necessary pre-conditions to the consideration of a death sentence. For example, as noted above, one constitutionally required eligibility finding is

that a defendant must himself have "killed, attempted to kill, or intended that killing take place or that lethal force will be employed," or, in some circumstances, acted with reckless indifference to human life. Enmund, Tison, *supra*. No defendant who fails to satisfy the Enmund liability requirement can, consistent with the Eighth Amendment, be eligible for a sentence of death. This Enmund determination must be made as a pre-condition to consideration of a death sentence, i.e., it is an "eligibility" criterion.

442. The "selection" determination then requires the capital sentencer to decide, for those who have been found eligible for a death sentence, whether such sentence is appropriate for the individual defendant. This selection determination usually requires sentencer consideration of relevant aggravating factors, *see e.g.* Zant v. Stephens, 462 U.S. 862, 877(1983), and always requires sentencer consideration of relevant mitigating factors, *see* Eddings v. Oklahoma, 455 U.S. 104 (1982).

443. These two determinations can be accomplished in several ways. The eligibility determination can be made at either the guilt-innocence phase of trial, or at sentencing, so long as it is made as a pre-condition to sentencer consideration of a death sentence. Lowenfield v. Phelps, 484 U.S. 231 (1988); Cabana v. Bullock,474 U.S. 376 (1986). Likewise, the selection phase may employ

sentencer consideration of aggravating and mitigating factors, *see* Gregg v. Georgia, 428 U.S. 153 (1976), or specific interrogatory questions which must enable the sentencer to consider all relevant mitigating evidence prior to a determination of the appropriate sentence. *See* Penry v. Lynaugh, 492 U.S. 302 (1989). What is important here, however, is that there are two distinct inquiries, and that the first, the eligibility inquiry, derives from the Eighth Amendment requirement that, to be constitutional, a death sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 877(1983).

444. Courts interpreting the FDPA have characterized the Act in accordance with the view set forth herein. In U.S. v. Webster, 162 F.3d 308, 323 (5th Cir. 1998), the Court described the (a)(2) intent finding as a gateway finding. According to Webster, only after that finding does the jury then weigh the aggravating and mitigating factors proffered by the parties. *Id.*; *see generally*, Jones, *supra* at *5 (describing "eligibility phase" and "selection phase" embodied in FDPA). Statutory and constitutional issues were created by the Court's merging of these two stages.

445. With respect to the statutory argument, Webster provides ample authority. In rejecting the contention that the lower court erred in failing to require the jury to specify which intent element it had found under sub-section (a)(2), the Court in Webster noted:

> [T]he instructions *accurately charged that the jury was not to weigh the elements of intent in deciding whether to impose the death penalty*. At least one of the elements of intent needs to be found only as a threshold, or gateway, matter; and only once at least one is found does the weighing of aggravating factors and mitigating factors take place--*with no further consideration of the 'elements of intent*.'"

162 F.3d at 323 (emphasis added). The Court continued:

> The instructions walked the jury through this sequential process. The court instructed the jury first to determine whether one of the requisite elements of intent existed. Then the instructions set forth the aggravating and mitigating factors.
> *The instructions nowhere indicated that the jury was to consider the elements of intent once it began to weigh the aggravating and mitigating factors. In fact, the jury specifically was instructed to weigh aggravating and mitigating factors with no mention of the elements of intent.*

*Id.* at 323-24 (emphasis added). The Court thus concluded:

> Finally, the court specifically instructed the jury to consider and *weigh only the aggravating and mitigating factors outlined in the instructions, which did not include the elements of intent*. Assuming, as we must, that the jury followed its instructions, it did not weigh the elements of intent even once.

*Id.* (emphasis added).

446. In Mr. Paul's case, precisely the opposite happened. The Court mis-characterized the intent finding as a "statutory aggravating factor" in a way that made clear to the jury that it was to weigh this finding along with the other aggravating factors in the selection portion of the process. For this reason, there is no question that the Court's instruction violated the FDPA.

447. On the constitutional issue, as noted, the Court's instructions allowed the jury to weigh the intent issue as an aggravating factor in the selection phase. Under the Eighth Amendment, however, before an aggravating factor can be used in the selection process, at least two additional requirements are imposed: (1) it must not be vague; and, (2) it must apply only to a subset of the larger universe of defendants eligible for the death penalty. On the latter, "[i]f the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." Arave v. Creech, 507 U.S. 463 (1993) (emphasis in original). With its broad language, describing virtually any defendant who participates in a murder in any manner, the Court's instruction on intent applies to "every defendant eligible for the death penalty," rather than to a narrower subclass of such defendants. Because of the factor's all-inclusiveness as defined, it was "constitutionally infirm." Arave, *supra*.

448. For several reasons, this issue should not be subjected to harmless error analysis. First, it is a structural error in the sentencing trial completely contrary to the statute. This error did not involve mere jury consideration of an invalid factor; it wholly violated the basic scheme envisioned by Congress. Second, because the intent finding, properly considered, was a necessary pre-condition to consideration of the death sentence, this Court cannot simply "disregard" the factor and re-weigh the remaining factors. To do so would effectively allow Mr. Paul to be sentenced to death absent the required statutory and constitutional findings. The Supreme Court has never authorized re-weighing under such circumstances.

449. Third, as argued elsewhere in this motion, the language of the intent finding was itself also violative of the statute and the Eighth Amendment's liability threshold. In addition, the Court's instruction informing the jury that the intent element "duplicates [an] element of the offense...." App. 195, invaded the jury's province to decide the facts and amounted to a directed verdict on a critical capital sentencing factor. Thus errors were piled one upon another with respect to the fundamental constitutional requirement that the sentencer determine Mr. Paul's personal mental state in connection with the offense. Under these circumstances, harmless error analysis would be ill-advised.

450. Should the Court decide that harmless error analysis should be employed, however, this error cannot be fairly termed harmless. The Supreme Court has held, "when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." Stringer v. Black, 503 U.S. 222, 230-36 (1992). Here, the jury's weighing of a factor that never should have been weighed, and was itself mis-defined, "created ... bias in favor of the death penalty...." by putting a "thumb ... [on] death's side of the scale." Stringer, *supra* at 236.

**XXIV. Upon Information and Belief, The Government Committed Misconduct Throughout All Phases of the Pre-trial, Trial and Post-Trial Process, Violating Mr. Paul's Rights Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

451. Upon information and belief, the government in general, and the prosecution specifically, engaged in repeated misconduct throughout all phases of the pre-trial, trial, and post-trial proceedings in this case, in violation of Mr. Paul's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

452. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

453. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

454. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

455. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

456. The entire process in this case was replete with government misconduct. Set forth herein is a listing of the main aspects of misconduct known at this time to undersigned counsel; by listing some specific examples, Mr. Paul does not intend to waive other instances of misconduct covered by the general characterizations and/or that are not known at this time despite the exercise of due diligence in his investigation but which become known after discovery, if any, is authorized.

457. The misconduct in this case occurred during the death certification process described elsewhere in this motion and incorporated herein by express reference. During that process, the government attempted to influence the decision at the Department of Justice as to whether to certify the case as a death penalty case by relying upon known false evidence and emphasizing such

evidence as one of the primary reasons why a death sentence was warranted in the case. *See* Little, R., The Federal Death Penalty: History and Some Thoughts about the Department of Justice's Role, 26 Fordham Urban L. J. 347, 499-500 (1999); Little, R. Why a Federal Death Penalty Moratorium?, 33 Conn. L.Rev. 791, 805-813 (2001).

458. In addition, as asserted elsewhere in this motion, and incorporated herein by express reference, the government relied upon the race of the defendant, Jeffery Paul, as a basis for seeking the death penalty and certifying his case as a death penalty case, and as a reason why the case was not de-certified once the co-defendant received a life sentence at his trial. *Id.*

459. After the initial certification for death, the government knowingly relied upon false testimony and evidence throughout the pre-trial and trial proceedings in this case. Such false testimony included, but is not limited to: making available a variety of benefits to numerous government witnesses in exchange for helpful testimony, such benefits including money and promises of money, leniency and immunity and assistance with other pending cases and charges and fines, and promises of leniency or immunity, assistance with other pending cases and/or charges and/or fines, etc., while denying the existence of such to the defense and in the presence of the jury; coercing, pressuring, and

coaching witnesses (including the defendant) to provide incriminating information, irrespective of its accuracy or the witness's ability actually to recall such information, to the government, and/or to testify against Mr. Paul at trial based on such coerced or coached information; knowingly proffering and relying upon false testimony and arguments at pre-trial hearings and during trial in the presence of the jury; and relying upon arguments to the jury based upon false information and/or false characterizations of the record. The witnesses referenced herein include most of the government witnesses who alleged that Mr. Paul made inculpatory statements to them, including, but not limited to, Jason Paul, Chris LaPaglia, John LaVoie, Kris Rogers, Suzy Arbuckle, Rebecca Pingle, & Crystal Davis. These witnesses also include other government agents who testified against Mr. Paul and received cash rewards and/or other benefits in exchange for their testimony and/or assistance.

460. The government also failed to disclose to the defense substantial exculpatory information within the possession of the government or its agents and assigns, and such evidence would have exonerated Mr. Paul and/or produced a different verdict at either or both phases of trial. Such evidence included, but was not limited to: witness statements concerning the time of death which would have exonerated Jeffery Paul; physical evidence which exonerated Jeff Paul; evidence

of the time of death and/or the time of the incident and/or the crime; evidence that Mr. Paul had allegedly confessed to other murders which he did not, in fact, commit.

461. It is a violation of due process for the prosecution to use testimony to obtain a conviction that it knew, or should have known, was false. Mooney v. Holohan, 294 U.S. 103, 112 (1935). In Mooney and its progeny, the Supreme Court has made clear that the deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary notions of justice." *Id.* A conviction obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Pyle v. Kansas, 317 U.S. 213 (1942), Alcorta v. Texas, 355 U.S. 28 (1957), Giglio v. United States, 405 U.S. 150 (1972).

462. In Napue v. Illinois, 360 U.S. 264, 269 (1959), the Supreme Court reaffirmed the expansive scope of this rule, stating that "[t]he same result obtains when the State, although not soliciting false evidence, allowed it to go uncorrected when it appears."

463. The government in this case violated Mooney, Giglio, and Napue, by lying to the defense and proffering false testimony to the jury, concerning the

benefits and promises granted to government witnesses in exchange for testimony and/or information implicating Mr. Paul, when the prosecution knew or should have known that such testimony or assistance was false but allowed to go uncorrected. It likewise violated these principles by coercing and/or coaching its witnesses to relate information and/or to testify against Mr. Paul whether or not the witness could actually recall or attest to the matters sought from them by the government.

464. A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Napue v. Illinois, *supra*, at 269-271; Alcorta v. Texas, *supra*; Giglio v. United States, *supra*. Much of the false evidence in this case went to the credibility of the primary government witnesses who testified against Mr. Paul and who provided the foundation and cornerstone of the prosecution's murder case against him. Evidence of the significant but concealed benefits and promises of benefits to these witnesses constituted powerful impeachment evidence that, had the jury heard it, would have provided a compelling reason for the jury to disbelieve these witnesses and to disregard their testimony in its entirety.

465. The government cannot prove, beyond a reasonable doubt, that this false testimony had no impact on the verdict at both phases of trial. *See* Kyles v. Whitley, 514 U.S. 419 (1995). For this reason, Mr. Paul's federal constitutional rights were violated by the prosecution's knowing use of false testimony, and he is entitled to a new trial.

466. Statements obtained from a criminal defendant may not be used against him or her at trial if, in the totality of the circumstances, the defendant shows that such statements were not given voluntarily and/or were not the product of knowing and voluntary waiver of the defendant's right to remain silent. *See* Colorado v. Connelly, 479 U.S. 157 (1986). In this case Mr. Paul's constitutional rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments were violated.

467. The prosecution also has a duty to disclose evidence that is favorable to the accused. Brady v. Maryland, 373 U.S. 83 (1963). This duty applies to evidence that may be used to impeach the credibility of the prosecution's witnesses, and not just to direct evidence of innocence. United States v. Bagley, 473 U.S. 667, 682 (1985). Brady also imposes a critical concomitant duty on the prosecution to personally become aware of potentially exculpatory evidence in the possession of other government actors. Kyles v. Whitley, 514 U.S. 419 (1995).

468. The prosecution's failure to disclose exculpatory evidence violates federal due process if the suppressed evidence is constitutionally material. Kyles v. Whitley, *supra*, 131 L.Ed. 2d at 506-507 (*citing* Bagley). The Bagley test of materiality has four aspects. First, under Bagley, materiality is a "reasonable probability" of a different result. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id.* Second, the Bagley test of materiality is not a sufficiency of the evidence test. The accused need not demonstrate that had he been privy to the suppressed evidence and presented the evidence at trial, he would have been acquitted. *Id.* Third, once constitutional error is found under Bagley, there is no further need for harmless error review. *Id.* That is because a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different means that the suppression clearly would also have had "substantial and injurious effect or influence in determining the jury's verdict." *Id.* Finally, Bagley materiality is to be measured and analyzed "in terms of suppressed evidence considered collectively, not item by item." Kyles v. Whitley, *supra*, 131 L.Ed.2d at 508-509.

469. In this case, the prosecution violated Brady by suppressing constitutionally material exculpatory evidence exonerating Mr. Paul and/or tending to exonerate Mr. Paul, and impeaching many of the most important government witnesses and/or tending to impeach many of the most important government witnesses in the case. But for the government's failure to disclose this information to the defense, the outcome would most likely have been different at either or both phases of trial.

**XXV. Upon Information and Belief Mr. Paul's Conviction and Death Sentence Violate The Constitution as Set Forth in Apprendi v. New Jersey, 530 U.S. 466 (2000) and its Progeny, Including Ring v. Arizona, ___ U.S.___, 122 S. Ct. 2428 (2002), And as Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

470. Upon information and belief, Mr. Paul's conviction and sentence of death were obtained pursuant to an indictment and procedure that was fundamentally flawed, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

471. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

472. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

473. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

474. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

475. Mr. Paul was charged by indictment with the crimes of §1111 murder and §924(c)(1) use of a firearm in the commission of a crime of violence. *See* App. 6. Count One of the indictment alleged only that Mr. Paul killed Sherman Williams with malice aforethought while aiding and abetting another individual and in the course of a robbery. Count Two charged Mr. Paul with the use of a firearm in connection with the aforementioned death of Mr. Williams. Importantly, however, the grand jury did *not* allege anywhere in the indictment that it had found any of the statutory aggravating circumstances which, under the Federal Death Penalty Act of 1994 ("FDPA"), must be found at trial in order to render the defendant eligible for the death penalty, or the gateway intent finding, *see* 18 U.S.C. §3591(a)(2) which, under the FDPA, must also be found by the jury at trial in order to render a defendant eligible for the death penalty. Pursuant to the

FDPA, those factors were separately alleged in the government's notice of intent to seek the death penalty against Mr. Paul, which enumerated the aggravating factors the government would seek to prove. App. 18.

476. Mr. Paul challenged the sufficiency of the indictment prior to trial, seeking a bill of particulars specifically regarding the elements of the aggravating factors relating to the government's notice of intent to seek the death penalty. Docket 27, 28. In response, the government relied directly upon the allegations contained in the indictment, arguing that this provided the defendant with sufficient notice of both the crime for which he was charged as well as the basis for seeking the death penalty in the case. Docket 60. The Court denied the defendant's motion, relying upon these same arguments, and holding that the indictment was sufficient to provide notice to the defendant because it contained facts supporting each element of the underlying offenses. Docket 87.

477. The Supreme Court held in Jones v. United States, 526 U.S. 227, 251-52 (1999), that the Fifth Amendment requires that all elements of a federal offense be "charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." That principle provides the basic building block upon which several important later cases, and the claim presented herein, rest.

478. On June 26, 2000, while Mr. Paul's case was pending rehearing in the Court of Appeals, the U.S. Supreme Court decided Apprendi v. New Jersey, 530 U.S. 466 (2000). In Apprendi the Court applied the aforementioned Jones principle to sentencing fact which, if found, increase a defendant's sentence beyond the otherwise available maximum punishment -- such facts, the Court, must, consistent with the constitution, be made by a jury and must be found to exist beyond a reasonable doubt.

479. On June 24, 2002, the Supreme Court decided Ring v. Arizona, ___ U.S. ___, 122 S.Ct. 2428 (2002). Ring overruled Walton v. Arizona, 497 U.S. 639 (1990), in light of Apprendi. A key application of the Apprendi decision in Ring was that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of *an element of a greater offense'*. . . ." Ring, 122 S.Ct. at 2443, *quoting* Apprendi, 530 U.S. at 494 n.19 (2000) (emphasis added). As the Court has made clear since Jones, an "element" for purposes of constitutional analysis is any "fact[] necessary to impose the maximum [punishment]." Harris v. United States, ___ U.S. ___, 122 S. Ct. 2406, 2419 (2002). Ring makes clear that aggravating factors in a capital case are elements because they are "legally essential" to increase the available sentence from life imprisonment to death (as

the Court put it in Harris, they are "necessary to impose the maximum [punishment]").

480. The principles set forth in Jones, as applied to sentence enhancing facts as set forth in Apprendi, dictate the conclusion that in a *federal* capital prosecution, the Fifth Amendment requires that all aggravating factors and mental state elements be alleged by indictment. For this reason, the indictment under which Mr. Paul was convicted and sentenced to death is fatally flawed because the grand jury failed to consider or find those elements of the capital offense.[37]

481. This absence of a fundamental procedural protection was not rendered harmless by the fact that the trial jury in Mr. Paul's case found at trial that the government had proved, even "beyond a reasonable doubt," the aggravating factors alleged in its notice of intent to seek the death penalty. First, as noted elsewhere in this motion, incorporated herein by express reference, under the unique facts of this case, the jury clearly *did not* make all eligibility findings set forth in the FDPA, most notably here, the so-called "gateway" on intent. For that reason alone, as set forth elsewhere in this motion, Mr. Paul's sentencing trial was unconstitutional under Apprendi.

---

[37] Upon information and belief, since Ring the Department of Justice has apparently directed prosecutors with pending FDPA cases to seek superseding indictments including aggravating factors .

482. Moreover, the Supreme Court has emphasized that the grand jury "controls not only the initial decision to indict, but also significant decisions such as how many counts to charge and whether to charge a greater or lesser offense, *including the important decision to charge a capital crime.*" Campbell v. Louisiana, 523 U.S. 392, 399 (1998), *citing* Vasquez v. Hillery, 474 U.S. 254, 263 (1986) (emphasis added). Ring makes clear that the grand jury which indicted Mr. Paul never made that "important decision." Its failure to do so cannot be rendered harmless by subsequent findings of the petit jury after the government appropriated the grand jury's constitutionally protected role. Indeed, a federal district court four days prior to the filing of this motion so held. *See* U.S. v. Davis & Hardy, Criminal Action No. 94-381 (E.D. La.) Mem. Order issued December 13, 2002. Mr. Paul urges the Court to follow the lead of the district judge in that case and hold Mr. Paul's death sentence unconstitutional.

483. This reading of Ring – that it requires the grand jury to allege in the indictment any fact-finding necessary to render the defendant death-eligible – is reinforced by the Supreme Court's action four days after Ring in Allen v. United States, ___ U.S.___, 122 S. Ct. 2653 (2002). The Court granted *certiorari*, vacated the decision below (United States v. Allen, 247 F.3d 741 (8th Cir. 2001)), and remanded for further consideration in light of Ring. The first question

presented in Allen's petition for *certiorari* was whether, in a capital case brought pursuant to the FDPA (*i.e.,* a capital case like Mr. Paul's), the Fifth Amendment required that aggravating factors be presented to, and found by, the grand jury, rather than simply being alleged by prosecutors as provided by 18 U.S.C. §3593. *See* Allen, 247 F.3d at 761-764 (addressing and rejecting this claim, prior to Ring). The Supreme Court's decision to vacate and remand Allen is strong evidence that the Fifth Amendment requires, in a federal capital case, that aggravating factors be presented to and found by the grand jury.[38] Because Mr. Paul's indictment did not contain those elements of the offense, his conviction and death sentence violate his right to grand jury indictment under the Fifth Amendment and this Court should grant relief.[39]

---

[38] Ring does not discuss the grand jury issue since that case arose in the context of a state prosecution, where the Fifth Amendment's Indictment Clause does not apply. Hurtado v. California, 110 U.S. 516 (1884). Apprendi and Ring clearly establish, however, that aggravating factors in a scheme such as the FDPA operate as "elements" (of the sentence) that must, in the federal system, be alleged by way of indictment. The only issue presented by Allen's petition for writ of *certiorari* to which Ring could apply was the applicability of the Indictment Clause to aggravating factors in a case brought pursuant to the FDPA.

[39] Ring – which concerns the definition of what elements constitute a particular (greater or lesser) offense – is a decision of substantive constitutional criminal law, and thus should be retroactively applicable in this case notwithstanding the fact that Mr. Paul's conviction became "final" on direct review prior to the decision in Ring. *See, e.g.*, United States v. McPhail, 112 F.3d

(continued...)

484. Ring's declaration that the aggravating circumstances and mental state factors in the FDPA are elements of the offense, indeed, renders the FDPA itself facially unconstitutional and requires relief from Mr. Paul's death sentence on that basis as well. The "greater offense" of which those findings are elements (which, for the sake of convenience, we will denote here as "federal capital murder") has not yet been created by Congress, which alone can establish and define federal criminal offenses and the penalties which attach to them. United States v. Hudson, 11 U.S. 32, 34 (1812); Bousley v. United States, 523 U.S. 614, 620-21 (1998) ("[O]nly Congress, and not the courts, [can] make conduct criminal"). While

---

[39](...continued)
197, 199 (5th Cir. 1997) (Bailey v. United States, 516 U.S. 137 (1995), "applies retroactively to cases on collateral review" because it "articulate[d] the substantive elements that the government must prove to convict a person charged [under 18 U.S.C.] § 924(c)(1)," and thus was "a substantive, non-constitutional decision concerning the reach of a federal statute" and "not … a new rule of criminal procedure [implicating] the retroactivity analysis set forth in Teague v. Lane,") (citation omitted). In any event, Mr. Paul's conviction did not become final until after the Court decided Apprendi. *See* Griffith v. Kentucky, 479 U.S. 314, 321 n. 6 (1987) (for retroactivity purposes, "[b]y 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied."). He is thus entitled to rely upon the principles set forth therein in support of any claim he makes in this motion. Apprendi provides all the law that is needed to underscore the constitutional merit to the claims he sets for here and elsewhere in this motion. *See* U.S. v. Thomas, ___ F. 3d ___, 2002 WL 31545772 (D.Del.)) ("The Ring case, however, is basically an application of Apprendi in the context of capital sentencing. In the Court's view, Ring does not create any new right [additional to those set forth in Apprendi.]").

Congress no doubt intended to create such a death-eligible offense, the plain import of Apprendi and its application in Ring is that it failed to do so.

485. Additionally, the doctrine of separation of powers, combined with the non-delegation doctrine[40] and the long-established constitutional principle forbidding judge-made "common law" criminal offenses, compel the conclusion that the FDPA cannot, after Apprendi and Ring, be judicially "construed" to create an offense and associated procedures which comply with constitutional mandates.[41] Even if this Court is confident it can divine how Congress would have defined the elements of "federal capital murder" had it been legislating against the post-Apprendi legal landscape, and even if this Court believes it could craft workable solutions to the numerous procedural questions about how to accommodate the provisions of the FDPA to the Apprendi/Ring characterization

[40] The non-delegation doctrine, *see* Mistretta v. United States, 488 U.S. 361, 371-372 (1989), would preclude either the Executive or the Judiciary, whether acting individually or in tandem, from substituting its judgment for that of Congress in relation to prescribing the elements and the procedures for application of a federal death penalty.

[41] The doctrine of "constitutional avoidance," *see* United States *ex rel.* Attorney General v. Delaware & Hudson Co., 213 U.S. 366, 408 (1909); *see also* Jones, 526 U.S. at 239–40, has no place in this analysis because the portions of the FDPA which are impossible to square with Ring are wholly unambiguous. This Court may not accomplish that which Congress never intended by "construing" the FDPA in a way Congress never contemplated. *See* United States v. Albertini, 472 U.S. 675, 679 (1985).

of sentence enhancing (aggravating) factors as elements of the offense,[42] the law forbids it from doing so. United States v. Jackson, 390 U.S. 570, 572-582 (1968) (rejecting efforts to save a comparably flawed federal death penalty statute). It is not that this Court is not competent to fix the FDPA, but that the Constitution places that power, for good or ill, exclusively in the hands of Congress.[43] Under Apprendi and Ring, this Court's duty is to declare the FDPA facially unconstitutional and vacate Mr. Paul's death sentence.

486. In enacting the FDPA, Congress was not silent on the issue of how it was that a case of federal murder would be transformed into a death penalty case. The statute explicitly assigned exclusive responsibility for that decision to the

---

[42] These procedural problems include, but are not limited to, the following: whether non-enumerated aggravating circumstances as provided by 18 U.S.C. § 3592(c) ("any other aggravating factor for which notice has been given") must, like the enumerated aggravating circumstances in § 3592(c)(1) –(c)(16), be found by the grand jury and alleged in the indictment (and, if so, in what language and with what particularity); whether the accused must plead to the aggravating circumstances and/or mental state factors; and whether some elements of the "greater offense" of "federal capital murder" -- but not others – may be proved by evidence that does not satisfy the Federal Rules of Evidence. *Cf.* § 3593(c) (making "information" admissible at the special sentencing hearing "regardless of its admissibility under the rules of evidence governing admission of evidence at criminal trials").

[43] *See* Jackson, 390 U.S. at 573, 578; *id.* at 580 (a court may "fill a minor gap in a statute," but not "create from whole cloth a complex and completely novel procedure" solely to rescue a statute from being declared unconstitutional).

Executive. Thus, pursuant to the FDPA, a sentence of death may not be sought unless, as set forth in the statute itself, "the attorney for the Government believes that the circumstances of the offense are such that a sentence of death is justified . . . ." 18 U.S.C. § 3593(a). Where the government attorney does believe death is warranted, the next step in the legislatively-selected process is for that attorney to serve and file a notice, signed by the attorney for the government, stating, *inter alia*, that "the Government believes that the circumstances of the offense are such that, if the defendant is convicted, a sentence of death is justified . . . and that the Government will seek a sentence of death; . . . ." 18 U.S.C. § 3593(a)(1).

487. The FDPA also requires proof – and allegation in the notice by government attorneys – of one or more of four "gateway" state-of-mind factors. 18 U.S.C. § 3591(2). The notice, in addition, is required to set forth the statutory aggravating factors the government proposes to prove if the defendant is convicted, and also permits the government to serve notice of victim-impact evidence, 18 U.S.C. § 3593(a), and various *non*-statutory aggravating factors. 18 U.S.C. § 3592(d).

488. Thus, the situation with which this Court is faced is fundamentally different from the role of the escalating penalties associated with drug-quantities in Title 21 cases or the extent of injury suffered by the victim of a car jacking. In

both such cases, Congress was silent on whether such factors – now clearly seen as elements of a greater offense – were to be found by judge or jury. Thus, both categories of cases were fair game for a saving judicial construction. *See, e.g.,* Harris v. United States, 122 S.Ct. 2406 (2002); United States v. Cotton, 122 S.Ct. 1781 (2002); Jones v. United States, 526 U.S. 227 (1999). In the case of the FDPA, however, Congress was not silent on the process of commencing a capital case. Thus, whatever "fix" this Court may wish to read into the FDPA on these issues, it "is not the scheme that Congress enacted." United States v. Jackson, 390 U.S. 560, 573 (1968).

489. Another federal court's recent decision in United States v. Fell, 2002 *U.S. Dist. LEXIS* 17932 (D.Vt. 2002) underscores the constitutional importance of this issue. In Fell Judge Sessions concluded that Apprendi and Ring's declaration that sentence enhancing factors, such as aggravating factors, serve as "elements" just like elements of the underlying offense, combined with the constitution's requirement for heightened reliability in capital cases, rendered the FDPA unconstitutional since the FDPA's "direction to ignore the rules of evidence when considering information relevant to death penalty eligibility is a violation of the Due Process Clause of the Fifth Amendment and the rights of confrontation and

cross-examination guaranteed by the Sixth Amendment." *Id.* at *1.[44] As noted in the Fell opinion, this result followed from the Supreme Court's Apprendi- Ring jurisprudence since, were the government's perspective to prevail, exposure to the death penalty would become, "the federal criminal justice system's sole exception to the practice of requiring that offense elements be proven by admissible evidence comporting with due process and fair trial guarantees." *Id.* at *50. "This," concluded Judge Sessions, "makes no sense." *Id.*

490. In reaching that result, as argued herein, Judge Sessions declined to "correct" the congressional decision to allow a relaxed standard of proof at the penalty phase of a capital case, writing:

> This is not a situation where a Constitutional question can be avoided by adopting one of two plausible constructions. *Cf.* Jones, 526 U.S. at 239-40. This is not a situation where the Court can correct a gap or a Congressional oversight, can state, in effect, if Congress had known that the death-eligibility factors were the functional equivalent of elements, Congress would have ensured that the rules of evidence applied. Given the fact that Congress has spoken on the issue, the court is not permitted to fashion its own evidentiary rules for the eligibility of a capital sentencing proceeding in defiance of the Congressional mandate. The FDPA "cannot be saved by judicial reconstruction." United Sates v. Jackson, 390 U.S. 570, 585, 20 L.Ed.2d 138, 88 S.Ct. 1209 (1968).

---

[44] Judge Sessions also noted that there may be legal merit to the view of the Court in United States v. Quinones, 205 F.Supp.2d 256 (S.D.N.Y. 2002) that the FDPA is invalid because of the constitutionally unacceptable risk of executing the innocent. Fell, at *5.

*Id.* at *53. Judge Sessions also noted that the unconstitutional portion of the FDPA could not be severed since, without the provision, "the basic operation of the FDPA is substantially altered." *Id.* at *54, n. 10, *citing* Alaska Airlines, Inc. v. Brock, 480 U.S. 678, 685 (1987) as setting forth the basic test of severability, *i.e.,* "whether the statute will function in a manner consistent with the intent of Congress."

## XXVI. Upon Information and Belief, Mr. Paul was Denied His Right to the Effective Assistance of Counsel Throughout All Phases of the Pre-Trial, Trial and Post-Trial Process, In Violation of His Rights as Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution

491. Upon information and belief, Mr. Paul was denied his right to the effective assistance of counsel at all phases of his pre-trial, trial, and post-trial proceedings, and he was prejudiced thereby and/or prejudiced should be presumed from such denial, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

492. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

493. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

494. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

495. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

496. But for all of the instances of counsels' ineffectiveness set forth herein and to be articulated further once the Court has allowed for discovery, if any, both individually and cumulatively, there is a reasonable probability outcome would have been different at all stages of the pre-trial, trial, and post-trial proceedings. In any event, the instances of counsels' ineffectiveness set forth herein and to be articulated and developed in these proceedings are sufficient to undermine confidence in the verdicts at both phases of trial.

497. Set forth herein are a number of instances of trial counsels' ineffectiveness. The instances set forth herein are not meant to be a detailed, exhaustive list of every specific thing counsel did or did not do throughout all phases of this case; rather, they are meant to provide the Court and the government reasonable notice of the variety of ways in which Mr. Paul is claiming that his trial

counsels' performance violated his Sixth Amendment right to the effective assistance of counsel.

498. Trial counsel failed adequately to investigate the facts of the case, the crime, and all other bad acts and uncharged offenses of Mr. Paul that were presented by the government to the jury.

499. Trial counsel failed adequately to investigate their client's background, history, and his mental, physical and medical condition throughout his life, at the time of the offenses, both charged and un-charged, which were presented to the jury at both phases of the trial, and at the time of all pre-trial, trial, and post-trial proceedings. Had they performed sufficient investigations, they would have learned of substantial exonerating and/or exculpatory and/or mitigating evidence, as well as evidence of his incompetence to stand trial, and they would have investigated, developed and presented such evidence to the Court and/or to the jury during one/or both phases of trial, either through lay witnesses, and/or through expert witnesses.

500. Trial counsel failed adequately to investigate all aspects of the prosecution's case and/or interview, or interview appropriately, all relevant witnesses on the government's witness list and/or presented by the government at either phase of trial.

501. Trial counsel failed to seek to interview and present testimony from the co-defendant in this case, Trinity Ingle, especially after he had been convicted and given a life sentence but before or during Mr. Paul's trial. Had they done so, they would have been able to develop and present substantial strong evidence which would have exonerated their client, Jeffery Paul.

502. Trial counsel failed to seek and conduct adequate scientific and expert testing of all of the evidence upon which the prosecution relied at either or both phases of trial. This includes, but is not limited to, the physical evidence the government allegedly obtained from the scene of the offense and from other sources during the investigation of the murder of Sherman Williams.

503. Trial counsel failed adequately to investigate all avenues and lines of defense, including factual innocence and duress, and failed to present critical evidence at both phases of trial which would have proven their client innocent at the guilt-innocence phase, and not eligible or otherwise not suitable for a death sentence during the sentencing phase.

504. Trial counsel failed adequately to investigate, interview, consult with, and prepare the one defense witness which they did call to testify at trial. As a result, that witness failed to relate substantial information in mitigation to the jury, and/or ended up relating substantial aggravating information to the jury.

505. Trial counsel affirmatively presented to the jury evidence that was damaging and prejudicial to their client, during both phases of the trial.

506. Trial counsel failed to seek funds for appropriate expert assistance and/or to make an adequate showing of their need for defense expert services to assist them in preparing for all of the pre-trial and trial proceedings, the direct examination of their own witnesses, and the cross-examination of prosecution witnesses, the rebuttal of the prosecution's case at both the guilt-innocence and sentencing phases of trial, and the presentation of the defense case at all phases of the pre-trial, trial, and post-trial proceedings. Such experts would have included, but are not limited to: forensic scientists such as firearms examiners, medical examiners, crime scene experts, ballistics experts, false confession experts, psychiatrists, toxicologists and psychopharmacologists.

507. Trial counsel labored under an actual conflict of interest which adversely affected their performance at all phases of the pre-trial, trial, and post-trial proceedings.

508. Trial counsel failed to file numerous pre-trial motions to preserve and protect the rights of Mr. Paul, and/or failed to investigate, research, and/or present available evidence regarding those motions they did file before, during and after trial.

509. Trial counsel failed properly to preserve and file and argue those motions they did file before, during and after trial.

510. Trial counsel improperly sought, and/or failed to seek and obtain altogether, critical and important evidence that was in the possession of the prosecution, its agents or assigns, and/or other agencies and/or entities, and/or was otherwise readily available to the defense from these and/or other sources, which would have been exculpatory at the guilt-innocence and/or sentencing phases of trial, and which, if discovered, investigated, developed and presented at either pre-trial or trial proceedings, would have materially altered the outcome at all phases of the pre-trial, trial and post-trial proceedings.

511. Trial counsel failed to move properly, or at all, for a mistrial during repeated instances in the trial when a mistrial was warranted and should/would have been granted had such motions been made.

512. Trial counsel conducted an inadequate voir dire, thereby failing to learn of the factual information that would have provided the basis to for-cause challenges of numerous potential jurors and actual jurors, and thereby also failing to learn of biases and prejudices of all potential and actual jurors in the case, knowledge of which was essential to the proper exercise of for-cause and

peremptory challenges, as well as to address and rebut the prosecution's for-cause challenges and its unlawful and/or unconstitutional use of peremptory challenges.

513. Trial counsel failed to assert, argue and preserve numerous challenges to the prosecution's conduct during voir dire, including, but not limited to, engaging in improper and/or erroneous factual assertions and/or legal assertions or arguments before the venire either in general or individually, tainting some members of the venire by engaging in misconduct in the presence of such members, exercising peremptory challenges in an unlawful and/or unconstitutional manner, and numerous other instances of misconduct in which the prosecution engaged during voir dire.

514. Trial counsel failed properly to object and preserve numerous issues that arose or occurred during voir dire, including, but not limited to, the restrictive manner in which the Court conducted the voir dire, the Court's refusal to allow questioning of certain members of the venire and/or to allow certain questions of some and/or all members of the venire, the prosecution's unlawful use of peremptory challenges, the Court's dismissal of members of the venire without adequate legal justification, and/or the Court's unlawful reliance upon *in camera*, *ex parte* proceedings to conduct portions of the voir dire and or portions of the pre-trial, trial and post-trial proceedings.

515. Trial counsel failed to object to the testimony in whole or in part of numerous witnesses throughout all stages of the pre-trial, trial, and post-trial proceedings, and such failure resulted in an unfair pre-trial, trial and/or post-trial proceeding and/or in the jury erroneously hearing substantial prejudicial testimony which would not have been heard had counsel performed adequately.

516. Trial counsel repeatedly failed properly to object to, argue and preserve numerous legal issues that arose and/or occurred throughout the pre-trial, trial, and post-trial process, including, but not limited to, all issues presented herein and in the accompanying motion for discovery, incorporated herein by express reference.

517. Trial counsel failed properly and/or effectively to cross-examine and/or impeach each of the government's witnesses who testified at both phases of trial.

518. Trial counsel failed properly and effectively to examine, and present evidence through the one defense witness called to testify at the sentencing phase of trial.

519. Trial counsel were ineffective in failing properly to assert their client's incompetence to stand trial, either before or during trial, and in failing to seek a formal hearing regarding Mr. Paul's incompetence, despite the fact that Mr. Paul

was in fact incompetent to stand trial as set forth elsewhere in this motion, incorporated herein by express reference. Even if Mr. Paul was not incompetent before trial, counsel was ineffective in failing to recognize the deterioration in his mental state during trial, and thereby failing to ask the Court for a hearing concerning Mr. Paul's mental competency at some point during the trial.

520. Trial counsel were ineffective in failing to provide Mr. Paul with adequate advice and counsel regarding his decisions concerning the plea in the case, concerning whether or not to testify at either or both phases of trial, and concerning the investigative leads and/or other potential witnesses that may or should have been interviewed and/or called at all phases of the pre-trial, trial and post-trial proceedings. Trial counsels' failure to recognize and/or assert their client's incompetence prejudiced the decisions that were made with respect to any plea offers made to Mr. Paul.

521. Trial counsel were ineffective in refusing to allow Mr. Paul to testify in his own behalf, and in failing to inform him that such right was his and his alone to exercise regardless of their objection to such.

522. Trial counsel failed to raise and preserve numerous meritorious issues for litigation in post-conviction proceedings.

523. Trial counsel were insufficiently familiar with the government's case, its witnesses, the relevant documents, the crime scene, the possible defenses and defense witnesses; as a result, counsel were not prepared to contest the government's case and present their own coherent theory of the case at either or both phases of trial.

524. Trial counsel improperly failed to object to numerous erroneous and unlawful jury instructions at both phases of the trial.

525. Trial counsel failed adequately to research and/or understand the relevant law and legal principles governing all aspects of all phases of the pre-trial, trial, and post-trial proceedings. Such failures contributed to counsels' failure to object, move for mistrial, and file other formal motions regarding numerous errors that occurred during the course of the pre-trial and trial proceedings.

526. Trial counsel failed to develop a coherent and/or consistent theory of the case at either or both phases of the trial, and failed to investigate, develop and present a theory or theories of the case that were available and should have been presented at either or both phases of trial.

527. Trial counsel failed adequately to investigate and present evidence on the theory of the defense they did choose to pursue at either or both phases of the trial.

528. At the guilt-innocence phase of trial, the defense called no witnesses, lay or expert, despite that fact that several could have been found and would have been available, including possibly the co-defendant, to exonerate Mr. Paul.

529. Counsel failed to utilize, present affirmative evidence upon, and highlight the fact that the government presented evidence indicating that someone other than Jeff Paul was at the scene of the offense and involved in the taping of the deceased's hands and feet, thereby once again confirming that even if Jeff Paul made statement to friends, acquaintances, and/or government agents implicating himself in the offense, those statements were false and Mr. Paul was in fact innocent of the killing of Sherman Williams.

530. Defense counsel also failed to highlight, and present affirmative evidence, consistent with their theory of defense at guilt-innocence, demonstrating that Jeff Paul lied about many things, including his role in this offense, and that the physical evidence confirmed this theory and clearly refuted many of the factual underpinnings of Mr. Paul's alleged statements. For example, the government presented evidence refuting Mr. Paul's supposed statement to a witness that he had

kicked the deceased in the head at all, and certainly not so hard that his eye had popped out. The physical evidence simply contradicted that statement. Yet despite this evidence and its obvious implications for the defense's theory at the guilt-innocence phase of trial, defense counsel never explored, investigated, developed and/or presented their own testimony, and never focused on this government testimony and its utility in helping show that Jeff Paul lied, that he lied about himself and just how tough he really was in an effort to gain stature in a world of criminals and hoodlums, and for that reason that he had lied about his supposed involvement in the murder of Sherman Williams.

531. The defense failed to pursue vigorously their theory of Jeff's lying at the guilt-innocence phase of trial. They failed to call numerous witnesses, lay and expert, who were available to testify about Mr. Paul's propensity for lying, and who could have taken each of the statements he supposedly had made and demonstrated the falsity thereof through expert and lay testimony.

532. After Mr. Paul was convicted, counsel rendered ineffective assistance in their handling of the sentencing phase of trial. With respect to the evidence they did present, one witness, namely, Jeffery Paul's mother, it fell far short of the available mitigating evidence regarding Mr. Paul's character, background, and the circumstances of his offense. Moreover, the defense also affirmatively presented

and conceded substantial aggravating evidence at sentencing, including presenting testimony about Mr. Paul's prior bad acts, some adjudicated, some not.

533. Defense counsel also failed to present substantial testimony on all of the mitigating circumstances, statutory or otherwise, which they asserted existed in the case. Such testimony included, but is not limited to, substantial testimony and evidence developed and presented by the government and the defense during the trial of the co-defendant, Trinity Ingle, which would have proven a number of mitigating factors, including the mitigating factor that a co-defendant of equal or greater culpability received a life sentence.

534. As a result, when jurors retired to decide if Jeff would live or die, they were required to do so relying on the limited, flawed, and misleading testimony of a single defense witness who, by virtue of her role in Jeff's life (his mother), was easily discountable by the jury as an obviously biased witness, and who otherwise could not attest to facts in support of many of the mitigating circumstances, statutory or otherwise, that the defense could have proven. Just as the defense presentation failed adequately or objectively to depict Jeff's internal family life and its impact on his mental state, behaviors (both outside and inside the courtroom), actions, and ability to make good choices and judgments, counsels' reliance on only one witness, their client's mother, also denied to the jury a

comprehensive and unbiased view of Jeff's life and background exterior to his family, which included friends, associates, teachers, counselors, mental health professionals, and numerous other persons with critical mitigating information about Jeffery Paul which his mother simply did not know and/or could not articulate or explain herself due to lack of knowledge, expertise and the like.

535. Counsel failed to present substantial expert testimony regarding Mr. Paul's age at the time of the offense, and the mitigating aspects of his age and the level of emotional and mental development at the time of the offense. This is so despite the existence and availability of many experts and substantial information regarding the brains and the emotional status of any teenager, especially one as damaged as Mr. Paul was due to circumstances over which he had no control. Such information would have readily proven that Mr. Paul's young age was a substantial mitigating factor in his case, demonstrating as it would have that his brain physiology and his emotional state grossly impacted his ability to exercise good judgment, control his impulses, and repel and resist the domination of other persons, factors which were critical to a mitigating understanding of whatever role Jeff played in the events that culminated in the death of Sherman Williams.

536. As noted, Jeff's mother, Paula Paul, was the sole defense witness during the sentencing phase of the trial. She was, in fact, the sole defense witness

for the trial in total. While she depicted in broad outlines some of the troubles Jeff encountered as a child in the family system in which he was raised, she was, after all, *an integral* part of the very dysfunctional system that grossly impacted how Jeffery Paul came to the place he did in facing federal capital murder charges. Understandably then, due to this role, Mrs. Paul gave a diminished, misleading and, as noted, easily discountable account of Jeff's childhood, family upbringing, and interactions while growing up. Indeed, for her own part, even Mrs. Paul made clear that she was unaware of many of the facts of Jeff's life, and that she had been misled by her husband, a known liar, and Jeff, who had been trained by his own father to exaggerate from a very early age.

537. Critically too, Jeff's counsel affirmatively drew from her testimony about his alleged criminal behavior while growing up, without placing it in the context of the severe familial disturbance from which such conduct emanated and to which she was a major contributor. Mrs. Paul's inability and/or unwillingness to connect this early childhood criminal behavior directly to the dysfunction in the family (*e.g.*, Jeff began stealing at an early age *so that his father could sell the stolen items and pay for essential family needs such as food and rent* – to be discussed later), rendered large parts of the defense's "mitigating" case in fact aggravating in nature. In doing so the defense bolstered aggravating factors that

the prosecution had neither addressed nor presented evidence on, while failing completely to place the young Jeff's activities in a context that would have turned such aggravating information into highly mitigating information.

538. Mrs. Paul trivialized both the extent of her husband, Dennis Paul's, pathological lying and its devastating impact on the family system in general and Jeff Paul specifically. Although experts were available and could have testified in much more detail and with greater accuracy about the depth of Dennis Paul's pathology, they also could have explained its etiology as a way of showing and confirming both that Jeff had learned similar ways of coping with his own self-loathing, and how Jeff's propensity to exaggerate and bolster his own image was derived from a long family history of such behavior. This is critical mitigating testimony which Paula Paul simply could not provide, and yet which defense counsel was well aware was available at the time of trial. Such explanations would clearly have helped the jury understand more clearly, and believe with greater certainty, one of the central themes of the defense case at both phases of trial, namely, that Jeff Paul's alleged statements about the crime had to be taken with a grain of salt and filtered through the lens of recognition that he was himself an exaggerator and "teller of tall tales" and that he had grown up with a key role model for such activity in the person of his own father. This information was

known to many available witnesses, but not to Mrs. Paul, the defense's only witness at trial.

539. That family history began long before Jeff was born. As a child Jeff's dad, Dennis, himself was alienated, afraid, and abused. At school he was labeled "mentally retarded," felt that he was an outcast because of the way he dressed, talked, and smelled. He was routinely beaten up and berated by other kids and by his own family members. These facts were known to available witnesses, but not to Mrs. Paul.

540. As a defense against this constant assault Dennis created a fantasy person to keep everyone away. This fantasy self was a soldier, a fighter, and even a killer. The extent to which he son Jeff would follow in his footsteps, even claiming to have killed people that he did not, is as striking as it is disturbing in its implications for the outcome of this trial. There was no foundation for the lies Dennis Paul told, but he became an expert at convincing others of his own self-fantasies, and they seemed to impress others and thus bolstered Dennis' self-confidence. This information was known to available witnesses, but not to Mrs. Paul.

541. Dennis did not just lie to his children, their friends, and the family's associates; he also used fraud to obtain employment, claiming to be a physical

therapist after forging a certificate, and even working as such a therapist for some period of time before he was "found out.". He also ran a martial arts center for some period of time, claiming to be a black belt when he had no training whatsoever, defrauding both his students and his business partners; again, he was able to maintain this lie for some time before he was caught. This information was either not known to Mrs. Paul, or she was unwilling to tell the jury about it, but there were plenty of other witnesses available to attest to these facts.

542. In addition to the damage Dennis Paul caused through his continual lies, throughout Jeff Paul's childhood his father would disappear from the family for long periods of time without warning or explanation. When asked about this behavior at trial, Mrs. Paul was only able to say she did not know why he left. In point of fact she accepted her husband back without question each time he repeatedly abandoned the family throughout Jeff's childhood. The destructive consequences of the parents' behavior in this regard were many. Dennis was not able to maintain employment, and the family learned to expect the unexpected and brace against untold hardships: the disconnection of utilities, the absence of food from the house, habitual relocation.

543. Importantly for the issue of counsels' failures at the sentencing phase of trial, the family learned that while they could not depend on their father, they

could also not depend on their mother. Mrs. Paul was unable or unwilling to protect her children from the chaotic nature of Dennis' life. They learned that their well being came secondary to the unpredictable whims of their father. Mrs. Paul was obviously unable to share this with the jury, but numerous other members of the family were both able and willing to do so, and expert witnesses could have explained the critical impact of this on Jeff Paul's character, childhood development, and behaviors.

544. Mrs. Paul was not capable of appreciating the extent of the damage caused on the family and on Jeff by her husband's behaviors and actions. For example, she stated that Dennis Paul did not drink, and was not a substance abuser, and that was the end of it. Whether or not accurate, the missing link here is that Dennis Paul's actions and behaviors had the impact on the family that a substance abusing role model would have had: it matters little whether or not Dennis was abusing substances if his actions are indecipherable from a man who was. Expert witnesses who were or could have been available to testify would have readily explained how Dennis Paul's actions and the resulting family chaos were classic examples of those associated with alcoholism. In this case the fact that Mrs. Paul was the sole defense witness not only failed to put the family history in context, it distorted that history. It is one of many instances where she

glossed over the deep damage done to her family by a husband whom she continually accepted back into the household, without question and without requiring changes despite such damage, all in a transparent effort to "put on a good face in public" at the expense of the life of her son.

545. Another of her son's attributes Mrs. Paul was incapable of describing, in part because her own contribution to the family dysfunction likely fostered this attribute, is the known fact that Jeff frequently felt protective of others, especially the helpless. Others were well aware, for example, that he would adopt sick and injured animals, spending what little change he might occasionally have to buy food for the homeless, and weeping when being forced to witness his father abuse animals. This "protector" role came about due to his early childhood self image, at the age of twelve, in which he saw himself protecting his own mother against the unpredictable abandonments and other abusive conduct of his father.

546. It was at this very early and critical period in his life when Jeff came to realize that he could not depend upon his father to provide for the family in any consistent manner. Inheriting the "man of the household" role when he was only twelve years old, he began to look for jobs that he could do to bring money into the family. In one critical and desperate first effort and "providing" for the family, the twelve year old Jeff walked up and down his street asking to carry groceries,

do yard work, anything to help with the family expenses. Unfortunately, possibly due to age, and possibly due to economic conditions in the neighborhood, he was met with one rejection after another. This information, known to available witnesses, was neither known nor appreciated by the sole defense witness at trial, Jeff's mother.

547. Having "failed" in his effort to be the "man of the household," it was at this crucial point in his life when Jeff began to steal – not for his own thrill or enjoyment, but as a way of providing for the needs of the family in the face of his desperate failed efforts at finding work in his neighborhood.

548. Experts and other witnesses with perspective would have, from all of this information, been able to explain Jeff's early involvement in criminal behavior, not as the product of a deviant miscreant out for a thrill, but rather as that of a frightened and insecure child rendered desperate in his attempts to provide basic food and shelter for a family rendered destitute by an absentee and otherwise incapable father. Again, this information was known to a variety of available witnesses, both lay and expert, but not to his mother.

549. So Jeff began stealing at the age of twelve. In most families this behavior, when made apparent to the parents, would result in correction. And indeed, a "normal" family, i.e., one free of the glaring deficiencies seen here which

resulted from the father's lack of support, would have corrected such behaviors in a twelve year old child who would otherwise not have been experiencing the sense of desperate need Jeff was experiencing at this age.

550. Instead, and critically here as a mitigating framework within which to understand the remainder of Jeff's childhood conduct, Jeff's father (when he was at home) responded to Jeff's initial stealing by *encouraging* him to do so again and again, taking the stolen goods from him and selling them as a way to make money for essential family needs such as food and clothing. This critical fact – that the father had pulled lured and encouraged the young boy into an arrangement a life a petty thievery (at first) as a way of providing for the family – was a fact (straight out of a Dickens novel) Jeff Paul's sentencing jury never heard. Despite the compelling nature of such information to soften the blow of later stories of criminal conduct – "the defendant got his start in crime by stealing for his father to help pay the family bills" – Mrs. Paul did not relate it to the jury, either because she was unaware of this arrangement, or willfully blind to the criminal conspiracy between father and son. Whatever, what is clear is that by relying solely on her testimony the defense attorneys were ensuring that this critical link in Jeff's history would never reach the jury.

551. Even more troubling, however, Mr. Paul's attorneys went to great lengths to draw from the mother Jeff's criminal history, supplying her with the information when she was unable to remember, eliciting affirmative responses, completely devoid of this critical mitigating framework -- that the father was inextricably linked to and responsible for setting his own son down this path. Otherwise, merely informing the jury of Jeff's criminal conduct, without more, merely aided the government in its attempts to paint Jeff (falsely) as a deviant sociopath lacking in redeeming qualities.

552. It is clear from her testimony that Mrs. Paul simply could not (or would not) appreciate the magnitude of the damage being done to her family at the hands of her own husband. Jeff always felt particularly protective of his mother. The result of this at trial was, ultimately, detrimental to Jeff, for out his protectiveness toward her he kept much information from her, about his life as well as about his feelings about his family. Defense counsels' choice to rely solely on her to convey the entire mitigating story to the jury was thus fundamentally ill-conceived for this reason alone.

553. The defense was well aware of the fact that much information had been kept from Mrs. Paul by both Jeff and his father. They made several direct references to this in her testimony. Yet, even acknowledging and eliciting from

their sole witness the paucity of knowledge she had, they failed to present associates and friends who could have given the jury the more critical family information the jury needed in order to understand that, whatever role he played in the crime against Sherman Williams, he nevertheless deserved to live.

554. There were, however, numerous individuals who were capable of providing this information to the jury. Associates and friends knew Jeff as a caring, protective, kind, and insecure person. They could see how powerless Jeff felt in the face of his family's chaotic instability, how he struggled to assist them, how ashamed he was of his inability to effect positive change in his family, and how his efforts led him down a dangerous path of criminal activity. They could have talked about the extremely negative impact Dennis had had on Jeff, not only as a role model, but as an accomplice.

555. Numerous of Jeff's childhood friends, as well as their parents and families, were acutely aware of the impact Jeff's chaotic family was having on him. The Jeff they knew was caring, protective, intelligent, and concerned. And as for the criminal conduct he began to display at an early age, what they saw was a child getting in over his head, engulfed by the unmet survival needs of his own family and by the criminal behaviors of older people, and a boy infected with his

father's insecurity and inability to take care of his own family, with the need to lie to bolster a damaged self image.

556. Invariably, of course, but always as a direct result of his early childhood stealing to provide for the family, Jeff was exposed to the world of drug and alcohol use and addiction. Mrs. Paul mentioned that there were alcohol bottles in the closet, but again, was unable or unwilling to discuss Jeff's substance abuse. There were, however, numerous individuals available to tell the jury about the extent of Jeff's drug use and abuse, and to place it in the context of the broader picture.

557. Jeff's drug use began at age ten when Jeff smoked marijuana for the first time. T hat fact alone -- that a boy so young was already experimenting with drugs -- was a sure sign that his home life had led him astray. By age 12 Jeff was using marijuana on a regular basis, skipping school to smoke marijuana he and his brother and cousins had found at his uncles' house. It was also at the age of 12 that Jeff used LSD for the first time. By age 15 Jeff was using LSD about every three days; at 16, Jeff was using methamphetamine almost on a daily basis. In addition Jeff inhaled gold spray paint and used PCP. Many of these drugs were the likely cause of severe and permanent brain damage which forever

compromised Jeff's ability to exercise good judgment, control impulses, and extract himself from stressful and difficult situations.

558. Jeff's attorneys also failed to call upon psychological and psychiatric experts capable of putting much of this social history information in context, and capable of discerning and describing the serious and debilitating mental disorders and medical conditions from which he suffers and which explain much about Jeff's life and conduct.

559. Such experts would have noted, and explained, the significance of the fact that Jeff's extended family had a history of psychological disorders, as well as and drug and alcohol abuse. Mrs. Paul briefly mentioned this fact, but was neither qualified nor capable of explaining what it meant to Jeff's psychological make-up.

560. Mrs. Paul also noted that Jeff had been seen by several counselors as a child. But once again, she failed to explain the depth of his treatments, as well as their significance in terms of confirming his serious mental disorders. In fact Jeff spent months in and out of mental institutions as a kid, with additional time in out-patient treatment, yet none of the many counselors, doctors, and therapists who treated and worked with him were called to the stand to discuss the conclusions they came to after countless hours spent with Jeff. None of them were allowed to tell the jury how they had witnessed in real time the extent of the psychological

damage Jeff was suffering due to the chaotic home life to which he was being subjected; likewise, none were allowed to tell the jury how on numerous occasions Jeff would have the opportunity to make real advances in his mental health snatched away from him by his family, who had begun to rely upon him as a family "breadwinner" and needed him to continue his criminal conduct for financial support. On several occasions Jeff's parents removed him from therapy, claiming he was adequately improved, when in fact he was not even close to having completed his treatment. These counselors, doctors, and therapists could have discussed the devastating effects of removing Jeff from necessary medical and mental health treatment due to financial considerations which included the need for Jeff to make money on the streets. They also could have given the jury an understanding of how Jeff's drug problems and use were clearly an attempt to medicate himself against the mounting stress and trauma of his ongoing family life and the serious mental disorders and emotional instability from which he suffered.

561. In addition to the experts that had been working with Jeff in childhood, the defense could have presented evidence from other available experts, including psychologists, neuropsychologists, and psychiatrists, who could have testified about Jeff's serious mental disorders and his severe organic brain damage. Rather than viewing whatever the jury perceived to be Jeff's role in the

offense as the product of an evil bent of mind, the jury's picture would have been that of a severely injured and under-developed young man suffering from serious medical and mental conditions for which he was neither responsible nor capable of controlling.

562. Mrs. Paul was simply incapable of knowing, relating, and explaining all of this to the jury. She did not appreciate nor could she admit that her husband was a critical and devastating link which connected Jeff the child – who adopted and cared for abandoned animals – to the Jeff that the jury had just determined played some role in the death of another human being. *Jeff's father, Dennis Paul, drove his family to financial ruin through abandonment and then, when Jeff was attempting to correct the situation, Dennis encouraged him to do so with a life of crime*. Mrs. Paul was of course blind to this dynamic, both because she was kept unaware of many things, and because by merely accepting her husband back into the household repeatedly, and without questioning or demanding changes in his behavior, she put the needs and whims of her husband before those of her own children. And yet she is the *sole person* defense counsel chose to explain to the jury why Jeff Paul was not so horrible a person, or such and evil human being, that he deserved something less than death.

563. All of the other available witnesses noted above – friends, family associates, experts, counselors, teachers, etc., – were, however, readily available to testify about the devastating impact of Mr. Paul's behaviors on his son Jeff. They witnessed physical abuse as well as the effects of the emotional abuse and instability. They knew of the transformation Jeff underwent from hopeful, caring, protective son to broken drug addict under the influence of destructive and violent criminals. They also knew, and could have told the jury, about how Mrs. Paul facilitated this transformation by making excuses for, and accepting her husband's detrimental behavior, allowing him to wreak havoc upon the stability and health of the family. They would have told the jury about Mr. Paul's own criminal activities and connections, as well as Mrs. Paul's inability and unwillingness to accept or even notice the degree to which her family was spinning out of control.

564. The defense team also refused to call even a single teacher, counselor or probation officer. As noted, Jeff was plagued by both emotional as well as psychological difficulties, the effects of which were exacerbated by family instability. These institutional employees were well aware that Jeff's true nature – as a caring, sensitive, and protective child – became increasingly overshadowed by the poor judgements he was making as a result of the mounting pressure, both internal and external. They could have testified about the violent people in whose

company Jeff increasingly found himself as a direct result of his initial efforts to care for and protect his own family. These institutional employees and the psychological counselors, doctors and therapists were also aware that Jeff would often, through after-the-fact lies, insert himself into violent situations where he was either never present or where he had had no active role.

565. By the time Mrs. Paul left the witness stand, not only had defense counsel failed to scratch the surface on the mitigating aspects of their client's character, background, record, and the circumstances of the offense, they had assisted the government in proving several aggravating factors which would have otherwise not been proven. In closing argument, defense counsel, having just made out the government's case on several aggravators through the testimony of their own witness, conceded the existence of several of the aggravators.

566. By doing so counsel failed once again both to highlight and to explore the fact that there was no real evidence of several of these aggravators, including, for example, that the murder was particularly heinous, given that the government's own witnesses acknowledged that there was no physical evidence of trauma to the neck or the eye.

567. Trial counsel failed to argue the appropriate federal law, constitutional, statutory, or otherwise, in support of the issues they did assert and raise at all stages of the pre-trial, trial, and post-trial proceedings.

568. Because of inexperience and existing workload, and due to counsel's failures adequately to address, raise and/or confront these issues, defense counsel was incapable of performing adequately throughout all phases of the pre-trial, trial, and post-trial proceedings.

569. After trial, counsel failed adequately to continue investigating and developing new evidence that would have been related to a variety of claims to be presented at the motion for new trial, including all claims raised (and incorporated by express reference herein) in this motion.

570. Trial counsel erroneously opened the door to substantial highly prejudicial testimony from both prosecution and defense witnesses at all phases of the trial.

571. Trial counsel failed properly to preserve objections to evidence, arguments, instructions, court rulings, and other prejudicial occurrences throughout all phases of the pre-trial, trial and post-trial proceedings.

572. Trial counsel failed to investigate and/or rebut and/or object or object properly to evidence concerning Mr. Paul's alleged involvement in other crimes,

adjudicated and/or unadjudicated, which evidence was then presented by the prosecution at either or both phases of trial.

573. Trial counsel was aware of, but failed adequately to investigate, develop and present, numerous affirmative and factual defenses at both phases of trial.

574. Trial counsel failed to make proper opening and closing statements at both phases of trial, by failing to respond to prejudicial and/or unlawful arguments by the prosecution, by failing to address material misstatements of fact or law relied upon by the prosecution, and/or by failing affirmatively to raise helpful facts or arguments for the defense, and/or by failing to provide proper and helpful advocacy in any and all respects.

575. Trial counsel were rendered ineffective by virtue of the prosecution's misconduct at all phases of the pre-trial, trial, and post-trial proceedings in this case, as set forth elsewhere in this motion, incorporated herein by express reference, including, but not limited to: the prosecution's decision to seek death in the first place, and to refuse to refrain from seeking death once the co-defendant had received a life sentence; the affirmative failure to disclose evidence that was exculpatory or demonstrated witness bias at either or both phases of trial with respect to the factual and legal issues, regarding the witnesses who did testify, or

those who did not but had relevant information which was concealed from the defense by the prosecution; the knowing use of perjured testimony at both phases of trial; and the improper and/or illegal arguments made in the prosecution's opening and closing statements at both phases of trial.

576. Trial counsel were ineffective in failing to ensure that all proceedings in the case were memorialized *via* a court reporter, including, but not limited to, all pre-trial hearings, conferences and phone conferences with the Court, all bench conferences during all hearings and proceedings in the case, and any other proceedings.

577. Trial counsel were ineffective in failing to ensure that Mr. Paul was present at all critical parts of the pre-trial and trial proceedings, including but not limited to all proceedings noted in the preceding paragraph.

578. Trial counsel were rendered ineffective by virtue of any jury misconduct that may have occurred throughout all phases of the pre-trial, trial, and post-trial proceedings, about which Mr. Paul is to date foreclosed from investigating, developing and presenting to this Court due to local rules, and about which Mr. Paul has sought discovery in the accompanying motion, incorporated herein by express reference.

579. Trial counsel were rendered ineffective by virtue of any and/or all of the Court's erroneous rulings in this case, including, but not limited to, all such rulings cited herein and in the accompanying motion for discovery, and in all appellate briefing filed by appellant on direct appeal, incorporated herein by express reference, and any such rulings to be identified hereafter in these habeas corpus proceedings.

580. Upon information and belief, trial counsel were rendered ineffective by virtue of the prosecution's and the Court's bias against the defendant and the defense in this case.

581. Upon information and belief, trial counsel were rendered ineffective by the acts of bias and/or misconduct of the Court and/or its officials, employees, and assigns that occurred before, during and after the trial in this case.

582. Trial counsel were rendered ineffective by virtue of the Court's refusal to allow the defense to obtain, investigate, develop and/or present relevant exculpatory and/or mitigating evidence which was otherwise unobtainable by the defense absent court order or authorization to do so.

583. Trial counsel were rendered ineffective by virtue of the Court's refusal to provided sufficient resources to investigate their case prior to and during trial with respect to all issues at both phases of trial.

584. Trial counsel failed adequately to investigate facts and issues about which they were or should have been on notice, for presentation at the motion for new trial, the failure of which may have waived Mr. Paul's right to present and litigate those issues on appeal or in habeas corpus proceedings.

585. Trial counsel failed properly to preserve any facts, claims or issues asserted here by Mr. Paul (or to be asserted later) which this Court or some future court may deem to have been waived by virtue of trial counsels' failure to have properly preserved such facts, claims or issues.

586. None of the acts or omissions of trial counsel cited herein or to be cited in future amended pleadings or as a result of evidence presented to this Court were the result of reasonable and/or pre-conceived strategy, either actual or hypothetical.

587. Any single instance of ineffective assistance of counsel set forth herein was or is sufficient to undermine confidence in the verdict at both phases of trial, and but for such instance, there is a reasonable probability that the outcome would have been different at all phases of the pre-trial, trial, and post-trial proceedings.

588. Any sub-set of the instances of ineffectiveness of counsel set forth anywhere in this motion were and are sufficient to undermine confidence in the

verdict at both phases of trial, and but for such instance or instances, there is a reasonable probability that the outcome would have been different at all phases of the pre-trial, trial, and post-trial proceedings.

589. All instances of ineffectiveness of counsel set forth anywhere in this motion, when viewed in combination, were and are sufficient to undermine confidence in the verdict at both phases of trial, and but for such instances, there is a reasonable probability that the outcome would have been different at all phases of the pre-trial, trial, and post-trial proceedings.

590. As a result of any one, or any combination of, or all aspects of counsels' inadequate performance, there was a breakdown in the adversarial process, and the trial lost its character as a confrontation between adversaries. For this reason, prejudice need not be proven to warrant the granting of a new trial.

591. The U.S. Supreme Court's decision in Williams v. Taylor, 529 U.S. 362, 120 S.Ct. 1495 (2000), confirms that Mr. Paul is entitled to relief on his claim that he was denied his right to the effective assistance of counsel at trial. The pertinent facts of Williams with respect to this claim are virtually indistinguishable from those in Mr. Paul's case.

592. In assessing the claim of ineffective assistance of counsel in Williams the Supreme Court addressed a broad range of factors, including the nature of the

crime and the aggravating evidence of other offenses, the mitigating evidence that was presented at trial, counsel's alleged trial strategy, and the undeveloped mitigating evidence presented in habeas corpus proceedings. Applying 28 U.S.C. § 2254 (d)(1), the Court held as both contrary to the governing law, *see* Strickland v. Washington, 466 U.S. 668 (1984), and "an unreasonable application" thereof, the state habeas court's finding that counsel's performance was not deficient and that the prejudice resulting therefrom did not affect the sentencing outcome. 120 S.Ct. at 1516. The Court found prejudice based upon the conclusion that the mitigating evidence not presented at trial but offered in habeas "might well have influenced the jury's appraisal of [Williams'] moral culpability." *Id.* at 1515.[45]

593. The relevant facts underlying the ineffectiveness issue in Williams are far weaker than those presented by this case. In Williams the jury learned that, in the case in chief, the defendant, acting alone, beat an elderly man with a wooden club, retrieved three dollars from the victim's wallet as he lay gasping for breath,

[45] In comparing Mr. Paul's case to Williams, it is important to note at the outset that unlike Williams his case is preceding outside the restrictions of 28 U.S.C. §2254(d). His case is a §2255 case, and thus this Court is not required to defer in any way either to the factual findings or to the legal conclusions of another court (such as the state habeas court in the Williams case). Thus the fact that the Court in Williams granted relief after finding not only that the §2254 habeas petitioner's Sixth Amendment rights had been violated, but also that the state court's failure to so find was "unreasonable," underscores why Mr. Paul is entitled to relief in this case. 120 S.Ct. at 1516.

and left him to die. 120 S.Ct. at 1499-1500. Primary evidence of guilt came from Williams' multiple confessions. *Id.* at 1499.

594. At sentencing the jury learned that Williams had engaged in a series of brutal assaults on elderly victims shortly after the crime: acting alone, he had set fire outside a man's home to facilitate a violent attack and robbery on the occupant, and he beat an elderly woman so severely that she had been left in a permanent vegetative state. *Id.* at 1500. The jury also learned that Williams had an extensive prior criminal record, including convictions for armed robbery, burglary, and grand larceny. *Id.* He had also been convicted of arson for setting fire to the jail while he awaited trial on the capital murder case. *Id.* Two psychological experts who examined Williams prior to trial told the jury that "there was a high probability that he would commit future criminal acts of violence and that he constituted a continuing threat to society." *Id.*

595. The facts of Mr. Paul's crime and background are far less severe than those presented in Williams. Unlike in Williams, Mr. Paul was only convicted of aiding and abetting in the shooting death of Sherman Williams. The evidence of his involvement in the crime was largely based upon statements he allegedly made to acquaintances, as well as government agents, whose testimony (unbeknownst to the jury) was bought and paid for by the federal government.

596. Wholly unlike the case in Williams, at sentencing in Mr. Paul's case the government presented no additional aggravating evidence other than the testimony of the deceased's two grown daughters and a former co-worker to describe some attributes of the life of Sherman Williams. In fact, as noted, some of the most damaging aggravating information about Mr. Paul came from the unexplained and non-contextualized testimony of the defense's only witness, Mrs. Paul. Even still, however, this evidence about a young boy's involvement in petty crime pales in comparison to the evidence of heinous other crimes committed by Mr. Williams.

597. On the mitigating side, in both the Williams case and in Mr. Paul's case, the sentencing jury heard comparatively little about each defendant's life; in both, however, the true story is replete with facts that, while they do not excuse the crime, at least put it in a mitigating context that "might well have influenced the jury's appraisal of [each defendant's] moral culpability." 120 S.Ct. at 1515.

598. Terry William's jury heard from three witnesses (the mother and two neighbors) in mitigation, in addition to excerpts from the testimony of an expert witness who had examined the defendant in another matter; Jeff Paul's jury heard from one witness, his mother. In Mr. Paul's case, no expert testimony whatsoever,

documentary or otherwise, was provided to the jury. In both cases, the witnesses provided generic testimony about the defendant's life.

599. In both cases this cursory mitigating presentation is to be contrasted with the "voluminous" mitigating evidence that was available and could have been presented by defense counsel had they been effectively doing their job. Once again, both in terms of quantity and substance, the evidence that was available but never presented in each case was remarkably similar: in both cases, the available but un-presented evidence included an awful childhood replete with severe poverty, abusive parents and improper adult supervision. *Id.* Just as Mr. Williams suffered from mental deficiencies, including being "borderline mentally retarded" and brain impaired, so too Mr. Paul suffers from severe brain damage and serious mental disorders.

600. Other character evidence proffered in Williams compares with that available, but not presented, at Mr. Paul's trial. Just as prison officers and a respected community member were willing to come forward on Mr. Williams' behalf, numerous teachers, neighbors, friends, counselors, probation officers and others were available and would have testified on Mr. Paul's behalf had the defense developed and presented this evidence to the jury.

601. As the Court held in Williams: "the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession." 120 S.Ct. 1514. Put another way, the Supreme Court has made clear that in such cases sufficiently voluminous mitigating evidence will trump a trial strategy otherwise deemed reasonable if the jury does not hear that evidence.[46]

602. In addition to all of the above regarding the woefully inadequate sentencing phase presentation, trial counsel were ineffective in numerous other respects not specifically delineated herein. The above-cited instances of trial counsels' ineffectiveness are not meant to exclude other instances of ineffective assistance. Other more specific instances are not delineated herein either because such specific instances of ineffectiveness are more generally covered by the

---

[46] This is also true even where some of the unpresented mitigating evidence is not helpful to the defendant. In Williams the Supreme Court held that counsel's failures were no less damning simply because "not all of the additional evidence was favorable to Williams." 120 .Ct. at 1514 (noting how some juvenile records proffered in habeas demonstrated criminal conduct as a juvenile). Likewise, the fact that some of the available evidence about Mr. Paul would have referenced his drug and alcohol problems, facts the defense affirmatively presented anyway at sentencing, does not "justif[y] ... the tactical decision" to simply fail to present the evidence. *Id.*; *see also* Macias v. Collins, 979 F.2d 1067 (5th Cir. 1992) (affirming District Court grant of habeas relief where trial counsel improperly failed to explore, and explain, defendant's drug abuse history simply because it involved some potentially damaging evidence).

allegations contained herein, or because, owing to the circumstances set forth throughout this motion and the accompanying motion for discovery, incorporated herein by express reference, Mr. Paul has not been able (through no fault of Mr. Paul or his attorney) to investigate, develop, research and/or present such additional specified instances of ineffective assistance of counsel. Finally, Mr. Paul reserves the right to amend his allegations of ineffective assistance of counsel after he has been given sufficient time, resources, and access to the relevant materials, files, documents, information and/or evidence to which he is entitled under federal law, and/or after such relevant materials, files, documents, information and/or evidence has been investigated, developed and presented to this Court through written affidavits, documents, depositions, or live testimony.

**XXVII. Upon Information and Belief, Cumulatively, All of the Errors Set Forth in this Petition, and the Prejudice That Resulted from These Errors, Denied Mr. Paul a Fundamentally Fair Trial In Violation of Rights Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

603. Upon information and belief, cumulatively, all of the errors set forth in this petition, and the prejudice that resulted from these errors, denied Mr. Paul due process, a fair trial, the effective assistance of counsel, a fundamentally fair trial, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, and as such provisions are interpreted in all federal case law citing to, noting, or otherwise relevant to an interpretation of each of these constitutional provisions, as well as any other law set forth throughout the body of this motion.

604. Mr. Paul hereby incorporates into this claim for relief, by express reference, the accompanying motion for discovery, all other paragraphs contained in this motion, all motions filed in this case previously and to be filed subsequent to the filing of this motion, as well as all appellate briefing (including certiorari litigation), filed by Mr. Paul in connection with the above-referenced criminal case, and any further amended motions or petitions to be filed by Mr. Paul at any time in the future.

605. The claim set forth herein is made in part based upon information and belief, and in part based upon investigations and facts known to Mr. Paul, through the exercise of due diligence, to date. Until this Court grants Mr. Paul the discovery he seeks in support of this claim, however, Mr. Paul is incapable of alleging with more specificity and/or with more factual certainty all of the facts that may be available or that may exist in support of this claim.

606. The facts in support of this claim, as well as the contours of the claim itself, are necessarily incomplete due to, *inter alia*: the denial of access to materials, documents, files, information and/or evidence to which Mr. Paul has a right under applicable federal law, said denial being occasioned by the failure and/or refusal of law enforcement and other federal government agencies, prosecutorial offices, court personnel and officials, and other pertinent entities and persons to provide such materials and information; and, the deprivation of timely appointed second counsel necessary to proceed effectively in this litigation.

607. Set forth herein is a statement of the constitutional/legal claims of which Mr. Paul is aware at this time, and those facts which he knows or has reason to believe are true, despite the denial of sufficient resources and access to the relevant materials, documents, files, information and/or evidence. Mr. Paul reserves the right to amend this claim, and/or add additional claims in an amended

§2255 motion, after he has been provided additional counsel, and/or once he has been provided access to all relevant files, documents, information, material and/or evidence to which he is entitled under applicable federal law and as more specifically requested in his motion for discovery (incorporated herein by express reference), and thereafter sufficient time to investigate and develop facts and witnesses in support of this and/or other claims that may arise once such counsel and access to information have been provided.

608. There were so many errors in this case (all of which that are currently known to Mr. Paul at this time prior to the availability of discovery and factual development, are set forth in this petition, and all of which are incorporated herein by express reference) that, even if none individually requires a new trial in this case, when viewed in combination, the cumulative effect was to deny to Mr. Paul a fundamentally fair trial and capital sentencing proceeding. For this reason, this Court should grant Mr. Paul a new trial. *See* U.S. v. Bledsoe, 531 F.2d 888 (8th Cir. 1976); Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992).

## CONCLUSION

For all the reasons set forth above, and those set forth in all pleadings filed with this Court in this case by Mr. Paul and his counsel, incorporated herein by express reference, Mr. Paul respectfully requests that this Court grant relief, and give Mr. Paul a new trial and/or a new sentencing trial in his case.

This 16th day of December, 2002.

Respectfully submitted,

ROBERT L. McGLASSON
Attorney at Law
Federal Defender Program, Inc.
100 Peachtree St. NW, Suite 200
Atlanta, Georgia 30303
(404) 688-7530

Attorney for Mr. Paul

**VERIFICATION**

STATE OF GEORGIA )
) ss.
COUNTY OF FULTON )

ROBERT L. McGLASSON declares as follows:

I am an attorney admitted to practice before the courts of the States of Georgia, Texas, Florida, and the United States District Courts for all districts in such states, and the United States Court of Appeals for the Fifth and Eleventh Circuits, and the United States Supreme Court. My office address is located at 100 Peachtree Street NW, Suite 200, Atlanta, Georgia 30030.

I am authorized by movant Jeffery Paul to file the foregoing Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence Made Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure on his behalf. Mr. Paul is confined and restrained of his liberty at the United States Penitentiary at Terre Haute, Indiana.

I declare that the contents of the foregoing Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence Made Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure are true and correct to the best of my information and belief, except for those matters in which the claim heading indicates that it is based upon information and belief; with respect to the latter, I believe the matters set forth in those claims also to be

true. The sources of my information and belief include, but are not limited to, official court records from the United States District Court for the Western District of Arkansas, various documents obtained and/or prepared during the investigation of this motion, and items in the possession of other lawyers, investigators and/or experts connected with the preparation and presentation of this case.

I make this verification on Mr. Paul's behalf because these matters are more within my knowledge than his.

I declare under penalty of perjury that the foregoing is true and correct.

ROBERT L. McGLASSON

This 16th day of December, 2002.

## CERTIFICATE OF SERVICE

I do hereby certify that I have served two copies of defendant's Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence, and for Relief from Judgment, Made Pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure Relief, upon counsel for the United States in this case, by placing a copy of same in the U.S. mail, with proper postage affixed thereto, and addressing it to the following:

Mr. Steven N. Snyder, Esq.
Assistant U.S. Attorney
P.O. Box 1524
Fort Smith, Arkansas 72901

This 16th day of December, 2002.

Robert L. McGlasson