# TRIAL TRANSCRIPT – GOVERNMENT'S GUILT-INNOCENCE REBUTTAL CLOSING ARGUMENT

then you must proceed, as the jury instruction for lesser included offenses say, to determine whether or not the Government has proven the guilt of the defendant beyond a reasonable doubt for any less serious offense included in that charge.

If the Government has not proved to your satisfaction -- if the Government has not proved to your satisfaction that Jeffery Paul wanted to kill Sherman Williams during the robbery, then you must and I ask you, please, consider the less serious charge of murder in the second degree and find Jeffery guilty of murder in the second degree.

Thank you.

BY THE COURT: All right. Thank you, Mr. Oliver. All right. For no more than 15 minutes please, Mr. Webb?

BY MR. WEBB: Thank you, Your Honor.

You know, ladies and gentlemen, this is the chart we prepared to give you some idea of the facts that we showed that occurred during the course of Thursday, June 22; Friday, June 23; Saturday, June 24; Sunday, June 25; and Monday, when the body was discovered; Tuesday, when the billfold discovered; and when they discovered that it was, in fact, Mr. Williams that had actually been killed; and Friday, when Mr. Maples notified the FBI of the discovery of the car, about the story about the FBI recovering the car of an elderly victim; and then what Jeff Paul told Kris Rogers and Chris LaPaglia on that day. On July 4, he leaves Hot Springs.

Now ladies and gentlemen, an important part of the United States' case against the defendant as it comes from several witnesses and several different sources from all across the United States -- We have witnesses that live as far east as Florida and as far west as California, and they all had one thing in common and that's that Jeff Paul told them that he was involved in a murder.

In addition, except for Special Agent John LaVoie, all these people were his friends: Chris LaPaglia, his girlfriend here in Hot Springs; Kris Rogers, a good friend of his, maybe not for more than three months but do we decide our friends and how close they are by how long we've know them? I think not. Cindy Wallace, his girlfriend in Key West; and Dan Coughlin, his roommate in Key West. What did he tell them? One, that he had kicked a man so hard that his eye came out, and he also told each one of those individuals that he was the one who shot the victim.

Now ladies and gentlemen, one thing that I want to cover throughout -- in this particular portion is about aiding and abetting because Mr. Oliver has really talked to you about aiding and abetting, and I want you to look at that instruction. We have to prove two things. One, that the defendant knew that a crime was being committed or going to be committed. Paul told Special Agent John LaVoie that he and Ingle had talked about, "Taking someone off" prior to the robbery. Now he explained

that meant they planned to rob someone. You know, taking someone off might mean something else, too, and one of the things that you don't have to do is leave your common sense at home when you go into that jury room and deliberate.

You also recall that Jason Paul testified that both Ingle and Paul had on long sleeve flannel shirts. Why? Well, part of that comes back to where Kris Rogers had testified about what occurred on June 8. When he saw them in their long sleeve flannel shirts that day, what did they have with them? Both of them had a gun. And what did Jason [sic] Paul wrap in his shirt; not a towel, but in his shirt, this long sleeved flannel shirt? A .38. And you know, apparently that's what they were there for this time was to hide their guns. And apparently they did such a good job because Jason Paul said he didn't know either one of them had a gun.

Also Jeff Paul told Special Agent LaVoie when they saw Mr. Williams get out of the car they decided to "roll this fool." And they followed Mr. Williams on up the trail to where they stopped him, asked for the time, and then pulled a gun on him at that point.

So ladies and gentlemen, the first element is established because he certainly intended to aid and abet in a robbery. Jeff Paul knew that a crime was going to be committed.

The second element is that the defendant knowingly acted in some way for the purpose of causing, encouraging or aiding in

the commission of such crime. In Paul's statement, he told Special Agent LaVoie, they asked for the time, they took his billfold which consisted of $98 and the keys to his car. He taped the hands and feet of Mr. Williams. He kicked him and you know, an interesting thing about that is, would you be the one that would kick someone if you were in a pair of open toed sandals or would it be the person that kicked him with a pair of Reebok tennis shoes with rubber on the front? Ask yourself that question when you go back there in the jury room.

Then according to what Mr. Paul said to Special Agent LaVoie, after Mr. Williams was shot, he helped drag the body off the trail and then he hid the billfold under several rocks in the creek, where you heard Billy Bars say that he discovered it in the creek.

He left with Mr. Ingle in the car and he helped spend the money. It's interesting to note that Mr. Paul says that Ingle decided to kill Mr. Williams because he didn't want to do time because the man saw his face.

Well, Ladies and gentlemen, Jeff Paul, as Mr. Oliver told you, is a convicted felon, too. And just think about it; not only did he see Trint Ingle's face, he saw Jeff Paul's face, too. So he had just as much to lose as Trint Ingle did with regard to that.

In addition, did Paul try to, according to what was testified to there, did he try to stop the robbery or the murder when

he went back up? Did he stay down there when they had walked off? No. He went right back with Trint Ingle up to that body or, excuse me, up to Mr. Williams where the trigger was pulled. Then depending on which version you believe, Jeff Paul either shot first, they both shot him, or Trint Ingle shot him.

But you know, ladies and gentlemen, it really doesn't matter at this point which version is correct because it's aiding and abetting. It doesn't matter which one pulled the trigger because they were both there, they were both involved in the robbery, and the decision was made.

Clearly, Mr. Oliver admitted to you he was involved in the robbery, he was involved in the planning of the robbery, and the murder occurred during the commission of the robbery.

So ladies and gentlemen, I submit to you that even under the aiding and abetting theory, no matter which way you do it, Jeff Paul is guilty of first degree murder.

Also, both Mr. Paul and Mr. Ingle were carrying guns and they must have known that if they were carrying a gun it was possible that the gun may have been used during the course of the robbery. If he decided to fight with it, that's what you have a gun there for is to show force and if somebody tries to give force, you may be forced to shoot.

Plus, as I mentioned earlier, if you recall, Kris Rogers said he gave Jeff Paul a .38 caliber pistol the week before the murder that had been returned when it was given on June 8. And

what kind of gun did Jeff Paul tell you that was used in the murder by Trint Ingle? A .38 caliber; the one that was given to Jeff Paul.

Therefore, ladies and gentlemen, I would submit to you that Jeff Paul is guilty of Counts 1 and 2 as I've indicated.

Now ladies and gentlemen, Mr. Oliver talked about the burden of proof. And you've heard the instruction given by Judge Hendren with regard to reasonable doubt. And that involves the affairs, as it states there, of the most important affairs of your life. And if you'll recall back in the voir dire, I gave you a real quick example of what reasonable doubt is and the most important affairs in your life. You know, sometimes you go out to make a purchase and you have a little bit of a hesitation. And you know, I think if we spend any money or if we make an important decision, there's always a little bit of hesitation. But you go ahead and make that decision and you know it's the right decision after you've done it and you feel good about it -- Then you've covered reasonable doubt in that respect.

Now ladies and gentlemen, Mr. Oliver is an advocate. His job is to try to take the position of his client and make points where he can. The only thing that I ask you to do is to look at those points he's tried to make throughout the trial and in his closing argument. The first is that these witnesses hope to get a reward. Did you hear one witness say that they had been

promised anything in this case? Maybe there was an article in the paper that said something of a reward, but no one has been promised anything in this case. You heard Special Agent Tom Ross say there might be a possibility but no one has been promised anything.

Now Jeff -- also the next one is Jeff is a teller of tall tales. What are his tall tales? We didn't hear one tall tale that Jeff told throughout this thing other than Mr. Oliver to say, Jeff was known as a teller of tall tales. Well, yeah.

Well, then the other is a fear of prosecution. Dan Coughlin told you, yeah, I might be prosecuted for that but I'm here today to tell the truth about what occurred in this matter. I know I did wrong but I'm here to tell you what actually occurred.

And then finally, parental disapproval; that somehow Chris LaPaglia was motivated by parental disapproval of Jeff Paul. Well, she didn't come in here and willfully tell everything. She regretted it and she said she still loved him today.

You know, ladies and gentlemen, another thing that's pointed out is that Mr. Oliver told you there's no indication that Mr. Williams' neck was broken. Well, you heard Roger Purtee say that when he first examined the body, the head was nearly detached from the body.

And second, I thought it was interesting where Mr. Oliver said that Jeff Paul told Chris LaPaglia the story because it

might help her from -- keeping her to break up. Give me a break. How many of you sitting here, if someone told you that they just murdered someone, would that keep you from breaking up with that person? I think most of us with common sense would tell us you would run as far as you could from someone that was telling you that type of thing.

Now also, that there was no blood on these tennis shoes. And you recall when I asked the serologist, Dick Reem, who's a former FBI Special Agent? He said, well, what could affect that would be the length of time, if they had been washed, and if they had been worn every day.

So ladies and gentlemen, there may have been blood on it. Kris Rogers said he saw it the day after but because of the time, we were not able to find that blood.

Now ladies and gentlemen, the evidence in this case fits together and the facts reinforce each other to show you the entire process. And ladies and gentlemen, when you go back into that jury room and you fit all the pieces together, what you're going to find in this case is that the defendant, Jeff Paul, was standing there right over Mr. Williams, bound, gagged, hands tied behind his back and unable to protect himself, and then he pulled the trigger.

Ladies and gentlemen, I appreciate all the attention that you've showed this morning and I thank you; and I'm sure after you've looked at all the evidence, that you'll return verdicts

of guilty in this case.

BY THE COURT: All right. Thank you, Mr. Webb. Thank all of you counsel for your presentations.

Ladies and gentlemen, you have it now. You've heard the proof, you've heard the instructions on the law, and you've now heard the summations of the attorneys. I notice that we are getting close to the lunch hour. I'd like to suggest that you might want to go back and one of your first tasks, of course, is select your foreperson.

We have made arrangements -- I believe we have. Ms. Ramsey, have we for lunch?

BY COURTROOM DEPUTY: Yes, Your Honor.

BY THE COURT: To conduct you, I believe, where; to the Hilton?

BY COURTROOM DEPUTY: Hilton.

BY THE COURT: Over to the Hilton Hotel and have you eat there together at Government expense. I suppose if you don't want to do that, you don't have to. I'll leave that to your discretion, but let me suggest that that might be a good idea.

Please do not do your deliberations when you're out for lunch. You should do that back here in the jury room. And so I might suggest that you do that. This will be the time when we will ask our fine alternate jurors, who certainly will be welcome to go to lunch with the other jurors. You will not be