# TRIAL TRANSCRIPT – GOVERNMENT'S SENTENCING CLOSING ARGUMENT

Government's opening address. That should take us about an hour and then we'll take a recess and then hear the defense and we'll see where we are then.

So if you will, give attention to Mr. Snyder, please.

BY MR. SNYDER: Ladies and gentlemen, the first thing we've got to prove is that at the time of the offense, the defendant was at least 18 years old. The defendant's birth certificate has been introduced into evidence which shows that he was, in fact, 18 years old at the time of the offense.

Now the first statutory aggravating factor that we've got to prove is that Sherman Williams was intentionally killed, and the facts that were presented in the guilt phase of the trial clearly shows that there was an intentional killing of Sherman Williams.

The defendant told Kris Rogers on June 24, 1995 that he shot Mr. Williams in the head. In March of 1996, the defendant told Cindy Wallace that he and his partner followed the old man into the national park and he, Jeffery William Paul, shot the old man in the head.

One thing I would like to do at this time, ladies and gentlemen, is quote you some of the excerpts from the tape the defense played during the penalty phase, and this is a tape between the defendant's partner, Trint Ingle, and Jonah Jones and Derrick Bell, who were, at that time, Government informants. And during the tape the defendant played, I'm going to read you certain portions of the conversation.

"TRINITY INGLE: Andy and Bob, they know, did this for some money you know. Bob said, you know, can't be havin' no more of this shit, man. We both been on parole. We can't be havin' none of this shit, you know. Pow, pow, pow.

"JONES: The dude y'all was robbin' saw your face, saw your buddy's, saw y'all's face?

"INGLE: Yeah, it's automatic time right there.

"INGLE: Bob and Andy did this.

"JONES: Right.

"INGLE: The only thing they've got is hearsay.

"JONES: I see why you're so quiet now.

"INGLE: See what I'm sayin'.

"JONES: Did both y'all shoot him or just one of y'all?

"INGLE: Bob and Andy both did this.

"JONES: Oh.

"INGLE: They know -- they both know the consequences and they both know what's gonna happen.

"JONES: Damn, you're home boy raw, ain't he?

"DERRICK BELL: Um-hmm.

"INGLE: He'll drop lead.

"INGLE: Okay. Bob and Andy know they was up there together in the park and they said, think it boys walked off.

"JONES: Um-hmm.

"INGLE: Pop, pop, pow, pow, pow. see what I'm saying?

"BELL: Um-hmm.

"INGLE: Whenever one did it, both did it.

"INGLE: Now the mother fucker's tied up.

"JONES: Um-hmm.

"INGLE: He's believin' now. Um-hmm. "He's thinkin'.

"JONES: That's why y'all had to kill him, because he didn't have no face piece?

"INGLE: Yeah.

JONES: How much money did he have?

"INGLE: Just enough to get by for the day, man.

"JONES: Is that right?

"JONES: It wasn't planned? Y'all just met up and it happened?

"INGLE: No. We knew we was gonna do somethin'. We didn't know exactly what, you know? We knew we was gonna do somethin', you know.

"JONES: Did you get at least a hundred?

"INGLE: Yeah."

Ladies and gentlemen, I submit there is no doubt that Sherman Williams was intentionally killed by the defendant, Jeffery William Paul.

Now the next thing we get to is that we've got to prove at least one of the following three statutory aggravating factors.

We only have to prove one of the three.

The first one is that the defendant committed the offense in an especially heinous, cruel and depraved manner and that it involved torture and serious physical abuse.

Now Judge Hendren told you that factors you can consider in determining whether a killing was especially heinous, cruel or depraved are the infliction of gratuitous violence beyond that necessary to commit the killing; needless mutilation of the victim's body; senselessness of the killing; and helplessness of the victim.

Well, the defendant told numerous people that he kicked Mr. Williams' eye out of the socket. We have an 82 year old man who was all alone, who walked up into the national park, who was followed by Trint Ingle and Jeff Paul who were armed with guns.

Mr. Williams was followed up the hill, he was confronted, and he was bound, gagged and taped. He couldn't run, he couldn't defend himself, he couldn't do anything except lie there and die, which is exactly what he did. He lied there waiting to die.

I imagine he probably thought at some point in time he's never going to see those two ladies sitting there in the court room ever, ever again on this earth. He's never going to be able to go home to his condominium on the lake and go fishing. He's never going to see his grandchildren. He's never going to see Mr. McCollough from the Farmer's Home Administration. His life was over. He was doomed and he knew it.

A simple walk in the park after breakfast at the Pancake House ended in a terribly brutal, senseless murder which left this fine 82 year old man - he still had a lot of years left in his life to enjoy - reduced to this simply because he decided to get a little exercise on June 22, 1995. Mr. Williams' ankles -- the poor man didn't have a prayer.

One of the other elements we've got to prove is pecuniary gain. When the defendant was arrested by Special Agent John LaVoie, sitting back there in the back row, he told Agent LaVoie, "We were looking for somebody to take off." He told Kris Rogers they needed some easy money fast and they were looking for a vulnerable victim.

When Mr. Williams' billfold was discovered, it contained identification, it contained phone numbers, it contained all kinds things but no money, not a dime. The motive was robbery; they got his money and they got his car.

The next statutory aggravating factor is vulnerability of the victim and I don't think there is any doubt that an 82 year old man who's got his hands duct taped behind his back and his ankles duct taped and duct tape wrapped around his mouth is a vulnerable victim, especially when there's nobody near to help him, come to his aid, or assist him. Unfortunately, Ranger O'Donnell didn't happen up the trail that day. I wish he had.

Non-statutory aggravating factors that you can consider are future dangerousness, which includes other acts of violence, and

I would direct your attention to the aborted liquor store robbery/murder plot that went awry because the door was locked.

In June, prior to this murder, the defendant told Kris Rogers that he had a .38 on June 8, 1995, because he and Trinity Edward Ingle had planned to rob the Tri-Lakes Liquor Store on Highway 70. They couldn't get in; the door was locked. And Tom Turner, who owns that liquor store, came in here and testified he locks the door at 10 o'clock, he counts the money - you can see in the window of the door - and he doesn't let anybody in he doesn't know, and thank God he doesn't.

Also consider the defendant's conviction for burglary and terroristic act with a shotgun. And there is something I'd specifically like to point out. The defendant was released from the Arkansas Department of Corrections on March 1995. April, May, June. He's released in March for a terroristic act with a shotgun, three months later he has a loaded .38, commits a robbery and a murder after having been released from the Arkansas Department of Corrections only three months earlier.

Another factor you can consider is successfully eluding capture for 14 months. When the defendant left Hot Springs, Arkansas on July of 1995, he left because he knew the FBI was looking for him. He fled to Marathon, Florida, he fled to Key West, he fled to South Carolina, and he fled to Mississippi. He left Key West because he knew the FBI was closing in. He had false I.D.. He stopped at his former employer and picked up some

cash before he hit the road to South Carolina.

And when he got to Water Valley, Mississippi, Agent LaVoie finally closed in and arrested him. The defendant had been on the run and he had been successful for 14 months, successfully eluding an arrest for capital murder.

Another factor you can consider is lack of remorse. The defendant has stated he doesn't feel bad about the murder. There has been testimony that while Mr. Williams lay on the ground, the defendant and Trint Ingle had a discussion between themselves about whether or not Mr. Williams would talk. And when the defendant and Trint Ingle decided he probably would, they'd have to get rid of him, Mr. Williams begged for his life.

Can you imagine being in the woods alone with two men who are armed with guns, having to beg for your life?

You can also consider victim impact evidence. You can consider the impact this horrible, tragic, unexpected, brutal, murder, death had on those ladies and their families. Can you imagine your father all of a sudden missing and you don't have a clue as to where he is? Not a clue. You go to his house, newspapers stacked up against the door, car gone, father gone. You go inside, you look around; it looks as if he expected to come home any minute. The TV Guide is open to June 22, 1995. You know he's been gone five days but you don't know where he is.

And then you start to realize the terrible, horrible reality that a body has been found on a mountain and you have to make a

terrible decision to have your father's dental record sent to the State Crime Laboratory to see if it's him lying there in the morgue.

And then you get the news: Your father's dead and you didn't even get a chance to say goodbye. They were deprived of an 82 year old man who was still in his prime and they did not deserve it; nobody on this planet does.

Ladies and gentlemen, I submit that we have proved these statutory aggravating factors that we are required to beyond a reasonable doubt. I thank you very much.

BY THE COURT: All right. Thank you, Mr. Snyder. Ladies and gentlemen, we've been out here almost and hour. We'll take a recess. Let's come back at five minutes after, please.

[Recess taken at 2:50 p.m. - Jury Out]

[Open Court - 3:07 p.m. - Jury Present]

BY THE COURT: All right. Thank you, ladies and gentlemen. Please be seated.

Mr. Williams, please?

BY MR. WILLIAMS: Thank you, Your Honor.

May it please the Court, ladies and gentlemen of the jury? I'm just going to take just a few seconds and -- well, it's one of them lawyer seconds the judge talks about -- for a point of personal privilege. It's been two weeks, really for me ten months that I've been involved in this case in hard work and high anxiety. And there's a lot of people who have made the Govern-