# TRIAL TRANSCRIPT – GOVERNMENT'S SENTENCING REBUTTAL CLOSING ARGUMENT

associated with; they also chose you. If it was not for the Grace of God, you may very well be sitting where Jeff is today.

That picture has always haunted me, not because it's a little boy, but because how he got from here to over there.

I have a ten year old, I have an eight year old. I have never asked for a boy's life to be spared, but I ask that you do it today. Thank you.

BY THE COURT: Mr. Williams. Gentlemen, Mr. Webb? No more than ten minutes, please.

BY MR. WEBB: You know, ladies and gentlemen, it's kind of ironic that two years ago today, Mr. Williams, unfortunately-- and I'm not doing this to show you but I just wanted to remember; Mr. Williams was laying out there in that forest right there on top of that mountain, and it wasn't for another two days that he was even found.

And you know, ladies and gentlemen, Mr. Williams didn't make the choice to be there laying dead; that was the choice of the defendant and his friend, Trint Ingle.

Now ladies and gentlemen, Judge Hendren has talked to you about several factors that are mitigating factors and so as to what the defendant's have alleged and what Mr. Williams talked about. Let's go through those very quickly.

The first one is participation in the offense was minor. No. No way. If you recall, you heard that tape that Mr. Williams says is the big mitigating factor. Well, ladies and

gentlemen, it's also a big aggravating factor because what did Trint Ingle say in there? Bob and Andy did this. They knew the consequences.

Now also there's another factor that says there was no significant prior history. Well, ladies and gentlemen, you heard Paula Paul state that he got in trouble which, as a juvenile, when he was eight years old. And that wasn't when he was doing bad in school. He was doing good at that time. If you recall looking at his grades and, you know, you can take those back there and look again. So his problems started long before he was having trouble in school.

And you know, let's talk about another little thing there while we're talking about school. Yeah, he went through five schools and you know, until he got into the sixth grade, he had changed how many times? Three or four at that point, and he still had good grades at that point. So I don't think it was all from moving.

Now another one is that he committed the offense while experiencing emotional distress. We didn't hear any testimony on that and Mr. Williams decided apparently not to even discuss that. So I submit to you that that's a mitigating factor that's not there.

The next one is that Trint Ingle will not be punished by death. Now ladies and gentlemen, if you recall on the second day of our voir dire, I got up and I asked one question and that

question -- Excuse me, that was another question I asked. Earlier in the voir dire, I asked if this would be a problem because of the fact that this defendant would be considered for the death penalty while Trint Ingle had already received life in prison without parole. And all of you said that no, that wouldn't make a difference and you'd consider this case on its facts and its circumstances, its merits. Don't be concerned about what happened in some other case, some other jury concern; make the decision for yourself. Look at the evidence and the law in this case.

Now the other factor is youth, and that's the question I asked you about on the second day, was would that make a factor with you? And all of you assured me that you could not.

Now with regard to the other non-aggravating factors, you know, there's one -- as I sit here and I was thinking about those non-aggravating factors there we're going to discuss just very briefly; you know, they all involve choices to a great extent. Trint Ingle knew the difference between right and wrong. There's nothing to indicate that he did not know. I think also -- Excuse me, Trint Ingle knew it and so did Jeff Paul. And in fact, in the tape, you heard him say, "Bob and Andy did this. They both knew the consequences." They knew the difference between right and wrong. They made the decisions as to the choices of who they associated with.

And you know, the other thing that we don't have to do is

you don't have to leave your common sense at home when you're looking at these things as I stated earlier.

Was there parental neglect in this case? No. Paula Paul was there. She was supportive. Let me ask you; does that mean that ever single parent has to have a fear that they've got a murderer in their household? I don't think so because not every family has two strong parents to always be there. But does that mean that's an excuse as to why you should not consider the death penalty, because he didn't have both parents that were strong?

But you know, ladies and gentlemen, the other thing I think we need to look at is Dennis Paul always had a job. He didn't stay with every job that long but, you know, not everybody is able to stay at every job that long. And yes, they moved around but does that mean that every member of the armed forces who you know as well as all of us, move very often; every two or three years. Does that mean that there's a possibility that they have a murderer in their house because they move? I don't think so. Many of you move on many occasions, but that's not an excuse, either.

Now also, that his parents -- Another factor is his parents failed to hold the defendant accountable. Do you recall her stating that as part of his punishment, she made an effort to try to do some things to punish him; to have a sign-in sheet. And also, do you recall that when he had problems, they took him to therapy. They tried to help him every way that they possibly

could, but the defendant was just out of control. He didn't want to do the right thing.

You know, and as Mr. Snyder pointed out, four months after he gets out for a terroristic threatening involving a shotgun, he goes even further and commits the ultimate -- Murder.

You know, the other one I guess is I don't think we really heard much about parental and the responsibility except for I guess that means maybe because Mr. Paul, at times, was not there. I'm not sure what that means -- Or the refusal or reversal of parental roles with his mother? I'm not sure about that, either. I don't think that was proved. Besides, who was doing the discipline? Who was there to support him?

Now ladies and gentlemen, Mr. Williams has also, as a good lawyer always does, he picks the important points. The things that really are going to be hopefully effective. You know, I think most of you do have a background and in this part of the country, with a religious background, and you have a sense of what the Bible is about. And you know, it's easy to talk.

There's so many examples both ways that it's really -- I don't want to get into that, but you know, if you start talking about what happened in Genesis, I think that the Ten Commandments all occurred after Genesis. It's in Exodus, Leviticus, Deuteronomy -- You know, there's a number of places there and I think that we have to look at this as a very serious decision. You know, it's difficult but you know, ladies and gentlemen, there

are, as in anything else, difficult decisions doesn't mean that you should shirk your responsibility and do the thing that may be easiest.

BY COURTROOM DEPUTY: Mr. Webb, you have one minute.

BY MR. WEBB: You know, in closing, there is a -- I think most of you know, have heard of Judge Isaac Parker, who was a federal judge in Fort Smith for a number of years. He made the statement that, "I never hang anyone. The law hangs them."

And you know, ladies and gentlemen, I think that when we look at that, every one of us really had to abide by the rules of law. In our business, whatever we do, whether you're a housewife, a teacher, a secretary, in computers, whether you drive a truck, whether you're a laborer or physical therapist or whatever you have, there are rules that you have to abide by.

And here in this courtroom, we have to abide by the rules of Judge Hendren. But on one very important set of rules which we must all live and abide by and which governs our society are the rules of law. We, as citizens of this country, must abide by them and we must live by them.

The defendant in this case has chosen not to obey the laws. He has committed the ultimate crime and I ask you accordingly that you seriously consider the sentence of death in this case.

Thank you very much.

BY THE COURT: All right. Thank you, Mr. Webb. Thank all of you counsel for your efforts.