IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

U.S. DISTRICT COURT WESTERN DISTRICT ARKANSAS FILED DEC 17 2002 CHRIS R. JOHNSON, CLERK BY [signature] DEPUTY CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. 96-60022-001 |
| | § | |
| JEFFERY WILLIAM PAUL | § | |
| | § | |
| | § | |

**MOTION FOR A NEW TRIAL AND TO VACATE, SET ASIDE AND CORRECT CONVICTION AND DEATH SENTENCE, AND FOR RELIEF FROM JUDGMENT, MADE PURSUANT TO 28 U.S.C. § 2255 AND RULE 33 OF THE FEDERAL RULES OF CRIMINAL PROCEDURE**

**APPENDIX**
**VOLUME II**

**ROBERT L. MCGLASSON**
Attorney at Law
Federal Defender Program, Inc.
100 Peachtree St. NW, Suite 200
Atlanta, Georgia 30303
(404) 688-7530

**ATTORNEY FOR MR. PAUL**

273

**APPENDIX**
**U.S. v. JEFFERY WILLIAM PAUL, CRIMINAL NO. 96-60022-001**

**VOLUME TWO**

**SELECTED EXCERPTS FROM**
**TRIAL OF CO-DEFENDANT TRINITY EDWARD INGLE**
U.S. V. INGLE, CASE NO. 96-60023-001
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

GOVERNMENT GUILT-INNOCENCE OPENING ARGUMENT . . . . . . . . . 251

TESTIMONY OF JASON RATLIFF & STEPHANIE MILLER . . . . . . . . . . . 272

TESTIMONY OF DERRICK BELL & JONAH JONES . . . . . . . . . . . . . . . . . . 305

TESTIMONY OF SPECIAL AGENT TOM ROSS (EXCERPTED) . . . . . . . . 421

TESTIMONY OF TRINITY INGLE (EXCERPTED) . . . . . . . . . . . . . . . . . . . 438

GOVERNMENT GUILT-INNOCENCE CLOSING ARGUMENT . . . . . . . . . 442

GOVERNMENT SENTENCING OPENING ARGUMENT . . . . . . . . . . . . . . . 469

TESTIMONY OF DERRICK BELL & RECORDED STATEMENT
OF TRINITY INGLE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 474

GOVERNMENT SENTENCING CLOSING ARGUMENT . . . . . . . . . . . . . . . 500

TRIAL OF U.S. V. TRINITY EDWARD INGLE,
NO. 96-60023-001
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

**GOVERNMENT GUILT-INNOCENCE OPENING ARGUMENT**

[Open Court - May 29, 1997 - 8:32 a.m. - Jury Present]

[Call to Order of the Court]

P R O C E E D I N G S

BY THE COURT: Good morning, ladies and gentlemen. Glad to have you back.

All right, ladies and gentlemen, I believe I explained to you last evening what we'd be doing so we'll be first hearing the opening remarks from the Government. Ladies and gentlemen of the defense, will you be opening at the outset?

BY MR. DEPPER: We will, Your Honor.

BY THE COURT: All right. I anticipate, ladies and gentlemen, we'll take a recess after these opening remarks because we have them scheduled to go up to at least an hour.

I've been told it's cold in here. Let's take a vote. How many think it is? Okay. I'm not sure I can do a thing in the world about it, but we'll try to get it warmed up a little bit.

All right. Are you ready to proceed, Mr. Snyder?

BY MR. SNYDER: Yes, sir.

BY THE COURT: Please do.

BY MR. SNYDER: Thank you, Your Honor.

Good morning, everybody. My name is Steve Snyder. I am an assistant U. S. Attorney and my office is in Fort Smith, Arkansas.

Now my job with the Department of Justice is to present cases in court against individuals who have been charged with

violating the laws of the United States. And as you all know in this case, the defendant, Trinity Edward Ingle, has been charged with the murder of Sherman Williams with malice aforethought. And that murder was committed in the perpetration of an armed robbery.

Trinity Edward Ingle has also been charged with using a firearm during and in the course of a crime of violence. And ladies and gentlemen, those are the two counts of the indictment the defendant is charged with and is standing trial for today in this courtroom.

Now ladies and gentlemen, I anticipate that our proof in this case is going to show that on June 22, 1995, almost two years ago, Sherman Williams was an 82 year old man. He was the retired Director for the State of Arkansas for the Farmers Home Administration. At that time, Mr. Williams had lived in Hot Springs for about 13 years. He liked the outdoors and he liked to hike the trails in the national park.

On June 22, 1995, the defendant, Trinity Edward Ingle, and another individual by the name of Jeff Paul were planning to commit a robbery in Hot Springs, Arkansas.

Ladies and gentlemen, around 8 o'clock the morning of June 22, 1995, Sherman Williams, as he usually did almost every morning, went to a newsstand on Central Avenue just across from the Arlington Hotel and he bought a newspaper. After he bought his newspaper, he walked down the street a couple of doors to the

pancake house and had breakfast.

After Mr. Williams had finished breakfast the morning of June 22, he went home and changed his clothes so he could hike on the trails in the national park later that afternoon.

Ladies and gentlemen, around noon on June 22, 1995, Jason Paul, who is Jeff Paul's brother, drove the defendant and Jeff Paul to downtown Hot Springs and he dropped them off in the vicinity of Monty's Pawn Shop, which is on Ouachita Avenue.

Now although it was a warm day - remember, it was June 22 - both Jeff Paul and Trint Ingle were dressed in long sleeve flannel shirts and they were both armed with handguns which were loaded with hollow point bullets and nine, Number 9 shot, which is commonly referred to as rat shot.

Now after Jason Paul had dropped Trint Ingle and Jeff Paul off at Monty's Pawn Shop, he went back home. He went back to the Paul residence, which is on Highway 70 West.

Well, after Jeff Paul and Trint Ingle had been dropped off on Ouachita Avenue, they eventually made their way to Fountain Street, which runs in front of the Arlington Hotel. And if you walk east on Fountain Street, you walk towards Happy Hollow Spring and eventually you end up at Hot Springs Mountain.

Well, when Jeff Paul and Trint Ingle got to Fountain Street, they walked down the street and the stopped in the vicinity of a parking lot and there they waited for somebody who they thought would be an easy target.

After they had arrived on Fountain Street and were looking and watching this parking lot, 82 year old Sherman Williams pulled his brand new 1995 gold Oldsmobile Delta 88 into that parking lot. He parked and he got out of his car.

They watched Mr. Williams walk eastward toward Happy Hollow Springs toward the Floral Trail and at that point, the defendant and Jeff Paul decided that was their target. Mr. Williams was alone and he was old and he was walking into the national park.

So they followed him. The followed him up the hiking trails that wind around the north slope of Hot Springs Mountain. And when they were about halfway up the hiking trail, Jeff Paul and Trint Ingle walked up to Mr. Williams. And when they walked up to Mr. Williams, they asked him what time it was. And when Mr. Williams looked down at his watch to see what time it was, he was struck in the head, he was knocked to the ground, and he was repeatedly kicked.

When Trint Ingle attempted to get into Mr. Williams' pockets to get what money he might have, Mr. Williams resisted and he said, "You shouldn't be doing things like this."

When Mr. Williams resisted the efforts to get his money, it was decided between Trint Ingle and Jeff Paul that one of them would go back to the parking lot to see if Mr. Williams didn't have something in his car they could tie him up with.

So while Trinity Edward Ingle stood guard over Mr. Williams, armed guard, Jeff Paul walked back down the mountain, went to Mr.

Williams' car, and he found a role of duct tape.

When Jeff Paul returned back up the side of the mountain with the role of duct tape, Mr. Williams asked Trint Ingle and Jeff Paul if they wouldn't just let him go. He wouldn't tell anybody anything.

According to the defendant, Mr. Williams was taped up execution style. His wrists were bound behind his back, next to each other. His ankles were taped firmly with duct tape, and duct tape was wrapped around his mouth.

At that point, they took Mr. Williams' billfold and once they had his billfold and his car keys, Mr. Williams was left there on the side of the trial, bound up with a hat pulled down over his eyes. And he was told, "Don't watch us leave. Don't you look at us."

So Trinity Edward Ingle and Jeff Paul, after they had the money and after they had the car keys, started to walk off. They started to walk off and leave Mr. Williams, bound and gagged, lying on the north slope of Hot Springs Mountain.

Well, they hadn't gone very far and Trinity Ingle decided that he'd turn around and take a look at Mr. Williams. And when he did, he saw that Mr. Williams was peeking up at him underneath the brim of his hat.

When Trint Ingle saw that Mr. Williams was looking at him, he and Jeff Paul decided at that point they had to get rid of the evidence because neither one of them, neither Trint Ingle or Jeff

Paul, was wearing any sort of disguise or mask.

They walked back to Mr. Williams, who was lying on the ground all taped up, and they again hit and kicked him. And Trinity Ingle put the barrel of a .38 behind Mr. Williams' left ear and he pulled the trigger. And after Mr. Williams had been shot in the head with a .38, he was shot again in the chest, this time with Number 9 shot.

When they finished shooting Mr. Williams and they were sure he was dead, Trinity Edward Ingle and Jeff Paul dragged Mr. Williams' body into the woods where they dumped it in some dead leaves, which is in a clear cut area on the north slope of Hot Springs Mountain. There dead, taped, lying face down, Trint Ingle and Jeff Paul put some dead tree limbs over Mr. Williams' legs and attempted to cover him up with leaves.

When they had finished, Trint Ingle and Jeff Paul walked on down the mountain and they stopped at what I call the stone pump house. It's a small stone structure right by Happy Hollow Spring.

And when they got to this small stone building, which is fairly close to the entrance to the Floral Trail, they still had Mr. Williams' billfold with identification in it. There is a drainage area which is right by the stone pump house. They walked down into the drainage area, picked up a rock, put the billfold on the ground, and put a rock over the top of the billfold, after they had removed the money.

After they had hidden the billfold under a rock, Trint Ingle and Jeff Paul walked to the parking lot, they got in Mr. Williams' car, and they drove back to Jeff Paul's house, which is on Highway 70 in Hot Springs.

Now when they got to Jeff Paul's parents' home, instead of driving up to the front door, they parked Mr. Williams' car in the parking lot of a restaurant, which is at the bottom of a hill. It's the Runway Cafe.

Now after they had parked the car in this restaurant parking lot, which is about 25 yards from Jeff Paul's home, Trint Ingle and Jeff Paul got out of the car and they walked up to Jeff Paul's residence.

When they arrived at the Paul residence, it was about 3 o'clock in the afternoon. Jeff Paul's brother, Jason, was inside and Jason was the person who dropped them off downtown earlier that afternoon. Jason could hear his brother outside, he could hear Trint Ingle, who he knew, so he went out on the porch to see what was going on.

Well, as soon as Jason saw Jeff Paul and Trint Ingle, they asked Jason if he was hungry and wanted to go get something to eat.

Now Jason thought if we go get something to eat, we're going to have to drive mom's car, I've got to pick her up at 5 o'clock, that will cause a problem. So he told Trint Ingle and Jeff Paul, "If we're going to go, we'd better go soon because it's getting

late and I'm going to have to pick mom up." "Hey, don't worry; we've got a car. We've got Trint Ingle's mother's car. We'll take it."

So the three of them got in the gold Delta 88, Trint Ingle was driving, Jeff Paul was in the passenger seat and Jason Paul was in the back seat, and they headed out for the Tastee Freeze to get something to eat.

But before they got to the Tastee Freeze, they went past Skip's Body Shop and Trint Ingle pulled in the driveway and stopped at Skip's Body Shop, which is on the way to the Tastee Freeze.

When they stopped at Skip's, Trint Ingle and Jeff Paul knew a man, or actually young man, by the name of Chris Rogers who worked there. Chris Rogers came out, talked to Trint Ingle and Jeff Paul for a few minutes, saw the car. When they were finished talking, Jeff Paul, Trint Ingle and Jason Paul got back in the car and went to the Tastee Freeze.

About two and a half, three hours after the murder, they went into Tastee Freeze, where they had frito chili pies and milk shakes. Trint Ingle paid.

When they had finished eating, all three of them got back in the car and Trint Ingle decided that he wanted to see a girl by the name of Rebecca Pingle, who was staying with a friend in a mobile home in west Hot Springs. So he drove over to see Rebecca Pingle. And when they arrived at the mobile home where Rebecca

Pingle was staying, she looked outside to see what sort of a car they had arrived in because the last time they had come, they were in a car that made a whole lot of noise and this time she didn't hear any noise. So she was a little curious about what kind of car they had come in this time. She looked out the window and she saw an Olds Delta 88, which she would describe as a family car.

Well, they were only there a few minutes, five or ten minutes; didn't really talk much. And after about five or ten minutes visiting with Rebecca Pingle, the three got back in the Oldsmobile: Trint Ingle, Jason Paul, and Jeff Paul.

And after they left that mobile home, Trint Ingle and Jeff Paul asked Jason, who was 21 years old, if he would rent a motel room for the two of them for that night; that is, Trint Ingle and Jeff Paul. Jason said, "Sure, I'll rent a room for you."

So on the evening of June 22, 1995, just hours after the murder of Sherman Williams, Trint Ingle gave Jason Paul $26.70 to rent Room 115 at the Fountain Motel on Central Avenue in Hot Springs, Arkansas.

After Jason Paul had paid the clerk the $26.70 and registered for the room, he left. They didn't see him for a long time after that.

Now ladies and gentlemen, a man by the name of Don Roberts operates one of the Duck Boat Tours and his place of business is located on Central Avenue down by bath house row. Now Mr.

Roberts has known the defendant, Trinity Edward Ingle, for a number of years and on either June 23 or 24, Mr. Roberts saw the defendant standing next to a gold, 4-door Olds Delta 88, just about a block away from Central Avenue. It was about a block away from where his business is located.

Now when Don Roberts saw the defendant standing by this car, Mr. Roberts was driving one of his ducks, which are those -- I'm sure y'all know what they are; those big amphibious vehicles. He was driving it towards Central and he was about a block away.

Now as Mr. Roberts got close to Central Avenue, all of a sudden this gold Delta 88 shot right in front of him and he thought it was going to hit him, but it didn't. Now after this Olds 88 shot in front of him, he looked back and when he looked back where he had just previously seen the defendant standing next to this gold Delta 88, the defendant wasn't there anymore and the car wasn't there anymore. Both the defendant and the car were gone.

On Sunday, June 25, three days after the murder, a man by the name of Sam Maples and his wife were out driving dune buggies in an abandoned gravel pit just off Mill Creek Road in rural Garland County. And while they were driving over this extremely rough terrain, they came to some huge gravel pits. And at the bottom of one of the pits about 100 feet below them, they could see a gold Oldsmobile Delta 88 lying at the bottom of the gravel pit.

Now either rightly or wrongly, Sam Maples did not call the police immediately when he saw that car at the bottom of the gravel pit. He didn't contact the authorities until after his wife had read an article in the local newspaper about a murder on the mountain which contained a description of the missing car, which in his opinion had to be the car at the bottom of the gravel pit.

So on June 30, Sam Maples took FBI agents out to that gravel pit and he showed them where that gold Delta 88 was located and it was, in fact, the car that belonged to Sherman Williams.

After the car had been pulled out of the gravel pit, Ruby Ross, who is a fingerprint examiner for the State of Arkansas, processed that vehicle for what we call latent fingerprints. And after Ruby Ross had processed that gold Delta 88 for fingerprints, she located a fingerprint of the defendant, Trinity Edward Ingle, inside that car.

On the afternoon of June 26, four days after the murder, Allan Ritchie, who was a tourist from Ohio, was walking along the hiking trails on the north slope of Hot Springs Mountain. Apparently, Mr. Ritchie didn't see much that interested him on the trail, so he decided that he would walk off the trail, go down the mountain to see if he could find some quartz.

Now as Mr. Ritchie walked down the north slope of Hot Springs Mountain through the undergrowth, he came to a clear cut area. And when he got into the clear cut area, he saw a form

lying below him on the ground. Now he was far enough away so at first, he says he thought it might have been a doll or a manikin or something like that. But as he walked further towards this form that was lying on the ground, he suddenly realized it wasn't a doll, it wasn't a manikin; it was a human, or the remains of a human.

When Mr. Ritchie realized what he had come upon, he hurried down that trail as fast as his legs would carry him to a telephone so he could call the police to tell them what he had found on the north slope of Hot Springs Mountain.

The Hot Springs Police arrived. One of the officers who responded was Bill Cooley. And when Bill Cooley spoke to Allan Ritchie, it was obvious to him at that point that the body was within the boundaries of Hot Springs Mountain, which is in federal jurisdiction. So at that point, the Park Service was notified and the FBI was notified.

Ranger Jim O'Donnell with the Park Service responded to the call, as did Tom Ross with the FBI. Roger Purtee, who is the Garland County Deputy Coroner, was also called in to secure the area until a representative from the State Crime Laboratory could respond and come and pick up the body.

Now when Deputy Coroner Purtee was there, the FBI was there and the Park Service was there, without moving or disturbing the body in any way whatsoever, Deputy Coroner Purtee could tell the victim was a male. He could tell the victim's hands were bound

behind his back with duct tape. He could tell the ankles had been taped together. He could tell, at this point, duct tape was down around the neck of the victim; and he could also see a gaping wound in the right side of the victim's head.

A crime scene investigation of the area immediately around the body did not reveal any identification at all. So at this point, the body is what they call a "John Doe."

Now during the crime scene investigation, Agent Tom Ross found a brimmed hat, which has got a brim going all the way around it. People wear them to go fishing, people wear them to play golf, you can just kind of roll it up and stick it in your back pocket. That hat, which was found a short distance from the body, had some stains on it. The hat was sent to the FBI Laboratory and the stains on that hat have been determined to be human blood.

On June 27, the following day, Dr. Charles Kokes, who is an associate medical examiner with the State of Arkansas, performed an autopsy on the body that was discovered by Allan Ritchie the day before.

During his examination, Dr. Kokes located a gunshot entrance wound on the left side of the head just behind the eye. That gunshot wound resulted in a path through the head, exiting the right temple area.

It was Dr. Kokes' opinion that the cause of death was a gunshot wound to the head. It was also Dr. Kokes' opinion that

the manner of death was a homicide.

Now based upon the size of the entrance and the exit wounds, it was Dr. Kokes' opinion that the wound had been inflicted by a .38 caliber bullet.

During his examination of the body, Dr. Kokes also discovered the presence of lead shot in the left chest area. Those pellets were removed from the body and they were delivered to Berwin Monroe, who is a firearms expert with the State Crime Laboratory. Mr. Monroe looked at the pellets, examined the pellets and in his opinion, the pellets which were removed from the body were Number 9 shot, which Mr. Monroe will tell you is commonly referred to as "rat shot."

Mr. Monroe will also tell you that in his opinion, the Number 9 shot could have been fired from either a .38 or a .357 magnum handgun.

The very same day that the autopsy was being performed in Little Rock, Billy Bars, who works for the Park Service and does restoration and construction work, was assigned to do some work at what I call the stone pump house at Happy Hollow Spring. As part of his work, Mr. Bars had to go into this drainage ditch area to do some work on the drainage. When Mr. Bars went down to the drainage area, picked up a rock, started to move the rock when he saw something under the rock. He saw a billfold.

Mr. Bars picked up the billfold, opened the billfold to see if there was any identification, see who they needed to return it

to. He opened the billfold and he saw that it belonged to Sherman Williams and there were numerous pieces of identification in the billfold, but there was no money. So Mr. Bars took the billfold to the ranger station and it was eventually turned over to Ranger Jim O'Donnell.

Now when Ranger O'Donnell got the billfold, okay, Sherman Williams' phone number -- I'll call Mr. Williams and give him his billfold. Ranger O'Donnell called Mr. Williams, called Mr. Williams, called Mr. Williams. No answer; Mr. Williams is not home. Okay, there is another number in the billfold: Carol Sherman. I'll call her and tell her I have her father's bill-fold. Maybe she can get in touch with him. Carol Sherman tries to call her father. No answer, nobody home.

So at this point, the family tells Ranger O'Donnell we can't get a hold of him so Ranger O'Donnell says, "I'll go out to the house and see what's going on, see if I can find anything else."

So on the 27th of June, Ranger O'Donnell drove out to the home of Sherman Williams. When he got there, he saw three things: newspapers stacked up by the front door, no car, no Mr. Williams.

Well, at this point, it was obvious nobody had seen Mr. Williams for some time and at this point, a decision was made to obtain Mr. Williams' dental records and send them to the medical examiner to see if they might match with the body that had been found on the mountain.

So Mr. Williams' dental records were obtained from his dentist in Little Rock, they were delivered to the State Crime Laboratory, and there was a match. The body that Allan Ritchie discovered on June 26 was, in fact, that of Sherman Williams.

Now ten months later, we move to April, 1996; ten months after the murder of Sherman Williams. The defendant, Trint Ingle, is in the Crawford County Detention Center in Van Buren. While he is there, he meets and becomes friends with a man by the name of Derrick Bell, who is also at the detention center.

While Trint Ingle and Derrick Bell are together there in Van Buren, they begin talking to each other of all different kinds of things. And over the course of their relationship in Van Buren, the defendant, Trint Ingle, begins telling Derrick Bell about something that he had been involved in in Hot Springs; some sort of an incident he had been involved in.

And over the course of several conversations, the incident that Trint Ingle is describing to Derrick Bell involves the murder of an individual in Hot Springs. And during the course of several conversations on that very subject, Trinity Ingle told Derrick Bell that he and his partner had followed an old man into the national park in Hot Springs. The defendant told Derrick Bell that he and his partner had confronted an old man and demanded his wallet. Ingle said when the old man refused, he was knocked to the ground and he was kicked.

Trint Ingle told Derrick Bell that when the old man resist-

ed, his partner walked down to the old man's car to get something to tie him up with. The defendant said that his partner came back with a roll of duct tape. Trint Ingle said the old man pleaded with Ingle, that if they would let him go, he wouldn't tell anybody. Trint Ingle said he hit the old man and told him to shut up. Trint Ingle said they took the old man's billfold and money and shot him in the head and shot him in the chest with rat shot. They dragged him into the woods and looked for a place to put the body where it wouldn't be easily found.

And Trint Ingle said that after they covered the body with some leaves, Ingle and his partner went down to the mountain, got into the old man's car and went joy riding. Trint Ingle described this car as a beige gold-colored new car, big, all power, and he said he dumped it over a cliff.

Jonah Jones was also in the Crawford County Detention Center in Van Buren during March and April of 1996. In late March or early April, Derrick Bell and Jonah Jones began sharing a room. At this time, Derrick Bell told Jonah Jones what he had learned from Trint Ingle about a murder in Hot Springs. Around this time, Jonah Jones was introduced to Trint Ingle.

Now Jonah Jones had, on a previous occasion, worked as an informant for the Federal Bureau of Investigation. He had worked for Agent Bill Maddalena, who is stationed in Fort Smith, Arkansas.

When Jonah Jones heard about the murder, which he felt had

some sort of federal implication, federal involvement, he called Agent Bill Maddalena and left a message on his answering machine, that he needed to talk to Bill Maddalena about what he had learned about a murder that he thought had federal involvement.

A day or two after Jonah Jones called Bill Maddalena, Bill Maddalena went over to talk to him. And Jonah Jones explained to FBI Agent Bill Maddalena that this person named Ingle had been talking about a murder that he had participated in in the national park in Hot Springs.

Now since the case was in Hot Springs and Bill Maddalena was stationed in Fort Smith, he didn't know anything about it. So after making several telephone calls, Agent Bill Maddalena spoke to Tom Ross, who is the case agent here in Hot Springs. And after Agent Tom Ross was notified about the information, Jonah Jones consented to be wired with what's called a NAGRA body recorder; it's a tape recorder, it's very small, it can easily put on the body.

On April 3, 1996, Jonah Jones was, in fact, equipped with a NAGRA body recorder, which was taped to his body.

Over the next several hours, Jonah Jones, Derrick Bell and the defendant, Trint Ingle, spoke about the Hot Springs murder as well as other matters.

Now ladies and gentlemen, we have the tape of that conversation. It's a two-hour tape. We don't plan on playing the entire two hours of that taped conversation for you. What we have done

or chosen what we consider to be the pertinent portions of that tape which relate to the charges the defendant is facing here today. And those are the portions of the tape that we anticipate playing for you so you can hear the defendant describe in his own words what happened and how he did it.

And ladies and gentlemen, some but not all of the things that Trint Ingle told Jonah Jones and Derrick Bell during that recorded conversation, which we anticipate playing, include -- To be on the safe side, during this conversation, Trint Ingle explained that he would refer to himself and his partner as "Bob and Andy" rather than using his own names. And he explains that by using Bob and Andy, that way nobody can tie him into it. He'll be Bob and his partner would be Andy during this discussion with Jonah Jones and Derrick Bell. So during the tape, you'll hear references that Bob and Andy did this, Bob and Andy did that.

During this tape, you'll hear Trint Ingle state that both he and his partner shot the old man. The reference will be, "Bob and Andy both did this." He states the old man was shot because he and his partner weren't wearing masks. The old man was shot in the day time in broad daylight with the sun up. Other people in the area might or might not have heard the gun shots.

Ingle shot the old man first. The old man was shot in the head. He didn't bleed much when he was shot. The didn't have to carry the body very far. The tied the old man up.

The old man was tied up when his body was discovered by a hiker. They carried the body into the wood, threw it in some leaves and covered it up.

Some nature walker found the body. The old man's car was new, all power. It was a gold color. It had power locks.

The old man was shot on a mountain in Hot Springs National Park where there are woods. The old man was shot in the summer, ten months ago; ten months from April of 1996 was June of 1995.

The old man was shot in the tourist area where people hike and have picnics about a block away.

They got about $100 from the old man, just enough for the day. The old man didn't mean anything to Ingle. The old man was in the wrong place at the wrong time.

Ladies and gentlemen, I know that sitting on a jury is a personal inconvenience and nobody has certainly ever, ever said that sitting in judgment of somebody is an easy task. But being chosen as a juror is an honor and very worthwhile experience because at the end of this trial, it will be your sworn duty to determine the facts of this case and whether or not the defendant, Trinity Edward Ingle, is guilty of capital murder.

At this time, I want to personally thank you for the attention that I know you're going to show throughout the course of this trial as the evidence is being presented because as we all know, this is a very, very, extremely important case.

Ladies and gentlemen, after you've heard all of the evidence

and what I've outlined for you is not necessarily all of the evidence, but after you have heard all of the evidence, I have all the confidence that you will be able to return verdicts of guilty against the defendant for the murder of Sherman Williams.

Thank you.

BY THE COURT: All right. Thank you, Mr. Snyder. All right. Ladies and gentlemen, let's take a recess here and we will come back out at 9:30 and we'll hear the remarks by Mr. Depper.

So we'll be in recess.

[Recess taken at 9:16 a.m. - Jury Not Present]

[Open Court - 9:32 a.m. - Jury Present]

BY THE COURT: Ladies and gentlemen, please be seated.

All right, Mr. Depper, are you ready to proceed?

BY MR. DEPPER: May it please the Court, Your Honor; Mr. Snyder, Mr. Webb --

Ladies and gentlemen of the jury, on behalf of myself and Ms. Cathy Compton and, of course, Trinity Ingle, we, too, thank you for your jury service that has been thus far and that we know will be in the future. And we know that which you have to decide is not an easy task. Any type of case is difficult for jurors, but particularly a murder case. And we appreciate the difficulty that we know you will endure throughout this process.

Now at this particular point, I am reminded of the fact that after hearing an opening statement such as the Government has

TRIAL OF U.S. V. TRINITY EDWARD INGLE,
NO. 96-60023-001
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

**TESTIMONY OF JASON RATLIFF & STEPHANIE MILLER**

BY THE COURT: All right. Thank you, ma'am. You're excused, you're released, you may leave if you like.

Call your next, please?

BY MR. WEBB: Your Honor, we would call Jason Ratliff.

BY THE COURT: Gentlemen, I didn't suggest this before but would we save any time by swearing all of the witnesses that you have? Do you have them all here or --

BY MR. WEBB: We've got some that we were going to use this morning, Your Honor.

BY THE COURT: Well, let's just take them one at a time. Come on, Mr. Ratliff, is it? Would you come up front here and stand in front and raise your right hand and be sworn to answer questions, please, sir?

Mr. Ratliff, come around and have a seat, if you will, in this witness box and if you will, try to arrange that microphone and pull it down a little bit. Now it comes out of the hole there so you have to watch that, but kind of lean forward and talk into it so we can hear you, please, sir.

BY THE WITNESS: All right.

BY THE COURT: All right, thank you. Go ahead?

JASON RATLIFF, GOVERNMENT'S WITNESS, SWORN

<u>DIRECT EXAMINATION</u>

BY MR. WEBB:

Q. Tell us your name, please?

A. Jason Ratliff.

Q. And where do you live, Mr. Ratliff?
A. 596 Plain Street, Hot Springs.
Q. Okay. What do you do for a living?
A. I work at McClard's Barbecue as a cook.
Q. Okay. Do you know an individual by the name of Trint Ingle?
A. Yes, I do.
Q. And is he in the courtroom today?
A. Yes, he is.
Q. And could you point him out for us?
A. Right there. [indicating]
Q. Are you referring to the man that's sitting at this table here?
A. In the striped shirt, yeah, with the short hair.

BY MR. WEBB: Your Honor, we would like for the record to reflect that the witness has identified the defendant.

BY THE COURT: All right. Will.you state -- It's a gentleman seated at the counsel table?

BY THE WITNESS: Yes, sir.

BY THE COURT: What kind of shirt? What's the color of it?

BY THE WITNESS: White with stripes on it.

BY THE COURT: All right. Let the record show that the witness has identified the defendant.

BY MR. WEBB:

Q. How long have you known Mr. Ingle?

A. I think I met him in October of '93.
Q. What type of relationship did you have with him?
A. I just knew who he was.
Q. Let me refer you back to June of 1995, June 15. Did you see Trint Ingle on that date?
A. Yes, sir.
Q. And where did you see him?
A. At the Total Station, gas station.
Q. All right. And where is that Total Station located?
A. It's on Central and Crawford Drive. It's real close to the race track.
Q. And about what time did you see him there?
A. About 11:30.
Q. Morning or night?
A. Night.
Q. Why were you there so late?
A. I was going to see a late showing of a movie with my girl-friend.
Q. And who is your girlfriend?
A. Stephanie Miller.
Q. Was there anyone else with you besides Stephanie Miller?
A. Her friend, Jamie White.
Q. Okay. Tell us what happened when you got to the Total Station?
A. I went in to get some cigarettes and Stephanie went in with

me; she was getting some candy. And as I came out, Jamie asked me if I knew this guy, and I looked over and I saw the guy's back and stuff. And so I walked closer to him. He was cussing at some friends of mine that were another car with us. So I walked up behind him, he turned around and it was Trinity.

Q. Okay. And what happened at the time when he turned around and you saw Trinity?

A. Well, I said, "What's up?" because he was messing with my friends and stuff. Then he yelled to his friend to get his strap.

Q. All right. Now what does it mean, "Get my strap"?

A. It means get a gun. A strap would be a gun.

Q. Okay. All right. Now after he said get my strap, then what happened?

A. He didn't wait for his friend. He just ran over to the car as soon --

BY MR. DEPPER: Your Honor, I think at this we're going to have to object. We're talking about something that might have happened prior to the death of Mr. Williams and such in the case has no relevance in this case whatsoever.

BY THE COURT: What's the purpose of it, Mr. Webb?

BY MR. WEBB: Your Honor, he was about to state -- This is 404(b) and it's identity to show --

BY THE COURT: Just a minute. Let's talk at side-bar, please.

Ladies and gentlemen, please excuse us just a moment.

[Side-bar Conference - Jury Not Present]

BY THE COURT: Now do you need to have the defendant up here? Do you?

BY MR. DEPPER: I think we should, judge. Thank you.

BY THE COURT: All right. Well, if you do, then have him come up.

All right. Have a seat there. All right. Tell me what --

BY MR. WEBB: Your Honor, obviously under 404(b), there is a number of different areas where we could admit this evidence.

BY THE COURT: Well, tell me first of all, what is the evidence? The murder happened on what day allegedly?

BY MR. WEBB: June 22.

BY THE COURT: All right. So you're asking about something that happened a week previous, the 15th?

BY MR. WEBB: That's correct.

BY THE COURT: All right. And what are you trying to get at; that he had a weapon or that he threatened somebody or that it was quarrelsome or what?

BY MR. WEBB: The primary reason we're using, Your Honor, is to show that he pulled a gun that is going to be identified as being very similar to the gun that was used in the crime of this case; to show that he had possession of a gun.

And under <u>United States versus Barkley</u>, 855 F.2d 547, the

defendant there was in gun's possession six months prior to the time and the Court there held that that was admissible for the purpose of identity, to show that --

BY THE COURT: I think the issue has been raised as to whether or not the defendant was present at the scene of the alleged crime and the issue has been raised, as least by the remarks of counsel, as to whether or not he did any killing. And so I think it's relevant to determine or to show that he may have been in possession of a weapon that's similar to that, that close in time.

What troubles me about this is the way it's being presented; that he threatened get my strap, and so forth. I think that's -- I don't think that's relevant. I think to the extent that the witness can testify that he had a weapon and it describe it, I think that's relevant. But beyond that, I think it's unnecessary.

BY MR. WEBB: So, Your Honor, before I go any further with him, you're saying that I can ask him -- The next question was going to be, you know, what happened? He got the gun out after he said get my strap. Can I ask him --

BY THE COURT: Well, it's not alleged, though, that he was accused of any crime in connection with these activities, is it?

BY MR. SNYDER: He was convicted.

BY MR. WEBB: He was convicted of it.

BY THE COURT: Of this event?

BY MR. WEBB: Yes, sir. In fact, that's what he was in jail for in Crawford County.

BY THE COURT: What about that, Mr. Depper?

BY MR. DEPPER: It's true. He was.

BY THE COURT: Then why is that not relevant?

BY THE COURT: Well, because judge, it doesn't show motive, it doesn't show opportunity, intent, preparation, plan, knowledge, identity relative to this particular murder.

BY THE COURT: No, I don't agree. It shows that he had possession of a weapon. Was the conviction a weapon's charge?

BY MR. SNYDER: Yes, sir.

BY MR. WEBB: Yes, sir.

BY THE COURT: Okay. Objection will be overruled.

BY MR. DEPPER: Very well.

BY MR. WEBB: So, Your Honor, how far --

BY THE COURT: I'm not giving advisory opinions. I'm overruling an objection so you can proceed unless and until there is another objection.

[End of Side-bar Conference - Open Court - 10:07 a.m. - Jury Present]

BY THE COURT: All right. Ladies and gentlemen, again, thank you for your patience with us.

Proceed, Mr. Webb.

BY MR. WEBB:

Q. Okay. I believe I had asked you, or to summarize, you had said Mr. Ingle said, "Get my strap" which meant get my gun?
A. To get his gun. Yeah.
Q. All right. Then what happened then?
A. He just turned around and ran to the car his self and pulled the gun out from under the front passenger seat.
Q. Okay. What kind of gun was it?
A. Well, a revolver, large caliber, probably a .357, .44.
Q. Okay. Did you look at it close enough that you could --
A. No. He was probably 40 feet away, 50 feet away.
Q. Okay. Now what happened once he pulled this gun?
A. He said, "What's up now?" and he pointed it at me and I just started saying, "Chill, chill," meaning to calm down and started backing up to get back in the car and I told my girl to get back in the car.
Q. Okay. Now once you got back to the car, then what happened?
A. We pulled out and left. And as we were leaving, he put the gun to his side and he said, "What's up? It's one on one, just me and you. Come back." And I was, like, you've got a gun so, you know, we just kept going.
Q. Okay. And where did you go from there?
A. We took a right on Crawford and went to the stop sign and took a left on Higdon Ferry and took another left into the movie theater parking lot.
Q. Okay. Now where is this movie theater in relationship to

this Total Station?
A. It's caddy-corner up at the other end of the block across the street.
Q. Is there some kind of shopping center --
A. Yeah. Yeah, it's like a flea market or something like that.
Q. Okay. All right. Now did you report this to the police at that time?
A. No, sir.
Q. Did you tell anyone else about it?
A. I didn't; no, sir.
Q. Okay. Someone else did?
A. I think so.
Q. All right. Do you know of any reason why Trint Ingle pulled a gun on you?
A. I have no idea.
Q. Had you had any contact with Mr. Ingle prior to that time?
A. No, sir, not -- No. I knew who he was but, no, we had never had any problems or anything like that.
Q. And have you had any contact with him since that time?
A. No, sir.

BY MR. WEBB: Pass the witness.

BY THE COURT: All right. Cross, please?

BY MR. DEPPER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DEPPER:

Q. Mr. Ratliff, how old are you, sir?
A. Twenty-three (23).
Q. And I think you had indicated that you had known Trinity Ingle since 1993?
A. October.
Q. Okay. And why do you remember the month of October as the time you came to know Trinity Ingle?
A. Because I was locked up in the county jail and he was in there.
Q. Okay. And you were locked up in the county jail for what purpose, sir?
A. I had got into a fight, a disorderly conduct charge, on federal property and in this courtroom, they sentenced me to three months in prison.
Q. I see. And so you spent that in the county lock-up?
A. No. I spent the first 17 days, I think, in the county lock-up.
Q. And then you went to a federal penitentiary?
A. In Texarkana.
Q. Okay. Have you served any other time in a penitentiary or a jail?
A. No, sir.
Q. Okay. And you say that you were for disorderly conduct?
A. It's a misdemeanor; yes, sir.
Q. Does that mean you got in a fight?

A. Got into a fight, fist fight.
Q. Okay. On federal land?
A. On federal property.
Q. That's all over the place in Hot Springs --
A. Yes, sir.
Q. You say a fist fight?
A. Yes, sir.
Q. You didn't use a weapon at all?
A. No, sir.
Q. Okay. How far did you go in school, sir?
A. Eleventh grade.
Q. You testified under direct that you didn't report this incident to the police?
A. No, sir.
Q. Did someone report it to the police?
A. I'm not sure. All I know is the FBI left his message on my girlfriend's answering machine for us to call, so we did and went down there and gave statements.
Q. You went down and gave statements to who?
A. Tom Ross.
Q. Do you remember when you went down and gave statements to Mr. Tom Ross?
A. No, I don't recall the exact date. Probably a month or so after the incident.
Q. After the incident that you just described for us?

A. Uh-huh.
Q. And you said that this incident was June 15. Why do you remember that particular date?
A. Well, I just remember the date. I mean, if somebody pulls a gun on you, you usually remember when that is.
Q. Okay. All right. Has anyone ever pulled a gun on you before?
A. No, sir.
Q. Okay. Could it have been June 16?
A. Possibly.
Q. Could it have been June 14?
A. Possibly.
Q. Could it have been June 20?
A. I doubt that.
Q. Could it have been June 3?
A. No.
Q. Okay. So you think it's pretty much around the 15th area?
A. Yeah.
Q. All right. Well, let me ask you if you were so concerned about this incident, why did you not call the police?
A. I wasn't that concerned about the incident.
Q. I see. Okay. So you didn't feel threatened or endangered at all?
A. Well, I had a gun pointed at my chest. I felt threatened, I didn't feel like I should call the police, though.

Q. Well, why not?
A. Because that's just how I am.

BY MR. DEPPER: I see. Thank you, Your Honor. I have no further questions of this witness.

BY THE COURT: Anything further?

BY MR. WEBB: No, Your Honor.

BY THE COURT: All right. Thank you, sir. May he be excused?

BY MR. WEBB: As far as we're concerned, Your Honor.

BY MR. DEPPER: As far as the defense is concerned, yes.

BY THE COURT: Okay. Call your next, please?

BY MR. WEBB: We call Ms. Stephanie Miller.

BY THE COURT: Please raise your right hand and be sworn. Would you have a seat around here in the witness box and please try to speak into that microphone.. You may need to adjust it somewhat, but we need to hear you.

BY THE WITNESS: Okay.

BY THE COURT: All right, thank you. Go ahead, please.

STEPHANIE MILLER, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WEBB:
Q. Tell us your name, please?
A. Stephanie Miller.
Q. And where do you live, Ms. Miller?

A. I live up in Little Rock. Do you need a street address?
Q. No; just the fact you live in Little Rock is fine. What do you do for a living, Ms. Miller?
A. I'm a manager at a tanning salon.
Q. All right. And is that in Little Rock, also?
A. Yes.
Q. Ms. Miller, let me refer you back to June of 1995. Where were you working at that time?
A. At the Central City Tan Cinema here in Hot Springs.
Q. And where is that located at?
A. It's located on Higdon Ferry Road.
Q. Okay. Is there a shopping center or something in front of it?
A. It's behind the, well, the K-Mart.
Q. Okay. Don't remember what's there --
A. Red Roof Craft and something like that.
Q. Okay. Ms. Miller, let me refer you to June 15 of 1995 around midnight or 12:30 in the morning. Were you at a Total Station in that area?
A. Yes. Yes, sir.
Q. And where is that Total Station located at?
A. On the corner of Central and Crawford.
Q. And for us that don't know where Central and Crawford is here in Hot Springs, where is that close to?
A. South of the race track.

Q. And why were you there so late that night?
A. We were screening a movie. I was the supervisor there and we screened movies when there was a movie.
Q. Okay. What do you do when you screen a movie?
A. We have to wait till all of the theaters get out, all of the movies let out so we can screen it when no customers are there; just employees and they are allowed to bring a friend or two.
Q. Okay. Basically, you're going to watch the movie for the first time; is that it?
A. Yes, sir, and we were going to get snacks --
Q. Okay. At the Total Station there?
A. Uh-huh.
Q. Okay. What happened when you got to the Total Station?
A. I went inside first and got snacks and then Jason went inside after me.
Q. Okay. Let me ask you: Who was with.you when you went to the Total Station?
A. My friend Jamie, myself and Jason were in Jamie's car and my friends Laura and Jacob, who also worked at the cinema, were in her car along with two of their friends.
Q. Okay. Now what happened when you came out of the Total Station?
A. I came out and just stood, talking through the window to Jamie and then whey Jay came out is when --
BY MR. DEPPER: Excuse me for a moment. I believe

we're getting in the same type of testimony that we were talking about with our previous witness and I would like to interpose an objection, realizing the Court may have the previous ruling but I would like the record to reflect my objection.

BY THE COURT: The objection will be overruled for the same reasons.

BY MR. DEPPER: Thank you.

BY THE COURT: Go ahead.

BY MR. WEBB:

Q. Okay. You came out and what happened at that point?

A. There was another car parked at the gas pumps and there was two guys there. One of the guys had walked over to Laura's car, which was parked facing Crawford. We were parked on the side facing Central. And he was talking and gesturing through the window to them.

When Jason came out of the store, Jamie said, "Hey, I think something is going on over there." And so Jason walked over there and said, "Hey, what's going on." And I had started to walk over there, too, and at that time, the guy that was talking through the window said, --

BY MR. DEPPER: Your Honor, I'm going to have to object to the hearsay. Certainly, she has no problem testifying as to what she observed, but I do object to hearsay.

BY THE COURT: Ma'am, I'm having difficulty hearing you. You were saying you walked over toward the car and you hear

people say things? Is that what you're saying?

BY THE WITNESS: He was talking through the --

BY THE COURT: Who was talking?

BY THE WITNESS: Trinity. They guy that had walked over to the car was talking through the window to --

BY THE COURT: All right now, just a minute. To the extent that she's talking about what the defendant said --

BY MR. DEPPER: Then I have no problem with that, judge.

BY THE COURT: All right. If you can, ma'am, try to identify who was talking, okay?

BY THE WITNESS: Okay.

BY THE COURT: All right. Go ahead.

BY MR. DEPPER: Thank you.

BY MR. WEBB:

Q. Excuse me, Stephanie. Let me ask you; be sure and speak into the microphone because Mr. Snyder said he couldn't hear you --

A. Can he hear me at all now?

Q. And I know you're a little nervous --

A. A little bit.

BY THE COURT: You have a soft voice but if you will, try to get up like this. I know it may be hard.

BY THE WITNESS: Okay. Was talking through the window, I think he was saying are you in 9 - 0, something like that, and

then when he saw Jay - Jason said, "Hey, what's going on?" He turned around, saw Jason, looked back toward his car and said, "Get my gat. Get my gat." He said it twice.

And at that point, the other guy that he was talking to just stood there and he then proceeded to kind of, not really run, but walk over to his car and reached under the passenger side and pull out a gun.

BY MR. WEBB:

Q. Let me stop you right here. Do you recognize the person that said that, said "Get my" -- What did you say, gut?

A. Gat.

Q. Gat? Okay. And is he in the courtroom today?

A. Yes, sir.

Q. Could you point him out for us?

A. He's sitting over at that table.

Q. Okay. And could you describe what he's wearing for us?

A. A blue and white button down pin-stripe, khaki pants it looks like.

BY MR. WEBB: Okay. Your Honor, we would like for the record to reflect that Ms. Miller has identified the defendant, Trinity Ingle.

BY THE COURT: The record may so show.

BY MR. WEBB:

Q. Okay. Now after he said this and you started toward the car, then Ms. Miller, what happened at that point?

A. Jason walked kind of toward me and we were kind of, we were standing together then about probably five feet from the car where Jamie was still in the car. When he pulled the gun out, he was kind of waiving it around and pointing it at us, alternating, and saying "Who has the power now and respect? Who has respect?" I mean, he kept repeating these things, over and over.
Q. Let me ask you; can you identify what the gun looked like?
A. To me, it looked like a "Billy the Kid" gun. It wasn't a new automatic weapon. It had the, I want to say revolver; is that right?
Q. Okay. It had a cylinder with --
A. Yes, a cylinder. That's what I'm looking for. Thank you.
Q. The bullets go around it?
A. Uh-huh, and it was long.
Q. A long one?
A. Well, --
Q. It seemed very long to you?
A. Yes, it seemed very long.
Q. Are you familiar with guns, Ms. Miller?
A. Yes, I am.
Q. Okay. Do you know what caliber it was? Could you identify it or did you get that good a look at it?
A. No, not -- No.
Q. Okay. After this happened and you said he was saying these things, then what did you start doing at that point, Ms. Miller?

A. We started backing back toward Jamie's car, vehicle very slowly. Jason was saying to me under his breath in my ear, "Walk back really slow. Just walk real slow." And he was saying to Trinity, "That's okay. That's okay. You're cool, it's okay," and trying to, I guess, calm him down a little bit. And at the time, we were slowly easing backwards to the car.
Q. Let me ask you: Then what happened when you got to the car?
A. We got in the car, told Jamie to take off. She backed out and drove right past him in front. We got to the road, then Trinity started yelling, "Come back and fight, come back and fight." And Jason was, like, "You have a gun." You know, he just yelled out the window, "You have a gun." You know, and so I was, like, "Jamie, go." And so we just took off.
Q. Okay, and where did you go?
A. We were headed back to the movie theater. They jumped in their car, the two guys - Trinity and the other guy that was with him - got in their car and started chasing us. I don't know -- On Crawford, you can take a left and cut to the movie theater parking lot or you can go to the stop sign and then take either a left or a right. We took the cut through and just sped through the parking lot to get down to the theater where everybody else was. They stayed straight and went to the stop sign and then took a left onto Higdon Ferry and drove right -- We reached the parking lot, they drove by, were honking the horn and yelling, and we thought they were going to start shooting, so we just

ducked, and then they were gone.

Q. Okay. Did you tell anyone about what happened?

A. My manager at the theater. Everybody there, "What was going on? What's going on?" And we were all, you know, just freaking out and saying, "They pulled a gun on us." And there was a security officer there that worked at the cinema that we told about it.

Q. Okay. Do you know what he did besides being a security officer?

A. I wasn't clear if he was still a -- I think he was still a police officer. I mean, I was pretty sure he stated that. He just worked at the theater on nights, occasional nights.

Q. Okay. Did you report it to the police yourself?

A. No. We did not, no.

Q. And why not?

A. I don't know, we just didn't. Nothing had happened and we just wanted to forget it.

BY MR. WEBB: Pass the witness, Your Honor.

BY THE COURT: Cross, please?

BY MR. DEPPER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DEPPER:

Q. Ms. Miller, what was the security officer's name, do you recall?

A. I'm sorry, I don't remember.

Q. Okay. How long did you work at that movie theater, please?
A. I worked at the Central City Twin, which was located next door, from I believe April of '94 up until about February of '95. I quit for about three months and then came back when they started building the ten screen and was there through probably June or July of that summer -- I mean, through the summer until I left for college.
Q. Okay. And this security officer; did he work there all the time that you worked there?
A. We really needed him on the nights that we got new movies and we knew we were going to have a big crowd, just kind of was crowd control. He was there off and on. It wasn't, I mean, a couple of nights a week, I guess.
Q. Okay, all right. Now you made a statement that you thought that these people were chasing you. The fact --
A. They were chasing us.
Q. Well, stay with me for a minute. Do I understand that after y'all drove out, they followed behind you?
A. Yes.
Q. And you went one direction and they went another?
A. We hung a left right into the parking lot. I don't know if they -- They stayed to the stop sign and then took a left, so they chased us down the Crawford and yes, we did. I --
Q. I'm sorry. Go ahead. I didn't mean to cut you off --
A. But I guess that's the definition of chasing.

Q. Okay. But they didn't go into the parking lot with you?
A. No.
Q. They didn't follow in the parking lot?
A. No.
Q. You said that you sped down the parking lot?
A. Uh-huh.
Q. How far was that that you traveled down the parking lot?
A. Maybe two, 300 feet. I'm not real good --
Q. Okay. A football field length?
A. Possibly, about that. From Crawford all the way down to the cinema.
Q. All right. So when you made that turn to the parking lot, as you both traveled in the general direction --
A. Uh-huh.
Q. -- same general direction, do I understand that you're gradually traveling farther away from them?
A. Well, we were parallel in the parking lot.
Q. Okay. How much space was between the two vehicles?
A. The parking lot, I don't know --
Q. Well, think of it as a football field visually?
A. Maybe half of a football field.
Q. Half of a football field? Okay. And the vehicle that they were riding in; can you describe that vehicle for me?
A. It was mustard colored and it looked like, it was very long like an older Cadillac.

Q. Was it a Cadillac?
A. I'm not sure.
Q. Okay. Well, you know cars, I guess; is that right?
A. Well, I try to.
Q. Okay. I'm sorry; you are how old?
A. I'm 19.
Q. Nineteen? Cars are pretty important at age 19 as I recall--
A. My car is.
Q. Okay. So you thought it was a Cadillac. Could you tell me what year of Cadillac or type of Cadillac?
A. I would say maybe late 70s or early 80s.
Q. Okay. And you used the word "Gat." Is that G-A-T, is that what --
A. Sir, he used the word "Gat."
Q. I understand but that's what you told us, gat. Is it G-A-T?
A. Yeah.
Q. In the vernacular of the street, do you know what that means?
A. Gun.
Q. Okay. How do you know if that means gun in the vernacular of the street?
A. I hear it on movies and it's slang for gun, I know that.
Q. Okay. Pull up to this gas station which, I'm sorry, I didn't quite understand. How far is it away from the theater?
A. Just right up the road. The theater is in --

Q. Quarter mile?
A. No, not even that much.
Q. Two block?
A. Just a couple of, yeah, just a couple --
Q. And you said we went to get snacks?
A. Snapple to be exact. I bought Snapple to drink and chips, candy bar.
Q. I'm curious; does the theater not have snacks?
A. Well, we had to pay $2 to get a candy bar there.
Q. Oh, it's more expensive there?
A. Uh-huh.
Q. I see, okay. And then the people in the car; how many people were in that car, please?
A. In the car I was in?
Q. Yes, ma'am?
A. Just three. In the other car were four.
Q. All right. In your car was Jamie, Jason --
A. And myself.
Q. And yourself. What about Jacob?
A. In Laura's car with Laura and Jacob, and I believe two other people. It may have just been one other person.
Q. So there was another car that went up there with you?
A. Another car.
Q. So when you pull out, do Laura and Jacob follow you?
A. The other car had left as soon as Trinity turned away from

their car after he had been speaking through the window to them. As soon as he had turned away, saw Jason and said "Get my gat," she took off. I don't know if she heard him say that or if she thought something was fixing to, you know, about to happen, or if she just was ready to go --

Q. Okay. And when you saw this gun there at the gas station, how far away were you, please?

A. Maybe ten feet. Maybe less.

Q. Okay. Maybe less? Maybe more?

A. Seven to ten feet.

Q. Okay. Could it have been more than that?

A. No.

Q. And when you saw this gun, who was right there in the vicinity with you?

A. Jamie was in the car.

Q. That would be Jamie who?

A. Jamie White was her name.

Q. Okay. Who else?

A. Jason was standing beside me.

Q. Jason who?

A. Ratliff.

Q. Okay?

A. And then Trinity holding a gun, and then the other guy that was with Trinity but still on the other side of the car, between the car and the gas pump.

Q. Okay. All right --
A. Still standing there.
Q. Thank you. And you're now here a witness at the request of the Federal Government. That causes me to believe that you've spoken to the FBI about this case?
A. Yes, sir.
Q. Tell me how it was that you were contacted to talk with the FBI about this case?
A. I was, they had called me at my parent's --
Q. I'm sorry, I didn't understand?
A. They called me at my parent's house.
Q. The FBI did?
A. That summer, yes, after maybe a month possibly after it happened. But my understanding was that the security officer had, you know, told them what had happened and then after what happened next, the week after, with us, decided to call us in and find out just exactly what had happened with us.
Q. Okay. After what happened next? I mean, you know you're here for a murder?
A. Uh-huh.
Q. Or for a murder case?
A. Yes, sir.
Q. How soon after that murder case or that murder that you understand were you called in by the FBI?
A. Maybe two to four weeks. It's been long.

Q. I understand, it's been a long time --
A. Yeah.
Q. Okay. And when you were called in, you went to the FBI office here in Hot Springs?
A. Yes, sir.
Q. And you gave a statement to who, please?
A. I believe it was to Tom Ross.
Q. Is that Special Agent Tom Ross?
A. Uh-huh.
Q. Okay. And when you gave that statement, who was present in the room, please?
A. Jason and myself both went in. Jason Ratliff and myself both went in to give a statement. I think we were the only ones. There may have been another agent there. I don't really remember.
Q. Okay, but non-FBI people, it was just you and Jason Ratliff?
A. And Tom and someone else.
Q. Okay, thank you. And when you gave your statement, was Jason there in the room at the same time?
A. I don't remember.
Q. Okay. Do you remember Jason giving his statement?
A. I think we were in the room at the same time.
Q. Okay, and I know it's hard, but as you think back on it, think of the set up. When you're telling and explaining to Special Agent Ross what went on, Jason was there at the same

time?
A. I believe we were in the same room at the same time; yes, sir.
Q. And I presume that when Jason gives his statement to the FBI, you're in the same room as well; is that correct?
A. Well, our statements were identical.
Q. Well, I understand that but you were in the room at the same time?
A. Yes, sir.
Q. You heard his, he heard your's; is that correct?
A. Yes, sir.
Q. Did you and Jason, by chance, talk about -- I mean, the fact that you go talk to the FBI is no little event. I mean, when the FBI calls us, I'm sure we all get a little concerned. Did you and Jason talk about what y'all were going to tell the FBI before you went up there?
A. He said tell them the truth, tell them what happened.
Q. Okay. All right. And did you two talk about what the truth was?
A. We knew what the truth was. Our statement is the truth.
Q. Okay, that's fine. What I'm saying, though, is did you two talk about it?
A. No, we knew what had happened. We didn't need to discuss it with each other.
Q. Okay. Prior to coming up and testifying today, did you do

anything to prepare for your testimony?
A. I just reviewed it in my head.
Q. Okay. Did you review the statement you gave the FBI, by chance?
A. I remember the night, every detail exactly.
Q. My question wasn't clear; I'm sorry. When the FBI took your statement, I presume they recorded your statement?
A. Yes, sir.
Q. Okay. When they recorded it, did they record it on a tape recorder or did they write it down?
A. They wrote it down.
Q. Okay. And before you left the FBI headquarters here in Hot Springs, did you review that statement for accuracy?
A. Yes, sir.
Q. Okay. And I presume it was accurate?
A. Yes, sir.
Q. As you had told it to them?
A. Uh-huh.
Q. In preparing for court today, did you review that statement again, please?
A. We were -- Before we came in here.
Q. Yes, ma'am?
A. We talked with -- but not with the FBI; with a man named John.
Q. Okay. You don't know who John's last name -- What his last

name is?
A. Schultsen [phonetic], possibly?
Q. And did John give you your previous statement that the FBI had recorded?
A. No.
Q. Did you review it with him as far as his talking to you about your previous statement?
A. I don't understand.
Q. The question was poorly asked. Do you understand that John worked for the Government?
A. I think that he did.
Q. Well, help me understand. What did John do with you concerning your testimony?
A. Before I came in here?
Q. Yes, ma'am, please?
A. He just said that these are the questions, you know, some they're going to ask you, and he tried to just help me calm down and not be nervous.
Q. Good reason. Nobody is going to get you in here, okay? All right. And did you discuss with John your testimony?
A. In a, kind of. I mean, I kind of reviewed it, kind of how I knew I was going to have to come in here and say what happened, so I kind of said what had happened to him, like preparing.
BY MR. DEPPER: Okay. Sure, all right. Thank you, ma'am.

BY THE WITNESS: Thank you.

BY MR. DEPPER: Thank you, Your Honor.

BY THE COURT: Anything further?

REDIRECT EXAMINATION

BY MR. WEBB:

Q. Ms. Miller, you also talked at one point with Mr. Snyder and I --

A. Yes.

Q. It's been three or four months ago; is that correct?

A. Yes, sir.

BY MR. WEBB: I don't believe I have any further questions.

BY THE COURT: All right. May she be excused?

BY MR. DEPPER: As far as I'm concerned, yes.

BY THE COURT: All right. May she be excused?

BY MR. WEBB: Yes, Your Honor.

BY THE COURT: Thank you. You may stand down, you're excused, you're released, and you may leave if you like.

Let's take a recess, ladies and gentlemen, and we'll come back at ten minutes till, please.

[Recess taken at 10:34 a.m. - Jury Not Present]

[Open Court - 10:53 a.m. - Jury Present]

BY THE COURT: All right. Please call your next?

BY MR. WEBB: Call Ms. Marie Bosson.

BY THE COURT: All right. Ma'am, would you come

TRIAL OF U.S. V. TRINITY EDWARD INGLE,
NO. 96-60023-001
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

# TESTIMONY OF DERRICK BELL & JONAH JONES

A. That's very possible. I don't remember specifically.

BY MR. DEPPER: Okay, fair enough. Thank you very much, sir.

BY MR. SNYDER: Nothing further.

BY THE COURT: May he be excused then?

BY MR. SNYDER: Yes, sir.

BY MR. DEPPER: Yes, sir, thank you.

BY THE COURT: Thank you, sir. You're excused, you may stand down.

BY THE WITNESS: May I be --

BY THE COURT: May he be released?

BY MR. DEPPER: As far as I'm concerned; yes, sir.

BY MR. SNYDER: Yes, sir.

BY THE COURT: All right. Yes, sir, you may. Thank you.

Call your next, please, sir?

BY MR. SNYDER: Call Derrick Bell.

BY THE COURT: Mr. Bell, would you come around front, please, and raise your hand to be sworn.

Mr. Bell, would you step over here to the stand, please, sir? And we would appreciate it if you would try to speak into the microphone so we can hear you.

BY THE WITNESS: Yes, sir.

DERRICK BELL, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SNYDER:
Q. Would you please state your name?
A. Derrick Bell.
Q. Mr. Bell, where did you grow up?
A. Fort Smith, Arkansas.
Q. And what do you currently do for a living?
A. Assistant Grocery Manager.
Q. And what are your duties in that position?
A. Supervision.
Q. Mr. Bell, have you pled guilty to a felony?
A. Yes, sir.
Q. What did you plead guilty to?
A. Embezzling.
Q. Okay. Is that a state charge?
A. Huh-uh. Federal.
Q. And did you also have a state charge?
A. Yes, sir.
Q. What was that?
A. Theft by deceiving.
Q. And how long ago was that?
A. A year ago.
Q. Okay. You said theft by deception; what happened there?
A. Well, I drew some unemployment that I wasn't supposed to.
Q. Were you unemployed for a while?
A. Yes, sir.

Q. And you just kept getting it?
A. Yes, sir.
Q. And you shouldn't have?
A. Yes, sir.
Q. Mr. Bell, did you agree to cooperate in this case?
A. Yes, I did.
Q. And at the time you agreed to cooperate, were you serving your state sentence?
A. Yes, I was.
Q. Do you remember how much time you got?
A. Two years.
Q. And as a result, did you apply to Governor Huckabee for Executive Clemency?
A. Yes, sir, I did.
Q. Was it granted?
A. Yes, sir.
Q. Did it have any effect on how much time you did?
A. No, sir.
Q. And you did the whole state sentence anyway?
A. Yes, sir.
Q. And I believe you said you pled guilty to a federal charge?
A. Yes, I did.
Q. And do you know if you got any relief on that sentence?
A. Yes, sir, I did.
Q. Do you remember how much?

A. Three months.
Q. And do you know how much time you had to serve?
A. Six months.
Q. And did you also get some money from the FBI?
A. Yes, I did.
Q. And did you get it after you were released?
A. Yes, sir.
Q. Did you ask for any money?
A. No.
Q. Did you have any idea you were going to get any money?
A. No, sir.
Q. How much did you get?
A. Three thousand dollars ($3,000).
Q. What did you do with it?
A. Living expenses, child support.
Q. And did you run up some child support while you were incarcerated?
A. Yes, sir.
Q. And you paid it?
A. Yes, sir.
Q. Mr. Bell, do you know an individual by the name of Trint Ingle?
A. Yes, I do.
Q. Is he here in court today?
A. Yes, sir.

Q. Can you identify him for me?
A. He's over with the striped shirt on.
Q. White shirt with stripes?
A. Yes.
Q. Do you remember about when you met him?
A. April of '96.
Q. Could it have been a little earlier, you think?
A. Yes, sir.
Q. How much earlier?
A. I believe February.
Q. And where did you meet him?
A. At the Sebastian County Detention Center.
Q. Crawford County?
A. Yes, sir.
Q. Was it in Van Buren or Fort Smith?
A. Van Buren; excuse me.
Q. And how did you happen to meet him?
A. Oh, we roomed together.
Q. Are you a little nervous?
A. A little bit.
Q. And did you talk to Mr. Ingle after you met him when you were there in the detention center?
A. Yes, sir.
Q. How often would you say that you'd see him?
A. On a day to day basis.

Q. And did you two develop any sort of a relationship?
A. Yeah, we become real good friends.
Q. Okay. Did he tell you where he was from?
A. Yes, sir.
Q. While you would talk to him, you know, see him every day and talk to him, did he ever tell you about an incident that had occurred in Hot Springs?
A. Yes, he did.
Q. Did he tell you what kind of an incident it was?
A. Yes, sir. He told me it was a murder.
Q. Did he tell you who was involved in this murder?
A. Yes, sir.
Q. Who did he tell you?
A. Excuse me. Could you repeat the question?
Q. Who did he tell you was involved in this murder?
A. Him and a friend of his.
Q. Now until the time the defendant told you about this murder in Hot Springs, had you ever heard about it before?
A. No, sir.
Q. Hadn't read about it or --
A. No, sir.
Q. Do you know why the defendant would tell you about a murder he had been involved in in Hot Springs?
A. Well, like I say, we became pretty good friends and, you know, we would tell each other different things.

Q. How many times would you say the defendant told you about the murder?
A. Around five times.
Q. How would this, how would it come up?
A. Well, we would just start talking and, you know, like I say, we'd talk about different things. So one night, he told me about a murder that him and his friend had committed.
Q. Did he tell you where in Hot Springs this murder had taken place?
A. Yes, he did. He said a national park.
Q. When he would tell you about the murder, would he use his name or would he use a different name?
A. He would use the name Andy and Bob.
Q. And who were Andy and Bob supposed to be?
A. Andy and Bob was him and his friend.
Q. And did he explain to you why he was.using names Andy and Bob?
A. Yes, sir.
Q. What did he tell you?
A. He was Andy and Bob was somebody that he would use in case someone tried to say that him and his friend did it.
Q. In case somebody was listening?
A. Yes.
Q. Where in the detention center would you and the defendant be when he'd tell you about the Hot Springs murder?

A. In our rooms.
Q. Would you bring it up or would he bring it up?
A. No, he would bring it up.
Q. Except for one instance, was anybody else ever present when the defendant would talk to you about this murder?
A. No, sir.
Q. Okay. And was somebody else present on one occasion when he told you about the murder?
A. Yes, sir.
Q. And who was that?
A. Jonah Jones.
Q. And do you remember where that conversation took place?
A. Yes, in our living conditions.
Q. Okay. And who were you living with at that time?
A. Jonah.
Q. Okay. Based on all four -- You said you probably had four to five conversations with him?
A. Yes, sir.
Q. Based upon all of those four or five conversations, did the defendant tell you about this murder from start to finish?
A. Yes, sir.
Q. Did he describe the victim to you or tell you who the victim was?
A. Yes, sir.
Q. What did he tell you?

A. He said he was an older male.
Q. Did he tell you where he and his partner first saw this old man?
A. Yes, sir.
Q. Where did he tell you?
A. He told me that he had seen him driving up in the park.
Q. Did he describe the car the old man was driving, too?
A. Yes, sir.
Q. What kind of car did he tell you he was driving?
A. He never did know what kind it was. He just kept saying it was a new car and had lots of power.
Q. Did he tell you what the old man was wearing?
A. Yes, sir.
Q. What did he tell you?
A. He said something, jogging clothes.
Q. Did the defendant tell you whether or not he and his partner were armed when they saw the old man wearing his jogging clothes?
A. Yes, sir.
Q. What did he tell you?
A. I believe he said they was armed with a .357 magnum.
Q. Did he tell you how many guns there were?
A. He just said they had several guns.
Q. Did the defendant tell you what kind of bullets were in these guns?
A. Yes, sir. He said it was, I believe, rat pellets.

Q. Any other kind of bullets?
A. Huh-uh. I believe he just said rat pellets.
Q. You're saying "I believe." I mean, is that -- do you remember?
A. Yes, sir. Yes, sir.
Q. Did he tell you if the old man got out of the car?
A. Yes, sir.
Q. And what did he tell you happened? What did the old man do when he got out of the car?
A. Well, he proceeded to walk up a trail.
Q. And what did the defendant tell you he and his partner did when the old man started walking up the trail?
A. They began following him.
Q. Did he tell you why they followed the old man up the trail?
A. Yes, sir.
Q. What did he tell you?
A. He said that they were just going to follow him up there just to rob him.
Q. Did the defendant tell you if they confronted the old man on the trail?
A. Yes, sir.
Q. And did he tell you what this area was like where they actually confronted the old man?
A. He just kept saying a wooded area.
Q. Did he tell you if anybody else was around?

A. No, sir.
Q. Did the defendant tell you what, if anything, was said to the old man when they confronted him?
A. Yes, sir. I believe they asked him for the time.
Q. And what happened at that -- What did the defendant tell you happened at that point?
A. He said they asked him for the time and the older guy gave them the time and at that time, I believe Ingles struck him and he fell.
Q. Did the defendant say anything was done with the old man while he was lying on the ground?
A. Yes, sir. His friend had started kicking him.
Q. Did the defendant tell you if the old man said anything to them at that point?
A. Yes, sir.
Q. What did he tell you?
A. He told them that they didn't need to be doing that.
Q. Did the defendant tell you if they demanded anything from the old man?
A. Yes, sir.
Q. What did he tell you?
A. His wallet.
Q. And did the defendant tell you if the old man gave it to them?
A. Yes, sir.

Q. What did he tell you?
A. Yeah, he said he gave it.
Q. Did the defendant tell you if they pulled out their guns?
A. Yes, sir.
Q. Did he tell you when they did that?
A. I believe when he got up.
Q. Okay. Did the defendant tell you if they got any money?
A. Yes, sir.
Q. How much did they get? Did he tell you how much they got?
A. He said two to $300.
Q. Did the defendant tell you if he and his partner wore any sort of disguises?
A. Yes, sir. He told me his partner wore a mask but he didn't.
Q. Are you sure?
A. No, no. Ingles wore the mask, but his partner didn't.
Q. And that's what he told you?
A. Yes, sir.
Q. Did the defendant tell you if they had a conversation or talked to the old man about talking, him talking?
A. Yes, sir.
Q. What did he tell you?
A. He told me that after the old man got up, Ingles told him that don't, you know, told him don't turn around or anything like that.
Q. Did he mention anything about tying him up?

A. Yes, sir.
Q. What did he tell you about that?
A. He told me that after he got up and they had pulled a gun on him, then they had tied him up and told him to turn around and count to 500.
Q. Did he tell you what they tied him up with?
A. Yes, sir; duct tape.
Q. Did he tell you where it came from?
A. Yes, sir. He said it came out of the old man's car.
Q. Did he tell you who went to get it?
A. Yes, sir.
Q. Who did he tell you?
A. He said that he had went to get it.
Q. Did Mr. Ingle describe to you how the old man was taped up?
A. Yes, sir. He said execution style.
Q. And did he demonstrate anything or explain what that meant? Did he show you anything with his hands or wrists?
A. Yes, sir.
Q. What did he show you?
A. He just showed me what position he had tied him up in.
Q. And what position was that?
A. With his hands tied to his feet.
Q. His hands tied to his feet?
A. Right.
Q. Well, could his feet and hands had been tied?

A. Yes, sir.

Q. And did he tell you who bound the old man up?

A. Yes, he did.

Q. Who did that?

A. He did.

Q. Okay. And you mentioned that they left him there on the trail?

A. Yes, sir.

Q. And you mentioned something about a hat; is that right?

A. Yes, sir.

Q. What did he tell you about leaving the old man on the trail with his hat?

A. With his hat?

Q. Yeah. The old man was taped up?

A. Yes, sir.

Q. What happens after the old man was taped up? What does the defendant tell you what happened?

A. Okay. After the old man is taped up, he said that they told him to turn around and count to 500.

Q. Okay. Did he tell you what happened next?

A. Yes, sir. He said once him and his friend started walking around - I mean, started walking off - that the old man had turned around and Ingles remembered that he didn't have a mask on, or his friend didn't have a mask on. So at that time, they started coming back and he remembered the old man had seen his

face.

Q. Did the defendant tell you if he said anything to the old man when he walked up to him?

A. Yes, sir.

Q. What did he tell you he told the old man?

A. He said, "This mother fucker is trying to resist."

Q. Did he tell you what happened next?

A. Yes, sir.

Q. What did he tell you?

A. I believe he pulled out his gun and shot him.

Q. Okay. Now you say "I believe." Now I want to know what he told you --

A. Okay.

Q. What did he tell you?

A. He told me that he had pulled out his gun and had shot him.

Q. Did he tell you where he shot him?

A. Yes, sir.

Q. Where did he tell you?

A. He used the word "Dome" and I guess it meant shot him in the head, and then shot him in the chest.

Q. Did the defendant say anything to you about blood after the old man was shot?

A. Yes, sir.

Q. What did he tell you?

A. He said he wasn't for sure if he was dead or not because,

you know, he had remember that they shot him with rat pellets and that he said it wasn't very much blood.

Q. Did the defendant tell you what, if anything, they did with the body?

A. Yes, sir.

Q. What did he tell you?

A. He said that they carried it up a hill and throwed it in some brush and covered it up with leaves.

Q. Did the defendant tell you what he and his partner did after they drug the body off into the woods?

A. Yes, sir.

Q. What did he tell you?

A. They went down and got his car and I believe they went joy riding.

Q. Did the defendant tell you what, if anything, happened to the old man's car?

A. Yes, sir. He said that -- He said he rode around in it for about two hours and then he said he ditched it. And I asked him where did he ditch it at and he just said it's someone where nobody will ever find it.

Q. Now when you talked about this murder with the defendant on four or five occasions, how would you describe his mood while he was talking to you?

A. Calm.

Q. Did he ever laugh at any point?

A. Yes, sir.
Q. At what point would he laugh?
A. He would laugh when he said he shot the guy in the dome.
Q. Did he tell you how he felt about the murder?
A. He just said the guy was at the wrong place at the wrong time.
Q. Okay. Did you tell somebody else at the detention center what the defendant had told you?
A. Yes, sir.
Q. Who did you tell?
A. Jonah Jones.
Q. Why did you tell him?
A. We was roommates.
Q. Do you know if Mr. Jones contacted anybody after you told him what Mr. Ingle had told you?
A. Yes, sir; the FBI.
Q. Okay. And are you aware of what happened after Mr. Jones contacted the FBI?
A. Yes, sir.
Q. And what happened?
A. I believe Mr. Jones came in with a tape and we proceeded to have a conversation with Mr. Ingles.
Q. The tape recorder?
A. Yes, sir.
Q. Did you see it?

A. Not at first, I didn't.
Q. When did you see it?
A. After the fact.
Q. Did you know a tape was being made?
A. No, sir.
Q. You didn't know a tape was being made while Mr. Jones was talking to Ingle?
A. No, sir.
Q. Now did you agree to cooperate in this case?
A. Yes, I did.
Q And did you ask for anything?
A. No, sir.
Q. Have you ever asked for anything?
A. No, sir.
Q. Let me show you Government's Exhibit 47, and I'd ask if you've seen this tape before?
A. Yes, I have.
Q. Have you listened to that tape?
A. Yes, sir.
Q. And what is that a tape of?
A. The conversation between me, Ingles, and Jonah Jones.
Q. And what's discussed during that conversation?
A. The murder.
Q. And is that a true and accurate recording of the conversation concerning the murder between Mr. Jones, yourself, and Trint

Ingle?

A. Yes, sir.

BY MR. SNYDER: Pass the witness, Your Honor.

BY THE COURT: All right. Ladies and gentlemen, we've been out here about an hour. Let's take a recess. We'll come back at 20 minutes till, please.

[Recess taken at 2:21 p.m. - Jury Not Present]

[Open Court - 2:41 p.m. - Jury Present]

BY THE COURT: Mr. Depper, do you have cross, please?

BY MR. DEPPER: I have, sir. Thank you.

CROSS-EXAMINATION

BY MR. DEPPER:

Q. Mr. Bell, at this particular time, I believe you said that you are a supervisor now, or assistant supervisor?

A. Yes, sir.

Q. And that's at, I understand, a Kroger Company?

A. Yes, sir.

Q. And that's in Little Rock?

A. Yes, sir.

Q. How long have you been in that position?

A. Seven months.

Q. All right. And how did you get that position, please?

A. That's the job that I worked before.

Q. Okay. Before what, sir?

A. Before I was incarcerated.

Q. Okay. And how long had you worked for that job before you were incarcerated?
A. A year.
Q. Okay. And then I note that you were incarcerated at one time for embezzlement?
A. Yes, sir.
Q. Okay. And can you explain what that means for us? What did you do?
A. Took money that didn't belong to me.
Q. From who?
A. From a military base; Fort Chaffee.
Q. Okay. And were you working there at Fort Chaffee?
A. Yes, sir.
Q. All right. And what did you do there?
A. Stocker.
Q. You were a stocker?
A. Cash register operator.
Q. For the post exchange?
A. Yes.
Q. Okay. And how much money did you take from them, please?
A. Seven hundred dollars ($700).
Q. Can you define that a little more specifically for us, please?
A. Seven hundred dollars.
Q. Oh, 700. I thought you said several hundred. I'm sorry.

And did you take it out of a cash register?
A. Yes, I did.
Q. Okay. And did you do it during business hours?
A. Yes, I did.
Q. How did you get caught? Camera? Video camera?
A. Video camera.
Q. Okay. And for that, you were incarcerated for how many months?
A. Six months.
Q. Now help me understand. As you understand it, that six months; was it a felony or was it a misdemeanor?
A. It was a felony.
Q. Okay. And then your state charge was theft by receiving?
A. Right.
Q. And what did you receive?
A. Two years.
Q. No, I'm sorry. I wasn't clear. What particular item did you receive that apparently had been stolen?
A. Money.
Q. Okay. And who did you get the money from?

BY MR. SNYDER: Your Honor, I'm going to object. I think the particulars of the crime are not admissible as long as he admits he committed a felony.

BY THE COURT: I think you're right about that. I don't think it's necessarily abusive. We don't need to go

through all of the details. I'll overrule the objection and let you flesh it out, but then let's move on to something else.

BY MR. DEPPER: Okay. Thank you, Your Honor.

BY MR. DEPPER:

Q. Well, the issue of clemency: You received clemency on the state charge, theft by receiving; is that correct?

A. Yes, sir.

Q. Did you want clemency?

A. Yes, sir.

Q. And your clemency came in after you were released from jail?

A. Yes, sir.

Q. All right. After you were released from jail, how soon after that did you get your clemency?

A. A few days after.

Q. Okay. Did you contact the Governor's office when you were released from jail? Did you contact the state Government's office to tell them, I'm sorry, I'm out of jail, I don't need clemency any more?

A. No, they knew.

Q. Okay. And they still gave you the clemency?

A. Yes, sir.

Q. Okay. You still wanted the clemency?

A. Yes, sir.

Q. Okay. Now you said that the money you had gotten from the FBI you had used to pay for child support?

A. Yes, sir.
Q. And I believe Mr. Snyder and you had discussed the fact that this child support, at least in part, accumulated while you were in jail?
A. Yes, sir.
Q. Had any other accumulated before you were in jail?
A. Yes, it did.
Q. Okay. And of the $3,000, how much of that did you spend on child support?
A. Half.
Q. Okay. And so it's $1,500 that had accumulated at least in part while in jail. How much of that $1,500 had accumulated before you were in jail?
A. I don't understand the question.
Q. Okay. Let me clarify it for you. Fifteen hundred dollars, child support. You said part of that child support arrearage had accumulated while you were jail?
A. Yes, sir.
Q. You told us a moment ago part of it had accumulated before you went into jail?
A. Yes, sir --

BY MR. SNYDER: Your Honor? Excuse me. I'm going to object. I don't see the relevancy of how much accumulated while he was in jail or how much was owed before he was in jail. The fact of the matter is he paid it.

BY THE COURT: What's the relevance of it, Mr. Depper?

BY MR. DEPPER: Well, two things, Your Honor. Firstly, this is -- Counsel had asked this gentleman did this child support accumulate during jail, and the answer was yes so I believe I'm wanting to explore that on cross-examination.

BY THE COURT: How is that relevant --

BY MR. DEPPER: Well, and that's what I'm getting to. I believe it's relevant because the impression that is left, perhaps as I interpret the testimony, the impression that is left is that it wasn't his fault that child support accumulated while he was in jail, and I'm wanting to show that is not just that; that there was some that accumulated before jail, which speaks to an issue of fault.

BY THE COURT: An issue of fault?

BY MR. DEPPER: And issue of this man's motivation?

BY THE COURT: Well, I think it's clear that if child support isn't paid when it's supposed to be, that's fault --

BY MR. DEPPER: Yes, sir.

BY THE COURT: All right. I'm going to sustain the objection. Let's get on to the issues of the car.

BY MR. DEPPER: Very well.

BY THE COURT: It's showing this man's background and I think we've explored the details sufficiently, so let's move on.

BY MR. DEPPER: Very well. Thank you, Your Honor.

BY MR. DEPPER:

Q. Now this tape that we understand we're going to hear today-- Mr. Bell, let me ask you this: The relationship between you and Jonah Jones; I think you said you were friends?
A. Yes, sir.
Q. Did you develop this friendship while you were jail?
A. Yes, sir.
Q. And you were in the same pod with him or the same room with him?
A. Yes.
Q. Okay. When you first met him, were you in the same room? Were you roommates?
A. No.
Q. Okay. Were you in the same pod?
A. No.
Q. Okay. And you and I know what we're talking about. Let's make sure the jury. The way that county jail is set up, we've got a common room in one place and there are rooms off that common room; is that right?
A. Yes, sir.
Q. That's a pod; is that right?
A. Yes, sir.
Q. And then there are other pods like that throughout the jail; is that correct?
A. Yes, sir.
Q. All right. How long were you in jail before you met Mr.

Jonah Jones?

A. Four months.

Q. And then how long were you in jail before you met Trinity Ingle?

A. Two months.

Q. Okay. Who did you meet first, Jonah Jones or Trint Ingle?

A. Ingles.

Q. Okay. Originally, let's see, when this statement was taken, what pod were y'all in?

A. Excuse me?

Q. The pod, the jail pod that you were in when this statement was taken. What pod were you in, please? 2G?

A. I don't know.

Q. You don't remember?

A. No, sir, I don't.

Q. Okay. Now you indicated that you had spoken to Trinity Ingle a total of five times - I think you said about five times?

A. Yeah, I said four or five times.

Q. Four or five times. Could it have been more than that?

A. It could have.

Q. Could it have been less than that?

A. I don't think so.

Q. Okay. Now this tape that the Government had shown you, the tape that you've got in front of those two tapes -- and that's got Exhibit Number what on it, sir?

A. Forty-seven.
Q. Thank you. Exhibit Number 47; prior to today, have you listened to this tape?
A. Yes, sir.
Q. On how many occasions have you listened to this tape?
A. Several times.
Q. Okay. Can you define that a little closer for us?
A. No, sir.
Q. More than once?
A. Yes.
Q. Less than ten?
A. Yes.
Q. More than five?
A. Yes.
Q. All right. And can you tell me on those five occasions, did you listen to the tape all in the same location?
A. No.
Q. Okay --

BY MR. SNYDER: Your Honor, excuse me. I'm again going to object. I don't see how the fact that he may have listened to this tape more than once is an issue in this case.

BY THE COURT: Well, I'm hoping there will a point to it. Is there, Mr. Depper?

BY MR. DEPPER: There is indeed, Your Honor.

BY THE COURT: Let's please get to it. Let's move on.

BY MR. DEPPER: Thank you. Thank you.

BY MR. DEPPER:

Q. Now when you listened to these two tapes, okay? What was the purpose, were you listening to?

A. I guess to make sure everything was correct.

Q. Okay. In fact, isn't it true when you listened to these tapes, the purpose of listening to these tapes was to see whether or not the transcript that you had in front of you was accurate; is that correct?

A. Yes, sir.

Q. And when you did that, if you found someplace in the transcript that you thought was in error, you would make a change, wouldn't you?

A. Yes, sir.

Q. For example, if it said that it was you talking and it was Jonah Jones talking, you'd reflect it was Jonah Jones; is that right?

A. Yes, sir.

Q. If there was a section that was listed as unintelligible -- and there were those sections; is that right?

A. Yes, sir.

Q. On the transcript?

A. Yes, sir.

Q. And you knew what was said, you'd fill in what was said; is that right?

A. Yes, sir.
Q. Even though you couldn't hear it on the tape?
A. Oh, we could hear it on the tape.
Q. Okay, it just was unintelligible?
A. Right.
Q. Okay. And how much time in total did you spend making these corrections?
A. I don't recall.
Q. Okay. More than an hour?
A. Yes, sir.
Q. Less than ten hours?
A. I believe so.
Q. Okay. More than five hours?
A. Probably a little longer.
Q. Okay. And when you did this, was Mr. Jones with you in the same room listening to the same tape?
A. On some occasions.
Q. And was he also making changes?
A. Yes, he was.
Q. Did you and he discuss the changes that should be made?
A. On some occasions.
Q. So the transcript that you had in front of you was in error then?
A. Yes, it was.
Q. What became of the transcripts that you had that you wrote

on? What became of those, do you know?
A. No, sir.
Q. Okay. Who did you give them to when you finished listening to the tapes? Who did you give the transcripts to?
A. Mr. Snyder.
Q. Okay, thank you. Now I made a note here. I'm not certain as to what my note meant, so let me address this issue with you a little more.

You and Jones were roommates and was it when you were roommates that you told him about Trinity Ingle?
A. Yes, sir.
Q. Did Jonah Jones explain to you that he knew the FBI?
A. Not at that time.
Q. Okay. When did Jonah Jones explain to you that he knew about the FBI?
A. I believe after he had spoke to them.
Q. Okay. Before the tape was made?
A. Yes, sir.
Q. Okay. And a moment ago, you told us that you didn't know the tape was being made?
A. No, sir.
Q. Is that true?
A. Yes.
Q. Okay. And when did you first become aware of the fact that the tape was made?

A. After it was made.
Q. Had you and Mr. Jones spoken prior to the tape being made?
A. Yes, we have.
Q. Well, let me finish my question, please. Had you two spoken about the prospect of going to the FBI and trying to get them in on the case?
A. No, sir.
Q. The conversation that you had with Trinity Ingle, okay? Do you remember where it was?
A. Yes, I do.
Q. The one that was taped; do you remember where it was?
A. Yes, sir.
Q. Do you remember when it was?
A. I don't recall when it was.
Q. Okay. But now as you listen to the tape, can you recall in your mind when the conversation took place?
A. Yes, sir.
Q. Okay. And can you tell me, how long was that conversation, please?
A. Several hours.
Q. Can you define that a little closer for us, please?
A. No, sir.

BY MR. DEPPER: Okay. Very well. Thank you, sir. I have no further questions of this witness, Your Honor, I would pass.

BY MR. SNYDER: Nothing further.

BY THE COURT: May he be released?

BY MR. SNYDER: Yes, sir.

BY MR. DEPPER: Your Honor, I may wish to call him back.

BY THE COURT: All right, Mr. Bell. You may step down. You are not released from your subpoena, but you are released today.

All right. Call your next, please, sir?

BY MR. SNYDER: Call Jonah Jones.

BY THE COURT: Mr. Jones, would you raise your right hand and be sworn, please?

All right, sir. If you will, come around, please, and get on the witness stand. And we'll ask you to try to speak into that microphone. You may have to adjust it, but please, yeah, lean forward where you can speak into it.. Thank you.

All right. Go ahead.

JONAH JONES, GOVERNMENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SNYDER:

Q. Would you please state your name?

A. Jonah Jones.

Q. Mr. Jones, what do you do for a living?

A. Laborer.

Q. And how old are you?

A. Twenty-six.
Q. Are you married?
A. I am.
Q. And where do you live?
A. In fort Smith, Arkansas.
Q. Mr. Jones, have you ever been convicted of a felony?
A. I have.
Q. And what have you been convicted of?
A. Failing to appear.
Q. Anything else?
A. Felon in possession of a firearm.
Q. Mr. Jones, did you agree to cooperate in the investigation of this case?
A. I did.
Q. And where were you at the time you agreed to cooperate?
A. Crawford County Detention Center, Van Buren, Arkansas.
Q. And when you agreed to cooperate, had you been working or had you worked with a particular law enforcement agency?
A. I had.
Q. And what agency was that?
A. FBI.
Q. And was there a particular agent that you had worked with?
A. There was.
Q. And who was that?
A. Bill Maddalena.

Q. Mr. Jones, when you agreed to cooperate with the FBI in this case, did you ask them for anything?
A. No.
Q. Did you, however, eventually get something from the FBI?
A. Oh, yes, I did.
Q. And is one of the things you received some dental work?
A. It was.
Q. And is that something you needed?
A. Yes.
Q. What kind of dental work did you get?
A. Bridge.
Q. And where is the bridge?
A. Here in the front.
Q. And that was -- Who paid for that, FBI?
A. Government.
Q. Okay. And do you know if that money was paid directly to your dentist?
A. It was.
Q. And was also something done for you while you were incarcerated with respect to your mother?
A. Yes.
Q. And what was done in that respect?
A. Well, during the time she was sick and in the hospital, I was allowed to go visit her.
Q. Did she eventually die?

A. Yes, she did.
Q. And was something done for you after she died? Were you allowed to go somewhere?
A. Oh, yes. I was allowed to go to the funeral.
Q. Mr. Jones, as a result of your cooperation, have you received any reduction in your sentence?
A. None whatsoever.
Q. So you weren't just let out of jail?
A. No.
Q. How long did you remain in jail after you cooperated?
A. Roughly, 13 months.
Q. Okay. Is that when you were eligible for parole?
A. Yes.
Q. And were you paroled as scheduled?
A. I was.
Q. Mr. Jones, do you know an individual by the name of Trint Ingle?
A. I do.
Q. Is he here today in court?
A. Yes. Yes, he is.
Q. Can you identify him for me?
A. Yes. [indicating]
Q. What's he wearing?
A. Pin stripe shirt. Looks red from here; red and white.
Q. Is it a white shirt?

A. Yes.
Q. Where did you first meet him?
A. In the Crawford County Detention Center.
Q. And how did you happen to meet him?
A. Well, he happened to have been an associate of another inmate there.
Q. And who was that?
A. Derrick Bell.
Q. Okay?
A. Me and Derrick got to talking and he brought up Ingles and the next thing you know, Ingles was moved in to where we were 'cause they was in a different living area from the beginning.
Q. He was in a different room?
A. He was in a different lock, living quarters.
Q. Okay. Did somebody introduce you to him?
A. Yes.
Q. And who was that?
A. Derrick Bell.
Q. Do you know why Derrick Bell introduced you to the defendant?
A. Well, he mentioned some of the problems Mr. Ingles had had and, well, we all had problems and we just got introduced. Nothing that was, you know, planned or anything, just happened.
Q. Let me ask you this again: Where was the defendant living when you first met him and started talking to him in relation to

where you lived?
A. Across from the living quarters that we stayed in from like where I am to like, the bench out there.
Q. About that far away?
A. Across the room, yeah.
Q. But you weren't living in the same room with him?
A. No.
Q. Okay. Did you begin to talk to Mr. Ingle after you met him there in the detention center?
A. We conversed a little bit, not much, about, you know, really nothing from the beginning.
Q. Okay. Now did Mr. Bell give you some information about the defendant, about things the defendant had told him?
A. He did.
Q. And was that all based upon what the defendant had told Mr. Bell?
A. Yes.
Q. And what did that -- What subject did that information pertain to?
A. Murder.
Q. Okay. And did you discuss that eventually with the defendant?
A. I did.
Q. Do you remember how soon that was after you had first met him?

A. I can't really remember if it was later that night or the next day.
Q. Okay. Pretty soon?
A. Pretty soon.
Q. And do you remember where you talked to him about murder?
A. Yes. We were talking in Mr. Bell and my's living quarters.
Q. How many times did you talk to him about that, do you remember?
A. Once or twice, but once for sure.
Q. You say once or twice?
A. Well, you know, but just really talk to him about detail for detail about, you know, the charge, you know, just once.
Q. Okay. But did you talk to him in general terms about it before? You're talking about when you really talked to him. Is that when it was taped?
A. Yes.
Q. Okay. Did you talk to him about the murder before the tape was made?
A. He'd made a few statements but, you know, didn't really start off a conversation.
Q. Do you know why the defendant would confide in you and tell you about a murder?
A. I have no idea.
Q. Did he tell you any details about this murder?
A. Yes, he did.

Q. And as you stated, one of those occasions was recorded. Where were you when he first told you about the murder?
A. I was in my living area, my living quarters.
Q. Was anybody else there?
A. Mr. Bell.
Q. And how did this murder happen to come up?
A. Well, Mr. Bell had mentioned to me Mr. Ingles' incident and I was thinking, well, this is true, then I just wanted -- I was just curious. I wanted to know for myself if this was true, somebody was just killed for no reason at all.
Q. Did the defendant tell you what type of person was killed?
A. Yes, he did.
Q. What did he tell you?
A. He said it was an older, white male.
Q. Did he tell you if anybody was with him when this older white man was killed?
A. He did.
Q. And what did he tell you?
A. I don't remember the accomplice's name, but I remember him just mentioning a friend.
Q. Just somebody was with him?
A. Yeah.
Q. Did he tell you where this murder occurred?
A. Yes.
Q. What did he tell you?

A. At somewhere here in Hot Springs at a park.
Q. Okay. Did he tell you anything about how they approached this old man?
A. Yes.
Q. What did he tell you?
A. Well, he stated that they had been walking and come to the conclusion that they needed some money.
Q. Now you say they; are you talking about he and his partner?
A. Him and the friend or whatever. And they come to the conclusion that they needed some money so they take off walking and end up running into this old guy. And came up with the plan, the making of walking and needing the money. So he said that they walked up to the older guy and asked him what time it was and upon asking what time it was, struck him and knocked him to the ground.
Q. Did Mr. Ingle tell you if he said anything to the old man while he was lying on the ground?
A. It's been a long time but I remember Mr. Ingle saying something to the effect of, well, I don't want to say what I think he said. I don't remember.
Q. Okay. If you don't remember, that's fine. Did he tell you if they did anything to the old man while he was on the ground?
A. Yes, he did.
Q. What did he tell you?
A. He said that they kicked him in the head and kicked his eye

out and punched him a little bit.

Q. Did he say anything about tying the old man up?

A. He did.

Q. Did he tell you what the old man was bound with?

A. Yes.

Q. What did he tell you?

A. He said they duct taped his hands with duct tape.

Q. Did he use a term for the way the old man was taped up?

A. Yes. He said that they duct taped his hands execution style.

Q. And did he demonstrate that to you?

A. Yes.

Q. What did he show you?

A. He placed his hands together like this [indicating] but in the back of his -- from behind him, like this. [indicating]

Q. Only in the back?

A. Yes.

Q. Did he tell you where the duct tape had come from?

A. He just mentioned that during the time they'd knocked him down and started rummaging through his pockets, his buddy had started to look for something to tie him up with and ended up going to the trunk of the car or something and getting some tape and whatever was at hand. He said it was duct tape, though.

Q. Did he tell you whose car they went to?

A. The victim's.

Q. Do you recall if the defendant told you why the old man was taped up?

A. He said something to the effect that he didn't want the old man to get out of line.

Q. Did the defendant tell you if anything was taken from the old man after he had been taped up?

A. Yes.

Q. What did he tell you?

A. He said that upon looking through his wallet, he ran across a couple of hundred dollars.

Q. Did the defendant tell you what happened after they got the money from the old man?

A. Yeah. He mentioned that once they took the money and taped him up, they pulled his hat down over his eyes and told him to mind his business; basically, don't pay attention as we walk away, count to a hundred. And upon doing that, he said -- Mr. Ingles said that he glanced back and noticed that the older man was peeking up at him from under the bill of his hat. And him and his buddy exchanged a few words regarding that, and decided to go back and kill him.

Q. Okay. What did he tell you, if anything, happened when they walked back to the old man?

A. Could you say that again, please?

Q. Did the defendant tell you what happened when they actually walked back to the old man?

A. Yes, he did.
Q. What did he tell you?
A. He told me that he shot him.
Q. Did he tell you where he shot him?
A. In the chest.
Q. Did he tell you anywhere else?
A. Yes. He said he shot him numerous times in the chest area and in the head.
Q. Did he refer to the head with a particular word?
A. Excuse me?
Q. Did he use a particular term for the head?
A. Yeah, he used dome.
Q. Did the defendant tell you why the old man was shot?
A. He mentioned because he identified them and to be sure that nothing never became of it, it just been best to kill him.
Q. Did the defendant tell you how many guns were at the murder scene?
A. He told me there was two.
Q. Did he tell you who had guns?
A. He mentioned that he had -- Mr. Ingles mentioned he had one and he mentioned that his buddy had one.
Q. Now did Mr. Ingle refer to himself, like, saying "I did this" and "I did that" or did he use a different term?
A. He used Bob and Andy, for instance.
Q. Did he tell you who Bob and Andy were?

A. Him and his friend was Bob and Andy. He was Bob and his friend was Andy.
Q. Okay. Did he tell you why he used the words Bob and Andy?
A. He said that that was the way of covering up their identity.
Q. Now Mr. Jones, did you know anything about this murder before the defendant told you about it?
A. No.
Q. Who, at first, did you think had been shot?
A. I thought it was a park ranger, a federal officer.
Q. And why did you think it was a park ranger?
A. Well, because that's what I was told from the beginning.
Q. Park Ranger?
A. Yeah. He just assumed that the guy was a park ranger. That's how it came out of his mouth. Like, as if he wasn't for sure, think he was a park ranger.
Q. Oh, he didn't know?
A. No.
Q. And did that have anything to do with the fact it was in the national park? Do you know?
A. I'm sure it was. I mean, you know, he mentioned it being a federal reservation so that also let me to believe it was a, you know, park ranger.
Q. Now after you learned about this murder, did you contact somebody?
A. I did.

Q. Who did you contact?
A. FBI, Bill Maddalena.
Q. And where is his office located?
A. I'm not -- I can't --
Q. I don't need a street address. What city is it in?
A. It's Fort Smith.
Q. Okay. And had you worked with him before?
A. I have.
Q. And how many times?
A. Once.
Q. And why did you call the FBI?
A. Well, I'll put it like this: I've done wrong, who hasn't? I've never murdered anybody and I figure somebody is doing without a grandfather now and I said, well, if this man was killed for no reason, it being an elder or somebody's grandfather -- I mean, I looked at it as if it was my grandfather. I'd want to know, so that's why I did what I did.
Q. Okay. Did you speak to Agent Maddalena?
A. I did.
Q. And where did you talk to him?
A. Well, I called home and got what you got. At my home, we've got what you call three way calling, and I called my family and my family called Mr. Maddalena for me.
Q. And did you talk to him in person?
A. Later, I did.

Q. And where did you talk to him?
A. Excuse me?
Q. Where did you talk to Agent Maddalena?
A. At the Crawford Detention Center, yeah, detention center.
Q. And when you talked to him, did you agree to do something?
A. I did.
Q. What did you agree to do?
A. I agreed to wear this wiring.
Q. Pardon me?
A. I agreed to wear wiring.
Q. A recorder?
A. Yes.
Q. And were you equipped with the recorder?
A. I was.
Q. And where was it put on your body?
A. My leg.
Q. And did somebody put it on for you?
A. Yes.
Q. And you probably don't know his name, but do you know who he worked for?
A. I don't -- He was with Mr. Maddalena, so appropriate enough, I guess.
Q. Were you given any instructions on how to operate that recorder or how to turn it on or off?
A. Yes.

Q. Okay. You understood how to use it?
A. Yes.
Q. Okay. Did Agent Maddalena or anybody else ever tell you what to say to the defendant or give you a script or anything like that?
A. No.
Q. And who was it left up to about what to say?
A. Me.
Q. Okay. And was a tape made of a conversation on April 3 of 1996?
A. If my predicts are correct.
Q. Pardon me?
A. I'm thinking. I think so. I can't really remember the date.
Q. But a tape was made?
A. It was.
Q. And where did the conversation occur when that tape was made? Where did you talk to him?
A. Excuse me?
Q. Where did you talk to Mr. Ingle when that tape was made?
A. Me, him, and Mr. Bell got together and decided to just converse about whatever anyway, so we went to Bell's cell; Mr. Bell's and my cell.
Q. Okay. Was anybody present besides you, Derrick Bell, and Trint Ingle when that tape was made?

A. No.
Q. Have you listened to the tape of that conversation?
A. I have.
Q. Let me refer you to Government's Exhibit 47, which is right here, and I'd ask if you can tell me what that is?
A. This is some of the material from the taping that I went over it.
Q. Is that the tape of the conversation that you listened to?
A. Yes.
Q. And are your initials on there?
A. They are.
Q. Showing that you have listened to it?
A. Yes. They're on both of them.
Q. And is that tape true and accurate? Is it a true and accurate recording of the conversation as it occurred on or about April 3, 1996?
A. Most definitely.
Q. Let me show you Government's Exhibit 54, which is entitled "Trial Version." Have you also listened to this tape?
A. I have.
Q. And is this, Government's Exhibit 54, are these segments from the entire conversation?
A. Yes.
Q. Okay. And are those segments that you listened to true and accurate recordings of the conversation you had with the defen-

dant on or about April 3, 1996?
A. Very much so.
Q. Let me show you what's been marked as Government's Exhibit 48, and I'd ask if you can tell me what that is?
A. Do you want me to look at this?
Q. Yeah, just look at it and tell me what it is?
A. Transcript.
Q. Okay. Is that a transcript of the conversation that's on Government's Exhibit 54?
A. That's exactly what it is.
Q. And have you gone over this transcript?
A. I have.
Q. And have you listened to the tape and gone over the -- Have you read the transcript and listened to the tape to make sure the transcript is as accurate as possible?
A. Yes.
Q. Are the speaker identifications on the transcript accurate?
A. Excuse me?
Q. Are the people -- I called them the speaker --
A. Oh, yes. Yes.
Q. Like, who's talking?
A. Yes.
Q. Okay. Now Mr. Jones, after having -- You have listened to this tape; is that correct? The whole conversation?
A. [Witness shaking head up and down.]

Q. Does the defendant, in that taped conversation, use any sound effects?
A. Yes, he did.
Q. What sort of sound effects does he use?
A. Popping sounds. Pows and booms, you know.
Q. Well, give me an example. Would he do something when he would make a pow?
A. When he mentioned shooting this guy, he'd stick out his hand and he'd go, "Pow, pow, pow." You know?
Q. Okay. During the taping of this conversation, did there come a time - or during the conversation in the tape, did there come a time when the defendant positioned you and Mr. Bell in certain locations in the cell or in the room?
A. Yes.
Q. Why did he do that?
A. Well, he was demonstrating what took place during the time, asking the victim what time it was. He was demonstrating. He was using me as the old man and using Derrick as himself.
Q. So was he re-enacting the crime in your room?
A. Yes. Yes.
Q. And he was explaining what was happening?
A. Yes.
Q. Do you recall what the defendant did after he had positioned you and Mr. Bell in the cell, and you being the old man?
A. Well, he told me to look at my wrist as if I was to look at

my watch and once I did, so he --

Q. Pardon me?

A. And once I did, so he would -- you know, hit me, and knocking him down.

BY MR. SNYDER: Your Honor, at this time, we would move to introduce Government's Exhibit 46, which is the NAGRA recording which has previously been identified.

BY MR. DEPPER: Your Honor, for the previously stated reasons, I would object to the introduction and I think at this point, it's probably appropriate to have a side-bar, if I could request that of the Court.

BY THE COURT: All right. Does it have to do with that same objection?

BY MR. DEPPER: Yes, sir, but then there is a closer issue on that at that point --

BY THE COURT: All right. Well, let me hear that at side-bar before I rule.

BY MR. DEPPER: Yes, sir.

BY THE COURT: Ladies and gentlemen, excuse us just a moment, please.

[Side-bar Conference - 3:22 p.m. - Jury Not Present]

BY THE COURT: All right. Mr. Depper.

BY MR. DEPPER: Thank you, Your Honor. Yes, sir. Previously in my motion, I had cited the Court to U. S. v. McMillen, 508 F.2d 101. In that Eighth Circuit case, 1974 case,

the Court had said seven things that had to be met, satisfied by the Government in order to introduce an audio tape.

Without belaboring the issue -- the place where the state most certainly falls short of the issue is at Number 6. It says that speakers are identified. They have to be readily identifiable on the tape.

Regarding a testimony from Mr. Derrick, that he has listened to these tapes several times and would go through and make changes. Sometimes those changes would be, they would have the wrong people identified. That says to me that, in fact, the speakers are not readily identifiable and that, therefore, this audio tape is of no value. It doesn't meet the McMillen requirements.

BY THE COURT: Objection overruled for the reasons previously stated because I think there is testimony in the record which if believed, would cause the jury to find that the speakers are readily identifiable. That will be for the jury to decide if and when they hear the tape.

Anything else?

BY MR. DEPPER: No, sir.

BY THE COURT: Okay. Objection overruled. It will be received.

BY MR. DEPPER: Thank you. Make sure my objection goes to all the same reasons I've previously listed, judge. Thank you.

[End of Side-bar Conference - Open Court - 3:24 p.m. - Jury Present]

BY THE COURT: All right. Objection overruled, as I mentioned at side-bar, and it will be received.

[Whereupon, Government's Exhibit 46 was received into evidence.]

BY MR. SNYDER: Your Honor, we would also move to introduce Government's Exhibit 47, which is the complete tape.

BY MR. DEPPER: The same objection, judge, for the same reasons previously stated and what I just stated at the side-bar.

BY THE COURT: That objection will be overruled for reasons previously stated and also based upon the Court's audition of the testimony of - I believe the witnesses name was Clark?

BY MR. SNYDER: Yes, sir.

BY THE COURT: The engineer that prepared that based upon that testimony. The objection also will be overruled. The Court had not heard that testimony at the time it previously ruled on your objection. Now it has and as that testimony supplemented it, the Court believes that the objection should be and it will be overruled.

[Whereupon, Government's Exhibit 47 was received into evidence.]

BY MR. SNYDER: And Your Honor, we would also move to introduce Government's Exhibit 54, which is the selected portions

of the tape the Government wishes to play to the jury.

BY MR. DEPPER: Same objection, Your Honor.

BY THE COURT: All right, now let's see. Is this -- I don't have that down, 54.

BY MR. SNYDER: We have just added it, Your Honor.

BY THE COURT: All right. Now you represent to me that 54 and I believe the witness testified 54 contains selected portions of what? Well, actually 46 and 47 are identical, the difference is that 46 is the original and 47 is the enhanced. But they're both full length?

BY MR. SNYDER: Correct.

BY THE COURT: So 54 is a selected portion of the enhanced tape, 47?

BY MR. SNYDER: Yes, sir.

BY THE COURT: Okay. All right. And you have the same objection?

BY MR. DEPPER: I do, sir. Thank you.

BY THE COURT: All right. That objection will be overruled for the reasons previously stated as supplemented by the testimony that the Court has heard today. Fifty-four will be received.

[Whereupon, Government's Exhibit 54 was received into evidence.]

BY MR. SNYDER: Your Honor, at this time, we would request that 54 be played and the transcripts be handed out to

the jury to aid them in their listening of the tape.

BY THE COURT: All right. Do you represent that the transcripts, and are we talking about Plaintiff's 48?

BY MR. SNYDER: That's --

BY THE COURT: Is that 48?

BY MR. SNYDER: That's correct, Your Honor.

BY THE COURT: That the transcript, 48, matches the portions that are to be played under 54?

BY MR. SNYDER: Yes, sir.

BY THE COURT: Correct?

BY MR. SNYDER: Yes, sir.

BY THE COURT: All right. May I see the transcript? The transcript that's 48 will not be received into evidence. Do you have copies for the jurors?

BY MR. SNYDER: Yes, sir.

BY THE COURT: All right. Ladies and gentlemen of the jury -- Do not pass them out yet, please.

Ladies and gentlemen of the jury, the Court has received into evidence the tape recording that you've heard discussed. There has also been testimony concerning a document that has been identified as Government's Exhibit 48. That Government's Exhibit 48 is not -- let me repeat -- not in evidence and it will not be in evidence.

It has been discussed on the record and denominated as Government's Exhibit Number 48 but it is not an exhibit. I am

specifically not receiving it. Nobody has offered it. The Government hasn't offered it, but I want to underscore that as strong as I possibly can. I told you at the commencement of this trial that you will decide the issues before you based on the evidence that has been received here in court; the testimony of witnesses that has not been objected to or otherwise stricken; and also, the exhibits that are received into evidence.

Now simply talking about it, which is all that's been done with this document, Number 48, doesn't make it "received into evidence." It is not received into evidence.

Now I will permit, however, this transcript to be given to you, copies of it, to each of you for your use to perhaps help you as you listen to this tape which is Government's Exhibit Number 54. You've heard it said that that tape contains only part of the whole tape. This document that I will allow you to look at purports to be a transcript of what you are going to hear. I don't know whether it is or not and I submit that you probably don't know. And I will tell you it is irrelevant whether it is accurate because it is not evidence. It is simply being given to you to use, if you wish, to perhaps follow along as you try to listen to this tape.

This transcript is not evidence and you may not consider it to be evidence accordingly. If you follow along with it as and when this tape is being played and you notice that what you hear is not the same as what you may see in this transcript, you will

disregard the transcript. It is not evidence. The evidence is what you are hearing. The tape itself is the evidence.

Now I go over this at length because it's very important that you do not take this document in hand and say okay, this is the evidence, because it is not. It is simply an aid to perhaps help you as you listen. If, no matter what this thing says, you cannot understand, then you will disregard what this says. It's only to the extent that you can hear and understand the tape that it's evidence.

Now that's a long explanation. Is there anybody on my jury panel that does not understand what I've said or wishes me to go over it again? All right. I am reasoning by that, that you understand so with that, Government counsel, you may now supply copies of the transcript to the jurors.

Ladies and gentlemen, we will give you these and as soon as the playing is completed, they will be retrieved and returned.

BY MR. DEPPER: Your Honor, prior to the dissemination of these, if I might renew our motion that we had on this procedure previously under what I believe is Federal Rules of Evidence 106.

BY THE COURT: Well, the motion will be denied for the reasons that have been previously stated.

BY MR. DEPPER: Thank you, sir.

BY THE COURT: Do you have any objection to the Court's limiting instruction?

BY MR. DEPPER: None whatsoever, Your Honor.

BY THE COURT: All right. Does the Government have any objection?

BY MR. SNYDER: No, sir, not at all.

BY THE COURT: All right. Then ladies and gentlemen, let's again be clear. These were given to you to follow with if you wish, as you listen.

Now what arrangements do you have to play the tape?

BY MR. SNYDER: Your Honor, Special Agent Parker Taylor with the FBI is prepared to play the tape. He also has headphones which would aid in the hearing of the tape, which he is prepared to hand out and which he's also prepared to explain the operation, which is very short.

BY THE COURT: Will it be necessary, in your judgment, for the jury to have headphone?

BY MR. SNYDER: It would be very helpful, Your Honor.

BY THE COURT: That sounds like, to me, that's going to be quite an operation to put 14 sets of headphones in there.

BY MR. SNYDER: Well, it's very easy to just hand them out. All they do is put them on.

BY THE COURT: Are they wired, though, or are they --

BY MR. SNYDER: Infrareds.

BY UNIDENTIFIED SPEAKER: They're wireless.

BY THE COURT: Okay. Well, that will be a lot better.

All right. Let's do this: Do you have any sort of a radio

check so that we can understand whatever the jurors are getting across?

BY UNIDENTIFIED SPEAKER: Yes.

BY THE COURT: All right. Ladies and gentlemen of the jury, this is a bit unusual but I am going to now ask the technician, the agent who is in charge of this, to hand you your phone, to give you an explanation.

Gentlemen, I don't know whether you need this on the record or not. Do you? The explanation that he's going to give on the headphone?

BY MR. SNYDER: Yes, sir. It would probably be a good idea.

BY THE COURT: All right. Then sir, I'll ask that you speak up and to the extent that -- Let me, and I'm handed a note here. You're quite correct. How long have we been out? We've been out here 50 minutes. How long is it going to take to play this?

BY MR. SNYDER: Forty minutes.

BY THE COURT: Well, we need to take a break before we start in on that. So I think we'll hold the explanation until we come back out because we do need to have it on the record and ladies and gentlemen of the jury, you may retire and step outside the courtroom and we'll try to get this arranged and we'll call you back out as soon as we can.

So let the jury retire. We are still in session, please.

[Jury Out at 3:33 p.m.]

[Open Court - Jury Not Present]

BY THE COURT: All right. Let the record show that the jury has withdrawn.

Now counsel, we have not discussed this before but I want to inquire: Notwithstanding what I have said to the jury, can we have an agreement that the Court Reporter, Ms. Hubbs, may utilize Government's Exhibit 48, which is not in evidence, in aid of preparation of the record with the understanding that should there be any discrepancy whatsoever, obviously the record would have to be made and would be made from the tape itself. But can we agree that she may use the transcript and not have to try to audibilize what is being played on the tape? Can we agree to that?

What says the Government?

BY MR. SNYDER: We agree, Your Honor.

BY THE COURT: What says the defendant?

BY MR. DEPPER: As long as we understand, judge, it's just an aid because we believe there are errors.

BY THE COURT: Oh, I agree, but I'm saying rather than have her try to sit here and to try to strain to hear what may or may not be being said, the tape itself would be the evidence - is the evidence - and I suppose in the event of an appeal, an appellate court would want to hear it itself because that's the evidence. But if it's to be gotten down on paper, I just think

it's a tremendous hardship on her to ask her to try to follow this and I'd like to get an agreement that we may simply permit her, if it's necessary to transcribe it, to have as an aid Government's Exhibit Number 48 with a clear understanding that it clearly is not evidence, it's not the record, and if it's necessary to actually get what's on the tape, she'd just have to take it off as best she could from the tape itself.

May we agree on that?

BY MR. SNYDER: Yes, sir.

BY MR. DEPPER: Yes, sir.

BY THE COURT: Very well. And then I would ask her, obviously, to stay alert and be ready in the event there should be any questions or comments or anything that should happen in the courtroom.

Okay. Now that said, you notice what the time is. If we take ten minutes or so and I think we ought to have at least that, you see, we're going to be crowding 5 o'clock just to get this first portion played and I assume that the defense -- Does the defense still desire to play or have --

BY MR. DEPPER: At this time, yes, sir.

BY THE COURT: -- the rest of it? Well, we don't know, I guess, till we hear all this.

All right. How many more witnesses does the Government have beyond this situation? Is this your last witness?

BY MR. SNYDER: Yes, sir.

BY THE COURT: So you'll be prepared to rest if we can complete that?

BY MR. SNYDER: Yes, sir.

BY THE COURT: Okay. I don't think -- And when you say at this time, Mr. Depper, can you give me an idea? If you're going to play some more, can you give me an idea how long it might be?

BY MR. DEPPER: It is just shy of two hours, judge.

BY THE COURT: Okay. Well, if we plan to try to get that done today, I need to ask for this jury's help in staying.

BY MR. DEPPER: We are happy from the defense, judge, just to do it next week.

BY MR. SNYDER: That will be fine.

BY THE COURT: Well, I just think it's a real problem in trying to do it this evening because I think we're talking about a very late hour because you never know how it's going to work and so forth.

All right. Well, with that understanding, then, I do not intend to keep us here past 5 o'clock. If we're going to try to do that, we need to tell them right now. It's not fair to just come up to 5 o'clock --

Do we agree?

BY MR. SNYDER: Yes, sir.

BY THE COURT: All right. Let's take about another ten minutes or so and, all right. When we come back out now, what I

think we need to do is to have the gentleman put the earphones on and explain what he's going to do and so forth. Now are you folks using earphones?

BY MR. SNYDER: I probably will, Your Honor.

BY THE COURT: Well, is there any need, in your judgment, either side, for the Court to do that?

BY MR. DEPPER: I don't believe so.

BY MR. WEBB: Not unless you desire to.

BY MR. SNYDER: It's up to you, judge. [Laughter]

BY THE COURT: Well then, there's not. Okay. All right. We'll be in recess.

[Recess taken at 3:37 p.m. - Jury Not Present]

[Open Court - 3:51 p.m. - Jury Present]

BY THE COURT: All right. Now are we ready to have the earphones and so forth explained?

BY MR. SNYDER: Yes, sir.

BY UNIDENTIFIED SPEAKER: These are stereo headphones. It receives a signal from an infrared transmitter, receives it to this little glass knob that's on your headphone. So when you place these on your head, you want the glass knob facing forward in the direction that you're looking.

Okay. Secondly, you can adjust the headphones for your particular head size and the other thing; the volume controls are on the side. The red and yellow slide switch is on the side. It will control the right and left channel. I hear some static. If

you cover up this little glass knob, it will interfere with the signal and you'll get some static, so you don't want to cover that up with your hand or whatever.

I have turned all of them on. They should be and ready to go. They've all been tested. If, by chance, one were to malfunction while we're listening, to let us know and I've got replacement batteries and replacement headphones.

That's basically it. It's pretty straightforward. You control the volume to suit your personal comfort.

BY THE COURT: All right. Ladies and gentlemen, as the play starts, if you are having any difficulty, just raise your hand and let us know. Now are we where we can stop that tape and wind it back if we have that kind of a problem?

All right. Let's have that agreement then, ladies and gentlemen, that if you're having trouble of any kind, don't hesitate; just raise your hand because, obviously, this is all done for your benefit and it's imperative that you be able to hear it and if you can't, well, we'll try to figure out why not and try to get it corrected.

So are you ready? All right. Maybe you folks can go ahead and put your phones on. All right, and let's proceed.

[At this time, the audio cassette introduced into evidence as Government's Exhibit 54 was played for the jury, and the transcript marked as Government's Exhibit 48 was used for record purposes only.]

"This is Bill Maddalena, Special Agent for the FBI. I'm presently in Van Buren, Arkansas. Today is April 3. I'm here with Jonah Jones. This is going to be a consensual tape between Jonah Jones and inmate Ingle at the Crawford County Detention Facility in Van Buren, Arkansas.

"INGLE: Uh, they're trying to get me with that charge.

"JONES: But I thought you was fed, I'm state.

"BELL: Yeah, yeah. He's fed, he's fed. You state (unintelligible).

"INGLE: See, I'm in the state right now, but the feds are trying to get me with that charge.

"JONES: Yeah.

"BELL: Right.

"INGLE: Trying to get me caught up in that shit.

"JONES: Yeah. I, uh, I, uh, see, cuz, they figure that, like they ain't had no witnesses with me and they talking about that, uh, they got witnesses telling 'em I'm the trigger. And there ain't nobody showed up yet. Ain't nobody come to my home. Ain't nobody that can pull up no motion for discovery with me.

"INGLE: Yeah, that is, like, in my case, they, they got, they got like, they got somebody saying that they saw me in that area.

"JONES: Mm-hmm.

"INGLE: In a certain person's car.

"JONES: Yeah.

"INGLE: Well, you know, what's that have to do with this, with this mother fucker we killed, you know?

"JONES: Mm-hmm, yeah.

"INGLE: You know, FBI said I was seen (unintelligible) with someone else who was supposed to have did the crime.

"BELL: Mm-hmm.

"INGLE: But now they're trying to charge me with it. They're trying to say that I did it. But they done said this man --

"BELL: How did, how did you get, how did they, how have they hooked you up with him?

"INGLE: See, that's what I don't understand. See, they, see, they knew we hung out a little bit.

"JONES: Right.

"INGLE: Yeah, yeah. I've met some good people. Yeah, there an Ole dude, been there, oh, I don't know, met last summer. Dirty Black. West Memphis, West Town boys. We set there an talk sometimes, set there, get high, you know? Whenever I, whenever we go to discussing certain matters, you know, and situations --

"JONES: Mm-hmm.

"INGLE: I might put in Andy and Tom, you know, decide to go do, do this.

"JONES: Mm-hmm.

"INGLE: They end up doing this, and this is what happened right here.
"JONES: Mm-hmm.
"INGLE: So I say something to you and names change.
"JONES: Words, words.
"INGLE: Understand what I'm saying?
"JONES: Mm-hmm.
"INGLE: It's all kinds of, you know, you done, you done told me, you, I'll go ahead and do this, I'm gonna tell you.
"JONES: Dog, you're safe with me. The word is mine.
"INGLE: And you done told me (unintelligible).
"JONES: And I'll tell you more.
"INGLE: (unintelligible).
"BELL: I hear ya.
"INGLE: You know, mother fucker broke, you know?
"JONES: Yeah.
"INGLE: You know, that mother fucker, he ain't doing too good, you know, mother fucker out on them drugs and shit. Rob a couple of mother fuckers. I stroll out at night. We scoping and shit. Making some money, you know? You know, he -- you know, we're scoping (unintelligible) mother fucker meet me somewhere, So, scoping -- (unintelligible) --
"JONES: Popped him?
"INGLE: Huh?

"JONES: Popped him.
"INGLE: Naw, not right now.
"JONES: What, what'd you say?
"INGLE: Said, you know, scoping.
"JONES: Coping?
"INGLE: Scoping.
"JONES: Scoping.
"INGLE: Put it right here.
"JONES: Mm-hmm.
"INGLE: Mother fucker look like he got money. He got to make tracks, you know, to get somewhere.
"JONES: Mm-hmm.
"INGLE: You know? (unintelligible) mother fucker (unintelligible) --come up with money -- dah, dah. You know, tied that mother fucker up, you know, and the mother fucker, mother fucker saw us, you know,.and I, I didn't need no witnesses to no crime.
"JONES: Who saw you?
"INGLE: The mother fucker, old man saw us walking from the forest.
"JONES: Right. Is this the case that the feds fucking with you, man?
"INGLE: Yeah, Andy; Andy and Bob.
"JONES: Andy and Bob?
"INGLE: Yeah, Andy and Bob.

"JONES: Who are they?
"INGLE: Andy and Bob, they, you know, did this for some money, you know? Bob said, you know, can't be having no more of this shit, man, we both on parole and, and we can't be having non of this shit here, you know, and -- pow, pow, pow, pow --
"JONES: The dude, the dude y'all was robbing saw your face? Saw your buddy's, saw y'all's face?
"INGLE: Yeah, so, you know, it's, it's automatic time right there.
"JONES: Yeah, you're damn right.
"INGLE: Andy told him, Don't, don't' turn around. So --
"JONES: How in the fuck did he see y'all's face?
"INGLE: 'Cause, see, the dude didn't have nothing to put over his face.
"JONES: Mm-hmm. He didn't have no pillow?
"INGLE: Yeah, he --
"BELL: Yeah, he didn't have nothing to cover up with.
"JONES: Your buddy?
"INGLE: Yeah.
"JONES: He didn't have nothing to --
"INGLE: Bob didn't have nothing to put over his face.
"JONES: Uh-huh.
"INGLE: And Andy did. Andy said, fuck it, you know? And, uh--
"JONES: Mm-hmm.

"INGLE: And then Bob, you know, then, they say Fuck it. Pow, pow, pow, pow --
"JONES: And y'all busted a cap in his ass?
"BELL: Mm-hmm.
"INGLE: Yeah.
"JONES: Was he a young dud?
"INGLE: Older dude.
"JONES: Black?
"INGLE: Naw, white.
"JONES: White dude? Why is it fed? What was he?
"INGLE: 'Cause it, it was supposed to happen on a federal reservation.
"JONES: Where is that?
"INGLE: It's federal ground.
"JONES: Federal ground?
"BELL: Yeah, you know, there was some Indian, Indian mount, you know, something like that.
"JONES: Mm-hmm.
"INGLE: National Park.
"JONES: National Park?
"INGLE: Yeah, Hot Springs.
"JONES: Mm-hmm.
"JONES: So, y'all, you, y'all busted a cap in his ass but, but the feds is going by hearsay?
"INGLE: Yeah. See, the feds are saying that Bob and Andy did

this --
"JONES: Uh-huh.
"INGLE: -- but the feds have no evidence to prove --
"JONES: Uh-huh.
"BELL: Mm-hmm.
"INGLE: -- Bob and Andy did this.
"JONES: Right.
"INGLE: The only thing they've got is, is hearsay (unintelligible).
"JONES: Well, I see why you're so fucking quiet now.
"BELL: Mm-hmm.
"INGLE: You see what I'm saying?
"JONES: 5-0, like a mother fucker. How the fuck did y'all end up on an Indian reservation? A federal park?
"INGLE: Hot Springs, see?
"BELL: Mm-hmm.
"INGLE: Hot Springs, is, man, a lot of it's federal --
"BELL: Yeah.
"INGLE: -- property.
"JONES: Oh, is it?
"INGLE: 'Cause it's a national park.
"JONES: Mm-hmm.
"INGLE: Like downtown? You know, it's got that natural water 'cause it, it sits, Hot Springs sit up on a canyon.
"BELL: Mm-hmm, Mm-hmm, Yeah.

"INGLE: So it's got these natural springs that comes up. That makes it federal property.
"BELL: Mm-hmm. How many times, how many times did ya shoot him? You don't know, ain't no telling?
"JONES: What, what does that have to do with the car and shit?
"INGLE: Car?
"JONES: Mm-hmm.
"INGLE: Uh, mother fucker went and got rid of it.
"JONES: Y'all sell it or burn it up, sell it?
"INGLE: We just wiped the mother fucker down --
"BELL: Mm-hmm.
"INGLE: The old mother fucker wouldn't doubt it.
"JONES: Then why they fucking with you? Did your buddy tell on you or something?
"INGLE: They said somebody saw me in the car.
"BELL: Mm-hmm.
"JONES: That right?
"BELL: Mm-hmm.
"INGLE: That's when the, that's when --
"JONES: So y'all, y'all went to the park, and this ranger started fucking with y'all?
"INGLE: Yeah, yeah.
"JONES: Well, what, what --
"BELL: You know, naw, he said that uh, he said that they were like, uh, you know, they were like low on ends, they

were low on ends and shit and, uh, uh, they, they robbed the old dude and they, they, then they shot him, then, they, they, they tied him, tied him up and uh, you know.

"JONES: But they, how did they hung you with that?

"INGLE: Hearsay says that I was seen driving this car.

"JONES: Mm-hmm. Oh, somebody said they seen you driving it?

"BELL: Mm-hmm. Mm-hmm.

"INGLE: Yeah, yeah.

"JONES: Well, did they see you driving it through town or --

"INGLE: Um, that's what they're saying. See, said, everything I said here.

"JONES: Did ya, did, did both of y'all shoot him, or did just your buddy shoot him because you --

"INGLE: Mm-hmm.

"JONES: Did both of y'all shoot him or just one of y'all?

"INGLE: Bob and Andy both did this.

"JONES: Oh.

"INGLE: They, they know, they both know, they both know the consequences --

"JONES: Mm-hmm.

"INGLE: -- and they both know what's gonna happen.

"JONES: Mm-hmm.

"INGLE: So can't neither one of 'em say, fuck this and this, that he did it, I did it, ya know?

"BELL: What'd ya do with him when ya tied him up?
"JONES: Is that the way they found him? Tied up?
"INGLE: Yeah. They said, the newspaper stated they found a man tied up covered up in some brushes.
"JONES: Mmm. Damn, your home boy raw, ain't he?
"BELL: Mm-hmm.
"INGLE: he'll drop lead.
"JONES: I heard that. One real, the other one got to be real.
"BELL: Just stock to your story.
"INGLE: That's like I say, you know, we use different names, you know, different names that's that's gonna represent somebody, and naturally, you know, you'll know what I'm talking about.
"JONES: Yeah.
"INGLE: Like I say Bob and Andy.
"JONES: Yeah.
"INGLE: Bob and Andy represents two certain people that they're --
"JONES: Mm-hmm.
"INGLE: -- trying to get caught up in this case.
"JONES: Mm-hmm.
"INGLE: See what I'm saying?
"JONES: Mm-hmm. Oh, 'cause you was losing me right there.
"INGLE: Yeah.
"JONES: Yeah, okay.

"INGLE: See, I do that so, you know?
"JONES: Mm-hmm.
"INGLE: It's just like saying Bob goes out, an Bob's this man here and --
"JONES: Mm-hmm.
"INGLE: -- and shoot him in the leg and takes his car.
"JONES: Mm-hmm.
"INGLE: You know, go sell his car.
"JONES: Mm-hmm.
"INGLE: Bob did that, you know?
"JONES: Did they, did they find who, who, uh, his car was sold to?
"INGLE: Naw, they found it abandoned.
"JONES: Mm-hmm, did they?
"INGLE: Yeah. It showed in the newspaper they found it abandoned someplace way out somewhere.
"JONES: Mm-hmm. So you're saying that, uh, you're saying that, uh, uh, that, uh -- Ya'll did bust a cap in his ass, but maybe y'all didn't because, uh, oh, I mean, but just because y'all two was together? Y'all two was together, right?
"INGLE: Bob and Andy, yeah, Mm-hmm.
"JONES: Bob and Andy was together?
"INGLE: Yeah.
"JONES: Why are we using Bob and Andy? Now?

"INGLE: That prevails so that --
"JONES: Okay. You, you told me --
"INGLE: -- you don't get, get yourself --
"BELL: Yeah, yeah.
"INGLE: -- into a situation.
"JONES: Right. Okay, I understand. Well, dog, I mean --
"JONES: You think, uh, your home boy'll tell on you?
"INGLE: See, this, this guy, they don't, they don't even know where he's at.
"BELL: Mm-hmm.
"JONES: They don't know where he's at?
"INGLE: No, they ain't even talked to him.
"JONES: So he ain't gonna tell?
"INGLE: No, as far as --
"JONES: If, if they catch him, he ain't gonna tell on you?
"INGLE: No.
"BELL: I mean, you didn't do it. You were just with 'em. You see what I'm saying? You didn't do it, dog. You, you were just with 'em, and they knew the consequences when they pulled the trigger. See what I'm saying?
"JONES: See, that's what they were trying to do to me.
"INGLE: Yeah.
"JONES: Uh, uh, I'm gonna ask you a question and then I'm gonna tell you why I'm asking it.

"Did he and, and, and, and, don't get leary on me because I,

what I'm gonna give ya as feedback will, will, you know, make you feel better. But did he shoot him, did you shoot him, or it was, is it was because y'all was partners and y'all was riding together? Just riding together on the charge? Fuck it, one got charged. We both got charged because they can't prove it, man, you know.

"Okay, check this out. If they was to catch him, do you think he'd tell on you?

"INGLE: No.

"JONES: Cool, he ain't gonna.

"INGLE: Naw, because, see, that's, see, okay, listen. Okay. Bob and Andy, you know, they was up there together in the park and they said, think it boys walked off the (unintelligible).

"JONES: Mm-hmm.

"INGLE: Pop, pop, pow. Pow, pow. See what I'm saying?

"BELL: Mm-hmm.

"JONES: Yeah.

"INGLE: Whenever one did it --

"BELL: Mm-hmm.

"INGLE: -- both did it.

"BELL: Yeah.

"BELL: Who, who, who tied him up, dog?

"INGLE: Hmm?

"BELL: Who tied the dude up? Who, who tied him up? No shit?

"INGLE: (unintelligible).
"BELL: Damn.
"JONES: Well, when, when, when y'all was, when y'all was robbing him, what, he wasn't, he wasn't cooperating? What, he wouldn't act right? He wouldn't act right?
"INGLE: First he, you know, mother fucker won't act right.
"JONES: But, hell, if y'all got the gats on him, he should've--
"INGLE: No. See, he, he's sitting there trying to focus on the mother fucker, you know, looking.
"JONES: Mm-hmm.
"BELL: See, see the dude's face?
"INGLE: See, okay, stand right over here.
"BELL: Uh-hmm, yeah.
"INGLE: Now you get over here.
"JONES: Mm-hmm.
"INGLE: Now you're gonna be, you, you gonna Bob.
"JONES: Okay.
"INGLE: And you, you here it, and you turn around.
"JONES: Okay.
"INGLE: Now you hear, "What time is it?" and turn around. You say, you look at your watch.
"JONES: Mm-hmm.
"INGLE: Actually, on this day and time.
"JONES: It's 10:00.
"INGLE: By this time, we (unintelligible).

"BELL: Mm-hmm.
"INGLE: Mother fucker telling you to get on the ground.
"JONES: Um-hum.
"INGLE: This mother fuckers here to size you up. I'm over here, over here beside him. You let him try to scope the mother fucker out. I ain't going for that, I'm getting in his pockets. He trying, mother fucker, look at -- Pow.
"BELL: So what he do? Did he hit him or shoot him in the face?
"JONES: When ya hit him, you punched him? Whew.
"INGLE: -- and then, after we hit him --
"BELL: He still didn't act right, after y'all --
"INGLE: Yeah, yeah. He, he, but he was just, like la mother fucker trying to throw a guilt trip on me --
"JONES: Mm-hmm.
"INGLE: -- or some shit, you know?
"JONES: Mm-hmm.
"INGLE: You know? He bullshitted about doing this. I ain't trying to hear this shit.
"JONES: Yeah.
"INGLE: I ain't here to hear non of this. If I wanted a education, I'd stayed in school
"BELL: (Laughing)
"JONES: I, you know, I could look at ya and tell you were, uh,

nice when you come in; that you take care of your's. You know what I'm saying?

"INGLE: Yeah, I'm, you know, when you set out to do something, man --

"BELL: (unintelligible)

"INGLE: -- you just do it and that's it.

"JONES: What, what, what, what happened, uh, uh, with that, with that, um, fool after you busted him in his grill?

"INGLE: (unintelligible)

"JONES: Dog, I'm trying to hear this. I'm trying to hear this because --

"BELL: I know --

"JONES: -- the way you was trying to tell me, talking around --

"BELL: Yeah, yeah.

"JONES: -- and I'm, I'm, I'm like, damn mother fuckers.

"INGLE: Yeah, see, he, see, anyway, now, now the mother fucker's tied up.

"JONES: Mm-hmm.

"INGLE: So the mother fucker's believing now.

"JONES: Mm-hmm.

"INGLE: The mother fucker's thinking --

"JONES: Mm-hmm.

"INGLE: Damn, mother fucker saw us, man. Um, they wasn't thinking at first 'cause, you know, they been up on that shit --

"JONES: Yeah.
"INGLE: -- all week now.
"JONES: Yeah.
"BELL: Mm-hmm.
"INGLE: Hell, no, man, fuck that.
"JONES: Mm-hmm.
"INGLE: You know? Pow, pow.
"JONES: Mm-hmm.
"INGLE: Pow, pow. See, whenever, whenever Bob (making cocking of gun sounds) --
"JONES: Mm-hmm.
"INGLE: --whenever Bob (making cocking of gun sounds again), Andy automatically --
"JONES: Mm-hmm.
"INGLE: Pow.
"JONES: Mm-hmm. Mm-hmm.
"INGLE: You know, the, they work together.
"JONES: Yeah, Mm-hmm. You know what --
"BELL: What, what, what kind of car is it? Is it Cadillac or something?
"INGLE: Uh, brand new, uh --
"JONES: '95? '95?
"BELL: I remember reading, I remember reading that in the paper. It was kind of a, I, I thought it was a Cadillac.

"INGLE: It was in the paper. It was in the paper for a little while.
"JONES: Mm-hmm.
"INGLE: (unintelligible) It was a nice car.
"BELL: Nice. Was it new?
"INGLE: Yeah. You could sit, sit over here, man. Lock the door, press those buttons, open, those door lock, all of them lock, pop the door open.
"JONES: Mm-hmm. Mm-hmm. Mm-hmm.
"BELL: Dog, now you know, you know the story. What, what can you do for him?
"INGLE: I hate asking you to do nothing for me 'cause I can have people do it, you know. I just told you my story 'cause, you know, you done told me your story.
"JONES: Did, did, did he, did he, did he pull a gun on y'all? Didn't pull a gun? Did he have .;a gun? Well, what the, what, what kind of dude was he?
"BELL: He was a old dude.
"JONES: I mean, but what, he, why is it federal?
"BELL: Because it was on a federal reservation.
"JONES: On the land?
"INGLE: Yeah, (unintelligible).
"JONES: So, if I kill you on --
"BELL: If you kill me on federal property, then you makes it feds.

"INGLE: If you go to, see, that mountain downtown? Any of the mountains in Hot Springs is federal.

"JONES: Mm-hmm.

"INGLE: Federal reservation, national parks. That's just like going out and killing at, what's that, Yogi?

"BELL: Yeah, yeah, yeah.

"INGLE: Yellowstone?

"BELL: Yellowstone? Yeah.

"INGLE: That's, that a national park. If you do something, that's a federal crime. You're going to a federal penitentiary. If you get into a fight down there in Hot Springs on a sidewalk downtown, you'll get six to eight months in a federal pen or longer. It just depends how (unintelligible).

"There's a old man that goes down there damn near every year when, whenever he gets out and gets locked back up when it starts getting cold 'cause he'll go to a federal joint, so he goes down there and starts a fight in the park or something (unintelligible). He'll go to the joint, you know?

"JONES: Hmm.

"INGLE: If you do something in a federal park, the feds (unintelligible). I mean, if you spit on their property, boy, they got ya.

"JONES: Yeah, I know they be tripping.

"INGLE: The feds.

"JONES: Mmm. But he was just a ol' mother fucker. He wasn't any special dude, then?

"INGLE: Huh-uh.

"JONES: I thought, damn, you something. I thought he was like a agent or something.

"INGLE: No, huh-uh.

"BELL: You know, what made it fed, you know it was federal park.

"JONES: Mm-hmm.

"INGLE: It's just like if, like, if I stole a car or something (unintelligible). They said they could charge me with carjacking and that would be federal. Anything that happened in that area --

"BELL: Turn that TV down out there.

"INGLE: -- is federal, I mean, you know.

"BELL: Can't even hear.

"JONES: I, you know what? I can't either, 'cause you --

"INGLE: Yeah, there you go. I'm just saying --

"BELL: Tell 'em to turn that TV down. We can't hear it, man.

"INGLE: -- anything on that property.

"BELL: Trying to talk over y'all.

"INGLE: Like you got a certain area in Hot Springs, man, you know, they, most of it's a federal reservation. Especially the mountains. You go in the mountains and get

in a fight, you're gonna go to federal court for it.

"BELL: Hey, Johnson.

"INGLE: You know, anything you do is federal right there, man. That's why mother fuckers try not to fuck with that shit.

"JONES: They, they knew y'all did it, but they can't prove y'all did it.

"INGLE: Basically.

"BELL: Mm-hmm.

"INGLE: They're some stupid mother fuckers.

"BELL: That's what I was telling you down there, you know, stick to your story.

"JONES: Yeah.

"INGLE: Said I don't know nothing. Only thing I know is what y'all done told me. So, you know, if y'all gonna convict me for what y'all told me, ya know shit, go right ahead.

"JONES: Right.

"INGLE: Said I'll see y'all in jury trial, you know?

"JONES: Yeah, because, uh, even though they telling you they, even though they telling you they know they know, they can't prove that they know they know.

"INGLE: Yeah. They just, they play a game, you know?

"JONES: Yeah.

"INGLE: And they've been doing it so long, they be thinking I'm

scared or something.
"JONES: Mm-hmm, and, and, and that's, and that's why y'all had to kill the dude because you didn't have no face piece?
"INGLE: Yeah. See, usually --
"JONES: But your buddy didn't he have a face piece?
"INGLE: No.
"JONES: But you had a face piece?
"INGLE: Yeah, I had one but, but I didn't wear it.
"JONES: Because your buddy didn't have one on --
"INGLE: Yeah.
"JONES: -- you took your's off?
"INGLE: Yeah.
"JONES: And he seen both of y'all's face?
"INGLE: Mm-hmm.
"JONES: Yeah, you had to do what you had to do then.
"BELL: Yeah, you did.
"INGLE: Mm-hmm. Say, if --
"JONES: It was either that or, you know, be on TV.
"INGLE: Yeah.
"JONES: You know what I mean?
"BELL: Yeah.
"INGLE: Mm-hmm.
"BELL: Yeah, yeah, I know what you mean.
"JONES: So, I mean that you guys, y'all kept it real there.
"INGLE: Mm-hmm, yeah.

"BELL: You had to do what you had to do.

"INGLE: Yeah, in situations like this, uh, state. I wish to, you know, I wish it'd been a state case.

"JONES: Yeah.

"INGLE: If it'd been a state case, it wouldn't even, man, the mother fuckers wouldn't even --

"JONES: Mm-hmm.

"INGLE: -- wouldn't have gone this far. The mother fucker would've been dropped. They wouldn't even fuck with me about this shit, man.

"JONES: Yeah.

"INGLE: But the feds, they just stay on you.

"JONES: Mm-hmm. You know why the feds stay on you, though? That's because, uh, like, see, like maybe if my shit was fed, they, I wouldn't be getting off as easy as I am now. You know what I mean?

"INGLE: They, they -- Dude ain't dead yet?

"JONES: He ain't dead?

"INGLE: Oh, no. The dude I done shot, he dead.

"JONES: Oh, yeah, he died.

"INGLE: Yeah, yeah --

"JONES: That's why they're fucking with him.

"BELL: Yeah, yeah, yeah.

"JONES: That's where I'm going. Didn't mean to cut ya off, but on that dude. I mean, I mean the fed dude that you got

the case behind. Did you get, how much money did you get?

"INGLE: Hmm?

"JONES: How much money did he have?

"INGLE: Just enough to get by for the day, man.

"JONES: Is that right?

"INGLE: Yeah. You know, but that, they got, they got it, too, to where I could go make the money I needed to have. You know what I'm saying?

"JONES: Where? Where? Home?

"INGLE: It got me to where I wanted to be.

"BELL: So did, did the feds find any guns on him?

"INGLE: They -- I told 'em, I said, uh, ain't a gun in my presence. They ain't going to have me give them mother fuckers something that they don't -- they don't already have put on out there.

"JONES: Yeah.

"INGLE: I told it to 'em like this: If I use it, I'm gonna get rid of it.

"JONES: Why didn't your -- Why didn't your buddy wear a mask?

"BELL: It happened so quick, huh?

"INGLE: Yeah. You know, you're already on that shit, man, and the mother fucker already ain't thinking.

"JONES: Yeah.

"INGLE: So, you know, we went out there and fuck it.

"JONES: Mm-hmm.

"INGLE: Mother fucker might walk into a damn mall and rob a mother fucker in daylight.

"BELL: But, but, if you had a, if you had a mask, he should've had one.

"INGLE: Yeah, but see, I, I came from somewhere else before we met up.

"BELL: Oh.

"INGLE: You know? He just, you know, he just met me at a certain spot, you know? I wasn't really thinking myself about it. I just happened to have it 'cause I carry it.

"JONES: Yeah.

"INGLE: I carry it with me every time, you know --

"JONES: Yeah.

"INGLE: -- not just in case, you know. .

"JONES: Yeah.

"INGLE: Yeah -- something happened.

"JONES: Yeah, you're using the head.

"INGLE: Yeah.

"JONES: Uh, but, so it, it wasn't planned. It, y'all just met up and it happened?

"INGLE: Yeah. NO, we, we knew we was gonna do something. We didn't know exactly what. You know? We knew we was gonna do something, you know?

"JONES: Then why, but I, I still don't understand why he didn't use a shirt or something to cover up.
"INGLE: You know, 'cause it --
"JONES: 'Cause, dog ---
"BELL: -- it, it happened, man. You know, it just happened.
"JONES: Well, I, I'd, I'd do some serious thinking.
"INGLE: You know yourself, when you boom, man, and when you hit that thing, you just, then you're rushing, rushing. you just going, you going, you ain't thinking then --
"JONES: Yeah.
"INGLE: -- and you ain't thinking then. You ain't thinking. But a lot of times you be thinking there's police out there (unintelligible) and shit. You know what I'm saying?
"JONES: Yeah.
"INGLE: But sometimes you ain't thinking at all 'cause, you know, you got your mind focused on that one thing and you're gonna do that thing --
"BELL: Mm-hmm.
"INGLE: -- no matter what happens.
"JONES: Yeah.
"INGLE: A police officer could've, could've stopped ya, and you can just pow! went on and went ahead and still went and took care of your business. It's, you know, you got focused on that thing.

"JONES: Right. So the dude was just in the wrong place at the wrong time?
"INGLE: Yeah.
"JONES: (unintelligible).
"INGLE: Yeah.
"JONES: I wanna be no --
"INGLE: One time.
"JONES: Did you, did you get at least a hundred?
"INGLE: Yeah.
"JONES: Where your, where your home boy at? Where your home boy at?
"INGLE: I couldn't even tell ya.
"JONES: He ain't, he ain't writing ya or nothing?
"INGLE: Naw, naw, naw. That's, that's the worst thing that can happen right there is to write ya.
"JONES: Why? I mean, who --
"INGLE: They don't even know that 'cause they, they can't never prove that I, that he was my friend.
"JONES: Yeah.
"INGLE: Aw, they keep coming and telling me that they need me to get him.
"JONES: Oh.
"INGLE: And they, they keep telling me they're gonna need --
"JONES: Oh, they're wanting you to snitch?
"INGLE: Yeah.

"JONES: Ain't that a bitch?

"INGLE: Yeah.

"JONES: So, so they want you to tell, they want you to tell -- If you tell on him, that'd be telling 'em that you was there, too.

"INGLE: Mm-hmm.

"JONES: So you'd be telling on yourself?

"INGLE: Mm-hmm. Mm-hmm. It's just like, see, they, they went to my uncle and told, tried to scare my family, ya know? They, they was harassing my people. Since I've been locked up, they go to 'em all the time. They're fucking with my mom and my uncle.

"JONES: So you mean to tell me that the only thing that's stopping them from getting him is you?

"INGLE: Could be.

"JONES: Okay. Can't nothing out there save him? You the only thing saving him?

"INGLE: I guess. See, they, they keep trying to run games, saying that they can charge him with this, but they keep saying they can charge him with murder. They want to charge him with capital murder if they can.

"JONES: What? They wanta kill him?

"INGLE: Yeah. That's what they're saying. Just, just, you know, you know how they, you know?

"JONES: Mm-hmm.

"INGLE: The police gonna run games. They're saying they can charge him with this. Well, if y'all can charge him, why ain't y'all got him locked up?
"JONES: Mm-hmm.
"INGLE: Why y'all been bothering me for the last ten months trying to say y'all need me? I don't work for the government. I don't need a job. I don't get paid for it, so, you know, what the fuck are y'all doing? Y'all ain't giving me nothing. You can just go on about your business. You know?
"JONES: Yeah.
"INGLE: Handle it yourself.
"JONES: Yeah.
"INGLE: Don't say nothing to 'em, you know?
"JONES: Mm-hmm. Damn, they wanta burn him. Shew.
"INGLE: The feds be playing too many games.
"JONES: But you're saving his ass. he owe you.
"BELL: They're saving each other's ass.
"INGLE: Yeah. You know, you know, see, as long as he don't, as long as he don't, as long as he don't say Andy did this, and Andy can't say Bob did this.
"JONES: Yeah, yeah.
"INGLE: And Andy ain't gonna go by what they say. Andy wants the facts.
"JONES: Mm-hmm.

"INGLE: Plus see hard evidence.
"JONES: Mm-hmm.
"INGLE: Know what I mean? He, uh, uh, see, they done tried to come with me with, they done come to me one time when I first got locked up.
"JONES: Mm-hmm.
"INGLE: They told me, 'Well, this dude made a statement against you. This brother made a statement against you.'
"JONES: Mm-hmm.
"INGLE: They can't put no hearsay and try not to say a word they were friends, and they did do this and do that.
"JONES: Only way they can get a charge is if y'all tell on each other.
"INGLE: Yeah, mm-hmm. See, they got mother fuckers out there saying that we hung out together. They can't even prove that. They can't even prove I've ever been to his house. They can't prove he's been to mine.
"JONES: And all the time he's your mother fucking natural guy?
"INGLE: Yeah. We, we, we used to not be, but we out there --
"JONES: Y'all cool?
"INGLE: --and got closer than a mother fucker.
"JONES: Yeah, hell, yeah.
"INGLE: You know? 'Cause I saw what he'd do, and i -- he saw what I'd do, you know, so he knows me.
"JONES: Mm-hmm.

"INGLE: We already knew to agree to this 'cause we done been down once, so we know what we gotta do, you know?

"JONES: What, what if, what if, what if, what if, uh, your buddy get busted, man? Just say, for instance, he get busted and tell on ya. What you gonna do then?

"INGLE: Depends how it goes. Depends, uh, it depends how it goes. If he, if he does --

"JONES: And what if he turns state on you and say that -- What, what if he turn, turn state on ya and tell the folks, see, they, like they asking you to turn state on him?

"INGLE: Mm-hmm.

"JONES: Well, what if he turn state on you and say that, uh, you did everything? What you gonna do then?

"INGLE: If they come to me with something like that, I'm gonna go to him and say, 'Well, this man's lying.' I'd say, I'd say, 'Me and this man don't get along.' I'd say, 'You know he's gonna lie on me.' I mean, I'll come to 'em. 'Well he's, he's the one that did that.' I'd say, 'Y'all been asking me all these months. Now I'm really telling ya,' you know?

"So, uh, you know? Whatever he, whatever he does to me, I'll do to him.

"JONES: Your word?

"INGLE: Do un-- you know?

"JONES: So, if he go tell the folks you did everything and it

was all your fault --
"INGLE: I'm gonna do the same to him. Mm-hmm, so whatever I get, he's gonna get.
"BELL: Mm-hmm.
"JONES: All right. So --
"INGLE: You know, if we get there, we can, you know?
"JONES: Mm-hmm.
"INGLE: Set him up.
"JONES: So he better keep his mouth shut?
"INGLE: Yeah.
"JONES: How, how long it been ago since, uh, y'all, uh, blasted that fool? Ten months you said?
"INGLE: Uh, let's see. [Pause] This is March, ain't it?
"JONES: Yeah.
"BELL: Mm-hmm.
"JONES: No, this is April.
"BELL: April, right.
"JONES: April 3.
"INGLE: Around ten months.
"JONES: Around ten months?
"BELL: Yeah, 'cause that was, uh, that was what? Last summer? Something like that?
"INGLE: Yeah.
"BELL: Yeah, seems like I remember reading that in the paper.
"JONES: Yeah.

"INGLE: Yeah, last summer.

"BELL: 'Cause I was just getting ready to, uh, turn myself in. You know, getting ready to do my time.

"JONES: So if he go to the, go and say, hey, I ain't the one that killed that old mother fucker, Ingle did it, and then you're gonna be like, blah, blah, blah, blah.

"INGLE: Mm-hmm.

"JONES: Eye for an eye?

"INGLE: Fucker, yeah, that's what I'm saying. Eye for an eye, you know?

"BELL: Mm-hmm. He'd say I did it, and I'd say you did it --

"BELL: Mm-hmm.

"INGLE: -- and then they got us both, so we both wanted out there and that's fucked up.

"BELL: Yeah.

"INGLE: You know, ain't no use in him saying that.

"BELL: Mm-hmm.

"JONES: Yeah.

"JONES: I just hope your home boy don't, don't get caught and, and, and rat on ya, man, and tell on ya --

"BELL: Well, --

"JONES: -- to where you got to, uh, uh, reveal your, your shit. you know what I mean?

"INGLE: Yeah.

"BELL: Well, they been keeping their cover solo. I mean, they

been keeping their cover ever since now. You know, so, you know?

"INGLE: Yeah.

"BELL: You know your home boy and, uh, he know you.

"INGLE: Yeah, I know. That's why I'm saying I don't think he gonna say nothing.

"JONES: Do what?

"INGLE: If, if -- I don't believe he'll say nothing. If he do, he ain't going back to Hot Springs or nowhere. He won't go back to Hot Springs. And he knows I have to come back to Hot Springs and go to court and shit. The mother fuckers up in there'll get him just for the simple fact. Mother fuckers, a lot of mother fuckers don't like him anyway.

"JONES: But, you know, you pretty much know that the old man is gonna be dead and that's the end of it?

"INGLE: Yeah, that's what I'm saying. Um, sometimes, you know, if it end up happening, fuck it.

"BELL: Mm-hmm.

"INGLE: That ain't nothing. Shit happens.

"BELL: Mm-hmm.

"JONES: Yeah.

"INGLE: He wasn't nothing, nobody to me.

"BELL: Yeah.

"JONES: Yeah. You say he was on the wrong federal ground at

the wrong federal time, huh?

"INGLE: Yeah.

"BELL: Yeah.

"JONES: That's a deep cover there.

"BELL: Boy, y'all too cold. Y'all too cold.

"JONES: So, if, but, but, but, if y'all would've both, if he'd have just had his rag on, y'all would've never had to kill that dude.

"INGLE: Probably not. He would've, you now, he wasn't talking about, you know, masking up --

"JONES: Mm-hmm.

"INGLE: -- but, hell, man, I mean, the spot where they, where they did this crime at, where the crime took place, I mean, you got tourists all down here walking.

"JONES: Yeah. No shit?

"INGLE: Yeah, tourists all around -- .

"BELL: Mmm.

"INGLE: -- in here walking, so, you know --

"JONES: Yeah.

"INGLE: -- covering your face, you know? Whatever, you know?

"JONES: Mm-hmm.

"BELL: Mm-hmm.

"INGLE: So, we fall in, watch him. They already got a eye on him.

"JONES: Was it daytime?

"INGLE: Yeah.
"JONES: Y'all killed him in daytime?
"BELL: Whew!
"JONES: In the day?
"INGLE: Yeah.
"BELL: Y'all too cold.
"JONES: Wait, wait, with the, with the --
"INGLE: While the sun out.
"BELL: Boy, you real. Y'all real, man.
"JONES: Y'all killed him with the sun up?
"INGLE: Mm-hmm.
"BELL: Y'all real. Shew! Mmm. But, you know --
"JONES: In a, in a, in a tourist place? And nobody seen y'all?
"BELL: You do what you gotta do.
"INGLE: Long as you go about it and do it the proper way.
"BELL: Mm-hmm.
"INGLE: See, we didn't really do it the way we should've. Uh, you know, the way it should've been done, they should've walked out (unintelligible) 'cause the mother fucker ain't even thinking.
"BELL: Mm-hmm.
"JONES: Yeah.
"INGLE: You know, if the mother fucker been thinking, dude, the right way --
"JONES: Mm-hmm.

"INGLE: -- they'd have never even came to him in the first place. But --
"JONES: Yeah.
"INGLE: You know, if was still to the point to where, where, you know, daytime, night time, it don't matter, man. Long as you do it proper.
"BELL: Mm-hmm.
"INGLE: You don't have to worry yourself about it.
"JONES: But how'd y'all shoot him in the daytime and nobody heard the gunshots?
"INGLE: The mother fuckers might've heard it, the mother fuckers might not have.
"JONES: Was y'all, did y'all run? Did y'all run?
"INGLE: No.
"JONES: Was it -- [knocking at door] Who is it?
"UNIDENTIFIED SPEAKER: Phone.
"JONES: Was it woods?
"INGLE: It's --
"JONES: Is it a wooded area?
"INGLE: There's woods right there where, where it happened because it was on the mountain, you know?
"JONES: It was on the mountain?
"INGLE: It happened on the mountain. And, uh --
"JONES: Wait. I thought it happened in a rest area.
"INGLE: Reservation, federal reservation.

"JONES: Hold on. I don't understand ya.

"INGLE: See, it's a, it's a federal reservation, right?

"JONES: Yeah.

"INGLE: It's, it's part of the mountain.

"JONES: Yeah.

"INGLE: Uh, you know, there's a little bit of trees and stuff around there --

"JONES: Right.

"INGLE: -- but --

"JONES: Is this way up in the air?

"INGLE: It ain't that far, a little bit. I, I, but --

"JONES: Right.

"INGLE: -- it was maybe a block, you know --

"BELL: Mm-hmm.

"INGLE: -- but the mother fucker just, yo know, he got, mother fuckers just a couple of blocks.right over here, you know?

"BELL: Mm-hmm.

"INGLE: A block and a half away.

"JONES: Yeah.

"INGLE: Sitting down and having picnics, you know, over here and hit.

"JONES: Yeah.

"INGLE: The mother fuckers liable to have heard it, but they might've been hiking or something, you know?

"BELL: Mm-hmm, yeah.
"JONES: Yeah.
"INGLE: (unintelligible). I, I ain't seen nothing naturally, you know?
"JONES: You got to shoot. But I, if --
"INGLE: Uh-huh.
"JONES: Dog, you mean to tell me, I heard -- Y'all shot the dude in broad daylight? In the daylight with the sun up, and it wasn't dark outside?
"INGLE: No.
"JONES: Boy. Y'all some treacherous mother fuckers, boy.
"BELL: [Laughter]
"JONES: Damn.
"BELL: Whew! Do --
"JONES: With the sun up?
"BELL: Do what you gotta do.
"JONES: But, damn, with the sun up in the, in the, in the, on the, in the park? In a reservation?
"INGLE: A good, a good thing about this; you can get, you can get yourself or, you know, Derrick, y'all could mask up.
"JONES: Mm-hmm.
"INGLE: And dress all black, all black. All, all black. They can't, they can't break that shit down on their computer whenever you wear like a ski mask and all that shit?

"JONES: Mm-hmm.
"INGLE: Wear all black and make sure your eyes are covered.
"BELL: But they (unintelligible).
"JONES: Was there cameras out there when y'all shot him? Damn. your buddy sound like a, like a Al Capone mother fucker. Let me ask you a question, though. Do you, which one of y'all the realest?
"INGLE: I, I wouldn't put myself in a position to say that.
"JONES: Okay, I feel ya.
"INGLE: But the fact that, you know?
"JONES: Did he, did, did, did he, did he, did he --
"INGLE: He wanted me, at first, you know?
"JONES: He wanted you to shoot him first?
"INGLE: Yeah. No, he was, he was wanting, at first, he wanted me to shoot him first, yeah. At first, you know, he didn't even want to shoot him 'cause --
"JONES: But he shot him first?
"INGLE: Bob did.
"JONES: Okay. You were Bob.
"INGLE: And, uh, you know, we sitting there and, yo know, we started walking and I was like, naw, man fuck that country mother fucker. You know?
"JONES: (unintelligible).
"INGLE: (unintelligible) saw Bob and Andy's face. Bob and Andy can't, you know, have nothing but shit then.

"Bob and Andy look back, you know? Pow, pow, pow, pow, you know? Walk on down, move the car out, you know?
"JONES: Just left him laying there?
"INGLE: No.
"JONES: Oh, y'all hid him?
"INGLE: Yeah.
"JONES: A '95? Car? Big one? Little one?
"INGLE: About, about kinda like --
"JONES: A '98?
"INGLE: Kinda like a Dynasty.
"JONES: Like a Dodge Dynasty?
"INGLE: Mm-hmm, yeah.
"JONES: A little car?
"INGLE: No.
"JONES: Oh, one of them clean little mother fuckers, huh?
"INGLE: It's a clean car.
"BELL: Mm-hmm.
"INGLE: Smooth.
"JONES: Was it?
"INGLE: Brand new. Nice, it was nice.
"JONES: Hell, yeah. Well, Dog, let me tell ya something. Uh, uh, if you shot him 'cause he seen ya, that's legit. But, but, since your buddy's free, maybe he should've shot him first. You know what I'm saying? Instead of you shooting him first because yo in jail and, if some-

thing was to happen out there, uh, 'Ingle shot him first.' Know what I'm saying? And --

"INGLE: If this fool, he, he could say that, but I can go, and I'll say the same thing about him. You know what I mean? They, they can't, they can't prove neither one of us, right?

"JONES: Now, see, if you'd have been in the city and not, and not -- If, if y'all would've been somewhere like in, see, I'm from Dallas. If y'all would've been somewhere like Dallas and killed that mother fucker --

"INGLE: Yeah, nothing would've ever became of it.

"JONES: Nothing would've ever became of it, like you said.

"BELL: How far did they, how far did, uh, how far did y'all have to carry the body? A long way?

"INGLE: No, not too far.

"JONES: Y'all didn't have to carry it far?

"INGLE: Naw, just by some trees and shit.

"JONES: Was he, was he bleeding bad?

"INGLE: Uh --

"BELL: You didn't stick around to find out?

"JONES: [Laughter]

"INGLE: Naw.

"BELL: Yeah, you --

"INGLE: Just, you know, in the dome.

"BELL: Yeah.

"JONES: In the dome?
"INGLE: Yeah, the, it wasn't bad or nothing. Yo know, 'cause once, once, that's through, you know?
"BELL: Mm-hmm.
"INGLE: It's through.
"JONES: Mm-hmm. Shoot him with a pistol? Whew. Nut right here, boy.
"I heard that if, if, if y'all, did y'all, did y'all have to carry him, or did y'all have to put him in the car?
"INGLE: Carried him.
"JONES: Y'all carried him? So wasn't no blood inside the car?
"INGLE: No.
"JONES: That was smart.
"INGLE: We just carried him and covered him.
"BELL: Mm-hmm.
"INGLE: Walked on and on down a little trail.
"JONES: Carried him about a block in the daylight?
"INGLE: No. We didn't carry him down a trail. We just carried him off in the woods a little bit.
"JONES: In the woods?
"BELL: Not too far from where you popped him, huh?
"INGLE: Yeah, yeah, yeah. Walked back down the trail, walked to the car, and then --
"JONES: Rolled off? Were you driving?

"INGLE: Yeah.
"JONES: Did you sell the car? You sold the car?
"INGLE: Naw, I had a mother fucker get rid of it.
"JONES: '95?
"INGLE: I was gonna, I was gonna take a chance on taking it out to California.
"JONES: Yeah.
"One more question. Was it, you said it was a '95? Was it dented up?
"INGLE: Naw, it was just clean, you know? It, it was like --
"JONES: What color was it?
"INGLE: Like, uh, like a gold color.
"JONES: Like a gold color?
"INGLE: It looked like it just came off a showroom.
"JONES: Mmm.
"BELL: Must've been new.
"JONES: Might've been a Fifth Avenue.
"INGLE: Yeah.
"JONES: A new, a new, a little, a little, a little New Yorker?
"BELL: You said it was a Dynasty, didn't ya?
"INGLE: It, it was something like a Dynasty.
"BELL: It was like a Dynasty? Yeah.
"INGLE: The mother fucker was sweet, man.
"BELL: It was nice, though, huh?
"JONES: Everything was power?

"INGLE: Yeah, everything, Mm-hmm.
"JONES: Man, you could've got grip for that, man.
"BELL: How did, how'd they, how'd they find, find his body?
"INGLE: Uh -- The newspaper said there was two hikers walking toward the trail and, uh, when they was hiking up to the side and they, they ran across it.
"BELL: Mm-hmm.
"INGLE: You know, nature walking?
"BELL: Mm-hmm.
"JONES: Y'all just left him out in, just in the open but just covered him up?
"INGLE: Yeah. Threw him in some leaves.
"JONES: Naw.
"INGLE: But, see, the, the newspaper stated they could not tell how long the man had been there. At first, they said he'd been there for a month and then they come back saying he'd been there for a, uh, a week. 'Cause, see, the chemicals on the mountain, you know? They spray that shit with chemicals. It deteriorates the body. They couldn't even tell how he was killed.
"JONES: Uh, Johnson, he called his self outside our door earlier today. About dinner, we gave him some pot pies and told him, 'Get your mother fucking ass away from here.'
"BELL: Pissed me off, man.
"INGLE: It's just like, see, on, you know, like I'm saying,

they can't even tell --

"JONES: How, how long had it been since y'all killed him that they found him? Was it a week?

"INGLE: Huh-huh, about two weeks, about a week and a half.

"JONES: Oh, so the paper was just talking?

"INGLE: Yeah. See, the paper, see, at first, they couldn't tell because of the chemicals on the forest. They, they deteriorate the body too fast."

[At this time, the playing of the audio cassette introduced as Government's Exhibit 54 was concluded.]b

BY THE COURT: All right. Does that conclude the tape?

BY MR. SNYDER: Yes, sir.

BY THE COURT: All right. Would you kindly retrieve the transcripts, please?

All right. Do you have additional questions, Mr. Snyder?

BY MR. SNYDER: Just a few more, Your Honor.

DIRECT EXAMINATION (continuing)

BY MR. SNYDER:

Q. Mr. Jones, during this tape, you asked the defendant --

BY THE COURT: Well, let me see here now. Do we need to pick up these headsets? I hate for the jury to have to wrestle them.

BY MR. SNYDER: Sure.

BY THE COURT: Why don't we just pick them up? All right. Go ahead.

BY MR. SNYDER:

Q. Mr. Jones, during the tape, you asked the defendant, "But he shot him first?" and the defendant said, "Bob did." Did the defendant make any gestures when you asked the question and said, "But he shot him first?" and then the defendant said, "Bob did"?

A. He pointed at his self as being Bob.

Q. How did he do it?

A. He said, "Bob did it."

Q. And you talk about face pieces. What do you mean by face piece?

A. Something to cover your identity, you know, to cover your face, to go unseen.

Q. And you also asked the defendant or you talked to the defendant about his partner turning state on him. What were you two talking about in that respect?

A. Well, we was discussing his partner turning him in, you know. That's basically --

BY MR. SNYDER: Pass the witness.

BY THE COURT: All right. Cross, please?

BY MR. DEPPER: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. DEPPER:

Q. Mr. Jones, in the course of your conversation with Mr. Ingle, how many times did he tell you that he or his partner had shot this individual?

A. I couldn't give you an accurate number.
Q. Well, did you give an accurate number to someone prior to today?
A. Excuse me?
Q. Did you give an accurate number to someone prior to today?
A. I said maybe four or five times.
Q. Okay. And I guess that maybe was based on, supposedly, this conversation with Trinity Ingle? You've got to speak up, sir?
A. Yes.
Q. Thank you. Now this conversation -- We only heard about a 40 minute piece of it. How long was this conversation that you had with Mr. Ingle, please?
A. Too long.
Q. Well, yes, sir, but how long was that, please?
A. Maybe two hours.
Q. Thank you --
A. Maybe longer.
Q. Yes, sir. And when you had this conversation, it was in your own private little pod, your jail room; is that right?
A. That's how you want to define it.
Q. Well, okay, fine, but who was in that room with you?
A. Me, Mr. Ingles, and Mr. Bell.
Q. And the door to your room -- That was a two-man room, wasn't it?
A. Yes.

Q. Okay. The door to your room was closed, wasn't it, sir?
A. It was.
Q. And in fact, I think there's a little slot there that you can open; that was even closed, wasn't it?
A. Correct.
Q. Y'all expected to have privacy in there at the time, didn't you?
A. Exactly.
Q. Okay. When you were talking to Trinity Ingle, isn't it true, sir, that you had admitted yourself to having shot a man?
A. It was mentioned.
Q. Okay, well, did you admit you killed him?
A. No.
Q. You just said you shot him?
A. Never really even shot a man.
Q. Did you tell him you shot him?
A. I said that.
Q. And what was the name of the man you supposedly shot?
A. There wasn't a name.
Q. Didn't give a name at all?
A. No.
Q. Okay. Did you ever tell Trinity Ingle in the course of this conversation that, "Hey, man, I can help you with something like that"?
A. I remember stating something like that.

Q. Did you ever say to him something to the effect of, "I've got a lawyer that's real good and he can help you and protect you, man"?
A. I said that.
Q. Did you ever say anything to the effect that, "Hey, brother" -- and I use the word brother. You referred to Trinity as your brother, didn't you?
A. Whether I like it or not, you are, too.
Q. Yes, sir. But you referred to him like that, didn't you, sir?
A. I did.
Q. Okay. And when you referred to him like that, didn't you suggest to him that, "Brother, this lawyer can help you"?
A. I said that but my intentions was dude, you're sick; you need some help.
Q. Okay?
A. Plain and simple.
Q. Okay. For your testimony today, okay? Tell me what you did to prepare for your testimony today?
A. Nothing, just being myself.
Q. Okay. Did you review this tape again?
A. Not today.
Q. Okay. When was the last time you reviewed this tape?
A. Wait, excuse me. I take that back. It was today.
Q. Okay. You reviewed the tape today?

A. Yes, I did.
Q. Prior to coming to this courtroom?
A. Yes. Yes.
Q. And who was with you when you reviewed it?
A. FBI Agent Bill Maddalena.
Q. Okay. Anyone else, please?
A. That was it.
Q. Did you discuss with Special Agent Maddalena what your testimony would be today?
A. No.
Q. Did you discuss with anyone from the Government what your testimony would be today?
A. No.

BY MR. DEPPER: Very well. Thank you, sir. No further questions, Your Honor.

BY THE COURT: Anything further?

BY MR. SNYDER: No, sir.

BY THE COURT: All right. May he be excused?

BY MR. SNYDER: Yes, sir.

BY MR. DEPPER: Just for -- I don't want him released from the subpoena, judge.

BY THE COURT: All right. Sir, you may stand down and you are not excused but you are released for today. You'll be notified by the attorneys when you'll need to be called back.

BY THE WITNESS: Thank you.

TRIAL OF U.S. V. TRINITY EDWARD INGLE,
NO. 96-60023-001
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

**TESTIMONY OF SPECIAL AGENT TOM ROSS (EXCERPTED)**

A. No.

BY MR. DEPPER: Very well, thank you. I have no further questions of this witness at this time. Thank you, Your Honor.

BY THE COURT: Cross?

BY MR. SNYDER: We have no questions, Your Honor.

BY THE COURT: May she be excused?

BY MR. SNYDER: Yes, sir.

BY THE COURT: Madam, you're excused, you may stand down, you're released, you may leave if you like.

BY THE WITNESS: Okay.

BY THE COURT: Call your next, please?

BY MR. DEPPER: Call Special Agent Ross to the stand.

BY THE COURT: Agent Ross, you've been sworn, have you not?

BY THE WITNESS: Yes, sir.

BY MR. DEPPER: May I proceed, Your Honor?

BY THE COURT: Yes, you may.

BY MR. DEPPER: Thank you.

TOM ROSS, DEFENDANT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. DEPPER:

Q. Agent Ross, I believe we were talking before and we all concluded that ultimately I had to talk to you on the defense case, so let's pick up where we left off the last time.

I believe last time we were talking about your having contact or attempting to contact or talk with Mr. Trinity Ingle. Was that the 4th of July, 1995?

A. It was the 7th of July, 1995.

Q. Thank you, sir. And if I remember right, he had been at the probation officer's, state probation officer's office, and you went over and asked him to come over and talk to you; is that correct?

A. Correct.

Q. And that you had ultimately gotten him over to your office and at that point, he just decided he wasn't going to talk. Is that a fair summarization?

A. It is.

Q. And you released him at that point and you went back over to the state probation office, as far as you know?

A. I accompanied him back to the probation office.

Q. Thank you. All right. Can you tell us as you continue with your investigation, or let me ask you: Up to that point, okay, can you tell me the names of the people whom you had spoken to concerning this crime as relates to the issue of whether or not Trinity Ingle was involved in the crime?

A. On July 4 of 1995, I spoke to Crystal Davis and Chris Rogers who implicated Mr. Ingle in the murder of Mr. Williams.

Q. If I understand the investigation properly, also they implicated Mr. Jeffrey Paul; is that correct?

A. Correct.
Q. All right. And did you attempt to, after talking to Mr. Rogers and Ms. Davis, I think, on the 4th of July, 1995, did you try to talk to Mr. Jeffrey Paul?
A. I did.
Q. And were you able to find him, sir?
A. I was unable to locate him in the Hot Springs area.
Q. All right. And did you also look for Mr. Jason Paul?
A. I did.
Q. All right. And the same time?
A. Yes, sir.
Q. And was this right after the 4th of July, 1995?
A. It was during this time period; yes, sir.
Q. Okay, thank you. And were you able to find Mr. Jason Paul?
A. I was not.
Q. All right. And can you tell me, were Jason and Jeffrey Paul ultimately found?
A. They were.
Q. And where were they found, please?
A. They were found in the vicinity of Water Valley, Mississippi.
Q. And when were they found, please?
A. The time they were arrested; last year, sir.
Q. Okay. And found by the FBI?
A. Yes.

Q. Okay. Now can you tell me as relates to your investigation, did you look to investigate something dealing with some blue tennis shoes?
A. There's Reebok shoes.
Q. Okay. Tell me how they focused into your investigation, please?
BY MR. SNYDER: Your Honor, I don't believe there has been any relevant testimony at all about any Reebok shoes relative to this defendant. I'm going to object.
BY THE COURT: Well, objection overruled. We'll see where it goes. He said there were shoes involved and there's been shoes mentioned. Whether or not that's the brand or not will be something for the jury to decide.
Objection overruled. You may answer.
BY MR. DEPPER: Thank you.
BY MR. DEPPER:
Q. Agent Ross, let me clarify to help -- You say Reebok shoes. What color were those shoes, please?
A. I believe they were blue.
Q. All right. Did they have any other name on them?
A. Not that I recall at this time.
Q. Okay. Would your notes reflect any other names?
A. Yes, sir. It would be reflected in the file.
Q. Did you bring those notes with you by chance?
A. I did not.

Q. Okay, thank you. All right. So you say that there were some blue Reebok tennis shoes involved. Tell me how they fit into your investigation, please?

A. In the statement of Chris Rogers, he mentioned that Jeff Paul had told him that he had kicked the victim. He also told him that the blood was still on his shoes and pointed to the shoe at the time he was relating the story. Later on, Chris Rogers advised that he asked Paul what happened to his shoes, and he stated that he had given them to Trinity Ingle, who needed to wear the shoes because they're required, to work at Sunbay, and you needed shoes.

Q. Okay. Did you ultimately obtain a pair of blue Reebok tennis shoes?

A. I did.

Q. And where did you get them from, please?

A. National Park Service Ranger Jim O'Donnell.

Q. Okay. And do your files reflect where Mr. O'Donnell got them?

A. He obtained them from Trinity Ingle on the day of his arrest on July 11, 1995.

Q. Okay, thank you. Now as we talk about Trinity was arrested on July 11, 1995, was he arrested at that particular day on a federal warrant?

A. He was not.

Q. Okay. Arrested on a state warrant?

A. State warrant for parole violation, I believe.
Q. Okay, thank you. Now can you tell me between July -- well, let me ask you. July the 7th; did you have any difficulty finding Trinity Edward Ingle?
A. Yes, sir.
Q. Okay. What difficulty did you have?
A. Attempted to obtain the shoes from Mr. Ingle at his place of employment Sunday, and I believe it was on July 7, 1995.
Q. Okay?
A. He fled the area when I attempted to locate him and --
Q. Okay. And that was after you had already spoken to him at the probation office?
A. That was after I had spoken to him at the probation office on July 6.
Q. Okay, thank you. And he apparently didn't want to talk to you or didn't want to give you the -- Did he know you wanted the shoes from him?
A. He did not.
Q. On the 7th?
A. He did not.
Q. Okay. Then tell me, if you would; after Trinity is arrested on the 11th of June, -- or July, 1995, tell me what other involvement you had with Trinity Edward Ingle, please?
A. During the course of the investigation, I received information indicating that Trinity Ingle had been involved in an

incident in June of 1995 at a Total station in which he threatened several individuals with display of a weapon on Central Avenue in Hot Springs.

Q. Okay. Now I think we all know what you're talking about, but let's make sure. Can you tell us the individuals who were involved in that, please, based on your investigation?

A. Jason Ratliff and Stephanie Miller --

Q. Okay?

A. -- and Ms. White.

Q. All right. That hones it in for us. Thank you --

A. Yes, sir.

Q. All right. And so you then went to speak to Trinity about that?

A. No, sir, I did not.

Q. Tell me what you did, please, relative to Trinity?

A. I disseminated this information concerning Trinity Ingle in possession of a weapon and threatening these individuals to Detective Steve Cooley at the Hot Springs Police Department due to the fact that the jurisdiction of the crime was within their jurisdiction.

Q. Okay. All right. What next did you do relative to Trinity Ingle, please?

A. My next contact with Trinity Ingle following -- was contact him at the Brickey Unit of the Arkansas State Penitentiary.

Q. Now the Brickey Unit is over in West Memphis; is that right?

A. Yes, sir.
Q. West Memphis, Arkansas. And can you tell me when that was, please?
A. Yes, sir. Initial contact was on January 4, 1996. I had a subpoena for major case prints or palm prints and hair samples.
Q. Okay. And so you went there to get these palm prints and hair samples from Trinity?
A. I did.
Q. Okay. Did you get them yourself or did the technician do that for you?
A. Detective Cooley obtained samples.
Q. So you took Detective Cooley from Hot Springs over to West Memphis?
A. I did.
Q. Okay. And at that particular time, did you discuss with Trinity Ingle the need for you to have Trinity to go over and testify in front of the grand jury?
A. I do not recall. The grand jury was mentioned.
Q. Okay. Did you speak to Trinity about taking him over to Fort Smith?
A. I did not.
Q. Okay. Well, what did you talk to Trinity about there at Brickey Unit?
A. I pointed out to Mr. Ingle that it would be to his benefit to cooperate in this investigation at this time.

Q. Okay. And did you explain to him what that meant; cooperating, what it meant?
A. During the course of the conversation, I was talking to Mr. Ingle. I told him that it would be definitely to his benefit if he cooperated in the investigation for obvious reasons.
Q. Well, did you tell him how it was to his benefit or what would result of these benefits or if he cooperated?
A. I was not or in not the position to make any type of bargain with him. I just pointed out that it would be in his best interest.
Q. Oh, understand that you weren't in any position to bargain because that has to go through a number of different channels to ultimately get that resolved. But did you explain to him what might potentially happen if he cooperated?
A. No, sir.
Q. Okay. Didn't explain to him that a certain charge could be brought or a different charge or anything of that sort?
A. I did not.
Q. Did you speak of anything referencing carjacking?
A. If it was mentioned, I don't recall.
Q. Okay. Well, was Trinity Ingle ultimately transported to Fort Smith, Arkansas?
A. He was.
Q. How soon after your seeing him at the Brickey Unit was he transported to the Fort Smith, Arkansas area?

A. I re-contacted Mr. Ingle at the Brickey Unit on January 29 of 1996, at which time he signed a waiver allowing him to be transported from custody of the Arkansas State Penitentiary to the Western District, Fort Smith, Arkansas.
Q. Okay, thank you. On the 4th of January, 1996, you were actually eyeball to eyeball with Trinity Ingle; is that right?
A. We are.
Q. On the 29th of January, 1996, are you in his presence at that particular time?
A. Yes.
Q. At the Brickey Unit?
A. Yes, sir.
Q. Okay. Between the 4th of January and the 29th of January, had you had any other contact with Trinity Ingle?
A. No.
Q. Okay. Tell us what happened on the 29th of January, 1996, between you and Trinity Ingle?
A. I contacted Mr. Ingle at the Brickey Unit, at which time he was furnished a waiver form.
Q. Okay. What was your purpose for contacting him that day?
A. To have him sign the form which allowed him to testify before a federal grand jury in Fort Smith, Arkansas.
Q. Okay. So that was the time you talked to him about testifying in front of the grand jury?
A. It was on the form, yes.

Q. Okay. Well, did you explain the form to him?
A. I went over the form with him. He stated that he understood it, he signed it and that was it.
Q. Okay. So he understood he was to be taken to testify in front of the grand jury?
A. Yes, sir.
Q. Relative to the charges that we have here?
A. Yes.
Q. And at that particular time, he hadn't been charged with the crimes that bring you here today; is that correct?
A. He had not.
Q. Okay. At that time, he was just sitting in jail on some state charges, revocation of some state charges; is that correct? Or parole violation, I guess?
A. He was in on state charges.
Q. Okay. At that particular time when Trinity Ingle had agreed to come over to the Fort Smith area and testify in front of a grand jury, did you make Trinity aware of the fact that he, in fact, might be a suspect in this case?
A. He was aware that he was a suspect in this matter.
Q. I presume from your previous contacts with him. I guess my question wasn't very clear. Did you re-emphasize that issue with him again when you had him sign this statement saying that he'll go to Fort Smith, talk to the grand jury?
A. I don't recall doing that. Other than going over the form

itself, there was no exchange of any other type. I don't recall any questions that Mr. Ingle had at that time.

Q. Okay. Did you remind him that it might be better if he cooperated with the Government?

A. That was the overall impression I made with him on the previous contact and I'm sure that's the impression I wanted him to have.

Q. Did you renew that impression on the 29th of January?

A. I don't recall specifically.

Q. Okay. As you told us that on the 4th, you explained to him that things might go a little easily -- On the 29th of January, did you speak with specificity to Trinity what might happen?

A. No, I did not.

Q. Okay. After the 29th, Trinity signed this statement saying he'd go to Fort Smith and talk to the grand jury, tell us what happens next, please?

A. He is transported from the Brickey Unit to Fort Smith.

Q. That day?

A. I don't know the date.

Q. Thank you. Do you know the date that he, in fact, gets to Fort Smith?

A. I do not know the date.

Q. Okay. When he gets to Fort Smith, he's put into the Crawford County Detention Facility; is that correct?

A. Yes.

Q. All right. As relates to your involvement with Trinity Ingle, can you tell us what happens next in this investigation?
A. Mr. Ingle was appointed counsel at Fort Smith. I contacted him on February 27th at Fort Smith, at which time he stated that he didn't want to make any statements relative to this investigation. That was my last contact with him.
Q. Okay, thank you. And that was after he was appointed counsel?
A. It was.
Q. And he was appointed counsel there in Fort Smith as a result of what?
A. As a result of his signing the waiver to appear before the grand jury. Counsel was appointed for him to consult with.
Q. Okay. Because he was a potential suspect, I believe; is that correct?
A. Yes.
Q. So after the 27th of February, Trinity had made it known to you that after having spoken to counsel, he wasn't going to testify in front of the grand jury?
A. Yes.
Q. All right. After that, what is your next involvement in the investigation of Mr. Trinity Ingle?
A. I received information from our Fort Smith resident agency from Special Agent Maddalena that he was contacted by an individual who was incarcerated in the Crawford County Jail, who had

information concerning a murder in a park.
Q. Okay?
A. And that he was in contact with Mr. Ingle.
Q. When were you contacted by Special Agent Maddalena, please?
A. In early April of 1996.
Q. All right. So what we have, then -- After Trinity explained to you on the 27th of February he can't talk to the grand jury, he's still in the Crawford County facility in early April?
A. Yes.
Q. Okay. Can you help us understand why was he not transported back to the Brickey Unit?
A. I have no idea.
Q. Okay. Was Trinity Ingle ultimately transported back to the Brickey Unit?
A. It's my understanding he was.
Q. And do you know the date that happened, please?
A. No.
Q. Okay. Agent Ross, as you do your investigations and move forward and try to find suspects and get witnesses to follow your leads and such, you often make conclusions and assumptions as to people's involvement; is that correct?
A. Would you explain assumptions?
Q. Sure. I'll be glad to clarify that; thank you. For example, as relates to Trinity Ingle, okay, and I'm just going to ask, just flat out: Did you ever tell Trinity that if he'd

cooperate, you'd get carjacking after the fact for him?
A. I don't remember making that statement.
Q. Okay. Are you telling me you didn't make it or you possibly could have made it?
A. During my April or January contact, initial contact when the hair samples were obtained, I explored several different possibilities with Mr. Ingle concerning different charges that he ought to consider this. I use as investigative aid of operating on the information I have received from people interviewed that he was a participant in the murder of Mr. Williams and I was talking to him, attempting to solve the murder and bring proper charges.
Q. And what potential charges did you tell him were there?
A. There were several different charges. Something to the effect that he ought to consider cooperating and I didn't offer him any particular type things, just as an interviewing technique, to minimize his participation in the murder.
Q. Okay. Did you ever explain to Trinity Ingle that you thought that his involvement in the murder was less than that of Jeffrey Paul?
A. At the time I talked to Mr. Ingle, again, attempting to solicit his cooperation, and he was being made aware that if he cooperated, it would indicate that possibly he was less involved in the murder than the other individual.
Q. Well, were you trying to manipulate him or did you lie to

him?

A. I did not lie to him.

BY MR. DEPPER: May I have a moment with co-counsel, judge?

BY THE COURT: Certainly.

BY MR. DEPPER: Thank you.

BY MR. DEPPER:

Q. The idea of having co-counsel, Agent Ross, is they listen and come back and tell me where, perhaps, I missed some points. As I asked you a moment ago whether or not you had tried to manipulate Trinity or did you lie to Trinity, let me ask you this in that regard: In this investigation, did you ever talk to Mary Ingle, Trinity's mother?

A. I did.

Q. Okay. And when you spoke to her, did you ever explain to her that Trinity wasn't as involved in this murder as Jeffrey Paul?

A. I pointed out to Mrs. Ingle that there's a possibility --

Q. Possibility that what, sir?

A. That he may have been less involved than the other individual.

Q. Okay. And you made a similar statement, I believe, to Mr. Charles Wilson; is that correct?

A. Mr. Wilson, Mr. Ingle's uncle?

Q. Uncle. Yes, sir?

TRIAL OF U.S. V. TRINITY EDWARD INGLE,
NO. 96-60023-001
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

**TESTIMONY OF TRINITY INGLE (EXCERPTED)**

or --

Q. Have you ever seen him with a --

A. Thirty-eight --

Q. -- .38 caliber weapon?

A. Yes.

Q. Have you ever seen him with a .357 weapon?

A. Yes.

BY MR. DEPPER: May I have a moment, Your Honor, with co-counsel?

BY THE COURT: Yes, you may.

BY MR. DEPPER: Thank you. [Pause] Thank you, Your Honor. At this time, we pass Mr. Ingle for cross-examination.

BY THE COURT: Cross, please?

CROSS-EXAMINATION

BY MR. SNYDER:

Q. Mr. Ingle, you were just asked about an incident that occurred on - you said - June the 8th at the Total Station?

A. I don't know the exact date. It was sometime around there.

Q. But isn't the fact it was June 15th?

A. I don't know the exact date. I remember the incident.

Q. And isn't it a fact that you pled guilty to possession of a firearm that arose out of that incident?

A. Yes.

Q. And you're telling this jury today that you didn't have a gun, you had a beer bottle?

A. There wasn't no gun there.
Q. But you pled guilty in circuit court to that charge?
A. I pled guilty to it, yes, for them to drop another charge, they said.
Q. So what did you do? You told the judge, "But, judge, I'm pleading guilty to a felony. I'm admitting I had a firearm," and that was a lie?
A. Yes.
Q. When were you convicted of burglary?
A. '94.
Q. July 15th?
A. I'm not the exact day. I just remember --
Q. And in addition to burglary, weren't you also convicted of another charge, a possession of a firearm, on the same date?
A. Yes.
Q. And then two months earlier, you were convicted of theft by receiving?
A. Yes.
Q. Don't you have another burglary conviction?
A. I can't remember. I think I had two at the same time --
Q. Isn't it a fact that you had five felony convictions within one year of Mr. Williams' murder?
A. I'm not sure. I think it was about four felonies. I can't remember.
Q. How old were you when you got your first felony conviction?

A. I was 18, I think.
Q. While you were in the Crawford County Detention Center on April 3, 1996, you had no idea Jonah Jones was wearing a tape recorder, did you?
A. No.
Q. When did you find out he was wearing a tape recorder and your conversation with he and Derrick Bell had been taped?
A. I didn't find out for some time. I'd say about five, six months later.
Q. Okay. And I'm sure you've seen a written transcript of that tape, haven't you?
A. Yeah.
Q. And I'm sure you've also listened to the tape?
A. Yes, sir.
Q. When did you have an opportunity to get a hold of a written transcript of that tape?
A. Well, I just got a transcript, I believe, about two months ago.
Q. So at the least, you've had two months to sit wherever you're sitting and read that transcript and prepare yourself to come in here and talk to the jury, haven't you?
A. I've had that much time but I haven't read it. I read half of it and it's been in my property.
Q. You're telling this jury today that you're facing capital murder and there is a transcript of a conversation by two indi-

TRIAL OF U.S. V. TRINITY EDWARD INGLE,
NO. 96-60023-001
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

# GOVERNMENT GUILT-INNOCENCE CLOSING ARGUMENT

Snyder, please. Go.

BY MR. SNYDER: May it please the Court? Ladies and gentlemen?

First thing I want to do right now is thank you for the attention you've shown throughout the course of this trial. I've noticed it, Mark Webb has noticed it and we really appreciate it because you have paid attention to this case and again, as I say, we really appreciate it.

I want to start out talking about the June 15 incident at the Total Gas Station, and that's the incident that Jason Ratliff and Stephanie Miller talked to you about. And they talked to you that around -- I think it was around 11, 11:30 at night, they went to the Total Station to get some refreshments and go back and watch a movie. While they were at the Total Station, they saw the defendant. And what did they say happened when they saw the defendant, Trint Ingle? An argument ensued. He told somebody in the other car to get his strap or his gat, and Trint Ingle pulled out a gun and he pointed it at them. And Stephanie Miller told you that she started to walk back very slowly; thought she was going to be shot.

They left the parking area as fast as they could and they went back to the movie theater, and the defendant - according to Stephanie Miller - chased them.

Now when the defendant testified, he told you, hey, I didn't pull out a gun. I pulled out my trusty beer bottle. The defen-

dant admitted that he pled guilty in circuit court to a firearms violation that arose out of that confrontation at the Total Station. And then he told you from that witness stand that he didn't do it, he didn't have a gun. And then he told you from that witness stand that he lied to the circuit judge.

And I submit, ladies and gentlemen, if Trinity Edward Ingle would sit on that witness stand and take an oath and tell you he lied to a circuit judge, he would lie to you.

The facts in this case that have shown the morning of June 22, 1995, Sherman Williams went through his normal routine; he bought a newspapers; he went to the Pancake House; he ate bacon and eggs; he went home to change his clothes. And what was the defendant and Jeff Paul doing that morning? I'll tell you exactly what they were doing. They were planning the robbery. They were wearing their long sleeve flannel shirts and they had guns stuck down in their belts, just like the time Chris Rogers told you he saw them on June 15 when they were wearing flannel shirts and Trint Ingle pulled his shirt up and Chris Rogers saw the butt of a gun in his belt. That was one week prior to the murder.

So on June 15, Jason Paul drops Trint Ingle and Jeff Paul downtown by Monty's Pawn Shop. They proceed down to the national park. They walk down Fountain Street and they stake out a parking lot.

And who are they looking for? Somebody easy, somebody

vulnerable -- an 82 year old man who's all alone. And what did Trint Ingle and Jeff Paul do when they saw Sherman Williams pull up in a brand new shiny 1995 Olds Delta 88? He was their man. He was their target. He was all alone. He was all alone in the national park, he was all alone in the woods, he was all alone on Hot Springs Mountain. And Jeff Paul and Trint Ingle followed Sherman Williams up that mountain until he was alone.

They walked up to an 82 year old man. They asked him for the time and when that 82 year old man looked at his watch and wasn't looking, what did they do? They hit him in the head and they knocked him down and they kicked him and they kicked him.

Mr. Williams told them they shouldn't be doing things like this -- let me go, I won't tell anybody, just let me go. And what did they do? Did they let him go? Did they take his money? No. Jeff Paul went down to Mr. Williams' car in that parking lot because they knew exactly where to go. They had the keys, they got in his car, and they got a roll of duct tape. And they brought that duct tape up the mountain and they taped him up, according to Trint Ingle, execution style; hands behind the back, feet together, and they taped his mouth shut, and then they took his money.

They gave him instructions not to say anything -- don't look, don't turn around, don't look at us. They pulled a hat down over Mr. Williams' eyes, told him not to peek. Trint Ingle looked back at Mr. Williams and what did he see? Mr. Williams

was peeking over the top of his hat.

At that point in time, they decided -- we'd better get rid of the evidence. They walked back to that old man, they put a gun to the back of his head, and they pulled the trigger. Mr. Williams, who was taped up, couldn't run. His arms were behind his back; he couldn't defend himself. In fact, ladies and gentlemen, he couldn't even scream.

After Mr. Williams was murdered, they dragged his body into the woods, they throw him in some leaves, they covered his legs up with some pieces of wood, and they went joyriding.

The first place they went, you heard, was Jason Paul's home. They picked him up and they went out and ate Frito chili pies right after they went to see Chris Rogers.

After they ate their Frito chili pies, they went over to see Rebecca Pingle. You've heard all these witnesses testify. All of them have identified the car. All of them have looked at the photograph of the car and they say, "We don't know for sure that's the car but boy, it sure looks like it." You've got Chris Rogers, you've got Jason Paul, you've got Rebecca Pingle, and you've got Don Roberts. And Don Roberts said that he saw the defendant in that oldsmobile right by Central Avenue.

You've all heard the testimony about how Mr. Williams' body was found by a hiker. It was taken to the state crime laboratory where it was identified through dental records. And Dr. Kokes told you that the manner of death was a homicide, and he ex-

plained that to you -- how the bullet went through; he explained the entrance path and the exit path. And Dr. Kokes also found pellets in the left part of the victim's chest.

And Berwin Monroe, who's a firearms expert, told you that those pellets were Number 9 shot which could have been fired from either a .357 or a .38. Berwin Monroe also told you that based upon the diameter of the entrance hole in the victim's skull, which I think he said was, like, 5/15ths or 6/15ths or something like that, would have come from a .38 slug.

Now two days after the murder, the testimony shows that Jeff Paul told Chris Rogers what had happened on the mountain. During the cross-examination by defense counsel of Chris Rogers, defense counsel drew out testimony from Chris Rogers wherein Chris Rogers said, "Jeff Paul told me, 'We went up on the mountain, Trint Ingle and me. We were gonna do a robbery, Trint Ingle and me. Trint was with me. We robbed the old man. We both shot the old man. We threw his body in the bushes, and he was taped up.'"

This is testimony the defense brought themselves. The defense brought out testimony that Jeff Paul made a statement that he and Trinity Ingle were involved in the murder. Now if Jeff Paul would make a statement which would implicate him in a potential capital murder case involving the death penalty, why in the world wouldn't he name the person who was with him?

He did name the person who was with him, ladies and gentlemen. It was Trinity Ingle. It wasn't Jason Paul. Jason Paul

has nothing to do with this murder.

You've heard testimony that in late March, early April 1996, the defendant, Derrick Bell, and Jonah Jones were at the Crawford County Detention Center. Derrick Bell was the first individual who met the defendant, Trinity Ingle, and they struck up a friendship.

Now who is Derrick Bell? Derrick Bell was in jail for a few months. Derrick Bell was in jail because he got a few unemployment checks he shouldn't have gotten -- he kept them and he pled guilty. He admitted he did it. He also admitted he took some money from a cash register that he shouldn't have taken.

Derrick Bell was granted executive clemency by the Governor of the State of Arkansas. Derrick Bell, at this point, right now, today, is an assistant manager at a Kroger Grocery Store. Derrick Bell told you that he had four to five conversations with Trint Ingle in jail before the tape was made, and Derrick Bell told you that during those conversations, the defendant told him about a murder that he, Trint Ingle, had participated in in the national park.

And during that conversation, Trint Ingle told Derrick Bell that they had approached the old man; that the old man told Trint Ingle that he and his partner shouldn't be doing things like robbing; he explained when the old man refused to hand over his billfold, he was dropped down, knocked down -- and these are things that Trint Ingle is telling Derrick Bell that he did, not

that Bob did, Andy. These are things that he did, that he and his partner did.

He told him that after they got the old man's billfold, they started walking off, and this was before the tape was made. He said they suddenly realized that the old man could recognize them because they weren't wearing masks. And he explained at that point, they walked back to the old man and they shot him. He talked. He explained to Derrick Bell how they got the car; the fact they went back to the car after they had shot the old man. He explained about the duct tape. He explained how his hands were tied behind his back execution style. He explained how the old man's feet and mouth were taped, and he explained that the old man was, "Shot in the dome" which to Mr. Bell, meant the head.

He explained how they had dragged the body off. He explained how the body was covered up with leaves. He explained how they went "joyriding," and he also told Derrick Bell that they had pushed the old man's car over a cliff.

And ladies and gentlemen, where was the victim's car found? It was found pushed over a cliff.

The defendant described Mr. Williams' car as new, big, shiny and gold. And I asked Derrick Bell that during these four or five conversations when the defendant is telling you about all these horrible things that occurred, how did he act? What did he do? What was his reaction? And Derrick Bell sat there from that

witness stand and he told you that Trint Ingle laughed. When he described the murder, he laughed.

In late March and early April, I told you that Jonah Jones also met the defendant, Trint Ingle. He had one brief conversation and then, of course, we know about the taped conversation. And again, during these conversations, Trinity Ingle again reiterated the same thing to Jonah Jones that he had previously told Derrick Bell about the murder, about the fact they were looking for somebody to rob, they weren't looking for anybody in particular but an easy target. They found their target and they robbed him.

And ladies and gentlemen, you've heard that on April 3, 1996 a tape was made of a conversation between Jonah Jones, Derrick Bell and Trint Ingle.

The defendant himself told you that when that tape was being made, he didn't know he was being taped. He had no idea that his friend, Jonah Jones, and his friend, Derrick Bell, were recording his conversation for the FBI. So his conversation at that point was unguarded. He was talking open and he was talking freely. He wasn't worried about what he was saying -- he thought he was among friends. The door was closed and they were alone, just the three of them, in that room.

And ladies and gentlemen, I submit that the defendant remembers all of the details that we played to you that are on that tape not because of a short conversation he had with Jeff

Paul in a motel room the night of the murder. I submit he knows all of the details that he told Jonah Jones and Derrick Bell about because he was there. He knows what happened, he knows who pulled the trigger. He knows it was in the daylight on a mountain in a tourist area with picnickers around.

What did Trinity Ingle tell Derrick Bell and Jonah Jones about the murder itself? Jonah Jones said, "Did you both, both, both y'all shoot him or just your buddy? Did both y'all shoot him or just one of you?" And he said, "Bob and Andy did this. They both know the consequences and they both know what's gonna happen."

Jonah Jones says, "So you're saying, you're saying y'all did bust a cap in his ass but maybe y'all didn't -- I mean, just because y'all two was together, y'all two was together, right?" Ingle: "Bob and Andy, yeah. Uh-huh. Bob and Andy know they was up there in the park and they say pow, pow, pow, pow. See what I'm saying? Yeah. Whenever one did it, both did it."

Jonah Jones says, "That's why you all had to kill the dude, because you didn't have no face piece?" Ingle says, "Yeah."

Trinity Ingle says, "The dude ain't dead yet." Jones says, "He ain't dead?" Ingle says, "Oh, no. The dude I done shot, he dead." And Jones says, "Oh, yeah, he died." And Ingles says, "Yeah."

Jones says, "But you know, pretty much know that the old man is gonna be dead and that's the end of it." And Ingle says,

"Yeah, that's what I'm saying. Sometimes, you know, if it end of happening" - blank. Ingle: "I ain't did nothing. Shit happens. He wasn't nothing, nobody to me."

Jones goes on to say, "If he'd had his rag on, you all never would have had to kill him." Ingle: "Probably not, but hell, man, I mean, the spot where they did this crime at? The crime took place? I mean, you got tourists all down there." Jones: "Yeah?" Ingle: "Yeah, tourists all around."

And then Jones goes on to say, "Y'all killed him in the daytime?" Ingle says, "Yeah." "You killed him with the sun up?" "Yeah." Jones then says, "How did y'all shoot him in the daytime and nobody heard the gunshots?" Ingle: "The mother fuckers might have heard, the mother fuckers might not have," straight from Trinity Ingle's mouth. Jones: "He wanted you to shoot him first?" "Yeah. No, he was, he was wanting, at first he wanted me to shoot him first, yeah. At first, you know, he didn't even want to shoot him 'cause" -- Jones: "But he shot him first?" Ingle: "Bob did."

And when Jonah Jones testified, I asked Jonah Jones if Trinity Ingle made any motions or gestures when he said, "Bob did." And Jonah Jones testified under oath that when Trinity Ingle said "Bob did," he pointed to himself and said, "Bob did."

Jonah Jones talks about, "Instead of you shooting him first because you in jail and if something was to happen out there - Ingle shot him first - know what I'm saying?" And Ingle says,

"If this fool, he could say that but I can go and I'll say the same thing about him. You know what I mean? They can't, they can't prove neither one of us, right?"

Jonah Jones: "Now see, if you'd been in the city, if y'all would have been somewhere like, see, I'm from Dallas. If y'all would have been somewhere like Dallas and killed that MF" -- Ingle: "Yeah. Nothing would have ever became of it."

About the body: "How far did you all have to carry the body; a long way?" "No, not too far." "Y'all didn't have to carry it far?" "No, just by some trees and shit." Ingle: [sic] "Just, you know, in the dome? Yeah, in the dome?" Ingle: "Yeah. It wasn't bad or nothing, you know? 'Cause once that's through, you know, it's through."

What did Trint Ingle tell Jonah Jones and Derrick Bell about disguises? Jonah Jones asked him if he'd just had his rag on, "Y'all never probably would have had to kill that dude." Ingle: "Probably not. He would have, you know, he was talking about masking up." Jones: "Why didn't you buddy wear a mask?" Bell: "It happened so quick, huh?" Ingle: "Yeah, you know, you're already on that shit, man, and MF ain't really thinking?" Jones: "Yeah." "So, you know, we went out there and" - blank it. Jones: "And that's why y'all had to kill the dude, you didn't have no face piece?" Ingle: "Yeah. See, usually" -- Jones: "But your buddy didn't have a face piece?" "No." Jones: "But you had one?" Ingle: "Yeah, but I didn't wear it." Jones:

"Because your buddy didn't have one?" "Yeah." Ingle: "Bob didn't have nothing to put over his face and Andy said" - blank it - "you know? And then Bob says," - blank it - "pow, pow, pow, pow." Jones: "And y'all busted a cap in his ass?" Bell: "Mm-hmm." Jones: "The dude y'all was robbing saw your face, saw your buddy's, saw y'all's face?" Ingle: "Yeah, it's automatic time right there."

During that taped conversation, the defendant also talked about how the victim was tied up. He said, "Yeah, see anyway, now the MFs tied up. The MFs believing now. The MFs thinking." Derrick Bell asked him, "What did you do when you tied him up?" Jones: "Is that the way they found him, tied up?" Ingle: "Yeah. They said the newspaper stated they found a man tied up, covered up in some brushes."

During this tape, the defendant told Jones and Bell about how he hid the body. They asked him, "Did y'all have to carry him or did y'all put him in the car?" Ingle said, "We carried him." Jones says, "Y'all carried him, so there wasn't no blood in the car?" And Ingle says, "No. We just covered him up, walked down the trail, and got in the car, and took off."

And then, Mr. Ingle goes on, on this tape, to tell Bell and Jones about the fact that a hiker found him - some nature walker. During that tape, the defendant, during this conversation which he had no idea was being taped, also described the victim's car. He said, "It was clean, you know. It was a gold color. Looked

like it just came off a showroom. It was sweet. It was a nice car. You could sit over here, man, lock the doors, press those buttons, pop those door locks, all of them lock, pop the door open."

During this taped conversation, the defendant also pinpointed the location of the murder. "Hot Springs, it's federal, federal property. It's a national park. It's got the natural water, it sits -- Hot Springs sits in a canyon. It's got these natural springs and that makes it federal property." Jones: "Why is it fed?" Ingle: "'Cause it was supposed to happened on a federal reservation. It's federal ground, national park, Hot Springs."

Not only does the defendant tell Bell and Jones it was in the national park, he also explains to them the fact that it was on a mountain. Ingle says, "It's part of a mountain, you know? There's a little bit of trees and stuff around." And Jones says, "Well, is it way up in the air?" And Ingle says, "It wasn't that far, a little bit." And the testimony has been that the body was found about halfway up the side of Hot Springs Mountain.

Jones wonders, "Well, how did you shoot him in the daytime and nobody heard the gunshots?" And Ingle explains, "Hey, maybe they did, maybe they didn't." And then Jones says, "Well, is this woods?" And Ingle says, "Yeah, there's woods right there," he says, "where it happened, because it was on a mountain, you know. It happened on the mountain. Federal reservation."

And then they go on further to describe how if you commit a violation in a federal park, you go to the federal penitentiary.

Not only do we get the way the murder was committed, the location of the murder, the time of day of the murder and the fact it was on a mountain, we also get the date of the murder.

Jonah Jones asked the defendant, "Well, how long has it been since y'all blasted that fool? Ten months, you said?" And then they calculate. Ingle says, "Uh, let's see. This is March, ain't it?" Jones says, "No, this is April." And Jones says, "It's April 3." April 3, 1996. And then Trint Ingle says, "Around ten months." And he says, "Yeah, last summer."

Ladies and gentlemen, ten months from April of 1996 would be June of 1995, the month the murder was committed.

Now the proof is shown that Mr. Williams would have been on the mountain sometime that afternoon. Jason Paul testified that he dropped Trint Ingle and Jeff Paul, his brother, off downtown around noon.

Jonah Jones says, "Wait, with the" -- And Trint Ingle says, "With all the sun out." And Jones says, "You killed him with the sun up?" Ingle: "Uh-huh." Jones: "In a tourist place and nobody seen y'all?" Ingle: "Long as you go about it, do it the proper way. See, we didn't really do it the way we should have. You know, as long as it was still to the point where, you know, daytime, nighttime, it don't matter, man. Long as you do it proper." Jones: "You killed him in the daytime?" Ingle:

"Yeah."

And then Jonah Jones goes on to say, "So, the dude -- the dude was just in the wrong place at the wrong time?" And Trint Ingle says, "Yeah." He says -- Ingle goes on to say, "Sometimes, you know, if it end up happening, fuck it. I ain't did nothing. Shit happens. He wasn't nobody to me." Jones says, "Yeah, you say he was on the wrong federal ground at the wrong federal time?" Ingle, chuckling, "Yeah."

And I submit again, ladies and gentlemen, these are unguarded conversations by the defendant. The defendant thought he was among friends. He had no idea those conversations were being taped.

Now the defendant told you that he had a transcript of this tape at least two months prior to this trial, so the defendant has had an opportunity to sit down and read this transcript, listen to the tapes, and prepare his defense to the tape that was made without his knowledge. And I submit that's exactly what he has done. He sat down, he's gone over these tapes, and he has made up a story and he came in here and he told it to you.

Now I picked out at least 16 points of corroboration - there are a lot more - in what the defendant told Jones and Bell and what the proof actually shows. The defendant told Jones and Bell the victim was shot with rat shot, shot in different parts of the body. The proof has been, though the state medical examiner and the coroner, there was rat shot present in the body.

The defendant described to these two men what the defendant was wearing. The crime scene photographs clearly show that Mr. Williams was wearing shorts, a shirt, and then you could see the jogging shoes. And you saw the jogging shoes which were in the photograph the medical examiner took, which had duct tape wrapped tightly and firmly around his ankles.

He explained the location: it was in a wooded area, federal reservation. That was exactly right. It was a wood area, it was a federal reservation. He said they took the defendant's wallet. We found the defendant's wallet under a rock at Happy Hollow Springs, which is at the base of Hot Springs Mountain which is directly up the hill to scene where the body was found.

They talk about an old man, an older dude. Well, it was an old man. It was an older dude. It was Mr. Sherman Williams, an 82 year old retiree from the Farmers Home Administration.

They explained about asking for the time. Both Chris Rogers said Jeff Paul told him they asked the old man for the time. Trint Ingle, on the tape, talks about asking the old man for the time, and Trint Ingle told Derrick Bell, independently of the tape, they asked the old man for the time. The medical examiner testified that when he did the autopsy of Sherman Williams, Mr. Williams was wearing a watch which was functional and showed the correct time and date.

They talked about hitting the victim. Chris Rogers testified that Jeff Paul told him the victim was struck. The tapes

reflect the victim was struck, and Trint Ingle told both Jonah Jones and Derrick Bell the victim was struck.

The defendant told Derrick Bell that the victim wouldn't cooperate when he demanded his money. And on the April tape, he was asked -- Mr. Ingles stated: "First, you know, he won't act right. He was, like, trying to throw a guilt trip on me." Well, I submit that's probably the truth because in order to get him to cooperate, Mr. Williams was bound and gagged - and that's the way the body was found - to get him to cooperate, to get him to be thinking, and to get him to be believing.

On the tape, Mr. Ingle talks about, "We started walking," and he talks in vulgar terms about, "No," - blank - "that country" - blank. And this all ties in with what the defendant told Jones and Bell, again, independent of the tape.

Jeff Paul told Chris Rogers the old man was shot. The defendant told Jones and Bell the old man was shot, and you could hear on the tape how the defendant re-enacts the shooting. How many times do you hear, "Pow, pow, pow, pow"?

Not only does the defendant state he was shot, he even adds some sound effects and he says, "Bob, you know, they say" - blank - "it. Pow, pow, pow, pow." "Both of y'all shoot him or just one of y'all?" "Bob and Andy both did this. Um-hum, you know, pow, pow, pow, pow. See, whenever Bob" - [sound of cocking gun] - "Um-hum, whenever Bob" - [sound of cocking gun] - "Andy automatically pow, pow, you know? They work together."

The defendant told Derrick Bell the old man was covered up with leaves after he was shot. On the tape, it's clear the defendant told both people on the tape they threw him in some brushes and they covered him up.

He talks about the murder on the mountain numerous times and, ladies and gentlemen, the murder was, in fact, on a mountain. He told them they dumped the car off the cliff and you know where the car was found? Pushed over a cliff, off of Mill Creek Road.

Then we get to the time of death, and these are all things that the defendant told these individuals which corroborated. The time of death; he said it was ten months ago. It was ten months ago. He said it was in the daytime. The murder had to have been in the daytime.

Ladies and gentlemen, with respect to Count 1 of the indictment, Judge Hendren has told you that we must prove, Number 1, the act or acts of killing Sherman Williams without justification; and Number 2, the act was done with malice aforethought; and three, the act of killing was done in the perpetration of a robbery.

With respect to the first element, it's crystal clear that there was absolutely no justification for the murder of Sherman Williams. The tape reflects that Mr. Williams was killed in order to prevent him from identifying his assailants and his robbers. Jonah Jones asked the defendant, "You mean, you would-

n't have shot him if y'all been masked up?" "No." He told Derrick Bell and Jonah Jones that they gave Mr. Williams explicit instructions not to turn around and look at them and when he did, they went back and they got rid of the evidence.

Mr. Jones said, "So the dude y'all was robbing saw your face, saw y'all's faces?" And what did Trinity Ingle say? "Yeah. You know, it's automatic time right there." And then he says, "Did y'all shoot him or just one of y'all?" And he says, "Bob and Andy did this; killed the dude because of no face piece." Trint Ingle says, "Oh, no, the dude. I done shot. He dead." Jones: "If he'd had his rag on, y'all never would have had to kill him?" "Probably not."

Talk about who heard? Well, somebody may, somebody might not have. Bob did this.

The reason Mr. Williams was murdered was to prevent him from identifying the defendants. Mr. Williams pleaded with them before they killed him and I imagine he had a pretty good idea of what was coming, being up on that mountain all alone with two people with guns pointed at you. He must have known what was coming because he pleaded with them -- "If y'all just let me go, I won't tell anybody. Just let me go."

Well, I can imagine what was going through his mind right then. I can especially imagine what was going through his mind when he saw that roll of duct tape come up the mountain. And I can especially imagine what was going through his mind when he

started getting his hands and his feet taped. I can really feel what was going through his mind when they started walking back.

There was no legal justification for the murder of Sherman Williams.

The second element that we're required to prove; that this murder was committed with malice aforethought. You heard Judge Hendren explain to you, you can consider such things which shed light upon the heart and mind of the killer at the time before, during, and after the deed. Sherman Williams was murdered for the few dollars he had in his pockets. Before Sherman Williams was murdered, he said, "Just let me go." He promised, "If you let me go, I won't tell anybody."

What sheds more light on the heart and mind of a killer than when that killer is describing to you what he did to this man on the mountain and he laughs, thinks it's funny. Shooting an old man - who was tied up - in the head, humors him.

He even talks about Mr. Williams trying to throw a guilt trip on him. And he says, "Bob and Andy both did this. They know the consequences and they know what's gonna happen. You know, you set out to do something, man, you just do it and that's it. You've got your mind focused on that one thing, and you're gonna do that one thing no matter what happened." And Jonah Jones says, "So he was just in the wrong place at the wrong time, huh?" "Yeah."

And Mr. Ingle says, "Sometimes, you know, if it end up

happening, it end up happening. I ain't done nothing. He wasn't nothing. He was nobody to me."

Not only does he go that far, but he talks about, "It's okay as long as you do it the proper way." And you know what? Apparently, he was maybe a little upset with himself because maybe he didn't think he did it totally proper. I don't know what in the world more you could have done to that poor old man. Mr. Ingle says, "You know," and then he starts to explain about doing it proper. Then he goes on to say, "Long as you do it proper, you don't have to worry yourself about it."

Ladies and gentlemen, I would submit that what they did in those statements certainly show his heart and soul when it comes to that murder. "He was nothing. He was nobody to me."

The third element that we must prove was the killing was done in the perpetration of a robbery. Now the whole purpose for following Mr. Williams up that mountain was to rob him. They picked out a target. They were going to get whatever money he had, take his car, and split. So they went up the mountain, robbed him, took his money, took his keys, took his car. His billfold was found under a rock. It was easy to figure out who it belonged to; it had his drivers license in it, had his ID in it. Wasn't any money in it.

So during the April 3 tape, Jonah Jones says, "Well, how much money did he have?" Then Trint Ingle says, "Just enough to get by for the day, man." And Jones says, "Well, did you get at

least a hundred?" "Yeah, we got a hundred."

Well, right after the murder, the evening after the murder, they went to eat, I guess they went to eat lunch, a late lunch, early dinner. Had Frito chili pies. Who paid? Trint Ingle and Jeff Paul paid. After they ate, went to see a few friends, got a motel room. Who paid? Trint Ingle and Jeff Paul paid. It was cash.

I submit, ladies and gentlemen, we have proved the third element and that was that this murder was done during, and during the course of the perpetration of a robbery, Mr. Williams was murdered during that robbery to keep him from talking.

With respect to Count 2 of the indictment, we've got to prove the defendant committed the crime of felony murder. And I submit - I've already explained to you - how we proved the defendant has committed a crime of felony murder; that is, they robbed the man, they killed the man, and they killed him with malice aforethought. That's the first element of Count 2.

The second element that we've got to prove is that the murder was committed, or during the crime, the defendant knowingly used a firearm. And ladies and gentlemen, that means that a firearm was available for him to use.

Now you've heard a lot of testimony from Dr. Kokes, from the defendant on the tape, what the defendant told our witnesses about the fact Mr. Williams was shot. There shouldn't be any doubt at all that a firearm was used in this homicide. Dr. Kokes

has told you, you know, it's an entry wound, exit wound caused by a gunshot.

I submit, ladies and gentlemen, that we have proved the second element of that crime in that a firearm was used during commission of a crime of violence.

Now Mr. Ingle, when he got up and testified, he told you that -- I didn't do this. Jason Paul and Jeff Paul did it. It wasn't me. I was out doing all these other things. You know, they showed up in a car. Yeah, I knew the car was stolen. No big deal. I wiped the car down to make sure they wouldn't find my fingerprints. Jeff told me he did a 187 -- I've never heard of a 187 in my life -- which to him meant Jeff went out and he killed a guy. Okay, you know, day to day activities. You know, they drove around in the car, stole the car. His fingerprints are in the car. Yeah, he'd expect them to be in the car because he was in the car. You know, I guess, and I said, "Well, were you a friend of Jason Paul and Jeff Paul?" "No, we weren't friends. No, I don't like them. Bad guys, bad guys. They're killers" --

I said, "Why in the world, if they weren't your friends, would Jeff Paul and Jason Paul sit down with you in a motel room a couple of hours after the murder and say, 'hey, Trint, guess what we did? We just did a 187. We just killed this old man up in the park.'"

I mean, to me, it seems a little strange that you're going

to murder a guy and then you're going to go tell, you know, a guy you don't even like. I said, "Why did they do that?" "Oh, that's unusual. We do that all the time." I said, "You mean, you sit around all the time and tell your friend or tell people you don't like about people you killed?" "Oh, yeah."

Well, I don't think anything could be further from the truth. To me, I mean, that's totally bizarre. But something I think even gets more bizarre is when the defendant meets with the FBI on July 4, July 7, July 11, two times in January and one time in February --

BY COURTROOM DEPUTY: Ten minutes, Mr. Snyder.

BY MR. SNYDER: Thank you -- and according to the defendant, he knows they're looking at him for this crime. Does he tell them? Does he say, "Hey, I can help you. I know who did it. Jeff Paul and Jason Paul did it and here's what they told me." No, he's not going to do that. You know why? He doesn't like the police. He doesn't trust them. He has an opportunity to tell Tom Ross, he has an opportunity to tell Detective O'Connell with the Hot Springs Police Department, and he has an opportunity to tell Jim O'Donnell with the Parks Service. Does he tell them? Nope. Doesn't tell a soul. The man is innocent. Charged with capital murder. "I'll keep my mouth shut. I'm not going to tell them what I really know."

Ladies and gentlemen, he is absolutely guilty. He didn't talk to them because he knew he was the target. What did he do

when Agent Ross went out and said I wanted to talk to you? He runs down the causeway. What happens when Agent Cooley saw him in the hamburger place? He runs across Central Avenue and hides in a shed. Is that normal behavior for an innocent man? No, it's not. That's behavior for a man who knows he is guilty and knows he has committed a very serious crime. That's reasonable behavior for a man who's running from the law, running from the police, and running from the authorities because he's committed a murder.

Ladies and gentlemen, I submit that we've done our job in presenting the evidence in this case through the witnesses who have testified and I submit they've done their job in taking their oath and getting on that witness stand and telling you what they knew and how they were involved.

And very soon, it will be your duty as sworn jurors in this case to go in the jury room and sit down and discuss the facts of this case and make a determination of what happened. That's your job.

And ladies and gentlemen, I have all the confidence that when you go back in that jury room and you look at the exhibits and you weigh the evidence and you see who has the most to lose by not telling you the truth, you will make a determination. You remember that. Who has the most to lose by getting on that witness stand and telling you a story?

I have all the confidence that you will be able to return

verdicts of guilty against the defendant, Trinity Edward Ingle, for the murder of Sherman Williams.

Thank you.

BY THE COURT: Thank you, Mr. Snyder. All right. Ladies and gentlemen, we've been out here 52 minutes. Does anybody need to make phone calls -- Okay. All right.

We anticipate -- let me see what my calculations are. I think we're looking at another, at least, probably an hour, 30 minutes to an hour. Has anybody got a problem with that? I realize it's an inconvenience but I really would like to ask your indulgence to see if we can get these arguments in.

Let me emphasize this is an important thing and I know that you've been here all day and that we want you to be attentive -- and that's why we're going to take these breaks. If there's anybody that can't stay with us, let me know - it's important.

Okay. Let's take a recess and let's work it about a ten to 15 minute frame work and anybody that needs to make a phone call, please come back and we'll certainly try to do that.

We'll be in recess.

[Recess taken at 4:44 p.m. - Jury Not Present]

[Open Court - 5 o'clock p.m. - Jury Present]

BY THE COURT: All right. All right. Mr. Depper, please?

BY MR. DEPPER: May it please the Court, Your Honor? Mr. Snyder, Mr. Webb, ladies and gentlemen of the jury: I, too,

TRIAL OF U.S. V. TRINITY EDWARD INGLE,
NO. 96-60023-001
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

# GOVERNMENT SENTENCING OPENING ARGUMENT

my final instructions and proposed verdict forms.

All right. Now ladies and gentlemen, I think I told you last night that the attorneys have asked for opening statements for no more than 45 minutes each. We are not sure that they will use that much, but they will have that opportunity if they desire to do so.

So we'll first hear from the Government for no more that 45 minutes, please, Mr. Snyder.

BY MR. SNYDER: May it please the Court, ladies and gentlemen. As Judge Hendren told you, in order for you to return a verdict pronouncing the death penalty against the defendant, Trinity Ingle, there are certain aggravating factors that we've got to prove beyond a reasonable doubt, and these are factors that have been passed by Congress and they are part of the law of the United States.

Now the first aggravating factor that we have to prove is that the defendant intentionally aided and abided in the killing of Sherman Williams. That's the first statutory aggravating factor we have got to prove.

Secondly, we have to prove that at least one of the following three factors beyond a reasonable doubt. The first of those three factors is heinous, cruel or depraved manor of committing the offense. And that means that the defendant committed the offense in an especially heinous, cruel and depraved manor in that it involved torture and serious physical abuse to Sherman

Williams.

The second of those three factors is pecuniary gain; in other words, the defendant committed the offense expecting to get something of pecuniary value, such as money or the car.

The third aggravating factor is vulnerability of the victim, and that is that the victim of this crime was particularly vulnerable due to old age. We have to prove at least one of those three factors beyond a reasonable doubt.

Now if you find that we have proved the first factor, which is the defendant was intentionally killed, and if you find one of the three factors which I just read to you which are heinous and cruel, pecuniary gain or vulnerability of the victim, then you can also consider additional factors which may assist you in determining whether or not to assess the death penalty. And those additional factors are future dangerousness of the defendant and victim impact evidence, which will come from the daughters of the victim and another individual who worked closely with Mr. Williams at the Farmers Home Administration over a great number of years.

With respect to victim impact statement, you will hear how the death of Mr. Williams directly affected and impacted on his family, how it's affected their lives.

Now ladies and gentlemen, with respect to the first element or the first factor I read you, which was Mr. Williams was intentionally killed; the other three factors which are heinous,

cruel, depraved manner, pecuniary gain and vulnerability of the victim.

We are, in part, going to rely on what we have already proved in the first phase of the trial and you can consider that evidence in determining whether or not we have proved the aggravating factors. What I am telling you is we don't have to retry the whole case. You can rely on what's already been proved with respect to those factors. But we do intend on presenting some additional evidence to you in this phase on those issues, which wasn't presented in the guilt phase.

And the evidence, the additional evidence that we're going to present on the heinous nature of the crime, pecuniary gain, vulnerability of the victim and intentional killing is going to be in the form of a tape. And we intend on playing additional portions of the conversation between the defendant and Jonah Jones and Trinity Ingle - excuse me - and Derrick Bell that we didn't play at the guilt phase. And we feel that when you hear these additional statements, that we hope that will give you some guidance on whether or not we have proved our aggravating factors.

We also intend on introducing certified copies of the defendant's prior convictions, which will show that the defendant had five felony convictions within 13 months of the murder. His felony convictions include one conviction for theft; two convictions for burglary; and two firearms convictions, all within

thirteen months of the murder.

And as I stated earlier, Carol Sherman will testify and Mary Ann McKuin will testify and they are the daughters of the victim, Sherman Williams.

Lawrence McCullough will testify. Mr. McCullough is currently with the Farmers Home Administration and he will tell you about certain things that Mr. Williams did during his career with the Farmers Home, and how Mr. Williams impacted on the lives of hundreds and thousands of people in the state of Arkansas through his work with the Farmers Home Administration.

I don't plan on taking 45 minutes. That's all I have to say and I would thank you for the attention I know you're going to show throughout the course of these proceedings.

Thank you very much.

BY THE COURT: All right. Thank you, Mr. Snyder. Ms. Compton?

BY MS. COMPTON: May it please the Court? Mr. Snyder, Mr. Webb?

Ladies and gentlemen of the jury. it has been so long sine you've heard from me. I would reintroduce myself to you at this time. I'm Cathy Compton, I practice law in El Dorado and I am extremely nervous as I stand before you today. I brought notes with me, which is something I don't usually do. I have not come up here today and if we are here tomorrow, I will not be here tomorrow to argue with you about your verdict or to challenge you

TRIAL OF U.S. V. TRINITY EDWARD INGLE,
NO. 96-60023-001
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

**TESTIMONY OF DERRICK BELL &**
**RECORDED STATEMENTOF TRINITY INGLE**

Garland County, Arkansas.

BY THE COURT: All right. Any objection to that?

BY MS. COMPTON: We have no objection.

BY THE COURT: Be received without objection. They are Plaintiff's 51, 52, and 53 be received.

[Whereupon, Government's Exhibits 51, 52 and 53 were received into evidence.]

BY MS. COMPTON: I'm sorry, Your Honor. What are the numbers?

BY THE COURT: Fifty-one, 52 and 53; is that right?

BY MR. SNYDER: Yes, sir.

BY THE COURT: Okay. I'm sorry, Mr. Snyder. Who? Who are you calling?

BY MR. SNYDER: Derrick Bell.

BY THE COURT: Come around. You've been sworn so I'll remind you you are still under oath. Please get back on the witness stand.

DERRICK BELL, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. SNYDER:

Q. Would you please state your name for the record?

A. Derrick Bell.

Q. Mr. Bell, let me show you that what has been marked as Government's Exhibit 55. I would ask you if you could tell me what that is?

A. It is a tape of the taped conversation between me, Ingle and Jones.
Q. Okay. Is that a portion of the two hour tape?
A. Yes, sir.
Q. Have you listened to that tape?
A. Yes, I have.
Q. Is that tape an accurate recording of the portion of the conversation that you had with defendant on April 3, 1996?
A. Yes, it is.
Q. Let me show you what has been marked as Government Exhibit 56. I ask if you can tell me what that is?
A. I believe it is a transcript of the taped conversation.
Q. Okay. Is that a transcript of the tape you have just identified?
A. Yes, it is.
Q. Have you read along on the transcript as the tape was played?
A. Yes, sir.
Q. And is the transcript true and accurate?
A. Yes, sir.
Q. Are the speaker identifications on the transcripts also accurate?
A. Yes, sir.

BY MR. SNYDER: Your Honor, at this time we would move to introduce Government's Exhibit 55 and request that it be

played to the jury and the transcripts be distributed to the jurors.

BY MS. COMPTON: Your Honor, our objection would be as it was stated in the earlier phase of this trial. That's under Rule 106. I understand what the Court's ruling is but we would like the record to reflect that we do object.

BY THE COURT: Very well. The objection will be overruled and again, we are in a different phase of the trial. Of course, the Rules of Evidence do not normally apply. I am going to overrule the objection. I am a bit puzzled here, now have you established, Mr. Snyder, that what you have dominated as Plaintiff's Exhibit Number 55 is an excerpt of what has been received into evidence in the first phase as Plaintiff's Number 47, which is the --

BY MR. SNYDER: Yes, sir.

BY THE COURT: Well, I am puzzled about that. Is 46 the complete tape and if that is so, what is 47? Is 47 a transcript?

BY MR. SNYDER: Forty-seven, Your Honor, are the cassette tapes that George Clark made in Washington D.C. These are the --

BY THE COURT: Well, my recollection is that Plaintiff's 48, which has not been received, was the transcript for the portion that was played during the first phase of this trial.

BY MR. SNYDER: Yes, sir.

BY THE COURT: Now what I am getting at, though, was not the portion played during the initial phase an excerpt from 46, which is the whole tape?

BY MR. SNYDER: That is correct.

BY THE COURT: So now are you saying that what you are offering as 55, is another portion of 46?

BY MR. SNYDER: Yes, sir.

BY THE COURT: And so the Plaintiff's 56; is it a transcript of the portion that you want to play?

BY MR. SNYDER: Yes, sir.

BY THE COURT: All right. Very well. All right. The objection to the defense to Plaintiff's Number 55 will be over-ruled and will be received into evidence in this phase of the trial.

[Whereupon, Government's Exhibit 55 was received into evidence.]

BY THE COURT: I don't know that you are offering 56 but I am going to --

BY MR. SNYDER: No, sir.

BY THE COURT: Okay, 56 will not be offered. It will be permitted to be distributed to the jury and used in the same fashion as it was in the initial phase.

BY MS. COMPTON: I neglected to say that our previous Motion to Suppress would also be renewed at this time.

BY THE COURT: Very well. Well, we'll deny that for

the same reason as previously stated.

Ladies and gentlemen, I will call -- You want go ahead and make those -- Are you going to play that now?

BY MR. SNYDER: Yes, sir.

BY THE COURT: All right. Go ahead and distribute your transcripts.

Ladies and gentlemen of the jury, I remind you of the instruction that I gave you in the first phase of this trial with respect to these transcripts, which are now being distributed to you. I will not repeat that instruction verbatim but let me emphasize that the transcript that you are given is not evidence. The evidence that has been received is in the form of a tape recording which you will be able to hear through the headphones that are now being distributed to you. The transcript is only offered to you as an aid to help you follow and understand, hopefully, what you are hearing. To the extent what you hear may be different from what the transcript shows, you will disregard the transcript because as I said, the transcript is not evidence; it is what you hear that is the evidence. So let us keep that in mind, please, and the transcript will be taken back up and re-called whenever this matter is completed.

All right. Are you ready to proceed then? Okay, thank you. Counsel, do we have the same stipulation with respect to Ms. Hubbs' duties on taking it? We're not going to ask her to copy this as it is played. Is that agreeable with the Government?

BY MR. SNYDER: Yes, sir.

BY THE COURT: Is that agreeable to the defense?

BY MR. DEPPER: That is agreeable to the defense.

BY THE COURT: All right, very well, same stipulations. Again, ladies and gentlemen of the jury, I guess we'll have a check here, but if you cannot hear, raise your hand to so indicate and we will make sure the jury will hear whatever is going to be played. Are you ready to proceed?

BY MR. SNYDER: Yes, sir.

BY THE COURT: All right. Okay, let us proceed. All right, hold it. You are not getting it?

BY UNIDENTIFIED SPEAKER: Everybody needs to turn them on. Sorry.

BY THE COURT: All right. Go back to the front and start over.

[At this time, the cassette tape admitted into evidence as Government's Exhibit 55 was played for the jury as follows:]

"INGLE: Andy and Bob, they, you know, did this for some money, you know? Bob said, you know, can't be having no more of this shit, man, we both on parole and, and we can't be having none of this shit here you know, and--- pow, pow, pow, pow,---

"JONES: The dude, the dude y'all was robbing saw your face? Saw your buddy's, saw y'all's face?

"INGLE: Yeah, so, you know, it's, it's automatic time right

there.

"Bob didn't have nothing to put over his face.

"JONES: Uh-huh.

"INGLE: And Andy did. Andy said, "Fuck it," you know? And, uh --

"JONES: Mm-hmm.

"INGLE: And then Bob, you know, then, they say, "Fuck it." Pow, pow, pow, pow!

"JONES: And y'all busted a cap in his ass?

"BELL: Mm-hmm.

"INGLE: Yeah.

"JONES: Was he a young dude?

"INGLE: Older dude.

"The mother fuckers, it's, it's just like, okay, I had a case back in what, '90, '94, when I -- right before I first got sentenced.

"JONES: Mm-hmm.

"INGLE: And the one dude tried to, you know, (unintelligible). (Making sound of a gunshot) You know, we was over there robbing him at the motel.

"JONES: Mm-hmm.

"INGLE: We was getting blowed, just like the 4th of July. Mother fuckers had a big party, a big party. Everybody hooked up. So you know, we're gonna hit this hotel and they scoped it out.

"JONES: Mm-hmm, hell, yeah. (Unintelligible)
"INGLE: Mn-hmm.
"JONES: Mother fucker be having them floor vaults.
"INGLE: Mn-hmm. Big mother fucker looked back (Unintelligible) was coming through the back just like planned. Mm-hmm. Mother fucker come out, come out the door with (unintelligible) and shit, (unintelligible), and that son of a bitch saw me coming out.
"JONES: Yeah.
"INGLE: (Unintelligible)
"JONES: Mm-hmm.
"INGLE: (Unintelligible). I've got a 12-gauge (unintelligible) --
"JONES: Mm-hmm.
"INGLE: (Unintelligible) (Making noises of shooting), takes off running, you know? Boom! You know, and it's just--
"JONES: Busted him in his ass?
"INGLE: Yeah, I shot him. I shot his leg.
"JONES: Did he get away?
"INGLE: Yeah, yeah, we got away (unintelligible).
"JONES: Did he get away?
"INGLE: Yeah, he did.
"JONES: And you busted him?
"INGLE: Yeah, I just shot his leg.
"JONES: Did both of y'all shoot him or just one of y'all?

"INGLE: Bob and Andy both did this.
"JONES: Oh.
"INGLE: They, they know, they both know, they both know the consequences --
"JONES: Mm-hmm.
"INGLE: -- and they both know what's gonna happen.
"JONES: Mm-hmm.
"INGLE: So can't neither one of 'em say, fuck this and this, that he did it, I did, ya know?
"BELL: What'd ya do with him when ya tied him up?
"JONES: Is that the way they found him? Tied up?
"INGLE: Yeah. They said, the newspaper stated they found a man tied up covered up in some brushes.
"Yeah, see, if me and you go to, say me and you go out somewhere --
"BELL: Mm-hmm.
"INGLE: -- we're selling dope to a mother fucker. The mother fucker fucked around and turned sour and, you know, bust, bust on this mother fucker. So we, we gonna be like-- Pow, pow! Um-hmm. You know?
"JONES: Mm-hmm.
"INGLE: Get rid of the evidence.
"BELL: So what he do? Did he hit him or shoot him in the face?
"JONES: When ya hit him -- You punched him? Whew!

"INGLE: -- and then, after we hit him --
"BELL: He still didn't act right, after y'all --
"INGLE: Yeah, yeah, he, he, but he was just, like a mother fucker trying to throw a guilt trip on me --
"JONES: Mm-hmm.
"INGLE: -- or some shit, you know?
"JONES: I, you know, I could look at ya and tell you were, uh, nice when you come in, that you take care of yours. You know what I'm saying?
"INGLE: Yeah, I'm, you know, when you set out to do something, man --
"BELL: (Unintelligible).
"INGLE: -- you just do it and that's it.
"Yeah, see, he, see, anyway, now, now the mother fucker's tied up.
"JONES: Mm-hmm.
"INGLE: So the mother fucker's believing now.
"JONES: Mm-hmm.
"INGLE: "Damn, mother fucker saw us man." Um, they wasn't thinking at first, 'cause, you know, they been up on that shit --
"JONES: Yeah.
"INGLE: -- all week now.
"JONES: Yeah.
"BELL: Mm-hmm.

"INGLE: "Hell, no, man fuck that."
"JONES: Mm-hmm.
"INGLE: You know, pow, pow!
"JONES: Mm-hmm.
"INGLE: Pow, pow! See, whenever, whenever Bob (making cocking of gun sounds) --
"JONES: Mm-hmm.
"INGLE: -- whenever Bob (making cocking of gun sounds again), Andy automatically --
"JONES: Mm-hmm.
"INGLE: Pow!
"JONES: Mm-hmm, mm-hmm.
"INGLE: You know, they, they work together.
"JONES: Mm-hmm.
"INGLE: And if, if, you go into a bank, and y'all going in there to make a big withdrawal --
"JONES: Mm-hmm.
"INGLE: Andy goes out like this.
"JONES: Mm-hmm.
"INGLE: Bob ain't supposed to run to the back.
"JONES: Mm-hmm.
"INGLE: And Bob supposed to go out with ya.
"BELL: Yeah.
"JONES: Mm-hmm.
"INGLE: As far as I'm concerned, otherwise Bob needs to --

"JONES: Mm-hmm.
"INGLE: -- he gets taken out by Andy. See what I mean?
"JONES: Mmm. But he was just a ole' mother fucker. He wasn't no special dude then?
"INGLE: Huh-uh.
"JONES: I though, damn, you, something. I thought he was like a agent or something.
"INGLE: No, huh-uh.

"I don't care what it is, if it's just robbing a convenience store. These mother fuckers, they'll tell you how to disguise yourself. I mean, I mean, you can put gauze in your mouth.
"JONES: Mm-hmm.
"INGLE: Man, they'll show you a way you can put gauze in your mouth, throw a little makeup on, throw a ski mask on, make sure you paint your eyebrows dark and throw some glasses on.
"JONES: Yeah.
"INGLE: See, they've got a computer that can break, break that shit down.
"JONES: Mm-hmm.
"INGLE: That take that, uh, that thing, uh, pantyhose? They can break that pantyhose down and see what you look like.
"JONES: No shit?

"INGLE: Yeah.
"BELL: Yeah.
"JONES: So, so --
"INGLE: But, as long as you do it a certain way, they can't do it.
"JONES: Mm-hmm, and, and and that's, and that's why y'all had to kill the dude because you didn't have no face piece?
"INGLE: Yeah. See, usually --
"JONES: But your buddy, didn't he have a face piece?
"INGLE: No.
"JONES: But you had a face piece?
"INGLE: Yeah, I had one but, but I didn't wear it.
"JONES: Because your buddy didn't have one on --
"INGLE: Yeah.
"JONES: -- you took yours off?
"INGLE: Yeah.
"JONES: And he seen both of y'all's face?
"INGLE: Mm-hmm.
"JONES: Yeah, you had to do what you had to do then.
"BELL: Yeah, you did.
"INGLE: Mm-hmm. Say, if --
"JONES: It was either that or, you know, be on TV.
"INGLE: Yeah.
"JONES: (Chuckling) You know what I mean?
"BELL: Yeah.

"INGLE: Mm-hmm.
"BELL: Yeah, yeah, I know what you mean.
"JONES: So, I mean, that, you guys, y'all kept it real there.
"INGLE: Mm-hmm, yeah.
"BELL: You had to do what you had to do.
"INGLE: Yeah, in situations like this, uh, state. I wish to, you know, I wish it'd been a state case.
"JONES: Yeah.
"INGLE: If it'd been a state case, it wouldn't even, man, the mother fuckers wouldn't even --
"JONES: Mm-hmm.
"INGLE: -- wouldn't have gone this far. The mother fucker would've been dropped. They wouldn't even fuck with me about this shit man.
"JONES: Yeah.
"INGLE: But the feds, they just stay on you.
"They, they -- Dude ain't dead yet?
"JONES: He ain't dead?
"INGLE: Oh, no, the dude I done shot, he dead.
"JONES: Oh yeah, he died.
"INGLE: Yeah, yeah.
"But, see, I just got here, uh, back in the county, I just had terroristic threatening and felon in possession.
"JONES: Mm-hmm.

"INGLE: This dude and these two bitches said I threatened to kill 'em at the store with a gun, large caliber Glock. I get parole violated and three months later, they bring me on these charges that I'm under federal investigation, federal investigation about these charges.

"JONES: That's where I'm going. Didn't mean to cut ya off, but on that dude, I mean, I mean the fed dude that you got the case behind. Did you get, how much money did you get?

"INGLE: Hmm?

"JONES: How much money did he have?

"INGLE: Just enough to get by for the day, man.

"But sometimes you ain't thinking at all 'cause, you know, you got your mind focused on that one thing, and you're gonna do that thing --

"BELL: Mm-hmm.

"INGLE: -- no matter what happens.

"JONES: Yeah.

"INGLE: A police officer could've, could've stopped ya, and you can just pow! went on and went ahead and still went and took care of your business. It's, you know, you got focused on that thing.

"JONES: Right. So the dude was just in the wrong place at the wrong time?

"INGLE: Yeah.

"JONES: (Unintelligible).
"INGLE: Yeah.
"JONES: I wanna be no --
"INGLE: One time.
"JONES: Did you, did you get at least a hundred?
"INGLE: Yeah.
"JONES: Only way they can get a charge is if y'all tell on each other.
"INGLE: Yeah, mm-hmm. See, they got mother fuckers out there saying that we hung out together. They can't even prove that. They can't even prove I've ever been to his house. They can't prove he's been to mine.
"JONES: And all the time he's your mother fucking natural guy?
"INGLE: Yeah. We, we, we used to not be, but we out there --
"JONES: Y'all cool?
"INGLE: -- and got closer than a mother fucker.
"JONES: Yeah, hell, yeah.
"INGLE: You know? 'Cause I saw what he'd do, and I -- he saw what I'd do, you know, so he knows me.
"JONES: Mm-hmm.
"INGLE: We already knew to agree to this 'cause we done been down once, so we know what we gotta do, you know?
"JONES: Yeah. Ain't nothing wrong with that. You can bust their ass if you have to.
"INGLE: Yeah.

"JONES: That's real, though.
"INGLE: Yeah, man, you got to be, man.
"JONES: So the dude, he's dead.
"INGLE: Mm-hmm, mm-hmm.
"JONES: So, yeah, so --
"INGLE: Yeah, so that means nothing when my time's through, I go back --
"BELL: What?
"INGLE: -- to my, my little state charge. Once I beat --
"BELL: Yeah!
"INGLE: -- the state charges, I'll go on to the house.
"JONES: But you know, you pretty much know that the old man is gonna be dead and that's the end of it?
"INGLE: Yeah, that's what I'm saying. Um, sometimes, you know, if it end up happening, fuck it.
"BELL: Mm-hmm.
"INGLE: I ain't did nothing. Shit happens.
"BELL: Mm-hmm.
"JONES: Yeah.
"INGLE: He wasn't nothing, nobody to me.
"BELL: Yeah.
"JONES: Yeah. You say he was on the wrong federal ground at the wrong federal time, huh?
"INGLE: (Chuckling) Yeah.
Mm-hmm. See, I know, man. I got a, I got a partner

(unintelligible). He's a white dude, man. We, we was kicking it, man. We was tight there for a while, you know? I was looking at his scars. They're from California, you know? And it's, he's got a Mexican step dad.

"JONES: Mm-hmm.

"INGLE: Dude's fucking crazy, man.

"JONES: Yeah.

"INGLE: Always doing that crank and shit.

"BELL: Mm-hmm.

"INGLE: Nobody works in the house. Everybody sells dope and does everything, you know, live on his hustle and shit. So, me and dude was tight, man. We was robbing people together and, uh, we done, we done shot this fucker over here and shot this mother fucker and robbed this place, we's tight. We gave out to a mother fucking burglary charge. Mother fuckers got us with some gun and charged us with burglary. They tell him well --

"JONES: What was y'all supposed to have robbed?

"INGLE: Naw, they got us with burglary.

"JONES: Oh, breaking in somebody's house?

"INGLE: Yeah, breaking in somebody's house. And, see, they, they had, they had, they had, they had me in a way because I had a gun on me that come from the place.

"JONES: Yeah.

"INGLE: But --
"JONES: The places y'all robbed?
"INGLE: Yeah.
"JONES: What was it? A gun place?
"So, if, but, but, but, if y'all would've both, if he'd have just had his rag on, y'all would've never had to kill that dude.
"INGLE: Probably not. He would've, you know, he was talking about, you know, masking up --
"JONES: Mm-hmm.
"INGLE: -- but, hell, man, I mean, the spot where, where they, where they did this crime at, where the crime took place, I mean, you got tourists all down here walking.
"JONES: Yeah. No shit?
"INGLE: Yeah, tourists all around --
"JONES: Y'all killed him with the sun up?
"INGLE: Mm-hmm.
"BELL: Y'all real. Shew! Mmm. But, you know --
"JONES: In a, in a, in a tourist place? And nobody seen y'all?
"BELL: You do what you gotta do.
"INGLE: Long as you go about it and do it the proper way.
"BELL: Mm-hmm.
"INGLE: See, we didn't really do it the way we should have. Uh, you know, the way it should have been done, they should've walked out (unintelligible) 'cause the mother

fucker ain't even thinking.

"You know, it was still to the point to where, where, you know, daytime, nighttime, it don't matter, man. Long as you do it proper --

"BELL: Mm-hmm.

"INGLE: You don't have to worry yourself about it.

"JONES: But how'd y'all shoot him in the daytime and nobody heard the gunshots?

"INGLE: The mother fuckers might've heard it, the mother fucke-rs might not have.

"JONES: But, damn, with the sun up in the, in the, on the, in the park? In a reservation?

"INGLE: A good, a good thing about this, you can get, you can get yourself or, you know, Derrick, y'all could mask up.

"JONES: Mm-hmm.

"INGLE: And dress all black, all black. All, all black. They can't, they can't break that shit down on their comput-er whenever you wear like a ski mask and all that shit?

"JONES: Mm-hmm.

"INGLE: Wear all black and make sure your eyes are covered?

"BELL: But they (unintelligible).

"INGLE: Wear all black and make sure your eyes are covered?

"BELL: But they (unintelligible).

e of it like you said.

"INGLE: Yeah. My parole wouldn't even have go violated--

(SECTION REDACTED)

"INGLE: Walk into Wal-Mart and fuck around and shoot above five or ten people. Run up and just take the cash register and bone out. All the mother, all the mother see, see on the TV camera, you know, is a spot, black spot (unintelligible).

"(unintelligible) saw Bob and Andy's face, Bob and Andy can't, you know, have nothing but shit them.

"JONES: Mm-hmm.

"INGLE: Both of us done got prior convictions, you know, and get locked up.

"JONES: Hell, yeah.

"INGLE: Bob and Andy look back, you know? Pow, pow, pow, pow, you know? Walk on down, move the car out, you know? (making car sounds)

"JONES: Just left him laying there?

"INGLE: No.

"JONES: Oh, y'all hid him?

"INGLE: Yeah.

"JONES: Hell, yeah. Well, dog, let me tell ya something. Uh, uh, if you shot him 'cause he seen ya, that's legit. but, but since your buddy's free, maybe he should've shot him first You know what I'm saying? Instead of you shooting him first because you in jail and, if

something was to happen out there, uh, 'Ingle shot him first.' Know what I'm saying? And --

"INGLE: If this fool, he, he could say that, but I can go and I'll say the same thing about him. You know what I mean? They, they ain't, they can't prove neither one of us, right?

"JONES: Now see, if you'd have ben in the city and not, and not -- If, if y'all would've been somewhere like in, see, I'm from Dallas. If y'all would've been somewhere like Dallas and killed that mother fucker --

"INGLE: Yeah, nothing would've ever became of it.

"JONES: Nothing would've ever became of it, like you said.

"INGLE: Yeah. My parole wouldn't even have got violated. "Just, you know, in the dome.

"BELL: Yeah.

"JONES: In the dome?

"INGLE: Yeah, the, it wasn't bad or nothing. You know, 'cause, once, once that's through, you know?

"BELL: Mm-hmm.

"INGLE: It's through.

"JONES: Mmmm. Shoot him with a pistol? Whew. Nut right here, boy.

"BELL: How did, how'd they, how'd they found, found his body?

"INGLE: Uh -- the newspaper said there was two hikers walking toward the trail and, uh, when they was hiking up to

the side and they, they ran across it.

"BELL: Mm-hmm.

"INGLE: You know, nature walking?

"BELL: Mm-hmm.

"JONES: Y'all just left him out in, just in the open but just covered him up?

"INGLE: Yeah. Threw him in some leaves.

"JONES: Naw.

"INGLE: But, see, the, the newspaper stated they could not tell how long the man had been there. At first, they said he'd been there for a month, and then they come back saying he'd been there for a, uh, a week. 'Cause, see, the chemicals on the mountain, you know? They spray that shit with chemicals. It deteriorates the body. They couldn't even tell how he was killed.

[This concludes the playing of Government's Exhibit 55 for the jury.]

BY THE COURT: All right. Does that conclude the tape?

BY MR. SNYDER: Yes, sir.

BY THE COURT: All right. Let us retrieve the transcripts, please. Will there be any further need for the earphones?

BY MR. SNYDER: No, sir.

BY THE COURT: Then will you retrieve those as well?

BY MR. SNYDER: Yes, sir.

BY THE COURT: All right. Let's be in recess and let's come back at ten minutes after, please.

[Recess taken at 9:47 a.m. - Jury Not Present]

[Open Court - 10:11 a.m. - Jury Present]

BY THE COURT: Thank you, ladies and gentlemen, you may be seated. You may continue with Mr. Bell.

BY MR. SNYDER: I have no further questions, your honor.

BY THE COURT: Do you have cross?

CROSS-EXAMINATION

BY MS. COMPTON:

Q. Mr. Bell you are the same Derrick Bell that testified here before; is that correct?

A. Yes, I am.

Q. Are you the same Derrick Bell that is currently employed at Kroger in Little Rock?

A. Yes, I am.

Q. Are you the same Derrick Bell that stole money from your former employer at Fort Chaffee and put it in his own pocket?

A. Yes, I am.

Q. And are you the same Derrick Bell who wrongfully took unemployment checks when you were not suppose to, and kept them for your own benefit?

A. Yes, I am.

Q. You are the same Derrick Bell then who served time either in

the Crawford County Detention Facility or the Arkansas Department of Corrections for those crimes; is that correct?

A. Yes.

BY MS. COMPTON: Thank you.

BY MR. SNYDER: I have nothing further, Your Honor, and may this witness be excused?

BY THE COURT: May he be excused, please, Ms. Compton?

BY MS. COMPTON: He may.

BY THE COURT: All right. Thank you, sir. You are excused, you're released, you may leave if you like.

Call your next, please?

BY MR. WEBB: Your Honor, we would call Ms. Mary McKuin.

BY THE COURT: Ms. McKuin, please come forward, please. Would you stand right here and raise your right hand and be sworn, please? I think you were previously sworn, pardon me. Please take the stand.

MARY McKUIN, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN

DIRECT EXAMINATION

BY MR. WEBB:

Q. Ms. McKuin, would you just state your name again for the record please?

A. Mary Ann McKuin.

Q. And you live in Little Rock; is that right?

A. Yes, I do.

TRIAL OF U.S. V. TRINITY EDWARD INGLE,
NO. 96-60023-001
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

# GOVERNMENT SENTENCING CLOSING ARGUMENT

the big hand gets on the seven. We'll be in recess.

[Recess taken at 3:25 p.m. - Jury Out]

[Open Court - 3:37 p.m. - Jury Present]

BY THE COURT: All right. Mr. Snyder, please, sir, for no more than 30 minutes, if you please?

BY MR. SNYDER: May it please the Court? Ladies and gentlemen?

Judge Hendren has told you there are certain aggravating factors that we're required to prove beyond a reasonable doubt.

The first factor we have to prove before you can go any further in your deliberations is the fact the defendant was intentionally killed. I'm really getting a little ahead of myself. The first factor we have to prove is the fact the defendant was over the age of 18 years old.

The evidence has been presented to you that the defendant was born on December 7, 1997 [sic], which would have placed him over the age of 18 at the time the crime was committed.

The next thing we've got to prove is that the murder was intentional. Ladies and gentlemen, the tape that we've played for you during the penalty phase showed that Jonah Jones asked the defendant, "Did y'all shoot him or just one of y'all?" And Trinity Ingle answered, "Bob and Andy both did this. They both know the consequences and they both know what's gonna happen."

Later on in that conversation, Trinity Ingle stated, "The dude ain't dead yet." And Jonah Jones asked, "He ain't dead?"

And Trinity Ingle's answer was, "Oh, no. The dude I done shot, he dead."

Later on in that conversation, Trinity Edward Ingle stated: "Saw Bob and Andy's face. Bob and Andy can't, you know, be having nothing but shit then. Both of us done got prior convictions, you know, and get locked up. Bob and Andy look back, you know. Pow, pow, pow, pow, pow, you know? Walk on down, move the car out."

You heard testimony from Dr. Kokes, the medical examiner. Dr. Kokes told you that in his opinion, the manner of death was a homicide.

I submit, ladies and gentlemen, that we have presented a tremendous amount of testimony in this case showing the victim, Sherman Williams, was intentionally shot in the head after he had been left in the woods bound, gagged, taped, told not to look at the defendants, and what happened when Trinity Edward Ingle looked back and he saw Mr. Williams peeking out from under his hat? They walked back, put a gun to his head, and they pulled the trigger.

I submit, ladies and gentlemen, we have proved the aggravating factor of intentional killing beyond a reasonable doubt.

We next have to prove one of the three factors. I mean, we can prove them all, but we have to prove at least one. The next series of factors that we're required to prove is that the crime committed was committed in a heinous, cruel, or depraved manner

of committing the offense.

And Judge Hendren instructed you that you can consider torture, and he instructed you that torture includes mental as well as physical abuse. A depraved manner includes the defendant relished the killing. Cruel means pain and torture was inflicted that wasn't necessary. Heinous means serious physical abuse and Judge Hendren also instructed you that pertinent factors you can consider in determining whether a killing was especially heinous and cruel includes infliction of gratuitous violence upon the victim and beyond that necessary to commit the killing. Needless mutilation of the victim's body; senselessness of the killing and helplessness of the victim.

Who could be more helpless than an 82 year old man lying alone in the woods with his ankles taped? He can't run away. With his wrists bound? He has no way of defending himself if he even wanted to. With his mouth taped? He can't even scream. What's more helpless than walking up to an old man, bound and gagged, and putting a gun to his head and pulling the trigger?

Needless mutilation of the victim's body. You heard testimony that when they confronted Mr. Williams before they shot him in the head, the kicked him in the face and kicked his eyes out.

I mentioned depraved in that the defendant relished the killing. You heard testimony from Derrick Bell who said he spoke to the defendant four or five times in jail before the tape was made on April 3. And you heard Derrick Bell tell you that when

the defendant described the murder to him, he thought it was funny.

The tape we played for you in the penalty phase contained this conversation:

"INGLE: You see, anyway now, now the mother fucker's tied up. So the mother fucker's believing now, the mother fucker's thinking. Damn, mother fucker saw us. Hell no, man. Fuck that, you know. Pow, pow, pow."

He told Derrick bell and Jonah Jones in what he thought was a private conversation, the victim is tied up; after he's tied up, the victim is believing. Not only that, after Mr. Williams is tied up, Mr. Williams is thinking. What do you imagine Mr. Williams was thinking when he was bound and gagged?

One of the next factors we can prove is the vulnerability of the victim. Sherman Williams, 82 years old, went for a walk in the park, left his TV Guide open the date of June 22, 1995. Sherman Williams was alone. The testimony is nobody lived with Sherman Williams. The testimony is that Jeff Paul and Trinity Ingle sat in a parking lot on Fountain Street in Hot Springs, Arkansas waiting for somebody to rob. And who did they pick? An 82 year old man who was all alone.

Did they try to rob Sherman Williams downtown where there are a lot of people? No, let's follow him up the north slope of Hot Springs Mountain. Let's get him alone. Let's ask him for the time and when he looks at his watch, let's hit him in the

head. And then after we knock him down, let's just kick him a little.

The next factor that we need to prove is that pecuniary gain played a part in the murder. During the April 3, 1996 tape we played for you, the following discussion occurred between Jonah Jones and Trinity Edward Ingle:

"JONES: Did you get -- How much money did you get? How much money did he have?

"INGLE: Just enough to get by for the day, man."

This man was murdered for just enough money to get by for the day.

Jonah Jones also asked the defendant later on, "Did you get at least 100?" And the defendant said, "Yeah. We got at least 100."

Not only did they get at least 100, they got Mr. Williams' car. They got Mr. Williams' 1995 Gold Delta 88. They got Mr. Williams' car and they drove around Hot Springs, Arkansas.

Jason Paul saw them; Chris Rogers saw them; Rebecca Pingle saw them; and Don Roberts saw them. The defendant's fingerprint is in the car. They robbed Mr. Williams for his money and they robbed Mr. Williams for his car and they shot him in the head so he couldn't tell.

And there was evidence and there was testimony introduced that when they initially confronted Mr. Williams, Mr. Williams said, "If you'll just let me go, I won't tell a soul." Well,

they didn't let him go and he hasn't told a soul.

Another factor in which you can take into consideration is future dangerousness. And two of the factors that you can consider: One is the June 15, 1995 incident at the Total Station where the defendant pulled a gun on Stephanie Miller and Jason Ratliff, and then chased them to the movie theater.

And do you remember when Mr. Depper asked Stephanie Miller, well, are you sure he chased you? She said something to the effect, "I know when I'm chased." And she was scared. And that's one of the crimes the defendant has pled guilty to. A firearms conviction exactly -- or a firearms violation, the conviction was later -- but a firearm's violation exactly one week prior to the murder.

Seven days before Sherman Williams was murdered, Trinity Ingle pulled a gun on people at that Total Station.

You can also consider the defendant's prior convictions. Thirteen months before the murder, we have two residential burglaries and we have two firearms convictions. Thirteen months before a murder.

In addition to that, during the April 3, 1996 conversation, there were quite a few discussions between Ingle, Bell and Jones concerning activities the defendant had either been involved in or contemplated. One of these goes like this:

"INGLE: You know, we was over there robbing him at the motel
so, you know, we're gonna hit this hotel and they

scoped it out. I got a 12 gauge. Takes off running, you know? Boom! You know? And it's just --

"JONES: Busted him in the ass?

"INGLE: Yeah, I shot him. Shot his leg.

"JONES: And you busted him?

"INGLE: Yeah. I just shot his leg."

Another discussion between Ingle and Jones went like this:

"INGLE: We're selling dope to a mother fucker. The mother fucker fucked around and turned sour and you know, bust on this mother fucker. So we gonna be, like, pow, pow, you know? Get rid of the evidence."

What does that remind you of -- "Pow, pow, get rid of the evidence." -- something that occurred on June 22, 1995?

Another discussion between Mr. Ingle and Mr. Jones:

"INGLE: I don't care what it is. If it's just robbing a convenience store. These mother fuckers, they'll tell you how to disguise yourself. I mean, you can put gauze in your mouth. Man, they'll show a way you can put gauze in your mouth, throw a little makeup on, throw a ski mask on, make sure you paint your eyebrows dark and throw some glasses on.

"JONES: Yeah?

"INGLE: See, they've got a computer that can break that shit down.

"JONES: Mm-hmm.

"INGLE: Take that panty hose? They can break panty hose down and see what you look like, but as long as you do it a certain way, they can't do it."

Another part of that tape -- Ingle, and he's talking about Derrick Bell:

"INGLE: A good thing about this, you know, you can get yourself, or you know, Derrick, y'all could mask up and dress all black, all black. They can't break that shit down in their computer whenever you wear a ski mask. Wear all black and make sure your eyes are covered. Year black and make sure your eyes are covered. Walk into a Wal-Mart. Fuck around and shoot about five or ten people. Run up and just take the cash. Take a cash register and bone out. All the mothers see on the TV, you know, is a spot. A black spot."

Another factor that you may consider is obstruction of justice and this is that the victim was killed to prevent the identification of the defendant.

The testimony is clear that on many occasions during this April 3 tape, Jonah Jones repeatedly asked the defendant:

"You wouldn't have had to have shot the old man if you'd been masked up?" "That's right. I wasn't masked up and my partner wasn't masked up. And he saw our faces and Bob and Andy can't be having nothing but shit then. Faces turn up on TV."

Says,

"If y'all just had your rag, you wouldn't have had to shot the old man?" "No. We're on parole. We can't be having none of that. Got to get rid of the evidence."

One of the other factors that you can consider that we feel that we have proved is a lack of remorse. And we submit, ladies and gentlemen, the defendant in this case has shown a total lack of remorse concerning his involvement in this crime.

Again, during that April 3, 1996 conversation, Jonah Jones tells the defendant:

"But you know, you pretty much know that the old man is gonna be dead and that's the end of it."

Now what is Trint Ingle's response to that?

"Yeah, that's what I'm saying. Sometimes, you know, if it end up happening, fuck it. I ain't did nothing. Shit happens. He wasn't nothing, nobody to me.

"JONES: So the dude, he's dead?

"INGLE: Yeah, so that means nothing. When my time's through, I go back to my little state charge. Once I beat the state charges, I'll go on to the house.

"JONES: Y'all killed him with the sun up? Mm-hmm.

"BELL: Y'all real, but you know --

"JONES: In a tourist place and nobody seen y'all?

"BELL: You do what you got to do.

"INGLE: Long as you go about it and do it the proper way."

That's how Trinity Ingle describes murdering a person -- "Long as you go about it and do it the proper way." And he goes on to say:

"See, we didn't really do it the way we should have. Well, you know, the way it should have been done, they should have walked out (unintelligible) because the mother fucker ain't even thinking."

He then goes on to say:

"INGLE: You know, it was still to the point to where, you know, daytime, nighttime, it don't matter, man. Long as you do it proper. You don't have to worry yourself about it."

Trinity Ingle was telling Derrick Bell and Jonah Jones that as long as you commit a murder the proper way, you don't have to worry about it.

Another factor you can consider on lack of remorse is the fact, as I told you earlier, the defendant laughed about what he did to that old man. He thought it was funny. He thought putting a bullet in a man tied up is humorous.

He also talked about Sherman Williams; an avid hiker, a man who liked to jog and walk in the national park. A man who was jogging and hiking in the national parks that you own. They're your national parks. They're Mr. Williams' national parks. How did he describe Mr. Williams' presence in the national parks that you own? He was in the wrong place at the wrong time. That's

how he describes Mr. Williams' presence in the national park.

You can also consider victim impact evidence. You can consider the terrible, agonizing, gut wrenching horror and terror it brought to that family right there.

Carol Sherman knew something was wrong. She knew her father, if he lost his billfold, he'd find it and he'd come after it. She knew something was wrong when she couldn't get a hold of him. She knew something was wrong when the ranger couldn't get a hold of him. She really knew something was wrong when she went to her dad's house and there were newspapers stacked in front of the door and the car was gone. And she told you that she knew something was wrong because whenever her dad left town, he stopped the newspapers. She absolutely knew something was wrong when she opened that door, went in the house, and she explained to you it looked like he was coming back any minute. She is the one that discovered the TV Guide open to June 22, 1995.

The reality of violence struck a family that didn't deserve it. It struck a man who although he was 82 years old, was leading a very active life. He had just bought a new car. He liked to hunt and fish. She described -- the daughter described that when her father would go out, he'd carry a camera; he'd carry a fishing rod. He had a condominium on the lake close to where you can fish. In fact, you can walk out the front door and throw a line in the lake. This is a man who although he was getting on in age, had a lot to live for.

Mary McKuin had recently moved to Little Rock. She had been gone, I think she said, for 28 years. She had moved and she thought that she was going to be able to be close to her father for the first time in 28 years and they would be able to get together and have a wonderful, golden age of his last years.

One June 22, 1995, Trinity Edward Ingle decided that wasn't going to be. Trinity Edward Ingle decided he needed some money to get by for the day, so Trinity Edward Ingle followed Mr. Williams up a path, forcibly took his money, and murdered him.

BY COURTROOM DEPUTY: Mr. Snyder, you have five minutes.

BY MR. SNYDER: And then he dragged his body into the woods and according to Mr. Ingle, he threw it in some brushes. A terrible way to die.

I submit to you, ladies and gentlemen, Mr. Williams saw Trinity Edward Ingle walking back to him. I submit he knew he was going to die. He knew there was nothing he could do about it. He knew he would never, ever, ever walk in the park again, fish again, see his daughters, grandchildren, or friends. He knew it was over.

I submit, ladies and gentlemen, that we have proved the aggravating factors that we are required to prove beyond a reasonable doubt. And I submit to you, ladies and gentlemen, and I would request that you do return a verdict imposing the death penalty on the defendant, Trinity Edward Ingle, for the savage

and brutal murder of Sherman Williams.

Thank you.

BY THE COURT: All right. Thank you, Mr. Snyder. Now ladies and gentlemen, we will have an address here by the defense and this will run for up to 45 minutes. I think that we want to try to get this in if we can, and let me remind you, of course, you're not prisoners here. If there is anybody that really needs to take a break, don't hesitate. I know the lawyers would much prefer that you let us know if we need to -- You need some more water?

BY THE JUROR: It probably wouldn't hurt.

BY THE COURT: Well, do you want defense water or prosecuting water or judge water? [Laughter]

BY THE JUROR: Well, it doesn't make any difference.

BY THE COURT: Seriously now, if there is any problem, let us know because we want you to be able to, of course, give careful attention.

So let's go into this and can we have that understanding? Mr. Depper, you'll be making the --

BY MR. DEPPER: No, no. Ms. Compton.

BY MS. COMPTON: Yes, sir.

BY THE COURT: Let's go on through your argument and if anybody has any difficulty, they'll just let us know and we'll just take a break. Is that all right?

Okay. Are you ready to proceed?

BY MS. COMPTON: Yes, sir.

BY THE COURT: All right. Please do.

BY MS. COMPTON: May it please the Court? Gentlemen of the Government? Ladies and gentlemen of the jury?

When I talked to you yesterday -- it seems like it was an awful longer time ago than that, but it was just yesterday when I talked to you -- we talked about the fact that you were going to hear a story. We talked about the fact that you had heard only pieces of a story, short pieces of a story, and that before the day was over with, you would hear a longer tale.

I think that y'all can agree with me probably that we could call this whole trial and everything that you've learned here in the past two weeks a tale of two tragedies. The first tragedy, of course, is the death of Mr. Williams, and it's indisputably tragic and it's indisputably awful.

The second tragedy, as you now know it, is the short and pretty miserable life of Trint Ingle. Two tragedies. Lots of people want to write books. You ladies and gentlemen are about to write the remaining chapters to this story, to the tale of two tragedies. You have two choices when you write the remaining chapters. You can write a long and, again, fascinating tale, several chapters long, or you can write one quick, swift, ugly chapter and the story will end.

You remember that I told you that I was going to start my story on December 7, 1975 because that's the day that Trinity was