ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

U.S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED
DEC 17 2002
CHRIS R. JOHNSON, CLERK
BY
DEPUTY CLERK

UNITED STATES OF AMERICA §
§
v. § CRIMINAL NO. 96-60022-001
§
JEFFERY WILLIAM PAUL §
§
§

# MOTION FOR LEAVE TO CONDUCT DISCOVERY AND SUPPORTING MEMORANDUM

Jeffery Paul, by undersigned counsel, pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and pursuant to Rule 6 of the Rules Governing §2255Proceedings, files his initial Motion for Leave to Conduct Discovery and Supporting Memorandum. This request for leave to conduct discovery, which includes requests for the production of records, documents, and evidence, is necessary for the investigation and presentation of the constitutional claims to be raised in Mr. Paul's 28 U.S.C. §2255 motion. Further discovery requests will likely be forthcoming once the Court has ruled upon this initial discovery request and Mr. Paul has had a reasonable opportunity to conduct whatever discovery, if any, this Court determines is appropriate.

As a general matter, discovery is authorized by Rule 6 of the Rules

274

Governing 28 U.S.C. § 2255 Proceedings. The requested discovery as set forth in more detail below is essential to guarantee Mr. Paul a full and fair opportunity to discover, develop and fairly present in his §2255 motion (and any subsequent amendments to that motion), all possible constitutional claims for relief in this case, and the factual bases for such claims. The contents of any §2255 motion filed prior to the authorization of such discovery (and sufficient time thereafter to investigate fully all possible leads arising from such discovery) will necessarily be incomplete both as to the scope and content of the claims to be presented as well as to the underlying factual predicate for any claims that are presented in the initial §2255 motion. In addition, unless the Court authorizes undersigned counsel, on behalf of Mr. Paul, to conduct such discovery, this Court will be deprived of any meaningful opportunity to review and resolve all such claims and their underlying factual bases.

For these reasons, Mr. Paul requests that this Court resolve the issues contained in this and any subsequent motions for discovery prior to foreclosing Mr. Paul from a final opportunity to amend his §2255 motion, and prior to the scheduling of an evidentiary hearing on any of the claims set forth in Mr. Paul's amended motion.

# I. LEGAL AUTHORITY FOR DISCOVERY

## A. Introduction

Rule 6 of the Rules Governing Section 2255 Proceedings for the United States District Courts gives this Court express authority to order discovery:

> A party may invoke the processes of discovery available under the Federal Rules of Criminal Procedure or the Federal Rules of Criminal Procedure[1] or elsewhere in the usages and principles of law if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

Rule 6(a) incorporates the United States Supreme Court's directive that a federal habeas corpus petitioner is "'entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts.'" Harris v. Nelson, 394 U.S. 286, 298 (1969); *see also* Blackledge v. Allison, 431 U.S. 63, 82-83 (1977); *cf.* Rules Governing Section 2254 Cases in the United States District Courts, Advisory Committee Note to Rule 6 ("Subdivision (a) is consistent with Harris v. Nelson").[2]

---

[1] Rule 6 for §2255 proceedings differs from the corresponding discovery rule under the §2254 rules in that it includes the processes of discovery available under the Federal Rules of Criminal Procedure as well as the Federal Rules of Civil Procedure.

[2] The Advisory Committee Notes to the Rules Governing Section 2254 Cases in the United States District Courts are "fully applicable to discovery under [the analogous Rule] for Section 2255 motions." Advisory Committee Notes to Rule 6, Rules Governing Section 2255 Proceedings for the United States District Courts.

### B. Good Cause

The Court may grant §2255 movants such as Mr. Paul leave to conduct discovery when "good cause" for doing so is shown. Under guiding principles set out by the United States Supreme Court, "good cause" for discovery in habeas corpus proceedings is established "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." Bracy v. Gramley, 520 U.S. 899, 908-909 (1997).[3] In Bracy the United States Supreme Court addressed issues related to Habeas Rule 6 in considerable detail, and it is worth recounting that discussion here. William Bracy was convicted of capital murder and sentenced to death before Cook County Circuit Judge Thomas J. Maloney in 1981. Bracy v. Gramley, 81 F.3d 684, 687 (7th Cir. 1995) (hereinafter "Bracy I"), *rev'd*, 520 U.S. 899 (1997) (hereinafter "Bracy II"). Judge Maloney accepted bribes from criminal defendants in his court, and in return for the bribes arranged for the defendants to be acquitted or convicted of lower-grade offenses. Bracy II, 520 U.S. 906-08; *see*

---

[3] By contrast, the Supreme Court has indicated that such good cause is absent when the petitioner's allegations are patently frivolous (*i.e.*, the product of "fantasy which has its basis in the paranoia of prison rather than fact." Harris, 394 U.S. at 300).

*also* United States v. Maloney, 71 F.3d 645 (7th Cir. 1995) (upholding Maloney's federal conviction on racketeering, extortion, and obstruction of justice charges), *cert. denied*, 519 U.S. 927 (1996). The judge fixed cases tried shortly before Bracy's case and shortly after, in each case skewing his rulings in order to ensure the acquittal (or the conviction on reduced charges) of murder defendants. *Id.* Mr. Bracy did not bribe Judge Maloney. *Id.* In his habeas petition, Bracy alleged that Judge Maloney had ruled against him on several discretionary matters in order (1) to "compensate" for his pro-defendant rulings in cases that had been fixed; and (2) to encourage criminal defendants to bribe him in fear of what would happen to them if they did not. Bracy I, 81 F.3d at 684. Bracy asked for discovery under Habeas Rule 6(a) "so that [he] can try to find out whether there was actual bias by Judge Maloney at their trial." *Id.* at 690. To that end, he requested access to documents revealing the disposition of cases before Judge Maloney, depositions of persons who could describe the judge's behavior in the cases where he did not receive bribes, and for evidence from the federal prosecution of Judge Maloney that would indicate Judge Maloney's behavior in non-bribe cases.

The Seventh Circuit upheld the District Court's decision to deny all three forms of discovery. First, the Bracy I court described Bracy's theory of "compensatory bias" as speculation. *See* Bracy I at 690. The Seventh Circuit

theorized that the "compensatory bias" theory might be incorrect. After all, the jury, not Maloney, convicted Bracy and sentenced him to death. *Id.* Further, assuming Maloney did rule harshly for the state in non-bribery cases while ruling conspicuously for the defendant in bribery cases, a pattern of compensatory bias might actually "create a pattern of inconsistent rulings that would lead people to suspect he was on the take." *Id.* On the other hand, the court mused, Maloney might have followed a policy of always being lenient towards defendants in order to generate consistent rulings, but by doing so would risk being voted out of office by a crime-weary public. *Id.* The Seventh Circuit freely acknowledged that it was "speculating about the likely impact of Maloney's corruption on the rulings that he made at the trial of these petitioners." *Id.* It maintained, however, that the "defendants are speculating too." *Id.* at 690. These passages, in which the court hypothesized that the theory the petitioners sought to prove by discovery might not be true, set the stage for the denial of Bracy's discovery request. The court derided Bracy's request as a "fishing expedition" that might reveal a pattern of compensatory bias, but which might "not show that he [Maloney] followed the practice in this case." After all, the court speculated, "[t]his may be a case in which any judge would have ruled in favor of the government in the instances of which the defendants complain." *Id.*

The majority's approach provoked a painstaking dissent by Seventh Circuit Judge Ilana Diamond Rovner. Judge Rovner noted that Bracy had actually presented evidence, which was utterly ignored by the majority, that Judge Maloney did in fact rule harshly against defendants who did not bribe him. *Id.* at 697 (citing transcript of Maloney's trial). She agreed that it was possible that the majority's speculative theory that Judge Maloney would *not* have been harsher to defendants in non-bribery cases might be true. However, she stressed, the time for such speculation is "*after* an evidentiary hearing on the matter, when the petitioners have had the opportunity to find and present whatever evidence there may be to establish any practice Maloney may have followed." *Id.* (emphasis added). "Without giving Bracy and Collins [Bracy's co-defendant] the opportunity to present that evidence," Judge Rovner continued, "their claim of conflict can only be resolved on the basis of speculation, as my colleagues agree." *Id.* Judge Rovner put the point precisely:

> We cannot simply assume that the "probability is slight" that discovery will yield Bracy and Collins anything. Let them try. If their discovery proves fruitless, we can at least take comfort in the knowledge that we have given them every opportunity to prove that Maloney's corruption deprived them of a fair trial. We cannot, after all, have it both ways: we cannot criticize Bracy and Collins for speculation and at the same time deprive them of the chance to render their theory anything more.

*Id.*; *see also* Carney v. United States, 50 F.3d 1097, 1103 (1st Cir. 1995) (chiding

majority for concluding that petitioner had not produced evidence documenting any effect on his trial stemming from the conflict of interest he alleged: "I hardly find [the majority's statement] surprising; there was no evidentiary hearing at which such evidence might have been developed.") (Bownes, J. dissenting).

On certiorari review, the Supreme Court largely ignored the Seventh Circuit's copious derision of Bracy's judicial bias claim, only briefly summarizing the lower court's reasoning. Bracy II, 520 U.S. at 903. It also acknowledged as true the Seventh Circuit's dictum that Bracy's theory of compensatory judicial bias was "quite speculative." *Id.* at 905 (quoting Bracy I, 81 F.3d at 689-90). The Supreme Court did point to the evidence noted by Judge Rovner in dissent that petitioner had noted in support of his theory, *id.* at n.5 (*citing* Rovner's dissent), but then in the very next sentence of Bracy II, the Court sidestepped even that point, describing instead the proper focus for review of a habeas petitioner's discovery request: "In any event, difficulties of proof aside, there is no question that, *if it could be proved*, such compensatory, camouflaging bias on Maloney's part in petitioner's own case would violate the Due Process Clause of the Fourteenth Amendment." *Id.* at 905.

Applying the governing law to the facts, the Court explained the proper application of Habeas Rule 6:

> In Harris [v. Nelson, 394 U.S. 286 (1969)], we stated that "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry." 394 U.S., at 300. Habeas Corpus Rule 6 is meant to be "consistent" with Harris. . . . It may well be, as the Court of Appeals predicted, that petitioner will be unable to obtain evidence sufficient to . . . [prove his claim], but we hold that he has made a sufficient showing, as required by Habeas Corpus Rule 6(a), to establish "good cause" for discovery.

Bracy II, 520 U.S. at 908-09.

Bracy II thus sets out a clear, straightforward framework for considering habeas petitioners' discovery requests. A court should first determine whether the petitioner has alleged the elements of the claim he wishes to prove, then determine whether he has made any "specific allegations" that support the particular discovery request. If the petitioner has properly alleged the claim and asked for probative evidence, he has shown "good cause" for discovery and the court has a duty to permit it. If he has not, the court may deny the request. What is unnecessary is extended speculation on the nature of the petitioner's claim, or on the possibility that the evidence the petitioner seeks may not prove his theory, or may prove the opposite of his theory. In this respect, the scope of discovery under Habeas Rule 6 is similar to the scope of discovery in conventional civil actions. A plaintiff who makes specific allegations which, if proven, would entitle him to legal relief is entitled, *without more*, to access to the fact-development procedures

necessary to flesh out his claims without undue interference. *Cf., e.g.*, Neitzke v. Williams, 490 U.S. 319 (1989) ("What [Fed. R. Civ. P.] 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations").

In short, a petitioner who has (1) made specific allegations warranting relief, (2) shown why the requested information is essential to the adequate factual development of his claims, and (3) demonstrated that the requested information is likely in the hands of the party or agency from whom discovery is sought and cannot be obtained through other means, has established "good cause" under Bracy and Rule 6. *See, e.g.,* Willis v. Newsome, 771 F.2d 1445 (11th Cir. 1985)(in federal habeas corpus actions, where specific allegations before the court show reasons to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is confined illegally and is therefore entitled to relief, it is the duty of the court to provide the necessary facilities and procedures for an adequate inquiry); Willis v. Zant, 720 F.2d 1212 (11th Cir. 1983) (petitioner's claim that young adults were under-represented in the jury pool remanded to the district court for an evidentiary hearing, and, if necessary, discovery); Horton v. Zant, 687 F. Supp. 594 (M.D. GA.1988) (discovery ordered "to permit petitioner's counsel to ascertain the facts" to support his Swain v. Alabama claim); *see also*

Murphy v. Johnson, 205 F.3d 809, 813-814 (5th Cir. 2000) ("where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he [is] entitled to relief, it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry"); East v. Scott, 55 F.3d 996 (5th Cir. 1995) (although a "district court generally has discretion to grant or deny discovery requests under Rule 6, a court's blanket denial of discovery is an abuse of discretion if discovery is indispensable to a fair, rounded, development of the material facts").

So long as the information before the court "support[s] the inferences" of constitutional deprivation alleged by the petitioner, "good cause" exists and discovery is mandated if "[t]he information requested by the petitioner would tend to prove or disprove the validity of such inferences and is relevant to petitioner's claim." Rice v. Black, 112 F.R.D. 620, 626 (D. Neb. 1986). *See e.g.,* Rice v. Clarke, 923 F.2d 117, 118-19 (8th Cir. 1991)(discovery of relevant FBI records required); East v. Scott, 55 F.3d 996, 1001 (5th Cir. 1995)(where petitioner alleged Brady violation, entitled to discovery to prove allegations) *granting relief after discovery,* East v. Johnson, 1997 WL 570214 (5th Cir. 1997); Teague v. Scott, 60 F.3d 1167 (5th Cir. 1995); Toney v. Gammon, 79 F.3d 693 (8th Cir. 1996) (petitioner entitled to discovery of physical evidence to establish constitutional

claims).

It should also be noted that in a §2255 case, like a civil case, discovery necessarily precedes resolution of claims on summary judgment. To be entitled to discovery, Jeffery Paul need not conclusively establish his entitlement to relief on the merits of his claims. Payne v. Bell, 89 F.Supp.2d 967, 971 (W.D. Tenn. 2000)(good cause to grant discovery is not as high as the standard for granting relief or even that for granting an evidentiary hearing).

**C. *McClesky v. Zant***

In McCleskey v. Zant, 499 U.S. 467, 489 (1991), the United States Supreme Court held that a habeas petitioner "abuses the writ" of habeas corpus "by raising a claim in a subsequent petition that he could have raised in the first, regardless of whether the failure to raise it stemmed from a deliberate choice." The petitioner who "abuses the writ" is not entitled to review of his claim, unless he can either show "cause and prejudice" for his actions, or demonstrate that failure to decide his claim will constitute a "fundamental miscarriage of justice." *Id.* at 498. In deciding whether a habeas petitioner has abused the writ, "the question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process, *see* 28 U.S.C. §2254 Rule 6 (Discovery); Rule 7 (Expansion of

Record); Rule 8 (Evidentiary Hearing)." *Id.* at 497. A federal habeas petitioner must include in his initial petition "what petitioner knows or could discover upon reasonable investigation. . . ." *Id.* Otherwise, he will later be foreclosed from having new claims considered on the merits in subsequent habeas actions.

Mr. Paul now seeks to make a "reasonable investigation" into all claims or potential claims for which he has a good faith basis to believe exist in his case, and to "pursue the matter through the habeas process" of discovery under Rule 6, the procedure expressly articulated by the Supreme Court in McCleskey. Having placed an affirmative duty upon those seeking habeas relief to raise all claims in their initial petition, McCleskey places a concomitant duty upon the federal courts to provide petitioners with the necessary tools to meet this obligation, including discovery and services necessary for counsel to effectively utilize these discovery devices. Because this is Jeffery Paul's first §2255 motion and he sets forth below a sufficient basis for alleging possible deprivations of his constitutional rights, McCleskey entitles him to discover evidence and information which could prove that he is entitled to relief.

**D.** ***The AEDPA***

The severe and potentially fatal consequences of any perceived failure on the part of a habeas petitioner to raise as soon as practicable all constitutional

claims in a federal habeas corpus petition have been codified and expanded upon by Congress with the passage of the Anti-Terrorism and Effective Death Penalty Act ["AEDPA"] of 1996. Under the AEDPA, claims not raised in an initial petition must be certified by the Circuit Court as either based upon newly discovered evidence establishing innocence or based upon a new rule of constitutional law that was previously unavailable. *See* 28 U.S.C. §2255. In short, the AEDPA expands upon the limitations set forth in McCleskey concerning the litigation of new claims in second or successive habeas corpus petitions, thereby underscoring the necessity of raising all possible claims in the first petition. With that necessity, therefore, comes a corollary duty on the part of the federal judiciary to provide habeas petitioners the means for discovering, developing and presenting all such claims and their factual bases through the recognized and available tools of claim/fact development, including discovery.

**F. Discovery Is Especially Warranted in a Capital Case**

The policies favoring discovery are even stronger in capital cases than in noncapital cases because the "finality" of death and its "qualitative[] differen[ce] from a sentence of imprisonment, however long," magnifies the "need for reliability" and, accordingly, the need for reliable fact-determination procedures. Woodson v. North Carolina, 428 U.S. 280, 305 (1976); McFarland, v. Scott, 512

U.S. 849, 855 (1994). Because this is a death penalty case, broad discovery is necessary to ensure that extra measure of process which is demanded in capital cases. "[I]f death is involved, the petitioner should be presented every opportunity possible . . . to present facts relevant to his constitutional claims." Wilson v. Butler, 825 F.2d 879, 883 (5th Cir. 1987). In fact, the capital petitioner who fails to request full discovery in his initial habeas petition may lose his life because he failed to investigate his case earlier. Tucker v. Kemp, 819 F.2d 978, 981 (11th Cir. 1987)(on eve of execution, court found abuse of the writ and denied relief where capital petitioner failed to seek discovery during first habeas proceeding). Given the gravity of this capital case, Jeffery Paul requests this Court's leave to conduct discovery which will enable him to fully investigate, develop, and present any and all relevant constitutional claims for relief in his capital §2255 motion.

## II. DISCOVERY REQUESTS

Jeffery Paul requests the process of this Court to order the production of the following evidence and information in support of his 28 U.S.C. §2255 claims:

### A. Federal Bureau of Investigation Files

Jeffery Paul requests that this Court order the government to produce any and all records and documents in the possession of the Federal Bureau of Investigation ("FBI") pertaining to the investigation and prosecution of Mr. Paul

and his co-defendant, Trinity Ingle, for the murder of Sherman Williams.[4]

Upon information and belief, Mr. Paul is claiming that the government engaged in misconduct in numerous ways in his case, including, but not limited to: making promises of and/or making available a variety of benefits to government witnesses in exchange for helpful testimony, while denying the existence of such to the defense and in the presence of the jury; coercing, pressuring, threatening, coaching, and making promises to witnesses (including the defendant) to provide incriminating information, whether or not accurate, to the government, and/or to testify against Mr. Paul at trial; knowingly proffering and relying upon false evidence, testimony and arguments during the death certification process initially and after the Ingle life verdict was returned, at pre-trial hearings and during trial in the presence of the jury; failing to disclose exculpatory information to the defense that would have exonerated Mr. Paul; relying upon arguments to the jury based upon false information and/or false characterizations of the record; and relying upon race as a factor in determining whether initially to seek a death sentence against Mr. Paul, and then later refusing to de-certify the death notice after the

[4] Knowledge of the existence of these documents and their contents, whether in the possession of the Department of Justice ("DOJ"), is imputed to the government. *See* United States v. Antone, 603 F.2d 566, 569-70 (5th Cir. 1979) (for Brady analysis, no distinction is drawn between different agencies under the same government — all are part of the "prosecution team").

Ingle life verdict was returned. All of these claims, and all other claims set forth in the accompanying §2255 motion, are incorporated herein by express reference.

In an effort to investigate such claims, Mr. Paul began to seek access under the Freedom of Information Act ["FOIA"], *see* 5 U.S.C. §552 et seq., to the FBI files in his case on April 3, 2002. On that date, through undersigned counsel, he sent specific letter requests pursuant to the FOIA to each field office of the FBI throughout the country, including the main office in Washington, D.C., specifically requesting any and all documents, evidence or other materials relating to the investigation, prosecution and conviction of Mr. Paul and his co-defendant, Trinity Ingle.[5] After making the initial letter request on April 3, 2002, undersigned counsel and/or his assistant made repeated letter or telephone inquiries to various personnel within the FBI urging prompt and cooperative action on this request.

On August 23, 2002, undersigned counsel finally received some documents from the FBI's Office of Information and Privacy in the Department of Justice,

---

[5] Undersigned counsel was aware that FBI agents from jurisdictions in various parts of the country were engaged in the investigation and prosecution of Mr. Paul's case. He could therefore not be certain, without asking, whether records pertaining to his case were in one centralized file or were scattered throughout various field offices. For this reason he sent his FOIA request simultaneously to all such offices.

Washington, D.C., from the file of Mr. Paul's case only, but not that of Trinity Ingle. Of the 1521 pages that the Office indicated were contained in Mr. Paul's FBI file and that it had reviewed pursuant to the initial request, 793 pages were withheld in their entirety – that is, *over one half* of that portion of Mr. Paul's FBI file which has been reviewed to date was withheld. Moreover, virtually all substantive information contained in the 728 pages that were disclosed was redacted, leaving a disclosure almost completely devoid of meaningful content.

Mr. Paul appealed this disclosure with the Office on September 18, 2002, and on October 28, 2002, the Office denied the appeal after disclosing 18 more pages of documents, many of which were, once again, heavily redacted. Notably here, this denial also declared that the only FBI file reviewed in the matter came from the field office in Little Rock, Arkansas, and that no other field office files had been searched in response to Mr. Paul's inquiry. The denial advised undersigned counsel that a separate request to each field office would be required. Of course, as noted above, such separate requests had in fact already been made on April 3, 2002, on the same date the request was made of the Little Rock field office.

On October 23, 2002, Mr. Paul, through undersigned counsel and pursuant to the Freedom of Information Act, specifically requested any and all documents,

evidence or other materials in the possession or control of the FBI relating to the investigation, prosecution and conviction of Trinity Ingle for the murder of Sherman Williams. To date undersigned counsel has received no disclosures from the FBI responsive to this request.

Despite the severely restricted nature of the disclosure of the Jeff Paul FBI files, contained within the documents disclosed were several pages (also heavily redacted) which reflect that government witnesses who testified at Mr. Paul's trial and/or provided incriminating information against him to the government were paid money by the federal government after the trial was over. Although most of the substance of these documents is redacted, including all names, the amount of money, and substantial information regarding the purpose for the payments, several facts can be gleaned from what is left un-redacted, including: a) some of the witnesses were government employees, others were not; b) the FBI and/or the U.S. Attorney's office was aware of and approved the payment of money to these witnesses; and, c) the money was paid as a result of helpful testimony and/or other assistance provided to the government in its prosecution of Mr. Paul.

Subsequent investigations in this case have revealed a number of other facts, including:

a) there are additional witnesses other than those indicated in the

disclosed FBI documents who received monetary rewards for their assistance in the prosecution of Mr. Paul;

(While the redactions of the disclosed documents prevent specific positive identification of the government witness in question, the disclosed portions do allow identification of which witnesses were government employees [*e.g.* FBI agents] and which were lay witnesses. Incorporating this information and the subsequent investigations noted above, undersigned counsel has determined that there are *additional* government witnesses [*i.e.* not noted in the any of the disclosed FBI documents] who either testified at trial and/or were on the government's witness list and provided incriminating information to the government about Mr. Paul, who also received money from the federal government for their assistance.);

b) at least some witnesses received government reward money, which was promised to them by the government prior to Mr. Paul's trial, in exchange for their favorable assistance and/or testimony against Mr. Paul;

c) at least some witnesses received their government reward money before the trial was over and well before the time periods reflected on the disclosed FBI documents concerning when *those* witnesses

received their government money.

Before and during trial the government represented that none of its witnesses had been promised any benefits for their cooperation and/or testimony against Mr. Paul in this case. This was done both in written responses to defense pre-trial discovery requests, *see* Docket Item #66, as well as during trial in representations made to the jury, *see* T. 905-06, argument of Assistant U.S. Attorney Webb (no government witness had been promised rewards in the case).

At a court hearing held *via* telephone conference in this case on August 26, 2002, undersigned counsel noted that he had received the aforementioned FBI disclosures three days earlier, and that while he had only cursorily examined the documents, it appeared they contained evidence of government reward money being paid to witnesses against Mr. Paul. The Court inquired briefly of counsel for the government concerning this matter, and counsel confirmed that in fact money was provided to at least some witnesses who testified against Mr. Paul.

In addition to the above, through ongoing investigations undersigned counsel has learned that the government may have also proffered false testimony concerning statements made to government agents by the defendant himself. This false testimony includes information that Mr. Paul was coached, pressured, coerced, misled, and/or given promises during his interrogation by government

agents after his arrest. No documents received through the aforementioned FOIA requests reflect any of the details of these interrogations, including, but not limited to, the notes made by government agents before, during or after such investigations. Mr. Paul requests that the Court order such disclosure. If none exist, Mr. Paul may seek other forms of discovery in order to investigate and develop the facts underlying these claims.

Mr. Paul has also alleged that the government committed misconduct in the death certification process. The discovery requests related to that claim are set forth in a separate section of this motion.

In addition, Mr. Paul has alleged that the government withheld significant exculpatory information from him during the pre-trial and trial proceedings. Included therein is information regarding the time of death and/or time of the incident regarding the death of Mr. Williams which would have exonerated, or tended to exonerate, Jeffery Paul.

These facts warrant a full and thorough investigation by counsel for Mr. Paul, *prior to* any evidentiary hearing or other formal proceeding in this case, and *prior to* the filing of a final amended §2255 motion, as they give rise to claims that the government engaged in constitutionally prohibited behavior in this case. *See, e.g.,* Colorado v. Connelly, 479 U.S. 157 (1986); Giglio v. United States, 405 U.S.

150 (1972); Napue v. Illinois, 360 U.S. 264 (1959). Using the only processes available to him at this point, however, (*i.e.*, the aforementioned Freedom of Information Act requests and his own investigative efforts), Mr. Paul has been deprived of the opportunity to substantially investigate this claim. The government has thus far refused to provide substantial documentation regarding such matters, despite the fact that portions of some documents that were disclosed directly confirm the payment of money to government witnesses, subsequent investigations reveal that yet other witnesses not accounted for in the disclosed documents also received cash rewards in exchange for their testimony or assistance in the case against Mr. Paul, and other documents provided indicate the other government misconduct and failings set forth above.

Moreover, because of the breadth of the redactions in the disclosed documents, it is impossible to ascertain from FBI investigative memos what witnesses are being interviewed, under what circumstances, and whether the interviews were initiated by the government or by the witness. Without this Court's intervention, Mr. Paul will be prevented from fully investigating, developing and presenting these claims and any other similar claims that might be reflected in the redacted portions of the documents disclosed, as well as other documents withheld from disclosure in their entirety.

**Access to All Documents Reflecting the Decision to Seek Death Initially, and to Refuse to De-Certify the Case After the Ingle Life Verdict**

Mr. Paul seeks access to all documents and materials and other information in the possession of the government reflecting the process whereby both the local U.S. Attorney's office, as well as the Department of Justice in Washington, determined to certify his (and his co-defendant's) case as a death penalty case, as well as all such information concerning the process whereby it was determined that his case would not be de-certified for death once the jury returned a life verdict in the Ingle case. Such documents include, but are not limited to, any items within the local U.S. Attorney's file concerning their request for death certification from the Department of Justice and the reasons therefore, any items at the Department of Justice concerning same, and any documents or information in the possession of the Court concerning the same. As with all other requests set forth herein, Mr. Paul reserves the right to supplement this request as other information becomes available.

In the accompanying §2255 motion Mr. Paul has alleged that the government engaged in misconduct at several points during this process, and that the government improperly exercised its discretion to seek death in this case and to refrain from seeking death after the close of the co-defendant's trial. He cites to

information indicating that, *inter alia*, the local U.S. Attorney's office relied upon known false and/or inaccurate information to influence the death certification committee in Washington to certify Mr. Paul's case for death. He cannot begin to prove that claim absent facts solely in the possession of the government which demonstrate precisely what alleged facts and arguments were proffered by the local U.S. Attorney's office in support of their request to the death certification committee and the Attorney General that Mr. Paul's case be certified as a death case.

Mr. Paul also asserts that the government improperly relied upon his race as a reason why the case should be certified as a death penalty case in the first place, and as a reason why it was not de-certified after the Ingle trial. If either of these allegations are true, then he is entitled to a new trial or at least to a reduction of his sentence to life in prison.

In Wayte v. United States, 470 U.S. 598 (1985), the Supreme Court held that "[i]t is appropriate to judge selective prosecution claims according to ordinary equal protection standards." *Id.* at 609 (footnote omitted). The same applies to the Mr. Paul's equal protection and Eighth Amendment claims here. To succeed on his claims, Mr. Paul must show that the federal prosecutorial policy had both a discriminatory effect and a discriminatory intent. *See* United States v. Armstrong

517 U.S. 456, 465 (1996). Proving discriminatory purpose is a difficult task, but it is made manageable by the procedural framework in which these claims are handled. Initially, all the defendant need do is show "that the totality of the relevant facts gives rise to an inference of discriminatory purpose." Batson, 476 U.S. at 94. Once this case is made, the burden shifts to the prosecution to defend its conduct. To do so, the government must offer concrete factual explanations; "[t]he State cannot meet this burden on mere general assertions that its officials did not discriminate or that they properly performed their official duties." *Id.*

In McCleskey v. Kemp, the Supreme Court held that the aggregate statistics presented by the petitioner were insufficient to raise "an inference of discriminatory purpose." As noted above, that does not mean that the type of statistical proffer and showing made here – discrimination by race of *defendant*, at the hands of a *single government officer* – would also be insufficient to constitute a *prima facie* case under the Fifth and Eighth Amendments. Nor does it mean that aggregate statistics are insufficient for relief under 18 U.S.C. § 3593, or under the Court's supervisory power.

The immediate question, however, is *discovery*. Mr. Paul need not establish a *prima facie* case of selective prosecution in order to receive the *discovery* he needs to make out such a case and/or actually prove his selective prosecution

claim. Proof of a *prima facie* case is a major substantive step in the process of litigating such a claim; it requires the government to formally defend its conduct. Discovery is a preliminary procedural issue, an initial step to permit the defendant to fully investigate his claim, and to perfect, or abandon, it.

In United States v. Jones, 159 F.3d 969 (6th Cir. 1998), a case following United States v. Armstrong, 517 U.S. 456 (1996), a black defendant claimed that the government's decision to prosecute him in federal court instead of state court was discriminatory. The court recognized that "[o]bviously, a defendant need not prove his case in order to justify discovery on an issue." *Id.* at 978. Instead, the Court held, that a defendant need only produce "some evidence" of discriminatory prosecution in order to obtain discovery. *See id.* This standard reflects two competing considerations:

> Forcing the defendant to come forward with some evidence to support a charge of selective prosecution protects the interests in open and frank discussions within prosecutorial offices; protects the government from harassment or delay by criminal defendants; and frees the judicial system of criminal trials [from] irrelevant massive discovery. At the same time, the relatively low burden recognizes that "most of the relevant proof in selective prosecution claims will normally be in the Government's hands. (citations omitted).

United States v. Heidecke, 900 F.2d 1155, 1158 (7th Cir. 1990) (*quoting* Wayte, 470 U.S. at 624 (Marshall, J., dissenting)).

Mr. Paul's claim is an excellent illustration of the wisdom of the "some

evidence" standard for ordering discovery. On the one hand, he has certainly presented "some evidence" of discriminatory impact and discriminatory intent. On the other hand, he cannot develop this claim further without additional evidence that is in the prosecution's exclusive control. Unlike the defendants in Armstrong and United States v. Olvis, 97 F.3d 739, 745-46 (4th Cir. 1996), the statistics submitted by Mr. Paul here do sufficiently account for the relevant variables, such that discovery is justified. They take into account all defendants who are eligible for capital prosecution and, unlike in Olvis, they are based not on an informal survey of attorneys, *see* 97 F.3d at 745, but on the government's own detailed and formal study.

Finally, in light of a similar request, and when faced with much the same information set forth in Mr. Paul's claim on this issue, the United States District Court for the Eastern District of Michigan recently granted a discovery request similar to the one made by Johnson here, on behalf of a black defendant. *See* United States v. John Bass, Case No. 97-80235, Judge Arthur J. Tarnow.

**Access to Court Files and Records**

Mr. Paul hereby seeks discovery of all documents, files, materials and other information in the possession of the Court or its agents and assigns which have not already been made a part of the official, public record in this case and to which he

has not already been given complete and full access.

As a part of his review of this case, undersigned counsel sought and obtained access to the official "court record" in the case at the courthouse for the U.S. District Court for the Western District of Arkansas, in Hot Springs, Arkansas. He was informed by the clerk of the court that the trial judge, the Honorable Jimm Larry Hendren, kept his own file in the case in chambers, and that access to such file could only be obtained with Court permission. Mr. Paul hereby requests that the Court release to him any documents, materials, files or other items in its possession which are not already a part of the "official" court file in the case. This is a request made not only for the sake of completion of the record; Mr. Paul has alleged several claims in the accompanying §2255 motion, incorporated herein by express reference, for which this Court's files, including any notes, records, documents, files, etc., may have clear significance and relevance.

For example, Mr. Paul has alleged both that he was incompetent in fact, and that he was entitled to a hearing on his competence to stand trial while the trial progressed and as his mental state visibly deteriorated. Of relevance to both claims, therefore, are any documents or materials reflecting the Court's knowledge about Mr. Paul's behavior, mental state, and actions before and during the trial proceedings. Upon information and belief, Mr. Paul has learned that the Court

consulted with members of his staff and/or the U.S. Marshal's office concerning these matters, and thus he seeks access to all information in connection with such contacts, including information regarding the timing and content of such contacts. As with all other discovery requests set forth herein, Mr. Paul reserves the right to seek deposition discovery of relevant witnesses, including possibly the Court itself, after the Court has ruled on this initial discovery request.

In another claim, Mr. Paul has alleged that the trial judge in this case, the Honorable Jimm Larry Hendren, was biased against him, having expressed to a number of individuals his disgruntlement with the unanimous decision of the DOJ committee in Washington to de-certify Mr. Paul's case as a death case after the jury in the co-defendant's case had rendered a life sentence. In connection with that claim he has alleged that there exist one or more hearings or conferences between the attorneys and Judge Hendren, which were either not reported by a court reporter, or were not transcribed and made a part of the official court record in the case, and in such hearings or conferences Judge Hendren expressed the aforementioned concerns. He also alleged that Judge Hendren expressed these concerns to other individuals in other settings other than hearings or conferences in Mr. Paul's case.

While Mr. Paul seeks access to *any* material in the possession of the Court

not already a part of the "official" record in the case, at the very least he should be entitled to any notes, files, documents, materials or other information in the possession of the Court or known to the Court, whether or not a part of the "official" court record, which contain information related to these allegations, so that he has access to all information and a reasonable opportunity to develop and eventually present all relevant evidence on this claim. As with other requests for discovery set forth herein, depending upon whether the Court grants such discovery, and if so, what is disclosed, Mr. Paul reserves the right to seek further discovery on this issue. Specifically with respect to the aforementioned conference(s), if no such documents exist, or if in fact such conference(s) were not reported, then he hereby requests a hearing at which a record of such conference(s) may be reconstructed.

Mr. Paul has also alleged that his right to testify in his own behalf was denied in this case. Again, in connection with this claim he alleges that there exist one or more instances in which he attempted to inform the Court of this desire, and of his attorneys' refusal to allow him to testify, and yet at least some such instances were either not reported, or if they were reported, were not transcribed and/or made a part of the official court record in this case. Once again, he seeks disclosure of the entire Court file in the case, whether or not currently a part of the

"official" court record. At the very least, he seeks disclosure of any notes, documents, or other items within the possession of the Court concerning any un-recorded bench conferences, hearings, or other proceedings in this case, to allow him to develop and eventually present all relevant evidence on this claim. He again reserves the right to supplement this request once the Court has ruled upon it and the other discovery requests set forth herein.

**Access to Jurors and Juror Questionnaires**

Mr. Paul seeks discovery of all juror questionnaires in this case, including any copies of such in the possession of the Court; he also seeks the Court's permission to interview all jurors and alternates who served at Mr. Paul's trial.

According to local rule, Mr. Paul or his representative may not interview the jurors in this case without permission from the Court. Mr. Paul has also thus far been prohibited from obtaining access to the juror questionnaires in his case. When undersigned counsel sought and obtained access to the official "court record" in the case at the courthouse for the U.S. District Court for the Western District of Arkansas, in Hot Springs, Arkansas, he asked the clerk of the court for access to the juror questionnaires in the case. The record reflects that juror questionnaires had been utilized in the case, yet they were not included in the court record. The clerk of the court informed undersigned counsel that the juror

questionnaires, as well as other unspecified documents and materials, were contained in the Court's "own file," and that such file was not subject to public access absent the Court's permission.

Mr. Paul seeks the Court's permission to obtain copies of all juror questionnaires in the case, and to interview the jurors in this case. He does so for several reasons, including, but not limited to: a) to determine whether there was specific juror misconduct of constitutional dimension that, by its nature, could not have been discovered and raised at trial and on motion for new trial, and which therefore would provide a basis for habeas corpus relief in its own right; and, b) to determine whether there was specific juror misconduct of constitutional dimension that defense counsel had a duty to discover and raise at trial or on motion for new trial, and which would establish the prejudice prong of a claim of ineffective assistance of counsel raised in the accompanying §2255 motion.

The law is clear that a criminal case may be overturned in post-conviction proceedings due to a variety of types of so-called juror misconduct. *See, e.g.,* Remmer v. U.S., 350 U.S. 377 (1956) (reversible error for juror to be approached by persons acting on defendant's behalf); Jones v. Kemp, 706 F.Supp. 1534 (N.D. Ga. 1989) (impermissible for jury to consult Bible in jury deliberations); Stockton v. Virginia, 852 F.2d 740 (4th Cir 1988) (granting habeas corpus relief where, at

lunch break during penalty phase deliberations, restaurant proprietor commented to several jurors that they "ought to fry the son-of-a-bitch"), *cert. denied*, 489 U.S. 1071 (1989); Fisher v. Angelone, 163 F.3d 835 (4th Cir. 1998) (reporting that elderly juror, who had been lone hold-out for life sentence, changed her vote on instruction of her husband, with whom she improperly discussed the case during overnight recess), *cert. denied*, 526 U.S. 1035 (1999); Williams v. Netherland, ___ F. Supp.2d ___, 2002 WL 112555 (E.D. Va. Jan. 24, 2002) (granting habeas relief where jury foreperson intentionally gave misleading answers on voir dire because truthful answers would have provided defense with basis to strike her for cause).

The Supreme Court has made this a bedrock principle of criminal law:

> In a criminal case, any private communication, contact, or tampering, directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial. . . . The presumption is not conclusive, but the burden rests heavily upon the Government to establish, after notice to and hearing of the defendant, that such contact with the juror was harmless to the defendant.

Remmer v. United States, 347 U.S. 227, 229 (1954) (*quoting* Mattox v. United States, 146 U.S. 140, 148-50 (1895)); Stockton, 852 F.2d at 743 (burden shifts to government to demonstrate absence of prejudice).

In many of the cases cited above the facts underlying the claim of misconduct are of a nature that information of which can only come from direct

interviews with the jurors themselves. Where, as here, the only way a defendant can competently inquire about the possible existence of a recognized constitutional claim for relief is by conducting interviews with members of the jury, then any rule prohibiting such investigation itself undermines the fairness of the proceedings and violates due process. For this reason, the discovery Mr. Paul seeks here is thus not merely a "fishing expedition." *See* Ashmus v. Calderon, 31 F. Supp.2d 1175, 1188 (N.D. Cal. 1998) ("there is a great difference between a fishing expedition, on the one hand, and competently inquiring into the possible existence of habeas claims, on the other. Indeed, the state has a strong interest in [providing for] the latter"), *aff'd*, 202 F.3d 1160 (9th Cir.), *cert. denied*, 531 U.S. 916 (2000).

**Access to DOJ/U.S. Attorney's Files In Both the Paul and Ingle Cases**

Mr. Paul seeks discovery of all documents and materials maintained by the U.S. Attorney's office and the Department of Justice and all of its branches and subsidiaries concerning the investigation and prosecution of Jeffery Paul and Trinity Ingle for the murder of Sherman Williams.

On August 1, 2002, Mr. Paul, through undersigned counsel and pursuant to the Freedom of Information Act, sought disclosure of all documents and materials

maintained by the U.S. Attorney's office and the Department of Justice concerning the investigation and prosecution of Jeffery Paul for the murder of Sherman Williams. On September 24, 2002, undersigned counsel received a response from the U.S. Attorney's office, which contained the disclosure of some documents, many of which were highly redacted. Mr. Paul appealed this response on November 22, 2002; that appeal is currently pending.

As reflected in the appeal, undersigned counsel was initially informed by DOJ personnel that the file in question contained over 8,000 pages. The response received on September 24, 2002, however, indicated that only 4419 pages of materials were reviewed for disclosure. In our appeal we have asked the Department to both review and disclose the remaining 3581+ pages of material. Of the 4419 pages that were reviewed, only 650 were actually disclosed, and many of them were highly redacted. Mr. Paul hereby requests that this Court order full disclosure, without redactions, of all files, documents and materials in the possession of the U.S. Attorney's office and the Department of Justice and all of its divisions and branches concerning the investigation and prosecution of Mr. Paul and Trinity Ingle for the murder of Sherman Williams.

In addition, on October 22, 2002, Mr. Paul sought disclosure of all documents and materials maintained by the U.S. Attorney's office and the

Department of Justice concerning the investigation and prosecution of Trinity Ingle for the murder of Sherman Williams. As with the Paul disclosure, undersigned counsel received only a partial disclosure of highly redacted documents. Mr. Paul requests that this Court order full disclosure of all material, files and documents in the possession of the U.S. Attorney's office and the DOJ and all of its divisions and branches regarding the investigation and prosecution of Trinity Ingle for the murder of Sherman Williams.

Mr. Paul has alleged a number of claims relevant to these requests, including a variety of claims involving prosecutorial misconduct, Brady violations, etc., all of which are incorporated herein by express reference. Both the paucity of documents actually disclosed, as well as the breadth of the redactions in the documents that were disclosed, are completely insufficient in light of the claims alleged in the accompanying petition. In particular, at a phone conference hearing with the Court on August 26, 2002, the Court inquired of counsel for the government whether the government's file contained documents reflecting the fact that witnesses were paid money by the government for their services in the case. Counsel for the government responded that his file did contain such documents. No documents of the sort, redacted or otherwise, were disclosed to undersigned counsel in the aforementioned FOIA proceedings.

As with other requests made herein, Mr. Paul reserves the right to supplement this request in light of further disclosures and/or investigations.

**Access to Treasury Department Files and Other Government Sources of Information Concerning Payments Made In Mr. Paul's Case**

Mr. Paul requests that this Court order disclosure of all documents, materials, files and other information, in the possession of any branch of the federal government, including, but not limited to, the Department of Justice (and all of its branches), the FBI, the Department of the Interior, and the Department of the Treasury, concerning the payment of funds to individuals, companies, or entities, in connection with the investigation and prosecution of Mr. Paul and Trinity Ingle in the murder of Sherman Williams. As set forth elsewhere in this motion and the accompanying §2255 motion, incorporated herein by express reference, Mr. Paul has alleged that numerous witnesses were promised monetary and other benefits and/or actually received monetary and other benefits in exchange for their assistance and/or testimony against Mr. Paul and Mr. Ingle. The above information is thus highly relevant to these claims and should therefore be subject to discovery.

**Access to the Physical Evidence For Purposes of Examination and Testing**

Mr. Paul seeks this Court's permission for access to, and testing of, all physical evidence obtained in this case. Such evidence included alleged bullets and/or bullet fragments, pellets and pellet fragments, clothing from the deceased, and tape from the deceased's body. In particular the tape contained palm prints and human hairs.

Mr. Paul has claimed that he is innocent of the crime of murdering or participating in the murder of Sherman Williams. Evidence relevant to this claim would include physical evidence at the scene of the offense, from the deceased's body or from the area in which it was found, which would tend to show that Mr. Paul did not participate in the murder of Sherman Williams. Without this Court's permission, he will be denied access to such information despite its obvious relevance to his legal claims.

**Access to Documents in the Possession of the U.S. Marshal's Service**

Mr. Paul seeks discovery of all documents, files, materials and other information in the possession or control of the U.S. Marshal's service, concerning the investigation, prosecution and trial of Jeffery Paul and Trinity Ingle in the crime of murder against Sherman Williams.

As noted elsewhere in this motion, Mr. Paul sought access to all documents and material maintained by the Department of Justice and its branches. One such branch is the U.S. Marshal's service. In response the U.S. Marshal's service disclosed 3 pages of heavily redacted materials, while withholding numerous other pages.

Mr. Paul has claimed that he is innocent of the crime of murdering Sherman Williams, that his attorneys were ineffective in failing to develop and present evidence thereof, and that any statements Mr. Paul may have made to other persons implicating himself in the murder were false and were known to be false by the government. All such claims from the accompanying §2255 motion are incorporated herein by express reference. Documents in the possession of the U.S. Marshal's office which confirm any of these facts, either directly or indirectly, are thus relevant to this claim and should be subject to discovery in this case.

Mr. Paul has also alleged that he was incompetent to stand trial, and that the Court was sufficiently aware of his deteriorating mental condition that it should have stopped the proceedings and held a hearing to determine whether Mr. Paul was indeed incompetent to stand trial. All such claims from the accompanying §2255 motion are hereby incorporated herein by express reference. Upon information and belief Mr. Paul has alleged that the Court consulted with the U.S.

Marshal's service concerning these issues. Any documents or materials within the possession of the U.S. Marshal's service regarding these facts would of course be relevant to these claims.

**Access to All Bureau of Prison Files and Records Concerning Jeffery Paul and Trinity Ingle**

Mr. Paul seeks discovery of all documents, files, materials and other information in the possession or control of the Bureau of Prisons concerning himself and his co-defendant, Trinity Ingle.

In May, 2002, Mr. Paul, through undersigned counsel and pursuant to the Freedom of Information Act, sought copies of all Bureau of Prison records and files on Mr. Paul. The Bureau responded by releasing some records and withholding others.

In December, 2002, he did the same with respect to Trinity Ingle. The Bureau has yet to respond to that request.

Mr. Paul requests that this Court order the Bureau of Prisons to release to undersigned counsel all documents and materials in its possession concerning both himself and Mr. Ingle. This request relates to several claims contained in the accompanying motion, incorporated herein by express reference.

First, Mr. Paul has alleged that he was incompetent to stand trial. He has

sought to develop evidence of such through, *inter alia*, evidence concerning any serious mental disorders from which he suffers now or in the past. The law is clear that a claim of incompetency rests not merely on evidence of past mental illness, but can also be established through evidence of current mental illness which likely existed at the time of trial. *See* Speedy v. Wrick, 702 F.2d 723, 727 (8th Cir. 1983) (notwithstanding pretrial psychiatric examinations concluding that defendant was competent, subsequent evidence of the defendant's irrational behavior immediately before and during trial suggested a post-evaluation deterioration and possible incompetency, mandating a competency hearing.) Any documents in the possession of the Bureau of Prisons relating to Mr. Paul's mental status, current or otherwise, are therefore relevant to this claim and should be released to him.

Mr. Paul has also alleged that he is innocent of the crime of murder. Any records in the possession of the Bureau relating to his potential innocence, either directly or indirectly, should therefore also be released. The same is true for the BOP file for Trinity Ingle, whom Mr. Paul claims confessed to the murder in this case and exonerated Mr. Paul. Records in Mr. Ingle's prison file reflecting statements he has made to other inmates, prison officials, counselors, etc., as well correspondence (written or telephonic) he has engaged in (which was screened by

BOP officials) concerning the crimes against Sherman Williams are thus highly relevant to this claim. BOP documents concerning Mr. Ingle's mental health history, as well as his character and behavior while in prison, are also thus highly relevant to this claim and should be ordered disclosed by this Court.

**Access to Any Sources of Information Concerning Unreported Conferences**

Mr. Paul seeks discovery of all documents, files, materials and other information and/or sources of information concerning any unreported conferences throughout the pre-trial and trial proceedings in this case, including, but not limited to, pre-trial hearings, bench conferences, in-chambers conferences, or any other proceedings in which the Court and/or counsel for either or both parties were involved in connection with his case or that of Trinity Ingle.

Mr. Paul has noted at several places in the accompanying §2255 motion, incorporated herein by express reference, that during the pre-trial and trial proceedings there were a number of conferences between the Court and the parties and/or the defendant which were either not reported, or which if they were reported, were not transcribed and made a part of the official court record. He also has obtained information indicating that the same is true with respect to the trial of his co-defendant, Trinity Ingle. He thus seeks access to any information from the

Court concerning these unreported or untranscribed proceedings.

These unreported or untranscribed proceedings relate to several of the issues set forth in the accompanying §2255 motion, including, but not limited, Mr. Paul's claims of incompetence, his claim of innocence, his claim of ineffective assistance of counsel, his claim that he was denied his right to testify, his claim that the trial judge was biased, and his claims that the government committed misconduct throughout all phases of the pre-trial and trial proceedings. Access to the complete record on any and all of these issues is of course essential to a full and fair post-conviction proceeding. *See* Bounds v. Smith, 430 U.S. 817 (1977); Griffin v. Illinois, 351 U.S. 12, 20 (1956).

**Access to Department of Interior Documents Concerning The Death of Sherman Williams**

Mr. Paul seeks access to and discovery of all files, documents, materials or other information in the possession or control of the U.S. Department of the Interior concerning the investigation, prosecution and trial of himself and his co-defendant, Trinity Ingle, in the murder of Sherman Williams.

In June, 2002, Mr. Paul sought pursuant to the Freedom of Information Act all documents and materials in the possession of the Department of the Interior concerning the death and investigation thereof of Sherman Williams. Because Mr.

Williams' body was found in a national park, the Department of Interior was involved in the investigation of this case. The Department responded to this request in August, 2002. The Department disclosed some documents and refused to disclose others; the Department also redacted numerous documents in the disclosed material. We supplemented our initial request in October, 2002, after learning from receipt of other materials in response to FOIA requests from other government agencies that the Department's disclosure was incomplete. To date the Department has not responded to that supplemental request.

Mr. Paul requests that the Court order the Department of Interior to disclose to him all documents and files in its possession pertaining to the death of Sherman Williams and the investigation thereof. Mr. Paul has claimed that he is innocent of the murder of Sherman Williams. In documents disclosed to us from other agencies (although not from the Department), there is information concerning the time and manner of death which, if true, would exonerate and/or tend to exonerate Mr. Paul. Mr. Paul should therefore be given full access to all documents, materials, files and information, completely un-redacted, in the possession of the Department of Interior which may support this and any other claim contained in the accompanying §2255 motion, incorporated herein by express reference.

## CONCLUSION

Given the gravity of this capital case, Jeffery Paul requests leave to conduct the requested discovery, including production of records and evidence, which will enable him to fully investigate, develop, and present any and all relevant constitutional claims including, but not limited to, incompetence, prosecutorial misconduct, factual innocence, possible juror misconduct, judicial bias, the right to testify, and ineffective assistance of counsel. There is "good cause" for discovery. By making this request at this time, Mr. Paul does not waive his right to seek additional discovery in the future, in the form of further requests for access to relevant documents and records, as well as depositions of relevant witnesses that come to light through the disclosure of such relevant documents and records.

This Court should also allow Mr. Paul to issue subpoenas to the relevant authorities for the production of the requested evidence. If the government alleges that any of the information Mr. Paul seeks *via* discovery is privileged and/or constitutes attorney work product, as it has done to date with respect to numerous documents he has requested *via* FOIA requests, he requests the Court to require the government to produce such information for *in camera* inspection and review by the Court. If the government submits any such material, and the Court nevertheless refuses to allow Mr. Paul and/or his counsel access to such material,

Mr. Paul then further requests the Court to copy the undisclosed material and maintain it in the record under seal for purposes of any potential subsequent appeal in this proceeding.

Mr. Paul also requests that any evidentiary hearing be delayed until the completion of the requested discovery, and that he be allowed to amend his §2255 motion in light of newly uncovered information from the discovery, if any, and from investigative leads produced from such discovery. He also requests leave to seek additional discovery as development of the facts and issues, in light of further discovery, may warrant.

For all the reasons set forth above and in his accompanying §2255 motion, incorporated herein by express reference, Mr. Paul respectfully requests that this Court grant Mr. Paul the requested discovery and other relief set forth in this motion.

This 16th day of December, 2002.

Respectfully submitted,

ROBERT L. MCGLASSON
Attorney at Law
Federal Defender Program, Inc.
100 Peachtree St. NW, Suite 200
Atlanta, Georgia 30303

(404) 688-7530

Attorney for Mr. Paul

**CERTIFICATE OF SERVICE**

I do hereby certify that I have served two copies of defendant's Motion for Leave to Conduct Discovery and Supporting Memorandum upon counsel for the United States in this case, by placing a copy of same in the U.S. mail, with proper postage affixed thereto, and addressing it to the following:

Mr. Steven N. Snyder, Esq.
Mr. Mark Webb, Esq.
Assistant U.S. Attorneys
P.O. Box 1524
Fort Smith, Arkansas 72901

This 16th day of December, 2002.

Robert L. McGlasson