IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

U.S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED
JUN 0 2 2003
CHRIS R. JOHNSON, CLERK
BY
DEPUTY CLERK

| | | |
|---|---|---|
| **JEFFREY PAUL**, Petitioner, | § | |
| v. | § | Criminal No. 6:96CR60022-001 |
| **UNITED STATES OF AMERICA**, Respondent. | § | |

GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITIONER'S MOTION FOR NEW TRIAL OR TO VACATE DEFENDANT'S CONVICTION AND DEATH SENTENCE UNDER 28 U.S.C. §2255 AND RESPONSE IN OPPOSITION TO PETITIONERS MOTION FOR DISCOVERY

COMES NOW the United States of America, by and through the United States Attorney for the Western District of Arkansas, and files this response in opposition to Petitioner's "Motion for New Trial or to Vacate Defendant's Death Sentence Under 28 U.S.C. § 2255," and would show the Court as follows:

I.

**Procedural Background Prior to the Filing of the Motion for Relief Pursuant to Section 2255.** On December 4, 1996, a two-count superseding indictment was filed in the United States District Court for the Western District of Arkansas charging Jeffrey William Paul (Paul), and another individual known to the grand jury, while aiding and abetting each other, within the confines of Hot Springs National Park, a place within the special maritime and



8

territorial jurisdiction of the United States, (1) with murder committed in the perpetration of robbery (count 1) and, (2) with using and carrying a firearm, during and in relationship to a crime of violence (robbery) that resulted in the death of a person under circumstances constituting murder (as defined by 18 U.S.C. § 1111(a)), in violation of 18 U.S.C. § 924 (c), 924 (i)(1) (count 2). On September 27, 1997, the government filed a notice of its intention to seek the death penalty in the event that Paul was convicted of either count, both of which were capital offenses.

A jury trial commenced on June 17, 1997, and on June 23, 1997, the jury returned verdicts of guilty on both counts. 4 T 913, DE 233, 234. After a separate penalty phase hearing, the jury unanimously recommended that Paul be sentenced to death. The district court (Hendren, J.) sentenced Paul to death on the two capital counts. 5 T 1174-75, DE 238. The court later denied Paul's motion for a new trial. DE 248. The appeal followed. DE 249.

On direct appeal, he raised the following contentions:

1. Whether Paul's constitutional and statutory rights were violated by the jury's failure to find that Ingle was an equally culpable co-defendant who received a sentence less than death?

2. Whether Paul's constitutional and statutory rights were violated by the jury's failure to unanimously find and consider Paul's purported youth as a mitigating factor?

3. Whether the sentencing phase instructions violated the Constitution or Title 18 capital sentencing procedures by restricting a juror's consideration of mitigating evidence to those factors that he or she individually found by a preponderance of the evidence?

4. Whether the jury made the finding of intent required by Title 18 capital sentencing procedures and the Constitution?

5. Whether the jury instructions required the jury to weigh the finding of requisite intent as an aggravating factor?

6. Whether the jury's weighing of aggravating factors that duplicated elements of the offense violated Paul's rights under the Constitution or Title 18 capital sentencing procedures?

7. Whether Paul's constitutional rights were violated by a sentence based on impermissibly vague or overbroad statutory and non-statutory aggravating factors?

8. Whether the aggravating factors found by the jury or the underlying facts overlapped, and, if so, did this violate the Constitution or the Title 18 capital sentencing statute?

9. Whether evidence relating to Paul's possession of a handgun and attempt to rob a local liquor store was properly admitted at the guilt-innocence phase and did not constitute impermissible punishment phase evidence?

10. Whether the introduction of victim impact evidence at the punishment phase of Paul's trial violated the Constitution or the Title 18 capital sentencing statute by creating an impermissible risk of a sentencing decision based on caprice or emotion rather than reason?

11. Whether admission of guilt-innocence phase testimony about the victim, his personal habits, and his family violated Federal Rule of Evidence 403?

12. Whether the Federal Death Penalty Act's authorization for government creation of and reliance on non-statutory aggravating factors constituted an improper delegation of powers under the Constitution?

13. Whether the prosecutor's closing arguments violated the Constitution?

14. Whether the government relied on inconsistent theories in the prosecutions of Paul and Ingle and, if so, whether this violated due process?

15. Whether Paul's conviction and/or death sentence should be reversed as a consequence of the trial court's failure to allow individual sequestered voir dire and rulings on challenges for cause?

16 Whether Paul's death sentence was based on passion and arbitrariness and, thus, violates the Constitution?

On June 27, 2000, Paul's conviction and sentence were affirmed by the United States Court of Appeals for the Eighth Circuit in a published opinion. *See United States v. Paul*, 217 F.3d 989

(8th Cir. 2000), (*reh'g denied,* Aug.30, 2000). Paul sought a writ of certiorari, in which he raised the following issue:

> Under the Federal Death Penalty Act, 18 U.S.C. § 3591(a)(2), the sentencing jury is required to make a threshold finding that the defendant acted with one of several specified culpable mental states, before it may consider other questions and decide whether to recommend capital punishment. The question presented is:
>
> Whether, under the circumstances of this case, it was reversible error for the district court to instruct the jury that its threshold finding must be whether the defendant "intentionally aided and abetted in the killing" of the victim.

Paul's petition for writ of certiorari was denied by the Supreme Court on October 1, 2001, and rehearing was denied on February 19, 2002. *See Paul v. United States*, 534 U.S. 829 (2001), *reh'g denied,* 534 U.S. 1156 (2002).

II.

**Evidence in Support of Conviction.** The evidence established that, on June 22, 1995, Paul and Trinity Edward Ingle (Ingle) were driven to downtown Hot Springs, Arkansas, by the defendant's brother, Jason Paul. As planned, Paul and Ingle identified a potentially vulnerable victim, Sherman Williams, followed him approximately one half mile up a trail in Hot Springs National Park, robbed him of his wallet and car keys, and killed him.

Each morning, Williams bought the Wall Street Journal at Allstate News and Liquor at 220 Central Street and then proceeded two doors down to the Pancake Shop at 216 Central. 4 T 515-16, 522. Williams was last seen by the owner of Allstate News on June 22, 1995.

On June 26, a hiker found an unidentified body, later identified as Williams' already deteriorating corpse, in a ravine between two trails in Hot Springs National Park. 4 T 519-20, 529. A day after Williams' body was found, a maintenance employee, who was doing rock work on the drainage system at Happy Hollow Springs, found Williams' wallet under a rock at the bottom of the drainage ditch. T 584-85. The wallet contained Williams' federal identification,

driver's license, two credit cards, and a list of emergency phone numbers. T 533, 586. In attempting to locate Williams and return his wallet, Ranger James O'Donnell called one of the listed emergency numbers, that of Williams' daughter, Carole Sherman. 3 T 533. Later, Ranger O'Donnell met Williams' granddaughter, Anna, at Williams' condominium. 3 T 534. The daily newspapers had accumulated at Williams' front door. *Id.* Inside, the television guide was opened to the schedule for June 22.

In his report, Roger Purtee, the Chief Deputy Coroner for Garland County, described the condition of the body when it was discovered.

> Body found in rocky, scrub area on side of Hot Springs Mountain dressed in shorts, shirt, lace-up tennis shoes. Body decomposition heavy on lower limbs, torso; upper torso yellowing and purplish. Skin, muscle, eyes, cranial matter mostly missing on face and head except for scalp. Head was nearly detached from spine. Hands were bound by duct tape behind back; ankles bound by duct tape. Also duct tape was around lower jaw. Presumed to be originally around mouth. Large open wound was evident on right temple above jaw. Unable to determine whether blunt or from other weapon. Back of shirt had three rips (tears) from apparent dragging or falling. Skin under all three tears showed signs of trauma or bruising. Body condition did not allow examination of frontal portion; however, no extreme trauma noted on frontal portion.

3 T 579. From dental records, the body found in Hot Springs National Park was identified as Williams. 3 T 591. The medical examiner was able to identify the two wounds to Williams' skull as entrance and exit bullet wounds from the bevel of the bones inward and outward respectively. 3 T 594-95. X-rays of the body revealed approximately 12 small lead shot pellets in Williams' chest, although body decomposition prevented initial visual discernment of that wound. 3 T 595-96.

Williams' car was found at the bottom of a quarry on Sunday, June 25, 1995, by Sam Maples. Maples contacted the FBI the following Friday, June 30, after seeing newspaper articles

in which the missing vehicle was described. 3 T 610-12. Only one latent print was recovered from the car, and that was from the ashtray and was made by Ingle. 3 T 621, 4 T 778-79. The afternoon of June 22, several acquaintances saw Ingle and Paul in a new vehicle similar in appearance to Williams'. Around 3 p.m. on June 22, Ingle, Paul, and Jason Paul visited Kris Rogers at Skip's Body Shop where he worked; they were driving a new car similar in appearance to Williams' car. 3 T 659-60. At 4:30 p.m., they visited Rebecca Pringle and were driving a car that they identified as belonging to Jeff's father. 3 T 639. According to Pringle, at this time, Paul was limping. 3 T 639.

***Jason Paul***

According to Jason Paul, in the early afternoon of June 22, 1995, he dropped Paul and Ingle off downtown. 4 T 783. They were dressed in baggy pants, flannel shirts, and tennis shoes. 4 T 784. Between two and three in the afternoon, Jason was at home when he heard Paul's and Ingle's voices and saw them getting out of a car parked in front of the Runaway Cafe, 20-30 feet from the house. 4 T 788. One of them changed into a different t-shirt at the house, and then they asked Jason if he wanted to go get something to eat with them. 4 T 789. They stopped at Skip's Body Shop to visit Kris Rogers and went to the Tastee Freeze. 4 T 790. They also stopped to see Jason's friend, Rebecca. Jason booked a room at the Fountain Hotel, and Ingle paid for it. 4 T 791. Paul and Ingle dropped Jason off at home, but Jason later returned briefly to the hotel with a friend and went to get Paul and Ingle some beer. 4 T 792. Jason never again saw the recently obtained vehicle driven by Ingle and Paul that day. 4 T 793.

***Christine LaPaglia***

Christine LaPaglia had met Paul five years earlier at Rivendale, where she was being treated for depression. 3 T 704, 713. They became friends and then dated for more than 2 ½ years. 3 T 704. In June 1995, LaPaglia got a call from Ingle who said that Paul wanted her to

come see him at the Fountain Hotel. An hour later, Paul called her. Paul told her that he was upset and needed her, that he had killed someone. 3 T 707. Paul called her again the next morning to inquire why she hadn't joined him at the hotel. 3 T 708. At that time, he said that his mother was upset with him and wouldn't talk to him because she found blood on his clothes and shoes. 3 T 708. Paul told her that he'd kicked someone and he thought he'd killed him, because he broke his neck. 3 T 715. On July 3, 1995, Paul called her again. He said that he was going camping with his brother at Lake Ouachita, that his mother was going to try to get him a passport, and that he was going to live with his grandparents in Mississippi until that time. 3 T 710. Paul talked about joining the foreign legion because they "just give you guns and you can kill everybody, and that's all he's good at anyway." 3 T 711.

***Kris Rogers***

The evening of June 24, 1995, Paul got together with Kris Rogers, Suzy Arbuckle, Crystal Davis, and Shelly Cornish at the home of Davis and Cornish. According to Rogers, Paul asked to speak to him alone, and they went outside in the back yard. There, Paul told him how they had killed an old man and obtained the new car. After Paul and Ingle had been dropped off downtown, they saw an old man, who looked like an easy target, getting out of his car. 3 T 666. They decided that, if the victim took a trail away from people, they would follow him and rob him. 3 T 667. When Williams wouldn't cooperate, they knocked him down and started kicking him. Paul told Rogers that he kicked Williams so hard that his eye popped out and he broke his neck, bending it to the side, so that a bone broke through the skin. 3 T 667-68. Paul said that he'd never kicked anyone that hard before. Paul and Ingle started to leave, but then went back and shot Williams. As Paul related it to Rogers, both Paul and Ingle had guns. Paul shot Williams first and then made Ingle shoot him, too. 3 T 668-69. Paul showed Rogers his shoes,

which he said had been spattered with blood. 3 T 670. Rogers called Paul after he saw an article about the murder. Paul just laughed. 3 T 673.

***Cindy Wallace***

Cindy Wallace met Paul in Key West, Florida, where he worked in a t-shirt shop down the street and then next door to where she worked. 3 T 728. He lived with her in the spring and early summer of 1996 before his arrest. Paul told her about a dream in which he and his "OG" (original gangster) followed an old man into a park, confronted him, took his money, and beat him up. 3 T 729. They asked the old man whether he would talk. He said no, but they didn't believe him. 3 T 730. The old man begged for his life. According to Paul, to finish his initiation, he had to shoot him or else he would be shot by the OG. Paul related that he shot him in the head and that his eye had popped out during the beating. 3 T 731. Paul told Wallace that he had read in the newspaper that a body had been found and knew that they were interviewing his friends. 3 T 732. His parents told him that Ingle had been arrested and that they were looking for him. 3 T 733. Paul said that he thought he was crazy because he shot the old man and couldn't feel anything. 3 T 736.

***The Gun***

The gun or guns used in the offense were never recovered. In addition to his admissions to friends that he used a gun in the offense, Paul's possession of a gun near the time of the offense was established by Kris Rogers' June 8, 1995, encounter with Ingle and Paul. 3 T 655. At 9-10 p.m. that evening, Ingle and Paul were standing by a pay phone in front of Foster's Foods. They were wearing jackets and dressed warmly despite the fact that it was 80 degrees outside. Just before Paul's parents pulled up in front of the pay phone in their car, Paul handed Rogers a .38 caliber gun wrapped in his jacket. 3 T 655-57. Paul came to Rogers' house to

retrieve the gun the following weekend. He explained that he and Ingle had intended to rob Tri-Lakes Liquor Store down the street and kill the owner. 3 T 957-58.

***Attempts to evade apprehension***

On July 4, 1995, Paul and his brother, Jason, left for Florida because they were wanted by the FBI for questioning. 4 T 794. First, they went to Marathon Key, where they worked on lobster boats for approximately two weeks. From there, they moved to Key West. 4 T 794. After two to three months, Jason Paul left for Mississippi. In July 1996, Jason returned to Key West with his father and his cousin, Ryan, to pick up Paul and move him to Mississippi. 3 T 737; 4 T 797. Paul's father brought him a book, "New ID in America," which described how to get false identification. 3 T 737. After picking up his last paycheck at Click's t-shirt shop and retrieving his belongings from Cindy Wallace's house, Paul left town. 3 T 739. Paul lived with his cousin Ryan in Mississippi until his arrest. 4 T 799.

Paul was arrested in Water Valley, Mississippi, by the FBI on August 22, 1996. 4 T 808. Later that evening, after being advised of his rights, Paul confessed to Special Agent John Lavoie, who recorded his confession as follows:

> He told me on June 22, 1995, he and Trint Ingle walked to the residence of his mother and upon arriving at that residence, convinced his brother, Jason Paul, to drive him and Trint Ingle to the downtown area of Hot Springs, Arkansas.
>
> Upon arriving in the downtown area, the defendant and Trint Ingle began to walk towards the Hot Springs National Park, they observed a white, elderly male exiting a 1994 or 1995 four-door, champagne colored Oldsmobile 88. This white male was wearing a hat, jogging shorts, and red striped knee high socks and grey velcro-type tennis shoes.
>
> Upon seeing the elderly white male, Trint Ingle stated to the defendant, "Let's roll this fool." Prior to seeing the white male, the defendant and Trint Ingle had discussed taking someone off. I asked the defendant what that meant and he said it meant to rob someone.

They then followed the elderly white male into the Hot Springs National Park Once on one of the trails, they then approached the white male, asked for the time. And as the white male provided the time, Trint Ingle then pulled a .38 caliber revolver and demanded money from the white male. The white male told the defendant, Trint Ingle, he had no money. At that time, Ingle stated, "Don't fucking say that to me." The white male then provided his wallet and his car keys to the defendant; the defendant withdrew $98 in United States currency; provided the currency and the keys to Trint Ingle. The defendant kept the wallet.

At that point in time, the defendant advised me that Trint Ingle then handed him a roll of duct tape at which time the defendant duct taped the white male's legs and hands. And at some point in time, Trint Ingle struck the white male with the butt of the revolver, knocking the white male to the ground. Trint Ingle then kicked the white male twice in the head. The defendant advised me that he kicked the white male once in the chest.

They then began to walk away from the white male, at which time Trint Ingle stated to the defendant that he was not going to do prison time for robbing the white male. They then turned and walked back to the white male at which time, Trint Ingle shot the white male once in the head with a hollow-point round and shot the white male a second time in the shoulder with a rat shot round.

At that point in time, the defendant and Trint Ingle then pulled the white male approximately 30 feet off of the trail. The defendant and Trint Ingle then began to walk back towards the Oldsmobile 88 and prior to reaching the vehicle, the defendant advised me that he hid the wallet under several rocks near a spring of water.

Upon reaching the vehicle, the defendant entered the passenger side of the vehicle and Trint Ingle entered the driver's side of the vehicle and they then drove away from Hot Springs National Park.

I asked the defendant after leaving the park what their activities were; his only recollection of the rest of that evening was that they drove to a Tastee Freeze in the Hot Springs Arkansas area.

> As I began to ask the defendant questions concerning his father, he advised that he no longer wished to continue the interview. At that point in time, I discontinued the interview and left the Lafayette County Detention Center.

4 T 810-812.

**Penalty Hearing Evidence**

***The Government's case***

At the punishment phase, the government presented the testimony of three witnesses: the victim's two daughters, Mary McKuin and Carole Lynn Sherman, 4 T 934-49, and the victim's co-worker, Lawrence McCullough. 4 T 950-61. The testimony of Sherman and McKuin established that the victim was 82 at the time of his death. 4 T 935. He grew up in a small town and was the youngest of 6 children, the only one to finish college. 4 T 935. He went to work at the Farmer's Home Administration in 1939 after finishing college. 4 T 936. McKuin and Sherman were born in the next four years. 4 T 936. During World War II, the victim served as a training sergeant at Fort Smith, Arkansas, and he later served in the Korean War. 4 T 937. Following his military service, he returned to the Farmers Home Administration and, at his retirement in 1979, was the State Director. 4 T 938. McKuin and Sherman described the victim as having been very involved in his work and proud of his agency's accomplishments; his few hobbies included photography, fishing, and jogging. 4 T 938-39, 945. They described him as being concerned with a healthy diet and lifestyle. 4 T 939.

In 1981 after his retirement, the victim moved to Hot Springs, buying a condominium on the lake where he had a fishing boat. 4 T 940. He often visited McKuin and Sherman in Little Rock, taking them to lunch as he had done just two and half weeks before his death. 4 T 942-43, 946. The victim was also often joined by McKuin when he took one to two day trips around the state. 4 T 941-42. He attended Razorback games or watched them on television with McKuin and her husband. *Id.*

McKuin and Sherman described the effect that the victim's death had on them. 4 T 943-44, 949. Sherman was stunned by the suddenness of his death. She found it hard to find peace because of the extent of his injuries, and she continued to feel a great deal of anxiety. 4 T 949.

At the time of his testimony, Lawrence McCullough was director of single family housing for the U.S.D.A. Rural Development, formerly the Farmer's Home Administration. 4 T 950. The victim had been the Northeast [Arkansas] District Director when McCullough started working for the Farmers Home Administration and was McCullough's mentor. 4 T 951. McCullough described the victim as a model employee, innovative in implementing change and a source of inspiration. 4 T 951, 954. In particular, McCullough credited the victim with helping his transition from life in a segregated environment to working comfortably in a virtually all white environment. 4 T 952.

***Paul's Evidence in Mitigation***

Paul's punishment phase evidence consisted of his mother's testimony, 5 T 972-1048, and a tape recorded conversation between Ingle and two other inmates in the Crawford County Jail. 5 T 1058-1110.

Paula Paul's testimony regarding the family and Paul's upbringing was extensive and detailed. Paula Paul was raised in Bruce, Mississippi, by Hubert and Martha Massey, who at the time of trial were, respectively, a security guard for a lumber company and a housewife, formerly a truck driver and cosmetologist, respectively. 5 T 973. Paula met Dennis Paul when his father was in the community to do crop dusting. She was 16 and Dennis was 17 when they got married. At the time of their marriage, Dennis was in the Navy, but he got out shortly thereafter. Between that time and when he "re-enlisted" in the Army shortly before Paul's birth, Dennis had a number of briefly held jobs. 5 T 978-82.

Their second child, Paul was born on September 2, 1976. 5 T 978. He was the only child of four that Paula Paul really wanted. She and Dennis had to try very hard to have Paul. Even so, the pregnancy was threatened by a fall she had when she was five months pregnant.

In 1979, the Pauls moved from Mississippi to Malvern, Arkansas, where Dennis' family lived. 5 T 983. The Pauls lived in four different homes in Malvern from 1979 to 1985. 5 T 986. While in Malvern, the Pauls attended church regularly, first at the South Main Missionary Baptist Church then Immanuel Baptist Church. In 1979, Dennis and Paula underwent their first of many separations. 5 T 985, 996.

According to Paula Paul, both of Dennis' parents were alcoholics. 5 T 983. Dennis' older half brother, who had stepped on a land mine in Vietnam, was described as drinking every day. 5 T 984. Dennis' "next younger brother" had been in the Navy and then had gone to work for a major utility company, but he also drank. 5 T 984. Another younger brother, who had a fairly successful construction business, also had a long term drug and alcohol problem. Dennis' youngest brother never did anything and had a severe drug and alcohol problem even after being partially paralyzed in a car wreck. 5 T 984.

Paul did well in early grade school. In second grade, they considered putting him in a gifted and talented program. 5 T 989.

When Paul was 8 years old, he was severely injured by a knife thrown by his father, who, with Paul and his brother Jason, was throwing knives in a neighborhood sandpit for recreation. 5 T 989-991. Paul required reconstructive surgery to his face involving 108 stitches on the surface of his face and over 100 beneath the surface. The injury left his face scarred. 5 T 989.

Paul was also 8 years old when he had his first brush with the law. 5 T 991. As related by his mother, Paul "supposedly" made an obscene gesture towards an elderly man who had yelled at him and his companions for making too much noise riding their mini-motor bikes by his

house. According to his mother, however, Paul didn't make the obscene gesture, another child had. 5 T 991-92.

Paul attended the fourth and fifth grades in Hot Springs, Arkansas, and encountered for the first time issues of peer status like name brands. Paul was teased and called Booboo and Carrot Top. 5 T 999-1000. Nonetheless, Paul was in the Cub Scouts and the Boy Scouts. 5 T 1001.

In Hot Springs, the Paul family continued to attend church regularly. 5 T 1002. After they had been in Hot Springs a while, the Pauls started purchasing a home on Marion Anderson Road, a home that they later lost as a consequence of Dennis' employment instability. 5 T 1003-05. After their next move in the fall of 1988, Paul entered another new school and his grades fell. 5 T 1006. According to Paula Paul, the school counselor told her that Paul would do better if she could buy him the name brand shoes that everyone was wearing and keep his clothes up. 5 T 1007. In the spring of 1989, after they moved to an apartment above Hays Rental where Mrs. Paul worked, Paul changed schools again, this time enrolling in the Hot Springs School District. 5 T 1008. (At this point in time, Dennis was still driving a truck and disappearing periodically. 5 T 1009.) According to his mother, Paul did not adjust well to the new school, because he had never attended school with black children before and didn't know how to handle it. She noted that sometimes he was the only white child on the bus. 5 T 1009.

When he was 12 years old, Paul witnessed the shooting death at Hot Springs Mall of another 12-year-old boy, who was standing six to eight feet away from him. The boy's head was "blown off." 5 T 1015. As a consequence, Paul had trouble sleeping and nightmares, and developed other insecurities. Until he was 17 years old, he would sleep in his mother's bed when he was afraid. 5 T 1016.

His mother took Paul to the Child Study Center in Little Rock, where he was diagnosed as having Attention Hyper Activity Deficit Disorder and was put on Ritalin. 5 T 1010-11. In October 1988, Paula Paul sought community counseling for Paul, who had sores and acne on his face and bit his knuckles. 5 T 1017. He failed the spring semesters in both the ninth and tenth grades. 5 T 1012.

Paul was admitted to Rivendale, a psychiatric residential treatment center, on two occasions, the first time as a consequence of a Garland County Juvenile Court adjudication for car theft, for which he received probation. 5 T 1021, 1024. Paula Paul explained the car theft this way. Paul and "another little boy were walking around one day and decided they wanted to go to Florida. And there was a car sitting out in front of a local barbeque joint with the keys in it and they got in it and kinda left." 5 T 1022. They got as far as Memphis before they called home from the airport. 5 T 1022. Dennis Paul told them to go to an airport security guard and to wait there until he could pick them up. 5 T 1023.

According to Paula Paul, 1992 was a very bad year for the Paul family. Ma Baker, Paul's grandmother to whom he was very close, died. 5 T 1025-26. Paul's dog Benji died the same year. 5 T 1027. Paul's older brother Jason dropped out of school that year. 5 T 1027. Finally, Paula Paul had a hysterectomy and her husband had an affair that year. 5 T 1026-27. But, she related that, when she came home from the hospital, Paul slept in the bed with her. 5 T 1026. In January 1993, Paul was again admitted to Rivendale, this time because he had tried to commit suicide. 5 T 1028.

After Paul had been at Rivendale, he attended Lake Hamilton High School for a half day and then the school decided that they did not want him there. 5 T 1019. Carol Nash was Paul's "homebound" teacher from Lake Hamilton High School. 5 T 1019. Paul did well with Ms.

Nash, but did not do so well with the next "homebound" teacher, Mr. Henry. 5 T 1020. Paul got his GED in October 1993. 5 T 1032.

In 1993, Paul was convicted for a burglary that his mother knew he didn't commit, because he was made to sign in and out of the house and her father was there at the time. 5 T 1028. A few months later, Paul "mistakenly" walked off with an earring from a sidewalk table at Claire's Boutique. 5 T 1030. On November 13, 1993, he was convicted as an adult and given probation for terroristic threatening, which involved "pulling a shotgun." 5 T 1031-33. His probation was revoked when Jason and Paul brought girls to their house, a situation that was described by Paula Paul as one girl just "trying to find a place to sleep." 5 T 1034. Paul was incarcerated in a unit of the Arkansas Department of Corrections in Varner. 5 T 1035. He was released in March 1995. 5 T 1036.

Mrs. Paul didn't recall anything different about Paul on June 22, 1995. 5 T 1040. She didn't recall him coming home with bloody shoes or clothes; he didn't tell her about committing the murder or that he was in trouble. 5 T 1043. She did not recall him limping. 5 T 1043. Paula Paul didn't offer to buy her son an airline ticket to go overseas or to get him a passport. 5 T 1040. His mother characterized Paul as a teller of tall tales.[1] 5 T 1041. Paul does not understand geography or time. 5 T 1037.

Mrs. Paul first found out her son was in Florida in October 1995. 5 T 1044. She visited him in Key West, and it was wonderful. He had lots of friends, and he was doing well. He gave her $500 to buy new clothes. 5 T 1045. She next saw him a week before he was arrested in Water Valley. Dennis knew where he was and took her to him. 5 T 1046.

Paula Paul promised that, if Paul was given a life sentence, she would write to him and visit. She believed that he had a lot to contribute even in prison, and she knew he could "refind"

---

[1] Paula also described her husband as a pathological liar.

his spiritual roots if they could just put this behind them. 5 T 1047. Finally, she said that Paul's death would be very difficult for the younger boys. 5 T 1048.

*Jury's Capital Verdict*

The jury's findings with respect to aggravating and mitigating factors were recorded on a special verdict form. DE 237. In Section II of the special verdict form, the jury unanimously found that the government had established beyond a reasonable doubt that the defendant intentionally aided and abetted in the killing of Sherman Williams. 5 T 1164.

In special verdict section III, the jury found the existence of the following statutory aggravating factors beyond a reasonable doubt: (1) that the defendant committed the offenses in an especially heinous, cruel or depraved manner in that they involved torture or serious physical abuse to Sherman Williams, (2) that the defendant committed the offenses in the expectation of the receipt of something of pecuniary value, and (3) that Sherman Williams was particularly vulnerable due to old age. 5 T 1164.

In special verdict section IV, the jury found the existence of the following non-statutory aggravating factors beyond a reasonable doubt: (1) that the defendant is likely to commit criminal acts of violence in the future which would be a continuing and serious threat to society, (2) that the defendant successfully eluded capture by the Federal Bureau of Investigation until his arrest in Mississippi on August 22, 1996, (3) that the defendant ha[d] demonstrated a lack of remorse for the capital offenses committed in this case, by statements and/or actions,[2] (4) that Sherman Williams was killed to prevent the defendant from being identified as a participant in the

[2] The enumerated actions were (a) the defendant stated that he did not feel bad about the murder, (b) the defendant stated the victim begged for his life, and (c) the defendant referred to the victim in vulgar terms.

robbery, (5) that the victim had personal characteristics as an individual human being,[3] and (6) that the family of the victim ha[d] suffered injury and loss, as a result of the victim's death.[4] 5 T 1164-66. The jury failed to unanimously find beyond a reasonable doubt the non-statutory aggravating factor "[t]hat the defendant ha[d] committed, attempted to commit, and/or threatened to commit other acts of violence in addition to the capital offense committed in this case, including but not limited to . . . an attempted armed robbery/murder at the Tri-Lakes Liquor Store, Hot Springs, Arkansas on or about June 8, 1995."

No jurors found the existence of four of the statutory mitigating factors set forth in special verdict form section V: (1) that the defendant's participation in the offense was relatively minor, (2) that the defendant did not have a significant prior history of other criminal conduct, (3) that the defendant committed the offense while experiencing emotional disturbance, and (4) that another defendant, Trinity Edward Ingle — equally culpable--would not be punished by death. 5 T 1166. Only one statutory mitigating factor garnered any votes from the jury; three jurors found that there were "other factors in defendant's background that mitigate[d] against imposition of the death sentence." 5 T 1166.

Paul fared better with non-statutory mitigating factors: (1) that the defendant experienced parental neglect, abandonment and corruptive influence was found by 12 jurors, (2) that the defendant experienced parental abdication as to holding defendant accountable for his behavior (12 jurors), (3) that the defendant experienced chaotic family instability (12 jurors), (4) that the

---

[3] The jury's consideration relevant to this factor included but was not limited to the following identified characteristics: (1) father, (2) grandfather, (3) college graduate, (4) retired state director of the FmHA, (5) avid fisherman, photographer, and jogger, and (6) United States Army veteran.

[4] The aspects of this loss enumerated for the jury's consideration were (1) disruption of order, (2) reality of violence, (3) a stunning troubling experience, and (4) indescribable feeling of loss.

defendant experienced modeled parental irresponsibility (8 jurors), (5) that the defendant identified with criminally convicted peers (12 jurors), and (6) that the defendant was youthful at the time of the offense (6 jurors). 5 T 1167. In addition, 6 jurors identified as mitigating that the defendant witnessed the shooting at the mall. 5 T 1167. No jurors found the proffered mitigating factor "that defendant reversed parental roles with his mother." 5 T 1167.

The jurors found that the aggravating factors sufficiently outweighed the mitigating factors and, by a unanimous vote, sentenced Paul to death. 5 T 1168. Finally, each juror certified that consideration of race, color, religious beliefs, national origin, or sex of the defendant or the victim was not involved in reaching his or her individual decision. 5 T 1168.

III.

**Relief pursuant to 28 U.S.C. § 2255 is strictly circumscribed**. The grounds for relief under section 2255 are narrower than those for relief on direct appeal. With very limited exceptions, relief may not be based on (1) an error that is not of jurisdictional or constitutional dimension, (2) a procedurally defaulted ground, (3) a claim previously raised and rejected on direct appeal, (4) a "new rule" as defined by *Teague v. Lane,* 489 U.S. 288 (1989), and its progeny, or (5) error that did not have a substantial and injurious effect or influence in determining the jury's verdict.

***Cognizable claims***

Section 2255 "is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." *United States v. Apfel*, 97 F.3d 1074, 1076 (8th Cir. 1996). Non-constitutional and non-jurisdictional claims that could not have been asserted on direct appeal can be raised on collateral review only if the alleged error constitutes "a fundamental defect which inherently results in a complete miscarriage of justice...." *Poor*

*Thunder v. United States*, 810 F.2d 817, 821-822 (8th Cir. 1987), *citing Johnson v. United States*, 805 F.2d 1284, 1287 (7th Cir. 1986), *quoting Hill v. United States*, 368 U.S. 424, 428 (1962). Under this rigorous standard, most non-constitutional violations of federal law are not cognizable on collateral review. *E.g.*, *United States v. Addonizio*, 442 U.S. 178, 186 (1979)(institution of parole guidelines); *United States v. Timmreck*, 441 U.S. 780, 783-84 (1979)(violation of Fed. R. Crim. P. 11); *Hill v. United States*, 368 U.S. 424, 429 (1962)(violation of Fed. R. Crim. P. 32); *United States v. Pollard*, 959 F.2d 1011, 1028 (D.C. Cir.) (violation of plea agreement by government), cert. denied, 506 U.S. 915 (1992); United States v. Stevens, 851 F.2d 140, 143-144 (6th Cir. 1988) (violation of Fed. R. Crim. P. 32); Fiumara v. United States, 727 F.2d 209, 213 (2d Cir.) (wiretapping violation), cert. denied, 466 U.S. 951 (1984); *see Peguero v. United States*, 526 U.S. 23, 26-29 (1999) (violation of Fed. R. Crim. P. 32(a)(2)).

***Procedurally defaulted claims***

Section 2255 relief is not available to correct otherwise cognizable constitutional errors that could have been raised at trial or on direct appeal, absent a showing of cause and actual prejudice, or a showing that the alleged errors were fundamental defects resulting in a complete miscarriage of justice. *See Ramey v. United States*, 8 F.3d 1313, 1314 (8th Cir. 1993), *citing United States v. Frady*, 456 U.S. 152, 167-68 (1982) and *United States v. Smith*, 843 F.2d 1148, 1149 (8th Cir. 1988) (per curiam). To establish cause, the convicted must show that defense counsel was prevented from raising the claim at the procedurally appropriate point by some factor external to the defense. *Murray v. Carrier*, 477 U.S. 478, 488 (1986). The novelty of a claim will constitute cause only where the claim was absolutely unavailable; it is not sufficient that subsequent legal developments have made counsel's task easier. *Wallace v. Lockhart*, 12 F.3d 823, 826 (8th Cir. 1994), *citing Smith v. Murray*, 477 U.S. 527, 537 (1986); *Engle v. Isaac*,

456 U.S. 107, 130 n.35 (1982), *quoting Myers v. Washington*, 646 F.2d 355, 364 (9th Cir. 1981)(Poole, J., dissenting)("futility cannot constitute cause if it means simply that a claim was 'unacceptable to that particular court at that particular time'").

The actual prejudice standard is more rigorous than the showing required to establish plain error on direct appeal. *Williams v. United States*, 98 F.3d 1052, 1054 (8th Cir. 1996), *citing United States v. Frady*, 456 U.S. 152, 166 (1982). To establish actual prejudice, the error must be demonstrated to have "worked to [the defendant's] *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. at 170. This requires the claimant to show a substantial likelihood that but for the alleged error, the jury would have acquitted him. *Johnson v. United States*, 278 F.3d 839, 844 (8th Cir. 2002).

A miscarriage of justice exists where the petitioner "produces reliable new evidence not available at trial which demonstrates that it is more likely than not that with new evidence, no reasonable juror would have convicted him," *Amrine v. Bowersox*, 128 F.3d 1222, 1226-27 (8th Cir. 1997). The miscarriage of justice is concerned with actual as opposed to legal innocence. *Partee v. Hopkins*, 30 F.3d 1011 (8th Cir. 1994), *citing Sawyer v. Whitley*, 505 U.S. 333, 339 (1992).

***Claim previously adjudicated on direct appeal***

Claims that have been raised and decided on direct appeal cannot be re-litigated on a motion to vacate under 28 U.S.C. § 2255. *United States v. Kraemer,* 810 F.2d 173, 177 (8th Cir. 1987); *United States v. Shabazz*, 657 F.2d 189 (8th Cir. 1981).

***New Rule of Criminal Procedure***

With two limited exceptions, a defendant is not entitled to a grant of relief under Section 2255 if it requires the court to announce or apply a "new rule." *Teague v. Lane*, 489 U.S. 288

(1989). A new rule is one that was not dictated by existing precedent when the defendant's conviction became final. *Id.* at 301. The first exception exists "for new rules forbidding criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997). The second exception, which is "even more circumscribed" than the first, is for "watershed rules of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." *Id.* at 157.

***Harmless Error***

On collateral review under Section 2255, a constitutional error is harmless "unless it had a substantial or injurious effect or influence in determining the jury's verdict," *Brecht v. Abrahamson*, 507 U.S. 619, 638 (1993), or leaves one in "grave doubt" as to whether it had such an effect. *O'Neal v. McAninch*, 513 U.S. 431 (1995); *United States v. Drummond*, 903 F.2d 1171, 1174 (8th Cir. 1990), *citing Kotteakos v. United States*, 328 U.S. 750 (1946). This standard applies even if the *Chapman* "harmless beyond a reasonable doubt" standard was applied on direct appeal. *See Hassine v Zimmerman*, 160 F.3d 941, 950-955 (3rd Cir. 1998), *cert. denied*, 526 U.S. 1065 (1999), *citing Chapman v. California*, 386 U.S. 18, *reh'g denied*, 386 U.S. 987 (1967).

***Discovery and an Evidentiary Hearing***

A § 2255 movant is entitled to discovery under Rule 6 of the Rules Governing Section 2255 Proceedings "where specific allegations before the court show reason to believe that petitioner may, if the facts are fully developed, be able to demonstrate that he is, entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997). A Section 2255 movant is entitled to an evidentiary hearing unless the motion, files, and record conclusively show that he is not entitled to relief. *Engelen v. United States*, 68 F.3d 238, 240-41 (8th Cir. 1995). A hearing is not

required, however, if (1) the movant's allegations, accepted as true, would not entitle the movant to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact. *Id.* at 240, *citing United States v. Rodriguez Rodriguez*, 929 F.2d 747, 749-50 (1st Cir. 1991). Where the record before the Court contains sharply conflicting evidence, it is an abuse of discretion to fail to hold hearing. *Koskela v. United States*, 235 F.3d 1148, 1149 (8th Cir. 2001).

IV.

**1. Paul cannot re-litigate in § 2255 review the claim previously raised and rejected on direct appeal that the government's purported reliance on inconsistent theories at Paul's and co-defendant Ingle's trials violated Paul's right to a fair trial and due process.**

Paul reiterates his challenge, previously raised on direct appeal, that the government's purported reliance on inconsistent theories at Paul's and co-defendant Ingle's trials violated Paul's right to a fair trial and due process. The Court of Appeals reviewed his claim for plain error.

> Paul asserts that the prosecutor argued at both Paul and Ingle's trials that the defendant on trial pulled the trigger, and argues the prosecution cannot take such inconsistent actions. Again, the government points out that there was no objection to this argument at trial and that review is for plain error. This court has recently issued an opinion addressing a similar argument. In *Smith v. Groose*, 205 F.3d 1045 (8th Cir.2000), we granted habeas relief to a petitioner because the prosecutor had relied upon factually inconsistent theories to obtain murder convictions in separate trials for the same murder. *See id.* at 1052-53. In *Smith*, we held that Smith's trial was fundamentally unfair and he was deprived of due process because the state relied upon factually inconsistent and irreconcilable evidence at the two trials, and because Smith could not have been convicted of felony murder under both theories. *See id.*
>
> Here, the theory that either Paul or Ingle, or both, shot Williams, was not factually irreconcilable and was supported by the evidence. Paul stated to both Chris Rogers and Cindy Wallace that he shot Williams. In addition, Paul told Rogers that Ingle also shot Williams after Paul did. The defense admitted the evidence was in conflict during closing argument at the guilt phase, stating: "I think throughout the testimony we heard three things; that Jeffrey shot Mr. Williams, that Trinity shot Mr. Williams, that Jeff and Trinity shot Mr. Williams. It is never a consistent story as to who shot Mr. Williams." More importantly, Paul could have been convicted of aiding and abetting in the murder of Sherman

> Williams under either theory. *See United States v. Clark*, 980 F.2d 1143, 1146 (8th Cir.1992) ("To convict under the aiding and abetting statute, 18 U.S.C. § 2, the government need only prove that [each] defendant associated himself with the unlawful venture, participated in it as something he wished to bring about, and by his action sought to make the activity succeed.").
>
> Finally, Paul only argues that the prosecutor made inconsistent *arguments* at the two trials, but cannot point to the use of evidence at the different trials which was factually inconsistent and irreconcilable. At the guilt-phase closing argument in Paul's trial, the prosecutor also conceded there were three possible scenarios with regard to the shooting. When it cannot be determined which of two defendants' guns caused a fatal wound and either defendant could have been convicted under either theory, the prosecution's argument at both trials that the defendant on trial pulled the trigger is not factually inconsistent. *See Nichols v. Scott*, 69 F.3d 1255, 1268-69 (5th Cir.1995) (regarding the analogous felony murder situation). Thus, because there was evidence that supported both theories, and since Paul could have been convicted of aiding and abetting under either theory, we find no error.

*United States v. Paul*, 217 F.3d at 998-99. Paul identifies no reason to circumvent the well-established prohibition on re-litigating in Section 2255 review claims previously adjudicated on direct appeal. Moreover, his challenges to the purportedly inconsistent theories of prosecution are also foreclosed in § 2255 review (1) by his procedural default, (2) under the *Teague v. Lane* prohibition against retroactive application of new rules, and (3) because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

**2. Paul cannot re-litigate in § 2255 review the claim previously raised and rejected on direct appeal that the government's authority, under 18 U.S.C. § 3592 (c) & (d), to designate and rely upon non-statutory aggravating factors results from an impermissible delegation of legislative authority.**

Paul reiterates his challenge, previously raised on direct appeal, that the government's authority, under 18 U.S.C. § 3592 (c) & (d), to designate and rely upon non-statutory aggravating factors results from an impermissible delegation of legislative authority, which is not cured by the articulation of an intelligible principle to which the delegated authority (and resulting non-statutory factors) must conform. (Compare Paul's § 2255 motion at 21-30, ¶¶ 32-46, and Appellant's brief attached as Appendix A at 143-50.) The Court of Appeals reviewed his claim for plain error.

> Paul argues that the FDPA allows the government to arbitrarily and creatively choose as many non-statutory aggravating factors as it wishes, in violation of the separation of powers doctrine. Paul argues the statute improperly delegates this inherently legislative authority to the executive branch. The only other circuit to consider this argument rejected it. *See United States v. Jones*, 132 F.3d 232, 239-40 (5th Cir.1998), *affirmed*, 527 U.S. 373, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999). The Fifth Circuit reasoned that the prosecution was adequately limited in its power to define non-statutory aggravators by the notice provisions in the FDPA, the Supreme Court death penalty jurisprudence, the district court functioning as a gatekeeper against impermissibly prejudicial information, and the FDPA's requirement that at least one statutory aggravating factor be found by the jury before it moves on to non-statutory factors. *See id.* Thus, the prosecution is sufficiently guided by "intelligible principles" to constitutionally exercise the delegated authority to define non-statutory aggravating factors. *See id.* at 240. We agree with the Fifth Circuit that the prosecutor's authority to define non-statutory aggravating factors is a constitutional delegation of Congress' legislative power.

*United States v. Paul*, 217 F.3d at 1003. Paul identifies no reason to circumvent the well-established prohibition on re-litigating in Section 2255 review claims previously adjudicated on direct appeal. Moreover, his claim based on the government's ability to rely under the FDPA on non-statutory aggravating factors is also foreclosed in Section 2255 review (1) by his procedural default, (2) under the *Teague v. Lane* prohibition, because relief was not dictated by existing precedent when his conviction became final, and (3) because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

**3. Paul cannot re-litigate in § 2255 review the claim previously raised and rejected on direct appeal that the trial court committed jury selection error by refusing to allow individual sequestered voir dire, the manner in which the voir dire was handled, and erroneously ruling on challenges for cause.**

Paul reiterates his challenge, previously raised on direct appeal, that the trial court committed jury selection error by refusing to allow individual sequestered voir dire, the manner in which the voir dire was handled, and erroneously ruling on challenges for cause. (Compare Paul's § 2255 motion at 31-42, ¶¶ 47-65, and Appellant's brief attached as Appendix A at 164-73.) The Court of Appeals reviewed his challenge to the voir dire procedure for plain error and challenges to the exclusion of three jurors for an abuse of discretion.

> Paul argues the district court should have allowed the defense individual and sequestered voir dire. He also argues the district court impermissibly shortened voir dire and made the process prejudicial to Paul and impaired his ability to exercise peremptory challenges. Paul made no objection during voir dire and we review for plain error. Voir dire in this case took approximately two days, and several jurors were questioned individually while sequestered from the rest of the venire. The district court has wide latitude over the conduction of voir dire and we review for an abuse of discretion only. *See United States v. Granados*, 117 F.3d 1089, 1092 (8th Cir.1997). We find the district court did not abuse its discretion and conducted voir dire in a way that protected Paul's Sixth Amendment right to a fair trial. *See id.*
>
> Paul also argues the district court improperly ruled on several challenges for cause, alleging that three jurors who were too pro-capital punishment were not dismissed, and that three jurors with anti-capital punishment views should not have been dismissed. With regard to the three jurors allegedly favoring capital punishment, the record shows that all three had indicated on the previously filled-out juror questionnaire that they did not believe a sentence of life without parole was a sufficient penalty for an intentional killing. However, all three of these jurors were individually questioned by defense counsel and by the trial judge,

and during questioning, at some point, each one said that he or she could fairly consider a sentence other than death for an intentional killing. A defendant subject to the death penalty may properly challenge for cause any juror "who will automatically vote for the death penalty in every case" and who will not consider aggravating and mitigating circumstances as required by the instructions. *Morgan v. Illinois*, 504 U.S. 719, 729, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992). That is not the case here. Each juror expressed a good-faith ability to consider a sentence of life without parole if Paul were convicted of the underlying charges. Furthermore, none of the three jurors actually sat on the jury. A defendant's right to exercise peremptory challenges is not denied or impaired when the defendant chooses to remove jurors who arguably should have been removed for cause. *See United States v. Martinez-Salazar*, --- U.S. ----, ----, 120 S.Ct. 774, 782, 145 L.Ed.2d 792 (2000). Furthermore, the Sixth Amendment guarantee to a fair trial is not violated in this situation because those jurors did not end up sitting on the jury. *See id.* at 781-82.

Paul also asserts that three jurors should not have been removed for cause because of their views in opposition to the death penalty. All three jurors indicated an opposition to the death penalty in open court in response to initial questioning by the trial court. Upon reading the transcript of the first juror's individual questioning by defense counsel and by the trial court, we find that this juror could not set aside her views against capital punishment. She stated unequivocally several times that she could not impose the death penalty. Further, Paul voiced no objection when the court dismissed her for cause.

The second juror, in response to extensive questioning by both attorneys and the trial court, once stated that she could consider, with difficulty, the death penalty, but at the close of her individual questioning, she stated unequivocally that she could not impose the death penalty. This time, defense counsel even agreed this juror be dismissed for cause, stating to the judge, "[y]ou don't have any choice."

The third juror was also not willing to set aside her views against capital punishment and follow the law. The closest this juror came to saying that she could even consider the death penalty was to say that if someone were to kill one of her own children, she "may want to pull the switch" herself. However, this juror

> obviously was not sitting on a jury for the trial of her child's killer. She made it clear that in reality, she could not fairly consider the death penalty, despite instructions from the court. Again, defense counsel did not object when this juror was dismissed for cause.
>
> Each of these three jurors indicated they could not fairly consider imposing the death penalty as a possible sentence, regardless of the instructions from the court. As such, the district court did not abuse its discretion by removing them for cause. *See Morgan*, 504 U.S. at 729, 112 S.Ct. 2222.

*United States v. Paul*, 217 F.3d at 1003-04. Paul identifies no reason to circumvent the well-established prohibition on re-litigating in Section 2255 review claims previously adjudicated on direct appeal. Moreover, his challenges to the voir dire process and the exclusions for cause are also foreclosed (1) by his procedural defaults, (2) under the *Teague v. Lane* prohibition against retroactive application of new rules, and (3) because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

**4. Paul's challenge to the prosecution's reliance on evidence of unadjudicated conduct was raised and rejected on direct appeal and cannot be re-litigated in the context of this § 2255 motion.**

Paul challenges in the instant Section 2255 motion, as he did on direct appeal, the admission into evidence at the guilt phase of the trial of statements made by Paul to an acquaintance regarding his plan to rob the Tri-Lakes Liquor Store and kill the owners. (Compare Paul's § 2255 motion at 43-53, ¶¶ 66-82 , and Appellant's brief attached as Appendix A at 107-17). Paul argues that the evidence was inadmissible under Federal Rule of Evidence 404(b) and that the jury's consideration of unadjudicated conduct (versus criminal convictions) at the sentencing phase was "neither authorized nor contemplated by the FDPA," Paul's § 2255 motion at 49, and violated Paul's constitutional rights. The Court of Appeals concluded as follows:

> Paul next argues that the prosecution relied upon unadjudicated bad act evidence at trial and at sentencing, in violation of Paul's statutory and constitutional rights. This evidence involves statements by Paul about a possible liquor store robbery. Chris Rogers testified that Paul had given him a gun and talked about using it to rob a liquor store and kill the owners. The government did not produce any other evidence concerning this alleged plan. Paul argues the evidence was inadmissible under Rule 404(b).
>
> Rule 404(b) of the Federal Rules of Evidence prohibits the admission of evidence of the defendant's prior bad acts if the evidence is offered to show that the accused acted in conformity with prior bad acts, but does permit the admission of bad acts if the evidence is offered for a purpose "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." Fed. R. Evid. 404(b). We employ a four-factor test for assessing the admissibility of Rule 404(b) evidence. Prior bad act evidence may be admitted if it is (1) relevant to a material issue, (2) proved by a preponderance of the evidence, (3) greater in probative value than prejudicial effect, and (4) similar in kind and close in time to the offense charged. *See*

> *United States v. Molina*, 172 F.3d 1048, 1054 (8th Cir.1999). Further, "[a] district court has broad discretion when deciding whether to admit or exclude prior bad act evidence, and this court will disturb a district court's decision only if we find that the evidence has no bearing on the case." *Id.*
>
> We find the district court did not abuse its discretion in allowing testimony about the plans to rob the liquor store because this evidence was relevant to establish that Paul had access to a gun, as the gun used in the murder was never found. This evidence was also relevant to show Paul's plan to perform a robbery only two weeks before the robbery and murder of Williams, and thus was similar in kind and close in time to the robbery and murder of Williams. Further, Rogers' testimony on this matter was sufficient to prove by a preponderance of the evidence there was a plan to rob a liquor store.
>
> Paul also argues this evidence was improperly used as an aggravating factor, because the FDPA requires that an aggravator related to prior criminal activity be based upon a criminal conviction. However, we note that the jury did not find that the attempted liquor store robbery was an aggravating factor. Therefore, any error in using this evidence as an aggravating factor was harmless.

*United States v. Paul*, 217 F.3d at 1002.

Paul's challenge in his Section 2255 motion precisely reiterates the claim raised on direct appeal, except that he now identifies the Supreme Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and *Ring v. Arizona*, 536 U.S. 584 (2002), as purportedly supporting the proposition that the government must prove beyond a reasonable doubt unadjudicated criminal conduct introduced as evidence in support of a non-statutory aggravating factor. *Apprendi* and *Ring* don't even remotely support the proposition advanced by Paul and do not provide a viable basis for resurrecting in Section 2255 review the claim rejected on direct appeal. The portion of the claim raised on direct appeal is foreclosed (1) by the previous adjudication, (2) to the extent

that it advances a claim that is not of constitutional dimension, (3) by the non-retroactivity principles of *Teague v. Lane*, (4) by procedural defaults, and (5) because the error, if any, did not have a substantial or injurious effect on the jury's determination of guilt or sentence. The arguments made in reliance on *Apprendi* and *Ring* and advanced for the first time in the instant § 2255 motion are foreclosed (1) by the non-retroactivity principles of *Teague v. Lane*, (2) procedural defaults reflecting the failure to object on that basis at trial and to raise the arguments on direct appeal; and (3) because the error, if any, did not have a substantial or injurious effect on the jury's determination of guilt or sentence.

In *Apprendi*, the Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. at 490. In *Ring*, the Court extended the rule of *Apprendi* to require that the jury find beyond a reasonable doubt the aggravating factors that render a capital defendant eligible for the death penalty. 536 U.S. at 608. The Court reasoned, "Because Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." *Ring* at 609, *quoting Apprendi*, 530 U.S. at 494, n.19. In the context of the Federal Death Penalty Act (FDPA), a defendant convicted of a capital offense is rendered eligible for the death penalty by the jury's finding beyond a reasonable doubt one of the threshold culpability factors set forth in 18 U.S.C. § 3591(a)(2) and one of the statutory aggravating factors set forth in 18 U.S.C. § 3592. Non-statutory aggravating factors inform the selection decision, in which the jury determines whether an defendant eligible for the death penalty should in fact receive a death sentence. *See Tuilaepa v. California*, as: 512 U.S. 967, 971 (1994)(distinguishing between the

eligibility decision and the selection decision); *United States v. Regan*, 221 F. Supp. 2d 672, 681 (E.D. Va. 2002)(non-statutory aggravating factors play a role in the selection decision). In short, because a non-statutory factor does not affect a defendant's eligibility for a death sentence, it is not the functional equivalent of an element of the offense and thus falls outside the ambit of *Apprendi* and *Jones*. However, even if the non-statutory factors were essential to a defendant's eligibility for the death penalty and functioned as an element of the offense, there would be no requirement that the evidence introduced in support of the factors be established beyond a reasonable doubt. *See McKoy v. North Carolina*, 494 U.S. 433, 449 (1990)(Blackmun, J., concurring).

**5. Paul cannot re-litigate in § 2255 review his various challenges to the prosecution's closing arguments, which were previously raised and rejected on direct appeal.**

Paul reiterates the various components of the claim of improper prosecutorial closing argument raised on direct appeal. (Compare Paul's § 2255 motion at 54-64, ¶¶ 83-98, and Appellant's brief attached as Appendix A at 151-158). Because Paul did not object to the arguments at trial, his claim was reviewed for plain error. The Court of Appeals concluded, "We have reviewed the record and find no error in the closing arguments and certainly no error which affected Paul's substantial rights." *United States v. Paul*, 217 F.3d at 1003. Paul identifies no reason to circumvent the well-established prohibition on re-litigating in Section 2255 review claims previously adjudicated on direct appeal. Moreover, his challenges to the prosecutors' closing arguments are also foreclosed in § 2255 review (1) by his procedural defaults, (2) under the *Teague v. Lane* prohibition against retroactive application of new rules, and (3) because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

***6.*** **Paul's claim that cumulative errors resulted in an arbitrary sentence will be addressed in conjunction with the claim of cumulative error presented as his twenty-seventh ground for relief.**

**7. Paul cannot relitigate in § 2255 review his claim that Federal Rule of Evidence 403 was violated by the introduction at the guilt-innocence phase of evidence of the victim's habits and family.**

Paul reiterates his challenge previously raised on direct appeal to the admission at the guilt-innocence phase of evidence pertaining to the victim's habits and family. (Compare Paul's § 2255 motion at 69-77, ¶¶ 106-120 , and Appellant's brief attached as Appendix A at 136-42). The Court of Appeals reviewed his claim for plain error.

> Paul next argues that the government presented unnecessary and prejudicial testimony during the guilt phase of the trial regarding the victim's personal life. Paul argues this evidence should have been excluded under Rule 403 of the Federal Rules of Evidence because its only purpose was to unfairly create sympathy for the elderly victim. Rule 403 provides "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." We have reviewed the record and find the district court did not commit plain error by admitting such evidence.

*United States v. Paul*, 217 F.3d at 1002-03. First, Paul's claim raises an issue of neither constitutional nor jurisdictional stature, but rather a violation of law that would be cognizable in Section 2255 review only if it resulted in a fundamental miscarriage of justice. The preceding conclusion of the Court of Appeals that the admission of the identified evidence was not plain error is inapposite to a finding that the admission constituted a fundamental miscarriage of justice. A miscarriage of justice exists only where the guilt phase error probably resulted in the conviction of someone who was in fact innocent. In this case, the purported error could not have had that effect. Second, Paul cannot re-litigate a claim raised and decided on direct appeal. Third, even if there were a constitutional component to Paul's claim, it would also be foreclosed

(1) by his procedural default, (2) under the *Teague v. Lane* prohibition against retroactive application of new rules, and (3) because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

**8. Paul's claim of actual innocence relies on evidence considered by the jury before finding him guilty beyond a reasonable doubt.**

Paul's claim of actual innocence is principally founded on a series of self-serving conclusions, such as, "Mr. Paul did not kill, . . . The co-defendant in this case, Trinity Ingle, is solely responsible for the killing of Mr. Williams. . . . In fact Mr. Paul attempted to stop Trinity Ingle from shooting and killing Sherman Williams." These self-serving and unsupported conclusions aside, Paul identifies the following as evidence of his purported innocence: (1) co-defendant Ingle's confession, (2) purported evidence demonstrating that the government's case rested on the testimony of witnesses who lied or were paid for their testimony, testimony which the prosecution purportedly knew to be "wholly inconsistent with the physical and forensic evidence in the case," and (3) the purported lack of physical evidence connecting Paul to the offense and "physical evidence in the possession of the government establishing that someone other than Paul taped Williams' hands and feet."

***Standard of Review***

Claims of newly discovered evidence advanced in a § 2255 motion are subject to the same substantive test as a motion for new trial on the same basis under Fed. R. Crim. P. 33.[5] Although Paul's claim of actual innocence seems to rely for the most part on evidence considered

---

[5] The "free-standing" post-trial claim of actual innocence advanced by Paul does not provide a cognizable, constitutional basis for relief in § 2255 review. In most respects, § 2255 review is coextensive with federal habeas review of state convictions under § 2254. "Claims of actual innocence based on newly discovered evidence have never been held to state a ground for federal habeas relief absent an independent constitutional violation occurring in the underlying criminal proceeding." *Meadows v. Delo* , 99 F.3d at 283, *quoting, Herrera v. Collins*, 506 U.S. 390, 400 (1993).

and rejected by the jury as a basis for finding him not guilty, if he could establish the factual predicate that he advances in his pleadings, which he cannot, it could provide an arguable basis for "a motion for new trial based on newly discovered evidence that [the] conviction was obtained by the prosecutor's knowing use of perjured testimony." *See United States v. Duke*, 50 F.3d 571, 577 (8th Cir.), *cert. denied*, 516 U.S. 885 (1995).

A five prong substantive standard is applicable if the newly discovered evidence raised in a § 2255 motion "comes from a neutral source and the prosecution did not know, or have reason to know, of its existence." *Id.* at 576. "[T]he evidence must have been discovered after the trial; (2) the failure to discover the evidence must not be attributable to a lack of diligence on the part of the petitioner; (3) the evidence must not be merely cumulative or impeaching; (4) the evidence must be material; and (5) the evidence must be likely to produce an acquittal if a new trial is granted." *Id.* at 576-77, *citing English v. United States*, 998 F.2d 609, 611 (8th Cir.), *cert. denied*, 510 U.S. 1001 (1993).

Where a motion for new trial is based on newly discovered evidence that a conviction was obtained by the prosecutor's knowing use of perjured testimony, as Paul claims here, a different standard applies. "[A] conviction so obtained 'must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury.'" *United States v. Duke*, 50 F.3d at 577, *quoting United States v. Agurs*, 427 U.S. 97, 103 (1976). Under this standard, "the fact that the testimony is perjured is considered material unless the failure to disclose it would be harmless beyond a reasonable doubt." *United States v. Bagley*, 473 U.S. 667, 680 (1985); *see also English v. United States*, 989 F.2d 609, 611 (8th Cir. 1993), *quoting Lindhorst v. United States*, 658 F.2d 598, 602 (8th Cir. 1981), *cert. denied*, 454 U.S. 1153

(1982)("Under this relaxed standard, a petitioner need only prove any reasonable likelihood that the false testimony could have affected the judgment of the jury."). To avail himself of this relaxed standard, however, Paul must establish both that the testimony was perjured and that the prosecution knew or should have known of the perjury at the time the testimony was presented. *Id.* Paul can make neither showing.

***The Evidence***

1. Paul first asserts that he "is able to present conclusive evidence . . . including, but not limited to, evidence indicating that Mr. Ingle, who was the sole perpetrator of the murder of Sherman Williams, and who was thus an eyewitness to Mr. Williams' murder, confessed to the above facts, and thus is solely responsible for the death of Sherman Williams." Paul's § 2255 motion at 81. Paul does not indicate whether the referenced "confession" is the recorded statements of Ingle to another inmate, portions of which were actually introduced at the punishment phase of the trial, another existing statement, or a hypothetical possible future statement of Ingle. Regardless, any evidence based on existing or prospective statements of Ingle would not be "newly discovered." "When a defendant who has chosen not to testify subsequently comes forward to offer testimony exculpating a co-defendant, the evidence is not 'newly discovered.'" *Meadows v. Delo*, 99 F.3d at 280, 282 (8th Cir. 1996), *quoting United States v. Rogers*, 982 F.2d 1241, 1245 (8th Cir. 1993).

2. Paul claims that heavily redacted records received from the FBI indicate that witnesses received money from the government. Paul relates that, due to the redactions, he is unable to ascertain whether the witnesses who received this money actually testified. (Paul does not further identify or provide the records upon which he bases his allegations.) From this point,

Paul's claim is sheer speculation. He speculates that the witnesses who received money falsely implicated Paul and that the prosecution knew the testimony to be false. As set forth *infra*, after trial, the FBI decided to award funds to two individuals, only one of whom testified, to reward them for their assistance in identifying and prosecuting Paul. *See* Appendix C, Affidavit of Tom Ross. There was no discussion between the FBI, the prosecution, and the recipients of the awards or promise of money prior to trial, much less a promise of funds conditioned on false testimony.

3. Paul speculates that there is physical evidence in the possession of the government establishing that someone other than Paul taped Williams' hands and feet. Rule 2 of the Rules Governing Section 2255 Proceedings requires Paul, in support of asserted claims, to "set forth in summary form the facts supporting each of the grounds thus specified." Paul's speculation does not support a claim of factual innocence. The government is aware that several light brown and grey Caucasian head hairs were found on duct tape on or near the body of the victim. The government is unaware however of any testing that excludes the victim as the source of these hairs.

Paul's unfounded speculations do not provide a credible basis for awarding a new trial.

**9. Paul cannot challenge the government's exercise of prosecutorial discretion to seek the death penalty in the first instance in § 2255 review.**

Paul claims that both the government's initial decision to seek a death sentence and the subsequent decision to continue to seek a death sentence after codefendant Ingle received a life sentence were founded on race and did not represent a proper exercise of prosecutorial discretion. According to Paul, an intentional discrimination against white defendants underlies the decision to seek the death penalty in his case and violates both the due process clause of the Fifth Amendment and the prohibition against arbitrary and capricious use of the death penalty derived from the Eighth Amendment. Paul also cites as independent legal grounds for his claim a statutory provision, 18 U.S.C. § 3593(f), and the court's "supervisory powers over the administration of federal criminal justice." Paul also seeks discovery in connection with this claim.

Paul's challenge to the exercise of prosecutorial discretion to seek a death sentence in his case does not provide a basis for relief on the merits or for discovery because (1) it is raised for the first time in § 2255 review and he cannot establish cause for the failure to raise the claim at trial and on direct appeal, or prejudice resulting therefrom; (2) Paul's statutory and supervisory power claims do not present a cognizable basis for Section 2255 relief; (3) the granting of relief would require the court to announce and rely upon a new rule of constitutional law in contravention of the prohibition of *Teague v. Lane* and its progeny; and (4) his arguments fails on their merits in any event because they are contradicted by controlling precedent.

***Procedural Default***

As indicated *supra*, the procedural default doctrine bars claims that were not raised at trial or on direct appeal, unless the defendant can show "cause" for the default in failing to raise the claim and "prejudice" resulting therefrom, or that the failure to review the claim would result in the execution of an "actually innocent" person. Here, Paul could have raised, both at trial and on direct appeal, his constitutional and non-constitutional claims that the government engaged in impermissible selective prosecution in seeking the death penalty, but he failed to raise his claims at either stage, resulting in two independent procedural bars to his claim (first, the default at trial, and second, the default on direct appeal). He cannot show, as to either of the two defaults, "cause" (i.e., that he was prevented from raising the claims by an objective impediment external to the defense) or "prejudice" (as defined *supra*).

Paul's claims are therefore barred unless he can show that, but for the otherwise-barred constitutional error, no reasonable juror would have found him guilty of the offense or eligible for the death penalty. *See Knox v. Iowa*, 131 F.3d 1278, 1282 (8th Cir. 1997); *Embry v. Hershberger*, 131 F.3d 739, 741 (8th Cir. 1997), *cert. denied*, 525 U.S. 828 (1998). His claim of selective prosecution cannot overcome this hurdle because it necessarily does not tend to show that an "innocent" person was convicted or sentenced to death. *See Embry v. Hershberger*, 131 F.3d at 740-41. Rather, his claim is predicated on the allegation that his case was improperly selected for capital prosecution from the larger class of death-eligible cases. Paul's § 2255 motion at 88-95.

***The claims grounded on Section 3593(f) and federal judicial supervisory powers are not cognizable on collateral review***

As mentioned *supra*, the legal provisions Paul cites as the grounds for his claims of impermissible discrimination in seeking the death penalty include not only specific clauses of the Constitution (including the Due Process Clause of the Fifth Amendment and the Eighth Amendment), but also a statutory provision, § 3593(f), and the court's "supervisory powers over the administration of federal criminal justice." Paul's § 2255 motion at 103-07. Section 3593(f), part of the Federal Death Penalty Act, provides that at the sentencing hearing, the court must instruct the jury, and jurors must sign a certification, to the effect that the race, color, religious beliefs, national origin, and sex of the defendant and the victim were not involved in the sentence determination. Paul raises no allegation that the court failed to instruct or that the jury failed to certify in accordance with the statute, and, to the extent that he argues that alleged selective prosecution violated the spirit of the statute, his claim fails because it is not cognizable on collateral review. His claim invoking federal judicial supervisory powers is likewise not cognizable.

Thus, even if Paul could establish a violation of Section 3593(f) or grounds for the exercise of supervisory power, he would not be entitled to collateral relief unless the violation is a fundamental defect – not merely a technical one – that amounts to a complete miscarriage of justice. That Paul cannot establish a constitutional violation (as discussed *infra*) suggests that his claim does not involve such a fundamental miscarriage, and this conclusion is bolstered by the fact that he cannot establish a violation of even the technical terms of Section 3593(f) – as previously noted, the court in fact instructed the jury according to the literal terms of the statute,

and the jury signed the certification required by the statute. For all of these reasons, Paul's statutory and supervisory power claims do not present a cognizable basis for Section 2255 relief. *See Reed v. Farley*, 512 U.S. 339, 347-55 (1994).

***Teague v. Lane non-retroactivity bar***

Paul's constitutional claims are barred under *Teague v. Lane* because they are predicated on proposed new constitutional rules of criminal procedure that were not in effect when Paul's conviction became final on direct review (i.e., on October 1, 2001, *see Paul v. United States*, 534 U.S. 829 (2001)). The rules Paul seeks to apply to his case are "new" because, as explained *infra*, a "court considering the defendant's claim at the time his conviction became final would [not] have felt compelled by existing precedent to conclude that the rule he seeks was required." *O'Dell v. Netherland*, 521 U.S. 151, 156 (1997) (alterations and internal quotations omitted). Further, neither of the two exceptions to non-retroactivity applies.

Paul acknowledges that the "racially disproportionate pattern of capital charging" that he alleges in his petition "does not, on its own, *prove* that the government has engaged in intentional discrimination in violation of the due process clause . . . or . . . the Eighth Amendment," but he nevertheless argues, citing *Batson v. Kentucky*, 476 U.S. 79 (1986), that his showing shifts to the government the burden of producing a "credible nondiscriminatory reason" for its charging decision. Paul's § 2255 motion at 95. However, Paul's reliance on statistical discrepancies to prove unconstitutional racial discrimination in the application of the death penalty is clearly at odds with the Supreme Court's decisions in *McCleskey v. Kemp*, 481 U.S. 279 (1987), and *United States v. Armstrong*, 517 U.S. 456 (1996). *See United States v. Edelin*, 134 F. Supp. 2d 59, 81-89 (D.D.C. 2001). Under these decisions, a defendant's Equal Protection claim of

impermissible selective prosecution requires proof of two elements: "[t]he claimant must show that the federal prosecutorial policy 'had a discriminatory effect and that it was motivated by a discriminatory purpose.'" *Armstrong*, 517 U.S. at 465 (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). The term "discriminatory" in this context refers to policies based on a defendant's race, religion, or other constitutionally suspect class, or to penalize the exercise of a fundamental constitutional right. *See Armstrong*, 517 U.S. at 464; *Wayte*, 470 U.S. at 608; *Oyler v. Boles*, 368 U.S. 448, 456 (1962); *United States v. Webster*, 162 F.3d 308, 333-34 (5th Cir. 1998), cert. denied, 120 S. Ct. 83 (1999). "To establish a discriminatory effect in a race case, the claimant must show that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465.

Citing *Batson*, Paul alleges that the Department of Justice statistical study he emphasizes "is sufficient to establish a prima facie case of discrimination, and to shift the burden to the government to produce a credible non-discriminatory explanation for its practice of disproportionately seeking death sentences for white defendants." Paul's § 2255 motion at 95. However, this is precisely the sort of abstract burden-shifting that the Supreme Court flatly rejected in *McCleskey*, opting instead for a requirement that a defendant show purposeful discrimination in his own case. The *McCleskey* Court specifically distinguished its decision in *Batson*, reasoning that "[r]equiring a prosecutor to rebut a study that analyzes past conduct of scores of prosecutors is quite different from requiring a prosecutor to rebut a contemporaneous challenge to his own acts." 481 U.S. at 296 n.17. The Court explained:

> Our refusal to require that the prosecutor provide an explanation for his decisions in this case is completely consistent with this Court's longstanding precedents that

> hold that a prosecutor need not explain his decisions unless the criminal defendant presents a prima facie case of unconstitutional conduct with respect to his case.

*Id.* at 296-97 n.18 (emphasis added); *accord Armstrong*, 517 U.S. at 467-68 (similarly distinguishing *Batson*).

In light of this authority, Paul's reliance on *Batson* proposes a new rule not in effect when his conviction became final. Neither of the two exceptions to non-retroactivity applies. His proposed burden-shifting rule self-evidently does not "forbid[] criminal punishment of certain primary conduct and rules prohibiting a certain category of punishment for a class of defendants because of their status or offense," or constitute a "watershed rule[] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding," akin to the rule granting indigent felony defendants the right to trial counsel. *O'Dell*, 521 U.S. at 157.

Paul's Eighth Amendment claim is likewise *Teague*-barred. He asserts generally that the Cruel and Unusual Punishments Clause imposes limitations on the exercise of prosecutorial power that are at least as strict as those that would apply under his burden-shifting interpretation of the Due Process Clause. Paul's § 2255 motion at 100. However, his Eighth Amendment claim requires a showing at least as great, if not greater, than that required for an equal protection claim under the Due Process Clause. *See McCleskey*, 481 U.S. at 306-15. Absent some showing of an express "invidious" intention underlying the imposition of the death penalty, there is no Eighth Amendment violation. *See id.* at 313, 319. A showing that similarly-situated defendants of different races did not receive the death penalty does not tend to show an Eighth Amendment violation, nor does it shift to the government the burden to produce a non-discriminatory explanation for its charging decisions. *Id.* at 306-07. Thus, Paul's Eighth Amendment claim

proposes a "new rule," which, for the reasons set forth *supra*, would not fall within either of the two narrow exceptions to non-retroactivity.

Finally, even apart from the burden-shifting aspects of his constitutional claims, it is apparent from the authorities recited herein that Paul is not entitled to relief under either the Due Process Clause or the Eighth Amendment. Paul would be entitled to relief only through an extension of existing law that would amount to a "new rule." Neither of the two exceptions to non-retroactivity would apply, for the reasons previously noted. Thus, in this additional respect, Paul's claims are *Teague*-barred.

***Paul's claims fail on their merits in any event***

Paul's due process and Eighth Amendment claims also fail on their merits. He cannot show that the government's charging decision here "had a discriminatory effect and that it was motivated by a discriminatory purpose," as required for the due process claim, *Armstrong*, 517 U.S. at 465, nor can he show an express "invidious" intention underlying the imposition of the death penalty, as required for the Eighth Amendment claim, *see McCleskey*, 481 U.S. at 313, 319. His request for discovery in support of his claims fails for similar reasons.

***Flawed Factual Predicate***

As an initial matter, the factual basis for his claim of race-based selective prosecution is, to say the least, severely flawed. Paul suggests that the circumstances of his case did not warrant a death penalty prosecution and that former Attorney General Reno decided to seek the death penalty against him, a white man, in order to counter the disproportionate number of blacks charged with death penalty eligible offenses and on federal death row.

Paul cites to two law review articles by Rory Little and a portion of the trial record for the proposition that "the local U.S. Attorney's office, in an over-zealous effort to obtain DOJ approval for death certification of what was in fact a weak case for federal death sentencing, . . . presented false information about the alleged heinousness of the crime to the death certification committee and to the Attorney General in Washington." Paul's § 2255 motion at 87, ¶143. As support for his proposition that his case was "a weak case for federal death sentencing," Paul references "Why a Federal Death Penalty Moratorium?", an article by Rory Little, who served for a time on the Attorney General's Review Committee for Capital Cases under former Attorney General Reno. Before rejecting a moratorium as appropriate for federal executions, Little briefly delineated the facts underlying the convictions of each of the death-sentenced inmates then on federal death row. Little described Paul's case as follows:

> Jeffrey Paul. Paul was convicted of beating an elderly man to death, with a co-actor, during a robbery on national parkland. The decision to prosecute this garden-variety (relatively speaking) robbery-murder as a federal capital case does raise, for me, significant jurisdictional and case-disparity concerns. That is, why should this particular robbery-murder result in a death sentence, when so many other similar cases do not?
>
> In addition, the fact that Paul's co-killer received life rather than a death sentence (albeit from a different jury) raises questions about equality of treatment. Yet diverse jury decisions must be accepted if we are to have a jury system at all.
>
> Nevertheless, these concerns do not go to "innocence" under even a broad interpretation, and there is no serious dispute that Paul committed the crime. Four witnesses testified that Paul had admitted the crime to them, and his appeal suggests no issue of innocence.

Rory K. Little, *Why a Federal Death Penalty Moratorium?*, 33 Conn. L. Rev. 791, 804 (2001). Little's personal ruminations about the appropriateness of seeking a death sentence for Paul are simply one person's viewpoint and do not establish in any authoritative sense that the circumstances of Paul's case presented a "weak case for federal death sentencing."

In support of his assertion that the prosecutors in the Western District of Arkansas presented false information about the alleged heinousness of the crime to the Attorney General's Review Committee for Capital Cases and to the Attorney General, Paul relies on the following contribution from another article by Little.

> . . . The beating lasted only a few minutes and did not seem "especially" gruesome,--is not every single beating death gruesome?-- except that the impact of one kick dislodged the victim's eyeball from the socket and it "hung" on his cheek. Unsurprisingly, this fact was repeatedly stressed in the prosecutorial documents advocating for the death penalty.
>
> While some urban jurisdictions such as New York might take an "average" beating death in stride as a deplorable but not capital crime, it is not difficult to describe any beating death as involving "serious physical abuse" if one is so inclined. More rural districts that see relatively fewer federal homicides, or federal prosecutors in states that fully accept capital punishment, may be more likely to decide to pursue such a beating death case as a capital case. A painstaking, second-by-second account of the beating, reasonably supported by autopsy reports, can easily meet the "gruesomeness" level that this factor, frankly, demands.
>
> My point is not that this beating did not merit the death penalty, but rather that some federal prosecutors might well conclude that it did not.

Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. 347, 499-500 (1999). Although Little labels the instant offense a garden-variety robbery-murder and speculates that some prosecutors might not find

particularly gruesome a beating in which the victim's eyeball is forced from its socket, Little's viewpoint is as irrelevant as it is exceptional.

Paul's claim of misrepresentation by the prosecuting U.S. Attorney is not furthered by citation once again (as on direct appeal) to a portion of the transcript for the proposition that "the medical examiner confirmed that there was no sign of trauma to the victim's head or neck other than the single gunshot wound that caused death." *See* Appendix A, Paul's brief on direct appeal at 30. In advancing this assertion, Paul yet again conveniently ignores the report of the deputy chief coroner for Garland County that the victim's "[s]kin, muscle, eyes, cranial matter [were] mostly missing on face and head except for scalp. Head was nearly detached from spine." 3 T 579. It goes without saying that there would be no sign of trauma resulting from a beating to the head if the skin, muscle, eyes, and cranial matter were missing (unless of course the beating resulted in a broken bone).

In summary, Little's personal ruminations about the appropriateness of a Paul's death penalty prosecution and sentence are, as Little himself recognized, insufficient to establish that Paul's conduct in this case did not warrant a death sentence. Paul's reliance on the coroner's failure to find evidence of trauma to the victim's head is, to say the least, disingenuous.

Finally, relying on the statistics pertaining to the federal death penalty released by the Department of Justice on September 12, 2000 (the "DOJ Survey"), Paul notes that, although Blacks were disproportionately represented in the pool of defendants charged with federal death penalty-eligible crimes as compared to their representation in the population generally, Attorney General Reno authorized seeking the death penalty for 38% of the White, 25% of the Black, and 20 % of the Hispanic death penalty-eligible defendants. Paul theorizes that "[t]he most obvious

explanation for that pattern is that, because of the glaring disparity between the gross number of capital eligible minority defendants and white defendants, and on federal death row, which has [sic] created an obvious incentive for the government to decrease that disparity by authorizing a disproportionate number of white defendants." See ¶ 149. Paul's speculation in this regard ignores steps taken by DOJ to insure that the decision to whether to seek the death penalty in each case is made not only without regard to but also without knowledge of the defendant's race.

> . . . Echoing the statute, 18 U.S.C. S 3593(f), the protocols direct that "bias for or against an individual based upon characteristics such as race or ethnic origin may play no role in the decision whether to seek the death penalty." In fact, to guard against such bias on a possibly unconscious level, the Attorney General has directed that prosecutorial death penalty review submissions be "race blind," that is, devoid so far as possible of racial identification information regarding the defendant or victim(s). Yet the Department as an institution does not ignore race; rather it collects race-identification information about capital defendants and victims (which obviously might be valuable for future study of federal death penalty administration) on a separate form, while instructing U.S. Attorneys that the information "will not be included in the materials presented to the Attorney General's Review Committee." Main Justice staff also reviews the materials that are submitted to the Committee to ensure that unnecessary racial information does not slip in. So, unless the defense informs the Committee, as they sometimes do for strategic reasons, or some fact necessary to the prosecution suggests ethnicity, the Attorney General and her review committee remain ignorant of race or ethnicity. This is a further indication of the Department's sensitivity to race issues in administration of the death penalty. While the Department maintains useful statistical information about race as it is intertwined with administration of the federal death penalty (although it has not publicly released this data), it self-consciously eliminates racial information from the Attorney General's review process.

Rory K. Little, *The Federal Death Penalty: History and Some Thoughts About the Department of Justice's Role*, 26 Fordham Urb. L.J. at 411-12.

***Paul has failed to make the required prima facie showing of discriminatory purpose.***

Paul has failed to make the prima facie showing of "discriminatory purpose" required for his equal protection claim under the Due Process Clause. The *McCleskey* Court defined "discriminatory purpose" as:

> "[M]ore than intent as volition or intent as awareness of consequences. It implies that the decisionmaker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."

481 U.S. at 298 (quoting *Personnel Administrator of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979)). The Court then went on to reject the use of statistics to prove discrimination in capital sentencing. *Id.* at 291-99. Paul has failed to present any express evidence of discriminatory purpose, and his reliance on the DOJ Survey to satisfy this element fails for precisely the same reasons that the evidence in *McCleskey* was found wanting.

In rejecting similar statistical evidence (the "Baldus study") that McCleskey offered to show prima facie discriminatory purpose in his capital prosecution, the *McCleskey* Court distinguished cases using statistical studies to prove purposeful discrimination in the selection of jury venires or under Title VII on the ground that "in those cases, the statistics relate to fewer entities, and fewer variables are relevant to the challenged decisions." 481 U.S. at 295. *McCleskey* emphasized the danger in extrapolating discriminatory intent based on statistical studies of the criminal charging process, noting that the "unique nature of the [charging] decisions at issue in this case also counsels against adopting such an inference from the disparities indicated by the Baldus study." *Id.* *McCleskey* observed that in the context of capital prosecutions:

> It is . . . questionable whether any consistent policy can be derived by studying the decisions of prosecutors. . . . Since decisions whether to prosecute and what to charge necessarily are individualized and involve infinite factual variations, coordination among district attorney offices across a state would be relatively meaningless. Thus, any inference from statewide statistics to a prosecutorial "policy" is of doubtful relevance.

*Id.* at 295 n.15.[6] Giving undue weight to such questionable statistics also would undermine the broad discretion traditionally allowed prosecutorial charging decisions, which are be presumed to have been made in good faith. *Attorney General v. Irish People, Inc.*, 684 F.2d 928, 947 (D.C. Cir. 1982), *cert. denied*, 459 U.S. 1172 (1983); *see also United States v. Eklund*, 733 F.2d 1287, 1290-91 (8th Cir. 1984) ("Without such a showing the criminal prosecution is presumed to have been undertaken in good faith and in a nondiscriminatory manner pursuant to a duty to bring violators to justice"), *cert. denied*, 471 U.S. 1003 (1985). Numerous courts in federal death penalty prosecutions have followed the holding of *McCleskey* and rejected claims of unconstitutional racial bias absent a specific showing of discriminatory purpose. *See, e.g., United States v. Kee*, 2000 WL 863119, at *5 (S.D.N.Y. 2000); *Cooper*, 91 F. Supp. 2d at 115;

---

[6] *McCleskey* expounded on the "infinite factual variations" as follows:

> The Constitution is not offended by inconsistency in results based on the objective circumstances of the crime. Numerous legitimate factors may influence the outcome. . . . If sufficient evidence to link a suspect to a crime cannot be found, he will not be charged. The capability of the responsible law enforcement agency can vary widely. Also, the strength of the available evidence . . . may influence a prosecutor's decision to offer a plea bargain or go to trial. Witness availability, credibility, and memory also influence the results . . . . The foregoing factors necessarily exist in varying degrees throughout our criminal justice system.

481 U.S. at 307 n.28.

*United States v. Cuff*, 38 F. Supp. 2d 282, 286 (S.D.N.Y. 1999); *United States v. Walker*, 910 F. Supp. 837, 859-60 (N.D.N.Y. 1995).

Even assuming, arguendo, that statistics could somehow be used to meet Paul's burden under *McCleskey*, the DOJ Survey simply does not prove what Paul claims it does. The DOJ Survey gathered statistics relating to the charging recommendations and decisions of the Attorney General in seeking the death penalty on, among other grounds, race and geography. Under the Attorney General's Protocol, implemented in 1995, if a defendant is charged with a federal capital offense, the U.S. Attorney must submit the case for review by the Capital Case Review Committee, regardless of whether the U.S. Attorney has recommended for or against seeking the death penalty. That procedure was followed in this case.

The statistics relied on by Paul implicate the entire range of discretionary factors considered when the prosecutors within the 94 United States Attorneys offices nationwide decide whether or not to charge a defendant with a capital offense. Accordingly, Paul is simply wrong in his claim that the statistics he presents do not call into question the decisions of scores of prosecutors but rather "a single person, the Attorney General of the United States." Paul's § 2255 motion at 102. The statistical disparities relied on by Paul to show purposeful discrimination is the very same type of statistical study that the Court in *McCleskey* found insufficient because, among other things, it fails to account for the myriad variables that factor into the prosecutorial discretion as to whether to charge a defendant with a capital offense.

Finally, even considering Paul's statistical evidence, and going so far as to indulge his claim that the burden has shifted to the Government to supply a race-neutral explanation for any disparity, his assertion of discriminatory purpose is easily rebutted, given the nature of Paul's

offenses and the extended history of criminal conduct as pleaded in the Government's death penalty notice. *See Webster*, 162 F.3d at 334-35. As the Court in *McCleskey* observed, "absent far stronger proof, it is unnecessary to seek such a rebuttal, because a legitimate and unchallenged explanation for the decision is apparent from the record: McCleskey committed an act for which the United States Constitution . . . permit[s] imposition of the death penalty." 481 U.S. at 296-97.

***Paul has failed to make the required prima facie showing of discriminatory effect.***

Apart from discriminatory purpose, Paul cannot prevail on his equal protection claim unless he additionally shows "discriminatory effect," i.e., "that similarly situated individuals of a different race were not prosecuted." *Armstrong*, 517 U.S. at 465. An individual should be deemed similarly situated for the purpose of demonstrating a discriminatory effect, only if "their circumstances present no legitimate prosecutorial factors that might justify making different prosecutorial decisions with respect to them." *United States v. Olvis*, 97 F.3d 739, 743 (4th Cir. 1996); *see also United States v. Smith*, 231 F.3d 800, 810 (11th Cir. 2000) (defining similarly situated vis-a-vis the decision to prosecute–versus a decision to seek the death penalty–"as one who engaged in the same type of conduct, which means that the comparator committed the same basic crime in substantially the same manner as the defendant–so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan–and against whom the evidence was as strong or stronger than that against the defendant."), *cert. denied*, 121 S. Ct. 1956 (2001).

Paul does not even attempt to make such a showing. Indeed, the one person most similarly-situated to Paul was his co-defendant, Ingle, against whom the government also sought the death penalty, although the jury did not ultimately impose it.

***Eighth Amendment***

As indicated *supra*, Paul's Eighth Amendment claim requires a showing at least as great, if not greater, than that required for an Equal Protection claim. *See McCleskey*, 481 U.S. at 306-15. Absent some showing of an express "invidious" intention underlying the imposition of the death penalty, there is no Eighth Amendment violation. *See id.* at 313, 319. A showing that similarly-situated defendants of different races did not receive the death penalty does not tend to show an Eighth Amendment violation. *Id.* at 306-07. As discussed *supra* with respect to Paul's equal protection claim, he presents no evidence of any express, invidious intention by the governmental decisionmakers in his case, thus dooming his claim. *Edelin*, 134 F. Supp. 2d at 89.

***Request for discovery***

To obtain discovery or an evidentiary hearing in support of such a claim, Paul must come forward with "some evidence tending to show the existence of the essential elements of the [claim] . . . discriminatory effect and discriminatory intent." *Armstrong*, 517 U.S. at 468; *United States v. Quinn*, 123 F.3d 1415, 1425-26 (11th Cir. 1997); *United States v. Edelin*, 134 F. Supp. 2d 59, 87 (D.D.C. 2001) (standards for obtaining evidentiary hearing same as for discovery). Raw statistics evidencing a racially disproportionate pattern of capital charging are insufficient to compel the discovery sought by Paul. *United States v. Bass*, 536 U.S. 862 (2002). Rather, to be entitled to discovery, Paul must demonstrate that similarly situated persons were treated differently. *Id.* This is true regardless of the fact that Paul limits his selective prosecution claim

to the decisions of one decision maker, Attorney General Reno. *Id.* To be similarly situated with respect to the Attorney General's decision to seek the death penalty, the comparator must have "committed the same basic crime in substantially the same manner as the defendant–so that any prosecution of that individual would have the same deterrence value and would be related in the same way to the Government's enforcement priorities and enforcement plan" and "the evidence [against the comparator must be as] strong or stronger than that against the defendant." *See United States v. Smith*, 231 F.3d at 810. In addition, the factors that properly inform a decision to seek the death penalty must be such that there can be no legitimate prosecutorial justification for not seeking the death penalty against the comparator while doing so for the defendant. *See United States v. Olvis*, 97 F.3d at 743. As indicated *supra*, Paul has made no such showing.

Paul's discovery claim fails for the additional reason that the information he seeks is protected from disclosure by the deliberative process privilege, the work product privilege, and the attorney-client privilege. *See United States v. Fernandez*, 231 F.3d 1240, 1246-47 (9th Cir. 2000); *Edelin*, 134 F. Supp. 2d at 89.

**10. Paul's tenth claim, which is founded on the Supreme Court's decision in *Ring v. Arizona*, will be addressed in conjunction with his other *Ring*-based claims in response to his twenty-fifth ground for relief.**

**11. Paul cannot re-litigate in § 2255 review, his claim, previously raised and rejected on direct appeal, that the FDPA and the Constitution were violated by the jury's failure to unanimously find and consider as a mitigating factor that Trinity Ingle was an equally culpable co-defendant who would not receive a death sentence.**

Paul reiterates his claim, previously raised on direct appeal, that the jury's failure to unanimously find and consider as a mitigating factor that Trinity Ingle was an equally culpable co-defendant who would not receive a death sentence violated the FDPA and the Constitution. (Compare Paul's § 2255 motion at 114-38 and Appellant's brief at 21-50.) The Court of Appeals found no error.

> Paul next argues that his rights under the FDPA and the Constitution were violated because the jury failed to unanimously find and consider as a relevant mitigating factor that Ingle only received a life sentence.[6] He argues that under *Lockett v. Ohio*, 438 U.S. 586, 605, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978) (requiring sentencer be able to give independent mitigating weight to aspects of defendant's circumstances), and *Eddings v. Oklahoma*, 455 U.S. 104, 115, 102 S.Ct. 869, 71 L.Ed.2d 1 (1982) (relevant mitigating evidence must not be excluded from consideration), no rational trier of fact could have concluded that Paul was more culpable than Ingle, who received a life sentence. Neither the FDPA nor *Lockett* and *Eddings* require a capital jury to give mitigating effect or weight to any particular evidence. *See Boyde v. California*, 494 U.S. 370, 377, 110 S.Ct. 1190, 108 L.Ed.2d 316 (1990) (holding that the Constitution requires that the jury be able to consider and give effect to all relevant mitigating evidence offered by the defendant). There is only a constitutional violation if there exists a reasonable likelihood that the jurors believed themselves precluded from considering relevant mitigating evidence. *See id.* at 386, 110 S.Ct. 1190. Here, the jury was certainly allowed to consider Ingle's life sentence, because this evidence was introduced at the penalty phase of the trial. Further we find support for the finding that Paul was more culpable than Ingle, because there was evidence that Paul, and not Ingle, shot Williams. Although there was also evidence that Ingle shot

> Williams, the jury was not required to credit this evidence. Accordingly, we find no error.
>
> [6] We question whether we are able to review the jury's findings regarding the number of jurors who found a particular mitigator because the FDPA does not require the jury to return special findings showing which mitigating factors the jury found to exist or the number of jurors who found a particular mitigator. *See United States v. Hall*, 152 F.3d 381, 413 (5th Cir.1998), abrogated on other grounds by *United States v. Martinez-Salazar*, --- U.S. ----, ----, 120 S.Ct. 774, 782, 145 L.Ed.2d 792 (2000) (which held, contrary to *Hall*, that Constitution not violated when defendant required to use peremptory challenge to remove jurors who should have been removed for cause if the jurors do not eventually sit on the jury). Because this argument is easily disposed of on its merits, we will address it.

*United States v. Paul*, 217 F.3d at 999-1000. Paul cannot re-litigate in Section 2255 review this claim that was previously adjudicated on direct appeal. Moreover, Paul's challenge to the jury's failure to unanimously find and give mitigating weight to Trint Ingle's life sentence is also foreclosed (1) under the *Teague v. Lane* prohibition against retroactive application of new rules, and (2) because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

**12. Paul cannot re-litigate in § 2255 review, his claim, previously raised and rejected on direct appeal, that the FDPA and the Constitution were violated by the jury's failure to unanimously find and consider as a mitigating factor Paul's youth.**

Paul reiterates his claim, previously raised on direct appeal, that the jury's failure to unanimously find and consider as a mitigating factor his youthful age violated the FDPA and the Constitution. (Compare Paul's § 2255 motion at 139-47, ¶¶ 217-234 and Appellant's brief attached as Appendix A at 51-57. The Court of Appeals found no error.

> Paul argues that the failure of six jury members to find his age as a mitigating factor was error because he was only eighteen when he committed the offense. While we again express doubt about the propriety of reviewing the jury's findings in this regard, we find no constitutional violation. The jury was certainly not precluded from considering Paul's youthful age as a mitigating factor. *See Boyde*, 494 U.S. at 386, 110 S.Ct. 1190. During the penalty phase, Paul's birth certificate was offered into evidence. It established that Paul was only eighteen at the time of the murder. The FDPA prohibits administering the death penalty to a defendant younger than eighteen at the time the offense was committed. See 18 U.S.C. § 3591(a)(2). Thus, the statute has a built-in guarantee that a minor will not be given the death penalty. However, Paul has not cited authority for the proposition that a jury is somehow required to give mitigating effect to any factor, let alone this one. Accordingly, we find no constitutional violation.

*United States v. Paul*, 217 F.3d at 1000. Paul cannot re-litigate in Section 2255 review this claim that was previously adjudicated on direct appeal. Moreover, Paul's challenge to the jury's failure to unanimously find and give mitigating weight to his youthful age is also foreclosed (1) under the *Teague v. Lane* prohibition against retroactive application of new rules, and (2) because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

### 13. The purported statements of the trial judge, expressing a view that the trial against Paul should proceed as a death penalty prosecution, are insufficient to establish a bias against Paul that violated the Constitution.

Paul advances a claim that "upon information and belief, the trial judge in his case . . . was biased against Paul depriving him of due process," Paul's § 2255 motion at ¶ 235, and seeks discovery to substantiate this allegation. The only purported evidence of this bias identified by Paul are statements he claims were made by the Court during the two weeks between the jury's return of a life sentence for Ingle and the Attorney General's decision to continue to seek a death sentence for Paul.

According to Paul, after the jury failed to return a death sentence for co-defendant Ingle, the Attorney General's Capital Case Review Committee unanimously recommended withdrawal of the notice of intent to seek a death sentence ("decertification") for Paul.[7] Paul notes that, in the two weeks intervening between the jury's return of a life sentence for Ingle and the beginning of his trial, the trial judge expressed concern about the decertification by the committee and questioned the authority of the committee to decertify a case. Then, according to Paul, the

---

[7] Paul notes that the Attorney General subsequently overrode the purported unanimous committee recommendation and decided to continue to seek the death penalty for Paul. Paul speculates that this was the only occasion in which Attorney General Reno ever decided to seek the death penalty despite a unanimous recommendation from the review committee that the death penalty not be sought. The basis for these assertions is indiscernible. Historically, the Review Committee's recommendation has been considered part of internal DOJ deliberations and privileged. Admittedly, there have been a few isolated instances in which the Review Committee's recommendations to the Attorney General have been inadvertently disclosed to the public. Nonetheless, Paul's assertions regarding the decision in his case are, at best, unreliable hearsay, and the inferences that he seemingly would have the court draw from this purported evidence are entirely unwarranted.

Attorney General "overrode the unanimous committee recommendation to de-certify the case." Paul's § 2255 motion at 152, ¶ 264.

Paul's attempt to discern bias in the Court's expression of concern over the authority of the Review Committee to decertify Paul's case is strained. First, as a practical matter, the Committee did not have the authority to command withdrawal of the notice of intent to seek the death penalty. Rather, the protocol made it clear that the authority to decide to seek the death penalty in any capital-eligible offense resided with the Attorney General. Correspondingly, the Attorney General, not the committee, had the authority to decertify the case. Second, it was unresolved at that time whether a decision to withdraw the death notice belonged exclusively to the Attorney General or whether the withdrawal required the concurrence of the Court. For example, under Federal Rule of Criminal Procedure 48, the Attorney General or the United States Attorney may dismiss an indictment, information, or complaint only by leave of court. Regardless, even if the Court's concerns were construed to reflect a perception on the Court's part that Paul's case was appropriate for capital prosecution, that would not constitute impermissible bias that rendered the Court's presiding over Paul's trial a violation of due process.

Paul does not rely on a statutory basis for recusal but rather asserts that the purported judicial bias in his case violated due process.[8] Paul's claim is foreclosed by the procedural

---

[8] Paul does not rely, and indeed it is too late for him to rely, on the provisions of either 28 U.S.C. § 144, requiring, upon a party's motion, the recusal of a trial judge for personal (extrajudicial) bias or prejudice, or 28 U.S.C. § 455, requiring a judge to disqualify himself under certain conditions. *United States v. Mathison*, 157 F.3d 541, 545 (8th Cir. 1998) ("claims under § 455 will not be considered unless they were timely made before the trial court").

defaults arising from his failure to move for the recusal of the trial judge on this basis at trial and his failure to raise the issue on direct appeal. Moreover, under the circumstances alleged by Paul, a finding of judicial bias in violation of due process would not be "dictated by" the rules applicable at the time his conviction became final. Accordingly, an extension of the Due Process Clause to prohibit a judge from presiding under the identified circumstances would require application of a "new rule" that is foreclosed by *Teague v. Lane* and its progeny.

The bias alleged by Paul does not fall within the ambit of due process protections. "[M]ost questions concerning a judge's qualifications to hear a case are not constitutional ones, because the Due Process Clause of the Fourteenth Amendment establishes a constitutional floor, not a uniform standard." *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Although the Supreme Court has stated "the floor established by the Due Process Clause clearly requires a 'fair trial in a fair tribunal,' [citation omitted], before a judge with no actual bias against the defendant or interest in the outcome of his particular case," the conduct identified by Paul does not reflect bias within the meaning of this prohibition. *Id.* at 904-905, *citing Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 821-822 (1986), and *Tumey v. Ohio*, 273 U.S. 510, 523 (1927). As the Supreme Court noted in *Liteky v. United States*, albeit in construing 28 U.S.C. § 455(a) and (b)(1), "[n]ot *all* unfavorable disposition towards an individual (or his case) is properly described by th[e] terms [bias or prejudice]." 510 U.S. 540, 550 (1994)(emphasis in original). "The words [bias and prejudice] connote a favorable or unfavorable disposition or opinion that is somehow *wrongful* or *inappropriate*, either because it is undeserved, or because it rests upon knowledge that the

subject ought not to possess...."[9] *Id.* "[N]ot subject to deprecatory characterization as 'bias' or 'prejudice' are opinions held by judges as a result of what they learned in earlier proceedings." *Id.* at 551.

***Requested discovery***

Paul seeks access to "documents, materials, files or other items" pertaining to his case that have been maintained by the trial judge in chambers. According to Paul, there was "one or more hearings or conferences between the attorneys and Judge Hendren, which were either not reported by a court reporter, or were not transcribed and made part of the official court record in the case, and in such hearings or conferences Judge Hendren expressed"..."his disgruntlement with the unanimous decision of the DOJ committee in Washington to de-certify Mr. Paul's case." Paul's Discovery Motion at 30.

Paul's request for discovery relevant to the purported judicial bias is founded exclusively on the court's alleged expressions of concern regarding the Review Committee's vote to withdraw the notice of intent to seek the death penalty and the Review Committee's authority to take such action. A § 2255 movant is entitled to discovery under Rule 6 of the Rules Governing Section 2255 Proceedings "where specific allegations before the court show reason to believe that petitioner may, if the facts are fully developed, be able to demonstrate that he is, entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997). Paul cannot satisfy this standard. His

---

[9] Based in part on this understanding of bias and prejudice, the *Liteky* Court concluded that the extrajudicial source doctrine was encompassed by and therefore applicable to disqualifications under 28 U.S.C. § 255 (a) and (b)(1). The extrajudicial source doctrine requires the bias or prejudice underlying a judicial disqualification to stem from an extrajudicial source. *Liteky*, 510 U.S. at 544.

claim is subject to multiple procedural defaults, is foreclosed by the *Teague* retroactivity analysis, and ultimately relies on the rational perceptions of the Court drawn from the trial of Paul's co-defendant and pre-trial proceedings in Paul's case, perceptions which do not constitute "wrongful or inappropriate" bias derived from extrajudicial sources. Accordingly, Paul should be denied discovery and relief on this claim.

**14. Paul cannot re-litigate in § 2255 review the claim previously raised and rejected on direct appeal that the sentencing phase instructions violated the FDPA and the Constitution by restricting the jurors' consideration of mitigating evidence to those factors that he or she individually found by a preponderance of the evidence.**

Paul precisely reiterates his claim, previously raised on direct appeal, that the sentencing phase instructions violated the FDPA and the Constitution by restricting the jurors' consideration of mitigating evidence to those factors that he or she individually found by a preponderance of the evidence. (Compare Paul's § 2255 motion at 158-163, ¶¶ 254-264, and Appellant's brief, attached as Appendix A, at 58-61.) The Court of Appeals found no error.

> Paul next asserts that a sentencing-phase instruction allowed only those jurors who found the existence of a mitigating factor to consider that factor, and that jurors who did not find that factor to be mitigating were precluded from considering it. The instruction states:
>
> > All of you must weigh any aggravating factors that you unanimously found to exist, whether statutory or non-statutory, and each of you must weigh any mitigating factors that you individually find to exist.
>
> Paul argues this language precluded Juror A from considering a mitigating factor found by Juror B, if Juror A had not also found that factor mitigating. Again, Paul did not object to the above instruction and thus our review is for plain error. At most, we find the instruction was ambiguous because it did not go on to state that Juror A may consider a mitigating factor found by Juror B even if not found by Juror A. *See Jones*, 527 U.S. at 377, 119 S.Ct. 2090 (jury may consider a mitigating factor in its weighing process so long as one juror accepts the factor by a preponderance of the evidence). However, viewed in the context of all the instructions, we find the challenged instruction does not violate either the Constitution or the FDPA. *See id.* at 391, 119 S.Ct. 2090 (instructions that may be ambiguous in the abstract cured when read in conjunction with other instructions).

> The jury was instructed at the penalty phase that regardless of its findings on aggravating and mitigating factors, it was "never required to recommend a death sentence." Thus, even if Juror A felt somehow precluded from considering a mitigating factor found by Juror B, Juror A was also instructed that regardless of the outcome of the aggravating and mitigating balancing, there was never a requirement to recommend a death sentence. Again, because the jury is presumed to have followed all instructions, we find no error.

*United States v. Paul*, 217 F.3d at 999. Paul cannot re-litigate in Section 2255 review this claim that was previously adjudicated on direct appeal. Moreover, although Paul purports to assert a violation of the "Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments," his only argument is that the instructions do not reflect the Congressional intent underlying 18 U.S.C. § 3593 that jurors be required to give mitigating effect to factors found by one or more jurors regardless of whether they personally believe the factors to be mitigating or established by a preponderance of the evidence.[10] To the extent that Paul asserts a statutory violation, his claim is not cognizable in § 2255 review. In any event, Paul's challenge to the punishment phase instructions is also

---

[10] Paul's reliance on *Jones v. United States*, 119 S.Ct. 2090 (1999), to support his statutory interpretation is unavailing. The language from the majority opinion cited by Paul is found in the Court's introductory description of the trial proceedings in Jones' case and precedes the Court's notation of the number of jurors that found each of the 11 mitigating factors submitted to Jones' jury. *Jones* at 2097 & n.4 The relied upon language does not even remotely purport to be a dispositive interpretation of the statute and, while it cannot be determined from the face of the opinion that the Jones trial court did not employ Paul's statutory interpretation, that is apparent from the fact that the special verdicts in that case required the jury to identify the precise number of jurors finding each factor. The descriptive language of the *Jones*' minority is even less availing of Paul's interpretation. *See Jones* at 2111 (dissenting opinion) ("The mitigating factors, seven statutory and any others tending against the death sentence, are individually determined by each juror; unlike aggravating factors, on which the jury must unanimously agree under a 'beyond a reasonable doubt' standard, a mitigating factor may be considered in the jury's weighing process if any one juror finds the factor proved by a 'preponderance of the evidence.'").

foreclosed (1) by his failure to object to the instructions on this basis at trial, (2) under the *Teague v. Lane* prohibition against retroactive application of new rules, and (3) because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

**15. Paul cannot re-litigate in § 2255 review the claim previously raised and rejected on direct appeal that the government's reliance on vague, overbroad and otherwise improper aggravating factors at sentencing violated the FDPA and the Constitution.**

Paul reiterates a multifaceted claim, previously raised and rejected on direct appeal, advancing a variety of challenges to the statutory and non-statutory aggravating factors found by the jury at the punishment phase. (Compare Paul's § 2255 motion at 164-73, ¶¶ 265-81, and Appellant's brief, attached as Appendix A, at 91-98). The Eighth Circuit rejected each of these challenges on direct appeal.

> Paul next argues that the statutory "heinous, cruel or depraved" and the "victim vulnerability" factors are vague, and that several non-statutory factors are also vague.[9] The "heinous, cruel and depraved" instruction was given with a limiting instruction extensively defining those three terms. With such an extensive limiting instruction, we find that this statutory aggravating factor is constitutional. *See United States v. Hall*, 152 F.3d 381, 414 (5th Cir.1998), *abrogated on other grounds by United States v. Martinez-Salazar*, --- U.S. ----, ----, 120 S.Ct. 774, 782, 145 L.Ed.2d 792 (2000). In fact, the instruction given by the district court in this regard was nearly identical to the instruction given in *Hall*. We have considered Paul's remaining arguments regarding aggravating factors and find no unconstitutional vagueness.
>
> [9] Specifically, Paul argues that lack of remorse, success in eluding capture by the FBI, and the victim-impact factor are vague.

*United States v. Paul*, 217 F.3d at 1001. Paul cannot re-litigate in Section 2255 review this claim that was previously adjudicated on direct appeal. Moreover, each facet of Paul's multifaceted challenge to the various sentencing factors is foreclosed (1) by his procedural default at trial, (2) under the *Teague v. Lane* prohibition against retroactive application of new rules, and (3)

because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

**16. Paul cannot re-litigate in § 2255 review the claim previously raised and rejected on direct appeal that the government's reliance on multiple similar aggravating factors that were founded on the same operative facts violated the FDPA and the Constitution.**

Paul reiterates his claim, previously raised and rejected on direct appeal, that the Constitution and the FDPA were violated by the government's reliance on multiple similar aggravating factors founded on the same operative facts. (Compare Paul's § 2255 motion at 174-83, ¶¶ 282-98, and Appellant's brief, attached as Appendix A, at 99-106.) The Eighth Circuit rejected each of these challenges on direct appeal.

> Paul also alleges the "heinous, cruel and depraved" factor and the "vulnerability of the victim" factor are duplicative of one another because they allow a jury to find two separate factors from identical facts. Each of these factors is directed to entirely distinct aspects or components of the offense, i.e. one factor addresses the quality of Paul's violence while the other factor speaks to the frailty of the victim, and therefore, we find the factors are not duplicative. We find that the evidence of the beating, which includes the fact that Paul and Ingle followed Williams as he set off into the park for a walk, and then beat him severely enough to almost knock his eye out of its socket, is sufficiently heinous, cruel and depraved, whatever the age of the victim. Because Williams was eighty-two years old and less physically able to resist his attackers, the jury could additionally find the vulnerability of the victim to be an aggravating factor separate from the heinous, cruel and depraved nature of the crime. Accordingly, we find no error.

*United States v. Paul*, 217 F.3d at 1001-02. Paul cannot re-litigate in Section 2255 review this claim that was previously adjudicated on direct appeal. Moreover, Paul's challenge to the jury's reliance on these two sentencing factors is foreclosed (1) by his procedural default at trial, (2) under the *Teague v. Lane* prohibition against retroactive application of new rules, and (3)

because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

**17. Paul cannot re-litigate in § 2255 review the claim previously raised and rejected on direct appeal that the victim impact evidence introduced at the sentencing phase of Paul's trial resulted in a death sentence based on emotion rather than reason in violation of the FDPA and the Constitution.**

Paul reiterates his claim, previously raised and rejected on direct appeal, that the victim impact evidence introduced at the sentencing phase of Paul's trial resulted in a death sentence based on emotion rather than reason in violation of the FDPA and the Constitution. (Compare Paul's § 2255 motion at 184-202, ¶¶ 299-331, and Appellant's brief, attached as Appendix A at 118-35.) The Court of Appeals found no error.

> Paul argues that the volume and emotional impact of the victim impact evidence offered at the sentencing phase violated his constitutional rights. The Eighth Amendment is not violated when the government uses victim impact evidence at the penalty phase because this evidence is relevant to the jury's decision about whether the death penalty should be imposed. *See Payne v. Tennessee*, 501 U.S. 808, 827, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991). Such evidence may be challenged on due process grounds only if "evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair." *Id.* at 825, 111 S.Ct. 2597. We find the evidence in this case was clearly admissible under *Payne*, 501 U.S. at 827, 111 S.Ct. 2597, and note that Paul was also able to present extensive mitigating evidence through the testimony of his mother. Therefore, we find no constitutional error.

*United States v. Paul*, 217 F.3d at 1002. Paul cannot re-litigate in Section 2255 review this claim that was previously adjudicated on direct appeal. Moreover, Paul's challenge to the victim impact evidence introduced in the sentencing hearing in his case is foreclosed (1) by his procedural default at trial,[11] (2) under the *Teague v. Lane* prohibition against retroactive

---

[11] Paul's pretrial motion to prohibit introduction of victim impact testimony challenged 18 U.S.C. § 3593 (a), "which authorizes and describes 'victim impact' information,

application of new rules, because a grant of relief under the circumstances presented by his case would not be dictated by current precedent, much less by precedent existing at the time his conviction became final, and (3) because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

---

[as] void for vagueness, provid[ing] inadequate guidance with respect to the nature of 'victim impact' information which may be presented and [] not provid[ing] adequate guidance to judge and jury as to how such information is to be considered." Here, Paul does not identify infirmities in the type of evidence admitted but only in its quantity. In any event, Paul did not lodge a contemporaneous objection to the introduction of the challenged evidence either on the basis of his pre-trial motion or on the basis asserted here.

**18. Paul cannot re-litigate in § 2255 review the claim previously raised and rejected on direct appeal that the jury did not make the requisite determination of intent required by the FDPA and the Constitution.**

Paul reiterates his claim, previously raised and rejected on direct appeal, that the jury did not make the requisite determination of intent required by the FDPA and the Constitution. (Compare Paul's § 2255 motion at 203-25, ¶¶ 332-64, and Appellant's brief, attached as Appendix A, at 62-75.) On direct appeal, there were two prongs to Paul's claim. The first identified a statutory violation, that jurors were not asked to find one of the four intent factors established by 18 U.S.C. § 3591 (a)(2), but rather were asked whether they "unanimously [found] that the government ha[d] established beyond a reasonable doubt that the defendant intentionally aided and abetted in the killing of Sherman Williams." In the second prong of his argument, relying on *Enmund v. Florida*, 458 U.S. 782 (1982), and *Tison v. Arizona*, 481 U.S. 137 (1987), Paul claimed a constitutional violation, that the instructions did not require the jury to make a determination that Paul acted with the level of culpability required by the Eighth Amendment. The Court of Appeals reviewed for plain error and found none.

> A conviction will not be reversed due to allegedly erroneous jury instructions unless, viewed in their entirety, the instructions fail to correctly state the law. *See United States v. Webster*, 162 F.3d 308, 322 (5th Cir.1998). Further, jury instructions are evaluated in the context of the entire charge and a jury is presumed to follow all instructions. *See Jones v. United States*, 527 U.S. 373, 391 & 394, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999).
>
> The best way to comply with section 3591(a)(2) is to actually use the language of the statute in the jury instruction. Because the language of the statute was not used here, we must review the totality of the jury instructions to decide whether the jury made a finding of intent adequate to satisfy the requirements

of section 3591(a)(2). In the guilt phase, the jurors were instructed that to aid and abet in the commission of a crime, the person must know the crime was being committed or going to be committed, and that the person knowingly acted to cause, encourage, or aid in the commission of the crime. The instructions further stated that merely being present is not enough, instead, the person must know the crime is occurring.

We hold that the jury's penalty-phase findings together with its guilt- phase conclusions are sufficient to satisfy the requirements of the FDPA. The jury found that Paul intentionally committed an act (aided and abetted), which he knew would kill Sherman Williams. This finding clearly satisfies section 3591(a)(2) because it closely tracks the language of subsection (C) of section 3591(a)(2) requiring that Paul "intentionally participated in an act, contemplating that the life of [Sherman Williams] would be taken." 18 U.S.C. § 3591(a)(2)(C).

If anything, to know that a life will be taken requires greater awareness than merely contemplating that a life will be taken. The dictionary definition of "know" which most closely corresponds to this situation is "to perceive or understand as fact or truth; to apprehend clearly and with certainty." WEBSTER'S UNABRIDGED DICTIONARY 1064 (Random House 2d ed.1997). The definition of "contemplate" most analogous to this situation is "to have in view as a future event." *Id.* at 438.

Under the aiding and abetting instruction at the guilt phase, the jury made a finding that Paul knew with certainty that his acts would take the life of Sherman Williams. The jury was then again instructed at the penalty phase that it must unanimously find that Paul intentionally aided and abetted in the killing of Sherman Williams. When the two instructions are viewed together, it is manifest that the jury was satisfactorily instructed on the intent requirements of the FDPA. Accordingly, we hold that Paul's substantial rights were not affected by the district court's failure to use the express language of section 3591(a)(2).[4] See, e.g., *Jones*, 527 U.S. at 394-95, 119 S.Ct. 2090 (assuming the jury was erroneously instructed that the defendant would receive less than a life sentence if the jury could not unanimously agree on either a sentence of death or life in prison, this arguably "plain" error did not affect the defendant's substantial rights).

> [4] Paul also argues that the instructions did not comport with the constitutional requirements of *Enmund v. Florida*, 458 U.S. 782, 798-99, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982), which requires specific intent to kill for imposition of the death penalty in a felony murder case. However, the constitutional intent requirement is satisfied when the defendant is a major participant in either the killing, or an underlying felony in the case of felony murder, and is recklessly indifferent to human life. *See Tison v. Arizona*, 481 U.S. 137, 158, 107 S.Ct. 1676, 95 L.Ed.2d 127 (1987); *Roberts v. Bowersox*, 137 F.3d 1062, 1067 (8th Cir.1998). Here, the evidence shows that Paul was a major participant in the killing of Sherman Williams and was recklessly indifferent to human life. Furthermore, the intent element can be satisfied in a later stage of trial, such as the sentencing phase, as here. *See Hopkins v. Reeves*, 524 U.S. 88, 100, 118 S.Ct. 1895, 141 L.Ed.2d 76 (1998). Finally, this is an aiding and abetting case, not a felony murder case, and therefore distinguishable from *Enmund*. Thus, the constitutional claim is without merit.
>
> It is also clear that Williams died as a direct result of Paul's acts. The medical examiner testified the cause of Williams' death was a gunshot wound to the head. The evidence showed, as will be discussed in greater detail in the next section, that either Paul or Ingle, or both men shot Williams. Either way, the evidence established, and the jury agreed, Paul aided and abetted in the shooting of Williams. Because the gunshot wound was the cause of Williams' death and the jury found that Paul aided and abetted in that act, the requirement in section 3591(a)(2)(C) that "the victim died as a direct result of the act" is satisfied by the jury's findings.

*United States v. Paul*, 217 F.3d at 997-98. Paul cannot re-litigate in Section 2255 review this claim that was previously raised and rejected on direct appeal. In addition, Paul's challenge to the jury instructions is foreclosed (1) to the extent that it relies on a statutory violation, (2) by the procedural default resulting from his failure to object on a corresponding basis at trial, (3) under the *Teague v. Lane* prohibition against retroactive application of new rules, and (4) because he

cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

Even if Paul could avoid the preclusive effect of the Court of Appeals' previous adjudication on direct appeal, his procedural default, *Teague v. Lane*, and the harmless error analysis, there would be an additional compelling basis for denying his claim. Paul requested inclusion in the instructions of the challenged provisions. While Paul's proposed instructions were not part of the record on appeal, the record can be supplemented with those defense submissions now.

Paul's challenge here differs from that addressed by the Court of Appeals only in his purported reliance on *Apprendi* and *Ring*. However, Paul's *Apprendi* and *Ring*-based argument requires the Court to conclude, contrary to the determination of the Court of Appeals, that a statutory culpability determination was not encompassed by the jury's actual findings. With this underlying assumption as the foundation of his remaining arguments, Paul claims that the purported error falls within the ambit of *Apprendi* and *Ring*.

According to Paul, the jury's failure to find a statutory culpability factor violates the holding of *Apprendi*, because "the sentencing jury in this case was relieved of its constitutional obligation to determine and find, beyond a reasonable doubt, all facts which 'increase[] the penalty for a crime beyond the prescribed statutory maximum.'" Paul's § 2255 motion at 203, ¶ 332. However, the Court in *Apprendi* expressly excluded capital sentencing eligibility factors from its ambit. 530 U.S. at 496 ("this Court has previously considered and rejected the argument that the principles guiding our decision today render invalid capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific

aggravating factors before imposing a sentence of death. "). It wasn't until *Ring* that the Supreme Court extended the rule of *Apprendi* to require that the jury find beyond a reasonable doubt the aggravating factors that render a capital defendant eligible for the death penalty. Although the *Ring* decision represents a relatively straight forward application of *Apprendi* in the context of capital sentencing, it was not dictated by *Apprendi*. *See Apprendi v. New Jersey*, 530 U.S. at 497; *see also Jones v. United States*, 526 U.S. at 251 (The Court's precedent "characterized the finding of aggravating facts falling within the traditional scope of capital sentencing as a choice between a greater and a lesser penalty, not as a process of raising the ceiling of the sentencing range available."). Indeed, the Court was required to overrule the established precedent of *Walton v. Arizona*, 497 U.S. 639, 647-48 (1990) to reach its decision in *Ring*. *See Cannon v. Mullin,* 297 F.3d 989 (10th Cir.), *cert. denied*, 536 U.S. 974 (2002) (Rejecting petitioner's claim that the Supreme Court, through the combination of holdings in *Teague, Ring,* and the cases in the *Apprendi* line, made *Ring* retroactive on collateral review.). Because *Ring* was not decided until after Paul's conviction became final on direct appeal, Paul would not be entitled to the benefit of that decision, even assuming that the Court were inclined to conclude, contrary to the holding of the Court of Appeals, that the jury had not made the statutorily proscribed determination of intent.

In sum, although Paul is entitled to the benefit of *Apprendi*, which was decided before his conviction became final, it does not dictate a grant of relief in his case. Rather, Paul seeks the benefit of a new rule in contravention of the non-retroactivity doctrine of *Teague*. Moreover, although *Apprendi* had yet to be decided, the basis for the claim was readily available at the time

of Paul's trial. Accordingly, he cannot establish cause for his failure to lodge a corresponding objection at trial and his claim is also foreclosed by his procedural default.

In any event, it is well-established that the omission of an element from the jury instructions and findings is subject to harmless error analysis, *Neder v. United States*, 527 U.S. 1, 8-20 (1999), as is error, similar to that at issue here, which is more appropriately characterized as a "misdescription" rather than an "omission." *California v. Roy*, 519 U.S. 2, 5 (1997). Thus, *Apprendi*-type errors are not beyond the scope of harmless error review, and the courts of appeals have consistently applied a plain error or harmless error analysis to such claims. *See United States v. Terry*, 240 F.3d 65, 74 (1st Cir. 2001); *United States v. Mojica-Baez*, 229 F.3d 292 (1st Cir. 2000)(cert. pending); *United States v. Slaughter*, 238 F.3d 580, 583-84 (5th Cir. 2001); *United States v. Mietus*, 237 F.3d 866, 875, (7th Cir. 2001); *United States v. Jackson*, 236 F.3d 886, 887 (7th Cir. 2001); *United States v. Poulack*, 236 F.3d 932, 938 (8th Cir. 2001); *United States v. Sheppard*, 219 F.3d 766 (8th Cir. 2000), *cert. denied*, 531 U.S. 1200 (2001); *United States v. Hishaw*, 235 F.3d 565 (10th Cir. 2000); *United States v. Keeling*, 235 F.3d 533 (10th Cir. 2000); *United States v. Canelario*, 240 F.3d 1300 (11th Cir. 2001); *United States v. Nealy*, 232 F.3d 825 (11th Cir. 2000); *United States v. Swatzie*, 228 F.3d 1278 (11th Cir. 2000)(cert. pending). A finding of a substantial and injurious effect on the jury's determination of verdict would be inconsistent with the conclusion of the Court of Appeals that Paul's substantial rights were not affected by the failure to require the jury to find intent as defined by the statute.

**19. Paul's claim that the Court and defense counsel prevented him from testifying in his own behalf is without foundation.**

Paul now claims that he wished to testify at both the guilt and punishment phases of the trial but was prevented from doing so by his counsel and the Court. He claims that he attempted on several occasions to inform the Court of his wishes, but on one occasion, "during an un-reported (or at least heretofore un-transcribed) conference, the Court interrupted Mr. Paul and ordered him to refrain from speaking." Paul's § 2255 motion at 228-229, ¶ 371. Paul also claims that another attempt to inform the Court of his desire to testify occurred "at the end of trial" and is reflected in some unspecified portion of the transcript in which the Court interrupted Paul before he was able to inform the Court that his attorneys were preventing him from testifying. *Id.* According to Paul, "eye-witness accounts [by unidentified individuals] of the exchange with the Court make clear that Mr. Paul was once again attempting to inform the Court that his attorneys were prohibiting him from testifying on his own behalf." *Id.* In other words, Paul advances no evidentiary support for his claim or reason to believe that there exist facts, which if fully developed, would entitle him to relief.

Moreover, Paul's claim is foreclosed by his failure to raise it on direct appeal. The so-called evidence advanced by Paul was available to him at the time of his direct appeal, in which he was represented by the same counsel as now represents him in § 2255 review.

While a defendant has right under the Fifth and Sixth Amendments to testify on his own behalf at trial, that right is not unqualified. *See United States v. Blum*, 65 F.3d 1436, 1444 (8th Cir. 1995), *cert. denied,* 516 U.S. 1097 (1996), *citing Rock v. Arkansas*, 483 U.S. 44 (1987) and *United States v. Stewart*, 20 F.3d 911, 917 (8th Cir. 1994). Where, as here, a defendant has been

fully informed by counsel that he has a right to testify and that the decision whether to exercise that right is his alone to make, the failure to act affirmatively and inform the Court at the appropriate time of his desire to testify constitutes a knowing and voluntary waiver of the right. *United States v. Blum*, 65 F.3d at 1444*, citing United States v. Bernloehr*, 833 F.2d 749, 752 (8th Cir. 1987). The appropriate time to inform the Court is when defense counsel rests without calling the defendant as a witness. *See Whitfield v. Bowersox*, 324 F.3d 1009, 1013 (8th Cir. 2003) (right to testify waived when counsel rested without comment or objection from defendant; court not required to reopen case when, at the conclusion of closing arguments, defendant said, "Can I talk on my own behalf?"); *United States v. Blum*, 65 F.3d at 1444 (8th Cir.1995) (holding defendant waived her right to testify where she chose not to testify, and then, after the close of evidence, sent a note to the court stating she had changed her mind); *United States v. Stewart*, 20 F.3d 911, 917 (8th Cir.1994) (affirming waiver where pro se defendant did not present evidence, but stated his desire to testify only after the trial court said it would next hear closing arguments, the trial court did not re-open the case). "The defendant may not ... indicate at trial his apparent acquiescence in his counsel's advice that he not testify, and then later claim that his will to testify was 'overcome.'" *United States v. Bernloehr*, 833 F.2d at 752 (finding waiver where petitioner made no objection when his counsel rested without calling him).

If trial counsel are released from the attorney-client privilege, the government expects that trial counsel will testify that they informed Paul of his right to testify and that the decision whether to testify was ultimately his alone to make. If Paul had informed counsel that he wanted to testify in his own behalf despite their advice to the contrary, counsel would have facilitated his testimony.

Paul followed counsel's professionally reasonable advice. Given Paul's conduct throughout the trial, which was, as conceded by Paul in his § 2255 motion, "disruptive, rude, threatening, menacing and hostile," the jury was unlikely to credit any exculpatory version of the offense advanced by Paul that was inconsistent with the facts or other testimony. Accordingly, it could reasonably be expected that Paul's testimony would at the very least suffer from cross-examination. Throughout both phases of the trial, Paul engaged in outbursts of temper that interrupted the process. But Paul cannot now legitimately claim that his generally contentious, sociopathic courtroom behavior constituted anything other than that. There was no outburst in which Paul stated or even attempted to state a desire to testify.

In summary, Paul's claim that he was denied the right to testify is foreclosed by the procedural default derived from his failure to raise the issue on direct appeal. In addition, Paul waived his right to testify by failing to assert it at the appropriate time at trial.

***Requested Discovery***

Paul seeks access to "documents, materials, files or other items" pertaining to his case that have been maintained by the trial judge in chambers, which he speculates may reflect the one or more purported instances in which "he attempted to inform the Court of [his desire to testify] and of his attorneys' refusal to allow him to testify." Paul's Discovery Motion at 31. While the Court's observations and recollections may be relevant to Paul's claim that he attempted to inform the Court that he wanted to testify, those perceptions and recollections can be brought to bear upon the issue without granting Paul access to the Court's personal files.

**20. Paul cannot relitigate in § 2255 review the claim previously raised and rejected on direct appeal that the FDPA and the Constitution were violated by the prosecution's reliance on aggravating factors that duplicated elements of the offense.**

Paul reiterates his claim, previously raised and rejected on direct appeal, that the FDPA and the Constitution were violated by the prosecution's reliance on an aggravating factor that duplicated elements of the offense. (Compare Paul's § 2255 motion at 230-238, ¶¶ 373-389, and Appellant's brief, attached as Appendix A, at 84-90.) Specifically, Paul again argues that "[t]he Court's instruction on intent essentially repeated the aiding and abetting instruction given to the jury at the guilt-innocence phase of trial" and that "[t]he pecuniary gain aggravating factor effectively reiterated an element of the offense of robbery." Paul's § 2255 motion at 232, ¶ 378. Paul concludes that the pecuniary gain and intent aggravating factors did not adequately accomplish the constitutionally mandated narrowing of the class of homicide offenders eligible for the death penalty, because they duplicated elements of the guilt determination. The Court of Appeals found no error.

> Paul also argues that because "pecuniary gain" was an element of the offense of robbery, and also was used as a statutory aggravating factor, the class of people eligible for the death penalty was not sufficiently narrowed. To withstand constitutional scrutiny, an aggravating factor which makes the defendant eligible for the death penalty must not apply to every defendant convicted of a murder, but instead only to a subclass of murder defendants, and it must not be unconstitutionally vague. *See Tuilaepa v. California*, 512 U.S. 967, 972, 114 S.Ct. 2630, 129 L.Ed.2d 750 (1994).
>
> There is a difference between the eligibility determination and the selection determination in death penalty cases. *See Jones*, 527 U.S. at 377, 119 S.Ct. 2090. During the eligibility phase, the jury makes the requisite age and intent findings, and the government must prove "beyond a reasonable doubt at least one of the statutory aggravating factors set forth at § 3592." *Id.* (emphasis

> added). If the government meets this burden, the jury then moves on to the selection decision, and must "consider all of the aggravating and mitigating factors and determine whether the former outweigh the latter." *Id.*
>
> Pecuniary gain was used as a statutory aggravating factor at the eligibility stage, in addition to being an element of the underlying offense. However, the jury found two other aggravators beyond a reasonable doubt, either of which would have made Paul death eligible.[8] Thus, any error in the use of "pecuniary gain" as a statutory aggravator was harmless.
>
> [8] The special verdict form instructed the jury that if it answered "YES" to one or more of the statutory aggravating factors, it could continue its deliberations in accordance with the instructions. If it answered "NO" to all three, however, deliberations were to cease.

*United States v. Paul*, 217 F.3d at 1001. Paul cannot relitigate in § 2255 review this claim that was previously raised and rejected on direct appeal.

In addition, Paul's challenge to the jury's finding and weighing of the pecuniary gain aggravating factor is foreclosed by his failure to object at trial and the resulting procedural default at trial. Although Paul filed a pre-trial "motion to strike the aggravating factors of intentional killing and pecuniary gain," DE 198, App. at 58-66, that was not the motion that was reurged at the beginning of the punishment phase. Rather, Paul reurged his motion for pre-trial hearing to determine the admissibility of non-statutory aggravating circumstances, which had an entirely different basis than the instant claim. DE 190, App. at 31-37. In the latter motion, Paul argued that a pre-trial hearing was necessary to determine the admissibility of any evidence to support the non-statutory aggravating circumstances.[12] At the punishment phase, Paul

---

[12] With regard to that motion, the district court ruled, "If and when the evidence is offered, I think the Court would have an obligation to consider it and determine if it has a degree of reliability and whether its otherwise appropriate. If there's an objection made, then I'll rule at

affirmatively stated on the record that he had no objections to the punishment phase instructions that included the two challenged factors. 5 T 1114.

It is also clear that a grant of relief would require the Court to overrule *Lowenfield v. Phelps*, 484 U.S. 231, 240-44 (1988), and announce and apply a new rule of law in contravention of the *Teague v. Lane* prohibition against retroactive application of new rules. Paul reasons that murder in the course of robbery constitutes felony murder, that felony murder was included within the common-law concept of murder, that Paul "was convicted of a crime that is the essential equivalent to common law murder," and that "[t]he Supreme Court's Eighth Amendment jurisprudence can be fairly read to hold that a capital sentencing scheme must narrow the jury's discretion beyond a finding of guilt as to common law murder." Paul's § 2255 motion at 234, ¶ 281 (relying on J. Stephan, *History of the Criminal Law of England*, to establish the perceived Eighth Amendment mandate). According to Paul, where the constitutional narrowing does not occur at the guilt-innocence phase of trial, the government cannot rely on an aggravator which merely duplicates an element of the offense to accomplish the narrowing at the punishment phase. Thus, under Paul's analysis, it follows that the government cannot rely on aggravating factors relating to intent and pecuniary gain because they duplicate aspects of the inadequately narrowed guilt determination.

The flaws in Paul's analysis are manifest. The fact that the murder committed by Paul was arguably subsumed within the common-law definition of murder does not mean that its

---

that time." Pretrial hearing transcript at 27. When the motion was reurged at the commencement of the punishment phase, the Court's ruling "remain[ed] the same for the reasons that ha[d] previously been stated." 4 T 917.

definition was as broad as the common-law definition of murder. Killing with malice aforethought in the perpetration of a robbery, as charged here, is not common law felony murder (felony resulting in death). In this instance, killing with malice aforethought constitutes murder, rendered capital-eligible by the fact that it was committed in the course of another felony. It is precisely in this manner that a number of capital sentencing statutes have been held to adequately narrow the class of murderers eligible for the death penalty. *Lowenfield v. Phelps*, 484 U.S. 231, 240-44 (1988) (Death sentence could be imposed for first-degree murder even though the sole aggravating circumstance found by the jury at the sentencing phase, that defendant knowingly created a risk of death or great bodily harm to more than one person, was identical to an element of the capital crime of which defendant was convicted, where state law narrowly defined the categories of murders for which death sentence could be imposed); *Jurek v. Texas*, 428 U.S. 262, 273 (1973).

The previous adjudication of the claim by the Court of Appeals, the procedural default, and the *Teague v. Lane* prohibition aside, Paul's claim is also foreclosed because he cannot demonstrate that the purported error had a substantial and injurious effect on the jury's verdict.

**21-22. Paul was competent to stand trial and was not denied due process by the trial court's failure to conduct a mental competency hearing at trial.**

Contrary to the pre-trial determination of his competency to stand trial, Paul claims, in his twenty-first ground for relief, that he was in fact incompetent to stand trial or became incompetent during trial. Paul claims that pre-trial psychological testing revealed that his mental condition was likely to deteriorate under the stress of the trial, rendering him incompetent to stand trial. Without abandoning his claim that he was incompetent to stand trial at the outset of trial, Paul claims that the predicted deterioration in his condition occurred, leading to "his continuous and uncontrolled disruptive, rude, threatening, menacing, and hostile behavior during trial." Paul's § 2255 motion at 241, ¶ 396. In his twenty-second ground for relief, Paul claims that, given the Court's knowledge that experts predicted that his mental condition would deteriorate during trial and the Court's observations of Paul's bizarre behavior during trial, it was incumbent upon the Court to revisit the competency issue mid-trial.

A defendant is competent to stand trial if he has a sufficient present ability to consult with his lawyer with a reasonable degree of understanding and . . . has a rational as well as factual understanding of the proceedings against him. *Dusky v. United States*, 362 U.S. 402 (1960). Substantive due process prohibits the trial of someone who is incompetent and procedural due process requires that a hearing be held whenever evidence raises a sufficient doubt about the mental competency of the person to stand trial. *Vogt v. United States*, 88 F.3d 587, 590 (8th Cir. 1996). Paul's argument's implicate both the substantive and procedural due process protections. On appeal, a district court's factual determination of competency to stand trial will be affirmed unless clearly erroneous. *United States v. Hinton*, 218 F.3d 910, 912 (8th Cir. 2000). Where, as

here, the defendant fails to object to the findings underlying the competency determination, those findings are reviewed for plain error. *United States v. Robinson*, 253 F.3d 1065, 1068 (8th Cir. 2001).

As an initial consideration, Paul should be deemed to have procedurally defaulted this claim, which was available to him on direct appeal. *See Robinson*, 253 F.3d 1065 (claim of incompetency to stand trial raised on direct appeal). In any event, Paul does not provide any basis for revisiting the Court's pretrial determination of competency.

On November 26, 1996, the Court granted Paul's motion for determination of mental competency to stand trial. Dkt 84. See also Dkt 89, 121. Pursuant to the Court's order, Paul was admitted to the Mental Health Division of the Federal Correctional Institution at Butner, North Carolina, (FCI Butner) for a psychiatric evaluation. On March 14, 2002, the Court and all counsel of record received the report of the psychiatric evaluation and the Court scheduled an in-court hearing regarding competency for April 28, 1997.

Dr. Bruce R. Berger and Angela Walden, Ph.D., who prepared the report of the evaluation undertaken at FCI Butner, reported a primary diagnosis of an antisocial personality disorder. Drs. Berger and Walden concluded:

> It is our opinion that Mr. Paul is not suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or assist properly in his own defense. This is based in part on our opinion that Mr. Paul demonstrates an adequate knowledge of the courtroom proceedings, the roles of the court personnel, the rights and responsibilities he himself has, the ability to work cooperatively with an attorney *should he so choose*, and the emotional stability to conform his behavior to proper courtroom decorum. As noted previously, his intellectual ability places him in the Average ability range. His negative statements

> toward his own attorneys and court proceedings in general are based on a pessimistic outlook on this aspect of his life rather than any mental disorder.
>
> * * *
>
> Mr. Paul is . . . currently on no psychotropic medication as none is indicated. He should be monitored for any change in his mental status.

Dkt 140 at 8 (emphasis added).

On April 4, 1997, defense counsel filed a "stipulation to [the] government['s] mental report as to the defendant's competency to stand trial" and waived the hearing on competency. Dkt 155. The government concurred in the stipulation. On April 23, 1997, the Court entered an order in which it, first, identified its obligation to conduct a competency hearing if there was reasonable cause to believe that the defendant was presently incompetent, and then concluded that an evidentiary hearing on Paul's competency was unnecessary. Dkt 162.

In the meantime, on April 7, 1997, the defense moved for the appointment of H. Anthony Semone, Ph.D., to conduct a forensic neuro-psychological examination of Paul for mitigation purposes. *See* Appendix B, May 12, 1997, Ex Parte Under Seal Motion for Appointment of Psychiatrist. In early May, Dr. Semone informed defense counsel that, as a consequence of Paul's scores on the MMPI, as well as his clinical observations, he had "reservations"about Paul's competency to stand trial. According to Dr. Semone,

> The results of the MMPI-2 confirm that Mr. Paul is at this time suffering from "a borderline psychotic panic or possibly an acutely psychotic decompensation. The profile suggests an acute current panic around an identity disorganization or disruptive threat. Inappropriate emotional reactions, odd mannerisms, overideational fantasies, a regression under stress are typical symptoms with this pattern. Evasiveness, talkativeness, and circumstantiality are likely to cover over paranoid projections and

> delusional ideas. He is apt to become hyperactive and panicky in transitory phases, and during these times he would appear, hostile, demanding, perplexed, and possibly disoriented."
>
> The fact that Mr. Paul was reported as competent by the Butner, NC evaluation does not negate the findings of my evaluation. There are several reasons why Butner data are not incompatible with my data. First, the Butner report was based on diagnostic interviews that could not be nearly as direct, forthright and stressful as the current meetings. Second, during the Butner evaluation, Mr. Paul blocked attempts by the team from talking about the charges against him. So the Butner team had no opportunity to see him decompensate as we could see. Third, the personality instrument that Butner used apparently could not discern that Mr. Paul has "an unusual ability to disguise or conceal psychopathology in interviews. A presentation as 'well put together' or as having 'aggression under control' should clearly not be taken at face value."

Appendix B, May 9, 1997, letter from Dr. Semone to defense counsel attached to Ex Parte Under Seal Motion for Appointment of Psychiatrist. Dr. Semone concluded that it was his professional opinion that Mr. Paul was presently unable to understand the charges against him or to cooperate sufficiently with counsel in effectively assisting in his own defense. Dr. Semone "also regard[ed] him [as] at serious risk of being unable to control himself throughout the rigors of trial." *Id.* In accordance with Dr. Semone's recommendation, Paul's counsel requested the appointment of a psychiatrist, Dr. Irving Kuo, to verify Dr. Semone's findings and make further recommendations to defense counsel and the Court. Appendix B.

Given counsel's diligent inquiry into the issue of Paul's competency to this point, if Dr. Kuo's evaluation of Paul had supported a determination of incompetence to stand trial, it is clear that counsel would have renewed their motion for a determination of incompetency to stand trial. Paul has also alleged that counsel rendered ineffective assistance by failing to effectively pursue

the issue of his incompetency to stand trial. After being formally released by the court from the constraints of attorney client privilege, counsels' testimony on this point will further clarify that there was no viable claim that Paul was incompetent to stand trial.

Paul's attempt to equate uncooperative and hostile behavior with incompetence to stand trial is unpersuasive. Both the report from FCI Butner and the May 9, 1997, letter from Dr. Semone to defense counsel demonstrate that Paul's uncooperative and hostile behavior were existent from the onset of the prosecution in this case, but neither the evaluating doctors at FCI Butner nor, subsequently, Dr. Kuo found Paul incompetent to stand trial. Given the coincidence of this behavior on Paul's part and evaluations that disclosed no basis for a finding of incompetence to stand trial, it was reasonable for both defense counsel and the court to regard Paul's "disruptive, rude, threatening, menacing and hostile behavior" as evidence not of incompetence to stand trial but of the diagnosed anti-social personality disorder. The Court's initial order of the FCI Butner evaluation makes it clear that it was aware of its responsibility to order a competency "hearing on its own motion, if there [wa]s reasonable cause to believe that the defendant [was presently] suffering from a mental disease or defect rendering him mentally incompetent to the extent that he [wa]s unable to understand the nature of the proceedings against him or to assist properly in his defense." Dkt 84.

Paul identifies no credible evidence to support his generally conclusory assertion of incompetency to stand trial. Paul asks the Court to draw an inference of incompetency from his hostile and disruptive behavior, contrary to the conclusions of the examiners at FCI Butner nor Dr. Kuo, who was fully aware of Paul's conduct and attitude. Given the conclusory and incredible basis of his claim, there is no hearing requirement.

***Requested discovery***

Paul seeks access to "documents, materials, files or other items" pertaining to his case that have been maintained by the trial judge in chambers. In an attempt to establish cause for the requested discovery, Paul speculates that the Court's personal files may contain "documents or materials reflecting the Court's knowledge about Mr. Paul's behavior, mental state, and actions before and during the trial proceedings." Paul's Discovery Motion at 29. Paul further asserts that "[u]pon information and belief, . . . the Court consulted with members of his staff and/or the U.S. Marshal's office concerning [Paul's behavior, mental state and actions], and thus he seeks access to all information in connection with such contacts, including the timing and content of such contacts." *Id.*

While the Court's observations and recollections may be relevant to the substantive and procedural due process issues raised by Paul, the discovery sought by Paul is unnecessary. The Court's perceptions and recollections can be brought to bear upon the issue without granting Paul access to the Court's personal files. Moreover, both the procedural and substantive incompetency issues can be resolved on the basis of the record or the record as supplemented by counsels' recollections via either affidavit or live testimony.

### 23. The punishment phase jury instructions required the jury to weigh the intent "eligibility" finding as a statutory aggravating factor in violation of the FDPA and the Constitution.

Paul claims again, as he did on direct appeal, that the FDPA and the Constitution were violated by punishment phase jury instructions that allegedly required the jury to weigh the threshold intent factor as a statutory aggravating factor. (Compare Paul's § 2255 motion at 263-272, ¶¶ 434-450, and Appellant's brief, attached as Appendix A, at 76-83.) The Court of Appeals found no error.

> Paul argues the district court erroneously instructed the jury that Paul's intent to kill Williams was a statutory aggravator to be weighed in the selection phase of the jury's sentencing determination.[7] Paul also argues that as an aggravating factor, the intent finding does not serve to narrow the class of people eligible for the death penalty.
>
> [7] The instruction states:
>
> > The process of weighing aggravating and mitigating factors against each other or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment is not a mechanical process.... In this regard, you may note that the statutory aggravating factor concerning the defendant's intent duplicates the intent element of the offense.
>
> The government concedes that this instruction erroneously labeled "intent" as an aggravating factor, but argues that the error was not repeated in the special verdict form wherein the mental state inquiry was separate from the aggravating and mitigating factors inquiry. After reviewing the special verdict form, we agree that the jury was not led to believe that intent was to be treated by the jury as a statutory aggravator. The special verdict form starts with roman numeral one, which is the jury's required finding that Paul was eighteen, and then numeral two, which contains the "REQUISITE MENTAL STATE" intent finding. Roman numeral three is labeled "STATUTORY AGGRAVATING FACTORS" and contains the three statutory aggravating factors used in this

> case. This clear separation of the mental state from the aggravating factors did not lead the jury to believe that "intent" was a statutory aggravating factor. We therefore need not address Paul's argument that "intent" as a statutory aggravator did not adequately narrow the class of people eligible for the death penalty.

*United States v. Paul*, 217 F.3d at 1000-01. Paul cannot relitigate in § 2255 review this claim that was previously raised and rejected on direct appeal. In addition to being foreclosed by the previous adjudication, Paul's claim is also foreclosed (1) to the extent that it relies on a statutory violation, (2) by a procedural default, because Paul failed to object at trial to the instructions on the basis that they required the jury to weigh the threshold intent factor, (3) under the non-retroactivity principles of *Teague v. Lane*, and (4) because the purported error could not have had a substantial and injurious effect on the jury's determination of sentence.

The only alleged constitutional dimension to Paul's claim is his assertion the jury's weighing of the intent factor violated the Eighth Amendment. Because the purported Eighth Amendment violation identified by Paul is not dictated by current precedent much less controlling precedent at the time his conviction became final, a grant of relief is foreclosed under *Teague* and its progeny.

As an initial matter, Paul confounds the Eight Amendment limitations imposed on the function of aggravating factors in the selection and eligibility decisions, respectively. The Supreme Court's capital jurisprudence addresses two different aspects of the capital sentencing decision process: the eligibility decision and the selection decision. *Tuilaepa v. California*, 512 U.S. 967, 971 (1994). The eligibility decision encompasses those parts of the process that ensure that the accused falls within the restricted class of death-eligible defendants as defined by the relevant statute. The eligibility decision is accomplished either, at the guilt-innocence phase, by

finding the accused guilty of one of a narrowly circumscribed, limited number of death-eligible offenses or, at the punishment phase, by finding one or more aggravating circumstances. *Jones v. United States*, 119 S.Ct. at 2096; *Tuilaepa v. California*, 512 U.S. at 971. To withstand constitutional scrutiny vis-a-vis the eligibility determination, an aggravating circumstance (1) must not apply to every defendant convicted of a murder; it must apply only to a subclass of defendants convicted of murder, and (2) may not be unconstitutionally vague. *Id.* at 972.

In contrast to the eligibility determination that assures that the accused falls within a narrowly circumscribed class of death-eligible defendants, the selection decision encompasses the individualized determination of whether a death sentence is appropriate in a particular case. *Tuilaepa v. California*, 512 U.S. at 972. The selection decision must be expansive enough to accommodate relevant mitigating evidence. *Id.*

Paul contends that the jury could not, consistent with the Constitution, consider the intent finding as a statutory aggravating factor, because it does not "apply only to a subclass of defendants convicted of murder." *See Id.* The inaccuracy of this statement aside, Paul overlooks the fact that his eligibility for the death sentence was independently established by the jury's unanimous, beyond a reasonable doubt affirmative findings of three statutory aggravating factors, as well as by the jury's finding him guilty of a sufficiently narrowed offense.

In sum, the premise of Paul's claim–that every aggravating factor must independently narrow the class of murderers eligible for the death penalty–was not dictated by controlling precedent at the time his conviction became final. *See Jones v. United States,* 119 S.Ct. at 2108 (the Court "ha[s] not, however, considered what it means for a factor to be overbroad when it is important only for selection purposes...."). Accordingly, even assuming, contrary to the

conclusion of the Court of Appeals, that the jury misinterpreted the instructions to require them to weigh the threshold intent factor, and even assuming that he could evade the effect of the previous adjudication and procedural default, his claim would be foreclosed under *Teague v. Lane*.

Finally, given the strength of the aggravating factors, including "that the defendant committed the offenses in an especially heinous, cruel or depraved manner in that they involved torture or serious physical abuse to Sherman Williams," and the paucity of mitigating factors found by the jury, Paul cannot demonstrate that the purported error had a substantial and injurious effect on the jury's determination of the verdict.

### 24. The government did not commit misconduct in any of the myriad conclusory forms alleged by Paul.

Paul advances myriad conclusory assertions of alleged prosecutorial misconduct. But the only claim for which he identifies any purported factual basis is that witnesses were paid for their testimony.[13] But the evidentiary support that he references does not support his conclusion that numerous witnesses testified falsely in return for payments or other benefits.

There is no dispute that two individuals, Gary Rogers and Crystal Davis King, received one time post-trial payments of $1500 and $500 respectively. Both of these individuals provided critical information that led to the identification, apprehension, and conviction of Paul and Ingle. In addition, Rogers testified before two grand juries and at both Ingle's and Paul's trials. After Paul's trial, Assistant United States Attorney Steven Snyder was approached by Special Agent Thomas Ross, who inquired whether the prosecution team had any objection to these two individuals receiving cash awards from the case fund. There was no agreement prior to or during trial between the prosecution team and the FBI, much less between either the prosecution team or the FBI and Gary Rogers and Crystal Davis King, that they would receive funds in exchange for testimony. Such arrangements were not contemplated or executed with any other witness. Paul's trial concluded on June 25, 1997. Special Agent Thomas Ross initiated the draft requests on August 7, 1997, and the drafts were authorized on November 10,

---

[13] Paul's claim that the government relied on false information in the process underlying the decision to seek the death penalty in the first instance and the decision to continue to seek the death penalty following the return of a life sentence for Ingle, as well as his request for discovery related to those allegations, is addressed elsewhere.

1997. See Appendix C, Affidavit of Tom Ross, and Appendix D, records pertaining to cash awards to Rogers and King.

On the basis of this legitimate post-trial Crime Stoppers-type award, Paul seeks discovery of all conceivable, and some inconceivable, sources of information relevant to his prosecution. Paul requests access to "all records and documents in the possession of the Federal Bureau of Investigation ("FBI") pertaining to the investigation and prosecution of Mr. Paul and his co-defendant, Trinity Ingle, for the murder of Sherman Williams." Paul justifies his request as follows:

> Upon information and belief, Mr. Paul is claiming that the government engaged in misconduct in numerous ways in his case, including, but not limited to: making promises of and/or making available a variety of benefits to government witnesses in exchange for helpful testimony, while denying the existence of such to the defense and in the presence of the jury; coercing, pressuring, threatening, coaching, and making promises to witnesses (including the defendant) to provide incriminating information, whether or not accurate, to the government, and/or to testify against Mr. Paul at trial, knowingly proffering and relying upon false evidence, testimony and arguments during the death certification process initially and after the Ingle life verdict was returned, at pre-trial hearings and during trial in the presence of the jury; failing to disclose exculpatory information to the defense that would have exonerated Mr. Paul; relying upon arguments to the jury based upon false information and/or false characterizations of the record; and relying upon race as a factor in determining whether to seek a death sentence against Mr. Paul and then later refusing to de-certify the death notice after the Ingle life verdict was returned.

Paul's Discovery Motion at 16.

According to Paul, documents obtained from the FBI pursuant to a Freedom of Information Act request disclose that "government witnesses who testified at Mr. Paul's trial

and/or provided incriminating testimony against him to the government were paid money by the government after the trial was over." Paul's Discovery Motion at 19. Paul asserts that "subsequent investigations in this case have revealed [that] there are additional witnesses other than those indicated in the disclosed FBI documents who received monetary rewards for their assistance in the prosecution." Paul's Discovery Motion at 20. But Paul does not identify what these "subsequent investigations" were or who the "additional witnesses" might be. The legitimate award of Crime Stoppers- type funds does not give the court reason to believe that a legitimate claim of prosecutorial misconduct will result from the wide-open discovery sought by Paul.

Paul requests disclosure of all documents, materials, files and other information, in the possession of any branch of the federal government, including, but not limited to, the Department of Justice (and all of its branches), the FBI, the Department of the Interior, and the Department of the Treasury, concerning the payment of funds to individuals, companies, or entities, in connection with the investigation and prosecution of Mr. Paul, and Trinity Ingle. There is no reason to believe that the requested discovery will result in a viable claim of prosecutorial misconduct.

Paul's counsel indicates that through "ongoing investigations" he has "learned that the government *may* have also proffered false testimony concerning statements made to government agents by the defendant himself." Paul's Discovery Motion at 21 (emphasis added). Paul speculates that FBI records might disclose that he was "coached, pressured, coerced, misled, and/or given promises during his interrogation by government agents," but if the records don't disclose such evidence he will seek "other forms of discovery." *Id.* at 21-22. Again, unless Paul

is willing and able to disclose specific, credible information obtained through counsel's "ongoing investigations," there is no reason to believe that there exist facts, which, if fully developed, would entitle him to relief.

Paul also speculates that FBI files may contain "exculpatory information relating to the time of death and/or time of the incident regarding the death of Mr. Williams which would have exonerated, or tended to exonerate, Jeffrey Paul." Paul's Discovery Motion at 22. This speculation does not provide reason to believe that full access to all even remotely relevant FBI files would substantiate this speculation.

In sum, the legitimate post-trial awards to Gary Rogers and Crystal Davis King are insufficient to trigger the vast discovery or fishing expedition sought by Paul.

**25. The non-retroactivity analysis of *Teague v. Lane* forecloses a grant of relief to Paul based on the failure to include the capital "eligibility factors" in the indictment.**

1. In purported reliance on the Court's decisions in *Apprendi v. New Jersey*, 530 U.S. 466, *Jones v. United States*, 526 U.S. 227, and *Ring v. Arizona*, 536 U.S. 584, Paul claims that his Fifth Amendment rights were violated by the failure to include in the indictment in his case the statutory aggravating factors that rendered him eligible for the death penalty. Because Paul seeks the benefit of a rule that was not dictated by *Apprendi*, *Jones*, or other precedent at the time his conviction became final, his claim is foreclosed under the non-retroactivity analysis of *Teague v. Lane.* Moreover, Paul cannot demonstrate cause and prejudice to surmount the procedural default derived from his failure to raise the claim at trial or on direct appeal. Finally, he cannot demonstrate that the purported error had a substantial and injurious effect on the determination of the verdict of guilt or sentence.

In *Apprendi*, the Supreme Court held that the Sixth Amendment right to a trial by jury required a jury determination beyond a reasonable doubt of any fact, other than the fact of a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum. 530 U.S. at 489. In *Ring*, the Supreme Court extended the rule of *Apprendi v. New Jersey* to require that the jury find beyond a reasonable doubt the aggravating factors that render a capital defendant eligible for the death penalty (eligibility factors). 536 U.S. at 609. Because *Ring* concerned a state death penalty prosecution, no issue was raised as to whether the aggravating factors also had to be alleged in the indictment. *Ring*, 536 U.S. at 597, n.4 (Ring does not contend that his indictment was constitutionally defective), *citing Apprendi*, 530 U.S. at 477, n.3

("Fourteenth Amendment has not...been construed to include the Fifth Amendment right to 'presentment or indictment of a grand jury'".).

Under *Teague* and its progeny, Paul is only entitled to the benefit of rules of criminal procedure dictated by precedent at the time his conviction became final on direct appeal. While both *Jones v. United States*, and *Apprendi v. New Jersey* had been decided when his conviction became final, neither dictates the rule he seeks to have applied in his case. Indeed, the Supreme Court expressly excluded from the ambit of its decisions in *Jones* and *Apprendi* the aggravating factors that render a defendant eligible for the death penalty. *See Apprendi v. New Jersey*, 530 U.S. at 496 ("[T]his Court has previously considered and rejected the argument that the principles guiding our decision today render invalid state capital sentencing schemes requiring judges, after a jury verdict holding a defendant guilty of a capital crime, to find specific aggravating factors before imposing a sentence of death."); *see also Jones v. United States*, 526 U.S. at 251 (The Court's precedent "characterized the finding of aggravating facts falling within the traditional scope of capital sentencing as a choice between a greater and a lesser penalty, not as a process of raising the ceiling of the sentencing range available.").

*Teague*

In an attempt to evade the preclusive application of the *Teague* analysis, Paul claims that relief in his case follows from *Jones*. Paul asserts that "[t]he Supreme Court held in *Jones* [] that the Fifth Amendment requires that all elements of a federal offense be 'charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt.' That principle [Paul contends] provides the basic building block upon which several important later cases, and the claim presented herein, rest." *See* Paul's § 2255 motion at 286. Contrary to Paul's

understanding, in *Jones* the Court was simply presented with an issue of statutory construction. "The question presented in *Jones* was whether the statute 'defined three distinct offenses or a single crime with a choice of three maximum penalties, two of them dependant on sentencing factors exempt from the requirements of charge and jury verdict.'" *Ring v. Arizona*, 536 U.S. at 600, *quoting Jones*, 526 U.S. at 229. With two equally tenable statutory constructions, the Court adopted the one that avoided "grave and doubtful constitutional questions." *Jones*, 526 U.S. at 239 , *quoting United States ex rel. Attorney General v. Delaware & Hudson Co.*, 213 U.S. 366, 408 (1909). In reading the statutory provision at issue to treat a factor that increased the maximum sentence as an element rather than an enhancement, the Court evaded the issue of whether the contrary interpretation would run afoul of the long standing principle (it did not originate with *Jones*) "that elements must be charged in the indictment, submitted to the jury, and proven beyond a reasonable doubt." *Jones*, 526 U.S. at 232, *quoting Hamling v. United States*, 418 U.S. 87, 117 (1974). Nonetheless, the Court recognized that its decision did not purport to claim that "every fact with a bearing on sentencing must be found by a jury," rather that the decision simply served to avoid a "genuine Sixth Amendment issue not yet settled." *Jones*, 526 U.S. at 248 ("Sixth Amendment and due process issues are by no means by the boards").

In sum, there is no dispute that Paul is entitled to the benefit of the established principle that elements must be charged in the indictment, submitted to the jury, and proven beyond a reasonable doubt. What remained in dispute until *Ring*, which was decided after Paul's conviction became final, was whether, for Sixth Amendment purposes, capital sentencing eligibility factors must be treated as the functional equivalent of an element of a greater offense and found by the jury beyond a reasonable doubt. Although the *Ring* decision represents a

relatively straight forward application of *Apprendi* in the context of capital sentencing, it was not dictated by *Apprendi*. Indeed, the Court was required to overrule the established precedent of *Walton v. Arizona*, 497 U.S. 639, 647-648 (1990), to reach its decision in *Ring*.

Moreover, the proposed rule from which Paul seeks to benefit is even one further step removed than *Ring* from the precedent applicable to his case. While, in the context of federal death penalty prosecutions, it may be presumed to follow from *Ring* that the eligibility factors must also be included in the indictment, *see United States v. Cotton*, 122 S. Ct. 1781, 1783 (2002) (in federal prosecutions, any fact, other than the fact of a prior conviction, that increases the penalty for a crime beyond the prescribed statutory maximum must also be charged in the indictment), that conclusion is not dictated by *Ring*. In any event, Paul is not entitled to the benefit of the *Ring* decision in § 2255 review.

Paul attempts to evade the non-retroactivity principles of *Teague* on the ground that *Ring* is a decision of substantive constitutional criminal law that must be applied retroactively, notwithstanding *Teague*. *See* Paul's § 2255 motion at 290, fn. 38. Paul's analysis in this regard is unpersuasive. *See Cannon v. Mullin,* 297 F.3d 989, 994 (10th Cir. 2002)(*Ring*, like *Apprendi*, announced a rule of criminal procedure, not a substantive rule), *cert. denied*, 123 S.Ct. 1 (2002). In his reliance on *United States v. McPhail*, 112 F.3d 197, 199 (5th Cir. 1997), Paul apparently contends that, like the Supreme Court's decision in *Bailey v. United States*, 526 U.S. 137 (1995), the Court's decision in *Ring* effectively articulated additional elements of the offense. However, Paul fails to recognize that, subsequent to its decision in *McPhail*, the Fifth Circuit Court of Appeals in *United States v. Brown*, 305 F.3d 304 (5th Cir. 2002), *reh'g denied*, 2002 WL 31718538 (5th Cir. November 4, 2002), *cert. denied,* 2003 WL 1609400 (April 28, 2003), held

that *Apprendi* was not substantive, but rather was a new procedural rule not entitled to retroactive application under *Teague v. Lane*. *Brown,* 305 F.3d at 309. Because *Ring* is an extension of the rule in *Apprendi,* it follows that the rule in *Ring* is also procedural and not substantive. *See Cannon v. Mullin,* 297 F.3d at 994.

In determining that *Apprendi* was a procedural rule, not a substantive rule, the Fifth Circuit Court of Appeals found that the decision in *Apprendi* was analogous to the decision in *United States v. Gaudin*, 515 U.S. 506 (1995). *Brown,* 305 F.3d at 308. In *Gaudin,* the Supreme Court determined that the "materiality" for purposes of a conviction under 18 U.S.C. § 1001 must be decided by a jury, not a court. *Brown,* 305 F.3d at 308. [14] In *United States v. Shunk,* 113 F.3d 31 (5th Cir. 1997), the Court held that *Gaudin* announced a new rule of criminal procedure, not a new substantive rule. *Shunk,* 113 F.3d at 35. The reasoning in *Shunk* was based, in part, on the fact that "*Gaudin* did not change what the Government must prove; materiality was always an element of a § 1001 offense. Instead *Gaudin* changed the party to whom the Government must prove materiality—from judge to jury." *Brown,* 305 F.3d at 309. Likewise, in *Apprendi*, the holding did not change what the Government had to prove in order to increase a sentence beyond the maximum allowed by statute, but only the party to whom the Government had to prove the sentence-enhancing fact. *See Brown,* 305 F.3d at 308; *Apprendi,* 530 U.S. at 490.

---

[14]Section 1001 prohibits knowingly and willfully making false, fictitious or fraudulent statements or representations in any matter under the jurisdiction of the United States government. *Brown,* 305 F.3d at 308.

This reasoning also applies in determining if the rule in *Ring* is substantive or procedural. *Ring* requires any factors that render a defendant eligible for a death sentence to be treated as the functional equivalent of elements of the capital offense, and, as such, to be submitted to the jury for a determination beyond a reasonable doubt. The essential holding in *Ring* is that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury," not a judge. *Ring,* 536 U.S. at 609. Thus, *Ring* simply extends the holding in *Apprendi* to aggravating or eligibility factors in capital cases and similarly, does not change what the Government had to prove in order to obtain a finding of an aggravating factor. *Ring* only changed to whom the Government was constitutionally obliged to prove an eligibility factor.

Paul does not, however, seek the direct application of *Apprendi* and *Ring*, but the application of even a newer rule, one which has yet to be announced, requiring the factors which render a defendant eligible for the death penalty to be alleged in the indictment. In Paul's case, the eligibility factors *were* found beyond a reasonable doubt by the jury, not the judge, and there was no direct violation of *Ring.*[15] A rule requiring certain facts to be pled in an indictment is certainly one of procedure, not substance. *Cotton,* 122. S.Ct. at 1786-87 (Although the Fifth Amendment grand jury right "serves a vital function in providing for a body of citizens that acts as a check on prosecutorial power," it is "surely no less true of the Sixth Amendment right to a petit jury, which, unlike the grand jury, must find guilt beyond a reasonable doubt."). Accordingly, the extension of *Ring* relied upon by Paul, as well as *Ring* itself, are rules of

---

[15]Therefore, contrary to Paul's assertion, he *has* been found guilty of a capital offense. *See* Paul's § 2255 motion at 291.

criminal procedure *(see Brown,* 305 F.3d at 305) and, thus, governed by the *Teague* doctrine in determining retroactivity.

In addition to being foreclosed by the non-retroactivity principles of *Teague,* the instant claim is also procedurally defaulted.

*Procedural default*

Paul argues that his claim was sufficiently preserved by his pretrial motion seeking a bill of particulars regarding the statutory aggravating factors identified in the government's notice of intent to seek the death penalty. Although that bill of particulars and the instant claim rely on different legal theories, the Court need not rely on that distinction in concluding that the claim is procedurally barred. A procedural bar here also rests on Paul's failure to raise the claim on direct appeal. Paul cannot demonstrate the cause and prejudice necessary to excuse his failure to raise the claim on direct appeal.

As previously stated, to establish cause, the convicted must show that defense counsel was prevented from raising the claim at the procedurally appropriate point by some factor external to the defense. *Murray v. Carrier*, 477 U.S. at 488. The novelty of a claim will constitute cause only where the claim was absolutely unavailable; it is not sufficient that subsequent legal developments have made counsel's task easier. *Smith v. Murray*, 477 U.S. at 537; *Engle v. Isaac*, 456 U.S. at 130 n.35 (1982)("futility cannot constitute cause if it means simply that a claim was unacceptable to that particular court at that particular time"). To establish actual prejudice, Paul must demonstrate "not merely that the errors at this trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. at 170.

Paul cannot establish cause based on the novelty of his claim. As previously recognized, the *Ring* decision represents a relatively straight forward application of *Apprendi* in the capital sentencing context. The basis of an *Apprendi* claim, and Paul's claim here, clearly was available when he filed his brief on direct appeal on August 5, 1999. *See United States v. Moss*, 252 F.3d 993, 1001-03 (8th Cir. 2001), *cert. denied*, 122 S. Ct. 848 (2002)(citing numerous cases in which an *Apprendi*-like claim was made before the decision in *Apprendi*).[16] In addition to the Eighth Circuit Court of Appeals, other Courts of Appeals have held that the rule announced in *Apprendi* was not novel and thus would not constitute "cause" for failure to raise the claim within the time frame encompassed by Paul's trial and direct appeal. *See McCoy v. United States*, 266 F.3d 1245, 1258-59 (11th Cir. 2001), *cert. denied*, 122 S. Ct. 2362 (2002); *United States v. Sanders*, 247 F.3d 139, 145-46 (4th Cir. 2001), *cert. denied*, 122 S. Ct. 573 (2001); *United States v. Smith,* 241 F.3d 546, 548 (7th Cir. 2001), *cert. denied,* 534 U.S. 918 (2001)("the foundation for *Apprendi* was laid long before 1992"); *United States v. Watkins,* 45 Fed. Appx. 838 (10th Cir. August 26, 2002)(unpublished), *cert. denied,* 123 S.Ct. 1337 (February 24, 2003). The rule in *Ring,* derived from the application of *Apprendi* to capital sentencing, is likewise not novel. *See Cannon v. Mullin, supra,* 297 F.3d at 994.

Further, although Paul seeks to extend *Ring* to require the federal death penalty eligibility factors to be alleged in the indictment, this extension of *Ring* is also not novel. The aspects of *Jones* and *Apprendi* that petitioner relies on to support his proposed extension of *Ring* are issues

---

[16] Indeed, *Apprendi* was decided before the conclusion of Paul's direct appeal and Paul relied on *Apprendi* in his motion for rehearing and rehearing en banc in the Eighth Circuit and in his petition for certiorari review in the Supreme Court.

that have been raised in multiple contexts in many jurisdictions and were reasonably available to Paul at the time of his direct appeal and his first writ. *See United States v. Oliver,* 60 F.3d 547, 551-52 (9th Cir. 1995), *rev'd, Jones v. United States,* 526 U.S. 227 (1999)(In 1995 defendants argued that "serious bodily injury" in federal carjacking statute was an element of the offense, not a sentencing factor, and was required to be pled in the indictment.); *State v. Apprendi,* 698 A.2d 1265, 1268 (N.J. Super Ct. App. Div. 1997), *rev'd, Apprendi v. New Jersey,* 530 U.S. 466 (2000)(In 1997, defendant argued that "using the preponderance of the evidence standard to mandate an extended term sentence violated the constitutional requirement that the State must prove the elements of a crime by the reasonable doubt standard."). Moreover, as early as 1997, the defendant in *United States v. Spivey,* 958 F. Supp. 1523 (D.N.M. 1997), made the same argument that Paul is making today. Defendant Spivey argued that 21 U.S.C. § 848 violated the Indictment Clause of the Fifth Amendment and Federal Rule of Criminal Procedure 7(a) because it allowed the Government to only give notice of the aggravating factors it intended to prove rather than requiring that these aggravating factors be presented to a grand jury. *Spivey,* 958 F. Supp. at 1527. Spivey also argued that the aggravating factors constituted elements of the offense and were required to be pled in the indictment. *Id.* at 1528. Spivey's claim made in 1997 was reasonably available to Paul during his direct appeal, and Paul's counsel was not prevented from raising this claim. *See Murray v. Carrier*, 477 U.S. 478 at 488. Simply because the decisions in *Ring, Jones*, and *Apprendi* have made this argument easier does not constitute "cause." *Smith v. Murray*, 477 U.S. at 537.

The Supreme Court's decision in *United States v. Cotton,* 122 S.Ct. 1781, forecloses any claim of prejudice. The Court in *Cotton* held that a failure to allege drug quantities in an

indictment, although error, "did not seriously affect the fairness, integrity, or public reputation of judicial proceedings." *Cotton,* 122 S.Ct. at 1786. The Court reasoned that the evidence of drug quantity found by the court was 'overwhelming' and 'essentially uncontroverted' and that the grand jury would have found the drug quantity ultimately determined by the court. *Cotton,* 122 S.Ct. at 1786. Given the fact that Paul had notice of the eligibility factors the government would rely upon in his case and that the jury found the factors that rendered him eligible for the death penalty beyond a reasonable doubt, Paul cannot demonstrate that he was prejudiced by the failure to submit the factors to the grand jury for a determination of probable cause and inclusion in the indictment. Because Paul cannot show "cause" or "prejudice," he has procedurally defaulted his *Ring* claim and he cannot be granted collateral review of this claim.

*Harmless error*

Even if *Apprendi* and *Ring* are applicable, however, there is no question but that the indictment's failure to include the aggravating factors and the culpable mental state did not prejudice Paul. The test for determining harmless error on collateral review, even with constitutional claims, is the standard found in *Kotteakos, supra,* which asks whether the error had a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson, supra*, 507 U.S. at 637; *Robertson v. Cain,* 324 F. 3d 297, *22 (5th Cir. 2003)(*Brecht* harmless error standard for collateral review is still valid in light of Antiterrorism and Effective Death Penalty Act (AEDPA)). The fact that the grand jury did not determine the existence of the statutory aggravating factors, had no "substantial and injurious effect or influence in determining the jury's verdict" and thus any error in this case was harmless. *Brecht v. Abrahamson*, 507 U.S. at 637(quoting *Kotteakos).*

In order to obtain a sentence of death, during the punishment phase, the government was required to prove beyond a reasonable doubt 1) that Paul's conduct satisfied one of the threshold culpability factors set forth in 18 U.S.C. § 3591(a)(2) and 2) the existence of one or more statutory aggravating factors. Although Paul asserts once again that the jury did not make the threshold determination of culpability under § 3591, that assertion is in direct conflict with the conclusion of the Court of Appeals, and the Supreme Court declined to grant certiorari review with respect to that issue. Paul also claims that the error cannot be harmless in this case because the grand jury did not make the decision in his case to charge him with the capital crime. Contrary to Paul's assertions, the function of the grand jury is not to determine what charges to bring but only to determine whether the charges sought by the prosecution are supported by probable cause. *See United States v. Calandra,* 414 U.S. 338, 343 (1974)(A grand jury's responsibilities include "both the determination whether there is probable cause to believe a crime has been committed and the protection of citizens against unfounded prosecutions."); *see also United States v. R. Enterprises,* 498 U.S. 292, 297 (1991)("The function of the grand jury is to inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred.") and *United States v. Matthews*, 246 F. Supp 2d 137, 147 (N.D.N.Y. 2002)("The role of the grand jury simply 'is to investigate possible crimes against the sovereign so that it can make a judgment whether a trial on specific charges is necessary'")(citations omitted). Inasmuch as the jury found the eligibility factors beyond a reasonable doubt, it is beyond peradventure that the grand jury would have found probable cause to include in the indictment the eligibility factors. Whether or not the grand jury was presented with the statutory aggravating factors does not change the facts in this case, which were sufficient

to prove beyond a reasonable doubt the eligibility factors. Thus, in light of these facts, any alleged error in the indictment is harmless and did not have a "substantial and injurious effect or influence in determining the jury's verdict." *Brecht v. Abrahamson, supra*, 507 U.S. at 637 (quoting *Kotteakos, supra*).

2. Paul also claims that the FDPA cannot be applied consistently with the *Ring* decision and therefore is facially unconstitutional. Paul claims that *Ring* established the eligibility factors as necessary elements of the capital offense, but because the capital offense enacted by Congress did not include those elements in its definition, Paul contends that his death sentence cannot stand.[17] Even if *Ring* dictated the conclusion advanced by Paul, which it does not, he would not be entitled to the benefit of that rule. As set forth *supra*, the non-retroactivity principles of *Teague* foreclose a grant of relief to Paul based on the *Ring* decision. Although Paul's assertion might be sufficient to identify an issue, albeit one without merit, were his case in a pretrial posture, the only issue before the Court in § 2255 review is whether he identifies a cognizable constitutional infirmity in his conviction or sentence, which he does not. Moreover, Paul cannot demonstrate cause and prejudice to surmount the procedural default derived from his failure to raise this claim on direct appeal.

---

[17] The courts have uniformly rejected the argument advanced by Paul. *United States v. Davis*, 2003 WL 1837701, ___ F.Supp.2d ___ (E.D.La. April 9, 2003)("Nothing in the *Ring* trilogy or elsewhere suggests that the United States Supreme Court has overturned the FDPA or even questioned its constitutionality."); *United States v. Matthews,* 246 F.Supp.2d 137, 146-47 (N.D.N.Y. 2002); *United States v. Denis*, 246 F.Supp.2d 1250, *11 (S.D.Fla. 2002); *United States v. Sampson*, 245 F.Supp.2d 327, 338 (D.Mass. 2003); *United States v. Lentz*, 225 F.Supp. 2d 672, 677-82 (E.D.Va. 2002); *United States v. Fell*, 217 F.Supp.2d 469, 483-84 (D.Vt. 2002); *United States v. O'Driscoll*, 2002 WL 32063818 (M.D.Pa. August 22, 2002); *United States v. Johnson*, 239 F.Supp.2d 924, 935-46 (N.D.Iowa 2003); *United States v. Church*, 218 F.Supp.2d 813, 815 (W.D.Va. 2002).

3. In his tenth ground for relief, in reliance on the district court's decision in *United States v. Fell*, 217 F.Supp.2d 469 (D.Vt. 2002), Paul claims that, following *Ring*, the FDPA's capital sentencing provisions cannot result in a valid death sentence because they allow for the introduction of punishment phase evidence under the so-called "relaxed evidentiary standard" of § 3593(c). Paul's claim in this regard again requires not only the benefit of the *Ring* decision but also a further extension of *Ring* (this time to conclude that the Constitution requires proof of the eligibility factors to be established pursuant to the Federal Rule of Evidence). As previously stated, application of either rule in Paul's case is foreclosed by *Teague,* as well as by his failure to object at trial or raise the issue on direct appeal and because the purported error did not have a substantial or injurious effect on the jury's determination of guilt or sentence.

Moreover, the court's decision in *Fell* not only reflects an analysis that has been rejected by all other courts to consider the issue, the analysis is without import to the conduct of Paul's sentencing hearing. *See United States v. Davis*, 2003 WL 1837701 at *9; *United States v. Sampson*, 245 F.Supp.2d at 339; *United States v. Johnson*, 239 F.Supp.2d at 946; *United States v. Lentz*, 225 F. Supp.2d at 682-84; *United States v. Regan*, 221 F.Supp.2d at 681-683 ("[a]ssuming that the Confrontation Clause applies to the determination of the statutory aggravating factors in the penalty phase, the Court can ensure that the reliability requirements are considered within the scope of § 3593(c).").

The Court in *Fell* concluded that because the eligibility factors were to be treated as the functional equivalent of elements of the capital offense, a determination of those factors not made pursuant to the Federal Rules of Evidence would necessarily violate the Fifth and Sixth Amendments. The Court seemingly concluded that the evidentiary standard of 18 U.S.C. §

3593(c) required admission of evidence in violation of the Sixth Amendment rights to confrontation and cross-examination. What has been clear to every court to examine the issue, except the *Fell* district court, is that Congress has the authority to proscribe the applicable rules of evidence, but as with the Federal Rules of Evidence, application of the § 3593 evidentiary rule is circumscribed by any constitutional requirements applicable to the punishment phase.[18] *United States v. Davis*, 2003 WL 1837701 at *9-10; *United States v. Matthews,* 246 F. Supp.2d at 144-45 (Contrary to the conclusion in *Fell,* "Congress did not eliminate the constitutional baseline for the admissibility of evidence in a criminal trial...[the § 3593] scheme expressly provides the trial court with the discretion necessary to exclude unreliable and/or prejudicial evidence the admission of which would be fundamentally unfair and, therefore, violate the defendant's right to a fair trial under the Bill of Rights."); *United States v. Johnson*, 239 F.Supp.2d at 946 (The "relaxed evidentiary standard... expressly supplants only *the rules of evidence*, not constitutional standards")(emphasis in the original); *United States v. Sampson*, 245 F.Supp.2d at 339; *United States v. Lentz*, 225 F. Supp.2d at 682-84. If the eligibility factors operate for certain purposes as the functional equivalents of elements, it may well be that the confrontation and cross-examination rights impose certain limits on the admission of evidence under § 3593. But Paul

---

[18]Congress, within constitutional limits, has the power to determine what evidentiary standards should apply at the penalty phase. "[W]here Congress has spoken, [the courts] have deferred to the 'traditional powers of Congress to prescribe rules of evidence and standards of proof in the federal courts absent countervailing constitutional constraints.'" *Steadman v. S.E.C.*, 450 U.S. 91, 95 (1981).

The evidentiary standard of the FDPA is constitutional because it permits a court to exclude such constitutionally inadmissible evidence. The language of 18 U.S.C. § 3593(c), though it mandates that the Federal Rules of Evidence are not controlling, does not interfere with a court's obligation to impose appropriate constitutional limits on the type of information that may be introduced, and the manner of introducing it.

does not identify any evidence introduced by the government at the punishment phase in violation of these rights or any other constitutional provision. Paul's case makes clear the error of the *Fell* district court–a sentencing proceeding conducted under § 3593 does not invariably violate the Constitution.

### 26. Paul did not receive ineffective assistance of counsel in violation of the Sixth Amendment.

Paul presents an exhaustive list of purported but unsubstantiated deficiencies in the performance of his trial counsel. Claims of ineffective assistance of counsel are evaluated under the two-prong *Strickland v. Washington* standard. 466 U.S. 668 (1984). To be entitled to relief, Paul must establish both that counsel's performance was deficient and that he was prejudiced by the deficient performance. *Id.* at 687. To establish a deficient performance, Paul must show that "counsel's representation fell below an objective standard of reasonableness," committing "errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Id.* at 687-688. To establish prejudice, Paul must demonstrate a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

Each claim in Paul's seemingly endless litany of ineffective assistance of counsel claims is foreclosed by the vague and conclusory nature of the allegation, which prevents finding either a deficient performance or resulting prejudice. *Sanders v. United States*, 236 F.3d 950, 952 (8th Cir. 2000). Although the allegations to which the government responds in the following pages are likewise vague and conclusory, the government is at least able to place them within the context of known trial occurrences and identifiable issues. With the exception of the claims addressed *infra.*, Paul's claims of ineffective assistance of counsel are not only entirely conclusory, but also lack any discernable context.

*A. Counsel rendered effective assistance in raising and pressing the issue of Paul's possible incompetency to stand trial.*

Paul alleges that trial counsel mishandled the issue of his incompetency to stand trial by failing to seek an incompetency hearing before trial or after observing Paul's purported deterioration during trial. As set forth, *supra*, in response to Paul's twenty-first and twenty-second grounds for relief, counsel diligently pursued a determination of whether Paul was competent to stand trial. On October 31, 1996, counsel filed an initial motion for determination of competency to stand trial, which resulted in an evaluation of Paul at FCI Butner and a determination that he was competent to stand trial. Then in May 1997, counsel requested and the Court appointed Dr. Irving Kuo to further assess Paul's competency to stand trial.

Paul does not identify information within counsel's knowledge that rendered the failure to seek a hearing on the competency issue professionally unreasonable. Although Paul now claims that his "disruptive, rude, threatening, menacing and hostile" behavior at trial signaled a deterioration in his mental condition that required further inquiry into his competency, Paul's behavior at this point did not differ in any significant respect from his behavior at the points in time at which examining mental health experts found him competent to stand trial. Paul's behavior was consistent with the antisocial personality disorder diagnosed by the doctors at FCI Butner.

Paul does not identify information within counsel's knowledge that rendered professionally unreasonable their failure to further pursue the issue of his competency to stand trial or information that would establish a reasonable likelihood of a finding of incompetency to stand trial.

*B. Counsel's counsel and advice regarding the plea offer was entirely consistent with reasonable professional norms.*

Contrary to Paul's allegations, trial counsel fully informed Paul of the plea offer, advised Paul to accept the plea offer, and exerted considerable effort in an attempt to persuade Paul to accept the proposed plea agreement. Once again, Paul fails to identify a specific, professionally unreasonable omission in counsel's attempt to persuade Paul to accept the plea agreement or a reasonable likelihood that, if the allegedly omitted action had been undertaken, it would have been sufficient to persuade Paul to plead guilty.

The deficiencies in Paul's pleading aside, the government anticipates that, if the Court formally relieves counsel from the constraints of the attorney-client privilege (which Paul has assuredly waived by making this claim), counsel's actions in this regard will be demonstrably sufficient to survive the challenge. In early May 1997, AUSA Steve Snyder informed defense counsel that he would seek the Attorney General's approval of a plea agreement pursuant to which, if Paul pleaded guilty, the government would waive the death penalty and Paul would receive a sentence of life imprisonment without the possibility of parole.[19] The following weekend, counsel spent several hours on both weekend days meeting with Paul, his parents and Dr. Semone. The focus of these lengthy and arduous meetings was to persuade Paul to plead guilty. A week later, Paul rejected the proposed plea agreement.

---

[19] The DOJ death penalty protocol applicable at the time of Paul's trial did not require Attorney General approval of plea agreements. There were occasions, however, in which the Attorney General asked to be consulted before a plea was entertained. This may well have been such an occasion.

*C. Paul was fully informed of his right to testify but followed counsel's advice against taking the stand.*

Paul alleges that trial counsel refused to allow him to testify in his own behalf and failed to inform him that he could testify irrespective of the advice not to do so. Paul's § 2255 motion at 307, ¶ 521. Trial counsel is expected to testify that Paul was fully informed of his right to testify and that counsel discussed the possibility of Paul testifying with him on numerous occasions. Ultimately, Paul adhered to counsel's advice and decided not to testify. If Paul had insisted on testifying contrary to counsel's advice, counsel would have facilitated that testimony consistent with the constraints of their ethical obligations not to present perjured testimony.

The expected testimony of defense counsel aside, Paul cannot establish prejudice. Given Paul's statements to acquaintances regarding his conduct in the commission of the offense and his callous, hostile and disruptive attitude at trial, there does not exist a reasonable probability that the jury would have credited his self-exculpating testimony and returned a sentence less than death.

*D. Paul's assertion that there was someone else, in addition to himself and Ingle, at the scene of the offense is contrary to the information that he gave to counsel at trial.*

Paul intimates that there existed evidence, albeit unspecified, indicating that someone other than Paul was at the scene and involved in the taping of the deceased's hands and feet. Paul's § 2255 motion at 309, ¶ 529. Defense counsel is expected to testify that, despite relating numerous versions of the offense, Jeffery Paul never informed his counsel that there was a third perpetrator or another person present at the scene. Nor did the testimony at Ingle's trial or Ingle's

recorded jailhouse statements indicate the presence of a third party. Paul's conclusory assertions are insufficient to establish either a deficient performance or prejudice.

*E. Counsel's failure to call an expert to testify regarding Paul's propensity to lie was professionally reasonable.*

Paul claims that counsel should have presented evidence demonstrating Paul's propensity to lie and testimony of witnesses lay and expert who could have demonstrated that his inculpatory statements were false. Paul's § 2255 motion at 309-310, ¶¶ 530-531. Paul does not establish why a purported propensity to lie would induce a jury to credit an exculpatory version of the events, contrary to all other evidence. Nor does Paul identify the lay and expert witnesses who could establish the falsehood of Paul's inculpatory statements or the basis of their testimony. Paul fails to establish either a deficient performance or prejudice.

*G. Counsel did not render ineffective assistance of counsel at the punishment phase by failing to present additional evidence relating to Paul's background and alleged mental disorders.*

Paul alleges that counsel rendered ineffective assistance of counsel at the sentencing phase of the trial by relying exclusively on the testimony of Paul's mother. Paul's § 2255 motion at 310, ¶ 532. According to Paul, there existed additional mitigating evidence relating to his character, background, and the circumstances of the offense that was beyond Mrs. Paul's knowledge or ability to relate as a member of the dysfunctional family in which many of his problems originated. Paul alleges that as a consequence, counsel did not adequately depict the effect of his internal family life and its impact on his mental state, behaviors, actions, and ability to make good choices and judgments. According to Paul, had his mother's evidence been supplemented by appropriate testimony, "[r]ather than viewing whatever the jury perceived to be

[Paul's] role in the offense as the product of an evil bent of mind, the jury's picture would have been that of a severely injured and under-developed young man suffering from serious medical and mental conditions for which he was neither responsible nor capable of controlling." Paul's § 2255 motion at 325-326, ¶ 561.

Paul complains that his mother's "inability and/or unwillingness to connect this early childhood criminal behavior directly to the dysfunction in the family (*e.g.*, Jeff began stealing at an early age *so that his father could sell the stolen items and pay for essential family needs such as food and rent* – to be discussed later), rendered large parts of the defense's 'mitigating' case in fact aggravating in nature." Paul's § 2255 motion at 313, ¶ 537.

Paul also complains that his mother "trivialized both the extent of her husband, Dennis Paul's, pathological lying and its devastating impact on the family system in general and Jeff Paul specifically." Paul's § 2255 motion at 314, ¶ 538. According to Paul, unidentified "experts were available and could have testified in more detail and with greater accuracy about the depth of Dennis Paul's pathology, they also could have explained its etiology as a way of showing and confirming both that Jeff had learned similar ways of coping with his own self loathing, and how Jeff's propensity to exaggerate and bolster his own image was derived from a long family history of such behavior." Paul's § 2255 motion at 314, ¶ 538.

Paul also reasons that reliance on his mother's testimony prevented the presentation of evidence that she was "unable or unwilling to protect her children from the chaotic nature of Dennis' life." Paul's § 2255 motion at 317, ¶ 543. According to Paul, "numerous other [unidentified] members of the family were both able and willing to do so, and expert witnesses

could have explained the critical impact of this on Jeff Paul's character, childhood development, and behaviors." Paul's § 2255 motion at 316-17, ¶ 543.

Paul asserts that counsel should have presented the testimony of unidentified experts that his father's behavior and its impact on his family were similar to those of an alcoholic. Paul's § 2255 motion at 317, ¶ 544. Paul asserts that, in the face of his father's undependability, he felt "protective of others, especially the helpless" and assumed the "protector" or "man of the household role." Paul's § 2255 motion at 318, ¶¶ 545, 546. When Paul couldn't provide for his mother and siblings by volunteering to carry groceries, he "began to steal – not for his own thrill or enjoyment, but as a way of providing for the needs of the family in the face of his desperate failed efforts at finding work in his neighborhood." Paul's § 2255 motion at 319, ¶¶ 547, 548. Therefore, in Paul's view, unidentified "experts and other witnesses with perspective would have been able to explain [Paul's] early involvement in criminal behavior, not as the product of a deviant miscreant out for a thrill, but rather as that of a frightened and insecure child rendered desperate in his attempts to provide basic food and shelter for a family rendered destitute by an absentee and otherwise incapable father." Paul's § 2255 motion at 319, ¶ 548. According to Paul, rather than correcting this behavior, his father encouraged it, taking the stolen goods from him and selling them. Paul's § 2255 motion at 320, ¶ 550.

According to Paul, unidentified "[a]ssociates and friends knew [Paul] as a caring, protective, kind, and insecure person. They could see how powerless [Paul] felt in the face of his family's chaotic instability, how he struggled to assist them, how ashamed he was of his inability to effect positive change in his family, and how his efforts led him down a dangerous path of criminal activity." Paul's § 2255 motion at 322, ¶ 554.

Paul also asserts that counsel should have relied on the effects of his substance abuse in mitigation at the punishment phase. According to Paul, his use of marijuana, LSD, methamphetamine, paint spray inhalent and PCP "were the likely cause of severe and permanent brain damage." Paul's § 2255 motion at 323, ¶ 557. Paul presents no evidence of severe or permanent brain damage.

Paul notes that he "spent months in and out of mental institutions as a kid, with additional time in out-patient treatment, yet none of the many counselors, doctors, and therapists who treated and worked with him were called to the stand to discuss the[ir] conclusions." Paul's § 2255 motion at 324, ¶ 560. According to Paul, they could have described "how they had witnessed in real time psychological damage that [Paul] was suffering due to the chaotic home life to which he was being subjected; likewise, none were allowed to tell the jury how on numerous occasions [Paul] would have the opportunity to make real advances in his mental health snatched away from him by his family, who had begun to rely on him as a 'breadwinner' and needed him to continue his criminal conduct for financial support." Paul's § 2255 motion at 325, ¶ 560. These counselors, doctors, and therapists could have discussed the "devastating effect of removing [Paul] from necessary medical and mental health treatment" and given the jury an understanding of how Jeff's drug problems and use were clearly an attempt to medicate himself against the mounting stress and trauma of his ongoing family life and the serious mental disorders and emotional instability from which he suffered." Paul's § 2255 motion at 325, ¶ 560. But Paul does not identify even one such counselor, doctor, or therapist who would have testified to this effect at trial.

Finally Paul asserts that defense counsel should have called unidentified psychologists, neuropsychologists, and psychiatrists, who could have testified about his unidentified "serious mental disorders and his severe organic brain damage." Paul's § 2255 motion at 325, ¶ 561.

In sum, Paul now contends that his mother's testimony should have been augmented with testimony of (1) family members and experts regarding Dennis Paul's pathology (lying, unreliability, encouraging Paul to steal, alcoholic-like behavior) and its effect on Paul's character, childhood development, and behaviors; (2) "'experts and other witnesses with perspective' [who] would have been able to explain [Paul's] early involvement in criminal behavior, not as the product of a deviant miscreant out for a thrill, but rather as that of a frightened and insecure child rendered desperate in his attempts to provide basic food and shelter for a family rendered destitute by an absentee and otherwise incapable father;" (3) "[a]ssociates and friends [who] knew [Paul] as a caring, protective, kind, and insecure person [and] could see how powerless [Paul] felt in the face of his family's chaotic instability, how he struggled to assist them, how ashamed he was of his inability to effect positive change in his family, and how his efforts led him down a dangerous path of criminal activity;" (4) counselors, doctors, and therapists who had previously cared for Paul to describe the "devastating effect of removing [Paul] from necessary medical and mental health treatment," that his drug use was "clearly an attempt to medicate himself against the mounting stress and trauma of his ongoing family life and the serious mental disorders and emotional instability from which he suffered;" (5) psychologists, neuropsychologists, and psychiatrists who could have testified about his unidentified "serious mental disorders and his severe organic brain damage;" and (6) an expert to identify the characteristics of Paul's youth that contributed to the offense.

Because Paul fails to identify specifically the uncalled witnesses and the substance of their testimony, his allegations are insufficient to raise an issue of ineffective assistance of counsel. *Saunders v. United States*, 236 F.3d 950, 952 (8th Cir. 2001). "Without knowing who [Paul] would have had counsel call as witnesses and what their testimony in his defense might have been, it is not possible for . . . anyone to determine whether counsel's failure to identify (assuming trial counsel in fact failed to identify these witnesses) or to call such witnesses was unreasonable at the time of trial." *Id.* "Further, the lack of specificity as to both the identity of the conjectural witnesses and the content of their testimony prevents [assessment] whether there was prejudice to [Paul's] defense as a result of counsel's performance." *Id.*

Paul is not entitled to withhold the identity of the proposed witnesses or the substance of their testimony for disclosure at an evidentiary hearing. Rather, the conclusory nature of his allegations justify dismissal of his claims without a hearing. "*A § 2255 petition can be dismissed without a hearing if* (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) *the allegations cannot be accepted as true because they are* contradicted by the record, inherently incredible, or *conclusions rather that statements of fact.*" *Delgado v. United States*, 162 F.3d 981, 983 (8th Cir. 1998).

Disclosure of the identity of witnesses and the substance of their testimony would be but a starting point, however, in the ineffective assistance analysis. Paul would also have to demonstrate that counsel's failure to identify or call the witnesses at the time of trial was professionally unreasonable, or deficient performance, and that the testimony of the uncalled witnesses would have created a reasonable probability of a different outcome, or prejudice. An assessment of prejudice would require consideration of: (1) the credibility of all witnesses,

including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution. *See McCauley-Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir. 1996).

Even if Paul were now to identify additional witnesses and establish that those witnesses would have testified at trial and the substance of their testimony, he could not establish that it was professionally unreasonable to limit the defense at the punishment phase to the testimony of Paul's mother. There are two reasons for this. First, the proposed testimony was merely cumulative. The aspects of Paul's background encompassed by the additional evidence suggested by Paul's § 2255 counsel were placed before the jury by Mrs. Paul's testimony and placed in the precise context proposed by § 2255 counsel in defense counsel's closing punishment phase arguments. Second, although counsel had Dr. Semone ready to take the stand when Mrs. Paul concluded her testimony, Paul's behavior had become such that, upon consultation with Dr. Semone, defense counsel decided to close with no further testimony.

In closing based on Mrs. Paul's testimony, defense counsel argued as follows:

> . . . [Y]ou can't choose your relatives. Jeffery didn't choose his parents. He got Paula and Dennis Paul when they were very, very young in life. He got paternal grandparents; they were alcoholics and vagabonds that beget Dennis. Dennis is the father. He is a pathological liar. He disappears, he's inconsistent, does not contribute in a meaningful way to his son. He is a corruptor of his son's morals – killing the, you know, killing Japanese. Killing someone, and he wasn't even born in World War II. He was not a positive influence.
>
> . . . [Paula] was too young to marry at that time, probably too young to have the children that she had and she was immature and didn't get them raised the right way. And it sure didn't help

> with a husband like Dennis, and it sure didn't help when you consider all of the problems of having two boys and then four boys, the later two 12 months apart.
>
> * * *
>
> Jeff was in at least five different school districts. I lost count of the number of jobs Dennis had, the number of different houses that they lived in – can't keep track of it. Can you imagine what the impact on you would have been had you been in five different school districts, had you lived in all those different houses, had your father disappeared.
>
> Finally, we ask why did Jeff and Trinity Ingle do such a thing? We all know right from wrong, so does he. But I submit this closing; that is not the right question to ask. The question is why are we different? Why are we blessed? We are blessed from those people who contributed to our lives. None of us is self-made.
>
> * * *
>
> Hopefully, your upbringing was much better than Jeff's. . . . Remember, you didn't choose your parents. You didn't choose those people that you associated with; they chose you. If it was not for the Grace of God, you may very well be sitting where Jeff is today.
>
> That picture has always haunted me, not because it's a little boy, but because how he got from here to over there.

T 1148-1149, 1151-1152. The jury clearly found Paula Paul's testimony in combination with defense counsel's closing argument to be persuasive on the very points that post-conviction counsel now claims that additional testimony was needed. The jury unanimously found the following mitigating factors: (1) that Paul experienced parental neglect, abandonment and corruptive influence, (2) that Paul experienced parental abdication as to holding him accountable for his behavior, (3) that Paul experienced a chaotic family upbringing, and (4) that the defendant identified with criminally convicted peers. In addition, eight jurors found as a mitigating factor

that Paul experienced modeled parental irresponsibility. Even if post-conviction counsel were able to identify specific witnesses and present credible evidence that they were available to testify about the influence of Paul's background and family in forming his character, there would be not basis for concluding that trial counsel rendered ineffective assistance by relying on Paula Paul's testimony.

*H. Failure to present expert testimony regarding the effects and characteristics of youth that contributed to Paul's commission of the capital murder.*

Paul asserts that counsel should have presented expert testimony to support Paul's age as a mitigating factor. According to Paul, such testimony could have established that his "brain physiology and his emotional state grossly impacted his ability to exercise good judgment, control his impulses, and repel and resist the domination of other persons." Paul does not identify the expert witnesses who would have testified in this manner at trial, much less that such testimony would have created a reasonable probability of a different outcome. The poor judgment and impulse control normally attributable to youth do not render Paul's behavior in the capital offense more comprehensible. If the factors placed before the jury through Mrs. Paul's testimony-and in many instances unanimously found by the jury-did not induce the jury to vote for life, additional evidence about the physiology and emotions of youth would be unlikely to have this effect.

*I. Purported failure to present evidence establishing Ingle as an equally or more culpable co-defendant who did not receive a death sentence.*

Paul also faults counsels' sentencing phase performance for failing to present "substantial testimony and evidence developed and presented by the government and the defense during the trial of the co-defendant, Trinity Ingle, which would have proven a number of mitigating factors,

including the mitigating factor that a co-defendant of equal or greater culpability received a life sentence. Paul does not identify the evidence developed at Ingle's trial that he believes would have been persuasive on this point, much less that it would have been admissible and sufficient to establish a reasonable probability of a different outcome. At the punishment phase, counsel introduced into evidence portions of statements made by Ingle to other prisoners regarding his role in the offense. Nonetheless, no jurors found that Paul's participation in the offense was relatively minor or that another defendant, Trinity Edward Ingle--equally culpable--would not be punished by death. If Ingle's crude, self-inculpating descriptions did not persuade a single juror to vote for either of these factors, it is difficult to imagine what evidence from Ingle's trial could even remotely be deemed sufficient to persuade jurors that Ingle was less culpable than Paul, who boasted about kicking the victim so hard that his eyeball was forced from his head and whose conduct and attitude at trial conveyed a lack of concern for what he had done or the consequences to himself. There does not exist a reasonable probability that evidence from Ingle's trial would have convinced jurors to reassess Paul's role in the offense and on that basis return a sentence less than death.

***Evidentiary hearing***

Where as here, the record is completely barren of any evidence to support his claims, a § 2255 movant is not entitled to an evidentiary hearing.[20] Paul's ineffective assistance of counsel claims raise nothing more than a smoke screen of conclusions and speculation. Paul must identify witnesses available to testify at the time of trial and the substance of testimony

---

[20] Contrary to Paul's assertions, the complete lack of evidence to support his claims readily distinguishes his case from that at issue in *Williams v. Taylor*, 529 U.S. 362 (2000).

sufficiently compelling to establish prejudice under *Strickland,* before it would be incumbent upon the Court to conduct a hearing to determine whether the underlying omissions by counsel were professionally unreasonable.

### 27. The cumulative effect of the alleged errors does not state a basis for relief.

In his twenty-seventh ground for relief, Paul argues that, even if none of the alleged errors individually requires a new trial, "their cumulative effect was to deny Mr. Paul a fundamentally fair trial and capital sentencing proceeding." Paul's § 2255 motion at 343. In his seventh ground for relief, Paul argued that "his death sentence was the result of arbitrariness" resulting from the cumulative error. Paul's § 2255 motion at 67. However, as demonstrated herein, there are no errors to cumulate in this case. Moreover, it is well-established that purported error cannot be cumulated as a basis for habeas relief. *Wainwright v. Lockhart*, 80 F.3d 1226, 1233 (8th Cir. 1996)("Neither cumulative effect of trial errors nor cumulative effect of attorney errors are grounds for habeas relief."); *Wharton-El v. Nix*, 38 F.3d 372, 375 (8th Cir. 1994)("We reject cumulative error as a basis for habeas relief."), *citing Girtman v. Lockhart*, 942 F.2d 468, 475 (8th Cir. 1991), and *Scott v. Jones*, 915 F.2d 1188, 1191 (8th Cir. 1990) ("[E]ach habeas claim must stand or fall on its own."), *cert. denied*, 499 U.S. 978 (1991).

## OPPOSITION TO DISCOVERY

As set forth, *supra*, in relation to each claim to which Paul's request for discovery is arguably relevant, there is no reason to believe on the basis of specific allegations that he will be entitled to relief if the facts are fully developed through discovery. Accordingly, Paul is not entitled to discovery under Rule 6 of the rules governing § 2255 proceedings. *See Bracy v. Gramley*, 520 U.S. at 908-909.

Paul also seeks discovery unrelated to any identified claim for relief. Paul seeks discovery of all juror questionnaires in his case, which he believes to be contained in the "Court's 'own file,'" and permission to interview the jurors. According to Paul, access to juror questionnaires and permission to interview the jurors will enable him "a) to determine whether there was specific juror misconduct of constitutional dimension that, by its nature, could not have been discovered and raised at trial and on motion for new trial, and which therefore would provide a basis for habeas corpus relief in its own right; and, b) to determine whether there was specific juror misconduct of constitutional dimension that defense counsel had a duty to discover and raise at trial or on motion for new trial, and which would establish the prejudice prong of a claim of ineffective assistance of counsel raised in the accompanying § 2255 motion." Paul's Discovery Motion at 22. The requirement of specific allegations under *Bracy v. Gramley* makes it clear that Rule 6 cannot be employed to go on a fishing expedition. Paul should be denied the requested discovery.

Paul's requested discovery is readily distinguishable from the documents which the government seeks to have unsealed. Paul's discovery pertains to items outside the record for

which he has not made the requisite showing. The documents under seal are part of the record in this case and are directly relevant to an assessment of counsel's performance.

## CONCLUSION

For the foregoing reasons, this Court should deny Paul's motion for discovery and his motion for new trial or to vacate conviction and death sentence.

Respectfully submitted,

THOMAS C. GEAN
United States Attorney
Western District of Arkansas

STEVEN N. SNYDER
WILLIAM M. CROMWELL
Assistant U.S. Attorneys
Western District of Arkansas

Margaret P. Griffey

MARGARET P. GRIFFEY
Chief, Capital Case Unit
Criminal Division
U.S. Department of Justice
Room 6140, Patrick Henry Bldg.
601 D Street, N.W.
Washington, D.C. 20530
Tel: (202) 353-7172

CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the Government's Response in Opposition to Petitioner's Motion for New Trial or to Vacate Defendant's Conviction and Death Sentence under 28 U.S.C. § 2255 and Response in Opposition to Petitioner's Motions for Discovery was mailed to Paul's counsel at the following address:

Robert L. McGlasson
Attorney at Law
Federal Defender Program, Inc.
100 Peachtree St. NW, Suite 200
Atlanta, Georgia 30303

Date: May 30, 2003

Margaret Griffey

Margaret P. Griffey
Attorney
Department of Justice
Washington, D.C. 20530
Tel: (202) 353-7172

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

| | | |
|---|---|---|
| JEFFERY WILLIAM PAUL | § | |
| Petitioner | § | |
| | § | |
| v. | § | Criminal No. 6:96CR60022-001 |
| | § | |
| | § | |
| UNITED STATES OF AMERICA | § | |
| Respondent | § | |

**ORDER**

The Petitioner's Motion for New Trial or to Vacate Defendant's Conviction and Death Sentence under § 2255 is denied.

It is so ORDERED.

SIGNED on this the _____ day of ________________, 2003.

______________________________
JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

| | | |
|---|---|---|
| JEFFERY WILLIAM PAUL | § | |
| Petitioner | § | |
| | § | |
| v. | § | Criminal No. 6:96CR60022-001 |
| | § | |
| | § | |
| UNITED STATES OF AMERICA | § | |
| Respondent | § | |

**ORDER**

The Petitioner's Motion for Discovery is denied.

It is so ORDERED.

SIGNED on this the _____ day of ________________, 2003.

JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE