IN THE UNITED STATES COURT OF APPEALS
FOR THE EIGHTH CIRCUIT

---

**CASE NO. 98-3497**

---

**UNITED STATES OF AMERICA,**
Plaintiff/Appellee,

-vs-

**JEFFERY WILLIAM PAUL,**
Defendant/Appellant.

---

APPEAL FROM THE DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

---

**BRIEF OF APPELLANT**

---

**ORAL ARGUMENT REQUESTED**

---

**ROBERT L. MCGLASSON**
Attorney at Law
1024 Clairemont Ave.
Decatur, Georgia 30030
Telephone: (404) 373-9334
Facsimile: (404) 373-9338

**STEVEN D. OLIVER**
Bachelor, Newell & Oliver
P.O. Box 1620
Hot Springs, Arkansas 71913
Telephone: (501) 321-2222
Facsimile: (501) 624-0533

**ATTORNEYS FOR APPELLANT**

## SUMMARY OF THE CASE

This is a federal capital case, on direct appeal before this Court pursuant to 18 U.S.C. §3595. Appellant Jeffery Paul was convicted and sentenced to death for the crime of murder on federal land, and the use of a firearm in relation to a crime of violence. See 18 U.S.C. §§1111, 924. He was eighteen years old at the time of the offense, and thus just eligible for the death penalty under federal law. 18 U.S.C. §3591(a)(D). The government charged and tried both Mr. Paul's case, and that of his co-defendant, Trinity Ingle, on a theory of aiding and abetting, 18 U.S.C. §2, although in each trial, the government contradictorily argued that the defendant on trial had actually shot the victim. Mr. Ingle received a life sentence for the same offenses less than three weeks before Mr. Paul received a death sentence. This Court has reviewed Mr. Ingle's non-death case on direct appeal and denied relief on issues not presented here and unrelated to Mr. Paul's case. U.S. v. Ingle, 157 F.3d 1147 (8th Cir. 1998) (8th Circuit Case No. 97-3443).

This is one of several of the first federal capital cases tried pursuant to 18 U.S.C. §3591 et seq., pending on direct appeal before this Court. Many of the issues are novel. Appellant raises numerous violations of his constitutional rights, some focused on the application of §3591 et seq. to his case. Undersigned counsel believe that, for these reasons and those that follow, this Court would be greatly aided by thorough oral argument, allowing sixty minutes per side.

# TABLE OF CONTENTS

SUMMARY OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

PRELIMINARY JURISDICTIONAL STATEMENT . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

**I. The Jury's Failure to Unanimously Find, and Consider, Relevant Mitigating Evidence That Mr. Paul's Co-Defendant Received a Life Sentence, Violated His Rights under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments** . . . . . . . . . . . . . . . . . . . . . . 21

**II. The Jury's Failure to Find Unanimously and Consider Mr. Paul's Youth as a Mitigating Factor Violated His Rights under the FDPA and under the Fifth, Sixth, Eighth and Fourteenth Amendments Requiring a Capital Sentencer to at Least Consider Any Evidence in Mitigation Offered by the Defendant** . . . . . . . . . . . . . 51

**III. The Court's Sentencing Phase Instruction Allowing Only Those Jurors Who Found the Existence of a Mitigating Factor to Consider it Violated Mr. Paul's Rights as Guaranteed under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments** . . . . 58

IV. The Jury Was Not Required to Make the Requisite Finding of Intent at Either Phase of Trial, in Violation of Appellant's Rights under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

V. The Trial Court's Instructions Erroneously Required the Jury to Weigh the Intent "Eligibility" Finding as an Statutory Aggravator During the "Selection" Stage of Sentencing Deliberations, in Violation of the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . 76

VI. The Prosecution's Reliance upon Aggravating Factors Which Were Duplicative of Elements of the Offense Violated Appellant's Rights under the FDPA and under the Fifth, Sixth, Eighth and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 84

VII. The Government's Reliance upon Vague, Overbroad, and Otherwise Improper Aggravating Factors at the Sentencing Phase of Trial Violated Appellant's Rights under the FDPA and under the Fifth, Sixth, Eighth and Fourteenth Amendments . . . . . . . . 91

VIII. The Prosecution's Reliance upon Aggravating Factors Which Were Duplicative of One Another and Relied Upon the Same Operative Facts Violated Appellant's Rights under the FDPA and Under the Fifth, Sixth, Eighth and Fourteenth Amendments . . . . . . . 99

IX. The Prosecution's Reliance upon Unadjudicated Offense Evidence at Both Phases of Trial Violated Appellant's Rights under the FDPA, the Federal Rules of Evidence, and the Fifth, Sixth, Eighth and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . 107

X. The Victim Impact Evidence Introduced During Sentencing Produced a Verdict Based upon Emotion Rather than Reason, in Violation of the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 118

**XI. The Admission of Guilt-innocence Phase Testimony about the Victim, His Personal Habits, and His Family, Violated Fed. Rule Evid. 403 and Rendered the Guilt Determination Constitutionally Unreliable, in Violation of the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 136

**XII. The FDPA's Authorization for Government Creation Of Non-statutory Aggravating Factors, Constituted an Improper Delegation of Powers in Violation of Mr. Paul's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments** . . . . . . . . . . . . . . . 143

**XIII. The Prosecutor's Closing Arguments at Trial Mis-stated the Law on Reasonable Doubt, Commented upon Appellant's Exercise of His Right to Remain Silent, Diminished the Jury's Sense of Responsibility for Their Sentencing Verdict, and Mis-stated the Law with Respect to the Jury's Duty to Consider Mitigating Evidence, in Violation of Appellant's Rights under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments** . . . . . . . . . . . . 151

**XIV. The Government's Reliance upon Inconsistent Theories At the Trial of Appellant and His Co-defendant Violated Mr. Paul's Right to a Fair Trial and Due Process, as Guaranteed under the Fifth, Sixth, Eighth and Fourteenth Amendments** . . . . . . . . . . . . . . . 160

**XV. The Trial Court Erred in Numerous Respects Throughout Voir Dire, Beginning with the Refusal to Allow Individual Sequestered Voir Dire, Continuing Through the Manner in Which the Court Handled Voir Dire and the Court's Rulings on Challenges for Cause, in Violation of Appellant's Rights under the Fifth, Sixth, Eighth and Fourteenth Amendments** . . . . . . . . . . . . . . . . . . . . . . . . 164

**XVI. Appellant's Death Sentence Resulted from the Influence of Passion and Arbitrariness, in Violation of His Rights under the FDPA and under the Fifth, Sixth, Eighth and Fourteenth Amendments** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 174

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 177

# TABLE OF AUTHORITIES

## CASES

*Aldridge v. U.S.*, 283 U.S. 308 (1931) .................................... 165

*Antwine v. Delo*, 54 F.3d 1357(8th Cir. 1996) ............ 19, 20, 158, 159

*Arave v. Creech*, 507 U.S. 463 (1993) ........................... 3, 81, 82, 86, 88, 92, 100

*Armstrong v. State*, 826 P.2d 1106 (Wy. 1992) ...................... 140

*Barclay v. Florida*, 463 U.S. 939 (1983) ................................ 144

*Battle v. Delo*, 19 F.3d 1547 (8th Cir.1994) ............................... 93

*Blystone v. Pennsylvania*, 494 U.S. 299 (1990) ...................... 149

*Booth v. Maryland*, 482 U.S. 496 (1987) ........................ 119, 120

*Boyd v. California*, 494 U.S. 370 (1990) .................................. 99

*Cabana v. Bullock*, 474 U.S. 376 (1986) ............................ 71, 78

*Cage v. Louisiana*, 498 U.S. 39 (1990) .................................. 152

*Caldwell v. Mississippi*, 472 U.S. 320 (1985) .............. 6, 19, 157, 158, 159

*Cargle v. State*, 909 P.2d 806 (Okla.Crim.App. 1995) ............ 123

*Chapman v. California*, 386 U.S. 18 (1967) ............................ 19

*Commonwealth v. Hoss*, 445 Pa. 98 (1981) .............................. 116

*Cook v. State*, 369 So. 2d 1251 (Ala. 1979) .............................. 116

*Darden v. Wainwright*, 477 U.S. 168 (1986) .......................... 152

*Devier v. Zant*, 3 F.3d 1445 (11th Cir. 1993) .......................... 115

*Donnelly v. DeChristoforo*, 416 U.S. 637 (1974) .............. 19, 154

*Dowling v. United States*, 493 U.S. 342 (1990) .................... 6, 162

*Drake v. Kemp*, 762 F.2d 1449 (11th Cir. 1985) .................. 6, 161

*Driscoll v. Delo*, 71 F.3d 701 (8th Cir. 1995) .......................... 158

*Eddings v. Oklahoma*, 455 U.S. 104 (1982) ........................ 2, 5, 6, 25, 52, 53, 54, 55, 56, 57, 61, 78, 134, 156

*Eldridge v. State*, 940 S.W.2d 649 .......................................... 176

*Enberg v. Meyer*, 820 P.2d 70 (Wyo. 1991) ............................ 104

*Enmund v. Florida*, 458 U.S. 782 (1982) ........................ 3, 62, 63, 65, 68, 70, 71, 72, 73, 76, 78

*Espinosa v. Florida*, 505 U.S. 1079 (1992) ......................... 92, 93

*Evans v. State*, 598 N.E.2d 516 (Ind. 1992) .............................. 44

*Gardner v. Florida*, 430 U.S. 349 (1977) ................................ 119

*Gilmore v. Armontrout*, 861 F.2d 1061 (8th Cir. 1989) ........... 158

*Gray v. Lucas*, 710 F.2d 1048 (5th Cir. 1983) .......................... 45

*Gray v. Mississippi*, 481 U.S. 648 (1987) .............................. 166

*Gregg v. Georgia*, 428 U.S. 153 (1976) .................................. 79

*Griffin v. California*, 380 U.S. 609 (1965) .................... 6, 19, 154

*Ham v. South Carolina*, 409 U.S. 524 (1973) ........................ 167

*Hendrix v. Norris*, 81 F.3d 805 (8th Cir. 1996) ........................ 17

*Hitchcock v. Florida*, 481 U.S. 393 (1987) .................... 2, 17, 25, 53, 57

*In Re Hitchings*, 6 Cal. 4th 97, 860 P.2d 466 (1993) .............. 172

*Johnson v. Texas*, 509 U.S. 350 (1993) .......................... 2, 54, 55, 57

*Jones v. State*, 569 So. 2d 1234 (Fla. 1990) ........................ 5, 139

*Jones v. U.S.*, 119 S. Ct. 2090 (U.S. 1999) .......... 2-4, 59, 64, 77, 79, 101, 102, 103, 150

*Kennedy v. State*, 455 So. 2d 351 (Fla. 1984)..............................104

*Lesko v. Lehman*, 925 F.2d 1527 (3rd Cir.1990) .................... 156

*Lockett v. Ohio*, 438 U.S. 586 (1978) ............................ 2, 17, 24, 25, 52, 54, 72, 133, 156

*Lowenfield v. Phelps*, 484 U.S. 231 (1988) .................... 3, 78, 87, 88

*Magwood v. Smith*, 791 F.2d 1438 (11th Cir. 1986) .................. 45

*Mak v. Blodgett*, 970 F.2d 614 (9th Cir. 1992) ........................ 174

*Mathenia v. Delo*, 975 F.2d 444 (8th Cir.1992) ......................... 93

*Maynard v. Cartwright*, 486 U.S. 356 (1988) ............................ 92

*McMillian v. Pennsylvania*, 477 U.S. 79 (1986) .................. 4, 115

*Miller-El v. State*, 782 S.W.2d 892 (Tex.Crim.App. 1990) ..... 140

*Mills v. Maryland*, 486 U.S. 367 (1988) ............................ 17, 120

*Milton v. Procunier*, 744 F.2d 1091 (5th Cir. 1984) ................ 117

*Mistretta v. United States*, 488 U.S. 361 (1989) .......... 5, 65, 145, 146

*Monk v. Zelez*, 901 F.2d 885 (10th Cir. 1990) ........................ 152

*Morford v. U. S.*, 339 U.S. 258 (1950) ...................................... 164

*Morgan v. Illinois*, 504 U.S. 719 (1992) ..................... 7, 165, 169, 172, 173

*Newlon v. Armontrout*, 885 F.2d 1328 (8th Cir. 1989) .......... 4, 93

*Nibert v. State*, 574 So. 2d 1059 (Fla. 1990) .............................. 44

*Nichols v. Collins*, 802 F. Supp. 66 (S.D.Tex. 1992) ... 6, 161, 162

*Old Chief v. United States*, 519 U.S. 172 (1997) ......... 5, 138, 141

*Patton v. Yount*, 467 U.S. 1025 (1984) ...................................... 164

*Payne v. Tennessee*, 501 U.S. 808 (1991) .................. 5, 118, 119, 120, 121, 122, 133, 134, 135

*Penry v. Lynaugh*, 492 U.S. 302 (1989) .............................. 28, 79

*People v. Balderas*, 41 Cal. 3d 144 (Cal. 1985) ...................... 117

*People v. Heishman*, 753 P.2d 629 (Cal.) ................................ 114

*People v. Hobley*, 159 Ill. 2d 272 (Ill. 1994) .................... 140, 142

*Prevence v. State*, 377 So. 2d 783 (Fla. 1976) ........................ 116

*Pulley v. Harris*, 465 U.S. 37 (1984) ....................................... 149

*Richmond v. Lewis*, 506 U.S. 40 (1992) ......................... 4, 91, 95, 96

*Rosales-Lopez v. United States*, 451 U.S. 182 (1981) . 7, 164, 167

*Sager v. Maass*, 907 F. Supp. 1412 (D.Or. 1995) .................... 140

*Sanders v. State*, 585 A.2d 117 (Del. 1990) .............................. 45

*Schad v. Arizona*, 501 U.S. 624 (1991) ............................... 73, 86

*Scott v. Jones*, 915 F.2d 1188 (8th Cir.1990) .......................... 174

*Scott v. State*, 297 Md. 235 (Md. 1983) .................................. 116

*Shurn v. Delo*, 177 F.3d 662 (8th Cir. May 10, 1999) ........... 158

*Sidebottom v. Delo*, 46 F.3d 744 (8th Cir.1995) ...................... 154

*Skipper v. South Carolina*, 476 U.S. 1 (1986) ........................ 134

*South Carolina v. Gathers*, 490 U.S. 805 (1989) .................... 119

*State v. Bartholomew*, 101 Wash. 2d 631(Wash. 1984) .......... 116

*State v. Bernard*, 608 So. 2d 966 (La. 1992) ................ 5, 123, 132

*State v. Bobo*, 727 S.W.2d 945 (Tenn. 1987) .......................... 116

*State v. Brooks*, 541 So. 2d 801 (La. 1989) ............................ 117

*State v. Cherry*, 257 S.E.2d 551 (N.C. 1979) ............................ 89

*State v. Debler*, 856 S.W.2d 641 (Mo. 1993) ...................... 4, 116

*State v. McCormick*, 272 Ind. 272 (1979) ............................... 116

*State v. Middlebrooks*, 840 S.W.2d 317 (Tn. 1992) .................... 89

*State v. Muhammad*, 145 N.J. 23 (1996) ................................. 123

*State v. Taylor*, 818 P.2d 1030 (Utah 1990) ............................. 114

*State v. Williams*, 113 N.J. 393 (1988) ............................ 165, 166

*Stringer v. Black*, 503 U.S. 222 (1992) .......................... 4, 18, 45, 83, 89, 91, 97, 98, 104, 105, 175

*Swain v. Alabama*, 380 U.S. 202 (1965) ................................. 167

*Thompson v. Calderon*, 120 F.3d 1045 (9th Cir. 1997) ....... 6, 161

*Thompson v. Keohane*, 519 U.S. 99 (1995) .............................. 17

*Tison v. Arizona*, 481 U.S. 137 (1987) ............................ 3, 63, 65

*Touby v. U.S.*, 500 U.S. 160 (1991) ........................................ 145

*Tuilaepa v. California*, 512 U.S. 967 (1994) ........................ 59, 64

*U.S. v. Bear Runner*, 502 F.2d 908 (8th Cir. 1974) ................ 164

*U. S. v. Black*, 685 F.2d 132 (5th Cir. 1982) ............................ 20

*U.S. v. Blount*, 479 F.2d 650 (6th Cir. 1973) .......................... 164

*U. S. v. Brewer*, 1 F.3d 1430 (4th Cir. 1993) .......................... 141

*U. S. v. Byrd*, 352 F.2d 570 (2nd Cir. 1965) .......................... 152

*U.S. v. Davis*, 904 F. Supp. 554 (E.D. La. 1995) ...... 94, 123, 144, 146, 148

*U.S. v. Davis*, 912 F. Supp. 938 (E.D.La. 1996) ........... 4, 94, 113, 148, 154

*U.S. v. Downs*, 56 F.3d 973 (8th Cir. 1995) .............................. 86

*U.S. v. Hall*, 152 F.3d 381 (5th Cir. 1998) ...................... 3, 72, 73, 87, 88, 117

*U.S. v. Harper*, 729 F.2d 1216 (9th Cir. 1984) ........................ 146

*U. S. v. Harris*, 542 F.2d 1283 (7th Cir. 1976) ......................... 171

*U. S. v. Indorato*, 628 F.2d 711 (1st Cir. 1980) ...................... 152

*U.S. v. Ingle*, 157 F.3d 1147 (8th Cir. 1998) ............................ 24

*U.S. v. Jones*, 132 F.3d 232 (5th Cir. 1998) ................ 91, 102, 149

*U.S. v. Kimball*, 73 F.3d 269 (10th Cir. 1995) ........................ 140

*U.S. v. Ledee*, 549 F.2d 990 (5th Cir.1977) .............................. 172

*U.S. v. Masters*, 622 F.2d 83 (4th Cir. 1980) .......................... 141

*U.S. v. McCullah*, 76 F.3d 1087 (10th Cir. 1996) ............. 3, 4, 88, 102, 104

*U.S. v. McCullah*, 87 F.3d 1136 (10th Cir. 1996) ..................... 104

*U. S. v. Moss*, 756 F.2d 329 (4th Cir. 1985) ............................ 152

*U.S. v. Naranjo*, 710 F.2d 1465 (10th Cir. 1983) ............ 141, 142

*U.S. v. Netz*, 758 F.2d 1308 (8th Cir. 1985) ............................ 152

*U.S. v. Petary*, 857 F.2d 458 (8th Cir. 1988) ........................... 141

*U.S. v. Polk*, 118 F.3d 286 (5th Cir. 1997) .............................. 175

*U. S. v. Pretlow*, 779 F. Supp. 758 (D.N.J. 1991) ..................... 150

*U. S. v. Rivera-Gomez*, 67 F.3d 993 (1st Cir. 1995) ................ 141

*U.S. v. Robinson*, 110 F.3d 1320 (8th Cir. 1997) ....................... 20

*U.S. v. Romanello*, 726 F.2d 173 (5th Cir. 1984) ....................... 21

*U. S. v. Ryan*, 41 F.3d 361 (8th Cir. 1994) ................................ 18

*U. S. v. Salerno*, 937 F.2d 797 (2nd Cir.1991) .......................... 162

*U. S. v. Sherer*, 653 F.2d 334 (8th Cir. 1981) ........................... 18

*U.S. v. Shoffner*, 71 F.3d 1429 (8th Cir. 1995) ......................... 111

*U.S. v. Webster*, 162 F.3d 308 (5th Cir. 1998) ................ 3, 64, 79, 80

*United States v. Copple*, 24 F.3d 535 (3d Cir. 1995) ... 5, 138, 139

*United States v. Koonce*, 991 F.2d 693 (11th Cir. 1993) ......... 113

*United States v. Martin-Trigona*, 684 F.2d 485 (7th Cir. 1982) ... 9, 152

*United States v. Mergerson*, 4 F.3d 337 (5th Cir. 1993) ...... 4, 114

*United States v. Williams*, 895 F.2d 1202 (8th Cir.1990) .... 4, 111

*Wainwright v. Witt*, 469 U.S. 412 (1985) .................... 7, 165, 166, 172, 173

*Walton v. Arizona*, 497 U.S. 639 (1990) ............................ 20, 97

*Whalen v. U. S.*, 445 U.S. 684 (1980) ....................................... 146

*Wong Sun*, 371 U.S. 471 (1963) ............................................... 111

*Woodson v. North Carolina*, 428 U.S. 280 (1976) ....... 19, 24, 52, 114, 156

*Zant v. Stephens*, 462 U.S. 862 (1983) ......................... 3, 71, 78, 79, 85, 86, 144

## STATUTES

18 U.S.C. §2 ...................................................................... 8,87

18 U.S.C. §924 .................................................................... 8

18 U.S.C. §1111 .............................................................. 3, 8 73, 85 87

18 U.S.C. §1201 ........................................................... 72, 87

18 U.S.C. §3591(a)(D) .......... 1, 14, 15, 51, 54, 63, 64, 69, 70, 72, 73, 74, 75, 143

18 U.S.C. §3591 .......... 3, 5, 62

18 U.S.C. §3592 .......... 4, 6, 25, 26, 55, 96, 113, 143, 145, 147, 150, 156

18 U.S.C. §3593 .......... 2, 3, 4, 26, 44, 58, 60, 89, 91, 104, 105, 143, 150

18 U.S.C. §3595 .......... 7, 23, 49, 50, 174, 175, 176

18 U.S.C. § 3742(a)(1) .......... 1

28 U.S.C. §§ 1291 and 1294 .......... 1

Fed.R.Evid. 404(b) .......... 4, 107, 110

## MISCELLANEOUS

Stephen P. Smith, Note, Unreliable and Prejudicial: The Use of Extraneous Unadjudicated Offenses in the Penalty Phase of Capital Trials, 63 Colum. L. Rev. 1249 (1993) .......... 114

## PRELIMINARY JURISDICTIONAL STATEMENT

Appellant Jeffery William Paul appeals from a judgment of conviction and sentence of death entered against him by the United States District Court for the Western District of Arkansas. Mr. Paul was charged with criminal offenses against the United States. 18 U.S.C. §§1111, 2, 924. The offenses were punishable by death. 18 U.S.C. §3591 et seq. The killing of Sherman Williams occurred within Hot Springs National Park, in Hot Springs, Arkansas. Therefore, the district court had jurisdiction pursuant to 18 U.S.C. §§ 3231, 3232, 3235 and 3236. The district court entered final judgment of conviction and sentence on June 25, 1997. The district court denied a timely filed Motion for New Trial on September 17, 1998. Mr. Paul filed a timely Notice of Appeal on September 25, 1998, within the period required by Rule 4(b) of the Federal Rules of Appellate Procedure. Accordingly, this Court has jurisdiction of this appeal under 18 U.S.C. § 3742(a)(1) and 28 U.S.C. §§ 1291 and 1294.

## STATEMENT OF THE ISSUES

I. **THE JURY'S FAILURE TO UNANIMOUSLY FIND, AND CONSIDER, RELEVANT MITIGATING EVIDENCE THAT MR. PAUL'S CO-DEFENDANT RECEIVED A LIFE SENTENCE, VIOLATED HIS RIGHTS UNDER THE FDPA AND THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Eddings v. Oklahoma, 455 U.S. 104 (1982)
Hitchcock v. Florida, 481 U.S. 393 (1987).
Lockett v. Ohio, 438 U.S. 586 (1978)
18 U.S.C. §§3592, 3595

II. **THE JURY'S FAILURE TO FIND UNANIMOUSLY AND CONSIDER MR. PAUL'S YOUTH AS A MITIGATING FACTOR VIOLATED HIS RIGHTS UNDER THE FDPA AND UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS REQUIRING A CAPITAL SENTENCER TO AT LEAST CONSIDER ANY EVIDENCE IN MITIGATION OFFERED BY THE DEFENDANT.**

Johnson v. Texas, 509 U.S. 350 (1993)
Hitchcock v. Florida, 481 U.S. 393 399 (1987).
Eddings v. Oklahoma, 455 U.S. 104 (1982)
18 U.S.C. §§3591, 3592

III. **THE COURT'S SENTENCING PHASE INSTRUCTION ALLOWING ONLY THOSE JURORS WHO FOUND THE EXISTENCE OF A MITIGATING FACTOR TO CONSIDER IT VIOLATED MR. PAUL'S RIGHTS AS GUARANTEED UNDER THE FDPA AND THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Jones v. U.S., ___ U.S. ___, 1999 WL 401258 (U.S.)(June 21, 1999)
18 U.S.C. §3593

**IV. THE JURY WAS NOT REQUIRED TO MAKE THE REQUISITE FINDING OF INTENT AT EITHER PHASE OF TRIAL, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FDPA AND THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Tison v. Arizona, 481 U.S. 137 (1987)
Enmund v. Florida, 458 U.S. 782 (1982)
U.S. v. Hall, 152 F.3d 381 (5th Cir. 1998)
18 U.S.C.A. §3591

**V. THE TRIAL COURT'S INSTRUCTIONS ERRONEOUSLY REQUIRED THE JURY TO WEIGH THE INTENT "ELIGIBILITY" FINDING AS A STATUTORY AGGRAVATOR DURING THE "SELECTION" STAGE OF SENTENCING DELIBERATIONS, IN VIOLATION OF THE FDPA AND THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Jones v. U.S., ___ U.S. ___, 1999 WL 401258 (U.S.) (June 21, 1999)
Arave v. Creech, 507 U.S. 463 (1993)
U.S. v. Webster, 162 F.3d 308 (5th Cir. 1998)

**VI. THE PROSECUTION'S RELIANCE UPON AGGRAVATING FACTORS WHICH WERE DUPLICATIVE OF ELEMENTS OF THE OFFENSE VIOLATED APPELLANT'S RIGHTS UNDER THE FDPA AND UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Arave v. Creech, 507 U.S. 463 (1993)
Lowenfield v. Phelps, 484 U.S. 231 (1988)
Zant v. Stephens, 462 U.S. 862 (1983)
U.S. v. McCullah, 76 F.3d 1087 (10th Cir. 1996)
18 U.S.C. §§1111; 2
18 U.S.C. §3593

**VII. THE GOVERNMENT'S RELIANCE UPON VAGUE, OVERBROAD, AND OTHERWISE IMPROPER AGGRAVATING FACTORS AT THE SENTENCING PHASE OF TRIAL VIOLATED APPELLANT'S RIGHTS UNDER THE FDPA AND UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Richmond v. Lewis, 506 U.S. 40 (1992)
Stringer v. Black, 503 U.S. 222 (1992)
Newlon v. Armontrout, 885 F.2d 1328 (8th Cir. 1989)
U.S. v. Davis, 912 F. Supp. 938 (E.D.La. 1996)
18 U.S.C. §3593(e)

**VIII. THE PROSECUTION'S RELIANCE UPON AGGRAVATING FACTORS WHICH WERE DUPLICATIVE OF ONE ANOTHER AND RELIED UPON THE SAME OPERATIVE FACTS VIOLATED APPELLANT'S RIGHTS UNDER THE FDPA AND UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Jones v. U.S., ___ U.S. ___, 1999 WL 401258 (U.S.) (June 21, 1999)
U.S.. v. McCullah, 76 F.3d 1087 (10th Cir. 1996)
18 U.S.C. §3593(c)

**IX. THE PROSECUTION'S RELIANCE UPON UNADJUDICATED OFFENSE EVIDENCE AT BOTH PHASES OF TRIAL VIOLATED APPELLANT'S RIGHTS UNDER THE FDPA, THE FEDERAL RULES OF EVIDENCE, AND THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

McMillian v. Pennsylvania, 477 U.S. 79 (1986)
United States v. Williams, 895 F.2d 1202 (8th Cir.1990)
United States v. Mergerson, 4 F.3d 337 (5th Cir. 1993)
State v. Debler, 856 S.W.2d 641 (Mo. 1993)
Fed.R.Evid. 404(b)
18 U.S.C. §3592

**X. THE VICTIM IMPACT EVIDENCE INTRODUCED DURING SENTENCING PRODUCED A VERDICT BASED UPON EMOTION RATHER THAN REASON, IN VIOLATION OF THE FDPA AND THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Payne v. Tennessee, 501 U.S. 808 (1991)
Eddings v. Oklahoma, 455 U.S. 104 (1982)
State v. Bernard, 608 So.2d 966 (La. 1992)

**XI. THE ADMISSION OF GUILT-INNOCENCE PHASE TESTIMONY ABOUT THE VICTIM, HIS PERSONAL HABITS, AND HIS FAMILY, VIOLATED FED. RULE EVID. 403 AND RENDERED THE GUILT DETERMINATION CONSTITUTIONALLY UNRELIABLE, IN VIOLATION OF THE FDPA AND THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Old Chief v. United States, 519 U.S. 172 (1997)
United States v. Copple, 24 F.3d 535 (3d Cir. 1995)
Jones v. State, 569 So.2d 1234 (Fla. 1990)

**XII. THE FDPA'S AUTHORIZATION FOR GOVERNMENT CREATION OF, AND RELIANCE UPON NON-STATUTORY AGGRAVATING FACTORS, CONSTITUTED AN IMPROPER DELEGATION OF POWERS IN VIOLATION OF MR. PAUL'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Mistretta v. United States, 488 U.S. 361 (1989)
Article 1, Section 1, U.S. Constitution
18 U.S.C. §§3591, 3592, 3593

**XIII. THE PROSECUTOR'S CLOSING ARGUMENTS AT TRIAL MIS-STATED THE LAW ON REASONABLE DOUBT, COMMENTED UPON APPELLANT'S EXERCISE OF HIS RIGHT TO REMAIN SILENT, DIMINISHED THE JURY'S SENSE OF RESPONSIBILITY FOR THEIR SENTENCING VERDICT, AND MIS-STATED THE LAW WITH RESPECT TO THE JURY'S DUTY TO CONSIDER MITIGATING EVIDENCE, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FDPA AND THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Caldwell v. Mississippi, 472 U.S. 320 (1985)
Eddings v. Oklahoma, 455 U.S. 104 (1982)
Griffin v. California, 380 U.S. 609 (1965)
United States v. Martin-Trigona, 684 F.2d 485 (7th Cir. 1982)
18 U.S.C. §3592

**XIV. THE GOVERNMENT'S RELIANCE UPON INCONSISTENT THEORIES BETWEEN THE TRIAL OF JEFFERY PAUL AND HIS CO-DEFENDANT VIOLATED MR. PAUL'S RIGHT TO A FUNDAMENTALLY FAIR TRIAL AND TO DUE PROCESS, AS GUARANTEED UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Dowling v. United States, 493 U.S. 342 (1990)
Thompson v. Calderon, 120 F.3d 1045 (9th Cir. 1997)
Drake v. Kemp, 762 F.2d 1449 (11th Cir. 1985)
Nichols v. Collins, 802 F.Supp. 66 (S.D.Tex. 1992)

**XV. THE TRIAL COURT COMMITTED ERROR IN NUMEROUS RESPECTS THROUGHOUT VOIR DIRE, BEGINNING WITH THE REFUSAL TO ALLOW INDIVIDUAL SEQUESTERED VOIR DIRE, CONTINUING THROUGH THE MANNER IN WHICH THE COURT HANDLED VOIR DIRE AND THE COURT'S RULINGS ON CHALLENGES FOR CAUSE, IN VIOLATION OF APPELLANT'S RIGHTS UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

Morgan v. Illinois, 504 U.S. 719 (1992)
Wainwright v. Witt, 469 U.S. 412 (1985)
Rosales-Lopez v. United States, 451 U.S. 182 (1981)

**XVI. APPELLANT'S DEATH SENTENCE RESULTED FROM THE INFLUENCE OF PASSION AND ARBITRARINESS, IN VIOLATION OF HIS RIGHTS UNDER THE FDPA AND UNDER THE FIFTH, SIXTH, EIGHTH AND FOURTEENTH AMENDMENTS.**

18 U.S.C. §3595

## STATEMENT OF THE CASE

This is a federal capital direct appeal involving the conviction and sentences of death entered against Jeffery William Paul, an eighteen year old youth at the time of the offense. Mr. Paul was convicted of aiding and abetting in: (1) the crime of first degree murder of Sherman Williams, violating 18 U.S.C. §1111; and, (2) the use of a firearm during and in relation to a crime of violence, violating 18 U.S.C. §924.

Mr. Paul was arrested on August 22, 1997. App. 1.[1] The grand jury returned a superceding indictment on December 4, 1997, charging him with violations of 18 U.S.C. §§2, 1111, & 924. App. 6. On January 27, 1997, the government filed its notice of intent to seek the death penalty. App. 18.

For a death penalty case, the trial from beginning to end was remarkably brief. Voir dire in the case began on June 17, 1997, and was concluded the

---

[1] Citations to the record in this case will be as follows. Citations to the Appendices (which include relevant docket entries and trial transcripts containing trial court instructions and government arguments) are denoted "App." followed by the page number(s). Those portions of the trial transcript not included in the Appendices, but part of the Record on Appeal, will be cited as "T." followed by the page number(s). References to transcripts of pre-trial hearings which are part of the Record on Appeal shall be cited as "T. [date of pre-trial hearing]" followed by the page number(s). Selected portions of the trial record of co-defendant Trinity Ingle which are germane to the issues in this case are found in Volume Two of the Appendices, and cited as noted above.

following day before the noon recess. See App. 73. The entire guilt-innocence phase evidentiary presentation lasted slightly longer than one day. The government's presentation of evidence began on June 19, 1997, and continued into the following morning, at which point both the government and the defense rested. Id. The trial court released the jury by 10:15 AM that day. Id. After a weekend break, instructions and closing arguments were presented, the jury began deliberations, and returned a guilty verdict by 2:40 PM on June 23, 1997. Id.

Without any break, the trial court began the sentencing phase of trial that same afternoon, and the government's presentation was concluded by the end of the day. Id. The defense sentencing presentation began the next morning, June 24, 1997, consisting of one witness and the submission of an audio-tape confession of co-defendant Trinity Ingle, and was concluded before noon the same day. Id. The jury began sentencing phase deliberations at 3:40 PM that afternoon, and returned a sentence of death the following day. Id. The court immediately sentenced Mr. Paul. Addendum at 1.

## STATEMENT OF FACTS

On June 26, 1997, a tourist walking in Hot Springs National Park discovered the body of elderly male. T. 516 Local Hot Springs police were contacted, as were officials with the National Park ranger's office and the Federal Bureau of Investigation. T. 529, 531. FBI Special Agent Tom Ross immediately took control of investigation of the scene. T. 532. Agent Ross contacted the Medical Examiner's Office in Little Rock, Arkansas, who retrieved the body later that evening for examination and autopsy. T. 560. The body had duct tape on the hands and ankles, and obvious trauma to the head. T. 558-59.

The next day an employee with the National Park Service found the wallet of Sherman Williams near a pump-house elsewhere in the National Park. T. 532, 583. The ranger's office called Carole Sherman, a daughter of Mr. Williams, who was listed as a contact "in case of emergency" on a piece of paper in the wallet. T. 533. Ms. Sherman made attempts to reach her father at his condominium in Hot Springs, without success. Id. As a result, officials with the ranger's office went to Mr. Williams' residence. T. 534. His car was missing, and he was not present at the condominium. Id. They obtained dental records and other documentation regarding his car and license plate. T. 535.

On June 30, 1997, an individual named Sam Maples contacted the FBI

regarding a car he had found at the bottom of a pit in an abandoned mine near Hot Springs. T. 611-12. An FBI agent accompanied Mr. Maples to the scene, where a late model Oldsmobile was found. T. 615. The FBI was able to determine that the car belonged to Mr. Sherman Williams. T. 619.

According to a doctor with the State Medical Examiner's office who performed the autopsy on the body recovered from the National Park, the victim died of a gunshot wound to the head. T. 597. Relying upon dental records, he was able positively to identify the body as being that of Sherman Williams. T. 591. Although the chest area showed no signs of external damage, an x-ray revealed small lead shot present. T. 596. There was no evidence of trauma to the head or neck area other than that caused by the entrance and exit wounds from the bullet that caused the death of the victim. T. 598-600.

On July 4, 1995, Appellant, who lived with his parents in Hot Springs, left for Florida with his brother Jason. T. 793. After approximately one year of living in Florida and North Carolina, Mr. Paul returned to Mississippi near where his family had moved. T. 796-99. Local FBI agents learned of his whereabouts, and arrested him pursuant to warrant on August 22, 1996. T. 807. Mr. Paul gave a statement to the arresting officer, implicating himself in the robbery of Sherman Williams, but implicating Trinity Ingle in the actual murder. T. 810-12.

The government's primary case against Mr. Paul at trial came from the testimony of four witnesses who were friends or acquaintances of the Appellant and who testified that he made statements to them regarding his involvement in the murder of an elderly man in Hot Springs National Park. For example, Gary Kristopher Rogers, who was contacted by the FBI about the matter after an un-named individual had provided information to them, T. 693, testified that Jeffery Paul had told him at a party on June 24, 1995, that he had been involved in the robbery and murder of an elderly man in Hot Springs National Park two days earlier, and that the man had been kicked and shot in the head. T. 664-69, 684-89. See also T. 705-715 (testimony of Chris LaPaglia, former girlfriend of Mr. Paul); T. 29-45 (testimony of Cindy Wallace, girlfriend of Mr. Paul); T. 755 (testimony of friend Daniel Coughlin). As set forth more fully in Claim I below, Mr. Paul's statements to these individuals were inconsistent, contradictory, and vague in numerous respects. The government also relied upon Mr. Paul's statement to FBI Agent John LaVoie. T. 811-14.

Other evidence linking Mr. Paul to the offense included a pair of "Reebok" brand sneakers, which were apparently owned by Mr. Paul, but had been loaned to Mr. Ingle and were recovered from Ingle at the time of his arrest. T. 567-68. Although examined, no blood was found on the sneakers. T. 608. The only other

physical evidence was a fingerprint of co-defendant Trinity Ingle found on the ashtray of the victim's car. T. 777-80.

Mr. Paul was convicted on both counts in the indictment. T. 913. At the sentencing trial, the government relied exclusively on extensive so-called "victim impact" testimony. T. 934-62. Mr. Williams' two daughters reviewed the entirety of his life and career, and also testified about their relationship with him and the impact of his death on them. Id. The defense presented the testimony of Mr. Paul's mother, who described Jeff's chaotic childhood in which he moved repeatedly throughout his life. T. 971-1050. His father was described as a "pathological liar" who never kept a steady job and would often leave the family for periods of time without explanation. T. 981-83, 1041-43. Jeff suffered mental health issues for which he was treated at a local psychiatric facility. T. 1017, 1021. After instructions and closing arguments, the jury returned affirmative findings on several aggravating and mitigating circumstances, and recommended that a sentence of death be imposed. T. 1164.

## SUMMARY OF THE ARGUMENT

In separate trials, the government relied upon a theory of aiding and abetting to convict Mr. Ingle and Mr. Paul. In both cases, the government sought to portray the defendant on trial as the actual shooter. Claim XIV. In both trials, however, the evidence did not establish with certainty who had done what, and the government argued that it did not matter under an aiding and abetting theory of liability. At neither phase of Mr. Paul's trial did the instructions require the jury to find that Jeffery Paul personally possessed the requisite intent. Claim IV. Voir dire was general and hurried, and was insufficient to ensure an accurate determination with respect to the intelligent exercise of for-cause and peremptory challenges. Claim XV.

At sentencing, the government sought to prove a number of statutory and non-statutory aggravating factors, some authorized under the Federal Death Penalty Act of 1994 [hereinafter the FDPA], 18 U.S.C. §3591 et seq., and some not, the latter of which constituted an invalid delegation of legislative authority and therefore a violation of the separation of powers doctrine. Claim XII. The defense sought findings based on a variety of mitigating factors, including the fact that Mr. Paul was quite young at the time of the offense, and the fact that his equally culpable co-defendant had just received a life sentence for the same

offense. Six jurors rejected the former, and all twelve, the latter. This is so despite the fact that Mr. Paul was only eighteen years old and thus younger than Ingle, his criminal record (both charged and uncharged), was far less serious, and the evidence in no way established any greater role by Mr. Paul in the offense. Because the court's instructions erroneously disallowed an individual juror to consider mitigators absent that individual juror's affirmative vote in favor of such, see Claim III, Mr. Paul's sentencer failed to give any weight to this relevant, constitutionally protected mitigating evidence. Claims I and II.

Numerous errors occurred with respect to the aggravating side of the equation. The trial court instructed the jury at sentencing that the intent finding required by §3591(a)(2) could be met so long as the jury found that Mr. Paul intentionally "aided and abetted" in the murder of Sherman Williams, which was erroneous under statutory and constitutional law. Claim IV. The court also instructed the jury, and the prosecution argued, that the intent eligibility finding was a statutory aggravating factor to be weighed in the selection phase along with the other aggravating and mitigating factors. Claim V. Many of the statutory and non-statutory aggravators were vague and overbroad, see Claim VII, while others were duplicative of elements of the offense or of one another, and therefore failed to provide sufficient constitutional "narrowing." Claims VI and VIII. The

prosecution relied upon unadjudicated offense evidence in violation of Appellant's rights under the FDPA and the constitution, see Claim IX, and committed misconduct in opening and closing arguments at both phases of trial. Claim XIII. At both phases the government utilized evidence regarding the character and background of the victim, Sherman Williams, and his family, in support of a guilty verdict, see Claim XI, and in support of a death sentence. Claim X. On the latter, the evidence introduced was so extensive and detailed that it unfairly turned Appellant's sentencing trial into a war of comparative worth between victim and defendant, one which the defendant ultimately lost.

All of these errors, viewed cumulatively along with the evidence in Mr. Paul's trial as compared with that in his co-defendant's trial, demonstrate that his death sentence was the result of undue passion and arbitrariness, requiring this Court's remand for imposition of a life sentence. Claim XVI.

## STANDARD OF REVIEW

This case presents several issues of first impression in this Circuit arising from a federal capital prosecution and sentence of death. Issues I through IV, inclusive, XII, XIV, present questions of law or mixed questions of law and fact, which this Court reviews de novo. Thompson v. Keohane, 519 U.S. 99 (1995); Hendrix v. Norris, 81 F.3d 805 (8th Cir. 1996). Some issues involve legal principles which are accompanied by a specific standard of review.

Errors in capital sentencer failure to consider relevant mitigating evidence, Claims I and II, are reversible unless it can be said that such error had "no effect on the jury." Hitchcock v. Florida, 481 U.S. 393, 399 (1987).

Eighth Amendment error regarding jury instructions on mitigation at the penalty phase of a capital trial, Claim III, are established when an instruction or any other factor causes the sentencer to refuse to "give any weight to aspects of the defendant's character and record and to circumstances of the offense proffered in mitigation..." Lockett, supra. "The critical question...is whether ... a reasonable jury could have drawn [an unconstitutional interpretation] from the instructions given by the trial judge and from the verdict forms used in th[e] case." Mills v. Maryland, 486 U.S. 367, 375-76 (1988).

With respect to Claim IV, "jury verdicts are not supportable when based on

instructions that do not require the proper finding of facts to support each element of the crime. . ." U. S. v. Ryan, 41 F.3d 361, 365-66 (8th Cir. 1994). The specific issue is "whether the instructions, when taken as a whole, adequately advise the jury of the essential elements of the offenses charged and the burden of proof required of the government." U. S. v. Sherer, 653 F.2d 334, 337 (8th Cir. 1981).

Trial court rulings exposing capital juries to evidence that risks the reliability of their judgments, see Claims V, VI, VII, VIII, and IX, must meet a more exacting standard than abuse of discretion. Stringer v. Black, supra ("requir[ing] close appellate scrutiny of the import and effect of invalid aggravating factors to implement the well-established Eighth Amendment requirement of individualized sentencing determinations in death cases").

Evidentiary rulings implicating substantive Eighth Amendment rights such as those presented in Claims X and XI (regarding victim impact evidence) present mixed questions of fact and law, which are reviewed for abuse of discretion or de novo depending upon whether the question involves primarily a factual inquiry or a consideration of legal principles. The issue here centers upon whether the victim impact evidence admitted by the trial court created a verdict based on emotion and not reason. This inquiry requires the making of a legal judgment on the basis of the evidence of record, which calls for a de novo judgment on the part of this

Court. Hendrix, supra. On the guilt-innocence phase issue, under Fed. Rule Evid. 403, the district court's striking of the balance between relevance and the danger of unfair prejudice is reviewed for abuse of discretion. If, however, evidence is sufficiently prejudicial that its introduction compromises the reliability of the determination of a capital defendant's guilt, the Eighth Amendment's concern for heightened reliability in death penalty cases provides an additional ground for exclusion of such evidence. Woodson v. North Carolina, supra.

Errors in prosecutorial closing argument, Claim XIII, are reviewed to determine whether Appellant received a "fundamentally fair trial", see Donnelly v. DeChristoforo, 416 U.S. 637 (1974). Where arguments implicate a specific right, e.g. Griffin v. California, supra,, such errors are reversible unless the government can prove them harmless beyond a reasonable doubt. Chapman v. California, 386 U.S. 18 (1967). Comments diminishing a capital jury's sense of responsibility for their decision are reversible unless the government proves the error had "no effect" on the outcome of the case. Caldwell v. Mississippi, supra. Finally, this Court held in Antwine v. Delo: "When we find that a prosecutor has made improper comments during his closing argument, we must: (1) measure the type of prejudice that arose from the argument; (2) examine what defense counsel did in his argument to minimize the prejudice; (3) review jury instructions to see if the

jury was properly instructed; and (4) determine if there is a reasonable probability that the outcome of the sentencing phase would have been different, taking into account all of the aggravating and mitigating circumstances." 54 F.3d 1357, 1362 (8th Cir. 1995), citing Newlon v. Armontrout, 885 F.2d 1328, 1337 n.10 (8th Cir. 1989), cert. denied, 497 U.S. 1038 (1990). "In order to determine the effect of a prosecutor's remarks, we examine the totality of the circumstances." Id. at 1363. When the resolution of an issue requires examination of the totality of the circumstances, de novo review is required. Thompson, supra, 516 U.S. at 112-13 & n. 11 ("totality of the circumstances" legal test "does not mean deferential review is in order.")

The procedures employed by the trial court during jury selection, Claim XV, are reviewed for abuse of discretion. When the substantial rights of the accused are prejudiced by the scope and content of voir dire, reversal is required. Compare U. S. v. Black, 685 F.2d 132, 134 (5th Cir.), cert. denied, 459 U.S. 1021 (1982).

If the Court determines that any errors presented herein should have been raised earlier but were not, the Circuit's plain error standard may govern. See U.S. v. Robinson, 110 F.3d 1320 (8th Cir. 1997) (reversal warranted if "(1) the court committed an error; (2) the error is clear under current law; and (3) the error affects [the defendant's] substantial rights."

## ARGUMENT

**I. The Jury's Failure to Unanimously Find, and Consider, Relevant Mitigating Evidence that His Co-Defendant Received a Life Sentence Violated Mr. Paul's Rights Under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.**

**1. Introduction**

The evidence before the jury in this case was irresistibly vague in one critical respect: it deflected any serious effort to distinguish the role Mr. Paul played from the role Mr. Ingle played in the murder of Sherman Williams. The two defendants were, like the poor departed soul and the lizard in The Inferno, "'fused like hot wax ... until neither wretch nor monster appeared what he had been when he began....'"[2] The evidence indicated that both confessed some involvement in the offense. Both gave conflicting statements about his own role and the role of the other – each at times saying or suggesting that the other was the shooter, each at times saying or suggesting that he was the shooter. The jury – like the government – had no rational basis upon which to distinguish the comparative

---

[2] "... I saw a lizard come darting forward on six great taloned feet and fasten itself to a [fellow soul] .... They fused like hot wax, and their colors ran together until neither wretch nor monster appeared what he had been when he began...." Dante, The Inferno, Canto XXV, Circle 8, Bolgia 7, lines 46-48, 58-60 (J. Ciardi, transl.), cited in U.S. v. Romanello, 726 F.2d 173, 174 (5th Cir. 1984).

culpability of Mr. Paul and Mr. Ingle. The physical evidence failed to provide any basis, and there was no other evidence upon which the jury could have done so. The most compelling proof of this inscrutable ambiguity was the prosecution's closing argument in the penalty phase of Mr. Paul's trial. The prosecution did not even attempt to rebut the defense argument that Mr. Paul was no more culpable than Mr. Ingle. Instead, it sought to deflect the jury's consideration of this matter by arguing that what another jury decided in Mr. Ingle's case was not, and should not be, determinative of what the proper punishment was for Mr. Paul. Thus, only by urging the jury to ignore entirely the matter of equal culpability could the prosecution hope to avoid the ineluctable conclusion that Mr. Paul could not be fairly put to death if Mr. Ingle was not going to be. The jury heeded the prosecutor's call, and in failing to find the equal culpability mitigating factor, failed to consider mitigating evidence that as a matter of law the Eighth Amendment and the capital sentencing statute required it to consider.

The record in Mr. Paul's case establishes by more than a preponderance of the evidence that Trinity Ingle, who received a life sentence, was no less, and probably more culpable than Jeffery Paul in the death of Sherman Williams. The evidence is sufficiently compelling in this regard, that no rational trier of fact should have concluded otherwise. For this reason, this Court should hold that the

jury was in error in refusing to find the "co-defendant life sentence" mitigator, and on that basis reverse Appellant's sentence of death.

Under the applicable statute, this Court is also required to determine whether the death sentence was "imposed under the influence of passion, prejudice, or any other arbitrary factor," 18 U.S.C. § 3595(c)(1). From that perspective, this Court has the benefit of being able to see Mr. Paul's case from a perspective not available to Mr. Paul's jury. This Court can and should examine the evidence and argument concerning relative culpability presented by the government in Mr. Ingle's trial and compare it to the evidence and argument in Mr. Paul's trial. From this perspective, the only conclusion that can be drawn is that, to the extent that Mr. Paul and Mr. Ingle can be differentiated in terms of culpability, the weight of all the available evidence points toward Mr. Ingle, not Mr. Paul, as the more culpable person. There can be no clearer example of the imposition of the death sentence arbitrarily, and this Court is duty-bound to correct that injustice.

In the presentation that follows, Appellant sets forth the evidence and argument from his trial that establishes the existence of the "co-defendant life sentence" mitigator. He also sets forth evidence and argument from the trial of

Trinity Ingle[3] which provides further support for the view that their relative culpability was indistinguishable at best.[4]

### 2. Mr. Paul's Capital Sentencing Jury Was Required to Consider All Relevant Mitigating Evidence

The Supreme Court has steadfastly held that a capital sentencing statute must permit consideration of the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976). The Court has never wavered from the principle that the Eighth Amendment requires full consideration of all relevant facts which a capital defendant proffers in mitigation at the sentencing phase of a capital trial. In Lockett v. Ohio, 438 U.S. 586 (1978), the Court held that under the Eighth

---

[3] The government's arguments at Ingle's trial regarding the issue of relative culpability are relevant here not only because of this Court's statutory duty to review Mr. Paul's case for arbitrariness; in addition, those arguments provide direct insight into what the government believes about whether a rational trier of fact could have reasonably rejected the "co-defendant life sentence" mitigator in Mr. Paul's case. This Court should therefore scrutinize the government's arguments at both trials in deciding the issues here.

[4] While portions of the Ingle trial transcript are found in the Appendices, Mr. Ingle appealed his case to this Court, and a copy of the entire record is contained in his case file. See U.S. v. Ingle, 157 F.3d 1147 (8th Circuit Case No. 97-3443) (1998).

Amendment, a capital defendant may not be precluded from presenting to his sentencer, as a mitigating factor, "any aspect of [his] character or record and any of the circumstances of the offenses that the defendant proffers as a basis for a sentence less than death." 438 U.S. at 604.

Critically here, expounding upon the Lockett principle, in Eddings v. Oklahoma, 455 U.S. 104, 115-116 (1982), the Court held that it was Eighth Amendment error for a capital sentencer to refuse to consider relevant mitigating evidence in the sentencing determination. As the Court put it, "[j]ust as the State may not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.... The sentencer ... may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." 455 U.S. at 113-114 (emphasis in original). See also Hitchcock v. Florida, 481 U.S. 393, 399 (1987).

Congress incorporated these principles into the FDPA. Section 3592 of the Act declares that at the sentencing phase of a capital trial held pursuant to the Act:

> [T]he finder of fact shall consider any mitigating factor, including...: [listing seven specific statutory mitigating factors, and] ...
>
> (8) Other factors. – Other factors in the defendant's background,

> record or character or any other circumstances of the offense that mitigate against imposition of the death sentence.

18 U.S.C. §3592(a) (emphasis added). One of the statutory mitigating factors enumerated in §3592(a) is:

> (4) Equally culpable defendants. -- Another defendant or defendants, equally culpable in the crime, will not be punished by death.

Congress also established a lower burden of proof for a defendant's mitigating evidence than that mandated for aggravating factors. Compare 18 U.S.C. §3593(c) (government must prove aggravating factor "beyond a reasonable doubt") with id. (defense must prove mitigating factor "by a preponderance of the information.").

In the present case, the defense submitted for the jury's consideration the statutory mitigating factor defined in §3592(a)(4) set forth above. The court instructed the jury, in accordance with §3593(c), that this factor should be considered by the jury if the defense established it by a preponderance of the evidence. App. 191-92. The court also instructed, contrary to the FDPA and Supreme Court precedent, see Claim III, that only those members of the jury who actually found the existence of a mitigating factor could consider it in their determination of the appropriate punishment. App. 194; see also App. 90. Thus, "as a matter of law" pursuant to the court's instruction, if no member of the jury found the existence of a mitigating factor, then no member of the jury considered

that factor in determining whether Mr. Paul should live or die.

In Mr. Paul's case, the jury unanimously rejected the (a)(4) mitigating factor concerning the fact that Trinity Ingle, Appellant's co-defendant, received a life sentence. App. 92. Thus, under the court's instruction, no member of the jury even considered, let alone gave weight to, the fact that Trinity Ingle, Appellant's co-defendant, had just days before Mr. Paul's trial, received a life sentence for his conviction for the same offense.

This is so despite the fact that it was undisputed Ingle had received a life sentence. This is also true despite the fact that, under any reasonable view of the evidence, Mr. Paul's comparative culpability in the case was no greater than, and probably less than that of Trinity Ingle.

### 3. Evidence of Equal Culpability – Jeffery Paul Trial

The record demonstrates that, under any rational view of the evidence, Mr. Paul carried his burden of proving by a preponderance of the evidence this (a)(4) mitigating factor. The jury's failure to so find violated Edding's requirement that the sentencer consider such evidence; in addition, this failure violated §3592's mandate that the sentencer "shall consider" all mitigating evidence proven by a preponderance of the evidence.

Although the trial court failed to define "equal culpability" for the jury, its common meaning connotes both the sense that the two co-defendants were actively involved in the commission of the offense, as well the more general point that, taking into account all other evidence regarding Appellant's character and background, he was no more "morally culpable" than his co-defendant. Cf. Penry v. Lynaugh, 492 U.S. 302 (1989) (capital sentencer must be allowed to take into account all aspects of character and background of defendant and give "reasoned moral response" thereto in death sentencing decision) . In this case, the evidence as to these factors established by more than a preponderance of the evidence that Appellant was no more culpable than his co-defendant, and no reasonable juror could have found differently. In the sections that follow, Appellant reviews the relevant evidence as to his "culpability" so defined.

(a) The Alleged Statements of Jeffery Paul

The government's case in chief was primarily based upon the testimony of four witnesses who claimed Appellant had made statements to them which, in some manner and to varying degrees, inculpated him in the offense. Gary Kristopher (Kris) Rogers, a convicted felon, T. 653, who had known Appellant for less than three months, T. 676, testified that on June 24, 1995, two days after the

offense, he, Appellant and several friends socialized together at the home of his girlfriend, Crystal Davis. T. 664. He testified that they were drinking but were not doing any drugs. T. 684. Rogers claimed that Appellant pulled him aside from the others and proceeded to tell him about an old man that "they" (Appellant and Trinity Ingle) had murdered. T. 666. Rogers testified that the plan, as related to him by Appellant, had been to rob the victim, but that they shot him after knocking him down and kicking him. T. 667-69. Rogers also testified that he saw what appeared to be blood on Appellant's shoe that evening, although he had not seen any blood when he saw him two days earlier, the day of the offense. T. 670, 683. He also testified that Trint Ingle had been wearing Mr. Paul's shoes that summer, because Ingle could not wear his own sandals to work. T. 670. He acknowledged that on June 24th, shortly after his alleged conversation with Appellant, he and his girlfriend got into a fight, and he was arrested for battering her. T. 687-88. Rogers admitted to knowing about a possible reward for his testimony, but when denying a financial motive for testifying against Appellant, he inferred that he was still waiting for his money: "It's been a nightmare for two years. I still ain't seen – you know." T. 692.

Chris LaPaglia, Appellant's former girlfriend, testified Ingle called her on June 22, 1995, asking her to come to the motel where they were because Appellant

was upset and needed her there. T. 705. She testified that Appellant later called her himself, and told her that he was upset because he had killed someone. T. 707. She also testified, however, that Appellant had never mentioned shooting anyone, only that he had kicked someone. T. 715. According to LaPaglia, the next day Appellant told her his mother was upset because he came home with blood on him, and that he had kicked someone and "broke his neck." T. 708. Appellant's mother testified, however, that she had not seen any blood on her son's clothes or shoes on June 22, 1995, nor had Kris Roger. T. 670, 683, 1040. The medical examiner confirmed that there was no sign of trauma to the victim's head or neck other than the single gunshot wound that caused death. T. 598-600.

Cindy Wallace, Appellant's girlfriend in Key West, Florida during the period after the crime but before his arrest, testified that Appellant told her about a dream he had in which he and a person he referred to as his "OG-original gangster" followed a man up a mountain to rob him, and shot him. T. 729-30. Wallace testified that at times Appellant said his "OG" forced him to shoot the man, at times he said they both shot him, and at times he said the "OG" shot the victim. T. 736, 739, 743. At one point Appellant told her he had not shot the victim at all. T. 743. Wallace testified that Paul had lied to her before and that she did not believe him when he told her about this incident. T. 744-45.

Daniel Coughlin, a friend of Appellant's while in Key West, testified that Appellant told him he and another man had robbed a man for his car, and then shot and killed him. T. 755.

Government witness John LaVoie, the FBI agent who arrested Appellant in Water Valley, Mississippi on August 22, 1996, testified that Appellant confessed to having been a part of the robbery of Sherman Williams, but expressly denied any direct involvement in the actual murder. According to Agent LaVoie, Appellant said Ingle pulled a gun on the victim when he refused to turn over his money, T. 811; that while Appellant had helped tape the victim's hands, Ingle had struck him with the butt of the revolver and kicked him twice in the head, id.; and, while first walking away from the victim, Ingle, a five time convicted felon, said he was not going to do more [prison] time for robbing the victim, and he turned around and shot the victim, once in the head, and once in the shoulder. Id. Agent LaVoie said Appellant had been cooperative and candid during the interview, T. 814, and he appeared confused about why he was being prosecuted for murder. Id.

(b) The Recorded Statement of Trinity Ingle

Unlike the statements of Mr. Paul, the only evidence of which was the hearsay testimony of witnesses, the jury also heard a recorded statement from co-

defendant Ingle. T. 1058-1110.[5] It is significant not only for its contents, described more fully below, but also for its heightened reliability as to the veracity and accuracy of the statements. Whereas all of the evidence regarding Mr. Paul's statements was subject to mis-quoting, mis-interpretation, elaboration, or worse, coming as it did solely from the memory of persons with questionable motives of their own, Ingle's recorded statement was a live, verbatim rendition. Thus added weight must be given to the truth of its contents as compared with Mr. Paul's statements.

Ingle's statement was taken by means of a concealed recording device provided by the FBI and placed on an inmate in the Crawford County Jail where Ingle was being held pre-trial. T. 1056. That inmate, Jonah Jones, and another inmate, Derrick Bell, were recorded while engaged in a conversation with Ingle about the murder charge on which he was being held. Generally speaking, Ingle's recorded statement can only be fairly described as the vulgar, street talking bravado of an obvious thug. Ingle's descriptions of his role, the victim, and the offense that he repeatedly admits to having committed, is filled with vulgarity,

---

[5] The defense also introduced into evidence certified copies of the indictment, judgement and order of (life) sentence in the Ingle case. T. 1110 (DE 21 & 21).

cursing and slang[6], and is otherwise wholly inconsiderate of basic human decency. To adequately assess Mr. Paul's claim here that no reasonable juror could have believed him to be any more culpable in the offense than Ingle, counsel urges the Court to read Ingle's recorded statement in its entirety.

Specifically, Ingle's recorded statement lays out the facts of the crime, the planning beforehand, the manner in which it was carried out, and the motive for the actual killing. At each step, Ingle describes himself as either the leader in the action, or at least an active co-participant. Several times during the recorded statement, Ingle admits to having actually shot and killed the victim himself. See e.g. T. 1084 ("the dude I done shot, he dead."); T. 1103 (when asked who shot him first, Ingle replies, "BOB did", and acknowledged "BOB" referred to himself).[7] To confirm, Jones followed up this statement with some advice to Ingle: "Well, Dog, let me tell ya somethin'. Uh, uh, if you shot him 'cause he seen ya, that's

---

[6] Rather than quote Ingle's actual language, counsel will use "_ _ _ _ _" to denote curse words in this Brief.

[7] Ingle explained elsewhere in the statement that in order to protect himself he would refer to he and his partner in the crime as ANDY and TOM. T. 1061. Apparently unable to remember his choice of names, he later changed them to BOB and ANDY. T. 1063; 1069-1070. Although he is often unclear whether one name is paired with one person in real life, at the point in the recording referenced here in text, he explicitly acknowledges that BOB refers to himself. T. 1103. At the Ingle trial, Jonah Jones verified that "BOB" referred to Mr. Ingle. App. 349.

legit. But, but, since your buddy's free, maybe he should've shot him first. You know what I'm sayin'. Instead of you shootin' him first because you in jail and, if somethin' was to happen out there, uh, "INGLE shot him first." Know what I'm sayin'?" T. 1104-05. When discussing where they put the body, the question is asked, "Not too far from where you popped him, huh?," to which Ingle replies, "Yeah, yeah, yeah." T. 1107. Ingle even described the feeling he had when he pulled the trigger: "You know yourself, when you boom, man, and when you hit that thing, you just, then you're rushin' rushin'...." T. 1087. Ingle admits to having gotten rid of the gun himself: "I told it to 'em like this. 'If I use it, I'm gonna get rid of it.'" T. 1085.

In addition to confessing personal responsibility for Mr. Williams' death, Ingle's recorded statement repeatedly acknowledges co-participation in the offense. <u>See e.g.</u>, T. 1060 ("we killed" the victim); T. 1063 (victim was killed because "we both on parole and, and we can't be havin' none of this s_ _ t here you know, and ... pow, pow. pow. pow..."); T. 1064 (replying affirmatively to the question, "And y'all busted a cap in his a_ s."); T. 1067 ("they robbed the old dude and they, they, then they shot him, then they, then, they tied him tied him up and uh, you know –"); T. 1068 (when asked "Did both of y'all shoot him or just one of y'all", Ingle replies BOB and ANDY both did this); T. 1075 ("we hit him..."); T.

1086 ("we knew we was gonna do somethin'. We didn't know exactly what...."); T. 1098 (when asked if "Y'all killed him in daytime?, Ingle replies, "Yeah.", and then again, "with the sun up?", "Mm-hmm."); T. 1106-07 ("we just carried him and covered him.... We just carried him off in the woods a little bit."). At one point Ingle states that he was the moving force in deciding to actually shoot the victim: "No, he was, he was wantin', at first, he wanted me to shoot him first, yeah. At first, you know, he didn't even want to shoot him..."). T. 1103. In terms of motive, again, Ingle takes personal responsibility for killing Sherman Williams: "I didn't need no witnesses to no crime." T. 1062-63. He also takes personal responsibility for getting rid of the stolen car after the crime: "I had a mother f_ _ _ _ r get rid of it." T. 1107.

Thus the arguably most reliable evidence regarding each co-defendant's role in the case, namely, Ingle's recorded statement, depicts Appellant as, at most, an equal co-participant, and more likely less active in the crimes than Ingle. A comparison of their respective statements demonstrates that no rational trier of fact could have concluded that Jeffrey Paul was any more culpable or involved in the murder of Sherman Williams than Trinity Ingle.

(c) Non-Testamentary Evidence of Jeff Paul's Involvement in the Offense

While the government contended that Mr. Paul said he had kicked the victim in the head, T. 472, other evidence belied this fact. First, FBI Agent Tom Ross testified, and the government's serologist confirmed, that the Reebok shoes, GE 27 (T. 608), which Mr. Paul was supposedly wearing at the time of the offense had no trace of blood on them. T. 567-68, 608. Second, as noted, the government's medical examiner testified that there was no evidence of any other trauma to the victim's head or neck other than the single gunshot wound. T. 598-99. In fact all trauma to the victim's head was associated with and caused by "exit wounding," namely, wounding caused as the bullet left the victim's skull. T. 600. Third, government witness Jason Paul, Appellant's brother, was with Appellant and Ingle shortly before and after the offense. While government witness Rebecca Pingle, an acquaintance of Appellant's, said she saw Paul limping on June 22, 1995, T. 639, both Kris Rogers, and Appellant's brother testified that he was not limping that day. T. 683, 804.

The government also contended that Appellant had blood on his shoes and/or clothes on the day of the offense. However, two government witnesses who saw him that day did not see any blood whatsoever on Mr. Paul. T. 670, 683,

801. As noted, Appellant's mother confirmed that she had not seen blood on her son's clothes or shoes on June 22, 1995. T. 1040. Finally, Kris Rogers testified it was Ingle who had borrowed, and was wearing Mr. Paul's Reebok shoes (which the government alleged were used in the offense) around the time in question. T. 670.

Finally, the government presented evidence that Appellant was seen in the victim's car on the day of the offense. T. 660. Importantly here, however, this same witness testified that Ingle was also in the car and was driving. T. 683.

### 4. Evidence of Equal Culpability – Trinity Ingle Trial

The government's evidence of Ingle's primary role in the offense was more substantial than that presented or argued by the government during Mr. Paul's trial. At Ingle's trial, government witness Derrick Bell testified that Ingle had repeatedly told him, at least five times, that he personally had hit and shot Sherman Williams, in the head and chest. App. 312-13, 320.[8] Ingle told Bell he was the one who struck the victim immediately after they first confronted him and asked for the time. App. 316. Ingle said it was he who bound the man up with

---

[8] It is noteworthy here that the victim suffered only two gunshot wounds, one to the head, and one to the chest. T. 596-600. Thus if Ingle's confession is true, he would have been the only person to have shot Sherman Williams.

duck tape, App. 318-19, it was he who had exclaimed "[t]his mother f_ _ _ _ r is trying to resist," and he who had then "pulled out his gun and shot him." App. 320. Bell testified Ingle told him he shot the victim in the "dome" [head] and then he shot him in the chest. Id. Bell testified that Ingle "would laugh when he said he shot the guy in the dome." App. 322.

Government witness Jonah Jones confirmed Bell's testimony, stating at Ingle's trial that Ingle had told him he had glanced back at the victim and noticed him peeking, and so then decided to go back and kill him. App. 347. When they went back, according to Jones, Ingle "told me that he [Ingle] shot him." App. 348. Jones said Ingle confirmed that he had shot the victim "in the chest area and in the head," id., and that he used the word "dome" for head. Id.

With respect to the battery of Sherman Williams, at Ingle's trial the government presented evidence and argued that Mr. Ingle hit the victim to the ground. See e.g., App. 267, 316 (testimony that Ingle struck victim; argument that he "hit" him). Alternatively, the government also presented evidence and argued at Ingle's trial that both Ingle and Paul had kicked the victim. See App. 345-46 (witness said Ingle said "they" kicked victim); App. 445 (government argument that "they" kicked victim). The government also presented evidence at Ingle's trial demonstrating that the Reebok shoes which, in Paul's trial, they alleged were

used by Paul during the offense to kick the victim, were in fact recovered from Ingle shortly after the offense, and that Ingle had borrowed them from Mr. Paul and had been wearing them himself. App. 426.

### 5. Other Evidence From Both Trials Relevant to Culpability

Additional evidence offered by both the government and the defense confirms Mr. Paul's lesser culpability for these crimes. His youth, his lesser criminal history, and evidence that he was the follower and not the leader in the offense, all point to this lesser culpability.

As discussed elsewhere in this Brief, Paul was only eighteen years old at the time, and was thus younger than Ingle. T. 978, DE 1 (birth certificate of Jeffery Paul); App. 501, 514 (Ingle nineteen years old at time of offense); see also Claim II.

Importantly here, Jeffery Paul's prior criminal history was far less substantial than that of Trinity Ingle. While Paul had a relatively minor criminal history, Ingle had five prior felony convictions, including two burglary convictions and two firearms convictions. T. 567; App. 472-73. The government also presented substantial testimony at Mr. Ingle's trial demonstrating that shortly before the murder Ingle had acted irrationally and violently while using a gun to

threaten innocent bystanders. App. 273-304 (witnesses describing how Ingle pulled gun and threatened people in angry confrontation at convenience store, during which witnesses thought he was going to shoot). Ingle then chased them in his car. App. 292. Ingle pled guilty to a felony firearms charge in relation to that incident. App. 439. Additionally, in an expanded version of his recorded statement, which the government played for the jury during Ingle's sentencing trial, he discussed numerous other crimes (unadjudicated) involving shooting people and committing additional robberies. App. 475-499. Finally, while the government highlighted the fact that Mr. Paul had eluded capture, indeed using it as a non-statutory aggravating factor at sentencing, Ingle also initially eluded capture. T. 569.

Furthermore, as noted above, evidence presented at both trials established Ingle as the ringleader in these crimes:

»Ingle said he struck the victim first, App. 316;

»Ingle said he taped the victim's hands and feet, App. 319;

»Ingle chose to shoot the victim because he peeked at them, App. 319-20;

»Ingle said he shot the victim himself in the head and chest, App. 320;

»Ingle drove the car, T. 683, App. 258;

»Ingle paid for food and motel afterwards, App. 258;

»Ingle got rid of the gun, T. 1085, 1107; and,

»Ingle got rid of the car, App. 321.

Confirming Ingle's role as the driver, the only item of direct, physical evidence in the entire case was the fingerprint of co-defendant Trinity Ingle, found on the ashtray of the victim's car. T. 777-780. While Appellant did not argue at trial that this evidence established no involvement on his part, it does highlight the leadership role Ingle played in this offense, including being in command of the car after the incident.

### 6. The Prosecution's Arguments in Both Trials

In assessing comparative culpability of co-defendants, the prosecution's arguments at both trials bears scrutiny. The primary prosecution theme in both cases referred to the crime in general terms, discussing what "they" had done, or arguing in the passive voice as to what "had happened," avoiding implicating either co-defendant specifically. At both trials the prosecution described how "they" scoped out the victim, compare App. 101 with App. at 254 , how "they" followed the victim up the trail, compare App. 101 with App. at 254, how "guns were pulled and they were pointed at him", App. 101, how "a demand was made" for money and how the victim "was hit in the face...." and how the victim "was

kicked," compare App. 101 with App. at 254, 445. See generally App. 150-51 (repeatedly referring to crime in third person plural). The same theme was struck in connection with the actual shooting of the victim. Compare App. 103 (a gun "was then placed" to the victim's head and "the trigger was pulled") with App. at 256, 446-47, 449, 451 (victim "had been shot in the head;" they put gun to head and they pulled the trigger; "we both shot the old man"; Ingle's recorded statement says they both shot the old man). See generally App. 168-171 (arguing that it did not matter who shot victim under aiding and abetting theory of liability); App. 161 (Jeff Paul "was just as guilty for helping as if he pulled the trigger.").

Perhaps most importantly for this Court's review of the issues presented here, although the prosecution argued at Mr. Paul's trial that his statements indicated he personally kicked and shot Sherman Williams, see App. 153-156, the government made these same arguments with respect to Mr. Ingle at his trial. See App. 256 ("And Trinity Ingle put the barrel of a .38 behind Mr. Williams' left ear and he pulled the trigger."); App. 451, 461-62, 501-02 (characterizing Ingle's statements as confession that he shot victim); App. 269 ("Ingle shot the old man first"); App. 267, 448-49 (Ingle kicked victim and Ingle knocked victim down); App. 452 (Ingle said he shot victim first); App. 462 (arguing with respect to malice, Ingle's individual participation satisfied requirements).

Indeed, at Ingle's trial, the prosecution painted a picture of him as the leader, arguing how it was Ingle who checked to see if the victim was looking at them, App. 255, 446, Ingle who drove the car after the offense, App. 258, and paid for the food and motel room, id., and Ingle who made the decisions about who to see and where to go after the offense. Id.

In sum, the prosecution's arguments in openings and closings throughout both trials leads to only one fair conclusion: according to the government, the only fair reading of the evidence established that, at most, Appellant's culpability was equal to that of his co-defendant, Trinity Ingle, and probably less. These arguments, and the evidence supporting them, establish this fact beyond any reasonable doubt, and certainly, at the very least, by a preponderance of the evidence. Having taken these positions in the trial court below, the prosecution should be estopped from taking any different view before this Court.

**7. Because Appellant Proved By a Preponderance of Evidence, And No Juror Could Have Reasonably Concluded Otherwise, That Mr. Paul was No More Culpable Than His Co-defendant, Trinity Ingle, the Jury's Failure to Find or Consider This Mitigating Factor Violated Appellant's Statutory and Constitutional Rights**

The defense was only required to prove by a preponderance of the evidence the mitigating factor that an equally culpable co-defendant received a life

sentence. 18 U.S.C. §3593(c). The jury was so instructed. App. 183, 192 (instruction); App. 89 (special verdict form). The evidence from Mr. Paul's trial leaves no doubt that Appellant carried his burden of proving this factor, and that no rational juror could have concluded otherwise. Failure to consider mitigating evidence which has been thus established in accordance with the requisite level of proof violates the Eighth Amendment. See Eddings, Hitchcock, supra. Many other courts have so held.

In Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990), the Florida Supreme Court reversed a death sentence and remanded for imposition of a life sentence where the trial judge erroneously rejected mitigating evidence which the reviewing court concluded had been sufficiently proven:

> [W]hen a reasonable quantum of evidence of a mitigating circumstance is presented, the trial court must find that the mitigating circumstance has been proved.

Id. Similarly, in Evans v. State, 598 N.E.2d 516, 519 (Ind. 1992), the Indiana Supreme Court remanded for the imposition of a life sentence on the ground that the trial court erroneously rejected non-statutory mitigating factors. The court observed that the sentencer's rejection of sufficiently proven mitigating evidence of parental neglect, abnormal behavior, psychiatric disorder and of the defendant's immediate surrender to authorities demonstrated that "the trial court's conclusion

that the death penalty is appropriate was arrived at without the required discrete and individualized consideration of the character of the offender." Id. See also Magwood v. Smith, 791 F.2d 1438, 1449-50 (11th Cir. 1986)(habeas relief granted on ground that trial judge's rejection of mitigating circumstances was not fairly supported by record); Gray v. Lucas, 710 F.2d 1048, 1055 n. 5 (5th Cir.), cert. denied 463 U.S. 1237(1983) (observing that had evidence of defendant's mental illness been presented at the penalty phase, he "would most probably now be entitled to a peremptory instruction to consider a mitigating circumstance that his capacity to conform his conduct to the requirements of law was substantially impaired...."); cf. Sanders v. State, 585 A.2d 117, 134 (Del. 1990)(requiring jury instruction that finding of "guilty but mentally ill" mitigates as matter of law).

Just as a jury's consideration of an improper aggravating factor skews its weighing process in assessing punishment and renders the sentence unreliable under the Eighth Amendment, see Stringer v. Black, 503 U.S. 222, 232 (1992), the erroneous failure to find and weigh relevant mitigation that is supported by the evidence infects the process of deciding whether death is the appropriate punishment. Here, the jury erred in failing to find that Mr. Paul's co-defendant, whom the evidence demonstrated was equally, if not more culpable than Mr. Paul, had received a life sentence. The jury's resulting failure to give any weight to this

mitigating evidence renders the death sentence that was imposed unreliable.

Admittedly, this Court should not treat lightly the reversal of a jury's finding regarding a mitigating factor in a capital case. Indeed, given the evidence noted above, and given the jury's willingness to find other mitigating factors, the question arises as to how to explain the fact that no juror found this mitigating factor. The answer likely lies in a prosecutorial tactic addressed as a separate misconduct issue in this Brief, see Claim XIII.

The prosecution employed a two-step strategy, begun during voir dire, and returned to in final summation at sentencing, designed to keep the jury from giving any consideration to otherwise self-evident mitigating factors. Referencing Ingle's life sentence, the government asked the general venire: "do you feel that you would be able to consider all of the evidence presented that is relevant to the sentencing issue and not focus on the fact that Trint Ingle got life without possibility of release? That is, that you could consider the evidence in this case and not take into consideration that one factor in making your decision?" T. 232. The defense objected to the obvious mis-statement of the law. The trial court did not rule. Instead, as it had done elsewhere during voir dire, the court took over the questioning and re-phrased the government's inquiry so as to avoid the obvious error. T. 232-34.

Notwithstanding the court's actions, the prosecution returned to this theme in final closing argument at sentencing. In the only reference to the co-defendant life sentence mitigating factor, the prosecution did not even suggest that the defense had not met their burden of proof. (That alone is relevant to this Court' s assessment of whether the defense proved its case on this factor). Instead, the government told the jury not to consider this evidence at all in mitigation of punishment, and did so by reference to their original, objectionable statements during voir dire:

> Now ladies and gentlemen, if you recall on the second day of our voir dire, I got up and I asked one question ... I asked if this would be a problem because of the fact that this defendant would be considered for the death penalty while Trint Ingle had already received life in prison without parole. And all of you said that no, that wouldn't make a difference and you'd consider this case on its facts and its circumstances, its merits. Don't be concerned about what happened in some other case, some other jury concern...

T. 1153-54. While this is what the prosecution had initially (and erroneously) asked of the jury during voir dire, the argument ran roughshod over the trial court's corrective interjection during voir dire.

Irrespective of the gravity of this separate argument error, see Claim XIII, this prosecutorial strategy provides perhaps the best and only explanation for why the jury unanimously rejected this factor during sentencing: the jury's vote may

fairly be interpreted as an acquiescence in the government's entreaty (unlawful though it was) to refuse to consider this factor, an invocation began during voir dire, and concluded during the final words spoken to the jury prior to their sentencing deliberations.

Whatever the reason, the jury could not, consistent with the evidence and the law, have reasonably failed to find that Jeffery Paul was at most an equal co-participant in the offense. Perhaps the clearest statement of equal culpability in the entire record came from the mouth of Trinity Ingle himself. When asked if only one did this or if both shot the victim, Ingle replies: "BOB and ANDY both did this.... They, they know, they both know, they both know the consequences.... and they both know what's gonna happen... So can't neither one of 'em say, f_ _k this and this, that he did it, I did it, ya know?" T. 1068. The prosecution expressly quoted and relied upon this very statement of Trinity Ingle in arguing for a sentence of death against Mr. Paul during the final summation at the sentencing phase of trial. App. 211. This is precisely Appellant's argument here: as Ingle himself admits on tape, at most they were equally culpable. The government chose that fact to highlight in arguing for a sentence of death, and never once questioned the underlying factual basis for this mitigating factor. The overwhelming weight of the evidence establishes this factor by any standard of

proof. Thus Appellant proved, by at least a preponderance of the evidence, that his culpability with respect to the offense was equal to or less than that of Trinity Ingle. This statement, coupled with the wealth of other evidence discussed above, leads to but one conclusion: no rational trier of fact could have failed to find Jeffery Paul equal or less culpable than Trinity Ingle. For this reason, this Court should reverse Mr. Paul's sentence of death and order that a life sentence be imposed.

### 8. Relief is Also Warranted Under This Court's Arbitrariness Review, 18 U.S.C. §3595(c)(1)

Although the evidence and argument presented at Mr. Paul's trial alone warrants the granting of relief, when compared with the evidence and argument presented at Trinity Ingle's trial, the arbitrariness of his death sentence is obvious. The Ingle record reveals a more culpable individual, and the evidence of his culpability is more reliable. He was older, and had a more substantial prior criminal record. Unlike in Mr. Paul's case, the testimony of witnesses who claimed Ingle had repeatedly confessed to personally having kicked and shot the victim was corroborated by a tape recorded statement. Ingle's own background and history reflect an individual who, as the government suggested, was well suited to the role of leader in the offense here. In addition to Ingle's prior felonies,

including one gun-toting rampage just days before this offense, he also confessed to having robbed and shot other people. The record from both trials thus leads inescapably to the conclusion that there is no rational way to find Mr. Paul more culpable in any sense than Mr. Ingle.

This Court is required to determine whether Jeffery Paul's sentence of death resulted from arbitrary influences. While there is no way to know for certain why the jury failed even to consider the fact that Trinity Ingle received a life sentence for the same offense, this Court may not ignore the substantial evidence demonstrating that (from the point of view of moral culpability) Mr. Paul deserved no worse. His death sentence then, can only be viewed as a result of a fundamental arbitrariness which this Court is statutorily required to correct. See 18 U.S.C. §3595(c)(2). For this reason, this Court should remand his case for the imposition of the only non-arbitrary result possible, namely, a life sentence.

**II. The Jury's Failure to Find Unanimously and Consider Defendant's Youth as a Mitigating Factor Violated His Rights Under the FDPA and His Fifth, Sixth, Eighth and Fourteenth Amendment Rights Requiring a Capital Sentencer to At Least Consider Any Evidence in Mitigation Offered by the Defendant.**

**1. Although Mr. Paul was Eighteen Years Old at the Time of the Offense, The Youngest Age at Which He was Eligible for the Death Penalty by Law, the Jury Failed to Unanimously Consider this Fact as a Mitigating Factor**

At the sentencing phase of trial, the defense introduced Appellant's birth certificate, indicating that he was born on September 2, 1976. T. 978, DE 1. Thus at the time of the offense, on June 22, 1995, Mr. Paul was eighteen years old.

Under applicable law, this was the youngest age that a person could be and still be eligible for the death penalty. Section 3591(a)(2) declares that "no person may be sentenced to death who was less than 18 years of age at the time of the offense." 18 U.S.C. §3591(a)(2).

In Appellant's case, the defense submitted as a mitigating factor at sentencing the fact that "the defendant was youthful at the time of the offense." App. 193. Only six jurors found this factor. App. 92 (verdict form indicating vote). Because of the court's instruction (also repeated on the special verdict form) allowing only those jurors who found a mitigating factor to consider it in the

overall balance of aggravating and mitigating factors, App. 194 (court's instruction); App. 90 (special verdict form), only six jurors considered Mr. Paul's youthfulness during sentencing deliberations. The remaining six were, as a matter of law, prohibited from considering Mr. Paul's youth in their sentencing deliberations.

### 2. The Jury's Failure to Unanimously Consider Mr. Paul's Youthfulness Violated His Statutory and Constitutional Rights

As noted above, the Supreme Court has steadfastly held that a capital sentencer must permit consideration of the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976); see also Lockett v. Ohio, 438 U.S. 586, 604 (1978). Historically, the condition of youth has been consistently recognized as a special factor worthy of particular attention in any sentencing scheme, and especially in capital sentencing proceedings. "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." Eddings, supra, 455 U.S. at 115-116. For this reason, the Court has recognized youth as a mitigating factor

to be considered in a decision whether a person should be sentenced to death.

Furthermore, as noted in the preceding claim, in Eddings the Court held it was Eighth Amendment error for a capital sentencer to refuse to consider relevant mitigating evidence such as youth in the sentencing determination. ("The sentencer ... may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."). 455 U.S. at 113-114; Hitchcock, supra.

In concert with these principles, section 3592(a) of the FDPA declares:

> [T]he finder of fact shall consider any mitigating factor, including...:
>
> (8) Other factors. -- Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

Both constitutional and statutory mandates were violated in Appellant's case.

It is indisputable that Mr. Paul established beyond all doubt that he was "youthful" under any meaningful definition of that term. He was only eighteen years old. No reasonable person could rationally determine that, at that age, Jeffrey Paul was not "young" as that term is commonly used. This fact finds ample support in both the statute and in Supreme Court authority.

Congress itself, by implication, legislatively determined Mr. Paul's youthfulness. This follows directly from the dictates of the FDPA. As noted,

under the Act Jeffery Paul was the youngest a person could be and still be eligible for the death penalty. 18 U.S.C. §3591(a)(2). There is no suggestion in the Act that Congress intended to eviscerate entirely youth as a mitigating factor by adopting an 18 year old age-eligibility criterion in sub-section (a)(2). Thus if any person could be a candidate for having youthfulness considered as a mitigating factor under the FDPA, Jeffery Paul was that person. He could be no younger and still be eligible for the death penalty.

Moreover, the U.S. Supreme Court has found by implication that Jeffery Paul's eighteen year old status was "youthful" and therefore required mitigating consideration by his capital sentencer. In Johnson v. Texas, 509 U.S. 350 (1993), the Court characterized a nineteen year old defendant as "youthful" for purposes of Eighth Amendment jurisprudence, and therefore found that his age and youthfulness were constitutionally protected mitigating factors requiring capital sentencer consideration. The Court reiterated the importance of youth as a mitigating factor in capital sentencing:

> There is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury if a death sentence is to meet the requirements of Lockett and Eddings. ... A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions. A

> sentencer in a capital case must be allowed to consider the mitigating qualities of youth in the course of its deliberations over the appropriate sentence.

509 U.S. at 367 (citations omitted).

Yet in this case, one half of the jury did not consider Mr. Paul's young age as a mitigating factor in determining the appropriate sentence. This fact must be assumed from the language of the court's instruction, as well as that on the verdict form, noted above. In short, any juror who did not find the existence of a mitigating factor, and in this case there were six who failed to find Mr. Paul's youth as a mitigating factor, App. 90, were instructed as a matter of law not to consider it in mitigation of punishment. This result violates Eddings: "[A]s a matter of law ... [they gave] it no weight by excluding such evidence from their consideration." 455 U.S. at 113-114 (emphasis in original). Moreover, because no reasonable juror could have failed to find Mr. Paul youthful, this result also violated the mandate of the statute that the finder of fact "shall consider" factors such as youthfulness in mitigation. 18 U.S.C. §3592(a). For this reason, Mr. Paul's statutory and Eighth Amendment rights were violated, entitling him to a new sentencing trial.

As with the co-defendant life sentence factor, the jury's seemingly inexplicable vote here can perhaps be explained once again by the prosecution's

two-step tactic at voir dire and during closing argument. During the general voir dire, the government propounded the following to the entire venire: "Would any of you have great difficulty in sentencing someone to death because of that individual's age? Okay. I take it by your silence that that would not be a problem. If someone was young would that make a difference?" No jurors responded to this second question. T. 285. Those statements themselves are an erroneous statement of constitutional law, inviting the jury, as they did, to remove entirely from sentencer consideration the fact of Mr. Paul's youth.

The seed having thus been planted, the prosecutor sought to reap the harvest during final closing argument at sentencing, "reminding" the jury of their "assurances" given during voir dire: "Now the other factor is youth, and that's the question I asked you about on the second day [of voir dire], was would that make a factor [sic] with you? And all of you assured me that you could [sic] not." App. 211. This argument was a mis-statement of both the facts and the constitutional law governing the jury's sentencing determination. On the facts, the jury made no such "assurance" during voir dire. Yet the prosecution's clever characterization of the voir dire colloquy was intended to make jurors feel as if they could not consider Mr. Paul's youth without breaking a "promise" made to the prosecution during voir dire. On the law, this argument runs directly afoul of Eddings and the

statutory requirement that jurors "shall consider" mitigating evidence such as youth. Here, rather than simply allowing the jury to find what was an obvious mitigating factor in the case, the government told the jury to keep their "promise" and refuse even to consider it in mitigation of punishment. As such it amounted to a direct invitation to the jury to refuse to follow the law. Apparently it worked, at least with one half of the jury, who did indeed fail to consider Mr. Paul's youthfulness at all during their sentencing decision.

Whatever the explanation, the record is clear that the jury did not consider a relevant, constitutionally protected mitigating factor in their decision as to whether Jeffery Paul should live or die. No rational trier of fact could have found that Jeffery Paul was not youthful. Eddings, Johnson, Hitchcock, and the FDPA, required the sentencer to consider his youthfulness as a mitigating factor to weigh in the balance, and prohibited them from giving it no weight at all. The verdict form, however, coupled with the court's instructions, demonstrates that six members of the jury did just that. For these reasons, Mr. Paul's sentence of death must be reversed. Hitchcock, supra.

## III. The Court's Sentencing Phase Instruction Allowing Only Those Jurors Who Found the Existence of A Mitigating Factor to Consider It Violated Mr. Paul's Rights As Guaranteed Under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 1. Argument

The trial court instructed the jury at sentencing as follows:

> All of you must weigh any aggravating factors that you unanimously found to exist, whether statutory or non-statutory, and each of you must weigh any mitigating factors that you individually find to exist.

T. 1129 (emphasis added). This instruction violated the FDPA, and precluded full jury consideration of all mitigating evidence, in violation of Appellant's constitutional rights.

The FDPA specifically provides that a single juror may make a finding as to the existence of a mitigating factor. See 18 U.S.C. §3593(d). The statute then provides: "...the jury, or if there is no jury, the Court, shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist ..." 18 U.S.C. §3593(e) (emphasis added). Reading these sections together, the statute appears to require that "the [entire] jury" consider any mitigating factors found by any of its members. The Supreme Court's recent interpretation erases any ambiguity.

In Jones v. U.S., 119 S.Ct. 2090, 1999 WL 401258 (U.S.) (June 21, 1999), the Court faced its first case brought under the FDPA. In deciding the issues before it, the Court reviewed the structure of the capital sentencing scheme set forth in the Act. Summarizing the content of the two sections noted above, the Court stated: "the jury may consider a mitigating factor in its weighing process so long as one juror finds that the defendant established its existence by a preponderance of the evidence." Id. at *3, citing §3593(c), (d). While disagreeing with the majority's resolution of other issues in the case, the dissenting justices were in accord on this aspect of the statute: "[A] mitigating factor may be considered in the jury's weighing process if any one juror finds the factor proved by a 'preponderance of the evidence.'" Jones, supra, at *18, citing §3593(d). Thus, contrary to the instruction given in Appellant's case, the Supreme Court unanimously read the pertinent sections of the FDPA to require full jury consideration of any mitigators found by one or more jurors. The lower court's instructions violated Jones.

In this case, the error was not harmless. The jury that sentenced Appellant to die found four mitigating factors by less than a unanimous vote. See App. 91-92 (verdict form indicating: statutory factor (4) regarding defendant's background – 3 votes; nonstatutory factor (4) regarding parental irresponsibility – 8 votes;

nonstatutory factor (7) regarding defendant's youth – 6 votes; additional factor found by jury regarding defendant witnessing shooting in mall – 6 votes). Under the trial court's instruction, these four factors were not considered by all members of the jury during the weighing of aggravating and mitigating factors; instead, only those jurors who to find such factors were allowed to consider them in the balance.

Such a disharmonious sentencing deliberation, with some jurors considering some mitigating factors, and others jurors considering other mitigating factors, was surely not the result Congress intended. The FDPA reflects a clear commitment to a unanimous jury process at sentencing. It requires a unanimous jury vote for a life sentence, and a unanimous vote for a death sentence. 18 U.S.C. §3593(e). Absent unanimity, the judge is required to impose the appropriate sentence. 18 U.S.C. §3593(d). Congress obviously placed a premium upon jury agreement.

In allowing different jurors to consider different facts about the defendant in determining sentence, the instructions here produced the opposite result. Under these instructions, the possibility exists that twelve different jurors could completely disagree as to the mitigating evidence, and thus, while deliberating, be considering twelve different mitigating portraits of the defendant in determining the appropriate sentence. Indeed, in Appellant's case, one can only imagine the

discussion during jury deliberations, with some jurors arguing for a life sentence based upon facts about Jeff Paul's young age, or disadvantaged background, while at the same time others refusing even to listen to such arguments "as a matter of law," Eddings. One is reminded of two proverbial scenarios: (1) the image of ships passing one another at night unaware of the other; and, (2) an elephant being described by several non-seeing persons in completely different ways depending upon which part each is touching. Such a process, if legitimated by this Court, will likely lead to hung juries more often than not, which is precisely what Congress meant to avoid. Reading the statute as a whole, it cannot be fairly said that Congress intended to permit such a cacophonous consideration of the defendant's character and background. For this reason, this Court should hold the trial court's instructions invalid under the FDPA, and grant Mr. Paul a new sentencing trial before a properly instructed jury.

## IV. The Jury Was Not Required To Make the Requisite Finding of Intent At Either Phase of Trial, In Violation of Appellant's Rights Under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 1. Introduction

In this case the trial court instructed the jury at sentencing with respect to the jury's threshold obligation regarding the defendant's mental state during the offense:

> Before you may consider the imposition of the death penalty, you must first unanimously find beyond a reasonable doubt that the defendant intentionally aided and abetted in the killing of Sherman Williams.

App. 185[9] (emphasis added). This instruction was given presumably in an attempt to satisfy the requirements of the FDPA, see 18 U.S.C.A. §3591(a)(2), and the Eighth Amendment, see Enmund v. Florida, 458 U.S. 782 (1982), which mandate that the sentencer in a capital case, as a precondition for death eligibility, focus upon, and find certain facts with respect to, the defendant's personal mental state and role in the offense. The instruction in this case, however, both standing alone and when viewed in the context of the government's case and the other instructions given to the jury at both phases of trial, violated the provisions of the

---

[9] The verdict form sent back with the jury during sentencing deliberations contained the identical language. App. 82.

statute as well as constitutional mandates.

In Enmund the Court held that the Eighth Amendment precluded the imposition of a death sentence to anyone "who aids and abets a felony in the course of which a murder is committed by others but who does not himself kill, attempt to kill, or intend that killing take place or that lethal force will be employed." 458 U.S. at 797. In Tison v. Arizona, 481 U.S. 137, 158 (1987), the Court expounded upon Enmund, concluding that death is a disproportionate punishment for homicide unless a defendant either intended the victim's death, or, under certain circumstances, acted with reckless indifference to human life.

In response to the Eighth Amendment requirements of Enmund/Tison, Congress included in the FDPA an "eligibility" or "gateway" finding regarding the defendant's personal mental state at the time of the offense. See 18 U.S.C. §3591 (a)(2).[10] Such a finding has been so characterized because it is an express

---

[10] The statute permits sentencer consideration of a death sentence for:

> (a) A defendant who has been found guilty of...
> (2) any other offense for which a sentence of death is provided, if the defendant, as determined beyond a reasonable doubt at the hearing under section 3593 –
>> (A) intentionally killed the victim;
>> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
>> (C) intentionally participated in an act, contemplating that the life of a person

statutory pre-condition to the sentencer's consideration of a death sentence. See e.g., Jones v. U.S., 119 S.Ct. 2090, 1999 WL 401258 (U.S.) (June 21, 1999) at * 5; U.S. v. Webster,162 F.3d 308, 323 (5th Cir. 1998); cf. Tuilaepa v. California, 512 U.S. 967, 971-73 (1994) ("eligibility decision" determines whether crime is one "for which the death penalty is a proportionate punishment" under Eighth Amendment).

Here, the court's sentencing instruction regarding the gateway finding on intent violated the express language of §3591(a)(2) by authorizing the jury to consider a death sentence so long as the defendant was found to have "intentionally aided and abetted" in the offense. No such authorization is found in the statute. Section 3591(a)(2) is clear as to the four possible mental states that

---

> would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act ....

18 U.S.C. §3591(a)(2).

satisfy the eligibility intent finding.[11] Moreover, these sections were clearly drafted with an eye toward Enmund's requirements. The court's marked deviation from the statutory language thus also failed to comply with the constitutional requirements of Enmund and Tison. A brief overview of relevant trial record underscores the statutory and constitutional dimensions of this issue.

**2. Factual Background**

The government's theory as to Mr. Paul's role in the offense throughout both phases of his trial largely avoided direct focus on his precise role, relying as it did on the view that whoever actually killed Mr. Williams, Paul was a participant in the overall scheme and was therefore liable as an aider and abettor. This theory was embedded in the government's case from beginning to end, starting with the charging instrument and ending with the government's closing arguments at both phases of trial.

Both counts of the indictment charged Mr. Paul as an aider and abettor to

---

[11] The trial court's deviation from the statutory language created a separate constitutional problem. By instructing the jury contrary to the statutory language and scheme, the trial judge effectively re-wrote the statute. This, of course, cannot be done consistent with the separation of powers doctrine. Mistretta v. U.S., 488 U.S. 361, 380 (1989) ("This Court consistently has given voice to, and has reaffirmed, the central judgment of the Framers of the Constitution that, within our political scheme, the separation of governmental powers into three coordinate Branches is essential to the preservation of liberty.").

felony murder. See App. 6. The government's evidence, viewed in the light most favorable to its theory of the case, established beyond a reasonable doubt only that Mr. Paul participated in some of the actions leading up to and immediately following the offenses, but failed to establish with any degree of reliability the contours of his role or whether his actions actually resulted in the victim's death. Thus while some of Appellant's alleged statements implicated a greater personal role in the offenses, many did not, while still others only referred to actions "they" [Ingle and Paul] had taken on the day of the offense, without specifying who had done what. See Claim I (evaluating Appellant's statements). The only consistent picture emerging from Mr. Paul's statements was that he admitted some involvement in the plan to rob the victim; beyond that, his personal role in the actual murder was not established with any degree of certainty or reliability.[12]

Consistent with the indictment and the government's theory, the court's guilt-innocence charge informed the jury that Mr. Paul could be found guilty of either or both counts in the indictment whether or not they believed that he intended that Sherman Williams was to be killed:

> A person may be found guilty of any crime even if he only

[12] Notably here, at the guilt-innocence phase of trial, the defense attempted to present evidence regarding Ingle's role in the offense, but the trial judge disallowed such questioning. T. 567, 571-74.

> aided and abetted the commission of that crime. In order to have aided and abetted the commission of a crime, a person must before or at the time the crime was committed,
>
> One: Have known the crime was being committed or going to be committed, and;
>
> Two: Have knowingly acted in some way for the purpose of causing, encouraging, or aiding in the commission of such crime.
>
> For you to find the defendant guilty of any crime by reason of aiding and abetting, the Government must prove beyond a reasonable doubt that all of the essential elements of the crime were committed by some person or persons and that the defendant aided and abetted the commission of that crime.

T. 848-49. So instructed, the jury could find Mr. Paul guilty of the crime of murder without ever focusing upon, or making findings regarding, his personal mental state during the commission of the offense: so long as "some person or persons" had the requisite mental state, and so long as Mr. Paul aided or abetted that person as defined above, Mr. Paul's intent, and the extent of his actions with respect to the actual murder were irrelevant to whether the jury found him guilty of either or both offenses.

With the issues thus framed by the charging instrument, the evidence, and the instructions, the government understandably relied upon arguments to the jury that averted attention away from the specifics of Mr. Paul's role in the offense. App. 100-03; 150-51. Perhaps most telling as to the government's fall-back position and theory as to what the evidence established beyond a reasonable doubt,

during the final rebuttal closing argument the prosecution emphasized the aiding and abetting theory in arguing for a guilty verdict. Rebutting the defense's contention in closing that the evidence was weak as to Mr. Paul's personal role, e.g. T. 885, 888, 895, the government argued (correctly under the court's instruction), "it really doesn't matter at this point which version is correct because it's aiding and abetting." App. 171. "Depending on which version you believe, Jeff Paul either shot first, they both shot him, or Trint Ingle shot him." Id. "[I]t doesn't matter which one pulled the trigger because they were both there, they were both involved in the robbery, and the decision was made." Id. "[U]nder the aiding and abetting theory, no matter which way you do it, Jeff Paul is guilty of first degree murder." Id. In support, the government highlighted Paul's statement to Agent LaVoie (implicating Ingle in murder, himself in robbery), stressing that under this version, Paul assisted sufficiently in the robbery of Mr. Williams that he could be found guilty of murder as an aider and abettor. App. 168-70; see also App. 146 ("under the law ... he's just as guilty as if he pulled the trigger."). Without doubt, therefore, the jury's finding of guilt during the first phase of trial did not embody an Enmund finding regarding Appellant's personal mental state with respect to the killing of Mr. Williams.

Turning to the sentencing phase, as noted, the trial court's instruction

merely required the jury to find that Appellant "intentionally aided and abetted" in the murder as a pre-condition to his death eligibility. App. 185. Congress did not authorize imposition, or even consideration of the death penalty for one who merely aids and abets in an otherwise death-eligible crime. The FDPA sets forth four possible mental states, and requires the jury to find at least one as an absolute pre-condition to mere consideration of a possible death sentence. See n. 10 supra. The trial court did not define "aiding and abetting" during the sentencing phase instruction. Absent a definition that equated with one of the four required mental states set forth in §3591(a)(2), the jury was never required to make the requisite statutory finding.

Even the court's guilt-innocence instruction defining "aiding and abetting," (which the jury was never instructed to apply during sentencing phase deliberations and so is probably inapposite here), in no way equated with any of the statutory mental states or with the requirements of Enmund/Tison. That is, a jury finding (at guilt-innocence) that Mr. Paul "kn[ew] the crime was being committed or going to be committed, and ... knowingly acted in some way for the purpose of causing, encouraging, or aiding in the commission of such crime," App. 134, does not square with any of section 3591(a)(2)'s alternatives. The first two describe a far more culpable mental state than that found in the court's aiding

and abetting instructions. Alternatives (C) and (D) are similarly unavailing. Both require that the defendant possess a certain mind-state and perform an act "and the victim died as a direct result of the act." 18 U.S.C. §3591(a)(2); see n. 10 supra. The court's guilt-innocence phase instruction on aiding and abetting, however, authorized a finding of guilt regardless of whether the jury found that Jeffery Paul intentionally committed an act and "the victim died as direct result of the act." Finally, Enmund makes expressly clear that such aiding and abetting instructions fail to focus the jury's attention on the defendant's actual role and state of mind. For this reason, they do not square with the Eighth Amendment.

In short, under the evidence, the court's instructions, and the prosecution's argument, the jury's guilty verdict reflected a finding that Jeffery Paul had in some way encouraged or assisted Trinity Ingle in the robbery of Sherman Williams, without any intent whatsoever to engage or assist in any further crime. Under the indictment and instructions given, the jury's guilty verdict did not reflect a finding that Mr. Paul possessed any of the alternative mental states contained in §3591(a)(2).

### 3. The Instructions, In Light of the Entire Record of the Case, Violated Both Statutory and Constitutional Mandates

This set of circumstances thus sets up precisely the issue addressed by the

Court in Enmund and its progeny. That is, at neither phase of trial was the jury required to find that Mr. Paul possessed the mental state set forth in either Enmund or Tison. See Cabana v. Bullock, 474 U.S. 376 (1986) (in case with guilt phase aiding and abetting instructions and no further intent instruction at sentencing, "the jury may well have sentenced [the defendant] to death despite concluding that he had neither killed nor intended to kill; or it may have reached its decision without ever coming to any conclusion whatever on those questions.").

Contrary to the express language of the statute, and to the requirements of the Eighth Amendment, the jury was thus relieved of their duty to struggle with, focus upon, and resolve beyond a reasonable doubt, Mr. Paul's personal role and mental state in connection with Mr. Williams' murder. Instead, the jury was told that, just as in the first phase of trial, they could refer to and rely upon the actions and intentions of "some person or persons" other than Mr. Paul in deciding Appellant's death eligibility. This violated the Eighth Amendment's proscription that the sentencer in a capital case make an "individualized determination" based on the personal "character of the [defendant]" and their individual role in the offense. See Zant v. Stephens, 462 U.S. 862 (1983). As the Court explained in Enmund, "[t]he focus must be on [the defendant's] culpability ... for we insist on 'individualized consideration as a constitutional requirement in imposing the death

sentence.'" quoting Lockett, supra.

This issue is one of first impression in this Circuit and in the few cases decided in other Circuits under the FDPA. The Fifth Circuit addressed a related issue, however, and the manner in which it was resolved points decidedly in favor of Appellant's argument here. In U.S. v. Hall, 152 F.3d 381 (5th Cir. 1998), cert. denied 119 S.Ct. 1767 (1999), the Court considered Hall's contention that the statutory aggravating factor that death occurred during the commission of another offense, namely, kidnaping, was unconstitutional because it duplicated an element of the underlying §1201offense (kidnaping resulting in death of victim). Hall argued that this doubling violated the Eighth Amendment's requirement that capital sentencing schemes genuinely narrow the class of death-eligible murders. Although Hall lost on the issue, the Fifth Circuit agreed with him that, under Enmund, the §1201 offense itself did not render him death eligible because it supported a finding of guilt "regardless of the mental state of the defendant with respect to the death." 152 F.3d at 416-17. The Court nevertheless held that sufficient narrowing had occurred at sentencing because the trial court had properly instructed the jury as to the requisite intent element in the language set forth in §3591(a)(2). Thus, even though no Eighth Amendment narrowing had occurred at phase one or by virtue of the kidnaping aggravator, constitutional

narrowing did occur by virtue of the jury's "gateway" finding of the requisite intent under §3591(a)(2). 152 F.3d at 416-17.

The reasoning in Hall requires reversal here. As in Hall, the §1111 offense here did not render Appellant death eligible. Under the aiding and abetting charge and instruction, Mr. Paul could be found guilty "regardless of the mental state of the defendant with respect to the death." 152 F.3d at 416-17. Critically here, however, unlike in Hall, the court's sentencing charge merely repeated the aiding and abetting language, and thus failed properly to instruct on the intent element found in §3591(a)(2). The jury was thus free to find Appellant death eligible regardless of his personal role and mental state, so long as "some person or persons" involved in the offense had the requisite mental state.[13] Thus Enmund's

---

[13] As suggested in Hall, Appellant's issue can also be viewed as a violation of the Eighth Amendment requirement that a capital sentencing scheme genuinely narrow the class of death eligible persons. In Hall the Fifth Circuit found that even though the §1201crime failed to provide sufficient narrowing, a properly defined "intent" finding achieved narrowing at sentencing. Hall, supra at 415-16, citing Lowenfield v. Phelps, supra. Here, the crime of felony murder defined in §1111 was equivalent to basic common law first degree murder. See Schad v. Arizona, 501 U.S. 624, 640 (1991). Coupled with the aiding and abetting instruction, the crime as charged would include virtually all murders. At sentencing, the intent instruction did nothing to narrow the jury's discretion beyond what had already been accomplished during the guilt-innocence phase of trial. Thus unlike in Hall, constitutional narrowing did not occur at either phase of trial. Moreover, because the intent finding was itself constitutionally required under Enmund as a pre-condition to death eligibility, this narrowing deficiency created a flaw of constitutional proportions.

which resulted in Mr. Williams' death, as well as in acknowledging a mental state which satisfied the §3591(a)(2) requirements. Under any fair reading of the record, however, no reasonable juror could have found that the government proved, beyond a reasonable doubt, that Mr. Paul acted in a manner that met the requirements of §3591(a)(2). For this reason the Court must reverse Appellant's death sentence and order that a life sentence be imposed.

**V. The Trial Court's Instructions Erroneously Required the Jury to Weigh the Intent "Eligibility" Finding As a Statutory Aggravator During the "Selection" Stage of Sentencing Deliberations, In Violation of The FDPA and the Sixth, Eighth and Fourteenth Amendments.**

**1. The Trial Court Erroneously Instructed the Jury That the "Intent" Eligibility Finding was an Aggravator To Be Weighed**

The trial court's instruction on intent not only violated Enmund; it also erroneously characterized the intent finding as a statutory aggravator to be weighed in the selection phase of the jury's sentencing determination. These instructions undermined the reliability and validity of Appellant's sentencing trial.

After instructing the jury on intent as noted, App. 185, the trial court then instructed the jury at sentencing to consider this intent factor during the selection phase as a part of the weighing of aggravating and mitigating factors. Thus in discussing the weighing process, the court specifically referred to the intent finding as an statutory aggravating factor to be weighed in the balance:

> The process of weighing aggravating and mitigating factors against each other or weighing aggravating factors alone, if there are no mitigating factors, in order to determine the proper punishment is not a mechanical process.... In this regard, you may note that the statutory aggravating factor concerning the defendant's intent duplicates the intent element of the offense. Further, you may note that the aggravating factor concerning pecuniary gain duplicates one of the

elements of the offense of robbery.

App. 195-96 (emphasis added). Sandwiched between the reference to "weighing aggravating and mitigating factors" and the reference to the pecuniary gain factor as an "aggravating factor" (which it legitimately is), the intent instruction indisputably required the jury to weigh the intent finding as a "statutory aggravating factor." The prosecution compounded the error by also describing the intent eligibility finding as a "statutory aggravating factor" during the opening and closing arguments at sentencing. See App. 177 ("the first statutory aggravating factor that we have to prove beyond a reasonable doubt is intentional killing....") App. 200 (same). Thus the trial court's instructions, especially when coupled with the prosecution's argument, were clearly erroneous, both as a matter of statutory and constitutional law, and require reversal of Mr. Paul's death sentence.

### 2. Labeling the Intent Finding as A "Statutory Aggravating Factor" Violated Statutory and Constitutional Mandates

The Supreme Court has distinguished between that part of the capital sentencing process known as the "eligibility" determination and that known as the "selection" determination. See Jones v. U.S., 119 S.Ct. 2090, 1999 WL 401258 (U.S.) (June 21, 1999) at *5. In the first, the sentencer is required to make findings that are necessary pre-conditions to the consideration of a death sentence.

For example, as noted above, one constitutionally required eligibility finding is that a defendant must himself have "killed, attempted to kill, or intended that killing take place or that lethal force will be employed," or, in some circumstances, acted with reckless indifference to human life. Enmund, Tison, supra. No defendant who fails to satisfy the Enmund liability requirement can, consistent with the Eighth Amendment, be eligible for a sentence of death. This Enmund determination must be made as a pre-condition to consideration of a death sentence, i.e., it is an "eligibility" criterion.

The "selection" determination then requires the capital sentencer to decide, for those who have been found eligible for a death sentence, whether such sentence is appropriate for the individual defendant. This selection determination usually requires sentencer consideration of relevant aggravating factors, see e.g. Zant v. Stephens, 462 U.S. 862, 877(1983), and always requires sentencer consideration of relevant mitigating factors, see Eddings v. Oklahoma, 455 U.S. 104 (1982).

These two determinations can be accomplished in several ways. The eligibility determination can be made at either the guilt-innocence phase of trial, or at sentencing, so long as it is made as a pre-condition to sentencer consideration of a death sentence. Lowenfield v. Phelps, 484 U.S. 231 (1988); Cabana v.

Bullock,474 U.S. 376 (1986). Likewise, the selection phase may employ sentencer consideration of aggravating and mitigating factors, see Gregg v. Georgia, 428 U.S. 153 (1976), or specific interrogatory questions which must enable the sentencer to consider all relevant mitigating evidence prior to a determination of the appropriate sentence. See Penry v. Lynaugh, 492 U.S. 302 (1989). What is important here, however, is that there are two distinct inquiries, and that the first, the eligibility inquiry, derives from the Eighth Amendment requirement that, to be constitutional, a death sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." Zant v. Stephens, 462 U.S. 862, 877(1983).

Courts interpreting the FDPA have characterized the Act in accordance with the view set forth herein. In U.S. v. Webster, 162 F.3d 308, 323 (5th Cir. 1998), the Court described the (a)(2) intent finding as a gateway finding. According to Webster, only after that finding does the jury then weigh the aggravating and mitigating factors proffered by the parties. Id.; see generally, Jones, supra at *5 (describing "eligibility phase" and "selection phase" embodied in FDPA). Statutory and constitutional issues were created by the trial court's merging of these two stages.

> jury followed its instructions, it did not weigh the elements of intent even once.

Id. (emphasis added).

In Appellant's case, precisely the opposite happened. The trial court mis-characterized the intent finding as a "statutory aggravating factor" in a way that made clear to the jury that it was to weigh this finding along with the other aggravating factors in the selection portion of the process. For this reason, there is no question that the court's instruction violated the FDPA.

On the constitutional issue, as noted, the court's instructions allowed the jury to weigh the intent issue as an aggravating factor in the selection phase. Under the Eighth Amendment, however, before an aggravating factor can be used in the selection process, at least two additional requirements are imposed: (1) it must not be vague; and, (2) it must apply only to a subset of the larger universe of defendants eligible for the death penalty. On the latter, "[i]f the sentencer fairly could conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." Arave v. Creech, 507 U.S. 463 (1993) (emphasis in original). With its broad language, describing virtually any defendant who participates in a murder in any manner, the court's instruction on intent applies to "every defendant eligible for the death

penalty," rather than to a narrower subclass of such defendants. Because of the factor's all-inclusiveness as defined, it was "constitutionally infirm." Arave, supra.

For several reasons, this issue should not be subjected to harmless error analysis. First, it is a structural error in the sentencing trial completely contrary to the statute. This error did not involve mere jury consideration of an invalid factor; it wholly violated the basic scheme envisioned by Congress. Second, because the intent finding, properly considered, was a necessary pre-condition to consideration of the death sentence, this Court cannot simply "disregard" the factor and re-weigh the remaining factors. To do so would effectively allow Mr. Paul to be sentenced to death absent the required statutory and constitutional findings. The Supreme Court has never authorized re-weighing under such circumstances.

Third, as argued in Claim IV, the language of the intent finding was itself also violative of the statute and the Eighth Amendment's liability threshold. In addition, the trial court's instruction informing the jury that the intent element "duplicates [an] element of the offense...." App. 195, invaded the jury's province to decide the facts and amounted to a directed verdict on a critical capital sentencing factor. Thus errors were piled one upon another with respect to the fundamental constitutional requirement that the sentencer determine Mr. Paul's

personal mental state in connection with the offense. Under these circumstances, harmless error analysis would be ill-advised.

Should the Court decide that harmless error analysis should be employed, however, this error cannot be fairly termed harmless. The Supreme Court has held, "when the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." Stringer v. Black, 503 U.S. 222, 230-36 (1992). Here, the jury's weighing of a factor that never should have been weighed, and was itself mis-defined, "created ... bias in favor of the death penalty...." by putting a "thumb ... [on] death's side of the scale." Stringer, supra at 236.

## VI. The Prosecution's Reliance Upon Aggravating Factors Which Were Duplicative of Elements of the Offense Violated Appellant's Rights Under the FDPA and the Sixth, Eighth and Fourteenth Amendment.

### 1. The Prosecution Relied Upon, and The Trial Judge Instructed the Jury Regarding Two So-Called "Aggravating Factors" Which Were Also Elements of the Underlying Offenses

Two of the "aggravating factors" considered and weighed by the jury in the selection phase of the sentencing trial duplicated elements of the underlying offense. These were the intent finding. App. 82, 185 (which, as argued in the preceding claim, should not have been included as an "aggravating factor" to be weighed during the selection phase), and the pecuniary gain factor, App. 84, 196. The trial court's instruction on intent essentially repeated the aiding and abetting instruction given to the jury at the guilt-innocence phase of trial. Compare App. 134 with App. 185. The pecuniary gain factor effectively reiterated an element of the offense of robbery, which was also charged at the guilt-innocence phase as a part of the felony murder theory as to both counts in the indictment. Compare App. 128, 130-33 with App. 196. Indeed, the trial court specifically instructed the jury that these two "aggravating factors" were "duplicative" of elements of the offense already found by the jury. App. 195-96.

The defense filed several pre-trial motions aimed at preventing precisely the

type of error noted here. Thus, motions were filed to prevent government reliance upon the intent and pecuniary gain factors due to the noted doubling with elements of the offense, App. 38-58. Motions were filed and re-urged requesting that the trial court hold a hearing prior to the start of the sentencing phase to assess and screen the government's aggravating evidence to ensure its reliability. App. 31; T. Pre-trial Hearing June 11, 1997 at 18-24. The trial court denied these motions. Id. at 27, 33, 42. The defense re-urged its request for an evidentiary hearing at the outset of the government's case at sentencing. T. 916-17, and the court again denied the motion. Id.

**2. This Doubling Violated Appellant's Constitutional Rights**

This double counting violated Mr. Paul's right to a capital sentencing scheme which genuinely narrows the class of persons eligible for the death penalty. Zant v. Stephens, 462 U.S. 862, 877 (1983). Arguments with respect to the intent finding are set forth in Claims IV and V above.

With respect to the pecuniary gain factor, the analysis begins with the observation made previously that no constitutional narrowing occurred during the guilt-innocence phase of Appellant's trial for §1111 felony murder. The charging instrument and the court's instructions at guilt-innocence provided for a

conviction of felony murder under a theory of aiding and abetting. Basic premeditated murder and felony murder were both encompassed within the crime of murder at common law. See Schad v. Arizona, 501 U.S. 624, 640 (1991) ("At common law, murder was defined as the unlawful killing of another human being with 'malice aforethought.' The intent to kill and the intent to commit a felony were alternative aspects of the single concept of 'malice aforethought.'" citing 3 J. Stephen, History of the Criminal Law of England 21-22 (1883)); U.S. v. Downs, 56 F.3d 973, 974 (8th Cir. 1995) (noting section 1111 imports common law definitions of first and second degree murder). Thus during the first phase of trial, Appellant was convicted of a crime that is the essential equivalent to common law murder.

The Supreme Court's Eighth Amendment jurisprudence can be fairly read to hold that a capital sentencing scheme must narrow the jury's discretion beyond a finding of guilt as to common law murder. See Stephens, supra. The Court effectively so held in Arave v. Creech, 507 U.S. 463, 475 (1993). There the Court considered whether Idaho's aggravator involving the "cold-blooded" nature of the crime was constitutional in the context of that state's capital punishment scheme. As in Mr. Paul's case, the Court first noted that "[t]he class of murderers eligible for capital punishment under Idaho law is defined broadly to include all

first-degree murderers...." The Court nevertheless upheld Idaho's capital scheme because it found that the aggravator in question "identified a subclass of defendants" convicted of the broad crime of first degree murder. "By doing so, it has narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed." Id.

Similar observations have been made about the lack of narrowing in other federal crimes for which the death penalty has been sought. Thus in U.S. v. Hall, 152 F.3d 381, 416-17 (5th Cir. 1998), cert. denied 119 S.Ct. 1767 (1999), the Fifth Circuit reached the same conclusion with respect to 18 U.S.C. §1201, involving the crime of kidnaping during which a murder occurs. 152 F3d at 416-17. If §1201 murder fails to provide sufficient narrowing during guilt-innocence, then §1111 common law felony murder must surely also fail, especially where §2 aiding and abetting is applied as it was here.

To be constitutional, therefore, the FDPA as applied to Mr. Paul's case was required to achieve genuine narrowing by means of the aggravating factors at sentencing. Lowenfield v. Phelps, 484 U.S. 231 (1988) (constitutional narrowing must occur during at least one phase of trial; if not at guilt-innocence by legislative definition of crime, then at sentencing); Hall, supra. (lack of guilt-innocence phase narrowing requires sentencing phase narrowing under

Lowenfield); cf. U.S. v. McCullah, 76 F.3d 1087, 1108, 1110 (10th Cir. 1996), cert. denied 520 U.S. 1213 (1997) ("[u]nder Lowenfield, an aggravating factor that does not add anything above and beyond the offense is constitutionally permissible provided that the statute itself narrows the class of death-eligible defendants"; otherwise, "a broad capital punishment statute necessitates that the narrowing function be performed by the aggravating factors") (emphasis added) citing Arave, supra.

The pecuniary gain factor, however, did not provide any narrowing beyond the elements of the offense. In convicting Mr. Paul of robbery-murder, the jury necessarily found that the offense was motivated by pecuniary gain. Indeed, as noted above, the trial court so instructed the jury: "you may note that the aggravating factor concerning pecuniary gain duplicates one of the elements of the offense." App. 196. Yet that finding in no way distinguished Mr. Paul from any one else convicted of felony murder. This case thus presents the very issue left open in Lowenfield but which, by implication from that decision, as well as the Court's decision in Arave, the Fifth Circuit's decision in Hall and the Tenth Circuit's decision in McCullah, requires reversal here: where constitutional narrowing does not occur at the guilt-innocence phase of trial, is an aggravator which merely repeats an element of the offense constitutionally valid? The

answer, as discussed in the authorities cited, must necessarily be, no.

In fact, other courts reviewing the issue have held that such aggravators are invalid. See State v. Middlebrooks, 840 S.W.2d 317 (Tn. 1992), cert. dismissed, 510 U.S. 124 (1993); State v. Cherry, 257 S.E.2d 551 (N.C. 1979), cert. denied, 446 U.S. 941 (1980) (finding double counting between guilt-innocence and sentencing phases of trial violative of defendant's constitutional rights). This Court should similarly so hold.

The double counting between crime element and aggravator was not harmless. "[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." Stringer v. Black, 503 U.S. 222, 230-36 (1992). Because the FDPA is a weighing statute, 18 U.S.C. § 3593(e), the jury's finding of improper aggravating factors skewed the weighing process by "creat[ing] ... bias in favor of the death penalty...." Stringer v. Black, 503 U.S. 222, 236 (1992).

Appellant urges the Court not to attempt a re-weighing of whatever aggravating and mitigating factors survive and/or arise from the claims set forth in this Brief. The sentencing phase was so marked with error that such a re-weighing would not be appropriate.

However, even if the Court chooses to re-weigh, the pecuniary gain factor was a statutory aggravator, at least one of which the government was required to prove before Appellant could be eligible for the death penalty. It was also weighed in the balance with other factors, many of which were equally problematic, as noted elsewhere in this Brief. If this invalid doubling between elements of the offense and the aggravating factor had been removed from "death's side of the scale," especially in view of both the trial court's instruction that it had already been found, as well as the wealth of mitigating evidence presented and considered by the jury, there is a reasonable likelihood Mr. Paul would not have been sentenced to death.

## VII. The Government's Reliance Upon Vague, Overbroad, and Otherwise Improper Aggravators at Sentencing Violated Appellant's Rights Under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 1. Argument

At sentencing the government relied upon several aggravating factors which were arguably vague and overbroad, and otherwise improper. The relevant Eighth Amendment principles in this context are well settled. As the FDPA is a "weighing" statute, see U.S. v. Jones, 132 F.3d 232, 250 (5th Cir. 1998), cert. granted and aff'd on other grounds, 119 S.Ct. 2090, (U.S.) June 21, 1999, the sentencing jury was required to balance aggravating and mitigating factors found to exist. A death sentence is permitted only if the jury unanimously finds that the aggravating factors sufficiently outweigh the mitigating factors to justify such sentence. 18 U.S.C. §3593(e).

Aggravating factors utilized in capital sentencing schemes cannot be "of vague or imprecise content" such that they fail to channel the sentencer's discretion. Stringer v. Black, 503 U.S. 222, 237 (1992). "[A] statutory aggravating factor is unconstitutionally vague if it fails to furnish principled guidance for the choice between death and a lesser penalty," Richmond v. Lewis, 506 U.S. 40, 46 (1992) (citations omitted), and "fails adequately to inform juries

what they must find to impose the death penalty." Maynard v. Cartwright, 486 U.S. 356, 361-62 (1988). "An aggravating circumstance is invalid . . . if its description is so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor." Espinosa v. Florida, 505 U.S. 1079, 1081 (1992). Additionally, if the sentencer "could fairly conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." Arave v. Creech, 507 U.S. 463, 474 (1993) (emphasis in original).

The defense sought to prohibit the government from reliance upon vague aggravating factors prior to trial. App. 51. The trial court denied the defense motion in all respects but one (refusing to allow use of "low rehabilitation potential" as a separate factor apart from future dangerousness factor). T. Pre-Trial Hearing, June 11, 1997 at 25-27.

In this case, several aggravating factors relied upon by the government were either vague and/or overbroad. The trial court's instructions regarding the "heinous, cruel or depraved" (c)(6) aggravating factor, see App. 186-88, were confusing and contradictory. The court defined each of the three operative terms, "heinous," "cruel" and "depraved," in terms of torture. Id. at 1122. The court then defined torture in terms of "mental as well as physical abuse" of the victim, and

instructed that the victim must have been conscious of the abuse at the time inflicted. Id. The lower court also instructed that with respect to such abuse, the defendant must have specifically intended to inflict serious mental or physical pain upon the victim. Id. Finally, the court instructed that serious physical abuse may be inflicted either before of after death, and that it does not require the victim to be conscious. App. 188.

This lengthy and convoluted definition contradicts itself in a way that renders it meaningless and, as such, intolerably vague. Initially it instructs the jury that the victim must have been conscious of the torture being inflicted upon him to satisfy the (c)(6) factor. Then the instruction indicates that the victim need not be conscious of the torture to satisfy this factor. It cannot be both. Any reasonable juror would have had no idea as to the requisite findings. This level of confusion and vagueness in a statutory aggravator does not pass constitutional muster. Espinosa, supra.; cf. Newlon v. Armontrout, 885 F.2d 1328, 1333-1335 (8th Cir. 1989) cert. denied 497 U.S. 1038 (1990) ; Battle v. Delo, 19 F.3d 1547, 1562 (8th Cir.1994), opinion adhered to as modified 64 F.3d 347 (1995), cert. denied 517 U.S. 1235 (1996); see also Mathenia v. Delo, 975 F.2d 444, 449 (8th Cir.1992), cert. denied, 507 U.S. 995 (1993).

The court also instructed on the non-statutory aggravating circumstance

regarding Appellant's alleged lack of remorse. App. 189-90. Here the government sought Mr. Paul's execution in part based on evidence that the "victim begged for his life." Id. This alleged fact (the only evidence of which came from statements he allegedly made to acquaintances) does not relate to the concept of remorse and thus renders it meaningless. Remorse commonly refers to regret for a wrong committed in the past. What the victim may have said at the time of the offense is not relevant to whether Mr. Paul was later remorseful for his involvement in the crime. At least one federal district court has disallowed "lack of remorse" as a non-statutory aggravator due in part to its ambiguousness. See U.S. v. Davis, 912 F. Supp. 938, 945 (E.D.La. 1996) aff'd, 132 F.3d 1454 (5th Cir. 1997), cert. denied, 118 S.Ct. 1331 (1998). This Court should follow the court's lead in Davis and invalidate this factor as used here.

Here too, the evidence was itself ambiguous with respect to Mr. Paul's state of remorse after the offense. Government witness Rogers testified that when Mr. Paul allegedly told him about the offense two nights after it had happened, he was very upset about it. T. 689. Government witness LaPaglia testified that when Ingle called her the night of the offense, he said Mr. Paul was upset. T. 705. She confirmed this fact when Paul later called himself and said he was upset. T. 707. In such a situation, the better course would have been to avoid any such

ambiguity, especially because "[l]ack of remorse is a subjective state of mind, difficult to gauge objectively since behavior and words don't necessarily correlate with internal feelings." Davis, supra, at 945.

In addition, the government also sought and obtained a jury finding on an aggravating factor that the defendant had successfully eluded capture by the FBI until his arrest in August, 1996. App. 86 (jury verdict form). This factor, to the extent it had any relevance beyond the scope of the future dangerousness factor noted above, was an improper factor for use in aggravation of punishment. While the fact might relate to considerations regarding whether he would be a threat to society in the future, its relevance to any issue beyond that fact is either non-existent, or worse yet, wholly inappropriate as a separate basis on which to sentence a person to death. The only reasonable relevance this factor may have had apart from future dangerousness highlights the government's inability to track down, capture, and successfully arrest Mr. Paul. Such governmental reliance upon their own failings as a basis for concluding that Mr. Paul is more deserving of death than someone whom the government is able to arrest more quickly "fails to furnish principled guidance for the choice between death and a lesser penalty," Richmond, supra at 46.

Finally, the government's particular utilization of two factors, the statutory

vulnerability of victim factor, see §3592(c)(11), and the non-statutory victim impact factor, resulted in another vagueness and overbreadth problem. Here the government sought to portray the victim as "helpless" and "vulnerable" due to his old age, while at the same time healthy, in good shape, and having years of life left despite his age. In its presentation of sentencing phase evidence, in closing argument, and in the drafting of the non-statutory victim impact factor, the government portrayed Mr. Williams as a man who, though elderly, was strong, in good health, and had many years of life left in him. T. 939 (victim's daughter describes Mr. Williams as avid runner and fisherman, thin, fit, ate well and ran for health); T. 944 (daughter noting how loss of healthy, active parent harder than if infirm due to old age); App. 204 (prosecutorial argument that victim "still had a lot of years left in his life to enjoy"); App. 88 (verdict form on victim impact factor includes "avid jogger"). Nevertheless, the government specifically relied upon, and argued the fact that, because of his age, he was particularly vulnerable. Thus the government relied upon contradictory factors and evidence to stack the balance against Mr. Paul at sentencing.

Each of these factors were "so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor." Richmond, supra. The vagueness problem was exacerbated in some instances by

the fact that the jury was given no clear and consistent definition of the operative terms. See Walton v. Arizona, 497 U.S. 639, 653 (1990) ("it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face.").

The Supreme Court has identified several constitutional concerns arising from the government's reliance upon vague or ill-defined aggravating factors. First, use of such factors in the weighing process "creates the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be by relying upon the existence of an illusory circumstance." Stringer, 503 U.S. at 237. Reliance upon vague aggravating factors also creates the "possibility . . . of randomness," id., by providing no definitions, or worse yet, confusing and contradictory definitions of the operative terms, and permitting the jury to find factors without any common understanding of their meaning. Finally, use of such vague factors placed a "thumb [on] death's side of the scale," creating a bias in favor of the death penalty. Stringer, supra.

These errors were not harmless in this case. Taken singly, or together, the invalidation of any of these factors would have upset the balance between aggravating and mitigating evidence in this case. By placing a "thumb on death's

side of the scale," Stringer, supra, these vagueness errors resulted in an unconstitutional sentence of death. Appellant also urges this Court to avoid any attempt to re-weigh the sentencing phase factors in this case once it is determined that the above were invalid. Because of the extent of the errors in the jury's consideration of both aggravating and mitigating evidence set forth throughout this Brief, Appellant suggests the prudent course is to either remand for the imposition of a life sentence, or for a new sentencing proceeding conducted free of the variety of errors that plagued Appellant's trial.

**VIII. The Prosecution's Reliance Upon Aggravating Factors Which Were Duplicative Of One Another And Relied Upon The Same Operative Facts Violated Appellant's Rights Under the FDPA and the Fifth, Sixth, Eighth And Fourteenth Amendments.**

**1. The Prosecution Relied Upon, and The Trial Judge Instructed the Jury Regarding, Two Aggravating Factors Which Were Effectively One Factor; Such Doubling of Aggravating Factors Violated Appellant's Rights Under the Sixth, Eighth and Fourteenth Amendments**

The prosecutor relied upon, and the trial court instructed the jury regarding, the statutory "heinous, cruel and depraved" (c)(6) instruction, see App. 83, 186-88, and the statutory "vulnerability of victim" (c)(11) aggravator, see App. 83, 186. Because of the lower court's definitions of operative terms in the (c)(6) instruction, there is a reasonable likelihood the jury understood the instructions to allow the finding of two separate factors from identical facts. Boyd v. California, 494 U.S. 370, 380 (1990).

The lower court's instruction on the (c)(6) aggravator first defined each of the three terms, "heinous," "cruel" and "depraved." App. 187. The court noted that they were stated in the disjunctive, meaning that a finding of any one of them was sufficient for the jury to find the existence of the (c)(6) aggravator. App. 186-87. The court then instructed that, as a general matter, "pertinent factors" in

determining whether any one of the three terms existed included the "helplessness of the victim." App. 187-88. In effect, therefore, the jury was instructed as a matter of law that it could find the (c)(6) aggravating factor so long as it found that the victim was helpless.

With respect to the (c)(11) "vulnerability of the victim" factor, the verdict form only indicated that the victim's vulnerability was due to "old age." App. 84. Although the trial court's instruction failed to define either "vulnerable" or "helpless," in everyday usage these terms readily connote common ideas. Cf. Arave v. Creech, 507 U.S. 463, 472 (1993) ("We assume that legislators use words in their ordinary, everyday senses... resort to dictionaries for the common meaning" of words is acceptable practice) . This is of course especially true as applied to the facts of this case. That is, the victim, an elderly man, would have been seen as particularly helpless in large part due to his old age.

The improper doubling here was as much a product of the government's argumentative use of these factors as it was of the trial court's instructions. Well aware of the connection between the concept of helplessness under (c)(6) and the concept of vulnerability under the (c)(11) factor, the prosecutor capitalized on this commonality by repeatedly referring to the victim's old age in support of each factor. With respect to the (c)(6) factor, he expressly noted that the "helplessness

of the victim" was to be considered, and then immediately noted that the victim was "an 82 year old man." App. 203. He continued to comment upon the victim's age and his status as a grandfather in discussing the (c)(6) factor. App. 203-04. When discussing the victim vulnerability factor, he immediately noted that the victim was "an 82 year old man." App. 204. Thus the government sought a finding of two aggravating factors based upon the same evidence, namely, that the victim was elderly.

As note elsewhere, the defense filed several pre-trial motions aimed at preventing precisely the type of error noted here. The defense sought, at the very least, a hearing prior to the start of the sentencing phase to assess and screen the government's aggravating evidence to ensure its reliability, and re-urged the request at the start of the sentencing phase. App. 31; T. Pre-trial Hearing June 11, 1997 at 18-24, T. 916-17. Nevertheless, the court denied all such motions. Id. at 27, 33, 42 & T. 916-17.

**2. This Doubling Violated Appellant's Constitutional Rights**

The Supreme Court faced a similar issue recently in Jones v. U.S., 119 S.Ct. 2090, 1999 WL 401258 (U.S.) June 21, 1999. There the Court addressed the appellant's contention that the jury was allowed to find two separate nonstatutory

aggravating factors based on similar sets of facts. Id. at *12-*17. A majority of the Court failed to agree on the proper resolution of the question whether the aggravating factors there were unconstitutionally overbroad, vague, or duplicative. See id. at*1, *17, *25 (only four justices concur in section III-A of opinion, in which Court addresses noted arguments; Scalia, J., fails to join that section of opinion). The Court nevertheless affirmed the Fifth Circuit's affirmance of the death sentence, because a majority did agree that, whether or not there was error, it was harmless under the facts of that case. Id. at *16-*17 (part III-B of opinion, in which five justices concurred). Furthermore, although commenting upon the Tenth Circuit's decision in U.S.. v. McCullah, 76 F.3d 1087, 1111 (10th Cir. 1996), cert. denied 520 U.S. 1213 (1997) (finding reversible error with this type of double-counting of aggravators), and the Fifth Circuit's decision in Jones, (finding that constitutional error could result from such double-counting error), the four-justice plurality opinion in Jones did not reverse either the McCullah case or that aspect of the Fifth Circuit decision finding that such error was possible in the right case. Jones, supra. at *13-*14. Indeed, the plurality simply noted: "We have never before held that aggravating factors could be duplicative so as to render them constitutionally invalid, nor have we passed on the 'double counting' theory that the Tenth Circuit advanced in McCullah and the Fifth Circuit appears to have

followed here." Id. at *14. The Court then accepted "for the sake of argument, petitioner's 'double counting' theory", and found that it did not render Jones' sentence unconstitutional under the facts of that case. Id.

The doubling between the heinousness factor and the vulnerability of the victim factor here violated the letter and spirit of the Jones plurality. Unlike in Jones, here the trial court effectively instructed the jury that both factors could be found based upon the same piece of evidence, namely, the helplessness of the victim due to his old age. The prosecutor's argument repeated this view. In Jones, the aggravators in question referred to distinct aspects of the victim: one referred to the personal characteristics of the victim which the family would miss, while the other referred to characteristics about her vulnerability, i.e., her size, young age, etc. 1999 WL 401258 at *14. Here, the same aspect of the victim, namely his old age, was allowed to be the basis for a finding of two aggravating factors.

In Jones the Court also relied upon the fact that the government's closing arguments separated the distinct facts and aggravators. Id. at *14 ("to the extent that there was any ambiguity arising from how the factors were drafted, the Government's argument to the jury made clear that [the two factors in question] went to entirely different areas of aggravation...."). By contrast here, the prosecution specifically argued that the victim's age was an important fact in the

jury's consideration of both the (c)(6) and the (c)(11) statutory aggravators.

Appellant's view here is supported by the Tenth Circuit's decision in McCullah. There the Court found that where one aggravating factor "substantially overlaps" another, constitutional error results. 76 F.3d at 1111. Indeed, in commenting upon the denial of rehearing en banc, the Court held that the issue arose because the factors "were predicated upon the same acts" by the defendant. U.S. v. McCullah, 87 F.3d 1136, 1138 (10th Cir. 1996) (denying rehearing en banc). This was true even though one factor was broader than the other; so long as one factor was "subsumed by" the other, the doubling was invalid. In similar circumstances, numerous state court have held that reliance upon the same piece of evidence to support more than one aggravating factor in a capital sentencing scheme is unconstitutional. See e.g., Enberg v. Meyer, 820 P.2d 70, 89 (Wyo. 1991); Kennedy v. State, 455 So.2d 351, 354 (Fla. 1984), cert. denied 469 U.S. 1197 (1985).

The error was not harmless in this case. "[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." Stringer v. Black, 503 U.S. 222, 230-36 (1992). As noted elsewhere in this brief, the FDPA is a weighing statute, 18 U.S.C. § 3593(e), and therefore

the jury's finding of improper aggravating factors skewed the weighing process by "creat[ing] ... bias in favor of the death penalty...." Stringer v. Black, 503 U.S. 222, 236 (1992).

Appellant urges the Court not to attempt a re-weighing of whatever aggravating and mitigating factors survive and/or arise from the challenges set forth in this Brief, see Claim XVI. In part this is due to the fact that the sentencing phase was replete with error, making re-weighing inappropriate. In part this is due to the fact that, with respect to the current issue, the victim's age was a central element of the government's case for death; such centrality of the underlying facts in support of these aggravators makes re-weighing an impossible task.

Even if re-weighing were employed, Mr. Paul must prevail. Mr. Williams' age and helplessness as an older man was of critical importance to the prosecution's sentencing phase case for death. The government relied heavily in their sentencing presentation, and in argument, upon the fact that Mr. Williams was a particularly vulnerable victim, and his murder especially heinous, because he was a helpless senior citizen. Both of these factors were statutory aggravators, at least one of which was required to be found in order for Mr. Paul to be eligible for the death sentence. 18 U.S.C. §3593(c). Given the pivotal role Mr. Williams' age played in the government's case for death, there can be no question that the

jury's finding of these two statutory aggravators was given substantial weight in the balance. Absent these factors, it is highly likely that the jury in this case would have returned a life sentence. For all of these reasons, Mr. Paul respectfully urges the Court to remand the case for a new sentencing trial.

## IX. The Prosecution's Reliance Upon Unadjudicated Offense Evidence at Both Phases of Trial Violated Appellant's Rights Under the FDPA, the Federal Rules of Evidence, and the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 1. The Prosecution Relied Upon Unadjudicated "Bad Acts"

The government relied upon unadjudicated "bad act" evidence during both phases of Appellant's capital trial. This evidence was the focus of several pre-trial motions. The defense initially sought discovery of such pursuant to Fed.R.Evid. 404(b). App. 2. When the government responded that it intended to rely upon certain evidence regarding statements Mr. Paul had made about a robbery, App. 4, the defense moved to suppress. App. 8. The magistrate recommended denial of the motion, App. 22, and the court adopted the recommendation. App. 70. With respect to the government's reliance upon such evidence at sentencing, the defense filed several pre-trial motions aimed at preventing precisely the type of error noted here. Thus motions were filed and re-urged requesting that the trial court hold a hearing prior to the start of the sentencing phase to assess and screen the government's aggravating evidence to ensure its reliability. App. 31; T. Pre-trial Hearing June 11, 1997 at 18-24; T. 916-17. The court denied all such motions. Id. at 27, 33, 42; T. 917.

The government presented all of its 404(b) evidence at the guilt-innocence

phase of trial through government witness Rogers, a short time acquaintance of Mr. Paul. T. 676. He testified that on June 8, 1995, more than two weeks before the murder in question, Mr. Paul and co-defendant Trinity Ingle came to his workplace, and left a gun with him. T. 656. Both Ingle and Paul were carrying guns, but only Paul left his with Rogers. T. 676. The following weekend Appellant came to his house and retrieved the gun. According to Rogers, Appellant told him he and Ingle planned to rob Tri-Lakes Liquor Store by killing the owners and taking the money. T. 658. Rogers did not take Appellant seriously, T. 680, nor should he have, because the government never presented any evidence that a robbery or attempted robbery ever occurred at Tri-Lakes or any other local liquor store or any other business in the area during the relevant time period. Indeed, <u>the government neither produced nor attempted to introduce any other evidence of this alleged robbery plan</u>.

The government argued for a guilty verdict in part based upon this "bad act" evidence, referencing it repeatedly throughout closing argument. App. 144, 148-49, 162, 171. The government also relied upon this evidence in arguing for a death sentence. App. 178, 204-05. The government sought, and the trial court charged the jury that it could find, two separate non-statutory aggravators to which this evidence was relevant: a "future dangerousness" aggravator, <u>see</u> App. 85, 189,

and a "prior acts of violence" aggravator, App. 86, 189.

Importantly here, the government expressly relied upon this evidence in support of their argument for an affirmative finding on the future dangerousness factor: "Non-statutory aggravating factors that you can consider are future dangerousness, which includes other acts of violence, and I would direct your attention to the aborted liquor store robbery/murder plot..." App. 204-05. This is the government's only reference to the alleged attempted robbery during sentencing closing arguments. Notably, the reference does not even mention the separate "prior acts" aggravator (nor does the government discuss this aggravator in argument); rather, it focuses exclusively on the relevance of this evidence to the future dangerousness inquiry.

The jury unanimously found the future dangerousness aggravator, but unanimously rejected the "prior acts" aggravator. App. 85-86. Because the government relied upon the 404(b) evidence in support of the future dangerousness aggravator, however, any issue arising from its use at sentencing is nevertheless germane notwithstanding the jury's rejection of the separate aggravator. The rejection of the "prior acts" factor only indicates that the jury failed to unanimously find, beyond a reasonable doubt, that Jeffery Paul had committed an attempted robbery/murder of Tri-Lakes. It does not mean, however,

that this evidence was not considered. Some jurors may have disagreed with that finding, while others may have felt that Appellant had committed the act, but did not believe so beyond a reasonable doubt, either of which would have led to a non-unanimous decision and therefore a rejection of the factor. Under either scenario, however, any juror was free to consider the 404(b) evidence in connection with the future dangerousness inquiry – indeed, the government expressly invited them to do so.

### 2. The Prosecution's Reliance Upon This 404(b) Evidence At the Guilt-Innocence Phase Violated Appellant's Rights

The trial court erred in allowing the government to present and argue at the guilt-innocence phase of trial evidence of Mr. Paul's alleged statements about a never-proven aborted robbery attempt. The mere description of the evidence itself suggests its tenuous basis in fact. Indeed, judging from hindsight, the jury found that the government had failed to prove the underlying facts regarding this alleged robbery. See App. 86.

This Court has held:

> To be admissible as Rule 404(b) evidence, the evidence must be '(1) relevant to a material issue; (2) proved by a preponderance of the evidence; (3) higher in probative value than in prejudicial effect; and (4) similar in kind and close in time to the crime charged.'

U.S. v. Shoffner, 71 F.3d 1429, 1432 (8th Cir. 1995) (citations omitted). The Court has held that it is reversible error "when it is clear that the evidence has no bearing on the case." U.S. v. Williams, 895 F.2d 1202, 1205 (8th Cir.1990). "[T]he standard for admission of 'other acts' evidence is whether the jury could reasonably find by a preponderance of the evidence that the act occurred and that the defendant was the actor." Id.

The evidence submitted in this case fails several of these tests. First, the evidence itself was so tenuous that no reasonable jury could have found by any standard of proof that the act occurred. The evidence amounted to an uncorroborated confession which itself would have been insufficient to convict had Mr. Paul been charged with the crime of attempted robbery. See Wong Sun, 371 U.S. 471, 488-89 (1963) ("It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused..."), citing Smith v. U.S., 348 U.S. 147 (1954). Indeed, as the defense argued with respect to the alleged "attempted robbery," there was no "act" other than the alleged statement of the defendant. The insufficiency of the evidence is confirmed in the unusual circumstances here, where the jury's sentencing verdict denied the factual underpinning of the 404(b) allegation in rejecting the separate "bad act"

aggravator. App. 86.

Second, any probative value in this evidence was outweighed by its prejudicial effect. The fact that Mr. Paul may have made some comment to another person about robbing a local liquor store is irrelevant to the offense in chief. The factual differences between the two scenarios are clear. One involved a classic convenience store robbery in a business area; the other involved an unusual robbery of an elderly man taking a walk on a secluded mountainous nature trail. One was allegedly planned for night-time; the other, for daytime. The only similarity between the two offenses is that they both involved robberies with guns. However, this is an insufficient basis for admission of 404(b) evidence. Such scant probative value was outweighed by its obvious prejudice to the defense, painting as it did a picture of a young kid just looking to commit a robbery in whatever manner he could.

### 3. The Prosecution's Reliance Upon This 404(b) Evidence At the Sentencing Phase of Trial Violated Appellant's Statutory and Constitutional Rights

The prosecutor's reliance upon, and the jury's consideration of this unadjudicated "bad act" evidence at the sentencing phase of Appellant's capital trial was neither authorized nor contemplated by the FDPA. It is also a violation

of Appellant's constitutional rights.

The FDPA specifically lists a number of statutory aggravators related to prior criminal activity. In each, the aggravator requires a criminal conviction. See e.g. §3592(c)(4) (previous conviction of violent felony involving firearm); (c)(3) (previous conviction of offense for which sentence of death or life authorized); (c)(4) (previous conviction of 2 or more other serious offenses). By implication, therefore, it is apparent Congress intended that only those prior bad acts reduced to convictions were to be used at sentencing in support of non-statutory aggravators.[14] At the very least, the fact that Congress legislated a high burden of proof (beyond a reasonable doubt) for all aggravating factors, statutory and non-statutory, clearly suggests that the government should have been required to prove, and the jury to find, beyond a reasonable doubt, the underlying facts of the Tri-Lakes robbery, prior to relying upon those facts in support of any aggravator.

There are constitutional dimensions to this latter problem. Because a death sentence is qualitatively different from a sentence of imprisonment, the Supreme

[14] The "well-established" canon of statutory construction, inclusio unis est exclusio alterius, provides that by specifically including certain things in a statutory provision, Congress intends to exclude other related things. See e.g., United States v. Koonce, 991 F.2d 693, 698 (11th Cir. 1993); see also U.S. v. Davis, 912 F.Supp. at 940-41 (FDPA's statutory aggravators provide limiting principles as to scope and content of proposed non-statutory aggravators).

Court has determined that any proceeding which results in a death sentence must comport with the highest standards of reliability. Woodson v. North Carolina, 428 U.S. 280, 304-05 (1976). In U.S. v. Mergerson, 4 F.3d 337, 344-45 (5th Cir. 1993) cert. denied, 510 U.S. 1198 (1994), a non-capital case, the Fifth Circuit "recognize[d] a growing number of cases decided by courts in other circuits in which a higher standard of proof has been suggested or required when a finding of a particular fact relevant to sentencing dramatically increases the sentencing options of the court to the disadvantage of the defendant." Id. at 343. The Mergerson court also observed that "numerous lower courts have required that sentencing facts must be found beyond a reasonable doubt in the capital sentencing context." Mergerson, 4 F.3d at 344-45; see also, e.g., People v. Heishman, 753 P.2d 629 (Cal.), cert. denied 488 U.S. 948 (1988) (requiring specific reasonable doubt instruction); State v. Taylor, 818 P.2d 1030 (Utah 1990), cert. denied 503 U.S. 966 (1992) (same); Stephen P. Smith, Note, Unreliable and Prejudicial: The Use of Extraneous Unadjudicated Offenses in the Penalty Phase of Capital Trials, 63 Colum. L. Rev. 1249 (1993). As one Circuit Judge has noted:

> Assertions by the State at a capital sentencing hearing that the defendant committed crimes for which he has not been convicted are inherently suspect. ... On the other

> hand, the State has an important interest in presenting to the sentencing jury all relevant evidence regarding the defendant's character. ... The American justice system typically balances these competing concerns by requiring the State to present evidence sufficient to satisfy an applicable standard of proof and the court to instruct the jury as to that standard. ... Just as it is necessary to instruct the jury as to the standard by which the State must prove the elements of the primary crime [i.e., by proof beyond a reasonable doubt] in order to guarantee a fundamentally fair guilt-innocence proceeding, so too the jury must be instructed as to the standard by which a State must prove unadjudicated criminal conduct to be used as a[n] ... aggravating circumstance in order to guarantee a fundamentally fair sentencing proceeding.

Devier v. Zant, 3 F.3d 1445, 1467 (11th Cir. 1993) (Kravitch, J., concurring, joined by Clark, S.J.), cert. denied, 513 U.S. 1161 (1995).

The Supreme Court has also recognized the problem. In McMillian v. Pennsylvania, 477 U.S. 79 (1986), the Court held that, in certain situations, a sentencing fact found during a punishment phase of a criminal trial could be a "tail which wags the dog of the substantive offense" in the sense that criminal punishment drastically increases upon finding of such a pivotal sentencing fact. McMillian, 477 U.S. at 87-88. In such cases, the Court held, requiring the finding of the fact beyond a reasonable doubt may be necessary to satisfy due process. Id. As has been cogently put, the use of evidence of unadjudicated crimes becomes a ploy that "allows the state to secure a conviction on a strong murder case, then

seek the death penalty by providing a weak case before a jury which is undeniably prejudiced. This opens the door to death penalty recommendations upon a level of proof lower than proof beyond a reasonable doubt." State v. McCormick, 272 Ind. 272, 397 N.E.2d 276, 280 (1979).

Many state courts have held such evidence inadmissible. For example, the Supreme Court of Pennsylvania has concluded:

> In a capital case where a man's life is at stake, it is imperative that the death penalty be imposed only on the most reliable evidence. Prior convictions of record, and constitutionally valid admissions and confessions of other crimes meet this standard of reliability; piecemeal testimony about other crimes for which [the capital defendant] has not yet been tried or convicted can never satisfy this standard.

Commonwealth v. Hoss, 445 Pa. 98, 118, 283 A.2d 58, 69 (1981). The majority of subsequent state court decisions to consider the issue have refused to allow the use of unadjudicated crimes in capital sentencing.[15] Cf. State v. Debler, 856 S.W.2d 641 (Mo. 1993) (en banc) (reversing death sentence where state relied upon un-charged offense evidence and failed to give notice to defense). Other state courts

---

[15] State v. Bobo, 727 S.W.2d 945, 952-53 (Tenn.), cert. denied, 484 U.S. 872 (1987); State v. Bartholomew, 101 Wash.2d 631, 633-40, 683 P.2d 1079, 1082-85 (Wash. 1984); Scott v. State, 297 Md. 235, 245-47, 465 A.2d 1126, 1135-36 (Md. 1983); State v. McCormick, 272 Ind. 272, 279-80, 397 N.E.2d 276, 279-81 (Ind. 1979); Cook v. State, 369 So.2d 1251, 1257 (Ala. 1979); Prevence v. State, 377 So.2d 783, 786 (Fla. 1976).

that have reached a contrary decision require that the unadjudicated crime be proven either "beyond a reasonable doubt" or by "clear and convincing evidence."[16] In Mr. Paul's case, whether or not the use of unadjudicated offense evidence was a per se violation of statutory or constitutional rights, its use here without any burden of proof as to the underlying facts, violated the Eighth Amendment.[17]

---

[16] See State v. Brooks, 541 So.2d 801 (La. 1989) (clear and convincing evidence); People v. Balderas, 41 Cal.3d 144, 204-05, 222 Cal.App. 184, 219-20, 711 P.2d 480, 515-16 (Cal. 1985) (beyond a reasonable doubt).

[17] The Fifth Circuit's conclusion to the contrary in U.S. v. Hall, supra. is, respectfully, in error. First, the Court noted that Hall had "offered no legal support" for this proposition. Id. at 404. Whatever was offered in Hall, the above demonstrates not only some legal support, but abundant authority for the proposition that such evidence has no place in a capital sentencing trial under the FDPA or, at the very least, it requires exacting standards of proof. The Court in Hall cited three prior, non-federal capital cases from the Fifth Circuit, each of which ultimately relies upon the first such case, Milton v. Procunier, 744 F.2d 1091, 1097 (5th Cir. 1984) cert. denied 471 U.S. 1030 (1985) . Milton held as a general matter that evidence of unadjudicated extraneous offenses was admissible during a Texas capital sentencing hearing. The Court in Milton implicitly suggested, however, that limiting instructions should be required. The Court first noted that "there remains a long-held reservation about the use of wrongdoing not then being tried. These concerns express our acceptance that a jury suffers the human weakness of blending wrongs – a result inconsistent with our fundamental commitment to charge specificity." Id. at 1097. The Court then held that "these concerns are addressed by properly applied standards of relevance and sufficiency of proof." Id. (emphasis added). The Court in Hall fails to note this critical language in Milton, which Appellant asserts here supports his argument for some limiting instruction on the use of unadjudicated offense evidence in a capital trial.

## X. The Victim Impact Evidence Introduced At the Sentencing Phase of Mr. Paul's Trial Produced A Death Sentence Based Upon Emotion Rather Than Reason, In Violation Of the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 1. Introduction

Before the beginning of the penalty phase of Mr. Paul's trial, he filed a motion in limine to exclude all victim impact evidence, asserting that under the decision in Payne v. Tennessee, 501 U.S. 808 (1991), admission of such testimony would inevitably lead to a violation of his Eighth Amendment rights. App. 13. The court rejected this motion categorically, without proscribing any limitations upon the government's presentation of, or reliance upon, such evidence at the sentencing phase of trial. App. 25; 68; T. Pre-trial Hearing June 11, 1997 at 7. Mr. Paul then requested prior to trial that the court hold a pre-trial evidentiary hearing to determine the scope and admissibility of the government's evidence in support of the non-statutory aggravating factors. App. 31; T. Pre-trial Hearing June 11, 1997 at 18-24; T. 916-17. The court denied all such requests. Id. at 27; T. 917.

Pursuant to these rulings, the government presented the testimony of three witnesses, two daughters of the victim, and one long-term co-worker. See T. 934-962. Taken together, the evidence presented by these witnesses interjected a

constitutionally intolerable level of emotion into the sentencing proceeding and created a corresponding risk that Mr. Paul's sentence was the product of emotion overwhelming reason. Mr. Paul's sentence "[was not], and [does not] appear to be, based on reason rather than caprice or emotion." Gardner v. Florida, 430 U.S. 349, 358 (1977).

### 2. The Required Balance Between Introduction Of Limited Victim Impact Evidence And Preservation Of A Capital Defendant's Right To A Reliable, Individualized Sentencing Decision Envisioned In Payne

In Payne v. Tennessee, the Supreme Court overturned Booth v. Maryland, 482 U.S. 496 (1987) and South Carolina v. Gathers, 490 U.S. 805 (1989), to hold that the Eighth Amendment does not prohibit admission of victim impact evidence at the penalty phase of a capital trial. In banning victim impact evidence, the Booth Court had concluded that the introduction of such evidence violated two Eighth Amendment requirements for capital sentencing proceedings: the need for "heightened reliability," and the need for an "individualized determination" based on the "character of the [defendant] and the circumstances of the crime." Booth, 482 U.S. at 502, citing Zant v. Stephens, 462 U.S. 862 (1983). Victim impact evidence, the Court reasoned in Booth, is irrelevant to the individualized

consideration of the defendant's guilt, and "its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." Id.

The Payne Court disagreed, finding that Booth "unfairly weighted the scales in a capital trial," 501 U.S. at 822:

> [W]hile virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering 'a glimpse of the life' which a defendant 'chose to extinguish,' or demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide.

Id., citing Mills v. Maryland, 486 U.S. 367, 397 (1988) (Rehnquist, J., dissenting). On this basis, the Court held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." Id. at 827. The Court dismissed Booth's concerns that victim impact evidence would invite arbitrary and capricious, emotion-driven sentencing, noting that "in the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." Id. at 825. See also id. at 836 (Souter, J., concurring) ("there is a traditional guard against the inflammatory risk [of victim impact testimony], in the trial judge's

authority and responsibility to control the proceedings consistently with due process, on which ground defendants may object and, if necessary, appeal").

In permitting the introduction of limited victim impact evidence – which "offer[s] 'a glimpse of the life' which a defendant 'chose to extinguish,' or demonstrat[es] the loss to the victim's family and to society which has resulted from the defendant's homicide," Payne, 501 U.S. at 822 (emphasis supplied) – the Court did not intend to eviscerate the capital defendant's Eighth Amendment right to a reliable, individualized sentencing determination. Nor did it intend for a capital sentencing proceeding to become a contest between the worth of the victim and that of the defendant.[18] It sought instead to strike a balance between victim impact evidence and the defendant's Eighth Amendment rights. Such a balance is

[18] In responding to Payne's concern that the comparative worth between victim and defendant should not be a relevant capital sentencing factor, the Court stated:

> As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind – for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead each victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be.

501 U.S. at 823-24.

to be safeguarded by the trial court's "authority and responsibility to control the proceedings consistently with due process," 501 U.S. at 836, to restrict the presentation of victim impact evidence sufficiently that the emotion inherently associated with such evidence does not overwhelm the jury's responsibility to make a reliable, individualized sentencing determination based on a full and fair consideration of the mitigating and other aggravating circumstances.

Notwithstanding the dramatic shift in the law occasioned by its holding, Payne provided virtually no guidance for determining the scope of appropriate victim impact evidence, and even less for determining when that evidence is unduly prejudicial. Nor can guidance be found in other lower federal court decisions, for before Mr. Paul's case, the federal courts had few opportunities to address these issues in the context of a trial and direct appeal under the FDPA. For these reasons, Mr. Paul urged the trial court to provide some level of guidance (which is lacking in the FDPA) with respect to the proper scope of such evidence. Instead, the lower court denied the defense motion outright without any stated restrictions or limitations.

Other jurisdictions have had more time to wrestle with implementing Payne's allowance for some victim impact testimony while simultaneously protecting the defendant's right to individualized sentencing and the avoidance of

arbitrariness and emotion. For example, in State v. Bernard, 608 So.2d 966 (La. 1992), the court fashioned a cautionary principle which, if adhered to closely, might prevent the victim impact evidence from overwhelming the sentencing process:

> [I]ntroduction of detailed descriptions of the good qualities of the victim or particularized narrations of the . . . sufferings of the victim's survivors, which go beyond the purpose of showing the victim's individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury's sentencing decision.

608 So.2d at 972. Other courts have adopted a similarly cautious approach. See, e.g., State v. Muhammad, 145 N.J. 23, 45-48 (1996); Cargle v. State, 909 P.2d 806, 830 (Okla.Crim.App. 1995), cert. denied, 519 U.S. 831 (1996).

Appellant's request for a pre-trial evidentiary hearing on the government's proposed non-statutory aggravating evidence, which would have included victim impact evidence (a non-statutory aggravating factor), was the approach adopted by the court in Davis, supra, as well as that taken in state courts across the country. There, pre-trial hearings are held to hear and determine the admissibility of victim impact evidence. See State v. Muhammad, 145 N.J. at 45-48, 678 A.2d at, 175-177; Cargle v. State, 909 P.2d at 828; State v. Bernard, 608 So.2d at 672. Such hearings might have allowed the lower court to eliminate certain areas of

testimony or certain questions which were likely to elicit emotional testimony, or which delved in far too much detail into the victim's life story and his specific interests, habits, daily routines, and other facets of his life that ultimately provided significantly more than "a brief glimpse" into his life.

### 3. The Evidence Presented at Appellant's Trial

To illustrate Mr. Paul's concern, the record of the government's presentation at sentencing must be closely evaluated. At the outset it bears noting that the government's entire evidentiary presentation at sentencing focused on the victim – Sherman Williams, his personal characteristics, and a detailed re-telling of his complete life story. Indeed, all of the evidence offered by the prosecution in support of a sentence of death during the second phase of trial was about the victim, providing an elaborate recitation from two daughters (Mary McKuin and Carole Sherman) and one life-long co-worker (Lawrence McCollough) describing Mr. Williams' life history starting with childhood, his habits, hobbies, personality, interests, work career, and many other facets of his life.

Ms. McKuin described her father's life, in great detail, from childhood until shortly before his death. She talked of her father's family, the number of siblings he had, where they lived, and their modest means. T. 935. She talked about her

father's parents, how they were teachers in the rural community in which he was raised. Id. Ms. McKuin described how her father was the first in his family to attend college, how he graduated in three years, and how his sister had supported him financially through school. T. 935-36. She explained how he experienced tough times during those years, working while not in school, first at an ice cream plant, later on farms, sometimes living in the barns he worked at to support himself. Id. She described when she and her sister were born, and how his father's feelings of indebtedness to his sister put a strain on their family in the early years. T. 937. Ms. McKuin told of how her father joined the army during World War II, became a sergeant, and was later recalled into service during the Korean War. Id.

Ms. McKuin also talked at length about Mr. Williams' lifetime career with the Farmers Home Administration ["FHA"] of Arkansas, how he started in the lower ranks in 1939, and worked his way to the top, retiring as Director in 1979. T. 936-38. She also talked about her father's special love for rural parts of the state, traveling as he did all across the State of Arkansas for job-related reasons. She told of her father's accomplishments while at the FHA, how he brought water and sewer systems to many rural areas throughout the State. T. 938. She described how, through his work, her father picked up some skills in kitchen

design, and often while working with farming families would assist housewives in building more convenient kitchen facilities. T. 939. She said that he loved his job, and that work was his primary "hobby." Id. She described how he developed skills in photography through the FHA, as he was required to photograph the places and projects he oversaw. Id.

Ms. McKuin related a number of personal attributes about her father. She described how he enjoyed taking pictures of the same places in different seasons. T. 939. She talked about how he loved to fish, taking his fishing gear with him in the trunk of his car on work trips. Id. She described his love of walking and jogging, and how he was a very thin, fit, tall man. She said he ate well and ran for his health, describing him as a man ahead of his time. Id.

Ms. McKuin told how her father came to live in the retirement community on the lake in Hot Springs, how he thought carefully about where he wanted to retire, and eventually bought a condominium. She said he kept a boat in his dock, and that he did more fishing in retirement. T. 940.

Ms. McKuin also discussed her father's personality, describing him as a quiet man in private, although outgoing and congenial in public. T. 941. She described him as a wonderful conversationalist, easy to talk with, great company, and how he kept up with current events reading newspapers and watching

television. Id. She said Mr. Williams was particularly fond of educational television. Id. Her father was well-informed, and there were not too many subjects that he was unable to talk about with some level of knowledge. Id.

Ms. McKuin then discussed the later years of her relationship with her father. Having left the state with her husband for some period of time, she returned to Arkansas in 1993, and was determined to spend as much time as possible with her father. T. 941. In fact, he would take many one or two night trips around the state as he had done with the FHA, and Ms. McKuin would often accompany him. T. 942. She said this time together was wonderful, that her father knew so much about most areas of the State, "every tree, every rock", and that he would talk about what he had done to help whatever area they were in. Id.

Ms. McKuin ended her testimony by discussing the impact of her father's death on her, describing it as a great loss. Noting how he was a big sports fan, especially a Razorback fan, T. 942, she said that whenever she is watching one of the games and a big play is made, she turns to share it, and he is not there. Id. She said her father came to her home often to watch televised games. He would have dinner, spend the night, and then return home. She said they met in Little Rock frequently when he would come there to go to the dentist or take care of other business. Id. She talked about the last time she saw her father, the week before he

was killed, how she had gone to lunch in Little Rock with him and her sister. T. 943. She experienced his death as a loss of a great friend and traveling companion, and said that when you lose a parent who was otherwise healthy and active, the feeling of loss defies description. T. 944.

Carole Sherman, Mr. Williams' other daughter, also testified for the government at the sentencing phase. She repeated much of what Ms. McKuin had said. She noted that she lived in Little Rock, and worked with her husband, who was an attorney in Little Rock. T. 945. She described Mr. Williams as a good conversationalist, a good walking companion, and a good listener. Id. She spoke of her father as very forward looking yet proud of his accomplishments. T. 946. She said he was intentional about staying in contact with her and her sister, calling regularly, and getting together for lunch whenever he was in town. Id. She also described the long lunch she had with her sister and father the week before he died. Id.

Ms. Sherman then talked about what she went through when she first learned that her father was missing. She said a ranger had called to say they had found her father's wallet. She then began leaving messages for Ms. McKuin in Hot Springs. T. 947. She also started calling the Hot Springs police, and the local weather service to see when it had last rained, because the wallet had been found

wet. T. 948. She described how she called all of the area hospitals, and when there was no word of his whereabouts, she got in the car with her husband and drove to Hot Springs. Id. She said that when she arrived at his condominium, there were a number of people there, including FBI agents, rangers, and friends and family. T. 949. She noted how the TV Guide in his apartment was open to June 22nd, the day of his death. Id.

Like Ms. McKuin, Ms. Sherman testified about the impact of his death on her personally. She said she was stunned, that she had had no preparation, and that it was hard to find peace about the incident due to his injuries. T. 949. She also talked about how they were nevertheless able to celebrate his life. She described the leftover feelings from his death as a "lack of order" in her life. Id. She also spoke of the burial, and how they had him cremated (even though that had not been done in their family before) due to his injuries. T. 949. She said it was a private service because her father was such a private person. T. 950.

Lawrence McCollough then testified for the government. Ms. McCollough was a director of single family housing with the U.S.D.A. Rural Development, which he noted was formerly the FHA. T. 950. He had been with U.S.D.A./FHA for twenty six years, and when he first started, Mr. Williams was his supervisor. T. 951.

Mr. McCollough, who is African-American, described in great detail how Mr. Williams assisted him personally in dealing with his adjustment to living and working in a predominantly white community, because he had grown up in a very segregated community. Id. Mr. McCollough stated that "one of the best things that ever happened to me" was to begin his career working for Mr. Williams. T. 952. Mr. McCollough explained that Mr. Williams was attuned to the racial issues he was facing, and that he helped him learn how to project himself in a manner that would avoid conflict. T. 953.

Mr. McCollough explained in detail how Mr. Williams used, and taught him to use, the coffee break as a means of interacting, blending, and getting to know his co-workers as well as people in the surrounding community. Id. He explained how coffee breaks were an important part of Mr. Williams work day, how he organized his day around them, using the relaxed atmosphere to get much accomplished. T. 956. In fact, before he met Mr. Williams, he did not drink coffee, but Mr. Williams convinced him that it was essential to do so to grow in his career. T. 955. He noted how he still drinks coffee today, and uses coffee breaks the way Mr. Williams taught him. T. 956.

Mr. McCollough also described Mr. Williams as an innovative person in his work life. Id. He repeated prior testimony regarding how Mr. Williams loved to

travel, and how he was good at photography and used it in his work. Id. Noting how he also used photography in his work as a result of Mr. Williams' example, Mr. McCollough claimed that a lot of the things he does today are a result of things he learned from Mr. Williams. Id.

Mr. McCollough testified extensively about Mr. Williams leadership at the FHA, and about his personal relationship with him. He testified that Mr. Williams' motto was always, "be first," so that whenever any bureaucratic changes came into the office from the central administration, Mr. Williams encouraged his staff not only to incorporate the changes, but to do so as quickly as possible. T. 954. Mr. McCollough described Mr. Williams' leadership as "inspirational," as he wanted to help everybody. T. 953. Mr. Williams was a greater source of inspiration to him than anyone else he has ever worked with. T. 954. He said that Mr. Williams had helped him to grow and progress and be flexible in his work environment. T. 956. He described Mr. Williams as a father figure, talking to him about his personal struggles and correcting him when he was wrong. T. 957. Mr. McCollough stated that he became a member of the Jaycees because of Mr. Williams. T. 959. He credited Mr. Williams with the fact that he carries no animosity towards others, and that he has no hang-ups when it comes to racial issues. T. 960. Mr. McCollough testified that in his twenty six years with the

USDA FHA, Mr. Williams was the best employee the agency ever had. T. 957.

### 4. This Evidence Upset the Balance

The testimony described above leaves one feeling terribly sad at the immense loss of such a wonderful and decent life as that of Sherman Williams. This overwhelming feeling was, of course, by design and effect, precisely what the prosecution intended in presenting this testimony. The trial court should have, but did not, limit or restrict this presentation, despite defense counsel's requests. Without limitation, the prosecution was left free to tell the victim's entire life story in as much detail as they chose, and that is what they did. While it is clearly understandable that the close friends and/or family members of a murder victim will feel the need to express to others the admirable qualities of the deceased and details about his or her life, it is the duty of the court to prevent the sentencing phase of a capital trial from crossing the line. As some courts have begun to recognize, overly "detailed descriptions of the good qualities of the victim" risk interjection of emotion, see Bernard v. State, 608 S.2d at 972. They risk becoming eulogies. That is precisely what occurred in this case.

In analyzing the lower court's unwillingness to draw any line on the government's victim impact presentation, it is important to note that immediately

after the prosecution rested at sentencing, when the defense sought to present their story, the court sua sponte interrupted defense questioning of the only witness they called, and inquired in the presence of the jury if so much detail as to the defendant's story was necessary. T. 1042. The court then instructed defense counsel, again in the presence of the jury, to move along in the testimony. Id. This action by the court, especially in light of no similar court action in response to clearly repetitious testimony by prosecution sentencing witnesses, sent a clear message to the jury (the verbal equivalent of a symbolic gesture of tapping on one's watch): in the court's view, the details of the victim's story, no matter how often repeated, were more important than those of the defendant, despite no repetition. In effect, the court told the jury that they were to take as much time as they wanted reflecting on the entirety of the victim's life, but when it came time to considering the defendant's story, they needed to "move along."

Neither Payne nor other longstanding Eighth Amendment principles condone such a message. With respect to the victim, Payne contemplates "a brief glimpse" into his or her life and character. With respect to the defendant, on the other hand, Lockett v. Ohio, 438 U.S. 586 (1978) and its progeny, untouched by the Court's decision in Payne, hold that any evidence a capital defendant proffers regarding his character, background, or his involvement in the offense, is relevant,

cases which Payne left unaltered, and for that reason, Mr. Paul must be granted a new sentencing proceeding.

## XI. The Admission Of Victim Impact Evidence at Guilt-Innocence Violated Fed. Rule Evid. 403 And Rendered The Guilt Determination Constitutionally Unreliable, in Violation of Appellant's Rights Under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 1. The Government Presented Unnecessary and Prejudicial Testimony at the Guilt-Innocence Phase of Trial Relating to the Victim's Personal Story

The government's use of victim impact evidence and argument also tainted the guilt-innocence phase of trial. The first words of the government's opening statement at the outset of the trial described who the victim was, his work history, and his hobbies and interests. App. 99. Evidentiary presentation during the guilt innocence phase of trial began with the testimony of the victim's daughter, Mary McKuin. As at sentencing, the government used Ms. McKuin to describe her father's work history in at FHA, and how he had made his way to the director position within the Administration prior to his retirement. T. 510. She gave a detailed description of his physical condition and attributes. T. 511. She even discussed his hobbies and interests. Id. The government elicited similar testimony from other witnesses early on during the guilt-innocence phase of trial. For example, the government asked a waiter at a local pancake shop, where Mr. Williams was a regular customer, to describe "what type of man was Mr.

Williams." She responded by talking about how he was a "very, very nice person, very considerate." T. 523. She testified that he was always clean, and that he dressed very neatly. Id. She also described his conversational style, speaking a lot at times, other times keeping more to himself. Id. Finally, the first words from the government's mouth during closing argument at the guilt-innocence phase of trial referred to the personal characteristics of the victim. "[This case] is important because it involves the murder of an individual who lived in your community; who until June 22, 1995, Sherman Williams was an 82 year old man who enjoyed hiking, fishing, and his retirement from the Farmers Home Administration." App. 142. As noted, all defense efforts prior to trial to prohibit introduction of such evidence were rebuffed by the trial court. See App. 13, 25, 68; T. Pre-Trial Hearing, June 11, 1997 at 7.

### 2. Fed. Rule Evid. 403 And The Eighth Amendment Provide The Safeguards For Excluding Evidence Which Is Substantially More Prejudicial Than Probative

Fed. Rule Evid. 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair

prejudice" in this context "speaks to .he capacity of some admittedly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). That ground is "'commonly, though not necessarily, an emotional one.'" Id. (quoting Advisory Committee's Notes on Fed. Rule Evid. 403, 28 U.S.C. App., p. 860).

The admission of evidence in the guilt phase of a trial concerning a crime victims' personal qualities and experiences, and the family's suffering and loss as a result of the crime, is of particular concern under these principles. In a mail fraud case in which the victim's were funeral directors, for example, the Third Circuit held that introduction of evidence of the victims' financial losses and other victim impact evidence violated Rule 403. U.S. v. Copple, 24 F.3d 535, 545-546 (3rd Cir.), cert. denied, 513 U.S. 989 (1994). Copple speaks eloquently to the risk that such evidence can divert the jury from considering the facts of guilt to the need to compensate victims (or their survivors):

> The [victim impact] testimony was designed to generate feelings of sympathy for the victims and outrage toward Copple for reasons not relevant to the charges Copple faced. It arguably created a significant risk that the jury would be swayed to convict Copple as a way of compensating these victims wholly without regard to evidence of Copple's guilt.

defendant's fraudulent intent); Miller-El v. State, 782 S.W.2d 892, 895 (Tex.Crim.App. 1990) ("bare fact" of victim's injury was probative of defendant's intent to kill deceased victims). Without some specific connection to one of the elements of the crime, however, victim impact evidence has no place in the guilt phase of a trial. See, e.g., Sager v. Maass, 907 F.Supp. 1412, 1420 (D.Or. 1995) ("evidence of a crime's effect on the victim is generally not admissible during the guilt phase of trial"); People v. Hobley, 159 Ill.2d 272, 315 (Ill.), cert. denied, 513 U.S. 1015 (1994) (same); Armstrong v. State, 826 P.2d 1106, 1116 (Wy. 1992) (same).

Here, there was no connection to specific issues of guilt. The fact that Sherman Williams was a retired Director of the FHA, that he was in good shape and enjoyed fishing and jogging, and that he was a clean and considerate person who dressed neatly and was a good conversationalist, had absolutely no relevance to the issue of whether Jeffery Paul was guilty of robbing and killing him.

Admittedly, there is theoretical support in the law for the view that some such evidence may be admissible. As the Tenth Circuit explained in U.S. v. Kimball, 73 F.3d 269, 272 (10th Cir. 1995), "[e]vidence ... should not be suppressed when those facts come in as res gestae -- 'as part and parcel of the proof of the offense[] charged in the indictment.'" (citations omitted); see also

U.S. v. Masters, 622 F.2d 83, 86 (4th Cir. 1980) (evidence is admissible when it provides the context for the crime, "is necessary to a 'full presentation' of the case," or is "appropriate in order 'to complete the story of the crime on trial by proving its immediate context or the res gestae'"). Further, the prosecution's right "to prove its case free from any defendant's option to stipulate the evidence away," Old Chief v. United States, 519 U.S. at 188-89, rests on a similar basis. As the Court explained in Old Chief, id. at 188, "the prosecution may fairly seek to place its evidence before the jurors, as much to tell a story of guiltiness as to support an inference of guilt, to convince the jurors that a guilty verdict would be morally reasonable as much as to point to the discrete elements of a defendant's legal fault."

However, neither res gestae nor the prosecution's right to "tell a story of guiltiness" stands above Rule 403's rule of exclusion. "The district court must still consider carefully whether the prejudicial impact of the res gestae evidence substantially outweighs its probative value...." U. S. v. Brewer, 1 F.3d 1430, 1436 (4th Cir. 1993). Accord Old Chief, 519 U.S. at 188-92; U. S. v. Rivera-Gomez, 67 F.3d 993, 996 (1st Cir. 1995); U.S. v. Petary, 857 F.2d 458, 462 (8th Cir. 1988); U.S. v. Naranjo, 710 F.2d 1465, 1468-1469 (10th Cir. 1983).

The evidence about which Mr. Paul complains is evidence "of scant or

cumulative proba.ive force, dragged in by the heels for the sake of its prejudicial effect." Naranjo, 710 F.2d at 1469 . Its primary mission was to create sympathy for the elderly victim in this case, Sherman Williams, and outrage at the person accused of his murder, Jeffery Paul.

The Supreme Court of Illinois has observed that "[e]vidence concerning the background or family of a murder victim constitutes reversible error when it appears to have been presented by the prosecution in such a way as is calculated to give the jury the impression that it is relevant and material evidence on the question of the defendant's guilt or innocence." People v. Hobley, supra, 159 Ill.2d at 315. No clearer signal could emerge of the prosecution's intent with respect to the use of this evidence at the guilt-innocence phase of Mr. Paul's trial, than the fact that the government's lead opening argument, the government's lead guilt-innocence phase witness, and the government's lead argument in closing, all focused on the personal characteristics and qualities of Sherman Williams. As the Illinois Court held such tactics improper, this Court should also so hold, especially in a capital case, where the need for "heightened reliability" is significantly greater. Woodson, supra. at 305.

## XII. The FDPA's Authorization for Government Creation Of, and Reliance Upon Non-Statutory Aggravating Factors, Constituted An Improper Delegation of Powers In Violation of Mr. Paul's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 1. Argument

Under the provisions of 18 U.S.C. 3592(c), in determining whether a sentence of death is justified under Section 3591(a)(2), the jury is authorized to consider whether any "other" aggravating factor for which notice has been given exists. Thus, while Congress enumerated some sixteen "statutory" aggravating factors as a part of the FDPA, the jury is also required to consider any additional "nonstatutory" aggravating factors which the prosecution unilaterally decides may justify a sentence of death:

> The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

18 U.S.C. §3592(c)-(e). The FDPA provides no guidance for the government's choice, creation or definition of, or reliance upon these nonstatutory aggravating factors. Using whatever creativity they wish, the prosecution is free to make up as many aggravators as they choose. The jury is required to consider such factors found to exist, and to weigh them in the balance in determining whether a person deserves to live or die. 18 U.S.C. §3593(c). In effect then, the prosecution is

allowed to define the circumstances under which a defendant can be sentenced to death. See U.S. v. Davis, 904 F.Supp. 554, 558 (E.D. La. 1995)(because FDPA is weighing statute and because statutory and nonstatutory aggravators are to be equally considered in that balancing, Congress has delegated legislative authority to prosecution).

Such a sentencing scheme is unconstitutional. It delegates to the executive branch unbridled discretion to create and rely upon nonstatutory aggravating factors in favor of death, without setting forth any intelligible principle to guide that discretion. It amounts to an improper delegation of authority to the prosecution, and, it makes meaningful appellant review of a death sentence impossible.[19]

The delegation doctrine is rooted in the principle of separation of powers that underlies our tripartite system of government. "'The integrity and maintenance of the system of government is ordained by the Constitution's

---

[19] While the U.S. Supreme Court has suggested that states may use nonstatutory aggravating factors in some situations, see Barclay v. Florida, 463 U.S. 939 (1983), Zant v. Stephens, 462 U.S. 862 (1983), it has never condoned their use in the context of the constitutionally mandated federal separation of powers. Moreover, as the Court pointed out in Davis, supra, unlike in Stephens, under the FDPA the government-defined nonstatutory aggravators are given equal status to statutory aggravators in the final weighing of aggravating and mitigating factors that comprises the ultimate selection decision. 904 F.Supp. at 558.

mandate that Congress generally cannot delegate its legislative power to another branch." Mistretta v. U. S., 488 U.S. 361, 371-72 (1989), quoting Field v. Clark, 143 U.S. 649, 692 (1892). While Congress may obtain assistance from its coordinate branches through delegations of substantial enforcement and policymaking authority, Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." Mistretta, 488 U.S. at 372 (citation omitted). In Touby v. U.S., 500 U.S. 160, 164-65 (1991), the Court undertook a thorough review of the "delegation" doctrine, developing further the "intelligible principle" facet of this doctrine. Under these principles, the authority delegated by Congress to local prosecutors to delineate "non-statutory aggravating factors" fails to meet this "intelligible principle" threshold. Congress has provided no guidance whatsoever to the Attorney General in the selection of such factors, and the government apparently has unlimited discretion pursuant to 18 U.S.C. §3592(c) to devise, define and utilize these "non-statutory aggravating factors" in support of a death sentence.

Furthermore, in a weighing statute such as the FDPA, the submission of aggravating factors to the jury clearly plays a role in defining that class of murderers who will receive the death penalty, because only information

categorized as an aggravating factor may be considered and weighed by the jury in favor of a death sentence during the sentencing determination. Davis, supra. The definition of what constitutes criminal conduct and the setting of appropriate sanctions for that conduct, however, is a quintessentially legislative determination. See Whalen v. U. S., 445 U.S. 684, 689 (1980) ("[S]pecifying the circumstances under which someone may be put to death must . . . be a function of the elected representatives of the people."); U.S. v. Harper, 729 F.2d 1216, 1225-26 (9th Cir. 1984).

The infirmities in the delegation here are evident when contrasted to the delegation of discretion to formulate sentencing guidelines held constitutional in Mistretta. There, the Court emphasized that Congress had clearly delineated the goals to be achieved, the policy behind the goals, and the boundaries of the authority delegated. For example, Congress specified mandatory ratios among sentences for related crimes, listed specific guidelines the commission was to consider in categorizing offenses, and directed the commission to use current average sentences as a starting point for its discussions. 488 U.S. at 374-77. Here, however, except by negative inference (see Claim IX), Congress has provided no guidance whatsoever to prosecutors in their selection of potential aggravating factors. The government is free to highlight any aspects of the crime

or defendant or victim that it believes will increase the likelihood that the jury will impose death.

In this case, for example, as argued elsewhere in this brief, see Claim IX, the prosecution introduced and relied upon evidence of alleged unadjudicated "bad acts" of the defendant in support of two separate aggravating factors, and in doing so arguably circumvented the careful limitations Congress placed upon the jury's consideration of prior crimes. See 18 U.S.C. §3592(c). Additionally, the government relied in toto at the sentencing phase upon its lengthy presentation of detailed information about the victim, his life history, his work career from beginning to end, and his family. Then, in creating nonstatutory aggravating factors for this body of evidence, the government was allowed to devise two separate aggravating factors, each with six and four separate sub-parts respectively, containing a compendium of detailed information about the victim, his life, and his family and their tragic struggle with his death. App. 88-89. In essence, then, because the statute failed to proscribe it, and because the trial court refused to disallow it, the government was allowed to devise ten separate aggravating reasons in support of a death sentence, which the jury was required to consider, from this so-called "victim impact" evidence. See Claim X. Surely Congress did not intend for this result. Yet this was the result of the unlawful

delegation of its authority.

In Davis, supra, the lower court rejected a similar claim, but held that only those nonstatutory aggravating factors which were "consistent with the type and severity of the statutory factors" should be allowed, in order to conclude that Congress' delegation of legislative authority was circumscribed by an "intelligible principle." 904 F.Supp. at 558; see also U.S. v. Davis, 912 F.Supp. at 943 ("[t]o carefully define the statutory aggravating factors, but then allow wholesale introduction of nonstatutory aggravating information, would defeat the goal of guided and measurable jury discretion...."). In Davis, the lower court carefully scrutinized each of the challenged nonstatutory aggravators, and held some completely invalid, while with others the court ruled inadmissible much of the evidence upon which the government sought to rely in support of the proposed factor. 912 F.Supp. at 944-47. Here, no such limiting principles or scrutiny was applied.

The unbridled use of nonstatutory aggravating factors permitted the kind of arbitrary and capricious determination about who should live or die forbidden by the Eighth Amendment. Under such a framework, juries presented with different lists of aggravating factors will make different decisions about which crimes or

defendants warrant death,[20] undermining one of the central teachings of Furman – that death penalty statutes, to be constitutional, must focus jury discretion in a consistent and rational manner. 408 U.S. at 256 (Douglas, J., concurring), 309-10 (Stewart, J., concurring), 313-14 (White, J., concurring).

To be sure, the Supreme Court has indicated that states are free to experiment with a variety of capital sentencing schemes, so long as they do not violate the federal constitution. Blystone v. Pennsylvania, 494 U.S. 299 (1990). The federal government, however, is constrained by additional constitutional principles inapplicable to the states, namely, Article 1, Section 1 of the United States Constitution, which provides: "[a]ll legislative Powers here granted shall be vested in a Congress of the United States." As noted above, the non-delegation arising from this constitutional provision prohibits the kind of un-checked delegation of authority found in the FDPA.

Although this is an issue of first impression for this Circuit, at least one other Circuit Court has rejected this claim. See U.S. v. Jones, 132 F.3d 232, 239-240 (5th Cir. 1998), affirmed on other grounds, 119 S.Ct. 2090, (U.S.) (June 21,

[20] Although proportionality review is not required in all capital sentencing schemes, Pulley v. Harris, 465 U.S. 37, 50-51 (1984), the increased likelihood of arbitrary and inconsistent results created by the FDPA's provision for nonstatutory aggravating factors may constitutionally mandate such review.

1999). Appellant respectfu.ly submits that the panel in Jones was in error on this point. Jones indicates that "[t]he authority to define nonstatutory aggravating factors falls squarely within the executive's broad prosecutorial discretion, much like the power to decide whether to prosecute an individual for a particular crime." Appellant submits that there is a distinct and important difference between the government's ability to decide whom shall be prosecuted for the death penalty (prosecutorial discretion), and the ability to designate what factors shall constitute a death penalty offense (a legislative function). As the Court held in Whalen, supra at 689, the definition of what constitutes criminal conduct, and the setting of appropriate sanctions for that conduct, is a legislative function. Because only aggravating factors can justify a death sentence under §3592(c) and §3593(c)-(e), the power to identify such factors is necessarily a legislative power. The executive's authority to define non-statutory aggravating factors is therefore a delegated legislative power. See U. S. v. Pretlow, 779 F. Supp. 758, 766-67 (D.N.J. 1991).

Here the government asked the jury to sentence Mr. Paul to death in reliance upon multiple non-statutory aggravating factors which they devised. Because the executive branch received no valid delegation of the power to identify such factors, the sentence imposed on cannot stand.

## XIII. The Prosecutor's Closing Argument at Both Phases of Trial Mis-Stated the Law on Reasonable Doubt, Commented Upon Appellant's Exercise of His Right to Remain Silent, Diminished the Jury's Sense of Responsibility for Their Sentencing Verdict, and Mis-Stated the Law With Respect to the Jury's Duty to Consider Mitigating Evidence, in Violation of Appellant's Rights Under the FDPA and Under the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 1. Argument

The prosecutor committed several errors during his closing arguments at both phases of trial, which resulted in a violation of Appellant's constitutional rights. First, during the guilt-innocence phase rebuttal closing argument, the prosecutor told the jury that a finding of reasonable doubt did not require the elimination of a hesitation to convict. App. 172. The prosecutor erroneously defined "beyond a reasonable doubt" by describing a hypothetical shopping situation directed at the jurors, where the juror has "a little bit of hesitation. But you go ahead and make that decision and you know it's the right decision after you've done it and you feel good about it – Then you've covered reasonable doubt in that respect." Id. As with many of the government's instances of misconduct in this case, the prosecutor relied upon mis-statements of the law during voir dire to set the stage for this error during closing argument. T. 194 (giving venire

similarly erroneous, and overly lenient definition of reasonable doubt).

Condemnation of any attempt to define "reasonable doubt" is almost universal, "because often the definition engenders more confusion than does the term itself." U. S. v. Martin-Trigona, 684 F.2d 485, 493 (7th Cir. 1982); see also Monk v. Zelez, 901 F.2d 885, 889-890 (10th Cir. 1990); U. S. v. Moss, 756 F.2d 329, 333 (4th Cir. 1985); U. S. v. Indorato, 628 F.2d 711, 720-721 (1st Cir.), cert. denied, 449 U.S. 1016 (1980); U. S. v. Byrd, 352 F.2d 570, 575 (2nd Cir. 1965). Here, contrary to the trial court's instruction and the law, the prosecutor erroneously informed the jury that it was proper and lawful to find Mr. Paul guilty, even if there was some hesitation to do so. This is clearly erroneous under applicable law. See Cage v. Louisiana, 498 U.S. 39, 41 (1990)(reasonable doubt instruction requiring "substantial doubt" or finding of guilt only to "moral certainty" violates Due Process Clause). It also was contrary to the trial court's instruction to the jury regarding reasonable doubt. App. 127-28 ("reasonable doubt is the kind of doubt that would make a reasonable person hesitate to act."). As such, the prosecutor's mis-statements of the law violated Appellant's rights to fundamental fairness and due process. See Darden v. Wainwright, 477 U.S. 168, 181 (1986); U.S. v. Netz, 758 F.2d 1308, 1311 (8th Cir. 1985)(per curiam) (prosecutorial argument on reasonable doubt erroneous, but corrected by curative

instruc.ions).

Second, during the sentencing phase closing argument, in support of the government's "lack of remorse" non-statutory aggravator, the prosecution relied upon evidence indicating that Mr. Paul had allegedly stated that he did not feel bad about what had happened during the offense. App. 206. First, the prosecution mis-characterized this evidence. In fact, the government's evidence indicated that Mr. Paul had allegedly stated that he had not felt "anything" about the incident, and was very concerned about that fact. T. 736. In this same testimony, the witness stated that while Mr. Paul was describing this dream, he was upset and "freaked out." T. 742. In fact, the government's evidence regarding Mr. Paul's feelings after the crime are more accurately described as concerned and upset than as lacking in remorse. <u>See</u> <u>e.g.</u>, T. 689 (Paul was "upset" about incident when he first spoke with Kris Rogers); T. 705-707, 714 (immediately after incident, Ingle called Chris LaPaglia to say Paul was "upset and needed to see her"; later that evening, Paul called her and said he was "upset").

Regardless of how the evidence is characterized, the prosecution's closing argument transformed Mr. Paul's alleged past expressions into a present time state of mind: "the defendant has stated <u>he doesn't feel bad about the murder</u>." App. 206 (emphasis added). The present tense comments upon Appellant's current

mental state as he sat before the jury in the courtroom: "he doesn't feel bad." Mr. Paul had not testified at either phase of trial. By referencing Mr. Paul's current emotional state, the government effectively commented upon the fact that Mr. Paul had not shared with the jury anything at all about the crime, because he had not testified. This comment thus violated Appellant's constitutional rights. See Griffin v. California, 380 U.S. 609, 614 (1965) (condemning such attempts to penalize defendant's for "exercising a constitutional privilege"); Donnelly v. DeChristoforo, 416 U.S. at 643 ("[w]hen specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them."). This Court has ruled that even indirect comments on a defendant's failure to testify may be reversible error. See Sidebottom v. Delo, 46 F.3d 744, 759 (8th Cir.), cert. denied 516 U.S. 849 (1995) ("[i]ndirect references to a defendant's failure to testify are also prohibited if they either '(1) manifest the prosecutor's intention to call attention to the defendant's failure to testify, or (2) are such that the jury would naturally have understood them as a comment on defendant's failure to testify.'" (citations omitted).[21]

---

[21] As noted elsewhere in this Brief, see Claim VII, at least one lower federal court has disallowed altogether a "lack of remorse" nonstatutory aggravator under the FDPA precisely because it "encroaches dangerously on an offender's constitutional right" to remain silent. U.S. v. Davis, 912 F.Supp. at 945.

Third, in the sentencing phase closing argument, the prosecutor urged the jury not to follow the law, by encouraging them to refuse to consider what was clearly mitigating evidence in the case. In the guise of "reminding" the jury of assurances they had made during voir dire, the prosecutor told the jury not to consider the fact that Mr. Paul was young, being eighteen years old at the time of the offense, and that his co-defendant had received a life sentence for the same offense. App. 211. This argument mis-stated the facts from voir dire. With respect to the co-defendant's life sentence, the government had indeed attempted to secure a promise from the jury during general voir dire not to consider the co-defendant's sentence in mitigation of punishment, and the defense objected. The trial court then re-phrased the government's question to correct the record, without ever ruling upon the defense objection. T. 232-34. With respect to the youth factor, the government had sought an assurance from the entire venire that Mr. Paul's youth would not "make a difference" in their sentencing deliberations. T. 285. In this latter incident there was neither a defense objection, nor did the trial court sua sponte correct the mis-statement of law as it had done previously.

As discussed thoroughly throughout this brief, the prosecutor's attempt to persuade Mr. Paul's capital sentencing jury to refuse even to consider recognized, constitutionally protected mitigating evidence such as youth and co-defendant

with regard to the life/death decision violated Mr. Paul's rights under Caldwell.

Indeed, this Court has interpreted Caldwell to hold that "diminution of the jury's sense of responsibility undermines the Eighth Amendment's heightened need for 'the responsible and reliable exercise of sentencing discretion in capital cases.'" Antwine v. Delo, 54 F.3d 1357, 1363 (8th Cir.1995) 516 U.S. 1067 (1996), quoting Caldwell at 329; see also Shurn v. Delo, 177 F.3d 662 1999 WL 288371 at *5 (8th Cir. May 10, 1999). As this Court held in Driscoll v. Delo, 71 F.3d 701 (8th Cir. 1995), cert. denied 519 U.S. 910 (1996) (the analysis here should be "controlled by Caldwell v. Mississippi, in which the Supreme Court held it constitutionally impermissible to rest a death sentence on a determination made by a jury that has been led to believe that the responsibility for determining the appropriateness of the death sentence rests elsewhere." Id. at 712 (citations omitted). Caldwell "condemns state-induced comments that 'mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" Gilmore v. Armontrout, 861 F.2d 1061, 1066 (8th Cir.), cert. denied 490 U.S. 1114 (1989) (citations omitted).

In Antwine, this Court applied Caldwell to a different prosecutorial argument than the one found in Caldwell. There, the prosecutor had argued that

## XIV. The Government's Reliance Upon Inconsistent Theories Between The Trial of Jeffery Paul and His Co-Defendant Violated Mr. Paul's Right To A Fundamentally Fair Trial and To Due Process, As Guaranteed Under the Fifth, Sixth, Eighth and Fourteenth Amendments.

### 1. Argument

The government pursued inconsistent theories of the facts at the co-defendant's trials, claiming in each that the defendant on trial had shot the victim, Sherman Williams. At the trial of co-defendant Trinity Ingle, the government argued to the jury that Mr. Ingle shot the victim in the head: "Trinity Ingle put the barrel of a .38 behind Mr. Williams' left ear and he pulled the trigger." App. at 256. The government also argued repeatedly throughout Mr. Ingle's trial that the evidence indicated Ingle had in fact hit the victim and shot him in the head. App. 269, 452, 461-62.

Less than three weeks thereafter, at Mr. Paul's trial, the government urged the jury to find otherwise: "And ladies and gentlemen, when you go back into that jury room and you fit all the pieces together, what you're going to find in this case is that the defendant, Jeff Paul, was standing there right over Mr. Williams, bound, gagged, hands tied behind his back and unable to protect himself, and then he pulled the trigger." App. 174. As in the Ingle trial, the government also argued

that Mr. Paul's statements indicated that he had in fact both kicked and shot Mr. Williams in the head. App. 143, 150-164, 168.

"The state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for truth." Drake v. Kemp, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring), cert. denied 478 U.S. 1020 (1986). As one federal judge has observed, "[Ingle] and [Paul] cannot both be guilty of firing the same bullet because physics will not permit it." Nichols v. Collins, 802 F.Supp. 66, 74 (S.D.Tex. 1992), aff'd in part and rev'd in part, 69 F.3d 1255 (5th Cir. 1993), cert denied Nichols v. Johnson, 518 U.S. 1022 (1996). Yet this is precisely what the government argued in these two cases. This Court should condemn the prosecution's actions as a clear violation of fundamental fairness, and grant Mr. Paul a new trial.

Other Circuits have considered the question whether, in a capital case, the prosecution's reliance upon inconsistent theories between two co-defendants' trials violates due process. In Thompson v. Calderon, 120 F.3d 1045, 1058 (9th Cir. 1997) (en banc), rev'd on other grounds, 523 U.S. 538 (1998), the Court held: "[I]t is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer

inconsistent theories and facts regarding the same crime." The Second Circuit has held that when a prosecutor's relies upon an inconsistent theory between criminal trials, the defense is permitted to present evidence of the inconsistency. U. S. v. Salerno, 937 F.2d 797, 811 (2nd Cir.1991), rev'd on other grounds, 505 U.S. 317 (1992).

Lower federal courts have reached similar conclusions. For example, in Nichols, supra, the court held: "This Court determines that the due process boundary upon prosecutorial conduct and the appearance of basic fairness derived from that boundary command a determination that in a criminal prosecution, the State is constitutionally estopped from obtaining a fact finding in one trial and seeking and obtaining an inconsistent fact finding in another trial." 802 F.Supp. at 74.

Finally, although the Supreme Court has not ruled on this precise issue, it has held in a related context that while the government may proceed in a single prosecution on inconsistent theories, the Double Jeopardy Clause's prohibition against successive prosecutions prevents the government from retrying a defendant on a theory inconsistent with an earlier judgment of conviction or acquittal. See Dowling v. United States, 493 U.S. 342, 347- 49 (1990). For all of these reasons, this Court should reverse Mr. Paul's conviction, obtained as it was

based at least in part on a theory completely at odds with that pursued in the co-defendant's trial, and grant him a new trial.

**XV. The Trial Court Committed Error In Numerous Respects Throughout Voir Dire, Beginning With the Refusal to Allow Individual Sequestered Voir Dire, Continuing Through The Manner In Which the Court Handled Voir Dire and The Court's Rulings On Challenges For Cause, In Violation of Appellant's Rights Under the Fifth, Sixth, Eighth and Fourteenth Amendments.**

**1. Voir Dire In A Capital Case Is Governed By Clear Legal Standards Which Were Violated In This Case**

Voir dire plays a critical role in protecting a criminal defendant's Sixth Amendment right to an impartial jury. Rosales-Lopez v. U.S., 451 U.S. 182, 188 (1981); see Morford v. U. S., 339 U.S. 258 (1950); U.S. v. Bear Runner, 502 F.2d 908, 911 (8th Cir. 1974). "Without an adequate voir dire the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Rosales-Lopez, 451 U.S. at 188. Thus voir dire must include "questions that permit the intelligent exercise of challenges by counsel." U.S. v. Blount, 479 F.2d 650, 651 (6th Cir. 1973); see Patton v. Yount, 467 U.S. 1025, 1034-35 & n. 10 (1984). While trial courts exercise wide discretion over voir dire, this discretion is "subject to the essential demands of fairness," and "[a]t a minimum, when requested by counsel, inquiry must be made into matters where the likelihood of

prejudice is so great that not to inquire would risk failure in assembling an impartial jury." Aldridge v. U.S., 283 U.S. 308, 310 (1931). This is especially true in a capital case.

In the modern era, the process of probing jurors' punishment views, particularly about the death penalty, is unfamiliar terrain to federal courts. Yet experience from the trial of capital cases in state courts teaches that extracting reliable information on these sensitive issues is critical to choosing an impartial jury. "Given the important, delicate and complex nature of the death qualification process, there can be no substitute for thorough and searching inquiry . . . ." State v. Williams, 113 N.J. 393, 413 (1988) (emphasis added).

Capital cases present particularly difficult challenges for trial courts and attorneys, given the complex body of law governing for-cause challenges based on prospective jurors attitudes about the death penalty. Jurors who are "substantially impaired" by virtue of anti-capital punishment views must be identified and, if necessary, struck for cause, Wainwright v. Witt, 469 U.S. 412, 423-25 (1985). Similarly, jurors who are "substantially impaired" by virtue of pro-capital punishment views must likewise be identified, and removed if necessary. Morgan v. Illinois, 504 U.S. 719, 729 (1992). These latter jurors must be excused for cause if their views impair their ability to fully consider lawful mitigating

evidence. "Presumably, under today's decision a juror who thinks a 'bad childhood' is never mitigating must also be excluded." Morgan, id. (Scalia, J., dissenting). Accord State v. Williams, supra.

Adding to the complexities of capital voir dire is the well established fact that, with many jurors, initial responses to death-qualifying questions cannot be taken at face value. See Gray v. Mississippi, 481 U.S. 648, 662-663 (1987) ("[D]espite their initial responses, the venire members might have clarified their positions upon further questioning and revealed that their concerns about the death penalty were weaker or stronger than they originally stated. It might have become clear that they could set aside their scruples and serve as jurors or that they could not."); accord, Witt, 469 U.S. at 425. Indeed, in this case numerous members of the venire responded initially one way to a question on a written inquiry regarding their views on capital punishment, and then responded quite differently during voir dire. See e.g., T. 301.

Finally, over and above the need for specific and detailed questioning arising from capital punishment jurisprudence, all defendants have a right to intelligently exercise peremptory challenges based on inquiries into potential areas of bias, including the depth of prospective jurors' feelings regarding capital punishment, knowledge of the case and exposure to local press regarding the case.

Peremptory challenges remain one of the most important rights of the accused. Swain v. Alabama, 380 U.S. 202 (1965). Voir dire is the only means by which a defendant may gain the information necessary to do so. Rosales-Lopez, 451 U.S. at 188; see also Ham v. South Carolina, 409 U.S. 524 (1973).

### 2. The Voir Dire Process Overall Was Inadequate to Ensure A Fair and Reliable Determination of Juror Bias Or Whether Jurors Should Have Been Excused For Cause.

In the present case, the trial judge made it clear from the outset that he did not intend to spend much time in the voir dire stage of the trial. In the final pre-trial hearing before the opening day of trial, the defense sought individual sequestered voir dire, T. Pre-Trial Hearing, June 11, 1997, at 50-51, 55, and the court rejected it out of concern for "time and expense." Id. During that same hearing, the trial judge informed the attorneys that he planned for all of voir dire to be completed in one day. Id. at 68. The judge's expectations were surely colored by the fact that, as noted above, federal courts in the modern era are relatively unaccustomed to conducting voir dire in a death penalty case. Throughout jury selection the trial judge voiced his frustration with how long the process was taking. See e.g., T. 314. This is so despite the fact that, though unable to reach his initial goal, the trial judge did manage to complete all of voir dire in Mr. Paul's

capital case by noon on the second day of trial. T. 432. The judge even informed the entire venire that his decision not to allow individual sequestered voir dire was based on his desire to save time. T. 56.

Concerned as the lower court was with saving time, the truncated process utilized during voir dire was wholly inadequate to ensure veracity and reliability in the selection of Mr. Paul's jury. The trial court ordered the parties to submit a joint questionnaire, which they did. The court then modified the questionnaire, shortening it substantially. Most of the areas covered during voir dire were raised before the entire venire of over 100 persons. They were generally questioned about every subject allowed by the trial court, including exposure to pre-trial publicity, T. 113-127, knowledge of witnesses or parties, T. 129-132, views on capital punishment, T. 53-55, victimization by past crimes, T. 178-88, and all other areas of bias. In most cases, jurors were allowed to respond to questions in the presence of the entire venire, creating separate issues of jury contamination.

For example, many of the jurors were aware of the facts of the case from the local media, or from general knowledge in the community, and made reference to these facts in front of the entire venire. T. 113-127. Some jurors who had been victimized by prior crimes were allowed to discuss the facts in the presence of the venire. T. 178-88. Some of these incidents included crimes of violence, such as

murders (of family members), robberies and burglaries. Id. When the government questioned the entire venire about the concept of reasonable doubt, one juror began to discuss her own personal view of the matter (contrary to the law) before the trial court could stop her from contaminating the jury. T. 196-97. Many jurors were friends or acquaintances of witnesses, the parties, or the attorneys involved in the case. T. 132-56. Here too, the jurors were allowed to speak about their relationships while the entire venire was listening. See e.g., T. 145; 149. Indeed, one member of the venire even expressed his particular respect for a government witness, vouching for his integrity and credibility, and the entire venire was allowed to hear this colloquy. T. 146. As a result of this open voir dire process, prospective jurors learned what the court wanted to hear from them by listening to each other's answers. The trial court even made reference to that fact. T. 150.

With regard to the issue of death qualification, only when jurors requested to speak with the court and the parties in private, or when the court felt the need to do so based on a juror's initial response, were jurors removed from the general venire and questioned individually in chambers.[22] As a result, the record reflects

---

[22] Even here the record reflects confusion about whether all jurors with pro-death penalty attitudes who raised their hands in general voir dire were in fact questioned individually. Compare T. 55 (bailiff indicating four persons responding to Morgan inquiry) with T. 100-102 (only two such jurors questioned individually).

that the defense (and the court and government) never heard a word from any of the jurors who actually served as to their views on the death penalty. Compare T. 447-48 (list of jurors actually picked) with T. 57-112, 317-447 (jurors individually questioned). These actual jurors never opened their mouths on the subject.

Yet there was ample evidence before the trial court that the chosen general voir dire process was failing to encourage open and direct juror responses. Several jurors told the judge that it was asking too much of them to respond to such sensitive kinds of questions before an audience of over 100 people. See e.g., T. 245, 260, 275 ("I didn't want to talk about this in front of everybody"; "I avoided speaking up because I didn't think I would have to speak in front of all these people."). Defense counsel expressed concerns to the court about the incongruity between jurors' answers on the questionnaire and their responses in open court. T. 301. In the face of mounting evidence that it was a mistake to have denied individual voir dire in the case, rather than acknowledge that his choice of voir dire procedures was inappropriate (at least with respect to the issues surrounding death qualification and juror knowledge of facts and witnesses), the trial court continued with general voir dire, and allowed only those jurors who self-selected to speak privately, or whom defense counsel could identify as problematic from the questionnaire responses, to be individually voir dired in

chambers.

The in-chambers voir dire of selected jurors served to confirm that the trial court's chosen process was not working. Jurors who stated their views in one way on the questionnaire changed them, sometimes dramatically, during the discussions that ensued in private. See T. T. 102, 318-319, 336, 340, 344, 349, 353-55, 384, 391, 398; 410, 416-17, 419-21, 422, 426. Other prospective jurors who failed to respond in the general voir dire later indicated that they had in fact learned about the case from local media attention. See e.g. T. 416, 425. Irrespective of the trial court's rulings with respect to challenges for cause on individual jurors, the information learned during the brief individualized voir dire which was allowed should have been sufficient to convince the court that the only fair approach was to grant the defense motion for individual sequestered voir dire. Failing to have done so, it cannot be fairly said that the jury selection process in this case provided the level of accuracy and reliability needed to guarantee to Mr. Paul his right to a fair and impartial jury.

The lower court's voir dire procedure likewise thus impaired the defense's informed exercise of the right to peremptory challenge. See U. S. v. Harris, 542 F.2d 1283, 1294 (7th Cir.), cert. denied, 430 U.S. 934 (1976) ("the defendants must be permitted sufficient inquiry into the backgrounds and attitudes of prospective

jurors to enable them to exercise intelligently their peremptory challenges"); U.S. v. Ledee, 549 F.2d 990, 993 (5th Cir.), cert. denied, 434 U.S. 902 (1977) ("peremptory challenges are worthless if trial counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes."); see also In Re Hitchings, 6 Cal. 4th 97, 860 P.2d 466 (1993) ("The denial of the right to reasonably exercise a peremptory challenge is . . . the deprivation of an absolute and substantial right historically designed as one of the chief safeguards of a defendant against an unlawful conviction.").

**3. For-Cause Challenges of Individual Members of the Venire Were Erroneously Resolved**

The trial court also erroneously ruled on several for-cause challenges that were made. Three jurors should have been excused because their views in support of the death penalty were sufficiently strong that they were "substantially impaired" in their ability to consider a life sentence in Mr. Paul's case, Morgan v. Illinois, 504 U.S. 719, 729 (1992). See T. 353 (Juror Stevens); 397 (Juror Roberson); 410 (Juror Rogers). Two other jurors should not have been excused for cause because they indicated that, although difficult, they could set aside their views against capital punishment and follow the law, Witt, supra. See T. 66-86

(Jurors Poole and Kreiger); 102 (Juror Mills).[23]

For all of these reasons, the jury selection process denied Mr. Paul his constitutional rights to a fair and reliable voir dire and to an impartial jury on both the issue of his guilt or innocence and the issue of what punishment he deserved.

---

[23] Confirming that the general voir dire itself was a wholly inadequate means of obtaining accurate information about prospective jurors' death penalty attitudes, Juror Mills had responded affirmatively in the presence of the entire venire to the Morgan question, namely whether she was so pro-death penalty that she could not consider the alternatives. T. 55. However, after individual questioning, she was actually excluded as a Witt juror, because she testified she was against capital punishment.

## XVI. Appellant's Death Sentence Resulted From The Influence of Passion And Arbitrariness, in Violation of His Rights Under The FDPA And Under The Fifth, Sixth, Eighth And Fourteenth Amendments.

This Court is required to determine whether Appellant's sentence of death resulted from the influence of passion, prejudice or arbitrariness, 18 U.S.C. §3595(c)(1), and if it so finds, it must remand the case for reconsideration or for imposition of sentence other than death. See also 28 U.S.C. §2106. The errors presented in this Brief, considered singly or as cumulative error, see e.g. Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992), cert. denied 506 U.S. 951 (1993)[24] reflect clear arbitrariness. Applied here, section 3595 requires that this Court remand the case and order that a life sentence be imposed.

The sentencing phase of Appellant's trial was so replete with error as noted throughout this Brief (and incorporated into this claim by reference) that it can only be fairly said that his death sentence was the result of arbitrariness. Of obvious import in this regard is the looming fact that his co-defendant, for whom the evidence in both trials established that he was more culpable than Mr. Paul,

---

[24] This Circuit has decline to adopt cumulative error analysis in the context of cases brought under 28 U.S.C. §2254. See e.g. Scott v. Jones, 915 F.2d 1188, 1191 (8th Cir.1990), cert. denied, 499 U.S. 978 (1991). However, in a federal capital direct appeal brought under the FDPA, Appellant asserts that the Court is required to do so as a part of its duty under §3595(c)(1).

received a life sentence. Moreover, Appellant's jury refused to consider that fact, as well as his 18 year old youthfulness, in determining his sentence. Of additional importance here are the numerous clear errors committed by the trial court and the government in the implementation of the FDPA and the use of aggravating factors in Appellant's case. While some of these errors may by subjected to harmless error or re-weighing, see Stringer supra, Appellant urges the Court to utilize section 3595(c)(1) to conclude that Appellant's sentencing proceeding was cobbled by so many such errors that re-weighing would be inappropriate, and that instead, either a life sentence be imposed, or at the very least the case be remanded for a new sentencing trial.

Finally, this Court's responsibility under §3595(c)(1) is not a matter of legal sufficiency and, therefore, it is not the "upstream swim" against the view of the evidence in the light most favorable to the verdict noted in U.S. v. Polk, 118 F.3d 286, 291 (5th Cir. 1997). Instead, this responsibility is a factual sufficiency question and requires a de novo review and a balancing of the evidence from both trials. Section 3595(c)(1) provides the only means by which the Court will be able to make the necessary independent judgment regarding the bases of the sentence. This factual sufficiency review requires consideration of the evidence absent the prism of the "light most favorable to the verdict," looking toward whether the

sentence is contrary to the great weight and preponderance of the evidence, and whether when so viewed, evidence of undue arbitrariness is found. It is respectfully submitted that the review of the evidence required by 18 U.S.C. §3595 is essentially a proportionality review to examine the appropriateness of Appellant's death sentence. Although not constitutionally mandated, such review is demanded by §3595 and it provides a means of preventing arbitrary or capricious death sentences. Similar appellate reviews of the factual sufficiency of the evidence supporting a death sentence are found in other jurisdictions as well, see e.g., Eldridge v. State, 940 S.W.2d 649, 652, n. 9 (Tex.Crim.App. 1996).

When so reviewed, and taking into account all of the legal errors cited throughout this Brief, there can be little doubt that this Court must conclude Appellant's death sentence reflects precisely the sort of arbitrariness which the FDPA condemns and for which the Act requires the imposition of a life sentence.

## CONCLUSION

For all the reasons set forth above, Appellant respectfully requests that this Court grant relief, remand the case for the imposition of a life sentence, or in the alternative, remand for a new trial and/or a new sentencing trial in his case.

This 29th day of July, 1999.

Respectfully submitted,

ROBERT L. MCGLASSON
Attorney at Law
1024 Clairemont Ave.
Decatur, Georgia 30030
(404) 373-9334

STEVEN D. OLIVER
Bachelor, Newell & Oliver
211 Hobson Ave.
P.O. Box 1620
Hot Springs, Arkansas 71902
(501) 321-2222

By: ______________________
Robert L. McGlasson
GA State Bar No. 492638

Attorneys for Mr. Paul

## CERTIFICATE OF COMPLIANCE

The undersigned hereby certifies that the word processing program relied upon is Corel WordPerfect version 8.0, that the typeface is a serif – "Times New Roman" – 14-point type, and the word-count or relevant section comes to a total of 39,290 words. Appellant has this day filed an accompanying Motion for Leave to File Brief in Excess of Word Limits. Diskettes containing a copy of this brief, which have been filed with this Court and served upon Appellee's counsel, have been scanned for viruses and are virus-free.

Robert L. McGlasson
Co-Counsel for Appellant

# ADDENDUM TO BRIEF OF APPELLANT

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

UNITED STATES OF AMERICA PLAINTIFF

v. Crim. No. 96-60022-001

JEFFERY WILLIAM PAUL DEFENDANT

**JUDGMENT AND ORDER OF SENTENCE**

NOW on this 25 day of June, 1997, comes on for consideration the above-captioned matter and the Court, being well and sufficiently advised, finds and orders as follows:

1. The defendant, Jeffery William Paul, represented by Lynn Williams and Steve Oliver, was found guilty on Counts One and Two by a jury after a plea of not guilty. Accordingly, the defendant is hereby adjudged guilty on both of the following counts:

> **Count One:** On or about the 22nd day of June, 1995, in the Western District of Arkansas, Hot Springs Division, the defendant, Jeffery William Paul, and another individual known to the grand jury, while aiding and abetting each other, within the confines of Hot Springs National Park, a place within the special maritime and territorial jurisdiction of the United States, pursuant to Title 18 U.S.C. § 7(3), did, with malice aforethought, kill Sherman Williams, by means of gunshot wounds, in the perpetration of a robbery, in violation of 18 U.S.C. § 1111(a) and § 2.

> **Count Two:** On or about the 22nd day of June, 1995, in the Western District of Arkansas, Hot Springs Division, the defendant, Jeffery William Paul, and another individual known to the grand jury, while aiding and abetting each other, within the confines of Hot Springs National Park, a place within the special maritime and territorial jurisdiction of the United States, pursuant to Title 18 U.S.C. § 7(3), did, knowingly carry and use a firearm, during and in relation to a crime of violence for which he may be prosecuted in a court of the United States, to-wit: a robbery in the National Park, Hot Springs, Arkansas, on



AO 72A
(Rev. 8/82)

238

or about June 22, 1995 as set forth in Count 1 of this indictment which is realleged and incorporated by reference herein, in violation of Title 18 U.S.C. § 924(c)(1) and in the course of this violation caused the death of a person through the use of a firearm, which killing is a murder as defined in Title 18 U.S.C. § 1111, in that the defendant did unlawfully kill Sherman Williams by shooting him with the firearm in the perpetration of the robbery and attempted perpetration of the robbery in violation of Title 18 U.S.C. § 924(i)(1) and Title 18 U.S.C. § 2.

2. As pronounced on this date, June 25, 1997, the defendant is sentenced as provided herein below. This sentence is imposed pursuant to Title 18, United States Code, Sections 3591 through 3597, including particularly Sections 3594 and 3596. The Court declines to impose a fine on either Count due to the defendant's inability to pay. It is ordered that the defendant shall pay to the United States a special assessment of $100.00 For Count One and $100.00 For Count Two, which sums shall be due immediately.

3. Based upon the findings of the Special Verdict Form and Determination of the jury on June 15, 1997, the Court hereby imposes upon the defendant a sentence of death on Count One and a sentence of death on Count Two.

(a) The sentence shall be executed by a United States Marshal designated by the Director of the United States Marshals Service;

(b) The sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death;

(c) The sentence shall be executed on September 8, 1997, and at a place designated by the Director of the Federal Bureau of

Prisons, which date is not sooner than 60 days from entry of the judgment of death;

(d) If the date passes by reasons of a stay of execution, then a new date shall be designated promptly by the Director of the Federal Bureau of Prisons when the stay of execution is lifted;

(e) The sentence shall be executed at a federal penal or correctional institution designated by the Director of the Federal Bureau of Prisons, by a United States Marshal, designated by the Director of the United States Marshals Service, and assisted by additional personnel, selected by the Marshal and the Warden of the designated institution, acting at the direction of the Marshal;

(f) The sentence shall be executed by intravenous injection of a lethal substance or substances in a quantity sufficient to cause death, such substances or substances to be determined by the Director of the Federal Bureau of Prisons and to be administered by qualified personnel selected by the Warden and acting at the direction of the Marshal;

(g) Unless the President of the United States interposes, the United States Marshal shall not stay execution of the sentence on the basis that the prisoner has filed a petition for executive clemency.

4. The Court directs and orders that implementation of the sentence of death shall be in accordance with the provisions of 18 U.S.C. § 3596 and that, pursuant thereto, the United States

Marshal charged with the said implementation shall supervise the same in the manner prescribed by the law of the State of Arkansas, as set forth in Ark. Code Ann. §§ 5-4-615, 5-4-617, and 16-90-502-504, and any other applicable provision of the law of the State of Arkansas governing the implementation of a sentence of death.

5. After the execution has been carried out, qualified personnel selected by the Warden of the designated institution shall conduct an examination of the body of the prisoner to determine that death has occurred and shall inform the Marshal and the Warden of his determination. Upon notification of the prisoner's death, the Marshal shall complete and sign the Return hereunder or any similar document and shall file such document with the sentencing court.

6. The remains of the prisoner shall be disposed of according to procedures established by the Director of the Federal Bureau of Prisons.

7. No officer or employee of the Department of Justice shall be required to be in attendance at or to participate in any execution if such attendance or participation is contrary to the moral or religious convictions of the officer or employee, or if the employee is a medical professional who considers such participation or attendance contrary to medical ethics. For purposes of this section, "participation" includes personal preparation of the condemned individual and the apparatus used for execution and supervision of the activities of other personnel in carrying out such activities.

8. The defendant, Jeffery William Paul, is hereby committed to the custody of the Attorney General or her authorized representative for appropriate detention pending execution of this sentence.

IT IS SO ORDERED.

JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE

U. S. DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FILED

JUN 25 1997

CHRIS R. JOHNSON, CLERK
BY: Marcia A. Fletcher
DEPUTY CLERK



This document entered on docket in compliance with Rule 32 (b) (1) and Rule 55 FRCrP.

on 6.25.97 by 

AO 72A
(Rev. 8/82)

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

UNITED STATES OF AMERICA PLAINTIFF

v. Crim. No. 96-60022-001

JEFFERY WILLIAM PAUL DEFENDANT

**RETURN**

I have executed this Judgment as follows:

______________________________________________

______________________________________________

______________________________________________

Defendant was delivered on ______________ to ______________ at ______________________________ with a certified copy of this Judgment.

______________________________
United States Marshal
Designated by Director,
United States Marshal Service

______________________________
By: Deputy Marshal

I hereby inform this Honorable Court that the sentence of death imposed herein has been executed.

DATE:________________

______________________________
United States Marshal
Designated by Director,
United States Marshal Service

# CERTIFICATE OF SERVICE

I do hereby certify that I have served a copy of the foregoing Appellant's Opening Brief and Addendum by placing a copy of same in Federal Express, 2nd Day Delivery, and addressing it to the following:

Mr. Steven N. Snyder, Esq.
Mr. Mark Webb, Esq.
Assistant U.S. Attorneys
P.O. Box 1524
Fort Smith, Arkansas 72901

This 29th day of July, 1999.

Robert L. McGlasson