IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

**JEFFREY WILLIAM PAUL** **PETITIONER**

**v. Criminal No. 6:96CR60022-001**

**UNITED STATES OF AMERICA** **RESPONDENT**

**ORDER**

Now on this 21 day of June 2004, comes on for consideration petitioner's **Motion For Leave To Conduct Discovery And Supporting Memorandum** (document #274)("Motion"), and from said Motion; the respondent's response thereto; the presentations and arguments of counsel at a hearing conducted November 21, 2003; and all other matters appearing before the Court; the Court finds and orders as follows:

1. Petitioner is under sentence of death by this Court pursuant to 18 U.S.C. § 3591, *et seq.* Petitioner's direct appeal was unsuccessful, United States v. Paul, 217 F.3d 989 (8th Cir. 2000), and the Supreme Court denied review on certiorari, Paul v. United States, 534 U.S. 829 (2001). Petitioner's petition for writ of habeas corpus pursuant to 28 U.S.C. § 2255 ("§2255 Motion") is currently pending before this Court.

By his Motion, petitioner seeks leave to conduct discovery, including requests for the production of records, documents and evidence, in connection with his investigation and presentation of constitutional claims by his §2255 Motion.

2. The respondent, United States of America, resists the Motion contending, *inter alia*, that a §2255 petitioner is only



3

1

entitled to discovery under Rule 6 of the Rules governing §2255 Proceedings "where specific allegations before the court show reason to believe that petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." **Bracy v. Gramley**, **520 U.S. 899, 908-909 (1997)**; that petitioner has shown the Court no reason to believe that, with respect to any specific request, he would be entitled to any relief if the facts were developed on that issue through discovery; and that other discovery requested by petitioner -- unrelated to any specific claim for relief -- should be denied as an improper fishing expedition not permitted by Rule 6.

3. On November 23, 2003, this Court convened a hearing for the purpose of allowing counsel to be heard on the Motion and, at that time, heard lengthy presentations by both parties. The Court then took the matter under advisement intending to rule within a reasonable time after making a full review of the matters before it.

4. Some ten (10) days after the hearing of November 23, 2003, and before the Court had time to enter any ruling on the Motion, the Court received a handwritten, undated letter from petitioner, himself, in which he:

* asked that he be declared competent to waive further appeals;

* acknowledged that he is "guilty of the crime which resulted in the death of Mr. Williams (Sherman)";



AO 72A
(Rev. 8/82)

* expressed his regret for "the pain caused by the robbing, kicking and incapacitating Mr. Williams"; and

* asked the Court to "Please consider my appeals dropped."

Petitioner had not supplied a copy of his communication with the Court to either his own counsel or to counsel for the respondent. Accordingly, by certified letter of December 4, 2003, the Court notified petitioner that it had received his letter and, by copies of that letter to him, provided copies of petitioner's letter to counsel, together with a request that they provide to the Court any comments they might have on the matter no later than December 12, 2003.

(a) By letter of December 9, 2003, petitioner's attorneys advised that they had met with petitioner on December 8, 2003, and that petitioner desired to repudiate his *pro se* letter to the Court and to continue his appeal. They enclosed with their letter a notice written by them and signed by petitioner expressing those desires. Their letter indicated that copies thereof had been sent to the attorneys for respondent.

(b) By letter of December 12, 2003, the attorneys for the respondent advised that, although they understood that attorneys for petitioner had filed a pleading in response to the Court's letter of December 4, 2003, they had not been provided with a copy of same. They asked for ten (10) days after they received it as time in which to respond to it.

(c) By letter of January 28, 2004, respondent forwarded to

the Court, with copies to petitioner's attorneys, its **Government's Response To Petitioner's Vacillation Regarding Seeking Relief Under 28 U.S.C. §2255** (document #297). In its pleading, respondent noted the standard to be used for determining whether an inmate is competent to withdraw his appeal; expressed the view that there is no proper basis to now question petitioner's competence to decide whether to waive or continue to pursue his appeal; and suggested that, should petitioner again try to withdraw his appeal in the future, a video-conference hearing might be in order so the Court could then assess petitioner's understanding of his position and options and whether he is making a rational choice among them which is knowing, intelligent and voluntary.

5. As promised during the hearing held November 23, 2003, petitioner filed his **Motion To Disqualify The Honorable Jimm Larry Hendren** (document #296) on January 28, 2004. The respondent responded to the motion on February 19, 2004, and the Court denied it by its Order of February 26, 2004. (document #299).

6. By a one page, typewritten letter dated May 13, 2004, accompanied by a one page, handwritten addendum dated May 14, 2004 -- both received by the Court on May 26, 2004 -- petitioner again corresponded with the Court. Although the text of the typewritten portion of the letter states the identities of his two attorneys, it appears the letter was written without their knowledge. No copies were shown to have been provided by petitioner to either

his counsel or to counsel for the respondent.

(a) In the type-written page of the letter, petitioner:

* correctly states that he has an appeal pending before the undersigned; identifies his case by number and style; and names the two attorneys currently representing him;

* notes that his "case is at the 2255; Habeas Corpus stage at the moment"; and

* moves the Court to consider whether the "supreme court decision on Banks vs. Dretke U.S. no. 02-8286, decided 2/24/04 . . . . applies to my appeal. In specific, the prosecutorial misconduct, actual innocense (sic) and coercion -- elements noted in the text by my attorneys."

(b) In the handwritten page of the letter, petitioner states:

> In the event that you do not consider Banks vs. Dretke applicable to my case and compelling post conviction relief via a new trial or vacated guilty verdict, I do not wish to proceed to the 8th Circuit and would ask for an execution date to be set. Please consider this a motion to expedite the ruling.

By letter to petitioner dated May 28, 2004[1], the Court acknowledged receipt of petitioner's letter dated May 13/14, 2004. By copies of its letter, the Court provided to counsel for petitioner and respondent copies of petitioner's latest letter to the Court.

[1]The Court optimistically stated in the letter that it anticipated issuing one or more orders in this case "within the next two weeks." Unfortunately, the court's schedule has not permitted it to make this ruling within that time frame.



AO 72A
(Rev. 8/82)

7. The Court has not invited, nor received, any comments from the attorneys of record concerning petitioner's latest communication to the Court. The citation noted by petitioner had already come to the Court's attention and will be considered and addressed by the Court in its rulings. Petitioner's desire to see his case move along is quite understandable and is shared by this Court. Accordingly, his statement that he wishes to drop his appeal if the Court does not read the case in question as justifying relief to him will not be taken into account by the Court at this time. If the Court should deny petitioner relief and petitioner then wishes to ask that his appeal be dropped, the Court will then give consideration to any such request.

8. A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course. **Bracy v. Gramley, 520 U.S. 899 (1997).** Although the "broad discovery provisions" of the Federal Rules of Civil Procedure do not apply in habeas proceedings the Supreme Court has said that "where specific allegations before the Court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief, it is the duty of the Court to provide the necessary facilities and procedures for an adequate inquiry." **Harris v. Nelson, 394 U.S. 286, 300 (1969).** Congress has also adopted rules governing habeas proceedings. Rule 6(a) of the Rules governing Section 2255



AO 72A
(Rev. 8/82)

cases provides, in part, that

> A party may invoke the processes of discovery available under the Federal Rules of Criminal Procedures or the Federal Rules of Civil Procedure or elsewhere in the usages and principles of law if, and to the extent that, the judge in the exercise of his discretion and for good cause shown grants leave to do so, but not otherwise.

A habeas petitioner is, therefore, required to seek leave of the Court to conduct discovery in aid of his petition and must show good cause for the same; in the absence of a showing of good cause for discovery, the motion is properly denied. **Smith v. United States, 618 F.2d 507 (8th Cir. 1980).** However, while the district court generally has discretion to grant or deny discovery requests under Rule 6, a Court's blanket denial of discovery is an abuse of discretion if discovery is "indispensable to a fair, rounded development of the material facts." **Townsend v. Sain, 372 U.S. 322 (1963); Toney v. Gammon, 79 F.3d 693 (8th Cir. 1996).** A petitioner need not show that the discovery sought would definitely lead to relief; but, rather, need only show good cause to believe that the evidence sought would lead to relevant evidence regarding his petition. However, vague and conclusory assertions are not sufficient under Rule 6 and a petitioner may not embark on a fishing expedition intended to develop claims for which there is no factual basis. **See Payne v. Bell, 89 F.Supp.2d 967,970 (W.D.Tenn. 2000); Calderon v. U.S. Dist. Ct. for N.D. Cal., 98 F.3d 1102, 1106 (9th Cir. 1996).** Finally, the Court is



AO 72A
(Rev. 8/82)

obliged to distinguish between the need for discovery on the one hand, and the need for an evidentiary hearing on the other. "Allegations that are facially sufficient to entitle petitioner to discovery under Rule 6 might not entitle a petitioner to an evidentiary hearing if discovery reveals the absence of any genuine issues of disputed facts" **<u>Blackledge v. Allison</u>, 431 U.S. 63, 80 (1977)**

9. The Court understands petitioner's discovery requests, as stated in his Motion, to be as follows:

(a) **Federal Bureau of Investigation Files**: Upon information and belief, petitioner alleges misconduct on the part of the government involving:

* making promises of and/or making available a variety of benefits to government witnesses in exchange for helpful testimony -- while denying doing so to the defense and in front of the jury;

* coercing, pressuring, threatening, coaching and making promises to witnesses (including the defendant) to provide incriminating information, whether or not accurate, to the government, and/or to testify against Mr. Paul at trial;

* knowingly proffering and relying upon false evidence, testimony and arguments -- during the death certification process initially; after the Ingle life verdict was returned; at pre-trial hearings; and during trial in the presence of the jury;

* failing to disclose exculpatory information to the defense



AO 72A
(Rev. 8/82)

that would have exonerated Mr. Paul;

* relying upon arguments to the jury based upon false information and/or false characterizations of the record; and

* relying upon race as a factor in determining whether initially to seek a death sentence against Mr. Paul, and then later refusing to de-certify the death notice after the Ingle life verdict was returned.

(b) **Access to all documents reflecting the decision to seek death initially and to refuse to de-certify the case after the Ingle Life verdict:** Petitioner seeks access to all documents, materials and other information in the possession of the government reflecting the "process" involved wherein petitioner's case was certified as a death penalty case, as well as those reflecting the "process" wherein the determination was made not to de-certify the case. As a basis for the requests, petitioner:

* points to the misconduct he has alleged on the part of the government;

* alleges that the government improperly exercised its discretion to seek death in this case and to refrain from seeking death after the close of the co-defendant's trial -- implying that he has information indicating that the local U.S. Attorney's office relied upon known false and/or inaccurate information to influence the death certification committee in Washington to certify Mr. Paul's case for death; and



AO 72A
(Rev. 8/82)

* asserts that the government improperly relied upon his race as a reason why the case should be certified as a death penalty case in the first place -- and as a reason why it was not de-certified after the Ingle trial.

(c) **Access to Court Files and Records:** Petitioner seeks discovery of all documents, files, materials and other information in the possession of the Court or its agents and assigns which have not already been made a part of the official, public record in this case and to which he has not already been given complete and full access. As a basis for these requests, petitioner:

* states that the clerk of court advised him that the trial judge, Jimm Larry Hendren, kept his own file in the case in chambers and that access to such file could only be obtained with Court permission; that production of such a file is needed "for the sake of completion of the record"; and that such a file could reflect the Court's knowledge about petitioner's behavior, mental state and actions before and during the trial proceedings which allegedly demonstrated that he should have been given a hearing on his competence to stand trial while the trial progressed and "as his mental state visibly deteriorated";

* alleges, on information and belief, that the presiding judge consulted with members of his staff and/or the U.S. Marshal's office concerning the foregoing matters and, thus, petitioner is entitled to information regarding the timing and

content of such contacts;

* that the presiding judge was biased against him, having expressed his disgruntlement with the decision to de-certify Mr. Paul's case as a death case; that there were one or more hearings or conferences between the attorneys and presiding judge which were not made a part of the record; and that the presiding judge expressed his "concerns" to other individuals in other settings; and

* that petitioner was denied his right to testify; that "there exist one or more instances in which petitioner attempted to inform the Court of this desire, and of his attorneys' refusal to allow him to testify, and yet at least some of such instances were either not reported, or if they were reported, were not transcribed and/or made a part of the official court record in this case.

(d) **Access to Jurors and Juror Questionnaires**: Petitioner seeks discovery of all juror questionnaires in this case, including any copies of such in the possession of the court; he also requests permission to interview all jurors and alternates who served on the jury at petitioner's trial. As a basis for these requests, petitioner contends:

* that he needs to determine whether there was specific juror misconduct of constitutional dimension that, by its nature, could not have been discovered and raised at trial and on motion

for new trial, and which, therefore, would provide a basis for habeas corpus relief in its own right; and

* that he needs to determine whether there was specific juror misconduct of constitutional dimension that defense counsel had a duty to discover and raise at trial or on motion for new trial and which would establish the prejudice prong of a claim of ineffective assistance of counsel raised in the accompanying §2255 motion.

(e) **Access to DOJ/U.S. Attorney's Files In both the Paul and Ingle Cases**: Petitioner seeks discovery of all documents and materials maintained by the U.S. Attorney's office and the Department of Justice and all of its branches and subsidiaries concerning the investigation and prosecution of Jeffery Paul and Trinity Ingle for the murder of Sherman Williams. As a basis for these requests, petitioner points to "a variety of claims involving prosecutorial misconduct, Brady violations, etc."

(f) **Access to Treasury Department Files and Other Government Sources of Information Concerning Payments Made In Mr. Paul's Case**: Petitioner seeks disclosure of all documents, materials, files and other information in the possession of any branch of the federal government, including, but not limited to, the Department of Justice (and all of its branches), the FBI, The Department of the Interior and the Department of the Treasury, concerning the payment of funds to individuals, companies, or entities, in



AO 72A
(Rev. 8/82)

connection with the investigation and prosecution of Mr. Paul and Trinity Ingle for the murder of Sherman Williams. The basis for these requests is petitioner's allegation that "numerous witnesses" were promised monetary and other benefits and/or actually received monetary and other benefits in exchange for their assistance and/or testimony against Mr. Paul and Mr. Ingle. It is argued that "the above information" is highly relevant to these claims.

(g) **Access to the Physical Evidence For Purposes of Examination and Testing:** Petitioner seeks access to, and the right to test, all physical evidence involved in this case including "alleged bullets and/or bullet fragments, pellets and pellet fragments, clothing from the deceased and tape from the deceased's body. In particular the tape contained palm prints and human hairs." The basis for this request is petitioner's claim of actual innocence, wherein he allegedly says he is innocent of the crime of murdering or participating in the murder of Sherman Williams. It is argued that access to the evidence would tend to show that petitioner did not participate in the murder.

(h) **Access to Documents in the Possession of the U.S. Marshal's Service:** Petitioner seeks discovery of all documents, files, materials and other information allegedly in the possession or control of the U.S. Marshal's service concerning the investigation, prosecution and trial of Jeffery Paul and Trinity



AO 72A
(Rev. 8/82)

Ingle for the murder of Sherman Williams. As a basis for this request, petitioner contends that his claims of actual innocence and alleged incompetence to stand trial would be furthered by access to the materials sought. He alleges that "the Court was sufficiently aware of his deteriorating mental condition that it should have stopped the proceedings and held a hearing to determine whether Mr. Paul was indeed incompetent to stand trial (and that) . . . the Court consulted with the U.S. Marshal's Service concerning these issues." Petitioner argues that access to the materials sought would disclose evidence to support his said claims.

(i) **Access to All Bureau of Prison Files and Records Concerning Jeffery Paul and Trinity Ingle:** Petitioner seeks discovery of all documents, files, materials and other information allegedly in the possession or control of the Bureau of Prisons concerning petitioner and his co-defendant, Trinity Ingle. As a basis for this request, petitioner contends that his claims of actual innocence and alleged incompetence to stand trial would be furthered by access to the materials sought.

(j) **Access to Any Sources of Information Concerning Unreported Conferences:** Petitioner seeks discovery of all documents, files, materials and other information and/or sources of information concerning any unreported conferences throughout the pre-trial and trial proceedings in this case, including, but



AO 72A
(Rev. 8/82)

not limited to, pre-trial hearings, bench conferences, in-chambers conferences, or any other proceedings in which the Court and/or counsel for either or both parties were involved in connection with his case or that of Trinity Ingle. As a basis for this request, petitioner states his allegation that, during the pre-trial and trial proceedings in his case, as well as in the case of Trinity Ingle, there were "a number of conferences between the Court and the parties and/or the defendant which were either not reported, or which if they were reported, were not transcribed and made a part of the official court record. Petitioner argues that the information sought relates to his claims of incompetence; actual innocence; ineffective assistance of counsel; denial of his right to testify; bias of the trial judge; and his claims of governmental "misconduct throughout all phases of the pre-trial and trial proceedings."

(k) **Access to Department of Interior Documents Concerning The Death of Sherman Williams**: Petitioner seeks discovery of all documents, files, materials and other information allegedly in the possession or control of the U.S. Department of the Interior concerning the investigation, prosecution and trial of himself and his co-defendant, Trinity Ingle for the murder of Sherman Williams. The basis for this request is petitioner's claim of actual innocence. He argues that the materials sought would disclose information concerning the time and manner of Sherman



AO 72A
(Rev. 8/82)

Williams' death which, if true, would exonerate and/or tend to exonerate petitioner.

10. In response to petitioner's allegations, respondent argues that, with certain limited exceptions, relief under §2255 may not be based on (1) an error that is not of jurisdictional or constitutional dimension; (2) a procedurally defaulted ground; (3) a claim previously raised and rejected on direct appeal; (4) a "new rule" as defined by **Teague v. Lane, 489 U.S. 288 (1989),** and its progeny; or (5) error that did not have a substantial injurious effect or influence in determining the jury's verdict. Further, says respondent, §2255 "is reserved for transgressions of constitutional rights and for a narrow range of injuries that could not have been raised on direct appeal and, if uncorrected, would result in a complete miscarriage of justice." **United States v. Apfel, 97 F.3d 1074, 1076 (8th Cir. 1996).**

As to petitioner's request for discovery, petitioner contends that a § 2255 movant is entitled to discovery under Rule 6 "where specific allegations before the court show reason to believe that petitioner may, if the facts are fully developed, be able to demonstrate that he is entitled to relief." **Bracy v. Gramley, 520 U.S. 899, 908-909 (1997).**

Respondent denies that it committed misconduct of any kind in connection with this case. However, respondent states that, after the trial and conviction, payments were made to one witness who



AO 72A
(Rev. 8/82)

testified against petitioner and to one who did not. Respondent insists that the payments were neither promised nor arranged for prior to the trial and that no witness was encouraged or coached to give false information.

Perceiving it to be his duty [pursuant to **McCleskey v. Zant, 499 U.S. 467, 489 (1991)**] to raise the issue in this, his "initial petition", lest he be later foreclosed from doing so, petitioner merely suggests that, if he had known that the witness was going to be paid and could have pointed that out to the jury in cross-examination, the jury might not have believed the testimony of that witness. However, petitioner points to no part of the testimony of the witness who testified against him, and later received a payment, which he says is false.

In **McCleskey**, the Supreme Court was addressing whether there had been an abuse of the writ of habeas corpus through inexcusable neglect. It concluded that procedural default jurisprudence, as illustrated in **Wainwright v. Sykes, 433 U.S. 72 (1977)**, and abuse-of-the-writ jurisprudence were comparable and that the standard for excusing a failure to raise a claim at the appropriate time should be the same in both contexts. In **McCleskey**, the petitioner was seeking relief because a man named Evans has been placed by authorities in jail with McCleskey for the purpose of seeking incriminating statements from him. Although Evans testified against McCleskey at trial, the latter was unaware before or



AO 72A
(Rev. 8/82)

during trial that Evans had given authorities, before trial, a 21 page document outlining incriminating statements he said McCleskey had made in his hearing. Also, after trial and initial appellate proceedings, McCleskey learned of a jailer who allegedly knew that Evans had been "planted" so as to glean incriminating information to use against petitioner at his trial. Employing the cause and prejudice standard to determine whether McCleskey had abused the writ by failing to bring these matters up in his prior petitions, the Court noted that even if

> McCleskey did not possess or could not reasonably have obtained certain evidence fails to establish cause if other known or discoverable evidence could have supported the claim in any event. "[C]ause . . . requires a showing of some external impediment *preventing* counsel from constructing or raising the claim." *Murry v. Carrier*, 477 U.S., at 492 (emphasis added). For cause to exist, the external impediment, whether it be government interference or the reasonable unavailability of the factual basis for the claim, must have prevented petitioner from rasing the claim. See *id.*, at 488 (cause if "interference by officials. . . made compliance impracticable"); *Amadeo v. Zant*, 486 U.S. 214, 222 (1988) (cause if unavailable evidence "was the reason" for default). Abuse -of-the-writ doctrine examines *petitioner's* conduct: the question is whether petitioner possessed, or by reasonable means could have obtained, a sufficient basis to allege a claim in the first petition and pursue the matter through the habeas process, see 28 U.S.C. §2254 Rule 6 (Discovery); Rule 7 (Expansion of Record); Rule 8 (Evidentiary Hearing).

**<u>Id</u>, 497,498**

The Supreme Court then applied the foregoing principles -- in the abuse-of-the-writ context -- to the issue before it in **<u>McCleskey</u>**. It concluded that the 21 page document (Evans' statement to police) unavailable to McCleskey at the time of the



AO 72A
(Rev. 8/82)

first petition does not establish that McCleskey had cause for failing to raise the claim [based on **Massiah v. United States, 377 U.S. 201 (1964)** (Sixth Amendment right to counsel violated by receipt into evidence of incriminating statements elicited in a situation created to induce defendant to make incriminating statements without the assistance of counsel)] at the outset. It noted that, based on testimony and questioning at trial, McCleskey knew that he had confessed the murder during jail-cell conversations with Evans and that Evans had told the police about those conversations. That knowledge alone, said the Supreme Court, would put McCleskey on notice to pursue the **Massiah** claim in his first federal habeas petition as he had done in the first state habeas petition. Moreover, said the Supreme Court, since the contents of the 21 page document were based entirely on conversations in which McCleskey, himself, participated, even though McCleskey had not seen the document before trial or before he filed his initial habeas petition, he knew everything in the document. Thus, he had at least constructive knowledge all along of the facts he was then claiming to have learned about only from the 21 page document.

Analyzing Paul's several claims based upon the payments made to Rogers and Davis several weeks after the trial under that same standard of cause and prejudice, the Court notes several similarities between this case and **McCleskey**.



AO 72A
(Rev. 8/82)

The Court has reviewed the testimony of the witness in question -- Kris Rogers. He stated, *inter alia*, that on the evening of June 24, 1995, petitioner had gotten together with him (Kris Rogers), Suzy Arbuckle, Crystal Davis and Shelly Cornish at the home shared by Davis and Cornish; that petitioner had asked to speak to Rogers alone and did so in the back yard; and that petitioner then told him how he and Ingle and killed an old man and obtained his car. The time of this alleged conversation, as related by Rogers, was approximately two days after the murder which occurred on June 22, 1995. There is no evidence that, as of that time, either petitioner or Ingle had come to the attention of the FBI or any other investigating authorities. Hence, it could only be shear, unfounded and unsubstantiated speculation that police authorities had promised Rogers a payment if he would engage petitioner in a conversation about the murder in question. If, in fact, no such conversation took place on June 24, 1995, as recounted by Rogers, that would have instantly been known to petitioner and his attorneys at the time of the trial when Rogers testified. Petitioner could then have called anyone of three other people (Arbuckle, Davis or Cornish) to testify that no conversation occurred. If the conversation did occur, then petitioner, himself, was a party to it and would have immediately known if Rogers' statements were false or if they had been improperly influenced by police authorities.

Petitioner essentially argues that, since he did not know at trial that Rogers was going to receive a cash payment from the FBI after trial, he could not have raised the issue at trial when Rogers testified -- or, for that matter, on his direct appeal. The argument is defeated by the reasoning of **McCleskey**. If discovery should be permitted and it be found that, as alleged, Rogers was promised money for testifying falsely -- or for testifying at all -- neither of those facts would excuse petitioner for not raising the issue at trial or on direct appeal. He offers no excuse or reason as to why he did not object at trial to Rogers' testimony about a private conversation had alone with Paul in which the latter allegedly admitted his part in a vicious killing. Common sense and simple reason teach that, had Rogers testified falsely -- by reason of having been promised payment or for whatever other reason -- Paul and his attorneys would have made strong objection at the time he was giving such damning testimony against him. As in **McCleskey**, however, there is more in this case as well.

Crystal Gail Davis, the second person receiving payment after the trial, was not called to testify at trial although it appears she was at the home on June 24, 1995, when Paul had his conversation with Rogers -- and it further appears that she is the person who alerted police after Rogers passed on to her what Paul had told him. There is no indication that she could have passed



AO 72A
(Rev. 8/82)

anything more to the police than what Rogers told her and, of course, Rogers did testify at trial. It is not suggested how any promised payment to Davis might have encouraged false information from her or how any such false information could have prejudiced Paul since she did not testify against him.

In disposing of Paul's direct appeal, the Eighth Circuit noted the following after recounting the substance of Rogers' testimony at trial:

> Rogers' testimony was corroborated by several other witnesses. Christine Lapaglia testified that Paul told her he had killed someone when he kicked him and broke his neck. Cindy Wallace testified that Paul told her he had a recurring dream about following an old man, taking his money, and beating him so severely his eye came out of the socket. Paul told Wallace the old man begged for his life, but fearing that he would talk, Paul shot him in the head. Dan Coughlin testified Paul said that he and another Arkansas man had robbed an old man for his vehicle, then shot and killed him. Paul's brother also testified that he saw Paul and Ingle driving a car which matched the description of Williams' car.

**U.S. v. Paul, 217 F.3d 989,995 (8th Cir. 2000).**

Petitioner does not suggest what portions of Rogers' testimony were false as a result of his allegedly having been promised payment for testifying falsely. He also does not suggest what portions of the corroborating testimonies of Christine Lapaglia, Cindy Wallace, Dan Coughlin and his brother, Jason Paul, were false -- nor does he suggest that any of the corroborating witnesses were promised payment for testifying falsely.

When he was finally arrested in Water Valley, Mississippi, on August 22, 1996 -- a year and two months after the murder which



AO 72A
(Rev. 8/82)

occurred on June 22, 1995 -- Paul confessed to his participation in the murder of Sherman Williams. The confession was made to Special Agent John Lavoie after Paul had been advised of his rights. After telling SA Lavoie specific details incriminating himself in the murder, Paul then terminated the interview when questions were asked concerning his father -- thus indicating that Paul had understood the previous advice concerning his rights and that he was well aware of his right not to discuss the matter.

Prior to trial, Paul moved to suppress this confession but did not make any allegation that he had been coerced, pressured, threatened, coached or given promises in exchange for making it. Instead, he then contended that the statement should be suppressed because it was involuntary and was obtained in violation of Paul's privilege against self incrimination and his right to counsel as guaranteed by the Fifth and Sixth Amendments to the Constitution of the United States. (Doc. #90, para. 2-3)

The suppression motion was referred to a U.S. Magistrate Judge who, after hearing, found the following facts and recommended their adoption by the District Court (See doc. # 163):

* that on August 22, 1996, SA Lavoie advised Paul he wanted to talk to him about the June 22, 1995, murder in Hot Springs National Park;

* that Paul then read and signed an advice of rights form which fully informed him of his rights under both the Fifth and



AO 72A
(Rev. 8/82)

Sixth Amendments;

* that Paul then asked if an attorney could be appointed to represent him and was told that one could be appointed the next day at a hearing before a Magistrate Judge;

* that Paul was told he could stop the interview until an attorney could be appointed but that he said he wanted to proceed;

* that Paul did not appear to be under the influence of drugs or alcohol during the interview and that he appeared calm, coherent and able to understand where he was and what he was doing; and

* that Paul was not threatened and that he did not ask for food or drink.

Based on these facts, the Magistrate Judge expressed the following legal conclusions and recommended their adoption by the District Court:

* that, prior to questioning of Paul, SA Lavoie gave proper warning to Paul pursuant to the requirements of **Miranda v. Arizona**, **384 U.S. 436 (1966)**, and its progeny;

* that Paul fully understood and voluntarily executed a waiver of his known rights before making the incriminating statements;

* that Paul was not threatened or intimidated;

* that no promises were made to Paul nor were other inducements extended to him in order to persuade him to waive his

rights;

* that Paul knew of his right to an attorney;

* that Paul was told that he could terminate the interview at any time; and

* that, therefore, Paul's waiver of rights was voluntarily and knowingly made and that his statements to SA Lavoie were voluntary.

In response to the Magistrate Judge's Report and Recommendation on Paul's Motion to Suppress, petitioner stated only that: "The defendant has no objections to the Magistrate's finding of facts, but does object to his conclusions of law." (See Doc. # 166)

In its Order of May 2, 1997, the district court approved the Report and Recommendation completely, finding that Paul's pleading -- wherein he failed to object to the Magistrate Judge's findings of fact while objecting to the Magistrate Judge's conclusions of law -- "offer[ed] no citation to legal authority requiring departure from the Magistrate Judge's conclusions of law." The Order implemented the recommendations and the Motion to Suppress was denied. (See Doc. # 170)

In his direct appeal to the Eighth Circuit, Paul did not mention the denial of his Motion To Suppress his confession to SA Lavoie as a ground or basis for appeal. He also didn't then mention any other alleged defect in his confession in his direct

appeal to the Eighth Circuit Court of Appeals -- although one of his present attorneys in connection with this motion for discovery (Mr. McGlasson) was on the brief for Paul (with Mr. Steven D. Oliver) to the appellate court. Although petitioner now asserts that the government is guilty of "coercing, pressuring, threatening, coaching and making promises to witnesses (including the defendant) to provide incriminating information, whether or not accurate, to the government, and/or to testify against Mr. Paul at trial . . .", he does not suggest who may have exerted such improper influences on him or when they might have done so. If it is contended that SA Lavoie exerted such improper influences in connection with the taking of Paul's confession, then petitioner obviously knew it and had known it as far back as August 22, 1996 -- some ten months before his trial commenced on June 17, 1997. Also, at least one of his trial attorneys and at least one of his attorneys on the direct appeal (as well as on this motion for discovery) also knew it as far back as the appeal to the Eighth Circuit in July of 1999. No excuse or reason is offered by petitioner as to why any difficulties with his confession were not raised at his trial or on direct appeal.

Although not as complete as the version Rogers testified to at trial (based on what Paul said to him two days after the murder), Paul's confession to SA Lavoie -- fourteen months after the date of the murder -- is essentially the same: Paul and Ingle

robbed and killed Sherman Williams on or about June 22, 1995. From the foregoing, it may be safely concluded:

* that when Paul gave his confession August 22, 1996, he knew what he had told Kris Rogers on June 24, 1995;

* that when Paul heard Rogers testify at his trial in June of 1997, he knew what he had told Rogers June 24, 1995, and what he had told SA Lavoie August 22, 1997; and

* that, therefore, nothing disclosed to Paul after his trial -- about any payment that was made to Kris Rogers after the trial -- would or could alter what Paul, himself, knew about his conversations with both Kris Rogers and SA Lavoie.

This Court has already noted that Paul has written this Court stating that he is guilty of the crime of which he was convicted; that he regrets the pain he caused; and that he wishes to discontinue his appeals. In his **Notice of Defendant's Withdrawal Of Uncounseled Expression Of His Desire to Waive His Appeal**, dated and signed by Paul on December 8, 2003, petitioner stated that the notice was written by his attorneys who were advising him to pursue his appeals from his conviction and sentence. While the attorney-prepared notice says that Paul withdraws his "request to drop my appeals"; advises the Court that he ". . . will continue to pursue my pending motion under 28 U.S.C. § 2255"; and states ". . . I repudiate the positions expressed in my recent *pro se* letter to the Court in which I asked to drop my appeal of my



AO 72A
(Rev. 8/82)

conviction and sentence." -- the said notice conspicuously <u>does not</u> specifically disavow Paul's admission of guilt or his expressions of regret.

In his latest communication to the Court, petitioner personally asked the Court (without benefit of advice from his lawyers) to consider the U.S. Supreme Court case of **<u>Banks v. Dretke</u>, ___ U.S. ____, 124 S.Ct. 1256, 157 Ed.2d 166 (February 24, 2004)**. The Court had earlier noted the case and will briefly discuss what, if any, application it might have in the case now before it.

In **<u>Banks</u>**, the Supreme Court reversed the Fifth Circuit's reversal of a district court's grant of Banks' habeas corpus petition. Banks successfully contended that the state had failed to disclose that a key witness against him was a paid informant and had knowingly allowed the witness to testify falsely that he had not talked to police before giving his testimony. The Fifth Circuit had ruled that the issue of suppression of impeachment evidence was procedurally barred since Banks failed to pursue it in state court proceedings, despite indications known to him of prosecutorial misconduct. The Supreme Court disagreed, finding that Banks' claim was not procedurally barred since (1) he had shown cause for failing to develop the claim in state court; and (2) the impeachment evidence was clearly relevant. With respect to cause, it concluded that Banks' failure to investigate the



AO 72A
(Rev. 8/82)

informant's status came about because the prosecution's repeated misrepresentations and omissions concerning that status -- and that Banks was entitled to rely upon those representations. As to prejudice, the Court concluded that the prosecutions's heavy reliance on the informant's penalty phase testimony clearly prejudiced Banks.

It must first be noted, as did the Supreme Court in its decision in **Banks**, that, under **Lindh v. Murphy, 521 U.S. 320, 336-337 (1997)**, the standards of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) did not apply to Banks' petition. Such is not the case here since the AEDPA was enacted April 24, 1996 -- several months before Paul was indicted on December 8, 1996.

According to the Supreme Court's account of the facts in **Banks**, a little more than a week after the murder, an investigator got a call from a confidential informant that Banks would be traveling to Dallas, TX to meet someone and to pick up a gun. Based upon that tip, investigators followed Banks to a residence in Dallas and eventually arrested him with a gun in his possession. They also then encountered and interviewed Charles Cook at the residence -- and recovered a second gun from Cook which he said Banks had left with him earlier. The prosecution refused to identify the informer at a preliminary hearing claiming that information was privileged. However, the prosecution assured



AO 72A
(Rev. 8/82)

the defense that it would, without necessity of motions, provide to defense counsel all discovery to which he was entitled. At the trial the informer (a Robert Farr) and Cook both testified. Cook three times represented that he had not talked to anyone about his testimony when, in fact, he'd had at least one "pretrial practice sessions" with the investigator and prosecutors wherein he was intensively coached with respect to his future testimony. Also, Farr denied that he had been promised money or anything else in exchange for his testimony and further denied that he had talked to anyone about the case until a few days before trial. These denials were false since, in fact, he was a paid informant and he believed that he would be arrested for and charged with drug offenses if he did not assist with the investigation of Banks. In support of his petition, Banks offered the affidavits of both Cook and Farr which essentially backed up his assertions that the prosecution had wrongfully withheld crucial exculpatory and impeaching evidence.

As already implied earlier, the notion that Rogers may have testified falsely because of promised payment from prosecuting authorities after the trial appears to be based on nothing but hopeful speculation. Unlike the situation in **Banks**, neither Rogers, nor any other witness has come forward to offer any support for Paul's unfounded speculation that false evidence was given against him in exchange for payment from prosecuting

authorities. Also unlike **Banks**, wherein the key information was known only to the alleged perjurers and the authorities who suborned or coached them, there were witnesses in this case who corroborated Rogers' testimony. Moreover, as already noted and quite unlike the situation in **Banks**, Paul has not -- and cannot -- show good cause as to why he or his attorneys did not raise the issue of alleged false testimony by Rogers either during trial or on direct appeal. Finally, unlike **Banks** where the unknown facts were clearly relevant and perhaps quite material, the fact (if it be fact) that Rogers had been promised payment if he testified -- while relevant -- would not give the Court reason to believe that if the jury had known of such payment arrangements, it's findings would have been different in light of all the other evidence from corroborating witnesses. The Court, therefore, finds that **Banks** is readily distinguishable on its facts and that it does not support Paul's motion for discovery in this case.

In light of what has been said, the Court does not believe Paul has made specific allegations of misconduct on the part of the government which give reason to believe that, if facts related to those allegations were fully developed, he might be able to demonstrate he is entitled to relief. See **<u>Bracy v. Gramley</u>, 520 U.S. 899, 908-909 (1997).** Accordingly, this portion of the request for discovery will be denied.

11. Petitioner also contends he should be permitted

discovery concerning alleged bias on the part of the undersigned who was the presiding district judge at his murder trial. Petitioner's separate motion to disqualify the undersigned has already been denied by the Court for reasons fully set forth in this Court's Order of February 26, 2004. For those same reasons -- and for the further reason that the Court does not believe Paul has made specific allegations of conduct on the part of the presiding judge which give reason to believe that, if facts related to those allegations were fully developed, Paul could be able to demonstrate that he is entitled to relief on the basis thereof -- the Court will deny the motion for discovery in that regard. See **Bracy v. Gramley, 520 U.S. 899, 908-909 (1997).**

Paul also requests discovery of the so-called "chambers file" of the presiding judge concerning his allegations that he repeatedly asked to testify on his own behalf but was refused; that his conduct should have prompted the presiding judge to order an evaluation of whether Paul was competent to stand trial; that members of the jury may have been biased against him; and that death certification was improperly acquired and retained. In sum, Paul seeks discovery of "any and all notes, documents or other items within the possession of (the presiding judge) concerning any unrecorded bench conferences, hearings or other proceedings in this case . . ."

In the Court's view through the lens of applicable precedent,



AO 72A
(Rev. 8/82)

Paul has not made specific allegations which give reason to believe that, if facts related to those allegations were fully developed, he could be able to demonstrate that he is entitled to relief on the basis thereof. An additional reason to deny the requested discovery is the undersigned's personal knowledge that the materials sought either do not exist or that if there are any such materials, they would be irrelevant to any legitimate issue fairly raised in these proceedings. Furthermore, any constitutional or other injury allegedly suffered by Paul -- by reason of the presiding judge's alleged bias or his alleged concealment in a "chambers file" of matters which should have been made a part of the record -- were and are matters that could have been raised on direct appeal. They were not and no good cause for failure to do so has been alleged or shown.

Finally, nothing alleged would, if uncorrected, result in a complete miscarriage of justice. See **United States v. Apfel, 97 F,3d 1074, 1076 (8th Cir. 1996)**. Accordingly, the Court will deny the motion for discovery in that regard. See **Bracy v. Gramley, 520 U.S. 899, 908-909 (1997)**.

12. Petitioner further states he should be permitted discovery on his allegation that, with the full knowledge of the presiding judge, he was deprived of his right to testify and that the presiding judge also well knew that his mental condition was deteriorating during the trial to the point that the judge should

have, on his own motion and with no prompting by Paul's two trial lawyers, ordered a further competency hearing. There is no basis for either of these bare assertions. Moreover, if there were any such basis, no reason or excuse is given to the Court as to why either Mr. Oliver (one of Paul's trial attorneys and one of his appellate attorneys) or Mr. McGlasson (one of Paul's appellate attorneys) did not raise these issues with the Court or with the Eighth Circuit Court of Appeals on direct appeal. If there were merit in either allegation, there is no contention or suggestion as to why Paul, himself, could not have complained to Mr. McGlasson who is represented to be an experienced death penalty lawyer. As it was, Mr. McGlasson and Mr. Oliver pointed to no less than sixteen (16) issues on appeal and neither denial of his right to testify nor mental incapacity to stand trial were among them. This Court knows both Mr. Oliver and Mr. Williams to be experienced trial lawyers and has no doubt that they would have made proper motions on the record had there been any issue at trial concerning Paul's alleged desire to testify and/or his alleged incapacity to continue with the trial. Seeing no possibility that discovery would disclose facts which might support an entitlement to relief on these grounds, the Court will deny the request for discovery concerning them. See **Apfel** and **Bracy**, both supra.

13. Petitioner seeks discovery concerning alleged

exculpatory information which he says the government has. Paul proffers self-serving conclusions to the effect that he did not kill the victim but, rather, his co-defendant did; that the co-defendant allegedly confessed that he, alone, is responsible for killing the victim; and that Paul attempted to prevent the killing. In light of the proof in the record, the assertions are absurd. Moreover, Paul points to nothing which would qualify as newly discovered or wrongfully withheld evidence. As noted by respondent, when a defendant who has chosen not to testify later comes forward to offer testimony exculpating a co-defendant, the evidence is not "newly discovered." **Meadows v. Delo, 99 F.3d 280, 282 (8th Cir. 1996)** *quoting* **United States v. Rogers, 982 F.2d 1241, 1245 (8th Cir. 1993).** Paul's assertions of actual innocence and his contentions that discovery would disclose exculpatory evidence are baseless and his requests for such discovery will be denied.

14. Petitioner seeks discovery on his claim that race played a part in his alleged "selective" prosecution.

The Court agrees with respondent's contention that this claim is procedurally barred since it was not raised at trial or on direct appeal and no cause is shown for such failures. Moreover, in order for assertions of selective prosecution because of race to warrant discovery or relief in the face of such a bar, a petitioner must point to new reliable evidence of his innocence in



AO 72A
(Rev. 8/82)

light of which "it is more likely than not that no reasonable juror would have convicted him." See **Sawyer v. Whitley, 505 U.S. 333, 336, 338, 350 (1992); Knox v. State of Iowa, 131 F.3d 1278, 1282 (8th Cir. 1997).** As noted previously, there is no new reliable evidence that Paul is innocent of the offense of aiding and abetting the murder of Sherman Williams. His claim of selective prosecution, even if true, does not tend to show that an "innocent" person was convicted or sentenced to death. At most, it would only tend to show that his case was improperly selected for capital prosecution from a larger class of death-eligible cases. Discovery on this contention will, therefore, be denied.

15. Petitioner seeks discovery concerning the decision-making process whereby the government determined to seek the death penalty for Paul; and whereby, after the life sentence was awarded his co-defendant, Trinity Ingle, the government determined that it would not try to withdraw the death penalty certification. In support, he insists that improper use of prosecutorial discretion and intentional discrimination against him because of his race (white) violate the due process clause of the Fifth Amendment and the prohibition against arbitrary and capricious use of the death penalty flowing from the Eighth Amendment. He also says provisions of 18 U.S.C. § 3593(f) (relating to the court's "supervisory powers over the administration of justice") were violated in this case.



AO 72A
(Rev. 8/82)

The respondent argues that these challenges to the exercise of prosecutorial discretion to seek the death sentence in this case do not provide a basis either for habeas corpus relief or for discovery because:

* they are raised for the first time on this §2255 review and Paul can neither show good cause for failure to raise them at trial or on direct appeal nor can he show prejudice;

* they do not present cognizable claims under §2255;

* to grant the relief sought would require the Court to announce and rely upon a new rule of constitutional law in contravention of **Teague v. Lane**, **489 U.S. 288 (1989)** and

* Paul's arguments fail on their merits in any event because they are defeated by controlling precedent.

The Court agrees with all of respondent's arguments. Paul knew, through his two trial lawyers, how and by whom the decision was made to first certify his case for the death penalty and then later decline to de-certify it. No good cause is shown for the failure to raise the issue at trial or on direct appeal. Both Paul and his co-defendant are of the same race and both were certified for the death penalty proceeding by the same authority. Paul's theories of race based discrimination in death penalty application -- backed up by little more than allegedly relevant statistical discrepancies and two law review articles -- were not recognized by existing precedent when his direct appeal became



AO 72A
(Rev. 8/82)

final on or about October 1, 2001, and thus are barred from consideration by **Teague**. Moreover, even if that were not the case, the theories are at odds with the teachings of **McCleskey v. Kemp, 481 U.S. 279 (1987) and United States v. Armstrong, 517 U.S. 456 (1996).** They are, therefore, rejected and Paul's request for discovery with respect to them is denied.

16. Petitioner seeks discovery concerning the jury questionnaires. It is not suggested what, if anything, could be expected to be disclosed by such discovery which would meet the requirements of **Bracey** and/or **Apfel**. On direct appeal, Paul complained of various aspects of the voir dire process in his trial, to no avail. The present request is said to be for the purpose of determining (1) "whether there was specific juror misconduct of constitutional dimension that, by its nature, could not have been discovered and raised at trial and on motion for new trial . . ." and (2) "whether there was specific juror misconduct of constitutional dimension that defense counsel had a duty to discover and raise at trial or on motion for new trial and which would establish the prejudice prong of a claim of ineffective assistance of counsel . . ." There is no suggestion that any juror who served actually committed any misconduct. To permit such discovery now would be to allow an obvious fishing expedition which does not meet the strict criteria prescribed for § 2255 discovery under Rule 6. See **Bracey v. Gramley**, supra.



AO 72A
(Rev. 8/82)

Accordingly, this request for discovery will be denied.

17. It follows from what has been said that petitioner's request for discovery will be denied in full. It also follows from what has transpired in the past, that if petitioner desires to abandon his appeals in this matter and have an execution date set, this Court will give consideration to any such request.

The Court has never invited or encouraged direct communications from Mr. Paul to the Court and does not now do so. While the Court does not forbid such direct communications, it strongly discourages them since Mr. Paul is represented by able counsel in the matter. In the Court's view, Mr. Paul's attorneys are ethically and honorably bound to convey to this Court Mr. Paul's wishes in that regard -- whether they agree with them or not -- if he chooses henceforth to make them known. The Court joins in what it hopes is also Mr. Paul's belief that his attorneys will dutifully convey any request that he might have to discontinue these habeas corpus proceedings.

**IT IS, THEREFORE, ORDERED AND ADJUDGED** that, for the reasons set forth herein, petitioner's **Motion For Leave To Conduct Discovery And Supporting Memorandum** (Doc. #274) be, and the same hereby is, **denied.**

**IT IS SO ORDERED.**

JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE

U.S. DISTRICT COURT
WESTERN DIST ARKANSAS
FILED
JUN 21 2004
CHRIS R. JOHNSON, CLERK
BY DEPUTY CLERK



AO 72A
(Rev. 8/82)