IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

U. S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED
AUG 0 5 2004
CHRIS R. JOHNSON, CLERK
BY
DEPUTY CLERK

UNITED STATES OF AMERICA, )
)
Respondent, )
)
v. ) CRIMINAL NO. 96-60022-001
)
JEFFERY WILLIAM PAUL, )
)
Petitioner. )

**MOTION TO TERMINATE SCHEDULED HEARING,
AND TO REFRAIN FROM HOLDING ANY HEARING
PENDING FACTUAL DEVELOPMENT,
AND PENDING RULING ON OTHER MOTIONS**

COMES NOW defendant, Jeffery William Paul, by counsel, and moves this Court, pursuant to the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, and pursuant to Rule 6 of the Rules Governing §2255 Proceedings, to set aside its order requiring that a video conference "hearing" be held on Friday, August 5, 2004, and to refrain from holding any hearing in this case, or from conducting any further proceedings, pending allowance by petitioner to conduct and obtain factual discovery of relevant information as set forth in this motion. Petitioner further requests that this Court enter an order granting him discovery of the information requested herein, prior to the holding of any further proceedings, especially any hearing regarding recent

3
1
2

letters sent to the Court by petitioner regarding the status of his appeals. In support of this motion, petitioner provides the following:

1. In a letter dated July 19, 2004, this Court transmitted to the parties two letters it had received from petitioner regarding the status of his ongoing appeals. The Court indicated its intention to hold a hearing in response to these letters, and ordered the parties to file a response to the letter by July 26, 2004.

2. Undersigned counsel McGlasson was out of the office at the time, attending two separate conferences and then taking four days of vacation time, and was not scheduled to be back at work until after the July 26 deadline. In addition, undersigned counsel believed that an appropriate response to the Court's letter could not be made until counsel had conferred with petitioner himself. Hence, due to the obvious scheduling problems, petitioner's counsel filed a request to extend the deadline for responding to the Court's July 19 letter.

3. This Court immediately denied that request in an order dated July 27, 2004. The Court also wrote a letter directly to petitioner, also dated July 27, 2004, responding to petitioner's recent letters to the Court, and enclosing a copy of the July 27 order. The July 27 order scheduled a video conference "hearing" for August 6, 2004.

4. The next day, in a letter dated July 28, 2004, the Court informed the

parties that it had communicated (through various unidentified personnel in chambers) in an *ex parte* manner with agents of the United States of America, a party to this litigation. According to the July 28 letter, that communication involved at least two separate conversations, one between the Court's law clerk (unidentified) and AUSA Steve Snyder, counsel for the government, and one between the Court's courtroom deputy (unidentified) and Brad Shoemaker, identified by the Court in the letter as petitioner's case manager at the U.S. Penitentiary in Terre Haute, Indiana, which is a prison within the U.S. Bureau of Prisons (contained within the Department of Justice) and is the prison in which petitioner is confined. As set forth more fully below, these conversations involved matters relating directly to the issues the Court has indicated it intends to address at the scheduled hearing on August 6, 2004.

5. Recognizing as much, in the July 28 letter the Court indicated that it "will not, in any way, consider the information conveyed to its staff by either Mr. Snyder or Mr. Shoemaker in connection with its consideration of Mr. Paul's case." Letter of July 28, 2004, at p. 2. Later the Court further emphasized both that it "has no reason to believe that either communication was intended to improperly influence the Court" and that it "emphatically states that it will not be so influenced by them in any manner." *Id.* at 3.

6. Notwithstanding the Court's confidence as to the innocent nature of these improper communications, it is hard to perceive them as anything *but* direct attempts by a party to the litigation to prejudice Mr. Paul and his case before this Court. Moreover, without further inquiry of the Court as well as the actual participants in these communications, it is also impossible to assess whether, as the Court submits, it *can or should* be able fairly to proceed as an impartial judge in this matter. This is especially true given the nature and content of petitioner's assertions in his previous Motion to Disqualify the Honorable Jimm Larry Hendren, which he renews and which he incorporates herein by express reference.

7. For example, in the conversation between Mr. Snyder and the unidentified law clerk, Mr. Snyder apparently told the clerk (who then related the information directly to the Court and another law clerk) about alleged associations between petitioner and David Hammer, another inmate on federal death row in Terre Haute, Indiana, and one who according to Mr. Snyder's communication with the law clerk, has repeatedly vacillated about whether to terminate his own ongoing appeals in his case. According to the July 28 letter, Mr. Snyder also communicated his opinion (or that of another agent of the party-U.S. government or both) that Mr. Hammer's vacillations were merely a "tactic" designed to "delay" the proceedings in his case. Implicit in these communications is the obvious view

that Mr. Paul, under Mr. Hammer's influence, is likely engaged in similar "tactics." The Court does not provide any details in its July 28 letter regarding the conversation between Mr. Shoemaker and the unidentified courtroom deputy, but merely indicates that it involved "much of the same information imparted by Mr. Snyder."

8. Again, it is difficult if not impossible to discern what purpose was to be served by either Mr. Snyder or Mr. Shoemaker talking to Court staff about David Hammer, his alleged relationship to and undue influence over Jeff Paul, his ongoing appellate machinations, and their decidedly critical opinion thereof, *other than* as an attempt negatively to influence the Court's own viewpoint regarding Mr. Paul's motives. Put another way, it strains credulity to devise a *benign* motive for such communications. This is all the more clear given that the same negative, prejudicial information (which was and is directly related to the merits of the most recent ongoing matter in dispute in the case) was being conveyed by two different agents of the party-U.S.A. in two separate conversations with two different staff-persons in the Court's chambers on the same day.[1]

---

[1] It bears noting in this context that, upon information and belief, the government posited the same opinion of David Hammer's alleged motives in the Hammer case itself, and this viewpoint was ultimately rejected by the U.S. Court of Appeals for the Third Circuit, which allowed Mr. Hammer finally to proceed in his appeals despite the repeated vacillations in the past.

9. Viewed in this light, the Court's rush to whitewash the communications as "inadvertent" chitchat devoid of any illicit purpose, itself bears closer scrutiny before petitioner can adequately assess whether the Court is capable of acting as a fair and impartial arbiter on the pending issues or on any other issues in the case. Upon considering the Court's July 28 letter, one is left wondering how and why the Court was so quick to conclude that these *ex parte* communications, though improper, were not intentionally so.

10. Before further action is taken in this case, petitioner herein asserts that further factual development is in order, indeed, necessary, regarding the improper communications.

11. As noted, the Court has scheduled the August 6 hearing expressly to address Mr. Paul's recent correspondence to the Court regarding the status of his ongoing appeals. Of clear legal significance at that hearing will be the issue of whether Mr. Paul's alleged attempt to drop his appeals is the product of a rational, knowing, voluntary, and intelligent decision making process. The fact that a party to the litigation has communicated directly with Court personnel about alleged facts of obvious relevance to that issue, in a manner that is undisputedly prejudicial to another party, itself requires further exploration before any merits-related proceedings can fairly go forward.

12. If any hearing is to be held in this case involving petitioner's recent correspondence to the Court regarding the status of his appeals, it is beyond dispute that: a) petitioner is entitled to a full and fair hearing, b) conducted by a fair and impartial arbiter who has not been affected by, nor is being affected by, outside, non-record influences or information, and c) that the parties to the hearing are being represented by attorneys/agents who themselves are bound by and are following their clear ethical obligations as well as comporting themselves in accordance with basic notions of due process and fundamental fairness. *See* 28 U.S.C. § 144; 28 U.S.C. § 455; *Liteky v. United States* , 510 U.S. 540, 548 (1994); *Henderson v. Dept. of Public Safety and Corrections* , 901 F.2d 1288, 1296 (5th Cir. 1990); *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847 (1988); *United States v. Tucker*, 78 F.3d 1313, 1324 (8th Cir., 1996);, citing *United States v. Poludniak*, 657 F.2d 948, 954 (8th Cir., 1981), *cert. denied*, 455 U.S. 940 (1982); *Berger v. United States*, 255 U.S. 22 (1921); *United States v. Townsend*, 478 F.2d 1072 (3rd Cir., 1973).

13. At present it appears highly improbable if not impossible that any of the above conditions can be met by *this* Court in an adversarial proceeding at which the U.S.A.-party is being represented by *these* attorneys, namely Steve Snyder and/or other attorneys within the Department of Justice. At the very least, before

any hearing is held, petitioner is entitled to discover further obviously relevant information about exactly what was communicated by whom to whom, and when, in what manner, and for what purpose. *See* Rule 6 of the Rules Governing 28 U.S.C. § 2255 Proceedings; *Harris v. Nelson*, 394 U.S. 286, 298 (1969); *Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977); Rules Governing Section 2254 Cases in the United States District Courts, Advisory Committee Note to Rule 6; *Bracy v. Gramley*, 520 U.S. 899, 908-909 (1997); *Willis v. Newsome*, 771 F.2d 1445 (11th Cir. 1985); *Willis v. Zant*, 720 F.2d 1212 (11th Cir. 1983); *Horton v. Zant*, 687 F. Supp. 594 (M.D. Ga., 1988); *Murphy v. Johnson*, 205 F.3d 809, 813-814 (5th Cir., 2000); *East v. Scott*, 55 F.3d 996 (5th Cir., 1995); *Rice v. Black*, 112 F.R.D. 620, 626 (D. Neb., 1986); *Rice v. Clarke*, 923 F.2d 117, 118-19 (8th Cir., 1991); *Teague v. Scott*, 60 F.3d 1167 (5th Cir., 1995); *Toney v. Gammon*, 79 F.3d 693 (8th Cir., 1996); *Payne v. Bell*, 89 F.Supp.2d 967, 971 (W.D. Tenn., 2000).

14. For example, in order to discern whether this Court can fairly conduct any hearing regarding petitioner's recent correspondence (or perhaps any further proceedings in this case), undersigned counsel should be allowed a fair opportunity to question the Court, all members of its staff, AUSA Snyder, DOJ attorney Margaret Portman Griffey, Mr. Shoemaker, and any other relevant individuals, in the presence of a fair and neutral arbiter, regarding a variety of

relevant matters, including, but not limited to:

In what context did the conversation between AUSA Steve Snyder and the unidentified law clerk occur?

Where did the conversation between AUSA Snyder and the unidentified law clerk occur?

Was anyone else present during this conversation?

How long did either the Snyder-unidentified law clerk or the Shoemaker-unidentified courtroom deputy conversation last?

What was the source (or sources) of AUSA Snyder's and Mr. Shoemaker's information?

Have either AUSA Snyder or Mr. Shoemaker conveyed any of the information provided to the unidentified law clerk and the unidentified courtroom deputy to anyone else, and if so, in what context and for what purpose?

Did either AUSA Snyder or Mr. Shoemaker make any statements during these improper communications with court personnel which reflected their alleged purpose in conveying the information?

Was DOJ attorney Margaret Portman Griffey or any member of her office involved directly or indirectly in any of these communications?

Did Ms. Griffey or any member of her office provide any information to either Mr. Snyder, Mr. Shoemaker or other BOP personnel, or the Court or its staff, regarding David Hammer, his alleged relationship with Jeff Paul, the Hammer case and/or her opinions thereof?

What role, if any, did Ms. Griffey or any member of her office play in the litigation of the David Hammer case?

On how many occasions and under what circumstances was the subject of Mr. Paul's case, including the recent letters to the Court, discussed off the record and/or in an *ex parte* manner between any member of the Court's staff, and any other party to the litigation?

Did the Court, the unidentified law clerk, and/or the unidentified courtroom deputy express any opinions or beliefs about the information conveyed?

At any time during the pendency of Jeff Paul's case before this Court, has the Court or any member of its staff had any other *ex parte* communications regarding Mr. Paul's case, with any agents of the United States of America, including not only the U.S. Attorney's office in Arkansas, and the Department of Justice in Washington, but also any personnel working within the U.S. Bureau of Prisons division of DOJ?

On what basis did the Court reach the conclusion stated in its July 28 letter

that it "has no reason to believe that either communication was intended to improperly influence the Court ... ." *Id.* at 3)

Did the Court conduct any follow-up inquiry which led to the aforementioned conclusion, and if so, who was present, and what further information was received by the Court?

Are there any documents other than the Court's July 28 letter which reflect the nature and content of the improper communications, as well as the follow-up inquiry conducted by the Court, if any?

Did either the clerk of the courtroom deputy or any other person in chambers take any notes regarding these improper communications?

Are there files or documents maintained within the Bureau of Prisons reflecting the relationships between Mr. Paul and other inmates, Mr. Hammer in particular? How, by whom and for what purpose are these files maintained?

Does the U.S. Bureau of Prisons or the Department of Justice have a written policy on employees conducting *ex parte* communications with the court? If so, what are those policies? How are they communicated to employees? Were exceptions made in the instant case? If so, by whom and for what purpose were such exceptions authorized?

Does the U.S. Bureau of Prisons or the Department of Justice have a written policy on employees communicating with inmates' attorneys, their families or anyone outside the prison about their clients' disciplinary, health or conduct records? Why were counsel for Mr. Paul not informed by the Department of Justice, AUSA or the Bureau of Prisons staff about these matters, Mr. Paul's suicide attempts in particular?

15. In addition to the above, petitioner should be entitled to access to all relevant documents and records in the possession of BOP concerning Jeffery Paul, including, but not limited to, his entire prison file, disciplinary file, medical file, and his psychological and psychiatric file.

16. This information should be developed *before* this Court (or any other Court) attempts to proceed further with hearings on *any* aspect of petitioner's case. Failure to allow such development will undoubtedly render the proceedings wholly unfair.

WHEREFORE, for the foregoing reasons, petitioner moves this Court to enter an order calling off the hearing set for August 6, 2004, authorizing petitioner and his counsel to conduct the aforementioned discovery and obtain all relevant information as set forth herein prior to the scheduling of any hearing or other further proceedings and prior to ruling on any pending motions, including motions

to disqualify the Court and/or the U.S. Attorney's office for the Western District of Arkansas and/or the Capital Case Unit of the U.S. Department of Justice.

Respectfully submitted,

ROBERT L. MCGLASSON
Georgia Bar No. 492638
Federal Defender Program, Inc.
100 Peachtree St. NW, Suite 200
Atlanta, GA 30303
(404) 688-7530

SEAN D. O'BRIEN, MO Bar #30116
305 E. 63rd Street
Kansas City, MO 64113
(816) 363-2795

Attorneys for Mr. Paul

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Motion has been served upon counsel for respondent by sending a copy of same *via* facsimile to:

Mr. Steven N. Snyder, Esq.
Assistant U.S. Attorney
P.O. Box 1524
Fort Smith, AR 72901
fax # 479-783-7876

Ms. Margaret P. Griffey, Esq.
Chief, Capital Case Unit
Criminal Division
U.S. Department of Justice
Room 6140, Patrick Henry Bldg.
601 D. Street, N.W.
Washington, D.C. 20530
fax # 202/353-5779

This 5th day of August, 2004.

Sean D. O'Brien by WO
Sean D. O'Brien