**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF ARKANSAS**
**HOT SPRINGS DIVISION**

**UNITED STATES OF AMERICA, )**
**)**
**Respondent, )**
**)**
**v. ) CRIMINAL NO. 96-60022-001**
**)**
**JEFFERY WILLIAM PAUL, )**
**)**
**Petitioner. )**

## APPLICATION FOR CERTIFICATE OF APPEALABILITY

Comes now petitioner, by counsel, and moves this Court, pursuant to 28 U.S.C. § 2253 and Fed. R. App. Pro. 22 (b)(1), to grant a Certificate of Appealability ("COA") to permit Mr. Paul to appeal its Memorandum and Order denying Mr. Paul's Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence, and for Relief from Judgment, made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure, without authorizing investigative funds, without authorizing discovery, without allowing mental health experts to examine Mr. Paul, and without conducting a hearing. For his motion Petitioner states:

1. Petitioner seeks a COA to permit briefing on appeal of the following issues:

I. Whether Mr. Paul's right to due process of law, as guaranteed under the Fifth, Sixth, Eight, and Fourteenth Amendments, was violated when the

Government presented inconsistent theories between the trial of Jeffery Paul and his co-defendant Trinity Ingle, arguing in each trial that the defendant on trial was the actual killer of Sherman Williams.

II. Whether the FDPA's authorization for Government creation of, and reliance upon non-statutory aggravating factors, constituted an improper delegation of powers in violation of Mr. Paul's rights under the Fifth, Sixth, Eight and Fourteenth Amendments.

III. Whether the Court committed error in numerous respects throughout voir dire, beginning with the refusal to allow individual sequestered voir dire, continuing through the manner in which the court handled voir dire and the Court's rulings on challenges for cause, in violation of Mr. Paul's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments.

IV. Whether the prosecution's reliance upon evidence of unadjudicated alleged criminal conduct of the defendant at both phases of trial violated Mr. Paul's rights under the FDPA, the Federal Rules of Evidence, and the Fifth, Sixth, Eighth and Fourteenth Amendments.

V. Whether the prosecutor's closing argument at both phases of trial misstated the law on reasonable doubt, commented upon Mr. Paul's exercise of his right to remain silent, diminished the jury's sense of responsibility for their sentencing verdict, and misstated the law with respect to the jury's duty to consider mitigating evidence, in violation of Mr. Paul's rights under the FDPA and under the Fifth, Sixth, Eighth and Fourteenth Amendments.

VI. Whether Mr. Paul's death sentence resulted from the influence of passion and arbitrariness, in violation of his rights under the FDPA and under the Fifth, Sixth, Eighth and Fourteenth Amendments, because the jury refused to find and consider the fact that his co-defendant received a life sentence, as well as his youthfulness, in determining his sentence.

VII. Whether the admission of victim impact evidence and argument at the guilt-innocence phase of trial violated Fed. Rule Evid. 403 and rendered the guilt determination constitutionally unreliable, in violation of Mr. Paul's Rights under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.

VIII. Whether Mr. Paul's conviction and sentence of death must be reversed to avoid violating his rights as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, because he is innocent of the crime of § 1111 Murder and § 2 Aiding and Abetting therein in that the evidence would show that Mr. Paul's co-defendant, Trinity Ingle, is solely responsible for the killing of Mr. Williams, that Mr. Paul had no criminal responsibility whatsoever for the killing of Sherman Williams, and that, in fact, Mr. Paul tried to stop Trinity Ingle from killing Sherman Williams.

IX. Whether the Government improperly exercised its discretion whether to seek a death sentence against Mr. Paul, both in the initial decision to certify his case for death, and once his co-defendant Trinity Ingle had been sentenced to life, in violation of Mr. Paul's rights as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, where the local U.S. Attorney's office sought DOJ approval for death certification in a weak case for federal death sentencing, presented false information about the alleged heinousness of the crime to the death certification committee and to the Attorney General in Washington, and where Mr. Paul's race was a factor in the decision to certify his case for death.

X. Whether the FDPA is unconstitutional because it permitted the Government to violate a number of applicable constitutional amendments in its sentencing phase presentation and argument to the jury, including the Supreme Court's holding in Ring v. Arizona mandating that juries, not judges or prosecutors, must determine the existence of aggravating circumstances enumerated in a duly enacted death penalty statute, in violation of Mr. Paul's rights as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

XI. Whether the jury's failure to unanimously find, and consider, relevant mitigating evidence that his co-defendant received a life sentence violated Mr. Paul's rights under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.

XII. Whether the jury's failure to find unanimously and consider the defendant's youth as a mitigating factor violated his rights under the FDPA and

his Fifth, Sixth, Eighth and Fourteenth Amendment rights requiring a capital sentencer to at least consider any evidence in mitigation offered by the defendant.

XIII. Whether the trial judge was biased against the defendant in this case, depriving Mr. Paul of his rights as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

XIV. Whether this Court's sentencing phase instruction allowing only those jurors who found the existence of a mitigating factor to consider it violated Mr. Paul's rights as guaranteed under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.

XV. Whether the Government's reliance upon vague, overbroad, and otherwise improper aggravators at sentencing violated Mr. Paul's rights under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.

XVI. Whether the prosecution's reliance upon aggravating factors which were duplicative of one another and relied upon the same operative facts violated Mr. Paul's rights under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.

XVII. Whether the victim impact evidence introduced at the sentencing phase of Mr. Paul's trial produced a death sentence based upon emotion rather than reason, in violation of the FDPA and the Fifth, Sixth, Eighth, and Fourteenth Amendments.

XVIII. Whether Mr. Paul's rights under the FDPA and the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments were violated because the jury was not required to make the requisite finding of intent at either phase of trial.

XIX. Whether Mr. Paul was deprived of his absolute right to testify in his own behalf, at either or both phases of trial, in violation of rights guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

XX. Whether the prosecution's reliance upon aggravating factors which were

duplicative of elements of the offense, i.e. robbery and pecuniary gain, violated Mr. Paul's rights under the FDPA and the Sixth, Eighth and Fourteenth Amendments.

XXI. Whether Mr. Paul was incompetent before and during trial, rendering all phases of his trial unconstitutional in violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

XXII. Whether Mr. Paul's rights to due process, a fair trial, and the effective assistance of counsel, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution were violated when, after a bona fide doubt was raised about the defendant's mental competency to stand trial, the Court failed to hold an adequate hearing to address and adequately resolve the issue of competence to stand trial.

XXIII. Whether the Court's instructions erroneously required the jury to weigh the intent "eligibility" finding as a statutory aggravator during the "selection" stage of sentencing deliberations, in violation of the FDPA and the Sixth, Eighth and Fourteenth Amendments.

XIV. Whether the government committed misconduct throughout all phases of the pre-trial, trial and post-trial process, violating Mr. Paul's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

XXV. Whether Mr. Paul's conviction and death sentence violate the constitution as set forth in *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and its progeny, including *Ring v. Arizona*, 536 U.S. 584 (2002), and as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution, because the grand jury did not allege anywhere in the indictment that it had found any of the statutory aggravating circumstances which, under FDPA must be found at trial in order to render the defendant eligible for the death penalty.

XXVI. Whether Mr. Paul was denied his right to the effective assistance of counsel throughout all phases of the pre-trial, trial and post-trial process, in violation of his rights as guaranteed under the Fourth, Fifth, Sixth, Eighth and

Fourteenth Amendments to the U.S. Constitution, because trial counsel:

A) failed to conduct a reasonable investigation of the case, the crime, and all other alleged bad acts and uncharged offenses of Mr. Paul that were presented by the government to the jury;

B) failed to adequately investigate their client's background, history, and his mental, physical and medical condition throughout his life, at the time of the offenses, both charged and uncharged;

C) failed to investigate all aspects of the prosecution's case and/or interview, or interview appropriately, all relevant witnesses on the government's witness list and/or presented by the government at either phase of the trial; as a result, counsel were not prepared to contest the government's case and present their own coherent theory of the case at either or both phases of trial.

D) failed to investigate or raise the issue of Mr. Paul's competence to proceed when his mental condition deteriorated during the trial of the case to the point that Mr. Paul could not understand the proceedings or assist in his defense; trial counsels' failure to recognize and/or assert their client's incompetence prejudiced the decisions that were made with respect to any plea offers made to Mr. Paul.

E) failed to investigate and present a consistent theory of defense for both the guilt/innocence and penalty phase portions of the trial, including factual innocence and duress, and failed to present critical evidence at both phases of trial which would have proven their client innocent at the guilt-innocence phase, and not eligible or otherwise not suitable for a death sentence during the sentencing phase. As a result at the guilt-innocence phase of trial, the defense called no witnesses, lay or expert, despite that fact that several could have been found and would have been available, including possibly the co-defendant, to exonerate Mr. Paul, and failed to present readily available, persuasive evidence in support of a life sentence at the penalty phase of trial.

F) failed adequately to research and/or understand the relevant law and

legal principles governing all aspects of all phases of the pre-trial, trial, and post-trial proceedings, which contributed to counsels' failure to object, move for mistrial, and file other formal motions regarding numerous errors that occurred during the course of the pre-trial and trial proceedings;

G) Trial counsel were ineffective in refusing to allow Mr. Paul to testify in his own behalf, and in failing to inform him that such right was his and his alone to exercise regardless of their objection to such.

H) Trial counsel failed properly and/or effectively to interview, or interview appropriately, and/or impeach each of the government's witnesses who testified at both phases of trial all relevant witnesses on the government's witness list and/or presented by the government at either phase of trial cross-examine;

I) Trial counsel failed properly, adequately and effectively to investigate, interview, consult with, prepare, examine and present testimony and evidence in the penalty phase of trial, and as a result called only one witness, Paula Paul, who did not and could not present an accurate, reliable complete mitigation case because of trial counsel's inadequate preparation. The defense mitigation case fell far short of the presenting the reasonably available mitigating evidence of Mr. Paul's character, background and character in the following ways:

1. The defense affirmatively presented and conceded substantial aggravating evidence at sentencing, including presenting testimony about Mr. Paul's prior bad acts, some adjudicated, some not.

2. Mrs. Paul's testimony was, predictably, limited, flawed and misleading because, by virtue of her role in Jeff's life (his mother), she was easily discountable by the jury as an obviously biased witness, she lacked the expertise and knowledge to convey to the jury the impact of Jeff's chaotic and abused childhood for which she bore substantial responsibility; she was predictably reluctant to admit or discuss the dysfunctional family system of which she was an integral part; and she simply did not know many facts that

could have been presented to the jury in support of a life sentence.

3. Counsel's unreasonable reliance on this single witness denied the jury a comprehensive and unbiased view of Jeff's life and background exterior to his family, which included friends, associates, teachers, counselors, mental health professionals, and numerous other persons with critical mitigating information about Jeffery Paul which his mother made clear that she simply did not know and/or could not articulate or explain herself due to lack of knowledge, expertise and the like.

4. Mrs. Paul made clear that she was unaware of many of the facts of Jeff's life, and that she had been misled by her husband, a known liar, and Jeff, who had been trained by his own father to exaggerate from a very early age.

5. Counsel affirmatively drew from Mrs. Paul testimony about his alleged criminal behavior while growing up, without placing it in the context of the severe familial disturbance from which such conduct emanated and to which she was a major contributor. Mrs. Paul' s inability and/or unwillingness to connect this early childhood criminal behavior directly to the dysfunction in the family (*e.g.*, Jeff began stealing at an early age with his father's encouragement and prompting *so that his father could sell the stolen items and pay for essential family needs such as food and rent)* rendered large parts of the defense's "mitigating" case in fact aggravating in nature.

6. Mrs. Paul trivialized both the extent of her husband, Dennis Paul's, pathological lying and its devastating impact on the family system in general and Jeff Paul specifically. Although experts were available and could have testified in much more detail and with greater accuracy about the depth of Dennis Paul's pathology, they also could have explained its etiology as a way of showing and confirming both that Jeff had learned similar ways of coping with his own self-loathing, and how Jeff's propensity to exaggerate and bolster his own image was derived from a long family history

of such behavior.

7. Trial counsel failed to present testimony of readily available experts who could have testified in much more detail and with greater accuracy about the depth of Dennis Paul's pathology, they also could have explained its etiology as a way of showing and confirming both that Jeff had learned similar ways of coping with his own self-loathing, and how Jeff's propensity to exaggerate and bolster his own image was derived from a long family history of such behavior. In addition, a reasonable investigation would have turned up a family history of mental illness, as well as significant signs that Jeff was developing symptoms of serious mental illness before and during the time of his trial.

8. Mrs. Paul was unable to testify, for lack of understanding and knowledge, that the important family history of exaggeration and tall tales began long before Jeff was born. As a child Jeff's dad, Dennis, himself was alienated, afraid, and abused. At school he was labeled "mentally retarded," felt that he was an outcast because of the way he dressed, talked, and smelled. He was routinely beaten up and berated by other kids and by his own family members. These facts were known to available witnesses, but not to Mrs. Paul. As a defense against this constant assault Dennis created a fantasy world for himself to keep everyone away.

9. Trial counsel did not present readily available, persuasive evidence and testimony about Dennis Paul's fantasy that he was a soldier, a fighter, and even a killer. The extent to which his son Jeff would follow in his footsteps, even claiming to have killed people that he did not, is as striking as it is disturbing in its implications for the outcome of this trial. This information was either not known to Mrs. Paul, or she was unwilling to tell the jury about it, but there were plenty of other witnesses available to attest to these facts.

10. Counsel failed to present available testimony and evidence that

Dennis did not just lie to his children, their friends, and the family's associates; he also used fraud to obtain employment, claiming to be a physical therapist after forging a certificate, and even working as such a therapist for some period of time before he was "found out." He also ran a martial arts center for some period of time, claiming to be a black belt when he had no training whatsoever, defrauding both his students and his business partners; again, he was able to maintain this lie for some time before he was caught.

11. Trial counsel failed to present evidence that Dennis Paul was physically abusive toward Jeff, kicking, stomping hitting and throwing him into the wall, and on numerous occasions injuring him so severely that witnesses described bruises "from head to toe" and were moved to reach out to local law enforcement agencies and seek medical assistance. The only reason such did not happen is because Jeff objected for fear that his father would discover these revelations and retaliate against Jeff in even more severe ways. Susie Teague, the mother of Jeff's close friends Sara and Heather Ioccobacci, was close to Jeff and would have told the jury about times that she comforted him in the aftermath of abuse. Counsel could have called Jeff's friend, Zack Dryden, who would have testified about running away with Jeff at a time when Jeff was deeply depressed, and having Dennis Paul find them in Memphis, Tennessee, and the fearful abuse that he witnessed as they drove back to Hot Springs. This information was either not known to Mrs. Paul, or she was unwilling to tell the jury about it, but there were plenty of other witnesses available to attest to these facts.

12. Trial counsel failed to investigate the circumstances of Dennis Paul's knife-throwing "accident" in which a knife point was thrust deeply into Jeff's face, requiring hundreds of stitches and inflicting severe psychological trauma and permanent disfigurement. Garland County Deputy Sheriff Michael Roberson was one of Dennis Paul's "students" in the martial arts school, and could have told the jury about his own similar experience with Dennis Paul in which he was blindfolded and stood terrified against a wall while

Dennis Paul stood at a distance and threw knives into the wall next to him. Roberson lived with the Paul family for a period of time, and could have given the jury valuable insight into Dennis Paul's abusive and neglectful behavior toward his children.

13. Trial counsel presented no evidence of the damage Dennis Paul caused through his continual lies, and his lengthy, unexplained absences from the family. Throughout Jeff Paul's childhood his father would disappear from the family for long periods of time without warning or explanation. When asked about this behavior at trial, Mrs. Paul was only able to say she did not know why he left. In point of fact she accepted her husband back without question each time he repeatedly abandoned the family throughout Jeff' s childhood. The destructive consequences of the parents' behavior in this regard were many.

14. Trial counsel failed to inform the jury that Dennis was not able to maintain employment, which, coupled with his lengthy absences, conditioned family to expect the unexpected and brace against untold hardships: the disconnection of utilities, the absence of food from the house, habitual relocation. Importantly for the issue of counsels' failures at the sentencing phase of trial, the family learned that while they could not depend on their father, they could also not depend on their mother. Mrs. Paul was unable or unwilling to protect her children from the chaotic nature of Dennis' life. They learned that their well being came secondary to the unpredictable whims of their father. Mrs. Paul was obviously unable to share this with the jury, but numerous other members of the family were both able and willing to do so, and expert witnesses could have explained the critical impact of this on Jeff Paul's character, childhood development, and behaviors.

15. Trial counsel failed to present evidence and testimony that Jeff's father, Dennis Paul, drove his family to financial ruin through abandonment and then, when Jeff was attempting to correct the situation, Dennis encouraged him to do so with a life of crime. Mrs. Paul was of course blind to this dynamic, both because she

was kept unaware of many things, and because by merely accepting her husband back into the household repeatedly, and without questioning or demanding changes in his behavior, she put the needs and whims of her husband before those of her own children. And yet she is the *sole person* defense counsel chose to explain to the jury why Jeff Paul was not so horrible a person, or such and evil human being, that he deserved something less than death.

16. Trial counsel failed to present evidence that Jeff Paul was frequently protective of others, especially the helpless. Persons such as Susy Teague and Heather Miller were well aware, for example, that he would adopt sick and injured animals, spending what little change he might occasionally have to buy food for the homeless, and weeping when being forced to witness his father abuse animals. This "protector" role came about due to his early childhood self image, at the age of twelve, in which he saw himself protecting his own mother against the unpredictable abandonments and other abusive conduct of his father.

17. Trial counsel failed to present readily available evidence and testimony that at an early and critical period in his life Jeff came to realize that he could not depend upon his father to provide for the family in any consistent manner. Inheriting the "man of the household" role when he was only twelve years old, he began to look for jobs that he could do to bring money into the family. In one critical and desperate first effort and "providing" for the family, the twelve year old Jeff walked up and down his street asking to carry groceries, do yard work, anything to help with the family expenses. Unfortunately, possibly due to age, and possibly due to economic conditions in the neighborhood, he was met with one rejection after another. This information, known to available witnesses, was neither known nor appreciated by the sole defense witness at trial, Jeff's mother. There were, however, numerous individuals who were capable of providing this information to the jury.

18. Trial counsel failed to present evidence of associates and friends who knew Jeff as a caring, protective, kind, and insecure person. They could see how powerless Jeff felt in the face of his family's chaotic instability, how he struggled to assist them, how ashamed he was of his inability to effect positive change in his family, and how his efforts led him down a dangerous path of criminal activity. They could have talked about the extremely negative impact Dennis had on Jeff, not only as a role model, but as an accomplice. Numerous of Jeff's childhood friends, as well as their parents and families, were acutely aware of the impact Jeff's chaotic family was having on him. The Jeff they knew was caring, protective, intelligent, and concerned. And as for the criminal conduct he began to display at an early age, what they saw was a child getting in over his head, engulfed by the unmet survival needs of his own family and by the criminal behaviors of older people, and a boy infected with his father's insecurity and inability to take care of his own family, with the need to lie to bolster a damaged self image.

19. Jeff's attorneys also failed to call upon psychological and psychiatric experts capable of putting much of this social history information in context, and capable of discerning and describing the serious and debilitating mental disorders and medical conditions from which he suffers and which explain much about Jeff's life and conduct. Such experts would have noted, and explained, the significance of the fact that Jeff's extended family had a history of psychological disorders, as well as and drug and alcohol abuse. Mrs. Paul briefly mentioned this fact, but was neither qualified nor capable of explaining what it meant to Jeff's psychological make-up. Mrs. Paul also noted that Jeff had been seen by several counselors as a child. But once again, she failed to explain the depth of his treatments, as well as their significance in terms of confirming his serious mental disorders. In fact Jeff spent months in and out of mental institutions as a kid, with additional time in out-patient treatment, yet none of the many counselors, doctors, and therapists who treated and worked with him were called to the stand to discuss the conclusions they came

to after countless hours spent with Jeff. None of them were allowed to tell the jury how they had witnessed in real time the extent of the psychological damage Jeff was suffering due to the chaotic home life to which he was being subjected; likewise, none were allowed to tell the jury how on numerous occasions Jeff would have the opportunity to make real advances in his mental health snatched away from him by his family, who had begun to rely upon him as a family "breadwinner" and needed him to continue his criminal conduct for financial support. On several occasions Jeff's parents removed him from therapy, claiming he was adequately improved, when in fact he was not even close to having completed his treatment. These counselors, doctors, and therapists could have discussed the devastating effects of removing Jeff from necessary medical and mental health treatment due to financial considerations which included the need for Jeff to make money on the streets. They also could have given the jury an understanding of how Jeff's drug problems and use were clearly an attempt to medicate himself against the mounting stress and trauma of his ongoing family life and the serious mental disorders and emotional instability from which he suffered. In addition to the experts that had been working with Jeff in childhood, the defense could have presented evidence from other available experts, including psychologists, neuropsychologists, and psychiatrists, who could have testified about Jeff's serious mental disorders and his severe organic brain damage. Rather than viewing whatever the jury perceived to be Jeff's role in the offense as the product of an evil bent of mind, the jury's picture would have been that of a severely injured and under-developed young man suffering from serious medical and mental conditions for which he was neither responsible nor capable of controlling. Mrs. Paul was simply incapable of knowing all of this, let alone relating or explaining it to the jury. She did not appreciate nor could she admit that her husband was a critical and devastating link which connected Jeff the child – who adopted and cared for abandoned animals – to the Jeff that the jury had just determined played a role in the death of another human being.

20. All of the other available witnesses noted above – friends, family associates, experts, counselors, teachers, etc., – were, however, readily available to testify about the devastating impact of Mr. Paul's behaviors on his son Jeff. They witnessed physical abuse as well as the effects of the emotional abuse and instability. They knew of the transformation Jeff underwent from hopeful, caring, protective son to broken drug addict under the influence of destructive and violent criminals. They also knew, and could have told the jury, about how Mrs. Paul facilitated this transformation by making excuses for, and accepting her husband's detrimental behavior, allowing him to wreak havoc upon the stability and health of the family. They would have told the jury about Mr. Paul's own criminal activities and connections, as well as Mrs. Paul's inability and unwillingness to accept or even notice the degree to which her family was spinning out of control. By the time Mrs. Paul left the witness stand, not only had defense counsel failed to scratch the surface on the mitigating aspects of their client's character, background, record, and the circumstances of the offense, they had assisted the government in proving several aggravating factors which would have otherwise not been proven. In closing argument, defense counsel, having just made out the government's case on several aggravators through the testimony of their own witness, conceded the existence of several of the aggravators.

J) Trial counsel failed properly to object and preserve numerous issues that arose or occurred during voir dire, including, but not limited to, the restrictive manner in which the Court conducted the voir dire, the Court's refusal to allow questioning of certain members of the venire and/or to allow certain questions of some and/or all members of the venire, the prosecution's unlawful use of peremptory challenges, the Court's dismissal of members of the venire without adequate legal justification, and/or the Court's unlawful reliance upon in camera, ex parte proceedings to conduct portions of the voir dire and or portions of the pre-trial, trial and post-trial proceedings;

K) Trial counsel failed to seek funds for appropriate expert assistance

and/or to make an adequate showing of their need for defense expert services to assist them in preparing for all of the pre-trial and trial proceedings, the direct examination of their own witnesses, and the cross-examination of prosecution witnesses, the rebuttal of the prosecution's case at both the guilt-innocence and sentencing phases of trial, and the presentation of the defense case at all phases of the pre-trial, trial, and post-trial proceedings. Such experts would have included, but are not limited to: forensic scientists such as firearms examiners, medical examiners, crime scene experts, ballistics experts, false confession experts, psychiatrists, toxicologists and psychopharmacologists;

L) Trial counsel affirmatively presented to the jury evidence that was damaging and prejudicial to their client, during both phases of the trial;

M) Trial counsel failed to seek and conduct adequate scientific and expert testing of all of the evidence upon which the prosecution relied at either or both phases of trial. This includes, but is not limited to, the physical evidence the government allegedly obtained from the scene of the offense and from other sources during the investigation of the murder of Sherman Williams;

N) Trial counsel failed to seek to interview and present testimony from the co-defendant in this case, Trinity Ingle, especially after he had been convicted and given a life sentence but before or during Mr. Paul's trial. Had they done so, they would have been able to develop and present substantial strong evidence which would have exonerated their client, Jeffery Paul;

O) Counsel failed to utilize, present affirmative evidence upon, and highlight the fact that the government possessed evidence indicating that someone other than Jeff Paul was at the scene of the offense and involved in the taping of the deceased's hands and feet, thereby once again confirming that even if Jeff Paul made statement to friends, acquaintances, and/or government agents implicating himself in the offense, those statements were false and Mr. Paul was in fact innocent of the killing of Sherman Williams;

P) Defense counsel also failed to highlight, and present affirmative evidence, consistent with their theory of defense at guilt-innocence, demonstrating that Jeff Paul had a history of making false confessions to violent crimes, and that he told similar lies about things connected with this case, including his role in this offense, and that the physical evidence confirmed this theory and clearly refuted many of the factual underpinnings of Mr. Paul's alleged statements. For example, the government presented evidence refuting Mr. Paul's supposed statement to a witness that he had kicked the deceased in the head at all, and certainly not so hard that his eye had popped out. The physical evidence simply contradicted that statement. Yet despite this evidence and its obvious implications for the defense's theory at the guilt-innocence phase of trial, defense counsel never explored, investigated, developed and/or presented their own testimony, and never focused on this government testimony and its utility in helping show that Jeff Paul lied, that he lied about himself and just how tough he really was in an effort to gain stature in a world of criminals and hoodlums, and for that reason that he had lied about his supposed involvement in the murder of Sherman Williams;

Q) Counsel failed to present substantial expert testimony regarding Mr. Paul's age at the time of the offense, and the mitigating aspects of his age and the level of emotional and mental development at the time of the offense. This is so despite the existence and availability of many experts and substantial information regarding the brains and the emotional status of any teenager, especially one as damaged as Mr. Paul was due to circumstances over which he had no control. Such information would have readily proven that Mr. Paul's young age was a substantial mitigating factor in his case, demonstrating as it would have that his brain physiology and his emotional state grossly impacted his ability to exercise good judgment, control his impulses, and repel and resist the domination of other persons, factors which were critical to a mitigating understanding of whatever role Jeff played in the events that culminated in the death of Sherman Williams;

R) After trial, counsel failed adequately to continue investigating and developing new evidence that would have been related to a variety of claims to be presented at the motion for new trial, including all claims

raised in this motion;

S) Trial counsel failed to make proper opening and closing statements at both phases of trial, by failing to respond to prejudicial and/or unlawful arguments by the prosecution, by failing to address material misstatements of fact or law relied upon by the prosecution, and/or by failing affirmatively to raise helpful facts or arguments for the defense, and/or by failing to provide proper and helpful advocacy in any and all respects;

T) Trial counsel were rendered ineffective by virtue of the prosecution's misconduct at all phases of the pre-trial, trial, and post-trial proceedings in this case, as set forth elsewhere in this motion, incorporated herein by express reference, including, but not limited to: the prosecution's decision to seek death in the first place, and to refuse to refrain from seeking death once the co-defendant had received a life sentence; the affirmative failure to disclose evidence that was exculpatory or demonstrated witness bias at either or both phases of trial with respect to the factual and legal issues, regarding the witnesses who did testify, or those who did not but had relevant information which was concealed from the defense by the prosecution; the knowing use of perjured testimony at both phases of trial; and the improper and/or illegal arguments made in the prosecution's opening and closing statements at both phases of trial;

U) Trial counsel were rendered ineffective by virtue of the Court's refusal to provided sufficient resources to investigate their case prior to and during trial with respect to all issues at both phases of trial.

XXVII. Whether cumulatively, all of the errors set forth in this petition, and the prejudice that resulted from these errors, denied Mr. Paul a fundamentally fair trial in violation of rights guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.

2. In addition to the substantive issues presented in the petition itself, a COA should issue on the following issues raised during the course of, and/or as a result of the proceedings below, as required by *Slack v. McDaniel*, 529 U.S. 473, 484 (2000):

XXVIII. Whether this Court should have permitted discovery on the following matters:

A) Government documents, including the FBI, Department of Treasury, Department of Justice, the local U.S. Attorney, and the Department of the Interior, pertaining to interviews of its witnesses, including inducements, pressures, or financial rewards given to government witnesses, notwithstanding the government's claims at trial that it had created no expectation of reward or consideration in exchange for any testimony;

B) Access to the files of the local U.S. Attorney and the Department of Justice in both the Ingles and Paul cases pertaining to the decision by the DOJ to seek the death penalty against each defendant, and the decision not to de-certify the case for the death penalty after a jury sentenced Mr. Paul's more culpable co-defendant to life imprisonment;

C) Documents pertaining to the investigation of the homicide of Mr. Williams, including the statements and identities of witnesses who undermine the government's theory of when the shooting occurred;

D) Court files and records of the Honorable Jimm Larry Hendren consisting of his notes and observations of Mr. Paul, information received about Mr. Paul or his case from third parties, and conversations between the Court and third parties, including the U.S. Attorney or his representatives, the Department of Justice, The United States Marshall, or defense counsel, about Mr. Paul or any aspect of his case;

E) Copies of juror questionnaires, and permission to interview jurors;

F) Access to physical evidence for testing, including alleged bullets and/or bullet fragments, pellets and pellet fragments, clothing from the deceased, and tape from the deceased's body which contained as yet unidentified palm prints and human hairs;

G) Documents of the U.S. Marshall's Service concerning the investigation, prosecution and trial of Jeffery Paul and Trinity Ingle in the crime of murder against Sherman Williams, particularly any documents

pertaining to the issue of whether Mr. Paul was incompetent to stand trial, and whether the Court was sufficiently aware of his deteriorating mental condition that it should have stopped the proceedings and held a hearing to determine whether Mr. Paul was indeed incompetent to stand trial;

H) Documents, files, materials and other information in the possession or control of the Bureau of Prisons concerning Mr. Paul and his co-defendant, Trinity Ingle, particularly those files having a bearing on Mr. Paul's deteriorating mental health or Trinity Ingle's further admissions exculpating Mr. Paul in the homicide of Sherman Williams;

I) Documents, files, materials and other information and/or sources of information concerning any unreported conferences throughout the pre-trial and trial proceedings in this case, including, but not limited to, pre-trial hearings, bench conferences, in-chambers conferences, or any other proceedings in which the Court and/or counsel for either or both parties were involved in connection with his case or that of Trinity Ingle;

J) Files, documents, materials or other information in the possession or control of the U.S. Department of the Interior concerning the investigation, prosecution and trial of himself and his co-defendant, Trinity Ingle, in the murder of Sherman Williams.

XXIX. Whether Mr. Paul demonstrated the reasonable necessity of funds for a mitigation specialist to investigate issues pertaining to Mr. Paul's background, character, mental health and culpability.

XXX. Whether this Court abused its discretion in denying Mr. Paul's Motion to Permit Mental Health Experts to have access to him at the U.S. Penitentiary in Terre Haute, IN, to determine whether he suffers from a mental disorder in order to address legal and factual issues in the case, including:

A) Whether Mr. Paul suffers from a mental illness;

B) Whether Mr. Paul was competent to proceed during his trial and capital sentencing proceeding;

C) Whether the failure of Mr. Paul's trial counsel to investigate their client's deteriorating mental condition during trial violated Mr. Paul's Sixth Amendment right to the effective assistance of counsel;

D) Whether Mr. Paul's is presently competent to comprehend proceedings and assist counsel.

XXXI. Whether this Court applied an erroneous standard of review when it relied on the Abuse of the Writ standard enunciated in McCleskey v. Zant, 499 U.S. 467, 489 (1991), to reject Mr. Paul's first postconviction motion.

XXXII. Whether evidence and affidavits tendered by petitioner, including affidavits describing the Court's pre-trial comments expressing inappropriate opinions adverse to Mr. Paul, were sufficiently indicative of judicial bias to warrant further proceedings, including discovery and a hearing, into issues arising from judicial bias, including:

A) Whether Mr. Paul at the time of his trial was deprived of a fair and impartial judge, as guaranteed by the Due Process Clause of the Fifth Amendment;

B) Whether this Court should have been recused from deciding Mr. Paul's Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence, and for Relief from Judgment, made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.

C) Whether there should have been a hearing on issues arising from the Court's expressions of bias against Mr. Paul.

XXXIII. Whether, because many, if not all, of the above issues turn on questions of fact, this Court should have heard evidence prior to denying Mr. Paul's Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence, and for Relief from Judgment, made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.

XXXIV. Whether the Court deprived Mr. Paul of a full and fair habeas corpus

proceeding when it withheld ruling on a number of pending matters noted above, and then in one instance, ruled simultaneously upon all of these pending matters, *as well as* the entire 2255 motion, and a pending request by the Government to suspend the proceedings so as to allow Mr. Paul to withdraw his motion and proceed to execution.

## STANDARD FOR ISSUING A CERTIFICATE OF APPEALABILITY

This Court has the power and duty to issue a COA where a habeas petitioner has set forth claims for relief upon which reasonable minds could differ as to the appropriate treatment. Under AEDPA, to obtain a COA, Mr. Paul must make "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253. "This threshold inquiry does not require full consideration of the factual or legal bases adduced in support of the claims. In fact, the statute forbids it." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003). The Court explained, "Under the controlling standard, a petitioner must 'show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were '*adequate to deserve encouragement to proceed further*.''" *Miller-El*, 537 U.S. at 336 (*quoting Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (emphasis added)).

The Court in *Miller-El* rebuked the lower court for its longstanding COA practice which required far too stringent a showing of a habeas corpus petitioner. The law "[does] not require petitioner to prove, before the issuance of a COA, that some

jurists would grant the petition for habeas corpus." *Miller-El*, U.S. at 338. Rather, "[w]e look to the District Court's application of AEDPA to petitioner's constitutional claims and ask *whether that resolution was debatable amongst jurists of reason*." *Id*. at 336 (emphasis added). Thus, this Court must grant a COA if the underlying constitutional claim "is not frivolous on its face." *Evicci v. Comm'r of Corrections*, 226 F.3d 26, 28 (1st Cir. 2000). It is beyond reasonable discussion that Mr. Paul's claims in this case meet such a test.

The Supreme Court has also made it clear that a COA may issue with respect to procedural issues that affect the fullness of consideration given by a district court to a petitioner's claims for relief. "[W]hen the district court denies a habeas petition on procedural grounds without reaching the prisoner's underlying constitutional claim, a COA should issue when the prisoner shows, at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling." *Slack v. McDaniel*, 529 U.S. at 484 (emphasis added). In this case, the procedural issues at stake run to the heart of the fairness of these proceedings, implicating the impartiality of the judge, and the ability of the petitioner even to have adequate resources to present and prosecute his lawsuit, let alone have the issues considered only after the evidence has been investigated,

developed and reasonably presented in court.

As discussed below, not only could "jurists of reason . . . disagree with the district court's resolution of [Mr. Paul's] constitutional claims," (*Miller-El,* 537 U.S. at 327), but those jurists would be correct on the merits.

**I. THE PROSECUTOR'S USE OF INCONSISTENT THEORIES**

This case involved co-defendants who gave conflicting statements, each blaming the other for the acts that caused the death of Sherman Williams. The physical evidence and other circumstances favored Mr. Paul's explanation to authorities, i.e., that Trinity Ingle pulled the trigger that fired the fatal shot. Ingle submitted a sworn statement acknowledging his responsibility for the crime, and adding that not only did Mr. Paul not know that Ingle intended to shoot Mr. Williams, but that Paul attempted to discourage him from doing so. Ingle's trial commenced first; the prosecutor argued to the jury that Mr. Ingle shot the victim in the head: "Trinity Ingle put the barrel of a .38 behind Mr. Williams' left ear *and he pulled the trigger*." App. at 256 (emphasis added). The government also argued repeatedly throughout Mr. Ingle's trial that the evidence indicated Ingle had in fact hit the victim and shot him in the head. App. 269, 452, 461-62.

In Mr. Paul's trial, the same prosecutor argued, "And ladies and gentlemen, when you go back into that jury room and you fit all the pieces together, what you're

going to find in this case is that the defendant, Jeff Paul, was standing there right over Mr. Williams, bound, gagged, hands tied behind his back and unable to protect himself, *and then he pulled the trigger*." App. 174 (emphasis added). Also see App. 143, 150-164, 168.

By pursuing inconsistent theories of culpability in separate trials, the prosecutor deliberately misled Mr. Paul's jury. As one judge observed, "[Ingle] and [Paul] cannot both be guilty of firing the same bullet because physics will not permit it." Nichols v. Collins, 802 F.Supp. 66, 74 (S.D.Tex. 1992), *aff'd in part and rev'd in part* , 69 F.3d 1255 (5th Cir. 1993), *cert denied* Nichols v. Johnson, 518 U.S. 1022 (1996). Such conduct is clearly forbidden by the Due Process Clause. "The state cannot divide and conquer in this manner. Such actions reduce criminal trials to mere gamesmanship and rob them of their supposed search for truth." Drake v. Kemp, 762 F.2d 1449, 1479 (11th Cir. 1985) (Clark, J., concurring), *cert. denied* 478 U.S. 1020 (1986) .

This Circuit has specifically condemned as unconstitutional the very conduct committed by the prosecutor in this case. Smith v. Groose, 205 F.3d 1045 (8th Cir. 2000). *Accord*, Thompson v. Calderon, 120 F.3d 1045, 1058 (9th Cir. 1997) (en banc), *rev'd on other grounds*, 523 U.S. 538 (1998) ("[I]t is well established that when no new significant evidence comes to light a prosecutor cannot, in order to convict two defendants at separate trials, offer inconsistent theories and facts

regarding the same crime.") Because "jurists of reason . . . disagree with the district court's resolution of [Mr. Paul's] constitutional claims," *Miller-El*, 537 U.S. at 327, a COA should issue to allow the Court of Appeals to decide whether the prosecutor's misconduct violated Mr. Paul's rights under the Fifth, Sixth and Eighth Amendments to the Constitution.

## II. THE FDPA'S IMPROPER DELEGATION TO PROSECUTORS OF THE POWER TO INVENT AGGRAVATING FACTORS

While Congress enumerated some sixteen "statutory" aggravating factors as a part of the FDPA, the jury is also required to consider any additional "nonstatutory" aggravating factors which the prosecution unilaterally decides may justify a sentence of death:

> The jury, or if there is no jury, the court, may consider whether any other aggravating factor for which notice has been given exists.

18 U.S.C. §3592(c)-(e). The FDPA provides no guidance for the government's choice, creation or definition of, or reliance upon these nonstatutory aggravating factors. Using whatever creativity they wish, the prosecution is free to make up as many aggravators as they choose. The jury is required to consider such factors found to exist, and to weigh them in the balance in determining whether a person deserves to live or die. 18 U.S.C. §3593(c). In effect, the prosecution is allowed to define the circumstances under which a defendant can be sentenced to death. *See U.S. v. Davis*,

904 F.Supp. 554, 558 (E.D. La. 1995)(because FDPA is weighing statute and because statutory and nonstatutory aggravators are to be equally considered in that balancing, Congress has delegated legislative authority to prosecution).

Such a sentencing scheme is unconstitutional. It delegates to the executive branch unbridled discretion to make up nonstatutory aggravating factors in favor of death, without setting forth any intelligible principle to guide that discretion. The definition of what constitutes criminal conduct and the setting of appropriate sanctions for that conduct is a quintessentially legislative determination. *See* Whalen v. U. S., 445 U.S. 684, 689 (1980) ("[S]pecifying the circumstances under which someone may be put to death must . . . be a function of the elected representatives of the people.") Congress must "lay down by legislative act an intelligible principle to which the person or body authorized to [exercise the delegated authority] is directed to conform." Mistretta, 488 U.S. at 372 (citation omitted). In Touby v. U.S., 500 U.S. 160, 164-65 (1991). The statute's failure to do so therefore amounts to an improper delegation of authority to the prosecution.

The prosecution in this case pushed the limits of the improperly delegated power to define aggravating circumstances that warrant the death penalty. The prosecution introduced and relied upon evidence of alleged unadjudicated "bad acts" of the defendant in support of two separate aggravating factors, and in doing so

arguably circumvented the careful limitations Congress placed upon the jury's consideration of prior crimes. *See* 18 U.S.C. §3592(c). Additionally, the government relied *in toto* at the sentencing phase upon its lengthy presentation of detailed information about the victim, his life history, his work career from beginning to end, and his family. Based on this evidence, the government was allowed to devise *two separate aggravating factors*, each *with six and four separate sub-parts* respectively, containing a compendium of detailed information about the victim, his life, and his family and their tragic struggle with his death. App. 88-89. In essence, then, because the statute failed to proscribe it, and because the Court refused to disallow it, the government was allowed to devise ten separate aggravating reasons in support of a death sentence, which the jury was required to consider, from this so-called "victim impact" evidence.

In effect, the government asked the jury to sentence Mr. Paul to death in reliance upon multiple non-statutory aggravating factors which they devised. Because the executive branch received no valid delegation of the power to identify such factors, "jurists of reason could disagree with the district court's resolution of [Mr. Paul's] constitutional claims." *Miller-El*, 537 U.S. at 327.

## III. THE COURT FAILED TO CONDUCT A CONSTITUTIONAL JURY SELECTION PROCESS.

In the present case, the Court made it clear from the outset that he did not intend to spend much time in the voir dire stage of the trial. The Court refused to allow the defense to conduct individual voir dire out of concern for "time and expense." T. Pre-Trial Hearing, June 11, 1997, at 50-51, 55, and informed the attorneys that he planned for all of voir dire to be completed in one day. *Id.* at 68. The Court even informed the entire venire that his decision not to allow individual sequestered voir dire was based on his desire to save time. T. 56. Throughout jury selection the Court voiced his frustration with how long the process was taking. *See e.g.*, T. 314. This is so despite the fact that, though unable to reach his initial goal, the Court did manage to complete all of voir dire in Mr. Paul's capital case by noon on the second day of trial. T. 432.

**A. The Court's refusal to conduct individual voir dire had a biasing effect on the jury.**

The truncated voir dire was wholly inadequate to ensure veracity and reliability in the selection of Mr. Paul's jury. Although the parties agreed on a written, joint questionnaire, the Court shortened it substantially. Most of the voir dire was conducted before the entire venire of over 100 persons. They were generally questioned about every subject allowed by the Court, including exposure to pre-trial publicity, T. 113-127, knowledge of witnesses or parties, T. 129-132, views on capital

punishment, T. 53-55, victimization by past crimes, T. 178-88, and all other areas of bias. In most cases, jurors were allowed to respond to questions in the presence of the entire venire, creating separate issues of jury contamination.

Conducting a wide-open voir dire was prejudicial to Mr. Paul because the venire was exposed to statements of jurors who had prior knowledge of the case, T. 113-127, jurors who had been victimized by prior violent crimes, T. 178-88, one juror's legally offensive opinions about reasonable doubt, T. 196-97, jurors who were friends or acquaintances of witnesses, the parties, or the attorneys involved in the case, T. 132-56, including one juror who openly vouched for a the integrity and credibility of a government witness. T. 146. As a result of this open voir dire process, prospective jurors learned what the court wanted to hear from them by listening to each other's answers, and modifying their responses accordingly. The Court even made reference to that fact. T. 150.

With regard to the issue of death qualification, only when jurors requested to speak with the Court and the parties in private, or when the Court felt the need to do so based on a juror's initial response, were jurors removed from the general venire and questioned individually in.[1] As a result, the record reflects that the defense (and the

[1] Even here the record reflects confusion about whether all jurors with pro-death penalty attitudes who raised their hands in general voir dire were in fact

Court and government) *never heard a word* from *any* of the jurors who actually served as to their views on the death penalty. *Compare* T. 447-48 (list of jurors actually picked) *with* T. 57-112, 317-447 (jurors individually questioned). These actual jurors never opened their mouths on the subject.

Yet there was ample evidence before the Court that the chosen general voir dire process was failing to encourage open and direct juror responses. Several jurors told the judge that it was asking too much of them to respond to such sensitive kinds of questions before an audience of over 100 people. *See e.g.*, T. 245, 260, 275 ("I didn't want to talk about this in front of everybody"; "I avoided speaking up because I didn't think I would have to speak in front of all these people."). Defense counsel expressed concerns to the Court about the incongruity between jurors' answers on the questionnaire and their responses in open court. T. 301. In the face of mounting evidence that it was a mistake to have denied individual voir dire in the case, rather than acknowledge that its choice of voir dire procedures was inappropriate (at least with respect to the issues surrounding death qualification and juror knowledge of facts and witnesses), the Court continued with general voir dire, and allowed only those jurors who self-selected to speak privately, or whom defense counsel could identify as

---

questioned individually. *Compare* T. 55 (bailiff indicating four persons responding to Morgan inquiry) *with* T. 100-102 (only two such jurors questioned individually).

problematic from the questionnaire responses, to be individually voir dired in chambers.

The in-chambers voir dire of selected jurors served to confirm that the Court's chosen process was not working. Jurors who stated their views in one way on the questionnaire changed them, sometimes dramatically, during the discussions that ensued in private. *See* T. T. 102, 318-319, 336, 340, 344, 349, 353-55, 384, 391, 398; 410, 416-17, 419-21, 422, 426. Other prospective jurors who failed to respond in the general voir dire later indicated that they had in fact learned about the case from local media attention. *See e.g.* T. 416, 425. Irrespective of the Court's rulings with respect to challenges for cause on individual jurors, the information learned during the brief individualized voir dire which was allowed should convinced the Court that the only fair approach was to grant the defense motion for individual sequestered voir dire. It cannot be fairly said that the jury selection process in this case provided the level of accuracy and reliability needed to guarantee to Mr. Paul his right to a fair and impartial jury.

The Court's refusal to allow individual voir dire in this high-publicity capital case exposed the entire panel to prejudicial statements by venirepersons and discouraged honest disclosures by prospective jurors, thereby prejudicing the jury and impairing the defense's informed exercise of the right to peremptory challenge. *See*

U. S. v. Harris, 542 F.2d 1283, 1294 (7th Cir.), *cert. denied*, 430 U.S. 934 (1976) ("the defendants must be permitted sufficient inquiry into the backgrounds and attitudes of prospective jurors to enable them to exercise intelligently their peremptory challenges"); U.S. v. Ledee, 549 F.2d 990, 993 (5th Cir.), *cert. denied*, 434 U.S. 902 (1977) ("peremptory challenges are worthless if trial counsel is not afforded an opportunity to gain the necessary information upon which to base such strikes."); *see also* In Re Hitchings, 6 Cal. 4th 97, 860 P.2d 466 (1993) ("The denial of the right to reasonably exercise a peremptory challenge is . . . the deprivation of an absolute and substantial right historically designed as one of the chief safeguards of a defendant against an unlawful conviction.").

"Without an adequate *voir dire* the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled." Rosales-Lopez v. U.S., 451 U.S. 182, 188 (1981); *see* Morford v. U. S., 339 U.S. 258 (1950); U.S. v. Bear Runner, 502 F.2d 908, 911 (8th Cir. 1974). A COA should issue on this claim because "jurists of reason would find it debatable" whether this Court's voir dire procedures were inadequate to empanel a fair and impartial jury. *Slack v. McDaniel*, 529 U.S. at 484 (emphasis added).

**B. The Court erroneously retained biased pro-death penalty jurors, and**

**erroneously struck qualified jurors with conscientious scruples against the death penalty.**

The Court erroneously ruled on several for-cause challenges that were made. Three jurors should have been excused because their views in support of the death penalty were sufficiently strong that they were "substantially impaired" in their ability to consider a life sentence in Mr. Paul's case, Morgan v. Illinois, 504 U.S. 719, 729 (1992). *See* T. 353 (Juror Stevens); 397 (Juror Roberson); 410 (Juror Rogers). Two other jurors should not have been excused for cause because they indicated that, although with some difficulty, they could set aside their views against capital punishment and follow the law, Wainwright v. Witt, 469 U.S. 412, 423-25 (1985). *See* T. 66-86 (Jurors Poole and Kreiger); 102 (Juror Mills).[2] Mr. Paul is entitled to release if even a single scrupled juror was erroneously excluded. *See* Gray v. Mississippi, 481 U.S. 648, 662-663 (1987).

For all of these reasons, the jury selection process denied Mr. Paul his constitutional rights to a fair and reliable voir dire and to an impartial jury on both the

---

[2] Confirming that the general voir dire itself was a wholly inadequate means of obtaining accurate information about prospective jurors' death penalty attitudes, Juror Mills had responded affirmatively in the presence of the entire venire to the Morgan question, namely whether she was so pro-death penalty that she could not consider the alternatives. T. 55. However, after individual questioning, she was actually excluded as a Witt juror, because she testified she was *against* capital punishment.

issue of his guilt or innocence and the issue of what punishment he deserved. A COA should issue because whether this Court correctly decided the jury selection issues in this case is "debatable amongst jurists of reason." *Miller-El*, 537 U.S. at 341.

## IV. THE PROSECUTION'S RELIANCE UPON UNADJUDICATED OFFENSE EVIDENCE AT BOTH PHASES OF TRIAL

The prosecution's reliance upon unadjudicated offense evidence at both phases of trial violated Mr. Paul's rights guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Government witness Chris Rogers, a short time acquaintance of Mr. Paul, T. 676, testified that on June 8, 1995, more than two weeks before the murder in question, Mr. Paul and co-defendant Trinity Ingle came to his workplace, and left a gun with him. T. 656. Both Ingle and Paul were carrying guns, but only Paul left his with Rogers. T. 676. The following weekend Mr. Paul came to his house and retrieved the gun. According to Rogers, Mr. Paul told him he and Ingle planned to rob Tri-Lakes Liquor Store by killing the owners and taking the money. T. 658. Rogers did not take Mr. Paul seriously, T. 680, nor should he have, because the government never presented any evidence that a robbery or attempted robbery ever occurred at Tri-Lakes or any other local liquor store or any other business in the area during the relevant time period. Indeed, *the government neither produced nor attempted to introduce any other evidence of this alleged robbery plan*. Nevertheless, the government argued for a guilty verdict in part based

upon this "bad act" evidence, referencing it repeatedly throughout closing argument. App. 144, 148-49, 162, 171. The government also relied upon this evidence in arguing for a death sentence. App. 178, 204-05.

The admission of "bad act" evidence is reversible error "when it is clear that the evidence has no bearing on the case." U.S. v. Williams, 895 F.2d 1202, 1205 (8th Cir.1990). First, the evidence in this case was so tenuous that no reasonable jury could have found by any standard of proof that the act occurred. The evidence amounted to an uncorroborated confession which itself would have been insufficient to convict had Mr. Paul been charged with the crime of attempted robbery. *See* Wong Sun, 371 U.S. 471, 488-89 (1963) ("It is a settled principle of the administration of criminal justice in the federal courts that a conviction must rest upon firmer ground than the uncorroborated admission or confession of the accused..."), *citing* Smith v. U.S., 348 U.S. 147 (1954). Indeed, as the defense argued with respect to the alleged "attempted robbery," there was no "act" other than the alleged statement of the defendant. Second, any probative value in this evidence was outweighed by its prejudicial effect. The fact that Mr. Paul may have made some comment to another person about robbing a local liquor store is irrelevant to the offense in chief. Third, the prosecutor' s reliance upon, and the jury's consideration of this unadjudicated "bad act" evidence at the sentencing phase of Mr. Paul' s capital trial was neither authorized

nor contemplated by the FDPA.

Notably here, the jury was instructed to find the statutory and non-statutory aggravating factors beyond a reasonable doubt, but were not instructed that they must find the unadjudicated crimes alleged in support of these factors to be found beyond a reasonable doubt. Thus, the jury was not properly instructed as to how to consider alleged unadjudicated criminal conduct that was the evidence in support of a non-statutory aggravating factor.

Recent Supreme Court jurisprudence confirms that this failure further compounded the constitutional violations. *See* Apprendi v. New Jersey, 530 U.S. 466, 490 (2000) (holding that jury cannot constitutionally be relieved of its duty to find, beyond a reasonable doubt, all facts which "increase[] the penalty for a crime beyond the prescribed statutory maximum"); Ring v. Arizona, 536 U.S. 584 (2002).

The fact that reasonable jurists could differ on the issue of the admissibility of testimony of alleged unadjudicated bad acts is apparent where many state courts have held such evidence inadmissible. For example, the Supreme Court of Pennsylvania has concluded:

> In a capital case where a man's life is at stake, it is imperative that the death penalty be imposed only on the most reliable evidence. Prior convictions of record, and constitutionally valid admissions and confessions of other crimes meet this standard of reliability; piecemeal testimony about other crimes for which [the capital defendant] has not

yet been tried or convicted can never satisfy this standard.

Commonwealth v. Hoss, 445 Pa. 98, 118, 283 A.2d 58, 69 (1981). The majority of subsequent state court decisions to consider the issue have refused to allow the use of unadjudicated crimes in capital.[3] *Cf.* State v. Debler, 856 S.W.2d 641 (Mo. 1993) (en banc) (reversing death sentence where state relied upon un-charged offense evidence and failed to give notice to defense). Other state courts that have reached a contrary decision require that the unadjudicated crime be proven either "beyond a reasonable doubt" or by "clear and convincing."[4] In Mr. Paul's case, whether or not the use of unadjudicated offense evidence was a *per se* violation of statutory or constitutional rights, its use here without any burden of proof as to the underlying facts, violated the Eighth.[5]

---

[3] State v. Bobo, 727 S.W.2d 945, 952-53 (Tenn.), *cert. denied*, 484 U.S. 872 (1987); State v. Bartholomew, 101 Wash.2d 631, 633-640, 683 P.2d 1079, 1082-85 (Wash. 1984); Scott v. State, 297 Ind. 272, 279-80, 397 N.E.2d 276, 279-81 (Ind. 1979); Cook v. State, 369 So.2d 1251, 1257 (Ala. 1979); Prevence v. State, 377 So.2d 783, 786 (Fla. 1976).

[4] State v. Brooks, 541 So.2d 801 (La. 1989) (clear and convincing evidence); People v. Balderas, 41 Cal.3d 144, 204-05, 222 Cal.App. 184, 219-20, 711 P.2d 480, 515-16 (Cal. 1985) (beyond a reasonable doubt).

[5] The Fifth Circuit' s conclusion to the contrary in U.S. v. Hall, *supra*. is, respectfully, in error. First, the Court noted that Hall had "offered no legal support" for this proposition. *Id.* at 404. Whatever was offered in Hall, the above demonstrates not only some legal support, but abundant authority for the proposition that such evidence has no place in a capital sentencing trial under the

For the foregoing reasons, a COA should issue to allow Mr. Paul to present this issue to the Court of Appeals.

## V. PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT AT BOTH PHASES OF TRIAL.

The prosecutor's closing argument at both phases of trial mis-stated the law on reasonable doubt, commented upon Mr. Paul's exercise of his right to remain silent, diminished the jury's sense of responsibility for their sentencing verdict, and mis-stated the law with respect to the jury's duty to consider mitigating evidence, in violation of Mr. Paul's rights under the FDPA and under the Fifth, Sixth, Eighth and Fourteenth Amendments.

### A. The Prosecutor Misstated the Reasonable Doubt Standard.

---

FDPA or, at the very least, it requires exacting standards of proof. The Court in Hall cited three prior, non-federal capital cases from the Fifth Circuit, each of which ultimately relies upon the first such case, Milton v. Procunier, 744 F.2d 1091, 1097 (5th Cir. 1984) *cert. denied* 471 U.S. 1030 (1985) . Milton held as a general matter that evidence of unadjudicated extraneous offenses was admissible during a Texas capital sentencing hearing. The Court in Milton implicitly suggested, however, that limiting instructions should be required. The Court first noted that "there remains a long-held reservation about the use of wrongdoing not then being tried. These concerns express our acceptance that a jury suffers the human weakness of blending wrongs – a result inconsistent with our fundamental commitment to charge specificity." *Id.* at 1097. The Court then held that "these concerns are addressed by properly applied standards of relevance *and sufficiency of proof.*" *Id.* (emphasis added). The Court in Hall fails to note this critical language in Milton, which Mr. Paul asserts here *supports* his argument for some limiting instruction on the use of unadjudicated offense evidence in a capital trial.

During the guilt-innocence phase rebuttal closing argument, the prosecutor told the jury that a finding of reasonable doubt did not require the elimination of a hesitation to convict. App. 172.[6] As with many of the government's instances of misconduct in this case, the prosecutor relied upon mis-statements of the law during voir dire to set the stage for this error during closing argument. T. 194 (giving venire similarly erroneous, and overly lenient definition of reasonable doubt).

Condemnation of any attempt to define "reasonable doubt" is almost universal, "be-cause often the definition engenders more confusion than does the term itself." U. S. v. Martin-Trigona, 684 F.2d 485, 493 (7th Cir. 1982); *see also* Monk v. Zelez, 901 F.2d 885, 889-890 (10th Cir. 1990); U. S. v. Moss, 756 F.2d 329, 333 (4th Cir. 1985); U. S. v. Indorato, 628 F.2d 711, 720-721 (1st Cir.), *cert. denied*, 449 U.S. 1016 (1980); U. S. v. Byrd, 352 F.2d 570, 575 (2nd Cir. 1965). Here, the prosecutor erroneously informed the jury that it was proper and lawful to find Mr. Paul guilty, even if there was some hesitation to do so. This is clearly erroneous under applicable law. *See* Cage v. Louisiana, 498 U.S. 39, 41 (1990)(reasonable doubt instruction requiring "substantial doubt" or finding of guilt only to "moral certainty" violates Due

[6] The prosecutor erroneously defined "beyond a reasonable doubt" by describing a hypothetical shopping situation directed at the jurors, where the juror has a "little bit of hesitation. But you go ahead and make that decision and you know it's the right decision after you've done it and you feel good about it - Then you've covered reasonable doubt in that respect."

Process Clause). As such, reasonable minds could differ as to whether the prosecutor's mis-statements of the law violated Mr. Paul's rights to fundamental fairness and due process. *See* Darden v. Wainwright, 477 U.S. 168, 181 (1986); U.S. v. Netz, 758 F.2d 1308, 1311 (8th Cir. 1985)(*per curiam*) (prosecutorial argument on reasonable doubt erroneous, but corrected by curative instructions).

**B. The Prosecutor's "Lack of Remorse" Argument Misstated the Evidence and Violated Mr. Paul's Fifth Amendment Privilege.**

During the sentencing phase closing argument, in support of the government's "lack of remorse" non-statutory aggravator, the prosecution relied upon evidence indicating that Mr. Paul had allegedly stated that he did not feel bad about what had happened during the offense. App. 206. First, the prosecution mis-characterized this evidence. In fact, the government's evidence indicated that Mr. Paul had allegedly stated that he had not felt "anything" about the incident, and was very concerned about that fact. T. 736. In this same testimony, the witness stated that while Mr. Paul was describing this dream, he was upset and "freaked out." T. 742. In fact, the government's evidence regarding Mr. Paul's feelings after the crime are more accurately described as concerned and upset than as lacking in remorse. *See e.g.*, T. 689 (Paul was "upset" about incident when he first spoke with Kris Rogers); T. 705-707, 714 (immediately after incident, Ingle called Chris LaPaglia to say Paul was "upset and needed to see her"; later that evening, Paul called her and said he was

"upset").

Regardless of how the evidence is characterized, the prosecution's closing argument transformed Mr. Paul's alleged past expressions into a present time state of mind: "the defendant has stated *he doesn't feel bad about the murder.*" App. 206 (emphasis added). The present tense comments upon Mr. Paul's current mental state as he sat before the jury in the courtroom: "he doesn't feel bad." Mr. Paul had not testified at either phase of trial. By referencing Mr. Paul's current emotional state, the government effectively commented upon the fact that Mr. Paul had not shared with the jury anything at all about the crime, because he had not testified. This comment thus violated Mr. Paul's constitutional rights. *See* Griffin v. California, 380 U.S. 609, 614 (1965) (condemning such attempts to penalize defendant's for "exercising a constitutional privilege"); Donnelly v. DeChristoforo, 416 U.S. at 643 ("[w]hen specific guarantees of the Bill of Rights are involved, this Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them."). Courts have held that even indirect comments on a defendant's failure to testify may be reversible error. *See* Sidebottom v. Delo, 46 F.3d 744, 759 (8th Cir.), *cert. denied* 516 U.S. 849 (1995) ("[i]ndirect references to a defendant's failure to testify are also prohibited if they either '(1) manifest the prosecutor's intention to call attention to the defendant's failure to testify, or (2) are such that the jury would naturally have

understood them as a comment on defendant's failure to testify.'" (citations omitted).[7]

Because reasonable jurists could find the prosecutor's argument offensive to the Constitution, this Court should grant a COA on the issue.

**C. The Prosecutor Improperly Told the Jury to Disregard Mitigating Factors.**

In the sentencing phase closing argument, the prosecutor urged the jury to refuse to consider mitigating evidence in the case. In the guise of "reminding" the jury of assurances they had made during voir dire, the prosecutor told the jury not to consider Mr. Paul's youth (he was eighteen years old at the time of the offense) and that his co-defendant had received a life sentence for the same offense. App. 211. On voir dire, the government had sought an assurance from the entire venire that Mr. Paul's youth would not "make a difference" in their sentencing deliberations. T. 285. Neither the court nor trial counsel attempted to correct the prosecutor's mis-statement of law.

**D. The Prosecutor's Argument That the Death Penalty Was Mandated by Law.**

---

[7] As noted elsewhere in this motion, incorporated herein by express reference, at least one lower federal court has disallowed altogether a "lack of remorse" nonstatutory aggravator under the FDPA precisely because it "encroaches dangerously on an offender's constitutional right" to remain silent. U.S. v. Davis, 912 F.Supp. at 945.

Finally, at the end of the government's rebuttal sentencing phase closing argument, the prosecutor stated:

> You know, in closing, there is a – I think most of you know, have heard of *Judge Isaac Parker*, who was a federal judge in Fort Smith for a number of years. He made the statement that, "*I never hang anyone. The law hangs them.*"

App. 214 (emphasis added). This reference to Judge Parker was made in isolation, without any further background or explanation either before or after the comment. As such, its obvious intent, and effect, was to diminish the jury's sense of responsibility for a decision in favor of a sentence of death by suggesting that the law mandated a sentence of death.

The prosecutor's improper argument violated Mr. Paul's rights under the Fifth, Sixth, Eighth and Fourteenth Amendments. The prosecutor's attempt to persuade Mr. Paul's capital sentencing jury to refuse even to consider recognized, constitutionally protected mitigating evidence such as youth and co-defendant lesser sentence flies in the face of a wealth of Supreme Court authority requiring a capital sentencer to at least consider whatever mitigating evidence the defendant offers. *See* Woodson v. North Carolina, 428 U.S. 280, 304 (1976); Lockett v. Ohio, 438 U.S. 586, 604 (1978); Eddings v. Oklahoma, 455 U.S. 104, 113-116 (1982). The government's invocation to the jury to refuse to consider this relevant mitigating evidence thus runs completely contrary to Mr. Paul's well-settled Eighth Amendment rights, as well as the statutory

requirement that the sentencer "shall consider" all relevant mitigating evidence. 18 U.S.C. §3592(a). Such material mis-statements of the law, especially concerning this crucial function of the sentencing jury in a capital case, require reversal of Mr. Paul's sentence of death. *Cf.* Lesko v. Lehman, 925 F.2d 1527, 1545 (3rd Cir.) *cert. denied* 112 S.Ct. 273 (1990) (prosecutor's erroneous suggestion in capital case that jury had legal "duty" to sentence to death reversible error).

Likewise, the argument that the law, not the jury, would hang the defendant violates the Eighth Amendment. In Caldwell v. Mississippi, 472 U.S. 320, 332-33 (1985), the Supreme Court condemned prosecutorial argument at the sentencing phase of a capital trial which informed the jury that their sentencing decision would be reviewed on appeal. Decrying this "delegation of sentencing responsibility," *id.* at 320, the Court held that the prosecution's attempt to "minimize the jury's sense of responsibility" violated the Eighth Amendment. 472 U.S. at 341. "Because we cannot say that this effort had no effect on the sentencing decision, that decision does not meet the standard of reliability that the Eighth Amendment requires." *Id.*

Here, the prosecutor's argument was designed to distance the jury from a choice for death by providing two degrees of separation between them and their decision for death. First, he told the jury that responsibility for Mr. Paul's death would not be on their shoulders; instead, "it is the law that hangs him." Second, by

quoting a notable federal judge, the prosecutor gave legal imprimatur and authority to the first point: "do not worry about voting for death; federal Judge Parker says it is okay." This diminution in the jury's sense of gravity and duty with regard to the life/death decision violated Mr. Paul's rights under Caldwell.

Indeed, courts have interpreted Caldwell to hold that "diminution of the jury's sense of responsibility undermines the Eighth Amendment's heightened need for 'the responsible and reliable exercise of sentencing discretion in capital cases.'" Antwine v. Delo, 54 F.3d 1357, 1363 (8th Cir.1995) 516 U.S. 1067 (1996), *quoting* Caldwell at 329; *see also* Shurn v. Delo, 177 F.3d 662 1999 WL 288371 at *5 (8th Cir. May 10, 1999). As the Eighth Circuit held in Driscoll v. Delo, 71 F.3d 701 (8th Cir. 1995), *cert. denied* 519 U.S. 910 (1996), the analysis here should be "controlled by Caldwell v. Mississippi, in which the Supreme Court held it constitutionally impermissible to rest a death sentence on a determination made by a jury that has been led to believe that the responsibility for determining the appropriateness of the death sentence rests elsewhere." *Id.* at 712 (citations omitted). Caldwell "condemns state-induced comments that 'mislead the jury as to its role in the sentencing process in a way that allows the jury to feel less responsible than it should for the sentencing decision.'" Gilmore v. Armontrout, 861 F.2d 1061, 1066 (8th Cir.), *cert. denied* 490 U.S. 1114 (1989) (citations omitted).

Because there is ample authority from which a reasonable jurist could conclude that the prosecutor's arguments violated Mr. Paul's Fifth, Sixth, Eighth and Fourteenth Amendment rights, this Court should issue a COA on this issue.

**VI. Mr. Paul's Death Sentence Was Influenced by Passion and Arbitrariness.**

The errors presented in this motion, considered singly or as cumulative error, *see e.g.* Mak v. Blodgett, 970 F.2d 614, 622 (9th Cir. 1992), *cert. denied* 506 U.S. 951 (1993) reflect clear arbitrariness. The sentencing phase of Mr. Paul 's trial was so replete with error as noted above that it can only be fairly said that his death sentence was the result of arbitrariness. Of obvious import in this regard is the fact that his more culpable co-defendant, Trinity Ingle, received a life sentence. Mr. Paul' s jury refused to consider that fact, as well as his 18 year old youthfulness, in determining his sentence. Of additional importance here are the numerous clear errors committed by the Court and the government in the implementation of the FDPA and the use of aggravating factors in Mr. Paul's case, as well as the prosecutor's improper argument. Since a reasonable jurist could conclude that section 3595(c)(1) requires that a life sentence be imposed, this Cour should issue a COA to permit the Court of Appeals to determine whether Mr. Paul's sentencing proceeding was cobbled by so many such errors that either a life sentence be imposed, or Mr. Paul be given a new sentencing trial.

## VII. THE ADMISSION OF VICTIM IMPACT EVIDENCE AT GUILT-INNOCENCE VIOLATED FED. RULE EVID. 403 AND RENDERED THE GUILT DETERMINATION CONSTITUTIONALLY UNRELIABLE.

The admission of victim impact evidence at guilt-innocence violated Fed. Rule Evid. 403 and rendered the guilt determination constitutionally unreliable**,** in violation of Mr. Paul's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The first words of the government's opening statement at the outset of the trial described who the victim was, his work history, and his hobbies and interests. App. 99. Evidentiary presentation during the guilt innocence phase of trial began with the testimony of the victim' s daughter, Mary McKuin. As at sentencing, the government used Ms. McKuin to describe her father's work history in at FHA, and how he had made his way to the director position within the Administration prior to his retirement. T. 510. She gave a detailed description of his physical condition and attributes. T. 511. She even discussed his hobbies and interests. Id. The government elicited similar testimony from other witnesses early on during the guilt-innocence phase of trial. For example, the government asked a waiter at a local pancake shop, where Mr. Williams was a regular customer, to describe "what type of man was Mr. Williams." She responded by talking about how he was a "very, very nice person, very considerate." T. 523. She testified that he was always clean, and that he dressed very neatly. Id. She also described his conversational style,

speaking a lot at times, other times keeping more to himself. Id. Finally, the first words from the government's mouth during closing argument at the guilt-innocence phase of trial referred to the personal characteristics of the victim. "[This case] is important because it involves the murder of an individual who lived in your community; who until June 22, 1995, Sherman Williams was an 82 year old man who enjoyed hiking, fishing, and his retirement from the Farmers Home Administration." App. 142. As noted, all defense efforts prior to trial to prohibit introduction of such evidence were rebuffed by the Court. See App. 13, 25, 68; T. Pre-Trial Hearing, June 11, 1997 at 7.

Fed. Rule Evid. 403 authorizes the exclusion of relevant evidence when its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." "Unfair prejudice" in this context "speaks to the capacity of some admittedly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged." Old Chief v. United States, 519 U.S. 172, 180 (1997). That ground is "'commonly, though not necessarily, an emotional one.'" *Id.* (quoting Advisory Committee's Notes on Fed. Rule Evid. 403, 28 U.S.C. App., p. 860).

The admission of evidence in the guilt phase of a trial concerning a crime

victims' personal qualities and experiences, and the family's suffering and loss as a result of the crime, is of particular concern under these principles. The tendency of such evidence is to "generate feelings of sympathy for the victims and outrage toward [the defendant]" which creates a "significant risk that the jury would be swayed to convict . . . without regard to evidence of [defendant's] guilt." U.S. v. Copple, 24 F.3d 535, 545-546 (3rd Cir.), *cert. denied*, 513 U.S. 989 (1994). The evidence at issue here had no connection to specific issues of guilt. The fact that Sherman Williams was a retired Director of the FHA, that he was in good shape and enjoyed fishing and jogging, and that he was a clean and considerate person who dressed neatly and was a good conversationalist, had absolutely no relevance to the issue of whether Jeffery Paul was guilty of robbing and killing him. Because many cases condemn the use of evidence which has such ""of scant or cumulative probative force," U.S. v. Naranjo, 710 F.2d 1465, 1468-1469 (10th Cir. 1983), it is clear that a reasonable jurist could grant relief on this claim. *See*, U. S. v. Brewer, 1 F.3d 1430, 1436 (4 th Cir. 1993). Accord Old Chief, 519 U.S. at 188-92; U. S. v. Rivera-Gomez, 67 F.3d 993, 996 (1st Cir. 1995); U.S. v. Petary, 857 F.2d 458, 462 (8th Cir. 1988); U.S. v. Naranjo, 710 F.2d 1465, 1468-1469 (10th Cir. 1983). Therefore, Mr. Paul is entitled to a COA on this issue.

**VIII. Mr. Paul's Conviction Notwithstanding His Innocence of Murder and of**

**Aiding and Abetting Violates the Fifth, Sixth, Eighth and Fourteenth Amendments.**

Jeffery Paul is innocent of the murder of Sherman Williams. He is also innocent of aiding and abetting in Mr. Williams' murder. For this reason, his conviction and sentence of death must be vacated as violative of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The co-defendant in this case, Trinity Ingle, has admitted that he is solely responsible for the killing of Mr. Williams, and that Jeffery Paul had no criminal responsibility whatsoever for the killing of Sherman Williams. In fact, Ingle confirms that Mr. Paul attempted to stop him from shooting and killing Sherman Williams, which prompted Ingle to threaten to kill Mr. Paul, too, if he made further attempts to prevent Ingle from killing Mr. Williams.

In addition to Ingle's admission, Mr. Paul's innocence is supported by a) the existing weaknesses of the government's case against Mr. Paul at trial; b) shown now to be weaker still by further evidence set forth herein demonstrating that the government's case against Mr. Paul rested largely on the testimony of witnesses who either lied and/or were paid for the testimony, or both; c) a fingerprint on the duct tape used to bind the victim proves the criminal agency of one other than Mr. Paul; d) the known physical evidence which in no way implicated Mr. Paul; and e) the

government's witnesses who attribute admissions of guilt to Mr. Paul are now known to be bought-and-paid-for informants whose testimony is inherently suspect. Thus, the record sets forth substantial evidence that Jeffery Paul did not kill or take part in the killing of Sherman Williams.

These circumstances raise the question of whether Mr. Paul's conviction and sentence violate the Eighth Amendment. *See,* Herrera v. Collins, 506 U.S. 39 (1993), where United States Supreme Court assumed for the sake of argument that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief..." *Id.* at 856. The Court in Herrera did not ultimately set forth an actual innocence standard, because it determined that Herrera's evidence (a hearsay report of his brother's dying declaration) was not persuasive under any reasonable standard. Paul's case is much stronger than Herrera's, as it rests on the sworn admission of the real killer, corroborated by physical evidence and the government's admissions in Ingle's trial (see Issue I, above). The issue here is most certainly debatable among jurists of reason, therefore requiring that a COA be granted on this claim. *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003).

A COA should also be granted on the related issue of whether this Court should have granted discovery and an evidentiary hearing on Mr. Paul's claim.

**IX. The Government Improperly Exercised Its Discretion to Seek a Death Sentence Against Mr. Paul, Both Before and After his More Culpable Codefendant Was Sentenced to Life.**

The government improperly exercised its discretion whether to seek a death sentence against Mr. Paul, both in the initial decision to certify his case for death, and thereafter again once his co-defendant Trinity Ingle had been sentenced to life and government re-visited the death certification issue, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because:

1) the local U.S. Attorney's office, in an over-zealous effort to obtain DOJ approval for death certification of what was in fact a weak case for federal death sentencing, *see* Little, R. Why a Federal Death Penalty Moratorium?, 33 Conn. L.Rev. 791, 805-813 (2001), presented false information about the alleged heinousness of the crime to the death certification committee and to the Attorney General in Washington.[8]

---

[8] *See* Little, R., The Federal Death Penalty: History and Some Thoughts about the Department of Justice's Role, 26 Fordham Urban L. J. 347, 499-500 (1999); *compare* T. 598-600 (medical examiner's confirms there was no sign of trauma to the victim' s head or neck other than the single gunshot wound that caused death); *see also* Little, R. Why a Federal Death Penalty Moratorium?, 33 Conn. L.Rev. 791, 805-813 (2001); *compare* T. 598-600 (deceased's cause of death was due to gunshot, not beating).

2) Mr. Paul's case was certified for death by the DOJ in Washington because of the color of his skin. A recent study conducted by the Department of Justice confirms that the Department of Justice has authorized the United States Attorney to seek the death penalty for a substantially disproportionate number of white defendants who are charged with capital-eligible offenses, when compared to individuals of other.[9]

Mr. Paul discussed the DOJ study and its implications extensively in his Motion to Set Aside his Conviction and Sentence, and will not repeat that discussion here. However, the DOJ's own statistics give rise to a strong inference, if not an inescapable conclusion, that the color of a defendant's skin is a primary selection criteria for the death penalty. A review of the statistics concerning rates at which the U.S. Attorneys' offices, the Review Commission and the Attorney General recommended/authorized seeking the death penalty as to these individuals reveals that white defendants were recommended/authorized for pursuit of the death penalty at a rate almost one and one-half times higher than black defendants (1.44) and nearly twice as high as Hispanic defendants (1.8). Mr. Paul pointed out in his petition that the impact of race only

[9] The primary text of the DOJ study is presented in a 43 page "Introduction"; however, the study also has several hundred pages of Tables that follow. The entire document can also be downloaded from the Internet at: http://www.usdoj.gov/dag/pubdoc/dpsurvey.html/

increases at subsequent stages next step of the process, in which the DOJ Capital Case Review Committee and finally the Attorney General personally determines whether a trial will actually move forward as a death case, at which point white defendants are more than one and one-half times more likely to face death than black defendants (1.6), and nearly twice as likely to face death as Hispanic defendants. (1.9).

Petitioner acknowledges that a racially disproportionate pattern of capital charging – even one of this magnitude – does not, on its own, *prove* that the government has engaged in intentional discrimination in violation of the due process clause of the Fifth Amendment, or that it has sought the death penalty in an arbitrary and capricious manner, in violation of the cruel and unusual punishments clause of the Eighth Amendment. This showing, however, is sufficient to demonstrate a *prima facie* case of discrimination, and to shift the burden to the government to produce a credible nondiscriminatory explanation for its practice of disproportionately seeking death sentences for white defendants. *See* Batson v. Kentucky, 476 U.S. 79, 93-94 (1986). Further, it should trigger appropriate discovery and an evidentiary hearing into the question of whether Mr. Paul was targeted for capital punishment because of the color of his skin.

Petitioner also acknowledges that the capital charging practices of the Department of Justice have been primarily questioned with regards to the possible

discrimination against minority defendants. The argument as been made that the disproportionately higher number of black defendants charged with capital-eligible offenses (and authorized by the Attorney General) suggests discrimination by the government. However, the statistics presented above, which come from the government's own study, actually suggest a pattern of discrimination against *white* defendants. The most obvious explanation for that pattern is that, because of the glaring disparity between the gross number of capital eligible minority and white defendants, and on the federal death row, which has created an obvious incentive for the government to decrease that disparity by authorizing a disproportionate number of white defendants. Needless to say, discrimination against white defendants in order to counter-act the perception, or reality, of discrimination against minority defendants would be both inappropriate and unconstitutional.

In the past century, no judicial responsibility has laid greater claim on the moral and intellectual energies of the federal courts than "the prevention of official conduct discriminating on the basis of race." Washington v. Davis, 426 U.S. 229, 239 (1976). The Supreme Court has strived to eliminate all forms of state-sanctioned discrimination, "whether accomplished ingeniously or ingenuously." Smith v. Texas, 311 U.S. 128, 132 (1940). The Court has not hesitated to "look beyond the face of . . . [a] statute . . . where the procedures implementing a neutral statute operate [on]

racial grounds." Batson v. Kentucky, 476 U.S. 79, 88 (1986); *see also* Turner v. Fouche, 396 U.S. 346 (1970); Yick Wo v. Hopkins, 118 U.S. 356, 373-74 (1886). The Supreme Court has emphasized that "the core of the Fourteenth Amendment is the prevention of meaningful and unjustified official distinctions based on race." Hunter v. Erickson, 393 U.S. 385, 391.[10] The most obvious and destructive form that such discrimination can take is systematically unequal treatment of criminal defendants based upon their race. *See* McLaughlin v. Florida, 379 U.S. 184, 190 n.8 (1964) (*citing* Strauder v. West Virginia, 100 U.S. 303, 306-08 (1880) and Ho Ah Kow v. Nunan, 12 F. Cas. 252 (C.C.D. Cal. 1879)). The Supreme Court has insisted "that racial classification, especially suspect in criminal statutes, be subjected to the 'most rigid scrutiny' and, if they are ever to be upheld, . . . be shown necessary to the accomplishment of some permissible state objective, independent of the racial discrimination which it was the object of the Fourteenth Amendment to eliminate." Loving v. Virginia, 388 U.S. 1, 11 (1967).

---

[10] This case, as a federal prosecution, is not subject to the Equal Protection Clause of the Fourteenth Amendment, but the Due Process Clause of the Fifth Amendment, which has long been held to embody this requirement by implication. *See* Bolling v. Sharpe, 347 U.S. 497, 499 (1954); *see also* Weinberger v. Wiesenfeld, 420 U.S. 636, 638 n.2 (1975) ("[Our] approach to Fifth Amendment equal protection claims has . . . been precisely the same as to equal protection claims under the Fourteenth Amendment.").

Mr. Paul's claim is grounded in settled Supreme Court Eighth Amendment jurisprudence as well. In Furman v. Georgia, 408 U.S. 238 (1972), the Supreme Court invalidated all existing death sentences in the United States. The decision in Furman has been consistently interpreted as a condemnation of the "arbitrary and capricious" use of the death penalty. *See* Gregg v. Georgia, 428 U.S. 153, 188 (1976); Turner v. Murray, 476 U.S. 28 (1986) (capital defendants in interracial murders – but not noncapital defendants – are automatically entitled to have potential jurors questioned about the effects of possible racial biases). Condemnation of racial discrimination is apparent from the opinions of the Justices in the majority and those in dissent alike. For example, Justice Douglas concluded in Furman that the capital statutes before the Court were "pregnant with discrimination," 408 U.S. at 257, and thus ran directly counter to "the desire for equality . . . reflected in the ban against 'cruel and unusual punishments' contained in the Eighth Amendment." *Id.* at 255. Similarly, Justice Stewart lamented that "if any basis can be discerned for the selection of these few sentenced to die, it is the constitutionally impermissible basis of race." *See id.* at 364-66 (Marshall, J., concurring); *id.* at 389 n.12 (Burger, C.J., dissenting); *id.* at 449-50 (Powell, J., dissenting). Thus, in Zant, 462 U.S. at 885, the Court explained that Furman would be violated if a state based its capital sentencing on "factors that are constitutionally impermissible or totally irrelevant to the sentencing process, such

as . . . the race . . . of the defendant."

Taken together, these two points can be summarized as follows: The Cruel and Unusual Punishment Clause of the Eighth Amendment imposes a constitutional prohibition against racial discrimination in the use of the death penalty that is at least as strict as the general proscription of racial discrimination in the Fifth and Fourteenth Amendments.

The pattern of prosecutorial use of the death penalty also offends Subsection (f) of 18 U.S.C.§ 3593, which provides that in any capital sentencing proceeding:

> [T]he court . . . shall instruct the jury that, in considering whether a sentence of death is justified, it shall not consider the race . . . of the defendant or of any victim and that the jury is not to recommend a sentence of death unless it has concluded that it would recommend a sentence of death for the crime in question no matter what the race . . . of the defendant or of any victim may be.

Moreover, each juror is required to sign a certificate "that consideration of the race . . . of the defendant or any victim was not involved in reaching his or her individual decision and that the individual juror would have made the same recommendation . . . no matter what the race . . . of the defendant or any victim may be." *Id.* The explicit provisions of 18 U.S.C. § 3593 deal with jury instructions and jury decision making, but the purpose of this subsection is broader. Section 3593 was derived from a provision of the first post-Furman federal death penalty statute, 21 U.S.C. §848(o),

which is entitled "Right of the defendant to justice without discrimination." It reflects extreme sensitivity on the part of Congress to the danger of racial discrimination in capital prosecutions, and a commitment to eradicate any such discrimination.

This Court also has the authority to grant relief from such charging discrimination in the exercise of its supervisory powers over the administration of federal criminal justice:

> "[G]uided by considerations of justice," McNabb v. United States, 318 U.S. 332, 341 (1943), and in the exercise of supervisory powers, federal courts may, within limits, formulate procedural rules not specifically required by the Constitution or the Congress. The purposes underlying use of the supervisory powers are threefold: to implement a remedy for violation of recognized rights [citations omitted]; to preserve judicial integrity by ensuring that a conviction rests on appropriate considerations validly before a jury [citation omitted]; and finally, as a remedy designed to deter illegal conduct [citations omitted].

United States v. Hasting, 461 U.S. 499, 505 (1983).

With this claim, as with many set forth herein, discovery is absolutely essential to the proving and substantiation of such a claim. In Mr. Paul's request for discovery he sought the information necessary to determine how the Attorney General chose which defendants to charge capitally, in general, and in Mr. Paul's case in particular. The existence or absence of racial discrimination cannot be determined without information on the government's capital charging practices, information that is within the government's exclusive control. Therefore, this Court should grant a COA on the

issue of race discrimination and on the question of whether Mr. Paul demonstrated good cause to seek discovery on this issue.

**X. The FDPA is Unconstitutional Because It Permitted the Government to Violate A Number of Applicable Constitutional Amendments In Its Sentencing Phase Presentation and Argument to the Jury**.

The FDPA, is unconstitutional on its face and as applied in this case, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution, because, although statutory aggravating factors operate as elements of the underlying crime, the FDPA does not require a grand jury determination of aggravating factors, nor does it respect the constitutional rights of the defendant in the penalty phase of capital trials.

The precise holding in Ring v. Arizona,536 U.S. 584 (2002) – that juries, not judges, must decide on the existence or not of aggravating factors of the sentence in a death-penalty scheme – obviously has no direct "all fours" impact on the FDPA, since that is the procedure set forth in the statute. 18 U.S.C. § 3593. In order to get to its holding in Ring, however, the Supreme Court reached a predicate conclusion that does have enormous impact on the FDPA, *i.e.*, that aggravating factors are not mere sentencing factors but, instead, function as elements of an element.[11] From this

[11] The name by which these circumstances are referred to is of no great moment. As pointed out by Justice Scalia in *Ring*, it matters not a bit "whether the

predicate flow two conclusions: first, that in the federal system where the Fifth Amendment's Grand Jury Clause applies, all elements of an offense must be alleged by indictment (the claims arising from that fact are set forth elsewhere in this motion, incorporated herein by express reference; and, second, the predicate determination that aggravating factors are elements of an offense brings into play important and fundamental issues concerning the applicability of other constitutional protections and guarantees in the sentencing phase of a capital trial.

**XI. The Jury's Failure to Unanimously Find, and Consider, Relevant Mitigating Evidence that His Co-Defendant Received a Life Sentence Violated Mr. Paul's Rights Under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments**.

The jury's failure to unanimously find, and consider, relevant mitigating evidence that his co-defendant received a life sentence, violated Mr. Pau's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The evidence before the jury in this case was irresistibly vague in one critical respect: it deflected any serious effort to distinguish the role Mr. Paul played from the role Mr. Ingle played in the murder of Sherman Williams. The prosecution did not even attempt to rebut the defense argument that Mr. Paul was no more culpable

statute calls them elements of the offense, sentencing factors or Mary Jane," 536 U.S. at 610, the issue is one of function.

than Mr. Ingle. Instead, it sought to deflect the jury's consideration of this matter by arguing that what another jury decided in Mr. Ingle's case was not, and should not be, determinative of what the proper punishment was for Mr. Paul. Thus, only by urging the jury to ignore entirely the matter of equal culpability could the prosecution hope to avoid the ineluctable conclusion that Mr. Paul could not be fairly put to death if Mr. Ingle was not going to be. The jury heeded the prosecutor's call, and in failing to find the equal culpability mitigating factor, failed to consider mitigating evidence that as a matter of law the Eighth Amendment and the capital sentencing statute required it to consider.

The record in Mr. Paul's case establishes by more than a preponderance of the evidence that Trinity Ingle, who received a life sentence, was not less, and indeed more culpable than Jeffery Paul in the death of Sherman Williams. The evidence is sufficiently compelling in this regard, that no rational trier of fact should have concluded otherwise. For this reason, this Court should hold that the jury's refusal to find the "co-defendant life sentence" mitigator violated its duty under the Eighth Amendment to consider the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976). Accord, Lockett v. Ohio, 438 U.S. 586 (1978). "Just as the State may

not by statute preclude the sentencer from considering any mitigating factor, neither may the sentencer refuse to consider, as a matter of law, any relevant mitigating evidence.... The sentencer ... may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration." Eddings v. Oklahoma, 455 U.S. 104, 113-114 (1982).

Congress incorporated these principles into the FDPA. Section 3592 of the Act declares that at the sentencing phase of a capital trial held pursuant to the Act:

> [T]he finder of fact *shall consider* any mitigating factor, including...:
>
> [listing seven specific statutory mitigating factors, and] ...
>
> (8) Other factors. – Other factors in the defendant's background, record or character or any other circumstances of the offense that mitigate against imposition of the death sentence.

18 U.S.C. §3592(a) (emphasis added). One of the statutory mitigating factors enumerated in §3592(a) is:

> 4) Equally culpable defendants. -- Another defendant or defendants, equally culpable in the crime, will not be punished by death.

Congress also established a lower burden of proof for a defendant's mitigating evidence than that mandated for aggravating factors. *Compare* 18 U.S.C. §3593(c) (government must prove aggravating factor "beyond a reasonable doubt") *with id.* (defense must prove mitigating factor "by a preponderance of the information.").

In the present case, the defense submitted for the jury's consideration the

statutory mitigating factor defined in §3592(a)(4) set forth above. The court instructed the jury, in accordance with §3593(c), that this factor should be considered by the jury if the defense established it by a preponderance of the evidence. App. 191-92. The court also instructed, contrary to the FDPA and Supreme Court precedent, *see* Claim III, that only those members of the jury who actually found the existence of a mitigating factor could consider it in their determination of the appropriate punishment. App. 194; *see also* App. 90. Thus, "*as a matter of law*" pursuant to the court's instruction, if no member of the jury found the existence of a mitigating factor, then no member of the jury considered that factor in determining whether Mr. Paul should live or die.

In Mr. Paul's case, the jury unanimously rejected the (a)(4) mitigating factor concerning the fact that Trinity Ingle, Mr. Paul's co-defendant, received a life sentence. App. 92. Thus, under the court's instruction, no member of the jury even considered, let alone gave weight to, the fact that Trinity Ingle, Mr. Paul's co-defendant, had just days before Mr. Paul's trial, received a life sentence for his conviction for the same offense. In his petition for relief from his conviction and sentence, Mr. Paul detailed the evidence, including secretly recorded statements of Mr. Ingle, the defendants' respective statements to authorities and the physical evidence, all of which, taken together, establishes beyond question that Mr. Paul is certainly no

more culpably, and very probably far less culpable, than his codefendant, Trinity Ingle, who was sentenced to life imprisonment for this crime.[12]

The defense was only required to prove by a preponderance of the evidence the mitigating factor that an equally culpable co-defendant received a life sentence. 18 U.S.C. §3593(c). The jury was so instructed. App. 183, 192 (instruction); App. 89 (special verdict form). The evidence from Mr. Paul's trial leaves no doubt that Mr. Paul carried his burden of proving this factor, and that no rational juror could have concluded otherwise. Failure to consider mitigating evidence which has been thus established in accordance with the requisite level of proof violates the Eighth Amendment. *See* Eddings, Hitchcock, *supra*.

A COA should issue because jurists of reason have arrived at the opposite conclusion reached by this Court. See, e.g., Nibert v. State, 574 So.2d 1059, 1062 (Fla. 1990); Evans v. State, 598 N.E.2d 516, 519 (Ind. 1992); Magwood v. Smith, 791

---

[12] At Ingle's trial, government witness Derrick Bell testified that Ingle had repeatedly told him, at least five times, that he personally had hit and shot Sherman Williams, in the head and chest. App. 312-13, 320. Ingle told Bell he was the one who struck the victim immediately after they first confronted him and asked for the time. App. 316. Ingle said it was he who bound the man up with duck tape, App. 318-19, it was he who had exclaimed "[t]his mother f _ _ _ _ r is trying to resist," and he who had then "pulled out his gun and shot him." App. 320. Bell testified Ingle told him he shot the victim in the "dome" [head] and then he shot him in the chest. *Id.* Bell testified that Ingle "would laugh when he said he shot the guy in the dome." App. 322.

F.2d 1438, 1449-50 (11th Cir. 1986); Sanders v. State, 585 A.2d 117, 134 (Del. 1990). Just as a jury's consideration of an improper aggravating factor skews its weighing process in assessing punishment and renders the sentence unreliable under the Eighth Amendment, *see* Stringer v. Black, 503 U.S. 222, 232 (1992), the erroneous failure to find and weigh relevant mitigation that is supported by the evidence infects the process of deciding whether death is the appropriate punishment.

**XII. The Jury's Failure to Find Unanimously and Consider Defendant's Youth as a Mitigating Factor Violated His Rights Under the FDPA and His Fifth, Sixth, Eighth and Fourteenth Amendment Rights.**

The jury's failure to find unanimously and consider Jeffery Paul's youth as a mitigating factor violated his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. At the sentencing phase of trial, the defense introduced Mr. Paul 's birth certificate, indicating that he was born on September 2, 1976. T. 978, DE 1. Thus at the time of the offense, on June 22, 1995, Mr. Paul was eighteen years old. Under applicable law, this was the *youngest* age that a person could be and still be eligible for the death penalty. Section 3591(a)(2) declares that "no person may be sentenced to death who was less than 18 years of age at the time of the offense." 18 U.S.C. §3591(a)(2). the defense submitted as a mitigating factor at sentencing the fact that "the defendant was youthful at the time of the offense." App. 193. Only six jurors found this factor. App. 92 (verdict form

indicating vote). Because of this Court's instruction (also repeated on the special verdict form) allowing only those jurors who found a mitigating factor to consider it in the overall balance of aggravating and mitigating factors, App. 194 (court's instruction); App. 90 (special verdict form), only six jurors considered Mr. Paul's youthfulness during sentencing deliberations. The remaining six were, as a matter of law, prohibited from considering Mr. Paul 's youth in their sentencing deliberations.

As noted above, the Supreme Court has steadfastly held that a capital sentencer must permit consideration of the "character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death." Woodson v. North Carolina, 428 U.S. 280, 304 (1976); *see also* Lockett v. Ohio, 438 U.S. 586, 604 (1978). Historically, the condition of youth has been consistently recognized as a special factor worthy of particular attention in *any* sentencing scheme, and especially in *capital* sentencing proceedings. "[Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." Eddings, *supra*, 455 U.S. at 115-116. For this reason, the Court has recognized youth as a mitigating factor to be considered in a decision whether a person should be sentenced to death.

Furthermore, as noted in the preceding claim, in Eddings the Court held it was

Eighth Amendment error for a capital sentencer to refuse to consider relevant mitigating evidence such as youth in the sentencing determination. ("The sentencer ... may determine the weight to be given relevant mitigating evidence. But they may not give it no weight by excluding such evidence from their consideration."). 455 U.S. at 113-114; Hitchcock, *supra*. In concert with these principles, section 3592(a) of the FDPA declares:

> [T]he finder of fact shall consider any mitigating factor, including...:
>
> (8) Other factors. -- Other factors in the defendant's background, record, or character or any other circumstance of the offense that mitigate against imposition of the death sentence.

Both constitutional and statutory mandates were violated in Mr. Paul's case because it is indisputable that Mr. Paul established beyond all doubt that he was "youthful" under any meaningful definition of that term. He was only eighteen years old. No reasonable person could rationally determine that, at that age, Jeffrey Paul was not "young" as that term is commonly used. This fact finds ample support in both the statute and in Supreme Court authority.

The U.S. Supreme Court has found by implication that Jeffery Paul's eighteen year old status was "youthful" and therefore required mitigating consideration by his capital sentencer. In Johnson v. Texas, 509 U.S. 350 (1993), the Court characterized a *nineteen* year old defendant as "youthful" for purposes of Eighth Amendment

jurisprudence, stating, "There is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury if a death sentence is to meet the requirements of Lockett and Eddings." 509 U.S. at 367 (citations omitted). The Supreme Court concluded, "A sentencer in a capital case must be allowed to consider the mitigating qualities of youth in the course of its deliberations over the appropriate sentence." *Id.*

In spite of this constitutional mandate, one half of the jury did not consider Mr. Paul's young age as a mitigating factor in determining the appropriate sentence. This result violates Eddings: "*[A]s a matter of law* ... [they gave] it no weight by excluding such evidence from their consideration." 455 U.S. at 113-114 (emphasis in original). Moreover, because no reasonable juror could have failed to find Mr. Paul youthful, this result also violated the mandate of the statute that the finder of fact "shall consider" factors such as youthfulness in mitigation. 18 U.S.C. §3592(a). Thus, the record is clear that the jury did not consider a relevant, constitutionally protected mitigating factor in their decision as to whether Jeffery Paul should live or die. No rational trier of fact could have found that Jeffery Paul was not youthful. For these reasons, a COA should issue on Mr. Paul's claim.

**XIII. The Trial Judge Was Biased Against the Defendant in this Case, Depriving Mr. Paul of His Rights As Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.**

The trial judge in this case, the Honorable Jimm Larry Hendren, was biased against Mr. Paul, rendering his trial fundamentally unfair and depriving Mr. Paul of his right to due process and effective representation, as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The Federal Death Penalty Act of 1994 sets forth procedures for the prosecution of federal capital cases. 18 U.S.C. §3591(a) *et seq*. After passage of the Act, Attorney General Janet Reno promulgated a death penalty protocol, which can be found in §9-10.000 *et seq*. of the United States Attorney's Manual [the "Manual"]. That protocol provides for centralized review of any death penalty case decisions made by local U.S. Attorneys' offices, requiring such offices to seek and obtain approval by the Attorney General in order to have a case in which the indictment charges a capital count actually certified as a death penalty case.

As a part of the Attorney General's review process, the protocol establishes a "Review Committee on Capital Cases" [the "committee"], *see* Manual at §9-10.040, which has been variably comprised of several senior officials within the Department of Justice. After the Committee reviews a particular case and makes a recommendation to the Attorney General, the Attorney General then decides whether the government may seek the death penalty. Any local federal prosecutor who wishes to withdraw a previously approved death notice must, under the protocol, notify the

Department, seek a recommendation from the committee, and obtain approval from the Attorney General.

Mr. Paul and his co-defendant, Trinity Ingle, were both charged by indictment with §1111 murder for the crime of killing and/or aiding and abetting in the killing of Sherman Williams, a capital offense. Both cases were initially certified by the Attorney General for prosecution as death cases.

Mr. Paul's co-defendant, Trinity Ingle, was tried first, beginning in May, 1997, also in the Hot Springs Division of the U.S. District Court for the Western District of Arkansas, and also with the Honorable Jimm Larry Hendren, presiding. Within two weeks of the commencement of Mr. Paul' s trial, Mr. Ingle received a sentence of life in prison from the jury.

Shortly after the jury returned a life sentence in the Ingle case, the committee unanimously voted to de-certify Mr. Paul' s case as a death case, presumably due to the fact that co-defendant Ingle had received a life sentence. *See e.g.*, 18 U.S. C. §3592(a)(4) (providing as a statutory mitigating factor that "another defendant or defendants, equally culpable in the crime, will not be punished by death.").

During the intervening two week period, however, the trial judge in this case, the Honorable Jimm Larry Hendren, expressed anger and concern about the fact that the committee had de-certified Mr. Paul's case for death. He voiced these concerns in the

presence of trial counsel, and in the presence of counsel for Mr. Ingle, and in the presence of other individuals. In once such instance Judge Hendren expressed these concerns during a conference with counsel in the Paul case; such conference, however, was either not reported or, if it was, a transcript of the proceeding was not a part of the official court record made available to undersigned counsel. Of particular concern to Judge Hendren was his understanding that the committee did not have the authority to de-certify the case, and that only he, Judge Hendren, had such authority once the case had originally been certified as a death case. He voiced with clear disgruntlement his concern that the committee had voted to de-certify the death notice in Mr. Paul's case.

Shortly thereafter, again within the two week period intervening the two trials, Attorney General Janet Reno overrode the unanimous committee recommendation to de-certify the case. At that point in time, and possibly throughout her tenure as Attorney General for the United States, Ms. Reno had never overridden a unanimous recommendation of the committee. The record contains no explanation, however, for Ms. Reno's decision to override the unanimous committee recommendation in this case.

A reasonable person in Mr. Paul's position would believe from Judge Hendren's expressions of anger and disapproval at the Committee's recommendation that Judge

Hendren had prejudged the case, and that he would use his discretionary powers of control over the jury selection process, the evidence, the argument and the jury instructions to influence the proceedings in the direction of a conviction and sentence of death. As a starting point, "[f]airness of course requires the absence of actual bias in the trial of a case." In re Murchison, 349 U.S. 133, 136 (1955). for this reason, due process is violated "by judges who have no actual bias and who would do their very best to weigh the scales of justice equally between contending parties...." even if it merely appears that such bias is possible: "to perform its high function in the best way, 'justice must satisfy the appearance of justice.'" *Id.* at 136; *see also* Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825 (1986) ("The Due Process Clause may sometimes bar trial by judges who have no actual bias.... But to perform its high function in the best way, justice must satisfy the appearance of justice." (Internal quotation marks and citations omitted.)).

Coupled with the Court's pretrial expressions is the conduct of Mr. Paul during the trial itself. As the trial wore on, Mr. Paul became more disruptive and outspoken, even using profanity toward the Court and his lawyers. Present counsel contend, and believe, that Mr. Paul's conduct was the product of his deteriorating mental condition under the prolonged stress of trial. Counsel have tendered to this Court affidavits of highly qualified mental health experts who believe that Mr. Paul was likely sinking into

a profound mental disturbance at the time, and that he continues to deteriorate in prison. During the course of these proceedings the Court had ample cause and opportunity to allow these experts to conduct an evaluation of Mr. Paul to address these and other questions, but the Court has refused to permit a reasonable investigation of the issue. This case is not unlike Mayberry v. Pennsylvania, 400 U.S. 455 (1971), where the defendant during trial referred to the trial judge using epithets and charged the trial judge with running a "Spanish Inquisition," telling the judge to "Go to hell." *Id.* at 466. The Court in that case held that the trial judge to whom these remarks were made could not sit as the trial judge in a subsequent contempt proceeding in the face of this abuse. The litigant's insults were "apt to strike 'at the most vulnerable and human qualities of a judge's temperament.'" *Id.* (*quoting* Bloom v. Illinois, 391 U.S. 194, 204 (1968)). *See also* Taylor v. Hayes, 418 U.S. 488 (1974) (judge who had become embroiled in a "running controversy" with an attorney that resulted in "marked personal feelings ... on both sides," and during which the judge had displayed an "unfavorable personal attitude" toward the attorney, could not try the attorney for contempt). *Also see*, Withrow v. Larkin, 421 U.S. 35, 39-41 (1975)(explaining the Murchison facts as violative of due process "not only because the judge in effect became part of the prosecution and assumed an adversary position, but also because as a judge, passing on guilt or innocence, he very likely relied on 'his

own personal knowledge and impression of what had occurred in the grand jury room' an impression that 'could not be tested by adequate cross- examination.'" 421 U.S. at 53 (*quoting* Murchison, 349 U.S. at 138)). This Court's treatment of the mental health issues raised similar concerns; Judge Hendren was the butt of Mr. Paul's outbursts; Judge Hendren had already expressed outrage at the notion that the prosecution might waive the death penalty; Judge Hendren denied all opportunities to explore the likelihood that Mr. Paul's offensive behavior was connected to a mental disease or defect, ignoring the sworn declarations of qualified mental health experts.

The standard for disqualification is similar to that for granting a COA: Whether a reasonable person could find that the judge was biased. If, upon reading the declarations, Judge Hendren's "impartiality might reasonably be questioned," then recusal is required under 28 U.S.C. § 455. *Liljeberg v. Health Services. Acquisition Corp*., 486 U.S. 847 (1988). Reasonable legal minds could differ as to whether this Court should have presided over Mr. Paul's trial and subsequent 2255 proceedings after having expressed feelings indicating that even before hearing evidence in Mr. Paul's case he was of the opinion that Mr. Paul should be sentenced to death. This Court should therefore issue a COA to permit the appeal of this issue.

**XIV. This Court's Sentencing Phase Instruction Allowing Only Those Jurors Who Found the Existence of A Mitigating Factor to Consider It Violated Mr. Paul's Rights As Guaranteed Under the FDPA and the Fifth, Sixth, Eighth and**

**Fourteenth Amendments**.

This Court's sentencing phase instruction allowing only those jurors who found the existence of a mitigating factor to consider it violated Mr. Paul's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. This Court instructed the jury at sentencing as follows:

> All of you must weigh any aggravating factors that you unanimously found to exist, whether statutory or non-statutory, and *each of you must weigh any mitigating factors that you individually find to exist*.

T. 1129 (emphasis added). This instruction violated the FDPA, and precluded full jury consideration of all mitigating evidence, in violation of Mr. Paul's constitutional rights.

The FDPA specifically provides that a single juror may make a *finding* as to the existence of a mitigating factor. *See* 18 U.S.C. §3593(d). The statute then provides: "...the jury, or if there is no jury, the Court, shall consider whether all the aggravating factor or factors found to exist sufficiently outweigh all the mitigating factor or factors found to exist ..." 18 U.S.C. §3593(e) (emphasis added). Reading these sections together, the statute appears to require that "the [entire] jury" consider any mitigating factors found by any of its members. The Supreme Court's recent interpretation erases any ambiguity.

In Jones v. U.S., 527 U.S. 373 (1999), the Court faced its first case brought under the FDPA. In deciding the issues before it, the Court reviewed the structure of

the capital sentencing scheme set forth in the Act. Summarizing the content of the two sections noted above, the Court stated: "the jury may consider a mitigating factor in its weighing process so long as one juror finds that the defendant established its existence by a preponderance of the evidence." *Id.* at *3, *citing* §3593(c), (d). While disagreeing with the majority's resolution of other issues in the case, the dissenting justices were in accord on this aspect of the statute: "[A] mitigating factor may be considered in the jury's weighing process if any one juror finds the factor proved by a 'preponderance of the evidence.'" Jones, *supra*, at *18, *citing* §3593(d). Thus, contrary to the instruction given in Mr. Paul's case, the Supreme Court unanimously read the pertinent sections of the FDPA to require full jury consideration of any mitigators found by one or more jurors. This Court's instructions violated Jones.

In allowing different jurors to consider different facts about the defendant in determining sentence, the instructions here produced the opposite result. Under these instructions, the possibility exists that twelve different jurors could completely disagree as to the mitigating evidence, and thus, while deliberating, be considering twelve different mitigating portraits of the defendant in determining the appropriate sentence. Indeed, in Mr. Paul's case, one can only imagine the discussion during jury deliberations, with some jurors arguing for a life sentence based upon facts about Jeff Paul's young age, or disadvantaged background, while at the same time others refusing

even to listen to such arguments "*as a matter of law*," Eddings. One is reminded of two proverbial scenarios: (1) the image of ships passing one another at night unaware of the other; and, (2) an elephant being described by several non-seeing persons in completely different ways depending upon which part each is touching. Such a process, if legitimated by this Court, will likely lead to hung juries more often than not, which is precisely what Congress meant to avoid. Reading the statute as a whole, it cannot be fairly said that Congress intended to permit such a cacophonous consideration of the defendant's character and background. Reasonable jurists could conclude that the instructions precluded individual jurors from considering mitigating evidence, in violation of Mills v. Maryland, 486 U.S. 367 (1988).

In this case, the error was not harmless. The jury that sentenced Mr. Paul to die found four mitigating factors by less than a unanimous vote. *See* App. 91-92 (verdict form indicating: statutory factor (4) regarding defendant's background – 3 votes; nonstatutory factor (4) regarding parental irresponsibility – 8 votes; nonstatutory factor (7) regarding defendant's youth – 6 votes; additional factor found by jury regarding defendant witnessing shooting in mall – 6 votes). Under the Court's instruction, these four factors were not considered by all members of the jury during the weighing of aggravating and mitigating factors; instead, only those jurors who to find such factors were allowed to consider them in the balance.

For the foregoing reasons, this Court should issue a COA on this issue.

**XV. The Government's Reliance Upon Vague, Overbroad, and Otherwise Improper Aggravators at Sentencing Violated Mr. Paul's Rights Under the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments.**

The government's reliance upon vague, overbroad, and otherwise improper aggravators at sentencing in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The relevant Eighth Amendment principles in this context are well settled. As the FDPA is a "weighing" statute, *see* U.S. v. Jones, 132 F.3d 232, 250 (5th Cir. 1998), *cert. granted and aff'd on other grounds*, 527 U.S. 373 (1999) the sentencing jury was required to balance aggravating and mitigating factors found to exist. A death sentence is permitted only if the jury unanimously finds that the aggravating factors sufficiently outweigh the mitigating factors to justify such sentence. 18 U.S.C. §3593(e).

Aggravating factors utilized in capital sentencing schemes cannot be "of vague or imprecise content" such that they fail to channel the sentencer's discretion. Stringer v. Black, 503 U.S. 222, 237 (1992). "[A] statutory aggravating factor is unconstitutionally vague if it fails to furnish principled guidance for the choice between death and a lesser penalty," Richmond v. Lewis, 506 U.S. 40, 46 (1992) (citations omitted), and "fails adequately to inform juries what they must find to impose the death penalty." Maynard v. Cartwright, 486 U.S. 356, 361-62 (1988). "An aggravating

circumstance is invalid . . . if its description is so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor." Espinosa v. Florida, 505 U.S. 1079, 1081 (1992). Additionally, if the sentencer "could fairly conclude that an aggravating circumstance applies to every defendant eligible for the death penalty, the circumstance is constitutionally infirm." Arave v. Creech, 507 U.S. 463, 474 (1993) (emphasis in original).

The defense sought to prohibit the government from reliance upon vague aggravating factors prior to trial. App. 51. The Court denied the defense motion in all respects but one (refusing to allow use of "low rehabilitation potential" as a separate factor apart from future dangerousness factor). T. Pre-Trial Hearing, June 11, 1997 at 25-27.

Several aggravating factors relied upon by the government were either vague and/or overbroad. The Court's instructions regarding the "heinous, cruel or depraved" (c)(6) aggravating factor, *see* App. 186-88, were confusing and contradictory. The Court defined each of the three operative terms, "heinous," "cruel" and "depraved," in terms of torture. *Id.* at 1122. The Court then defined torture in terms of "mental as well as physical abuse" of the victim, and instructed that the victim must have been conscious of the abuse at the time inflicted. *Id.* The Court also instructed that with respect to such abuse, the defendant must have specifically

intended to inflict serious mental or physical pain upon the victim. *Id.* Finally, the Court instructed that serious physical abuse may be inflicted either before of after death, and that it *does not* require the victim to be conscious. App. 188.

This lengthy and convoluted definition contradicts itself in a way that renders it meaningless and, as such, intolerably vague. Initially it instructs the jury that the victim must have been conscious of the torture being inflicted upon him to satisfy the (c)(6) factor. Then the instruction indicates that the victim need not be conscious of the torture to satisfy this factor. It cannot be both. Any reasonable juror would have had no idea as to the requisite findings. This level of confusion and vagueness in a statutory aggravator does not pass constitutional muster. Espinosa, *supra*.; *Cf.* Newton v. Armontrout, 885 F.2d 1328, 1333-1335 (8th Cir. 1989) *cert. denied* 497 U.S. 1038 (1990) ; Battle v. Delo, 19 F.3d 1547, 1562 (8th Cir.1994), *opinion adhered to as modified* 64 F.3d 347 (1995), *cert. denied* 517 U.S. 1235 (1996); *see also* Mathenia v. Delo, 975 F.2d 444, 449 (8th Cir.1992), *cert. denied*, 507 U.S. 995 (1993).

The Court also instructed on the non-statutory aggravating circumstance that Mr. Paul allegedly lacked remorse. App. 189-90. Here the government sought Mr. Paul's execution in part based on evidence that the "victim begged for his life." *Id.* This alleged fact (the only evidence of which came from statements he allegedly made

to acquaintances) does not relate to the concept of remorse and thus renders it meaningless. Remorse commonly refers to regret for a wrong committed in the past. What the victim may have said at the time of the offense is not relevant to whether Mr. Paul was later remorseful for his involvement in the crime. At least one federal district court has disallowed "lack of remorse" as a non-statutory aggravator due in part to its ambiguousness. *See* U.S. v. Davis, 912 F. Supp. 938, 945 (E.D.La. 1996) *aff'd*, 132 F.3d 1454 (5th Cir. 1997), *cert. denied*, 118 S.Ct. 1331 (1998). Thus, a COA should issue because reasonable jurists have in fact decided this issue differently.

There is also a serious question as to whether the evidence supported a lack of remorse instruction. Government witness Kris Rogers testified that when Mr. Paul allegedly told him about the offense two nights after it had happened, he was very upset about it. T. 689. Government witness Chris LaPaglia testified that when Ingle called her the night of the offense, he said Mr. Paul was upset. T. 705. She confirmed this fact when Paul later called himself and said he was upset. T. 707. In such a situation, the better course would have been to avoid any such ambiguity, especially because "[l]ack of remorse is a subjective state of mind, difficult to gauge objectively since behavior and words don't necessarily correlate with internal feelings." Davis, *supra*, at 945.

In addition, the government also sought and obtained a jury finding on an

aggravating factor that the defendant had successfully eluded capture by the FBI until his arrest in August, 1996. App. 86 (jury verdict form). This factor, to the extent it had any relevance beyond the scope of the future dangerousness factor noted above, was an improper factor for use in aggravation of punishment. While the fact might relate to considerations regarding whether he would be a threat to society in the future, its relevance to any issue beyond that fact is either non-existent, or worse yet, wholly inappropriate as a separate basis on which to sentence a person to death. The only reasonable relevance this factor may have had apart from future dangerousness highlights the government's inability to track down, capture, and successfully arrest Mr. Paul. Such governmental reliance upon their own failings as a basis for concluding that Mr. Paul is more deserving of death than someone whom the government is able to arrest more quickly "fails to furnish principled guidance for the choice between death and a lesser penalty," Richmond, *supra* at 46.

Finally, the government's particular utilization of two factors, the statutory vulnerability of victim factor, *see* §3592(c)(11), and the non-statutory victim impact factor, resulted in another vagueness and overbreadth problem. Here the government sought to portray the victim as "helpless" and "vulnerable" due to his old age, while at the same time healthy, in good shape, and having years of life left *despite* his age. In its presentation of sentencing phase evidence, in closing argument, and in the

drafting of the non-statutory victim impact factor, the government portrayed Mr. Williams as a man who, though elderly, was strong, in good health, and had many years of life left in him. T. 939 (victim's daughter describes Mr. Williams as avid runner and fisherman, thin, fit, ate well and ran for health); T. 944 (daughter noting how loss of healthy, active parent harder than if infirm due to old age); App. 204 (prosecutorial argument that victim "still had a lot of years left in his life to enjoy"); App. 88 (verdict form on victim impact factor includes "avid jogger"). Nevertheless, the government specifically relied upon, and argued the fact that, because of his age, he was particularly vulnerable. Thus the government relied upon contradictory factors and evidence to stack the balance against Mr. Paul at sentencing.

Each of these factors were "so vague as to leave the sentencer without sufficient guidance for determining the presence or absence of the factor." Richmond, *supra*. The vagueness problem was exacerbated in some instances by the fact that the jury was given no clear and consistent definition of the operative terms. *See* Walton v. Arizona, 497 U.S. 639, 653 (1990) ("it is essential that the jurors be properly instructed regarding all facets of the sentencing process. It is not enough to instruct the jury in the bare terms of an aggravating circumstance that is unconstitutionally vague on its face.").

The Supreme Court has identified several constitutional concerns arising from

the government's reliance upon vague or ill-defined aggravating factors. First, use of such factors in the weighing process "creates the risk that the jury will treat the defendant as more deserving of the death penalty than he might otherwise be by relying upon the existence of an illusory circumstance." Stringer, 503 U.S. at 237. Reliance upon vague aggravating factors also creates the "possibility . . . of randomness," *id.*, by providing no definitions, or worse yet, confusing and contradictory definitions of the operative terms, and permitting the jury to find factors without any common understanding of their meaning. Finally, use of such vague factors placed a "thumb [on] death's side of the scale," creating a bias in favor of the death penalty. Stringer, *supra*.

These errors were not harmless in this case. Taken singly, or together, the invalidation of any of these factors would have upset the balance between aggravating and mitigating evidence in this case. By placing a "thumb on death's side of the scale," Stringer, *supra*, these vagueness errors resulted in an unconstitutional sentence of death. Mr. Paul also urges this Court to avoid any attempt to re-weigh the sentencing phase factors in this case once it is determined that the above were invalid.

Reasonable jurists have found aggravating circumstances similar to each of the circumstances discussed above to be constitutionally vague and overbroad, in violation of the Eighth Amendment. In this case, involving multiple aggravating factors

with potential constitutional infirmities, a COA should be granted to permit the Court of Appeals to resolve the issues.

**XVI. The Prosecution's Reliance Upon Aggravating Factors Which Were Duplicative Of One Another And Relied Upon The Same Operative Facts Violated Mr. Paul's Rights Under the FDPA and the Fifth, Sixth, Eighth And Fourteenth Amendments**

The prosecution's reliance upon aggravating factors which were duplicative of one another and relied upon the same operative facts violated Mr. Paul's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

The prosecutor relied upon, and the Court instructed the jury regarding, the statutory "heinous, cruel and depraved" (c)(6) instruction, *see* App. 83, 186-88, and the statutory "vulnerability of victim" (c)(11) aggravator, *see* App. 83, 186. Because of the Court's definitions of operative terms in the (c)(6) instruction, there is a reasonable likelihood the jury understood the instructions to allow the finding of two separate factors from identical facts. Boyd v. California, 494 U.S. 370, 380 (1990). The Court's instruction on the (c)(6) aggravator first defined each of the three terms, "heinous," "cruel" and "depraved." App. 187. The Court noted that they were stated in the disjunctive, meaning that a finding of any one of them was sufficient for the jury to find the existence of the (c)(6) aggravator. App. 186-87. The Court then instructed

that, as a general matter, "pertinent factors" in determining whether any one of the three terms existed included the "helplessness of the victim." App. 187-88. In effect, therefore, the jury was instructed as a matter of law that it could find the (c)(6) aggravating factor so long as it found that the victim was helpless.

With respect to the (c)(11) "vulnerability of the victim" factor, the verdict form only indicated that the victim' s vulnerability was due to "old age." App. 84. Although the Court's instruction failed to define either "vulnerable" or "helpless," in everyday usage these terms readily connote common ideas. *Cf.* Arave v. Creech, 507 U.S. 463, 472 (1993) ("We assume that legislators use words in their ordinary, everyday senses... resort to dictionaries for the common meaning" of words is acceptable practice) . This is of course especially true as applied to the facts of this case. That is, the victim, an elderly man, would have been seen as particularly helpless in large part due to his old age.

The improper doubling here was as much a product of the government's argumentative use of these factors as it was of the Court's instructions. Well aware of the connection between the concept of helplessness under (c)(6) and the concept of vulnerability under the (c)(11) factor, the prosecutor capitalized on this commonality by repeatedly referring to the victim's old age in support of each factor. With respect to the (c)(6) factor, he expressly noted that the "helplessness of the victim" was to be

considered, and then immediately noted that the victim was "an 82 year old man." App. 203. He continued to comment upon the victim's age and his status as a grandfather in discussing the (c)(6) factor. App. 203-04. When discussing the victim vulnerability factor, he immediately noted that the victim was "an 82 year old man." App. 204. Thus the government sought a finding of two aggravating factors based upon the same evidence, namely, that the victim was elderly.

The defense filed several pre-trial motions aimed at preventing precisely the type of error noted here. The defense sought, at the very least, a hearing prior to the start of the sentencing phase to assess and screen the government's aggravating evidence to ensure its reliability, and re-urged the request at the start of the sentencing phase. App. 31; T. Pre-trial Hearing June 11, 1997 at 18-24, T. 916-17. Nevertheless, the Court denied all such motions. *Id.* at 27, 33, 42 & T. 916-17.

The Supreme Court faced a similar issue recently in Jones v. U.S., 527. U.S. 373 (1999). There the Court addressed the contention that the jury was allowed to find two separate nonstatutory aggravating factors based on similar sets of facts. *Id.* at *12-*17. The Court accepted "for the sake of argument" the notion that predicating two aggravating circumstances upon the same operative facts and circumstances impermissibly stacks the deck in favor of the death penalty, but concluded that Jones

was not entitled to relief because if there was error, it was harmless in his case.[13]

Less ambiguous is the Tenth Circuit's holding in U.S. v. McCullah, 76 F.3d 1087, 1111 (10th Cir. 1996), *cert. denied* 520 U.S. 1213 (1997), finding constitutional error where one aggravating factor "substantially overlaps" another. Indeed, in commenting upon the denial of rehearing en banc, the Court held that the issue arose because the factors "were predicated upon the same acts" by the defendant. U.S. v. McCullah, 87 F.3d 1136, 1138 (10th Cir. 1996) (denying rehearing en banc). In similar circumstances, numerous state court have held that reliance upon the same piece of evidence to support more than one aggravating factor in a capital sentencing scheme is unconstitutional. *See e.g.*, Enberg v. Meyer, 820 P.2d 70, 89 (Wyo. 1991); Kennedy v. State, 455 So.2d 351, 354 (Fla. 1984), *cert. denied* 469 U.S. 1197 (1985). Given these holdings, it is clear that reasonable jurists could differ on the appropriate resolution of this claim; therefore, a COA should be granted.

**XVII. The Victim Impact Evidence Introduced At the Sentencing Phase of Mr.**

---

[13] The error was not harmless in this case. "[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death's side of the scale." Stringer v. Black, 503 U.S. 222, 230-36 (1992). As noted elsewhere in this brief, the FDPA is a weighing statute, 18 U.S.C. § 3593(e), and therefore the jury's finding of improper aggravating factors skewed the weighing process by "creat[ing] ... bias in favor of the death penalty...." Stringer v. Black, 503 U.S. 222, 236 (1992).

**Paul's Trial Produced A Death Sentence Based Upon Emotion Rather Than Reason, In Violation Of the FDPA and the Fifth, Sixth, Eighth and Fourteenth Amendments**.

The victim impact evidence introduced at the sentencing phase of Mr. Paul's trial produced a death sentence based upon emotion rather than reason, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Before the beginning of the penalty phase of Mr. Paul's trial, he filed a motion *in limine* to exclude all victim impact evidence, asserting that under the decision in Payne v. Tennessee, 501 U.S. 808 (1991), admission of such testimony would inevitably lead to a violation of his Eighth Amendment rights. App. 13. The Court rejected this motion categorically, without proscribing any limitations upon the government's presentation of, or reliance upon, such evidence at the sentencing phase of trial. App. 25; 68; T. Pre-trial Hearing June 11, 1997 at 7. Mr. Paul then requested that the court hold a pre-trial evidentiary hearing to determine the scope and admissibility of the government's evidence in support of the non-statutory aggravating factors. App. 31; T. Pre-trial Hearing June 11, 1997 at 18-24; T. 916-17. The Court denied all such requests. *Id.* at 27; T. 917.

Pursuant to these rulings, the government presented the testimony of three witnesses, two daughters of the victim, and one long-term co-worker. *See* T. 934-962. All three testified extensively about their relationship with the deceased and his good

character and background. That evidence is summarized extensively in Mr. Paul's petition for relief, and will not be repeated here. It is sufficient to observe that, taken together, the evidence presented by these witnesses interjected a constitutionally intolerable level of emotion into the sentencing proceeding and created a corresponding risk that Mr. Paul's sentence was the product of emotion overwhelming reason. Mr. Paul's sentence "[was not], and [does not] appear to be, based on reason rather than caprice or emotion." Gardner v. Florida, 430 U.S. 349, 358 (1977).

In Payne v. Tennessee, the Supreme Court overturned Booth v. Maryland, 482 U.S. 496 (1987) and South Carolina v. Gathers, 490 U.S. 805 (1989), to hold that the Eighth Amendment does not prohibit admission of victim impact evidence at the penalty phase of a capital trial. In banning victim impact evidence, the Booth Court had concluded that the introduction of such evidence violated two Eighth Amendment requirements for capital sentencing proceedings: the need for "heightened reliability," and the need for an "individualized determination" based on the "character of the [defendant] and the circumstances of the crime." Booth, 482 U.S. at 502, citing Zant v. Stephens, 462 U.S. 862 (1983). Victim impact evidence, the Court reasoned in Booth, is irrelevant to the individualized consideration of the defendant's guilt, and "its admission creates a constitutionally unacceptable risk that the jury may impose the death penalty in an arbitrary and capricious manner." *Id.*

The Payne Court disagreed, finding that Booth "unfairly weighted the scales in a capital trial," 501 U.S. at 822:

> [W]hile virtually no limits are placed on the relevant mitigating evidence a capital defendant may introduce concerning his own circumstances, the State is barred from either offering 'a glimpse of the life' which a defendant 'chose to extinguish,' or demonstrating the loss to the victim's family and to society which has resulted from the defendant's homicide.

*Id.*, *citing* Mills v. Maryland, 486 U.S. 367, 397 (1988) (Rehnquist, J., dissenting). On this basis, the Court held that "if the State chooses to permit the admission of victim impact evidence and prosecutorial argument on that subject, the Eighth Amendment erects no per se bar." *Id.* at 827. The Court dismissed Booth's concerns that victim impact evidence would invite arbitrary and capricious, emotion-driven sentencing, noting that "in the event that evidence is introduced that is so unduly prejudicial that it renders the trial fundamentally unfair, the Due Process Clause of the Fourteenth Amendment provides a mechanism for relief." *Id.* at 825. *See also id.* at 836 (Souter, J., concurring) ("there is a traditional guard against the inflammatory risk [of victim impact testimony], in the trial judge's authority and responsibility to control the proceedings consistently with due process, on which ground defendants may object and, if necessary, appeal").

In permitting the introduction of limited victim impact evidence – which "offer[s] *'a glimpse of the life'* which a defendant 'chose to extinguish,' or

demonstrat[es] the *loss to the victim's family and to society* which has resulted from the defendant's homicide," Payne, 501 U.S. at 822 (emphasis supplied) – the Court did not intend to eviscerate the capital defendant's Eighth Amendment right to a reliable, individualized sentencing determination. Nor did it intend for a capital sentencing proceeding to become a contest between the worth of the victim and that of the defendant.[14] It sought instead to strike a balance between victim impact evidence and the defendant's Eighth Amendment rights. Such a balance is to be safeguarded by the trial court's "authority and responsibility to control the proceedings consistently with due process," 501 U.S. at 836, to restrict the presentation of victim impact evidence sufficiently that the emotion inherently associated with such evidence does not overwhelm the jury's responsibility to make a reliable, individualized sentencing determination based on a full and fair consideration of the mitigating and other aggravating circumstances.

---

[14] In responding to Payne's concern that the comparative worth between victim and defendant should not be a relevant capital sentencing factor, the Court stated:

> As a general matter, however, victim impact evidence is not offered to encourage comparative judgments of this kind – for instance, that the killer of a hardworking, devoted parent deserves the death penalty, but that the murderer of a reprobate does not. It is designed to show instead each victim's "uniqueness as an individual human being," whatever the jury might think the loss to the community resulting from his death might be.

501 U.S. at 823-24.

Notwithstanding the dramatic shift in the law occasioned by its holding, Payne provided virtually no guidance for determining the scope of appropriate victim impact evidence, and even less for determining when that evidence is unduly prejudicial. Nor can guidance be found in other lower federal court decisions, for before Mr. Paul's case, the federal courts had few opportunities to address these issues in the context of a trial and direct appeal under the FDPA. For these reasons, Mr. Paul urged the Court to provide some level of guidance (which is lacking in the FDPA) with respect to the proper scope of such evidence. Instead, the Court denied the defense motion outright without any stated restrictions or limitations.

Other jurisdictions have had more time to wrestle with implementing Payne's allowance for some victim impact testimony while simultaneously protecting the defendant's right to individualized sentencing and the avoidance of arbitrariness and emotion. For example, in State v. Bernard, 608 So.2d 966 (La. 1992), the court fashioned a cautionary principle which, if adhered to closely, might prevent the victim impact evidence from overwhelming the sentencing process:

> [I]ntroduction of detailed descriptions of the good qualities of the victim or particularized narrations of the . . . sufferings of the victim's survivors, which go beyond the purpose of showing the victim's individual identity and verifying the existence of survivors reasonably expected to grieve and suffer because of the murder, treads dangerously on the possibility of reversal because of the influence of arbitrary factors on the jury's sentencing decision.

608 So.2d at 972. Other courts have adopted a similarly cautious approach. *See, e.g.*, State v. Muhammad, 145 N.J. 23, 45-48 (1996); Cargle v. State, 909 P.2d 806, 830 (Okla.Crim.App. 1995), *cert. denied*, 519 U.S. 831 (1996). In Louisiana, Oklahoma and New Jersey, pre-trial hearings are held to hear and determine the admissibility of victim impact evidence. *See* State v. Muhammad, 145 N.J. at 45-48, 678 A.2d at, 175-177; Cargle v. State, 909 P.2d at 828; State v. Bernard, 608 So.2d at 672. Such hearings might have allowed the Court to eliminate certain areas of testimony or certain questions which were likely to elicit emotional testimony, or which delved in far too much detail into the victim's life story and his specific interests, habits, daily routines, and other facets of his life that ultimately provided significantly more than "a brief glimpse" into his life.

In Mr. Paul's case, the government's *entire* evidentiary presentation at sentencing focused on the victim – Sherman Williams, his personal characteristics, and a detailed re-telling of his complete life story. Indeed, *all* of the evidence offered by the prosecution in support of a sentence of death during the second phase of trial was about the victim, providing an elaborate recitation from two daughters (Mary McKuin and Carole Sherman) and one life-long co-worker (Lawrence McCollough) describing Mr. Williams' life history starting with childhood, his habits, hobbies, personality, interests, work career, and many other facets of his life. The testimony

leaves one feeling terribly sad at the immense loss of such a wonderful and decent life as that of Sherman Williams. This overwhelming feeling was, of course, by design and effect, precisely what the prosecution intended in presenting this testimony. As some courts have begun to recognize, overly "detailed descriptions of the good qualities of the victim" risk interjection of emotion, *see* Bernard v. State, 608 S.2d at 972. They risk becoming eulogies. That is precisely what occurred in this case.

In analyzing the Court's unwillingness to draw any line on the government's victim impact presentation, it is important to note that immediately after the prosecution rested at sentencing, when the defense sought to present *their* story, the court *sua sponte* interrupted defense questioning of *the only witness* they called, and inquired *in the presence of the jury* if so much detail as to the defendant's story was necessary. T. 1042. The Court then instructed defense counsel, again in the presence of the jury, to move along in the testimony. *Id*. This action by the Court, especially in light of no similar court action in response to clearly repetitious testimony by prosecution sentencing witnesses, sent a clear message to the jury (the verbal equivalent of a symbolic gesture of tapping on one's watch): in the court's view, the details of the victim's story, no matter how often repeated, were more important than those of the defendant, *despite* no repetition. In effect, the Court told the jury that they were to take as much time as they wanted reflecting on the entirety of the victim's life,

but when it came time to considering the defendant's story, they needed to "move along."

Neither Payne nor other longstanding Eighth Amendment principles condone such a message. With respect to the victim, Payne contemplates "a brief glimpse" into his or her life and character. With respect to the defendant, on the other hand, Lockett v. Ohio, 438 U.S. 586 (1978) and its progeny, untouched by the Court's decision in Payne, hold that *any evidence* a capital defendant proffers regarding his character, background, or his involvement in the offense, is relevant, important, constitutionally protected evidence which the sentencer must be allowed to hear, Skipper v. South Carolina, 476 U.S. 1 (1986), and which the sentencer must consider, Eddings v. Oklahoma, 455 U.S. 104 (1982), in determining whether a person should die for their crime. The Court's actions in refusing to control or limit the prosecution presentation of victim impact evidence, while at the same time effectively communicating to the jury that the defendant's story (constitutionally protected) was "slowing down the wheels of justice," completely undermined Mr. Paul's Eighth Amendment rights.

The very nature of this case, entailing as it did the tragic loss of a highly respected senior citizen, Sherman Williams, who possessed a wealth of obviously admirable and noteworthy qualities, only highlighted the need for the Court to exercise

some control and restraint upon the prosecution's parade of victim impact evidence at the sentencing phase of Mr. Paul's trial. Instead, the only restraints exerted by the Court during sentencing were upon the defense's otherwise legitimate presentation of mitigating evidence, with no effort to limit the prosecution's presentation. This eviscerated entirely Mr. Paul's rights and vindicated only the view of those who think a capital trial is, primarily, the place to have the qualities of the victims, and the suffering of their survivors, aired. That is not what was contemplated in Payne, and in those Eighth Amendment cases which Payne left unaltered, and for that reason, Mr. Paul must be granted a COA on this issue.

**XVIII. The Jury Was Not Required To Make the Requisite Finding of Intent At Either Phase of Trial, In Violation of Mr. Paul's Rights Under the FDPA and the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments.**

**T**he sentencing jury in this case was relieved of its constitutional obligation to determine and find, beyond a reasonable doubt, all facts which "increase[] the penalty for a crime beyond the prescribed statutory maximum," *see* Apprendi v. New Jersey, 530 U.S. 466, 490 (2000),in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Two sets of instructions are germane to the issues presented here: the aiding and abetting instruction given at the guilt-innocence phase of trial, and the intent instruction given at the sentencing phase of trial. With respect to the first, and in accordance with the

prosecution' s express theme throughout trial, the Court instructed the jury during the guilt-innocence phase of trial as follows with respect to Mr. Paul's potential liability for §1111 murder as an aider and abettor:

> A person may be found guilty of any crime even if he only aided and abetted the commission of that crime. In order to have aided and abetted the commission of a crime, a person must before or at the time the crime was committed,
>
> One: Have known the crime was being committed or going to be committed, and;
>
> Two: Have knowingly acted in some way for the purpose of causing, encouraging, or aiding in the commission of such crime.
>
> For you to find the defendant guilty of any crime by reason of aiding and abetting, the Government must prove beyond a reasonable doubt that all of the essential elements of the crime were committed by some person or persons and that the defendant aided and abetted the commission of that crime.

T. 848-49. So instructed, the jury could have found Mr. Paul guilty of the crime of murder without ever focusing upon, or making findings regarding, his personal mental state during the commission of the offense, or without ever having determined that he committed any acts "and the victim died as a direct result of those acts." Under this guilt-innocence phase instruction, so long as "some person or persons" committed the acts that resulted in death, and so long as Mr. Paul aided or abetted that person as defined above, Mr. Paul's intent, and the extent of his actions with respect to the actual murder, were irrelevant to whether the jury found him guilty of either or both offenses.

During the sentencing phase of trial, the Court instructed the jury with respect to its threshold obligation to make specific findings of fact as a precondition to consideration of a possible sentence of death:

> Before you may consider the imposition of the death penalty, you must first unanimously find beyond a reasonable doubt that the defendant *intentionally aided and abetted* in the killing of Sherman Williams.

App. 185[15] (emphasis added). Although given presumably in an attempt to satisfy the requirements of § 3591(a)(2) set forth above, it clearly did not comply with the statutory requirement, and the government has conceded both that this is so, and that this critical discrepancy was plain error.

By contrast to the sentencing instruction actually given here, the federal capital sentencing statute under which Mr. Paul was sentenced to death disallows even *consideration* of a death sentence *unless* the sentencer makes an express finding of one of the following facts with respect to the defendant's state of mind and actions at the time of offense:

> (a) ... the defendant, as determined beyond a reasonable doubt at the hearing under [18 U.S.C.]section 3593 –
> (A) intentionally killed the victim;
> (B) intentionally inflicted serious bodily injury that resulted in the death of the victim;
> (C) intentionally participated in an act, contemplating that the life of a

[15] The verdict form sent back with the jury during sentencing deliberations contained the identical language. ROA 238.

> person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim died as a direct result of the act; or
> (D) intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim died as a direct result of the act ....

18 U.S.C. §3591(a)(2). In other words, §3591(a)(2) requires the sentencing jury to make certain factual findings that the defendant either committed the murder (or serious bodily injury) with intent, or that he intentionally engaged in some other act "and the victim died as a direct result of the act." Critically here, each of the four alternative intent findings include the necessity of finding that the defendant engaged in some act "and the victim died" as a result thereof. The Supreme Court has characterized such finding as a death "eligibility" or "gateway" finding, because the statute mandates its determination as a necessary pre-condition to jury consideration of a possible death sentence. *See e.g.*, Jones v. United States, 527 U.S. 373, 376-77 (1999); *see also* United States v. Webster,162 F.3d 308, 323 (5th Cir. 1998).

Unlike the aiding and abetting instruction given during the guilt-innocence phase and incorporated into the purported intent-gateway instruction given at sentencing, §3591(a)(2) requires the jury to find either that the defendant personally engaged in intentional acts to kill or inflict serious injury on the victim, *see* sub-sections (A) and

(B), or that the defendant participated in some other intentional act "and the victim died as a direct result of the act....," *see* sub-sections (C) and (D). Mere aiding and abetting, requiring only that the defendant have "knowingly acted in some way for the purpose of causing, encouraging, or aiding in the commission of" the crime, does not equate with any of these four possible intent "gateway" findings. The first two alternatives require personal participation in the actual murder or injury to the victim; aiding and abetting does not. The latter two require that the defendant engage in some death-causing act; again, aiding and abetting does not. This is true even though the Court added the element of "intent" to the aiding and abetting instruction at sentencing: still, none of the four gateway elements are met by a finding of "intentional" aiding and abetting.

After this issue was decided against Mr. Paul by a divided court on direct appeal, but well before his case became final, the U.S. Supreme Court decided the case of Apprendi v. New Jersey, 530 U.S. 466 (2000), holding that factfindings which increase a defendant's sentence beyond the otherwise available maximum punishment must, consistent with the constitution, be made by a jury and must be found to exist beyond a reasonable doubt. The Court of Appeals never addressed Mr. Paul's claim that, in light of Apprendi, his death sentence was unconstitutional because the jury was not required to make the specific gateway intent finding which Congress mandated as

a necessary prerequisite to death sentence consideration.

This Court's erroneous instructions, coupled with the Court of Appeals' majority decision, inescapably lead to the conclusion that the §3591 "gateway" finding is satisfied by mere conviction as an aider and abettor. Therefore, under the Court of Appeals' interpretation of the statute, §3591(a)(2) is satisfied in every case in which the defendant has been convicted of first degree murder or any other capital-eligible federal crime. This effectively nullifies §3591(a)(2), in which Congress made a deliberate choice (presumably in response to, and expanding upon, this Court's Eighth Amendment prescriptions set forth in the line of cases beginning with Enmund v. Florida, 458 U.S. 782 (1982)), to narrow the scope of the federal death penalty to persons who kill or whose actions "direct[ly] result" in death, which is certainly a far more narrow class than that defined by the aiding and abetting statute under which petitioner's jury was instructed at the guilt-innocence phase of trial. While it may be a "gateway" finding according to the Supreme Court, under the instructions and ruling in this case it is nothing less than a *flood*gate, and one which Congress clearly never intended.

Section 3591(a)(2) mandates a finding by the sentencer *as a pre-condition to consideration of a death sentence* that the individual defendant on trial engaged in intentional conduct and that "the victim died as a direct result of the [defendant's

intentional] act." 18 U.S.C. §3591(a)(2). Congress was unequivocal in mandating that this factfinding be made prior to jury consideration of a death sentence in any federal capital case. Jones, *supra*. The Court failed to instruct the jury in accordance with §3591(a)(2), instead essentially repeating the instruction already given at the guilt-innocence phase of trial that the jury need only find Mr. Paul guilty of aiding and abetting in the murder of the victim. According to this instruction, so long as Mr. Paul "acted in some way for the purpose of causing, encouraging, or aiding in the commission of" the crime of murder, the jury was free to find him guilty of murder *and* sentence him to death. The government even conceded this was plain error in this case. United States v. Paul, 217 F.3d 989, 996 (8th Cir. 2000).

The Court of Appeals' majority opinion nevertheless condones the ultimate death sentence here by means of a flawed holding that this Court's guilt-innocence phase aiding and abetting instructions required essentially the same factual findings as those necessitated under §3591(a)(2). 217 F.3d at 997-98. The dissent correctly recognizes the flaw, noting how those instructions, even if the jury was allowed to apply them during sentencing,[16] do not require a finding as required in §3591(a)(2),

[16] The panel majority points to a statement by this Court that the jury had these instructions before them during the sentencing phase deliberations. *See* 217 F.3d at 996 n. 3. The record reflects that while this Court left the guilt-innocence phase instructions in the "jury instruction booklet" provided to the jury at sentencing, never does this Court instruct the jury that these guilt-innocence phase instructions are to be applied by the jury at sentencing.

namely, that Mr. Paul either himself intentionally killed or inflicted bodily injury upon the victim, or committed some other intentional act "and the victim died as a direct result of the act." §3591(a)(2)(C) & (D). 217 F.3d at 1005-06 (Heaney, Judge, dissenting). Instead, this Court's guilt-innocence charge allowed a jury finding of guilt irrespective of any determination as to Mr. Paul's personal intentionality in causing the death itself and irrespective of whether he committed any acts which directly caused Mr. Williams' death. T. 848-49. As the dissent rightfully notes, under the aiding and abetting instruction, so long as "some person or persons" had the requisite mental state and engaged in the acts that caused the victim's death, Mr. Paul's individual mental state, as well as his personal acts in causing the death, if any, were not a part of the necessary factual findings required to convict. This is a far cry from the "close causal nexus" between the defendant's acts and the victim's death required at sentencing under §3591(a)(2). See 217 F.3d at 1006 (Heaney, J., dissenting).

This issue was important under the facts of this case. That is, as noted throughout this motion, Mr. Paul's case is precisely one in which Congress' statutory requirement that the sentencer in a federal capital case focus on the individual defendant and his actions was critical. The underlying evidence (as to Mr. Paul's state of mind and actual role in the death of Mr. Williams) was uncertain on just those factual issues Congress intended for the jury to address and resolve *prior to*

consideration of a sentence of death. While the evidence established that Mr. Paul may have participated in some of the actions leading up to and immediately following the offenses, it failed to establish with any degree of reliability the contours of his role or whether his actions actually resulted in the victim's death. Some of Mr. Paul's alleged statements implicated a greater personal role in the offenses, but many did not, while still others only referred to actions "they" [Ingle and Paul] had taken on the day of the offense, without specifying who had done what. The only consistent picture emerging from Mr. Paul's alleged statements was that he admitted some involvement in robbing the victim; beyond that, his personal role was unclear on the face of the trial court record.

The government was fully aware of these factual weaknesses in the case against Mr. Paul. Conceding that it could not prove whether Mr. Paul actually engaged in conduct causing Mr. Williams' death, the government instead took the position (a correct one at the guilt-innocence phase of trial) that Mr. Paul's individual state of mind and/or personal acts linked to the death of the victim were not important to a decision whether he could (or should) be found guilty of §1111 murder. The government largely avoided direct focus on Mr. Paul's individual acts or his state of mind, instead relying upon the view, confirmed by the court's guilt-innocence aiding and abetting charge, that regardless of who actually killed Mr. Williams, Mr. Paul was

a participant in the overall scheme and was therefore liable as an aider and abettor. This theory was embedded in the government's case from beginning to end, starting with the charging instrument and ending with the government's closing arguments at both phases of trial.

The government's heavy reliance on accessory liability theories and principles is particularly noticeable in its arguments and summations to the jury. For example, the government argued "it really doesn't matter at this point which version is correct because it 's aiding and abetting." T. 904. "Depending on which version you believe, Jeff Paul either shot first, they both shot him, or Trint Ingle shot him." *Id.* "[I]t doesn't matter which one pulled the trigger because they were both there, they were both involved in the robbery, and the decision was made." *Id.* "[U]nder the aiding and abetting theory, no matter which way you do it, Jeff Paul is guilty of first degree murder." *Id.*; *see also* T. 860 ("under the law ... he's just as guilty as if he pulled the trigger."). Thus the government capitalized on the guilt-innocence phase aiding and abetting instruction precisely to avoid forcing the jury to deliberate upon or consider Mr. Paul's personal role in the offense. This theory, while perhaps satisfactory as a guilt-innocence phase approach to the evidence as presented under the applicable law of aiding and abetting, was wholly insufficient as a matter of law to satisfy §3591(a)(2)'s requirement during the second phase of trial that the sentencer find

certain facts with respect to the *individual mental state and actions of the defendant himself*.

In short, this is a case in which the evidence was at least equivocal, and in fact admittedly ambiguous by the government's own account, as to the defendant's personal role in the offense. It is a case, therefore, to which the requirements of §3591(a)(2) speak with a voice of measured skepticism.

Indeed, the whole point of §3591(a)(2) is to prevent precisely what happened here: a jury finding of death eligibility without *any* requirement that the jury focus on the defendant's individual acts and state of mind. In section 3591(a)(2), Congress expressly prohibited sentencer consideration of the death penalty for one who merely aids and abets in an otherwise death-eligible crime. Yet that is what occurred in this case: this Court told the jury it could consider a death sentence so long as it found that Jeffery Paul aided and abetted in the crime. By contrast, §3591(a)(2) sets forth four possible scenarios of personal liability clearly beyond a mere finding of aiding and abetting, requiring the jury additionally to find at least one such scenario as a matter of fact and beyond a reasonable doubt, *before* any consideration of a possible death sentence. The Court's admittedly erroneous instructions thus relieved the jury of its duty to struggle with, focus upon, and resolve beyond a reasonable doubt, Mr. Paul's personal role and mental state in connection with Mr. Williams' death. Instead, the

jury was told that, just as in the first phase of trial, it could refer to and rely upon the actions and intentions of "some person or persons" other than Mr. Paul in deciding petitioner's death eligibility. This is precisely what Congress forbade in the statute.

The panel majority erroneously concluded that under the court's guilt-innocence aiding and abetting instruction, at least one of the four conditional factfindings set forth in §3591(a)(2) would have been made. A jury finding (at guilt-innocence) that Mr. Paul "kn[ew] the crime was being committed or going to be committed, and ... knowingly acted in some way for the purpose of causing, encouraging, or aiding in the commission of such crime," T. 848-49, does not square with any of §3591(a)(2)'s alternatives. The first two describe a far more culpable mental state than that found in the court's aiding and abetting instructions. (Indeed, the panel did not attempt to suggest that either of these alternatives squared with the aiding and abetting instruction). Alternatives (C) and (D), the first of which the panel embraced in affirming, are similarly unavailing. Both require that the defendant possess a certain mind-state *and* perform an act "*and the victim died as a direct result of the act*." 18 U.S.C. §3591(a)(2) (emphasis added). The dissent aptly describes the latter as requiring "a close causal nexus between the defendant's act and the victim's death." 217 F.3d at 1006 (Heaney, C.J., dissenting). As the dissent correctly notes, the trial court's aiding and abetting instruction fails to require such a nexus, authorizing a

finding of guilt irrespective of any finding as to whether Jeffery Paul engaged in an intentional act of which the victim died "as direct result." *Id.* For this reason, the dissent aptly urges:

> Where a life hangs in the balance, this court should not permit a district court to improvise its own standard for imposing the death penalty. The ultimate punishment requires more than an instruction that "closely tracks" the standard set forth by Congress. Rather, that the jury must grapple with the propriety of the death penalty for Paul according to the precise criteria set forth in §3591. Because that has not yet happened in this case, Paul is entitled to be resentenced.

217 F.3d at 1006 (Heaney, J., dissenting).

By directly violating the express will of Congress that a capital sentencing jury determine critical facts as a necessary pre-condition to consideration of a death sentence, the Court also violated petitioner's right to due process under the Fifth Amendment. In effect, the lower court substituted its own death sentencing factors for those mandated by Congress in §3591, withdrawing from the jury's consideration at all those factors which Congress mandated that a jury determine beyond a reasonable doubt before any consideration of a possible sentence greater than life imprisonment. *Cf.* Jones v. United States, 526 U.S. 227 (1999); Castillo v. United States, 530 U.S. 120 (2000).

For similar reasons, this Court's instructional interpretation of §3591(a)(2) also violated petitioner's Eighth Amendment rights. By including within its ambit all §1111

murderers, including those convicted as principals and those convicted as aiders and abettors under 18 U.S.C. §2, the lower court's reading and application of §3591(a)(2) in the context of the facts and other instructions in this case results in an interpretation of the federal death sentencing scheme which undermines any constitutionally required narrowing and otherwise usurps the legislative role of Congress in specifying the appropriate sentencing factors in a federal capital case. *See* Woodson v. North Carolina, 428 U.S. 280 (1976).

Finally, the Court also violated the dictates of intervening Supreme Court authority. On its face the §3591 finding is surely an "element" of federal *capital* murder as Apprendi and its progeny view that term. *See* Ring v. Arizona,536 U.S. 584 (2002). Indeed, as noted elsewhere in this motion, the key finding in Ring is that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of *an element of a greater offense*'. . . ." Ring, 536 U.S. at 609, *quoting* Apprendi, 530 U.S. at 494 n.19 (2000) (emphasis added).

The Court had previously held in Jones v. United States, 526 U.S. 227, 251-52 (1999), that the Fifth Amendment requires that all elements of a federal offense be "charged in the indictment, submitted to a jury, and proven by the Government beyond a reasonable doubt." As the Court has made clear since Jones, an "element" for purposes of constitutional analysis is any "fact[] necessary to impose the maximum

[punishment]." Harris v. United States, 536 U.S. 545, 566 (2002). It is a condition precedent to consideration of the death sentence, and has been specifically delegated to the jury by Congress.

Here, the jury was required to make the §3591 finding by proof beyond a reasonable doubt. The fact involved is a classic one regarding *mens rea* and *actus reus* of the offense. It therefore has all the hallmarks of an element as to which the defendant has a constitutional right to trial by jury.

The Court of Appeals gave the question no constitutional dimension at all. It simply affirmed on the basis of its own determination that the denial of a jury trial on this issue affected no substantial rights. The dissent rightly said this was reversible error, even before the Supreme Court had decided Apprendi and Ring, and in addition to the dissenting judge, four other judges of the Court of Appeals dissented from denial of rehearing. A brief discussion of Apprendi is warranted here.

In Apprendi v. New Jersey, 530 U.S. 466 (2000), the Supreme Court held that when a specified factual finding may enhance a sentence beyond the otherwise prescribed maximum, that finding must be made by a jury and must be found to exist beyond a reasonable doubt. Thus here, if Mr. Paul is correct that the jury's guilt-innocence finding that Mr. Paul aided and abetted in the crime of murder did not itself necessitate a finding of one of the four gateway intent findings, then because that

gateway determination is a factual finding that *must be made* and without which the maximum possible sentence is life imprisonment, Apprendi's requirements have been violated. If it is true that the jury was never required to make the factual findings set forth in §3591(a)(2), then there has been no jury finding beyond a reasonable doubt as to the existence of a fact which enhanced the punishment beyond the otherwise maximum sentence, in violation of Apprendi.

In Apprendi, a state criminal firearms possession case, the Supreme Court reviewed the constitutionality of a New Jersey statute providing for an enhanced punishment so long as a judge found by a preponderance of the evidence that the defendant committed the underlying offense with a purpose to intimidate others because of race, color, etc. 430 U.S. 468. Interpreting the Due Process Clause, the Court held that the factual determination (that the crime was committed with the unlawful racial purpose) authorizing an increase in the maximum punishment must be made by a jury: "[A]ny fact," the Court held, "that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 2362-63. The Court declared that it was unconstitutional to remove from a jury's determination the existence of a fact which, "if found, exposes the criminal defendant to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone."

*Id*. at 2359.

In reaching that conclusion, the Court noted that "New Jersey threatened Apprendi with certain pains if he unlawfully possessed a weapon and with additional pains if he selected his victims with a purpose to intimidate them because of their race." *Id.* at 2355. Labeling the latter as mere "sentence enhancement" did not address the underlying due process concerns arising from the distinct and additional punitive consequences flowing from a finding thereof. Responding to arguments made by the State of New Jersey that the enhancement provision merely inquired into "motive," a traditional "sentencing factor," the Court rejected the conclusion that it therefore did not require a jury determination:

> It makes no difference in identifying the nature of this finding that Apprendi was also required, in order to receive the sentence he did for [the underlying] weapons possession, to have possessed the weapon with a "purpose to use [the weapon] unlawfully against the person or property of another." A second mens rea requirement hardly defeats the reality that the enhancement statute imposes of its own force an intent requirement necessary for the imposition of sentence.... The defendant's intent in committing a crime is perhaps as close as one might hope to come to a core criminal offense "element."

*Id*. at 2364. As such, like any element of an offense, even if applied to enhance the maximum punishment, the Court held the enhancement intent factor must be found to exist by a jury and beyond a reasonable doubt.

Each of these principles apply directly to what the Supreme Court has labeled

as the statutory "gateway" finding regarding the defendant's actions and state of mind at the time of offense at issue here. Jones, *supra*. First, the requisite finding of intent coupled with a causal connection to the death of the victim set forth in §18 U.S.C. §3591 is one "that increases the penalty for a crime beyond the prescribed statutory maximum." Apprendi, *supra*. The statute is expressly clear on this point, and it has been so interpreted by the Supreme Court. That is, the intent finding set forth in the statute is a necessary pre-condition even to jury consideration, let alone infliction, of a death sentence. This is what Congress prescribed in the statute itself, and this is what the Court meant in describing this finding as a "gateway" finding. *See* Jones v. U.S., 527 U.S. 373, 376 (1999) (intent finding must be made as an initial matter prior to jury consideration of aggravating and mitigating factors). Absent such a finding, the maximum available sentence is life imprisonment.[17]

Second, the jury was relieved of any responsibility for making this gateway

---

[17] Admittedly, the federal murder statute under which Mr. Paul was convicted, 18 U.S.C. §1111, does provide for a maximum sentence of life *or* death. *Id.* Nevertheless, the federal statute governing actual sentencing as a capital offense makes clear that death is not an available sentence absent the necessary factfindings found in §3591(a)(2), findings which petitioner's jury was never required to make. At the very least it is an open question whether §3591(a)(2)'s findings are "elements" of the sort contemplated in Apprendi. Because this case is a federal capital case on direct review before this Court, and because no federal court has yet assessed the issue here in light of the obvious potential relevance of Apprendi, the case is worthy of review here on certiorari. Furthermore, irrespective of whether Apprendi itself is directly germane (i.e. assuming the §3591(a)(2) findings are not an "element" as defined in Apprendi), Congress' specific requirement of a jury finding on the subject created a due process right that gives this case additional constitutional dimensions.

factual finding in this case. This Court's erroneous sentencing instruction (coupled with the aiding and abetting instruction provided at the guilt-innocence phase) wholly relieved the jury of its duty to determine Jeff Paul's personal intent and individual actions at the time of the offense.

Third, under Apprendi, a post-trial, judicial (*i.e.* non-jury) determination of the facts cannot cure the error here. Apprendi turns on the very fact that a judge, not a jury, was allowed to make an evidentiary determination about critical sentence-determinative facts regarding the defendant's intentionality. The Court in Apprendi and Ring expressly held that such judge-determination of these facts was unconstitutional. So too here, the jury was precluded by the trial court's erroneous instruction from determining sentence-enhancing facts regarding the defendant's personal intent and/or his participation, if any, in death-causing acts. Under Apprendi, judicial determination of such facts, even on appeal, is impermissible.

Although this issue was decided on appeal, this Court should grant a COA to permit the appellate court to determine whether the Supreme Court's intervening decision in Ring requires a different resolution of the issue.

**XIX. Mr. Paul was Deprived of His Absolute Right to Testify in His Own Behalf, at Either or Both Phases of Trial, in Violation of Rights Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.**

Mr. Paul was deprived of his right to testify on his own behalf at either or both phases of trial, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Mr. Paul wished to testify in his defense at both phases of trial. At both phases of trial he wished to explain to the jury that he did not kill Sherman Williams, that he did not intend that Sherman Williams be killed, nor did he attempt to kill Mr. Williams, nor did he intentionally aid and/or abet in the killing of Sherman Williams, nor did he in fact aid and/or abet in the killing of Sherman Williams. Mr. Paul also wished to provide for the jury substantial mitigating evidence concerning his character, background, and the circumstances of the offense, in favor of a sentence less than death. Mr. Paul, however, was prohibited from doing so by his attorneys.

Mr. Paul attempted on several occasions to inform the Court that he wished to testify. On at least one such occasion, during an un-reported (or at least heretofore un-transcribed) conference, the Court interrupted Mr. Paul and ordered him to refrain from speaking any further. Mr. Paul complied with the Court order, but was thereby prevented from explaining to the Court that he wished to testify but that his attorneys would not allow him to do so. At the end of trial he again attempted to explain this fact to the Court, but was again interrupted, this time on the record, by the Court. While the official transcript does not report the Mr. Paul's complete statement

(apparently due to the Court's interruption), eyewitness accounts of the exchange with the Court make clear that Mr. Paul was once again attempting to inform the Court that his attorneys were prohibiting him from testifying in his own behalf.

In Rock v. Arkansas, 483 U.S. 44 (1987), the U.S. Supreme Court held that a defendant had a constitutional right "to testify on one's behalf at a criminal trial." That right was violated where, as here, Mr. Paul was prohibited from testifying on his own behalf despite his clear desire to do so, which he expressed to his attorneys and attempted to express to the Court on several occasions throughout the trial.

Even though there is an issue of material fact at the heart of this claim, this Court denied relief without permitting discovery and without a hearing. A COA should issue not only on the underlying claim, but also on the questions of whether the Court should have permitted discovery and conducted an evidentiary hearing prior to deciding the issue.

**XX. The Prosecution's Reliance Upon Aggravating Factors Which Were Duplicative of Elements of the Offense Violated Mr. Paul's Rights Under the FDPA and the Sixth, Eighth and Fourteenth Amendment.**

The prosecution's reliance upon aggravating factors which were duplicative of elements of the offense violated Mr. Paul's rights under the FDPA and as guaranteed under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution.

Two of the "aggravating factors" considered and weighed by the jury in the selection phase of the sentencing trial duplicated elements of the underlying offense. These were the intent finding. App. 82, 185 (which, as argued in the preceding claim, should not have been included as an "aggravating factor" to be weighed during the selection phase), and the pecuniary gain factor, App. 84, 196. The Court's instruction on intent essentially repeated the aiding and abetting instruction given to the jury at the guilt-innocence phase of trial. *Compare* App. 134 *with* App. 185. The pecuniary gain factor effectively reiterated an element of the offense of robbery, which was also charged at the guilt-innocence phase as a part of the felony murder theory as to both counts in the indictment. *Compare* App. 128, 130-33 *with* App. 196. Indeed, the Court specifically instructed the jury that these two "aggravating factors" were "duplicative" of elements of the offense already found by the jury. App. 195-96.

The defense filed several pre-trial motions aimed at preventing precisely the type of error noted here. Thus, motions were filed to prevent government reliance upon the intent and pecuniary gain factors due to the noted doubling with elements of the offense, App. 38-58. Motions were filed and re-urged requesting that the Court hold a hearing prior to the start of the sentencing phase to assess and screen the government' s aggravating evidence to ensure its reliability. App. 31; T. Pre-trial Hearing June 11, 1997 at 18-24. The Court denied these motions. *Id*. at 27, 33, 42.

The defense re-urged its request for an evidentiary hearing at the outset of the government's case at sentencing. T. 916-17, and the Court again denied the motion. *Id*.

This double counting violated Mr. Paul's right to a capital sentencing scheme which genuinely narrows the class of persons eligible for the death penalty. Zant v. Stephens, 462 U.S. 862, 877 (1983). With respect to the pecuniary gain factor, the analysis begins with the observation made previously that no constitutional narrowing occurred during the guilt-innocence phase of Mr. Paul's trial for §1111 felony murder. The charging instrument and the court's instructions at guilt-innocence provided for a conviction of felony murder under a theory of aiding and abetting. Basic premeditated murder and felony murder were both encompassed within the crime of murder at common law. *See* Schad v. Arizona, 501 U.S. 624, 640 (1991) ("At common law, murder was defined as the unlawful killing of another human being with 'malice aforethought.' The intent to kill and the intent to commit a felony were alternative aspects of the single concept of 'malice aforethought.'" *citing* 3 J. Stephen, History of the Criminal Law of England 21-22 (1883)); U.S. v. Downs, 56 F.3d 973, 974 (8th Cir. 1995) (noting section 1111 imports common law definitions of first and second degree murder). Thus during the first phase of trial, Mr. Paul was convicted of a crime that is the essential equivalent to common law murder.

The Supreme Court's Eighth Amendment jurisprudence can be fairly read to hold that a capital sentencing scheme must narrow the jury's discretion beyond a finding of guilt as to common law murder. *See* Stephens, *supra*. The Court effectively so held in Arave v. Creech, 507 U.S. 463, 475 (1993). There the Court considered whether Idaho's aggravator involving the "cold-blooded" nature of the crime was constitutional in the context of that state's capital punishment scheme. As in Mr. Paul's case, the Court first noted that "[t]he class of murderers eligible for capital punishment under Idaho law is defined broadly to include all first-degree murderers...." The Court nevertheless upheld Idaho's capital scheme because it found that the aggravator in question "identified a subclass of defendants" convicted of the broad crime of first degree murder. "By doing so, it has narrowed in a meaningful way the category of defendants upon whom capital punishment may be imposed." *Id.*

Similar observations have been made about the lack of narrowing in other federal crimes for which the death penalty has been sought. Thus in U.S. v. Hall, 152 F.3d 381, 416-17 (5th Cir. 1998), *cert. denied* 119 S.Ct. 1767 (1999), the Fifth Circuit reached the same conclusion with respect to 18 U.S.C. § 1201, involving the crime of kidnaping during which a murder occurs. 152 F3d at 416-17. If §1201 murder fails to provide sufficient narrowing during guilt-innocence, then §1111 common law felony murder must surely also fail, especially where §2 aiding and abetting is applied as it

was here.

To be constitutional, therefore, the FDPA as applied to Mr. Paul's case was required to achieve genuine narrowing by means of the aggravating factors at sentencing. Lowenfield v. Phelps, 484 U.S. 231 (1988) (constitutional narrowing must occur during at least one phase of trial; if not at guilt-innocence by legislative definition of crime, then at sentencing); Hall, *supra*. (lack of guilt-innocence phase narrowing requires sentencing phase narrowing under Lowenfield); *Cf.* U.S. v. McCullah, 76 F.3d 1087, 1108, 1110 (10th Cir. 1996), *cert. denied* 520 U.S. 1213 (1997) ("[u]nder Lowenfield, an aggravating factor that does not add anything above and beyond the offense is constitutionally permissible *provided that the statute itself narrows the class of death-eligible defendants*"; otherwise, "a broad capital punishment statute necessitates that the narrowing function be performed by the aggravating factors") (emphasis added) citing Arave, *supra*.

The pecuniary gain factor, however, did not provide *any* narrowing beyond the elements of the offense. In convicting Mr. Paul of robbery-murder, the jury necessarily found that the offense was motivated by pecuniary gain. Indeed, as noted above, the Court so instructed the jury: "you may note that the aggravating factor concerning pecuniary gain duplicates one of the elements of the offense." App. 196. Yet that finding in no way distinguished Mr. Paul from any one else convicted of

felony murder. This case thus presents the very issue left open in Lowenfield but which, by implication from that decision, as well as the Court's decision in Arave, the Fifth Circuit's decision in Hall and the Tenth Circuit's decision in McCullah, requires reversal here: where constitutional narrowing does not occur at the guilt-innocence phase of trial, is an aggravator which merely repeats an element of the offense constitutionally valid? The answer, as discussed in the authorities cited, must necessarily be, no.

In fact, other courts reviewing the issue have held that such aggravators are invalid. *See* State v. Middlebrooks, 840 S.W.2d 317 (Tn. 1992), *cert. dismissed*, 510 U.S. 124 (1993); State v. Cherry, 257 S.E.2d 551 (N.C. 1979), *cert. denied*, 446 U.S. 941 (1980) (finding double counting between guilt-innocence and sentencing phases of trial violative of defendant's constitutional rights). This Court should similarly so hold.

The double counting between crime element and aggravator was not harmless. "[W]hen the sentencing body is told to weigh an invalid factor in its decision, a reviewing court may not assume it would have made no difference if the thumb had been removed from death 's side of the scale." Stringer v. Black, 503 U.S. 222, 230-36 (1992). Because the FDPA is a *weighing* statute, 18 U.S.C. § 3593(e), the jury's finding of improper aggravating factors skewed the weighing process by

"creat[ing] ... bias in favor of the death penalty...." Stringer v. Black, 503 U.S. 222, 236 (1992). Further, the Court's comment to the jury that it had already found those factors amounted to a directed verdict in favor of the prosecution on the existence of those aggravators.

For the foregoing reasons, this Court should issue a COA with respect to this claim.

**XXI. Mr. Paul was Incompetent Before and During Trial, Rendering All Phases of His Trial Unconstitutional in Violation of the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

Mr. Paul was incompetent to stand trial before and during trial, and/or at least during critical periods of his trial, and as a result he was denied his rights to due process, effective representation, and a fair trial, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The facts which support this claim span the time from when Mr. Paul was a child, continuing through the time he was incarcerated pre-trial and during the trial. Other relevant facts involve a variety of mental health evaluations and reports which aid in establishing that Mr. Paul was incompetent during the trial in this case.

The most visible contemporaneous evidence raising doubt about Mr. Paul's mental competency at trial was his continuous and uncontrolled disruptive, rude, threatening, menacing, and hostile behavior during the course of the trial, the severity

of which increased as the trial proceeded. However, there was more evidence giving rise to the same doubt. As the Court is at least partially aware, Mr. Paul dealt with his lawyers in the same manner as he did the court and jury. And as the Court also knows, prior to trial, expert opinion concerning Mr. Paul's competence to stand trial was at best divided as to his present incompetence, and not divided at all about the possibility that the stress of trial might well undermine Mr. Paul's competence whether or not he was incompetent prior to trial. And in fact the experience at trial confirmed the un-contested prediction of the expert whose opinion was that Mr. Paul was not competent to be tried, and that, in any event, was likely to become incompetent during the trial proceedings. All of this evidence points to but one reasonable conclusion: that, whether or not Mr. Paul was competent to stand trial *prior to* the trial proceedings, he became incompetent, at least once the sentencing phase began, and therefore he is entitled to a new trial or, at the very least, a new sentencing proceeding.

The most dramatic evidence suggesting doubt about Mr. Paul's competency was his demeanor and irrational behavior at trial. Throughout the trial proceedings, Mr. Paul engaged in distracting, disruptive, threatening, and hostile outbursts and behaviors. Mr. Paul frequently talked in a loud, distracting tone of voice, sometimes with defense counsel, and sometimes just in open court, and made a point of passing notes to counsel with obvious displeasure. He made angry gestures and had angry

facial expressions during much of the testimony. He mouthed such words as "mother-f_ _ _er," when jurors were watching him. He frequently held his head in his hands and made noises. After the guilt-phase verdict was announced, and as the jurors were leaving the courtroom for a recess, Mr. Paul yelled at one of the prosecutors, "you're a b _ _ch."

At the beginning of the penalty phase, when Mr. Paul was brought into the courtroom, he was completely disheveled, without the coat and tie he had worn throughout the trial, and with his shirt hanging out of his pants. He was unkempt, having failed to bathe or take care of his personal hygiene.

At this point in the trial Mr. Paul's courtroom presence became so disruptive that his attorneys chose to forego presentation of most of the mitigating evidence they had developed due to the perceived danger of exposing the jury to more of Mr. Paul's escalating and deteriorating mental condition. Things became so unwieldy that, prior to the penalty phase closing arguments, one of his attorneys admonished him severely, out of the presence of the jury but loud enough to be reported by the local media.

Then, at the final sentencing, Mr. Paul unleashed a barrage of epithets at the Court in an outburst which was so uncontrolled that even the Court attempted to interrupt him and warn him of the dangers of such for future appellate proceedings. T. 1171-74.

Outside the courtroom, Mr. Paul's behavior was equally irrational and self-destructive. Mr. Paul's mental condition was a significant factor in his ongoing communications with his attorneys, both before and during trial. Their relationship was fraught with yelling and screaming back and forth, and frequently counsel were unable to communicate rationally with Mr. Paul due to his uncontrolled outbursts. For example, he flew into a rage when his attorneys approached him with a government plea offer for life without parole in exchange for a guilty plea. When members of his family tried to encourage him to consider the plea offer, his rage increased dramatically and, in the view of Dr. Anthony Semone, the neuropsychologist consulted by the defense, Mr. Paul regressed to the level of a 9 or 10 year old child.

Throughout the pre-trial and trial proceedings Mr. Paul was unable to appreciate the depth of his problems with the federal criminal justice system: he could neither understand nor accept that even if the jury merely believed he personally participated in the robbery only, they might still convict him and sentence him to death if he assisted Trinity Ingle in the commission of the killing of Sherman Williams.

Expert opinion concerning Mr. Paul's competence to stand trial confirmed that such problems existed. Early on, the Court ordered an evaluation of Mr. Paul at the federal forensic facility at FCI-Butner (North Carolina). Although the evaluation there concluded he was competent to stand trial at that time, the results of the psychological

testing that informed this conclusion indicated an underlying severe mental illness, complete with thought disorder, of a sort that could likely render him incompetent under the stress of a trial, a fact which the Butner report did not mention.

Thereafter Dr. Semone conducted an extensive clinical psychological evaluation, which included interviews, a variety of psychological and neuropsychological testing (some of which was designed to follow up on the results obtained from the Butner testing), and a consideration of a broad ranging psycho-social history. Dr. Semone found that Mr. Paul had been treated for Attention Deficit Disorder as a child, that he suffered the effects of severe family dysfunction in which he was regularly scapegoated and abused, and that he was profoundly self-destructive. Psychological testing revealed that he was prone to experiencing acute psychotic episodes. Dr. Semone also noted that the intake of sugar (through candy bars) seemed to have an unusual calming effect on Mr. Paul, which was suggestive of a metabolic and/or neurochemical disorder underlying and contributing to his impulsivity and frequently poor judgment, as well as to his tendency toward self-destruction. Dr. Semone found that Mr. Paul likely suffered from organic brain damage as well. Dr. Semone concluded that Mr. Paul's marked tendency toward uncontrollable self-destructive actions and behaviors was the result of a variety of severe mental disorders and that, if left untreated, he was either incompetent to stand trial at the time or, at the very least,

he was likely to become incompetent under the stress of the trial proceeding itself.

Because of Dr. Semone's concerns regarding the threat of a deteriorating mental condition, and the corresponding need for possible medication during trial, the Court authorized the defense to retain the services of a local psychiatrist, Dr. Irving Kuo. Dr. Kuo determined that Mr. Paul was not incompetent *at that time.* Importantly, however, Dr. Kuo failed to address the possibility, expressly found by Dr. Semone, that Mr. Paul might decompensate under the stress of trial and become incompetent during the trial proceedings. Additionally, Dr. Kuo failed properly to recognize and diagnose Mr. Paul's mental disorders – reaching the same conclusion that the staff at FCI-Butner had reached – without even attempting to explain what could have produced psychological test results (which were not only conducted by Dr. Semone, but also by personnel at Butner) showing a tendency toward acute psychotic episodes. Dr. Kuo also failed to conduct any investigation of the possible underlying neurochemical disorder associated with Mr. Paul's unusual reaction to sugar intake, as well as the clear and unrefuted evidence of his organic brain impairment, all of which directly refute any finding of a personality disorder of the sort found by Dr. Kuo.

Then at trial, as predicted by Dr. Semone, Mr. Paul's mental condition deteriorated severely. As noted above, Mr. Paul's behaviors became so uncontrolled

and disruptive, and his mental functioning deteriorated so badly, that his trial counsel determined not to present virtually any of the mitigating case for life they had developed prior to trial, for fear that Mr. Paul's outbursts and actions would further alienate the jury. That is, Mr. Paul's behaviors became so out of control that his attorneys unilaterally elected to shut down the sentencing phase of his case after presenting the testimony of only one witness, Mr. Paul's mother, despite the existence of numerous additional witnesses who would have testified about a broad range of mitigating factors in support of a life sentence.

The evidence of Mr. Paul's mental illness has grown during the pendency of these proceedings. Counsel for Mr. Paul have observed his mental condition steadily deteriorate. He has attempted suicide, and communication is becoming increasingly difficult for him as he loses contact with reality. Additional mental health experts, Karen Froming and Seymore Halleck, have evaluated Mr. Paul and have preliminary impressions that he is seriously mentally ill, but this Court has denied all requests for access to Mr. Paul that would permit a thorough assessment of his past and present mental condition. Nevertheless, given the fact that trial counsel were specifically warned that Mr. Paul could become mentally ill under the stress of trial, Mr. Paul's conduct and demeanor should have triggered a competent assessment of his condition. Because the facts raise a strong probability that Mr. Paul was in fact

incompetent during his trial, his constitutional rights were violated. *See* Medina v. California, 505 U.S. 437 (1992) ("the criminal trial of an incompetent defendant violates due process"); *see also* Pate v. Robinson, 383 U.S. 375 (1966). The U.S. Supreme Court has held that the test for mental competency is whether the defendant has a "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and a "rational as well as factual understanding of the proceedings against him." Dusky v. United States, 362 U.S. 402, at 402 (1960). A criminal defendant's right not to be tried while incompetent is so fundamental that the claim cannot be waived by either the defendant or his counsel, and may be presented to and litigated in a collateral attack on the conviction and sentence in federal court. *See e.g.*, Enriquez v. Procunier, 752 F.2d 111, 114 (5th Cir. 1984); Zapata v. Estelle, 588 F.2d 1017 (5th Cir. 1979). As the Supreme Court has more recently articulated, "Competence to stand trial is rudimentary, for upon it depends the main part of those rights deemed essential to a fair trial... The importance of these rights and decisions demonstrates that an erroneous determination of competence threatens a 'fundamental component of our criminal justice system' -- the basic fairness of the trial itself." Cooper v. Oklahoma, 517 U.S. 348 (1996) (citations and footnotes omitted).

To make out a claim of substantive mental incompetency, a defendant/petitioner must present facts which are sufficient to "create a real, substantial, and legitimate

doubt as to [his] mental capacity... to meaningfully participate and cooperate with counsel." Adams v. Wainwright, 764 F.2d 1356, 1360 (11th Cir. 1985), *quoting* Bruce v. Estelle, 483 F.2d 1031, 1043 (5th Cir. 1973); Lee v. Alabama, 386 F.2d 97, 105 (5th Cir. 1967) ( *en banc*). The record in this case shows that Mr. Paul was incompetent in fact.

As the Eighth Circuit taught in Lindhorst v. United States, 658 F.2d 598, 607 (8th Cir. 1981):

> Once there is such evidence from any source, there is a doubt that cannot be dispelled by resort to conflicting evidence. The function of the trial court in applying Pate's substantial evidence test is not to determine the ultimate issue: Is the defendant competent to stand trial? Its sole function is to decide whether there is any evidence which, assuming its truth, raises a reasonable doubt about the defendant's competency.

On the evidence set forth herein and to be developed in these proceedings, there is reasonable doubt. The Court is as aware as anyone else of the offensive and self-destructive manner in which Mr. Paul behaved in the courtroom. The Court is aware, from the pretrial filings expressing concerns about Mr. Paul's competency, that the behavior it saw in the courtroom was replicated every day and in every contact defense counsel had with Mr. Paul. The question raised by this evidence is this: was Mr. Paul's behavior the uncontrollable product of some underlying emotional, organic or neurochemical disorder or combination of disorders, or was it simply poor choices

by a person who has the capacity to make better choices and control his behavior as he wishes? On the basis of the warnings given defense counsel by Dr. Semone, and what is now known about Mr. Paul, there can only be one right answer: this Court was obliged to conduct an inquiry into Mr. Paul's mental condition at the time of trial. Further, given the more complete record available to the Court during these proceedings, the Court should have granted access to Mr. Paul by mental health experts for purposes of investigating mental issues relating to his competence prior to and during his trial, his competence during his appeal and postconviction proceedings, his mental condition at the time of the alleged offense, and his mental and developmental history.

While there is no template to be derived from other cases that can settle this matter, some guidance can be drawn from them. The cases in which disruptive, bizarre, self-destructive, or otherwise irrational courtroom behavior has been a critical factor in finding a defendant incompetent have all at the very least required hearings when the combination of factors has been similar to the combination set forth here. Thus, where the defendant has engaged in extremely bizarre, hostile, threatening, or disruptive behavior through the course of trial, and where expert opinion concerning competency has been divided, the courts have uniformly held that hearings are required under Pate and Drope. *See, e.g.,* Reynolds v. Norris, 86 F.3d at 801-802;

United States v. Williams, 113 F.3d 1155, 1160-1161 (10th Cir. 1997); Tillery v. Eyman, 492 F.2d 1056 (9th Cir. 1974). Where, however, such behavior has been fully taken into account by mental health experts and uniformly determined not to be the product of underlying disorders, hearings have not been required. *See, e.g.*, Speedy v. Wrick, 748 F.2d 481, 485-486 (8th Cir. 1984) (after remand); United States v. Lebron, 76 F.3d 29, 32-33 (1st Cir. 1996); United States v. Prince, 938 F.2d 1092, 1095-1096 (10th Cir. 1991).

Finally, there can be no question that if Mr. Paul's observed behaviors were the product of underlying disorders, he was not competent to stand trial. His inability to consider a plea offer for a sentence less than death reflects a less than rational understanding of the proceedings against him. *See* United States v. Dusky, 362 U.S. at 402 (proper assistance in the defense requires an understanding that is "rational as well as factual"). Moreover, courtroom demeanor and rational consultation with counsel at trial is a critical way in which a criminal defendant must be able to assist in his defense. *See* United States v. Williams, 113 F.3d at 1160; United States v. Hems, 901 F.2d 293, 295 (2nd Cir. 1990). As Justice Kennedy explained in a different context, involving the forcible use of medication to assure a defendant's competence in a capital prosecution, but equally applicable here:

> It is a fundamental assumption of the adversary system that the trier of

> fact observes the accused throughout the trial, while the accused is either on the stand or sitting at the defense table... At all stages of the proceedings, the defendant 's behavior, manner, facial expressions, and emotional responses, or their absence, combine to make an overall impression on the trier of fact, an impression that can have a powerful influence on the outcome of the trial...
> [This is particularly true] during the sentencing phase of the proceedings, when the sentencer must attempt to know the heart and mind of the offender and judge his character, his contrition or its absence, and his future dangerousness. In a capital sentencing proceeding, assessments of character and remorse may carry great weight and, perhaps, be determinative of whether the offender lives or dies.

Riggins v. Nevada, 504 U.S. 127, 142-143 (1992) (Kennedy, J., concurring).

Jeffery Paul should not go to his death because of his courtroom behavior where that behavior was the product of serious mental disorder over which he had no control and which substantially undermined his ability both to consult with his counsel and rationally understand and respond to the proceedings against him. A COA should issue to allow the Court of Appeals to determine the following issues relating to Mr. Paul's mental health:

Was Mr. Paul's right to due process of law violated by bringing him to trial while he was incompetent to proceed?

Was Mr. Paul's right to due process of law violated when this Court failed to conduct an inquiry into Mr. Paul' s competence to proceed in spite of the irrational behavior directly observed by the court?

Did Mr. Paul receive ineffective assistance of counsel when his attorneys failed to complete their investigation of his background, character and mental health history?

Did Mr. Paul receive ineffective assistance of counsel when his attorneys failed to take affirmative steps to conduct a reasonable investigation into Mr. Paul's mental health when he began to behave irrationally, as the defense psychologist had warned them may occur?

Should this Court have granted appropriate discovery on this issue, including entering orders to allow mental health experts to have access to Mr. Paul for purposes of evaluating him, prior to deciding this issue?

Should this Court have granted an evidentiary hearing on the issues relating to Mr. Paul's mental health?

**XXII. After a Bona Fide Doubt Was Raised about the Defendant' s Mental Competency to Stand Trial, the Court Failed to Hold an Adequate Hearing to Address and Adequately Resolve the Issue of Competence to Stand Trial, in Violation of Mr. Paul's Rights to Due Process, a Fair Trial, and the Effective Assistance of Counsel, as Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution**

Mr. Paul was deprived of his right to a full and fair hearing on the issue of whether he was competent to stand trial in this case, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The facts regarding Mr. Paul's mental competency in fact, which

underlie the claim presented here, are set forth in connection with the preceding claim that Mr. Paul was in fact incompetent to stand trial, and are incorporated herein by express reference. In short, however, as noted above, there was and is significant evidence that Mr. Paul was incompetent, and/or became incompetent as the trial progressed, and this Court was aware of that evidence during both the pre-trial and the trial proceedings. In addition to the above facts, counsel for Mr. Paul understand that the Court was sufficiently concerned about Mr. Paul's mental state during the trial proceedings that it consulted with the U.S. Marshal's service concerning his behavior and deteriorating mental condition.

For these reasons, at several points in the trial the Court should at the very least have stopped the proceedings and made inquiries into Mr. Paul's mental state and possible incompetence to proceed further. The Court's failure to do so violated Mr. Paul's right to a full hearing on the issue once a doubt as to his competency had been raised by all of the evidence, including the mounting evidence of Mr. Paul's deterioration during the trial.

The law is clear that the failure to conduct hearing in this case alone warrants a new trial or at least a new sentencing proceeding. In Drope v. Missouri, 420 U.S. 162, 179 (1975), the Supreme Court held that the trial judge committed constitutional error warranting a new trial when it failed to hold a full competency hearing in the face of

evidence that the defendant may have been incompetent. The Court also held that a retrospective hearing would not have been adequate to make the determination of competency. *See* Pate v. Robinson, 383 U.S. 375 (1966). Critically here, the Court ’s duty to conduct a hearing exists whether or not defense counsel make a full and adequate request for such a hearing. *Id*.

The Court’s failure to conduct the proper inquiry before trial was compounded by the events of trial as they unfolded within full view of the Court. As noted above, several times throughout the trial itself, the Court received further information that should have warranted the follow-up testing and evaluation contemplated by the court expert from the beginning.

In Pate v. Robinson, 383 U.S. 375 (1966), the Supreme Court first recognized that a criminal defendant has a right, protected by due process, to an evidentiary hearing on his competence to be tried whenever there is substantial doubt about his competency. Thereafter, in Drope v. Missouri, 420 U.S. 162 (1975), the Court further explained the contours of this procedural due process protection and made clear that the trial court must hold a hearing, *sua sponte*, if the evidence known to it gives rise to a reasonable doubt about the defendant’s competency.

There was, and still is, enough doubt about Mr. Paul’s competence to stand trial that the Court was obliged under Pate and Drope to hold a hearing into Mr. Paul’s

competency. In these circumstances, the law is quite clear: the Court's failure to hold a hearing concerning Mr. Paul's competence to stand trial deprived him of a fair trial.

In Reynolds v. Norris, 86 F.3d 796 (8th Cir. 1996), the Eighth Circuit reviewed the due process requirements set forth in Pate and Drope. The Court first noted the foundational safeguard that "'the Due Process Clause... prohibits the criminal prosecution of a defendant who is not competent to stand trial.'" *Id*. at 799-800 (*quoting* Medina v. California, 505 U.S. 437, 439 (1992)). The Court then set forth the criteria for competency, alternatively articulated by the Supreme Court in Drope, 420 U.S. at 171:

> to be competent to stand trial, one must have 'the capacity to understand the nature and object of the proceedings against him, to consult with counsel, and to assist in preparing his defense[.]'

and in Dusky v. United States, 362 U.S. 402 (1960):

> [a] defendant is competent to stand trial if 'he has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding - and [if] he has a rational as well as factual understanding of the proceedings against him.'

86 F.3d at 800.

The Court in Reynolds then explained that "[t]o safeguard this due process guarantee, the Supreme Court has established a separate procedural due process right to a competency hearing." *Id*. (*citing* Drope v. Missouri, 420 U.S. at 172; and Griffin

v. Lockhart, 936 F.2d 926, 929 (8th Cir. 1991)). "Due process requires the trial court to hold a competency hearing, either on motion or *sua sponte*, whenever evidence raises a 'sufficient doubt' about the accused's mental competency to stand trial." *Id*. (*citing* Branscomb v. Norris, 47 F.3d 258, 261 (8th Cir.), *cert denied*, 115 S.Ct. 2260 (1995); and United States v. Day, 949 F.2d 973, 981 (8th Cir. 1991)). The Court emphasized that this duty arises "any time" evidence suggesting doubt about competency emerges in trial court proceedings. *Id*. (*citing* Speedy v. Wrick, 702 F.2d 723, 727 (8th Cir. 1983), in which, notwithstanding pretrial psychiatric examinations concluding that defendant was competent, subsequent evidence of the defendant's irrational behavior immediately before and during trial suggested a post-evaluation deterioration and possible incompetency, mandating a competency hearing.) The Reynolds panel emphasized this duty by referring to the Supreme Court's cautionary note in Drope v. Missouri, 420 U.S. at 181:

> [e]ven when a defendant is competent at the commencement of his trial, a trial court must always be alert to circumstances suggesting a change that would render the accused unable to meet the standards of competence to stand trial.

*Id*. at 800.

Finally, the Reynolds panel explained that the determination of whether there is "sufficient doubt" to require a competency hearing rests upon several factors:

> While the Supreme Court has not described the precise quantum of proof necessary to establish sufficient doubt, it has indicated that the trial court should consider (1) evidence of irrational behavior by the accused, (2) the accused's demeanor at trial, and (3) any prior medical opinion as to the mental competency of the accused to stand trial.

*Id*. (*citing* Branscomb v. Norris, 47 F.3d at 261; Griffin v. Lockhart, 925 F.2d at 930; and Speedy v. Wrick, 702 F.2d at 727). "Additionally, the trial court may consider an express doubt by the accused's attorney, although such doubt alone is not enough to establish sufficient doubt." *Id*. (*citing* Branscomb, 47 F.3d at 261; Griffin, 935 F.2d at 930).

In determining whether there is sufficient doubt of a defendant's competency to hold a hearing, the Supreme Court has taught "that even one of these factors standing alone may, in some circumstances, be sufficient." Drope v. Missouri, 420 U.S. at 180. *See* Griffin v. Lockhart, 935 F.2d at 930; Speedy v. Wrick, 702 F.2d at 726. To provide additional guidance to the trial courts in determining whether there is sufficient doubt, the Eighth Circuit adopted, in Lindhorst v. United States, 658 F.2d 598, 607 (8th Cir. 1981), an explanation from Moore v. United States, 464 F.2d 663, 666 (9th Cir. 1972) (*per curiam*), of the kind of doubt that calls for a hearing:

> Under the rule of Pate v. Robinson, ... a due process evidentiary hearing is constitutionally compelled at any time that there is 'substantial evidence' that the defendant may be mentally incompetent to stand trial. 'Substantial evidence' is a term of art. 'Evidence' encompasses all information properly before the court, whether it is in the form of medical

> reports or other kinds of reports that have been filed with the court. Evidence is 'substantial' if it raises a reasonable doubt that cannot be dispelled by resort to conflicting evidence. The function of the trial court in applying Pate's substantial evidence test is not to determine the ultimate issue: Is the defendant competent to stand trial? Its sole function is to decide whether there is any evidence which, assuming its truth, raises a reasonable doubt about the defendant's competency. At any time that such evidence appears, the trial court *sua sponte* must order an evidentiary hearing on the competency issue.

The failure of trial counsel to make appropriate requests in the face of their client's bizarre behavior is not a bar to relief in a postconviction proceeding. In Pate v. Robinson, the Supreme Court rejected the argument that Robinson's failure to request a competency hearing at trial amounted to a waiver of the claim that due process entitled him to such a hearing. 383 U.S. at 384. Citing an Eighth Circuit opinion reaching the same conclusion, Taylor v. United States, 282 F.2d 16, 23 (8th Cir. 1960), the Court explained, "it is contradictory to argue that a defendant may be incompetent, and yet knowingly or intelligently 'waive' his right to have the court determine his capacity to stand trial." 383 U.S. at 384. This rationale explains why the due process right recognized in Pate must be protected by the Court *sua sponte*. Reynolds v. Norris, 86 F.3d at 800.

In addition, it is clear that the right recognized in Pate may rest upon evidence known to the trial judge as a result of any trial *or post-trial* proceedings in the case.

*See* Collins v. Housewright, 664 F.2d 181, 183 n.6 (8th Cir. 1981) ("[a] Pate violation is a procedural error by the trial court and it may occur only in the time frame encompassed by the trial itself and immediately related proceedings"); Acosta v. Turner, 666 F.2d 949, 955-956 (5th Cir. Unit B 1982) (finding a Pate violation, in part, on the basis of evidence emerging from post-trial psychiatric evaluations).

In short, where the trial court actually sees the defendant's condition deteriorate during the proceedings, the due process clause can only be satisfied by a contemporaneous evaluation of the defendant's competence to proceed. Neither the trial court's contemporaneous lay assessment of the defendant nor a *nunc pro tunc* psychological evaluation conducted months, weeks or years after the fact can satisfy the strong concerns of the due process clause that a defendant not be brought to trial if there are reasonable grounds to question his competence to proceed. Under the circumstances known to the Court at the time of trial, the failure to conduct a contemporaneous competency assessment is a clear cut violation of Drope v. Missouri, 420 U.S. 162 (1975). Therefore, a COA should issue to permit Mr. Paul to pursue his due process claim that this Court failed to conduct a mental evaluation when it had reason to believe he was unfit to stand trial.

As noted with respect to claim XXII, above, this Court should grant a COA on related issues, including:

Was Mr. Paul's right to due process of law violated by bringing him to trial while he was incompetent to proceed?

Was Mr. Paul's right to due process of law violated when this Court failed to conduct an inquiry into Mr. Paul's competence to proceed in spite of the irrational behavior directly observed by the court?

Did Mr. Paul receive ineffective assistance of counsel when his attorneys failed to complete their investigation of his background, character and mental health history?

Did Mr. Paul receive ineffective assistance of counsel when his attorneys failed to take affirmative steps to conduct a reasonable investigation into Mr. Paul's mental health when he began to behave irrationally, as the defense psychologist had warned them may occur?

Should this Court have granted appropriate discovery on this issue, including entering orders to allow mental health experts to have access to Mr. Paul for purposes of evaluating him, prior to deciding this issue?

Should this Court have granted an evidentiary hearing on the issues relating to Mr. Paul's mental health?

**XXIV. The Government Committed Misconduct Throughout All Phases of the Pre-trial, Trial and Post-Trial Process, Violating Mr. Paul's Rights Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S.**

**Constitution.**

The government in general, and the prosecution specifically, engaged in repeated misconduct throughout all phases of the pre-trial, trial, and post-trial proceedings in this case, in violation of Mr. Paul's rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. The entire process in this case was replete with government misconduct. Set forth herein is a listing of the main aspects of misconduct known at this time to undersigned counsel; by listing some specific examples, Mr. Paul does not intend to waive other instances of misconduct covered by the general characterizations and/or that are not known at this time despite the exercise of due diligence in his investigation but which become known after discovery, if any, is authorized.

The misconduct in this case occurred during the death certification process described elsewhere in this motion and incorporated herein by express reference. During that process, the government attempted to influence the decision at the Department of Justice as to whether to certify the case as a death penalty case by relying upon known false evidence and emphasizing such evidence as one of the primary reasons why a death sentence was warranted in the case. *See* Little, R., The Federal Death Penalty: History and Some Thoughts about the Department of Justice's Role, 26 Fordham Urban L. J. 347, 499-500 (1999); Little, R. Why a Federal Death

Penalty Moratorium?, 33 Conn. L.Rev. 791, 805-813 (2001).

In addition, as asserted elsewhere in this motion, the government relied upon the race of the defendant, Jeffery Paul, as a basis for seeking the death penalty and certifying his case as a death penalty case, and as a reason why the case was not de-certified once the co-defendant received a life sentence at his trial. *Id*.

After the initial certification for death, the government knowingly relied upon false testimony and evidence throughout the pre-trial and trial proceedings in this case. Such false testimony included, but is not limited to: making available a variety of benefits to numerous government witnesses in exchange for helpful testimony, such benefits including money and promises of money, leniency and immunity and assistance with other pending cases and charges and fines, and promises of leniency or immunity, assistance with other pending cases and/or charges and/or fines, etc., while denying the existence of such to the defense and in the presence of the jury; coercing, pressuring, and coaching witnesses (including the defendant) to provide incriminating information, irrespective of its accuracy or the witness's ability actually to recall such information, to the government, and/or to testify against Mr. Paul at trial based on such coerced or coached information; knowingly proffering and relying upon false testimony and arguments at pre-trial hearings and during trial in the presence of the jury; and relying upon arguments to the jury based upon false information and/or

false characterizations of the record. The witnesses referenced herein include most of the government witnesses who alleged that Mr. Paul made inculpatory statements to them, including, but not limited to, Jason Paul, Chris LaPaglia, John LaVoie, Kris Rogers, Suzy Arbuckle, Rebecca Pingle, & Crystal Davis. These witnesses also include other government agents who testified against Mr. Paul and received cash rewards and/or other benefits in exchange for their testimony and/or assistance.

The government also failed to disclose to the defense substantial exculpatory information within the possession of the government or its agents and assigns, and such evidence would have exonerated Mr. Paul and/or produced a different verdict at either or both phases of trial. Such evidence included, but was not limited to: witness statements concerning the time of death which would have exonerated Jeffery Paul; physical evidence which exonerated Jeff Paul; evidence of the time of death and/or the time of the incident and/or the crime; evidence that Mr. Paul had allegedly confessed to other murders which he did not, in fact, commit.

It is a violation of due process for the prosecution to use testimony to obtain a conviction that it knew, or should have known, was false. Mooney v. Holohan, 294 U.S. 103, 112 (1935). In Mooney and its progeny, the Supreme Court has made clear that the deliberate deception of a court and jurors by the presentation of known false evidence is incompatible with "rudimentary notions of justice." *Id.* A conviction

obtained by the knowing use of perjured testimony is fundamentally unfair, and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Pyle v. Kansas, 317 U.S. 213 (1942), Alcorta v. Texas, 355 U.S. 28 (1957), Giglio v. United States, 405 U.S. 150 (1972).

In Napue v. Illinois, 360 U.S. 264, 269 (1959), the Supreme Court reaffirmed the expansive scope of this rule, stating that "[t]he same result obtains when the State, although not soliciting false evidence, allowed it to go uncorrected when it appears."

The government in this case violated Mooney, Giglio, and Napue, by lying to the defense and proffering false testimony to the jury, concerning the benefits and promises granted to government witnesses in exchange for testimony and/or information implicating Mr. Paul, when the prosecution knew or should have known that such testimony or assistance was false but allowed to go uncorrected. It likewise violated these principles by coercing and/or coaching its witnesses to relate information and/or to testify against Mr. Paul whether or not the witness could actually recall or attest to the matters sought from them by the government.

A conviction obtained by the knowing use of perjured testimony is fundamentally unfair and must be set aside if there is any reasonable likelihood that the false testimony could have affected the judgment of the jury. Napue v. Illinois, *supra*, at 269-271; Alcorta v. Texas, *supra*; Giglio v. United States, *supra*. Much of the false

evidence in this case went to the credibility of the primary government witnesses who testified against Mr. Paul and who provided the foundation and cornerstone of the prosecution's murder case against him. Evidence of the significant but concealed benefits and promises of benefits to these witnesses constituted powerful impeachment evidence that, had the jury heard it, would have provided a compelling reason for the jury to disbelieve these witnesses and to disregard their testimony in its entirety.

The government cannot prove, beyond a reasonable doubt, that this false testimony had no impact on the verdict at both phases of trial. *See* Kyles v. Whitley, 514 U.S. 419 (1995). For this reason, Mr. Paul's federal constitutional rights were violated by the prosecution's knowing use of false testimony, and he is entitled to a new trial.

The prosecution also has a duty to disclose evidence that is favorable to the accused. Brady v. Maryland, 373 U.S. 83 (1963). This duty applies to evidence that may be used to impeach the credibility of the prosecution's witnesses, and not just to direct evidence of innocence. United States v. Bagley, 473 U.S. 667, 682 (1985). Brady also imposes a critical concomitant duty on the prosecution to personally become aware of potentially exculpatory evidence in the possession of other government actors. Kyles v. Whitley, 514 U.S. 419 (1995).

The prosecution's failure to disclose exculpatory evidence violates federal due

process if the suppressed evidence is constitutionally material. Kyles v. Whitley, *supra*, 131 L.Ed. 2d at 506-507 (*citing* Bagley). The Bagley test of materiality has four aspects. First, under Bagley, materiality is a "reasonable probability" of a different result. "The question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Id*. Second, the Bagley test of materiality is not a sufficiency of the evidence test. The accused need not demonstrate that had he been privy to the suppressed evidence and presented the evidence at trial, he would have been acquitted. *Id*. Third, once constitutional error is found under Bagley, there is no further need for harmless error review. *Id*. That is because a "reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different means that the suppression clearly would also have had "substantial and injurious effect or influence in determining the jury's verdict." *Id*. Finally, Bagley materiality is to be measured and analyzed "in terms of suppressed evidence considered collectively, not item by item." Kyles v. Whitley, *supra*, 131 L.Ed.2d at 508-509.

In this case, the prosecution violated Brady by suppressing constitutionally material exculpatory evidence exonerating Mr. Paul and/or tending to exonerate Mr. Paul, and impeaching many of the most important government witnesses and/or

tending to impeach many of the most important government witnesses in the case. But for the government's failure to disclose this information to the defense, the outcome would most likely have been different at either or both phases of trial.

For the foregoing reasons, this Court should grant a COA on the issues raised by the prosecutor's misconduct.

**XXV. Mr. Paul's Conviction and Death Sentence Violate The Constitution as Set Forth in Apprendi v. New Jersey, 530 U.S. 466 (2000) and its Progeny, Including Ring v. Arizona, 536 U.S. 584 (2002), And as Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.**

Mr. Paul's conviction and sentence of death were obtained pursuant to an indictment and procedure that was fundamentally flawed, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. Mr. Paul was charged by indictment with the crimes of §1111 murder and §924(c)(1) use of a firearm in the commission of a crime of violence. *See* App. 6. Count One of the indictment alleged only that Mr. Paul killed Sherman Williams with malice aforethought while aiding and abetting another individual and in the course of a robbery. Count Two charged Mr. Paul with the use of a firearm in connection with the aforementioned death of Mr. Williams. Importantly, however, the grand jury did *not* allege anywhere in the indictment that it had found any of the statutory aggravating circumstances which, under the Federal Death Penalty Act of 1994

("FDPA"), must be found at trial in order to render the defendant eligible for the death penalty, or the gateway intent finding, *see* 18 U.S.C. §3591(a)(2) which, under the FDPA, must also be found by the jury at trial in order to render a defendant eligible for the death penalty. Pursuant to the FDPA, those factors were separately alleged in the government's notice of intent to seek the death penalty against Mr. Paul, which enumerated the aggravating factors the government would seek to prove. App. 18.

Mr. Paul challenged the sufficiency of the indictment prior to trial, seeking a bill of particulars specifically regarding the elements of the aggravating factors relating to the government's notice of intent to seek the death penalty. Docket 27, 28. In response, the government relied directly upon the allegations contained in the indictment, arguing that this provided the defendant with sufficient notice of both the crime for which he was charged as well as the basis for seeking the death penalty in the case. Docket 60. The Court denied the defendant's motion, relying upon these same arguments, and holding that the indictment was sufficient to provide notice to the defendant because it contained facts supporting each element of the underlying offenses. Docket 87.

The Supreme Court held in Jones v. United States, 526 U.S. 227, 251-52 (1999), that the Fifth Amendment requires that all elements of a federal offense be "charged in the indictment, submitted to a jury, and proven by the Government beyond

a reasonable doubt." That principle provides the basic building block upon which several important later cases, and the claim presented herein, rest.

On June 26, 2000, while Mr. Paul's case was pending rehearing in the Court of Appeals, the U.S. Supreme Court decided Apprendi v. New Jersey, 530 U.S. 466 (2000). In Apprendi the Court applied the aforementioned Jones principle to sentencing fact which, if found, increase a defendant's sentence beyond the otherwise available maximum punishment -- such facts, the Court, must, consistent with the constitution, be made by a jury and must be found to exist beyond a reasonable doubt.

On June 24, 2002, the Supreme Court decided Ring v. Arizona, 536 U.S.584 (2002). Ring overruled Walton v. Arizona, 497 U.S. 639 (1990), in light of Apprendi. A key application of the Apprendi decision in Ring was that "Arizona's enumerated aggravating factors operate as 'the functional equivalent of *an element of a greater offense'*. . . ." Ring, 536 U.S. 609, *quoting* Apprendi, 530 U.S. at 494 n.19 (2000) (emphasis added). As the Court has made clear since Jones, an "element" for purposes of constitutional analysis is any "fact[] necessary to impose the maximum [punishment]." Harris v. United States, 536 U.S. 545, 566 (2002). Ring makes clear that aggravating factors in a capital case are elements because they are "legally essential" to increase the available sentence from life imprisonment to death (as the Court put it in Harris, they are "necessary to impose the maximum [punishment]").

The principles set forth in Jones, as applied to sentence enhancing facts as set forth in Apprendi, dictate the conclusion that in a *federal* capital prosecution, the Fifth Amendment requires that all aggravating factors and mental state elements be alleged by indictment. For this reason, the indictment under which Mr. Paul was convicted and sentenced to death is fatally flawed because the grand jury failed to consider or find those elements of the capital offense.[18]

This absence of a fundamental procedural protection was not rendered harmless by the fact that the trial jury in Mr. Paul's case found at trial that the government had proved, even "beyond a reasonable doubt," the aggravating factors alleged in its notice of intent to seek the death penalty. First, as noted elsewhere in this motion, incorporated herein by express reference, under the unique facts of this case, the jury clearly *did not* make all eligibility findings set forth in the FDPA, most notably here, the so-called "gateway" on intent. For that reason alone, as set forth elsewhere in this motion, Mr. Paul's sentencing trial was unconstitutional under Apprendi.

Moreover, the Supreme Court has emphasized that the grand jury "controls not only the initial decision to indict, but also significant decisions such as how many

---

[18] Upon information and belief, since Ring the Department of Justice has apparently directed prosecutors with pending FDPA cases to seek superseding indictments including aggravating factors.

counts to charge and whether to charge a greater or lesser offense, *including the important decision to charge a capital crime.*" Campbell v. Louisiana, 523 U.S. 392, 399 (1998), *citing* Vasquez v. Hillery, 474 U.S. 254, 263 (1986) (emphasis added). Ring makes clear that the grand jury which indicted Mr. Paul never made that "important decision." Its failure to do so cannot be rendered harmless by subsequent findings of the petit jury after the government appropriated the grand jury's constitutionally protected role. Indeed, a federal district court four days prior to the filing of this motion so held. *See* U.S. v. Davis & Hardy, Criminal Action No. 94-381 (E.D. La.) Mem. Order issued December 13, 2002. Mr. Paul urges the Court to follow the lead of the district judge in that case and hold Mr. Paul's death sentence unconstitutional.

This reading of Ring – that it requires the grand jury to allege in the indictment any fact-finding necessary to render the defendant death-eligible – is reinforced by the Supreme Court's action four days after Ring in Allen v. United States, 536 U.S.953 (2002). The Court granted *certiorari*, vacated the decision below (United States v. Allen, 247 F.3d 741 (8th Cir. 2001)), and remanded for further consideration in light of Ring . The first question presented in Allen's petition for *certiorari* was whether, in a capital case brought pursuant to the FDPA (*i.e.*, a capital case like Mr. Paul's), the Fifth Amendment required that aggravating factors be presented to, and found by, the

grand jury, rather than simply being alleged by prosecutors as provided by 18 U.S.C. §3593. *See* Allen, 247 F.3d at 761-764 (addressing and rejecting this claim, prior to Ring). The Supreme Court 's decision to vacate and remand Allen is strong evidence that the Fifth Amendment requires, in a federal capital case, that aggravating factors be presented to and found by the grand jury.[19] Because Mr. Paul's indictment did not contain those elements of the offense, his conviction and death sentence violate his right to grand jury indictment under the Fifth Amendment and this Court should grant relief.[20]

---

[19] Ring does not discuss the grand jury issue since that case arose in the context of a state prosecution, where the Fifth Amendment's Indictment Clause does not apply. Hurtado v. California, 110 U.S. 516 (1884). Apprendi and Ring clearly establish, however, that aggravating factors in a scheme such as the FDPA operate as "elements" (of the sentence) that must, in the federal system, be alleged by way of indictment. The only issue presented by Allen's petition for writ of *certiorari* to which Ring could apply was the applicability of the Indictment Clause to aggravating factors in a case brought pursuant to the FDPA.

[20] Ring – which concerns the definition of what elements constitute a particular (greater or lesser) offense – is a decision of substantive constitutional criminal law, and thus should be retroactively applicable in this case notwithstanding the fact that Mr. Paul's conviction became "final" on direct review prior to the decision in Ring. *See, e.g.*, United States v. McPhail, 112 F.3d 197, 199 (5th Cir. 1997) (Bailey v. United States, 516 U.S. 137 (1995), "applies retroactively to cases on collateral review" because it "articulate[d] the substantive elements that the government must prove to convict a person charged [under 18 U.S.C.] § 924(c)(1)," and thus was "a substantive, non-constitutional decision concerning the reach of a federal statute" and "not … a new rule of criminal procedure [implicating] the retroactivity analysis set forth in Teague v. Lane,") (citation omitted). In any event, Mr. Paul's conviction did not become final until

For the foregoing reasons, this Court should grant a COA allowing the Court of Appeals to decide the issues that arise in this case as a result of the Supreme Court's decisions in Apprendi and Ring.

**XXVI. Mr. Paul was Denied His Right to the Effective Assistance of Counsel Throughout All Phases of the Pre-Trial, Trial and Post-Trial Process, In Violation of His Rights as Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.**

Mr. Paul was denied his right to the effective assistance of counsel at all phases of his pre-trial, trial, and post-trial proceedings, and he was prejudiced thereby and/or prejudiced should be presumed from such denial, in violation of his rights under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution. But for all of the instances of counsels' ineffectiveness set forth herein and to be articulated further once the Court has allowed for discovery, if any, both individually and cumulatively, there is a reasonable probability outcome would have

---

after the Court decided Apprendi. *See* Griffith v. Kentucky, 479 U.S. 314, 321 n. 6 (1987) (for retroactivity purposes, "[b]y 'final,' we mean a case in which a judgment of conviction has been rendered, the availability of appeal exhausted, and the time for a petition for certiorari elapsed or a petition for certiorari finally denied."). He is thus entitled to rely upon the principles set forth therein in support of any claim he makes in this motion. Apprendi provides all the law that is needed to underscore the constitutional merit to the claims he sets for here and elsewhere in this motion. *See* U.S. v. Thomas, ___ F. 3d ___, 2002 WL 31545772 (D.Del.)) ("The Ring case, however, is basically an application of Apprendi in the context of capital sentencing. In the Court's view, Ring does not create any new right [additional to those set forth in Apprendi.]").

been different at all stages of the pre-trial, trial, and post-trial proceedings. Counsels' ineffectiveness set forth herein are sufficient to undermine confidence in the verdicts at both phases of trial. At pages 6-19 above, counsel set forth the specific factual basis for Mr. Paul's ineffective assistance of counsel claim, explaining the particular ways in which trial counsel's failure to conduct a reasonable investigation undermined confidence in the guilt/innocence and penalty verdicts of the jury. Those specific details will not be repeated here. It is sufficient to note for purposes of analyzing whether reasonable minds could differ with this Court's ruling that trial counsel failed to interview members of Jeff Paul's immediate family, failed to interview his closest friends and their parents, failed to interview mental health care providers, failed to complete an adequate social history which would have enabled defense experts to reach accurate conclusions that Mr. Paul suffers from mental illness, and performed deficiently in numerous other respects. Because of counsel's failure to investigate, the only witness called for the defense was his mother, Paula Paul, who was incapable of presenting a persuasive and complete mitigation case for the jury for many reasons, including her limited knowledge and perspective, and the total absence of independent corroboration.

Had trial counsel conducted a reasonable investigation, they would have learned that Mr. Paul was experiencing serious mental problems in the jail awaiting trial, that

friends and family had observed evidence of major psychotic symptoms, that there is a genetic history in his family of psychotic disorders, that there were numerous family problems that interfered with his emotional and intellectual development, that he was severely abused by his father and no adult in his life protected him from the abuse, and that he had suffered a severe, traumatic and disfiguring knife injury to his face while being terrorized by his father.

Counsel's failure to conduct a reasonable investigation prevented them from presenting persuasive evidence from friends and family that in spite of all these pressures and risk factors, Jeff is a sensitive, compassionate young man who attempted to bear a significant portion of parental responsibilities in his chaotic home. Witnesses could have attested to specific acts of kindness and decency that would enable the jury to see Mr. Paul's positive character.

Finally, counsel's failure to conduct a reasonable investigation caused them to overlook mental health issues in the case, including Mr. Paul's lack of competence to proceed before and during his trial, his diminished mental and emotional condition as he witnessed the death of Mr. Williams at the hand of Trinity Ingle, and numerous mitigating factors that would have been supported by his emotional and mental disabilities.

Even though Mr. Paul supported his claim with sworn statements of friends,

family, mental health experts and others, this Court denied relief without a hearing and without appropriately analyzing the issue of whether the evidence counsel failed to present might have affected the outcome of the trial. This Court's analysis of trial counsel's performance is completely at odds with the U.S. Supreme Court's decision in Williams v. Taylor, 529 U.S. 362 (2000), where the Supreme Court granted relief on a claim of ineffective assistance of counsel that is indistinguishable from Mr. Paul's case.

In assessing the claim of ineffective assistance of counsel in Williams the Supreme Court addressed a broad range of factors, including the nature of the crime and the aggravating evidence of other offenses, the mitigating evidence that was presented at trial, counsel's alleged trial strategy, and the undeveloped mitigating evidence presented in habeas corpus proceedings. Applying 28 U.S.C. § 2254 (d)(1), the Court held as both contrary to the governing law, *see* Strickland v. Washington, 466 U.S. 668 (1984), and "an unreasonable application" thereof, the state habeas court's finding that counsel's performance was not deficient and that the prejudice resulting therefrom did not affect the sentencing outcome. The Court found prejudice based upon the conclusion that the mitigating evidence not presented at trial but offered in habeas "might well have influenced the jury's appraisal of [Williams'] moral

culpability." *Id.* at 1515.[21]

The relevant facts underlying the ineffectiveness issue in Williams are far weaker than those presented by this case. In Williams the jury learned that, in the case in chief, the defendant, acting alone, beat an elderly man with a wooden club, retrieved three dollars from the victim's wallet as he lay gasping for breath, and left him to die. 529 U.S. 367-69. Primary evidence of guilt came from Williams' multiple confessions. *Id*. at 367.

At sentencing the jury learned that Williams had engaged in a series of brutal assaults on elderly victims shortly after the crime: acting alone, he had set fire outside a man's home to facilitate a violent attack and robbery on the occupant, and he beat an elderly woman so severely that she had been left in a permanent vegetative state. *Id*. at 1500. The jury also learned that Williams had an extensive prior criminal record, including convictions for armed robbery, burglary, and grand larceny. *Id*. He had

[21] In comparing Mr. Paul's case to Williams, it is important to note at the outset that unlike Williams his case is preceding outside the restrictions of 28 U.S.C. §2254(d). His case is a §2255 case, and thus this Court is not required to defer in any way either to the factual findings or to the legal conclusions of another court (such as the state habeas court in the Williams case). Thus the fact that the Court in Williams granted relief after finding not only that the §2254 habeas petitioner's Sixth Amendment rights had been violated, but also that the state court's failure to so find was "unreasonable," underscores why Mr. Paul is entitled to relief in this case. 529 U.S. 599.

also been convicted of arson for setting fire to the jail while he awaited trial on the capital murder case. *Id*. Two psychological experts who examined Williams prior to trial told the jury that "there was a high probability that he would commit future criminal acts of violence and that he constituted a continuing threat to society." *Id*.

The facts of Mr. Paul's crime and background are far less severe than those presented in Williams. Unlike in Williams, Mr. Paul was only convicted of aiding and abetting in the shooting death of Sherman Williams. The evidence of his involvement in the crime was largely based upon statements he allegedly made to acquaintances, as well as government agents, whose testimony (unbeknownst to the jury) was bought and paid for by the federal government.

Wholly unlike the case in Williams, at sentencing in Mr. Paul's case the government presented no additional aggravating evidence other than the testimony of the deceased's two grown daughters and a former co-worker to describe some attributes of the life of Sherman Williams. In fact, as noted, some of the most damaging aggravating information about Mr. Paul came from the unexplained and non-contextualized testimony of the defense's only witness, Mrs. Paul. Even still, however, this evidence about a young boy's involvement in petty crime pales in comparison to the evidence of heinous other crimes committed by Mr. Williams.

On the mitigating side, in both the Williams case and in Mr. Paul's case, the

sentencing jury heard comparatively little about each defendant's life; in both, however, the true story is replete with facts that, while they do not excuse the crime, at least put it in a mitigating context that "might well have influenced the jury's appraisal of [each defendant's] moral culpability." 529 U.S. at 398.

Terry William's jury heard from three witnesses (the mother and two neighbors) in mitigation, in addition to excerpts from the testimony of an expert witness who had examined the defendant in another matter; Jeff Paul's jury heard from one witness, his mother. In Mr. Paul's case, no expert testimony whatsoever, documentary or otherwise, was provided to the jury. In both cases, the witnesses provided generic testimony about the defendant's life.

In both cases this cursory mitigating presentation is to be contrasted with the "voluminous" mitigating evidence that was available and could have been presented by defense counsel had they been effectively doing their job. Once again, both in terms of quantity and substance, the evidence that was available but never presented in each case was remarkably similar: in both cases, the available but un-presented evidence included an awful childhood replete with severe poverty, abusive parents and improper adult supervision. *Id*. Just as Mr. Williams suffered from mental deficiencies, including being "borderline mentally retarded" and brain impaired, so too Mr. Paul suffers from severe brain damage and serious mental disorders.

Other character evidence proffered in Williams compares with that available, but not presented, at Mr. Paul's trial. Just as prison officers and a respected community member were willing to come forward on Mr. Williams' behalf, numerous teachers, neighbors, friends, counselors, probation officers and others were available and would have testified on Mr. Paul's behalf had the defense developed and presented this evidence to the jury.

As the Court held in Williams: "the failure to introduce the comparatively voluminous amount of evidence that did speak in Williams' favor was not justified by a tactical decision to focus on Williams' voluntary confession." 529 U.S. 396. Put another way, the Supreme Court has made clear that in such cases sufficiently voluminous mitigating evidence will trump a trial strategy otherwise deemed reasonable if the jury does not hear that evidence.

It should be noted that Mr. Paul's petition and the declarations submitted by counsel in support of this claim were prepared by counsel without the benefit of necessary discovery and investigative resources. The Court's refusal to grant discovery, reasonable funds for investigation, and access to Mr. Paul by mental health experts have denied Mr. Paul a fair opportunity to develop his claims. Nevertheless, counsel for Mr. Paul have presented a strong, prima facie case for relief. Because most reasonable, impartial jurists would disagree with this Court's disposition of this

claim, Mr. Paul is entitled to a COA.

**XXVII. Cumulatively, All of the Errors Set Forth in this Petition, and the Prejudice That Resulted from These Errors, Denied Mr. Paul a Fundamentally Fair Trial In Violation of Rights Guaranteed Under the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution.**

Cumulatively, all of the errors set forth in this petition, and the prejudice that resulted from these errors, denied Mr. Paul due process, a fair trial, the effective assistance of counsel, a fundamentally fair trial, and his right to be free from cruel and unusual punishment, as guaranteed by the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U.S. Constitution. There were so many errors in this case (all of which that are currently known to Mr. Paul at this time prior to the availability of discovery and factual development, are set forth in this petition, and all of which are incorporated herein by express reference) that, even if none individually requires a new trial in this case, when viewed in combination, the cumulative effect was to deny to Mr. Paul a fundamentally fair trial and capital sentencing proceeding.

This Court denied relief on this claim as a matter of law, holding that cumulative error is not a claim upon which relief can be granted. Reasonable jurists would disagree with that decision, *See* U.S. v. Bledsoe, 531 F.2d 888 (8th Cir. 1976); Mak v. Blodgett, 970 F.2d 614 (9th Cir. 1992), including a majority of the Supreme Court. *See* Kyles v. Whitley, 514 U.S. 419, 436 (1995), holding that federal courts must

determine the impact of constitutional error "collectively, not item by item." For this reason, this Court should grant Mr. Paul a COA.

**XXVIII. The Court's failure to permit Mr. Paul to conduct discovery or other fact development.**

Mr. Paul requested discovery to aid in the development of a number of meritorious issues in the case, including:

- government records of interviews of its witnesses, including inducements, pressures, or financial rewards given to them;

- the files of the local U.S. Attorney and the Department of Justice in both the Ingles and Paul cases pertaining to the decision by the DOJ to seek the death penalty against each defendant, and the decision not to de-certify the case for the death penalty after a jury sentenced Mr. Paul's more culpable co-defendant to life imprisonment;

- documents pertaining to the investigation of the homicide of Mr. Williams, including the statements and identities of witnesses who undermine the government's theory of when the shooting occurred;

- The Court's files, records and notes and observations of Mr. Paul, information the Court received about Mr. Paul or his case from third parties, and conversations between the Court and third parties, including the U.S. Attorney or his representatives, the Department of Justice, the United States Marshall, or defense counsel, about Mr. Paul or any aspect of his case;

- Copies of juror questionnaires, and permission to interview jurors;

- Access to physical evidence for testing, including alleged bullets and/or bullet fragments, pellets and pellet fragments, clothing from the deceased, and tape from the deceased's body which contained as yet unidentified palm prints and human hairs;

- Documents of the U.S. Marshall's Service concerning the investigation, prosecution and trial of Jeffery Paul and Trinity Ingle in the crime of murder against Sherman Williams, particularly any documents pertaining to the issue of whether Mr. Paul was incompetent to stand trial, and whether the Court was sufficiently aware of his deteriorating mental condition that it should have stopped the proceedings and held a hearing to determine whether Mr. Paul was indeed incompetent to stand trial.

- Documents, files, materials and other information in the possession or control of the Bureau of Prisons concerning Mr. Paul and his co-defendant, Trinity Ingle, particularly those files having a bearing on Mr. Paul's deteriorating mental health or Trinity Ingle's further admissions exculpating Mr. Paul in the homicide of Sherman Williams;

- Documents, files, materials and other information and/or sources of information concerning any unreported conferences throughout the pre-trial and trial proceedings in this case, including, but not limited to, pre-trial hearings, bench conferences, in-chambers conferences, or any other proceedings in which the Court and/or counsel for either or both parties were involved in connection with his case or that of Trinity Ingle.

- Files, documents, materials or other information in the possession or control of the U.S. Department of the Interior concerning the investigation, prosecution and trial of himself and his co-defendant, Trinity Ingle, in the murder of Sherman Williams.

Each of these requests related to specific claims presented in Mr. Paul' s Motion for New Trial. Further, counsel had already obtained limited disclosure from the government, by way of FOIA requests, indicating that additional disclosures would enable Mr. Paul to establish violations of his constitutional rights. In support of his request for discovery, Mr. Paul submitted examples of heavily redacted FOIA disclosures reflecting that unnamed government witnesses received reward money as

a result of their testimony; that an unnamed witness heard the fatal gunshots in Hot Springs Park at a time when government witnesses put Mr. Paul in a different part of town; that Mr. Paul appeared to be having mental problems in the county jail; that there was a fingerprint on the duct tape used to bind the victim that did not belong to Mr. Ingle, Mr. Paul, the victim or any of the investigating officers; that Trinity Ingle has made a sworn statement clearing Mr. Paul of any participation in the actual homicide of Mr. Williams; and that Mr. Paul's mental condition visibly deteriorated during his trial. These and other factors clearly indicate that the discovery requested is very likely to produce proof that Mr. Paul's conviction and sentence were obtained in violation of his rights.

This Court denied discovery, relying on McCleskey v. Zant, 499 U.S. 467 (1991), to hold that Mr. Paul is not entitled to discovery of evidence that could have been discovered by trial counsel had they used due diligence. McCleskey dealt with a habeas petitioner who was attempting to obtain a second bite at the apple through a second habeas corpus petition after having filed and lost an initial petition. The issue involved the application of the Abuse of the Writ doctrine, which "defines the circumstances in which federal courts decline to entertain a claim presented for the first time in a *second or subsequent petition* for a writ of habeas corpus." 499 U.S. 470 (emphasis added). The doctrine of abuse of the writ has no application to initial

petitions. Lonchar v. Thomas, 517 U.S. 314, 330 (1996). Indeed, as recently emphasized by the U.S. Court of Appeals for the Eighth Circuit, post-conviction claims that require the production of evidence outside the scope of the trial record, such as claims of ineffective assistance of counsel, are not cognizable at trial or on appeal, and instead can only be considered in a motion filed pursuant to 28 U.S.C. § 2255. United States v. Lee, 374 F.3d 637 (8th Cir. 2004).

Divorcing McCleskey from its procedural context, this Court relied upon that decision to deny petitioner's request for discovery, noting "several similarities between this case and McCleskey ." Order, page 19. Specifically, the court suggests that petitioner was obliged to object at trial to the testimony of Kris Rogers on the basis of his "having been promised payment or for whatever other reason." Order, page 21. The flaw in that reasoning is that trial counsel did not know of the reward because of the government's deception; the prosecution knew that Rogers was going to receive a reward for his testimony, but affirmatively represented to the Court, the parties and the jury, both in written responses to defense pre-trial discovery requests specifically asking about rewards or consideration to witnesses, see Docket Item #66, as well as during trial in representations made to the jury, see T. 905-06, argument of Assistant U.S. Attorney Webb, that no such rewards had been paid or promised to any witness.

A COA should issue because reasonable jurists could conclude that McCleskey

does not bar a postconviction claim based on exculpatory or impeaching information that was in the possession of the government at the time of trial. In Strickler v. Greene, 527 U.S. 263 (1999), Justice Stevens, writing for the court, noted that "in the context of a Brady claim, a defendant cannot conduct the 'reasonable and diligent investigation' mandated by McCleskey to preclude a finding of procedural default when the evidence is in the hands of the state." Mr. Paul's trial counsel had no reason to suspect that they were being misled by the government's representations, and trial counsel's shortcomings, whether real or imagined, do not absolve the government of responsibility for its misconduct. The only way for defense counsel to know whether the witnesses had an expectation of receiving a monetary reward was to ask the government, and rely on its response.

The Court's order also imposes too heavy a burden on Mr. Paul's request for discovery and on his *Brady* claim. It is clear from the Court's order that it believes Mr. Paul to be obliged to prove his innocence in order to prevail on his claim of government misconduct. That has never been the case; "a showing of materiality does not require demonstration by a preponderance that disclosure of the suppressed evidence would have resulted ultimately in the defendant's acquittal." Kyles v. Whitley, 514 U.S. 419, 434 (1995). The Court's order suggests that Mr. Paul cannot demonstrate materiality in light of evidence implicating him in the crime, but that reasoning, too, is flawed:

> The second aspect of *Bagley* materiality bearing emphasis here is that it is not a sufficiency of evidence test. A defendant need not demonstrate that after discounting the inculpatory evidence in light of the undisclosed evidence, there would not have been enough left to convict.

*Kyles v. Whitley*, 514 U.S. 419, 434-35 (1995). This Court's suggestion that the defense should have tried to exclude the false evidence by Kris Rogers as a prerequisite to bringing a *Brady* claim based on the secret reward is incompatible with the purpose and function of the prosecutor 's obligation under *Brady*:

> One does not show a Brady violation by demonstrating that some of the inculpatory evidence should have been excluded, but by showing that the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict.

*Id.* at 435.

Finally, it is important to note that the impact of suppressed evidence must be "considered collectively, not item by item." *Id.* This Court failed to address the fact that Kris Rogers' credibility was important to the government's claim, which was contradicted by the physical evidence, that Mr. Paul inflicted gratuitous violence upon Mr. Williams. In discussing Rogers' testimony, the Court made no mention of the most important, and most hotly contested, aspect of his claims about his conversation with Mr. Paul. He claimed that Paul admitted to active participation in the homicide of Sherman Williams, and also claimed that Paul claimed to have kicked Mr. Williams in the head and dislodged his eyeball– a fact which is not borne out by the physical evidence, and is refuted by the Medical Examiner's autopsy of Mr. Williams. Thus,

evidence of a reward would give the jury additional reason, aside from the physical evidence, to discredit Rogers' claim that Paul admitted to such actions. It is worth noting that the co-defendant, Trinity Ingle, who was the actual shooter, received a life sentence in the absence of any similar inflammatory evidence.

The Court also rests its decision to deny discovery on respondent's claim that "the payments were neither promised nor arranged for prior to the trial and that no witness was encouraged or coached to give false information." McCleskey relied upon a similar claim by the prosecution in that case that no *Massiah* violation had taken place. The Supreme Court specifically held that it was unreasonable for McCleskey 's post-conviction lawyer and his first federal habeas attorney to rely on the prosecutor's representation in lieu of conducting relevant discovery and investigation. The prosecution's defense of Mr. Paul's request for discovery injects specific issues of fact that Mr. Paul is entitled to contest, and which demonstrate the need for discovery in order to make a reliable determination. Counsel for Mr. Paul, based on the limited, redacted documents obtained through their FOIA request and their interviews with two government witnesses, have reason to believe that the government's representation that the subject of rewards never arose prior to trial is false. Indeed, Mr. Rogers himself has advised counsel for Mr. Paul that the government's claim is not true. He had an expectation of monetary reward well in

advance of the trial of this case. Likewise, the FBI's redacted FOIA disclosure reveals that more than one government employee received monetary rewards for their work in this case, though the identity of those witnesses have not been disclosed.

The court should also note that the US attorney for the Western District of Arkansas claims an open file policy. Such a claim on the part of the prosecution would leave a reasonable defense attorney to conclude that any evidence of monetary rewards received by the government's witnesses would have been disclosed pursuant to said policy:

> In light of the state's open file policy, we noted 'It is especially likely that Counsel would have suspected that additional impeaching evidence was being withheld.' [Citation omitted] Our decisions lend no support to the notion that defendants must scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed.

Banks v. Dretke, 540 U.S. 692 (2003). Thus, trial counsel's understandable failure to raise the monetary reward issue in no way limits Mr. Paul's ability to pursue that issue now that the government's deceit has been found out.

The fact that other witnesses testified about statements of Mr. Paul is not dispositive of his discovery request or his *Brady* claim. As the redacted documents reflect, more than one witness received reward money. Due to the heavy redaction, it is difficult, if not impossible, to tell how many witnesses received monetary

payments, or who they were. Nevertheless, Mr. Paul does not have to demonstrate Brady violations with respect to every witness to establish his right to a new trial or a new sentencing hearing. In *Kyles v. Whitley*, the government committed *Brady* violations pertaining to two of four identification witnesses. In rejecting the notion that the two untainted witnesses resolved the materiality question under *Brady*, the court pointed out that the test of materiality is not as stringent as the test for sufficiency of the evidence: "But the question is not whether the State would have had a case to go to the jury if it had disclosed the favorable evidence, but whether we can be confident that the jury's verdict would have been the same." *Kyles v. Whitley*, 514 U.S. at 453. Mr. Paul is entitled to an opportunity to develop evidence in support of his argument that he was denied important evidence with which to impeach Rogers, whose credibility was material to the outcome of this case, and that there may be other witnesses whose credibility is open to question as a result of the hidden financial incentives they received.

Because reasonable jurists would disagree that McCleskey constitutes a bar to discovery in a first federal postconviction action, or even whether the case is even applicable to the issues cited by this Court, the Court should issue a COA.

**XXIX. Whether Mr. Paul demonstrated the reasonable necessity of funds for a mitigation specialist to investigate issues pertaining to Mr. Paul's background, character, mental health and culpability.**

Mr. Paul requested funds to employ a mitigation specialist in order to investigate a number of issues in this case that are inextricably intertwined with Mr. Paul's social and developmental history, his character, and his emotional and mental condition. These include Mr. Paul's claims of ineffective assistance of counsel and claims relating to Mr. Paul's background, character and mental health, such as his competence to proceed, his mental state when he witnessed Trinity Ingle's murder of Sherman Williams, and many of his claims challenging the fairness of his capital sentencing hearing.

Mr. Paul's motion was supported by the declaration of Tena Frances, a mitigation specialist hired by trial counsel, stating that this Court authorized insufficient funds to complete her investigation, and trial counsel failed to return to the Court to request the additional funds that were necessary to complete the investigation into this case. Her declaration named dozens of witnesses who should have been interviewed, but were not, including counselors, physicians, mental health care workers, law enforcement officers, siblings, extended family, classmates, friends and others who could have substantially expanded and corroborated the scant mitigation case that was presented at trial.

Mr. Paul further advised the Court in support of his request that Dr. Karen Froming and Dr. Seymour Halleck had spoken with Mr. Paul and had grave concerns

about his mental health, particularly in light of his earnest suicide attempts at the United States Penitentiary. Given the reported family history of schizophrenia discovered by Mr. Paul's present counsel, coupled with Mr. Paul's own history of psychiatric treatment and his current state of mind, it is clear that a full exploration of Mr. Paul's family and social background is imperative to a reasonable investigation and development of the issues. Counsel submitted the declaration of Seymour Halleck in support of his request, which informed this Court that Dr. Halleck's conversations with Mr. Paul left him "convinced" that Mr. Paul was suffering "something of psychotic proportions," and that he did not believe the symptoms he detected were being malingered. Dr. Froming shared his concerns.

The Supreme Court recently described the use of a forensic social worker to prepare a social history report as "standard practice" in capital cases, *Wiggins v. Smith*, 539 U.S. 510, 534 (2003), and was critical of ineffective trial counsel who "chose not to commission such a report." *Id.* The Court elaborated:

> Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)--standards to which we long have referred as "guides to determining what is reasonable." *Strickland, supra*, at 688, 80 L Ed 2d 674, 104 S Ct. 2052; *Williams v. Taylor* , supra, at 396, 146 L Ed 2d 389, 120 S Ct. 1495. The ABA Guidelines provide that investigations into mitigating evidence "should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor." ABA Guidelines for the Appointment and

> Performance of Counsel in Death Penalty Cases 11.4.1(C), p 93 (1989) (emphasis added). Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources. *Cf. id.*, 11.8.6, p 133 (noting that among the topics counsel should consider presenting are medical history, educational history, employment and training history, *family and social history*, prior adult and juvenile correctional experience, and religious and cultural influences) (emphasis added); 1 ABA Standards for Criminal Justice 4-4.1, commentary, p 4-55 ("The lawyer also has a substantial and important role to perform in raising mitigating factors both to the prosecutor initially and to the court at sentencing. . . . Investigation is essential to fulfillment of these functions").

*Id*. at 524-25 (Court's emphasis).

Tena Francis was the person who attempted to serve this vital role in this case. Unfortunately, defense counsel did not attempt to secure the resources necessary for her to do her job. Ms. Francis indicates that her investigation was terminated against her wishes before she was finished. She advised counsel of specific aspects of her investigation that were incomplete, and counsel failed to request either additional time or resources to continue the reasonable investigation into Mr. Paul's background and character. And as noted, at sentencing defense counsel presented only the testimony of Mr. Paul's mother, and played an audio tape of Trinity Ingle's jailhouse confession containing ambiguous references to Mr. Paul's role in the alleged offense.

One issue before this Court is "whether the investigation supporting counsel's decision" not to introduce mitigating evidence of Mr. Paul's background "was itself

reasonable." *Wiggins* at 523. In *Wiggins*, trial counsel conducted a limited investigation into their client's background, but claimed to have made a "strategic" choice to focus their efforts on their client's claim of innocence to the exclusion of evidence about their client's tragic childhood. Counsel's investigation in that case consisted of gathering social service and other records of Wiggins' background, arranging for a general psychological assessment, and consulting a criminologist who testified that persons in Wiggins' situation, serving a life sentence, tend to adjust well and refrain from further violence. *Id.* at 526. While the record was clear that counsel had done *some* investigation, it was equally clear that what was known to Wiggins' counsel suggested that further investigation would be fruitful. Under such circumstances, the Supreme Court held that counsel's failure to continue the investigation violated his constitutional duty of competent performance:

> In assessing the reasonableness of an attorney's investigation, however, a court must consider not only the quantum of evidence already known to counsel, but also *whether the known evidence would lead a reasonable attorney to investigate further*. Even assuming Schlaich and Nethercott limited the scope of their investigation for strategic reasons, *Strickland* does not establish that a cursory investigation automatically justifies a tactical decision with respect to sentencing strategy. Rather, a reviewing court must consider the reasonableness of the investigation said to support that strategy.

*Id.* at 527 (emphasis added) (citation omitted). The Court concluded that trial counsel's claim of valid trial strategy to justify the failure to present more mitigating

evidence was invalid in light of counsel's failure to investigate further:

> Counsel's investigation into Wiggins' background did not reflect reasonable professional judgment. Their decision to end their investigation when they did was neither consistent with the professional standards that prevailed in 1989, nor reasonable in light of the evidence counsel uncovered in the social services records--*evidence that would have led a reasonably competent attorney to investigate further*.

*Id.* at 533 (emphasis added).

Here, Ms. Francis' investigation turned up indications of a pattern of serious mental disease in Mr. Paul's family. She saw "a portion of the chaos and dysfunction that shaped Jeff as a child," including the fact that Jeff's father " had been, at the very least, emotionally unstable when Jeff was a child." Ms. Francis concluded that "[u]nderstanding the causes for his instability was paramount to completing the investigation." She is able to establish what counsel knew, but equally important is what counsel did not know when the investigation was prematurely terminated:

> Prior to his request for additional funding file on April 4, I sent a memo to Lynn Williams advising him that I had obtained some of Jeff's medical, educational and other records, but that *some of those records were incomplete*. I also told him that *I had not yet begun to explore the family history of education, mental health, employment, military history, and criminal history*. I advised Mr. Williams that my impression of the parents was they were not being totally forthcoming with us because of embarrassment, guilt, and anxiety associated with some of the most important historical information. *I knew that all of Jeff's siblings had been in therapy, but did not know the nature of any diagnosis or treatment.* Such information is very important to understand the client's mental health and character because it affects both his genetic predisposition to mental illness and his environment. I advised Mr.

> Williams that this is particularly important in this case because of the likelihood that such an investigation would enable the defense to refute the conclusions of government examiners that Mr. Paul had an antisocial personality disorder. The bottom line is *there was obviously a lot more information to be developed in order to have a true understanding of Jeff Paul's life history, which included the possibility of a history of mental illness within the family.*

Tena Francis affidavit, filed under seal, p. 4. A history of major mental illness in Mr. Paul's family would put his deteriorating appearance and behavior during trial in a different light, and would have prompted counsel to explore the mental health implications of these developments. A reasonable investigation in this case will show that Mr. Paul "has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability." *Wiggins* at 535 (citing *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989)) ("'Evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable than defendants who have no such excuse'").

There is also a relationship between the work of a qualified mitigation specialist and the reliability of expert mental health assessments. Dr. Seymour Halleck stated in his declaration that

> In spite of my impression that Mr. Paul was experiencing a serious mental illness, it is necessary for me to evaluate him in person to reach a definitive conclusion. Further, it would be very important to ascertain additional family and medical history. I would be particularly interested

> in whether there were persons in his family tree who had been diagnosed with schizophrenia or other major mental illness. A thorough investigation and evaluation could enable me to determine the nature and extent of Mr. Paul's mental illness, and how it affected him during any of the events leading up to his conviction and sentence.

Declaration of Dr. Seymour Halleck, filed under seal, p. 2. Because mental illness tends to run in families because of both genetic and environmental factors, the family history could help resolve the question of whether certain aspects of Mr. Paul's behavior are the product of a serious disability, as opposed to an allegedly flawed character. A fair and reliable resolution of the issues raised in Mr. Paul's motion for relief from his conviction and sentence of death requires that he be allowed the resources to complete the social history investigation that was prematurely abandoned by his trial lawyers, and that he receive a thorough assessment of his mental condition at critical points in his life.

In spite of the substantial indicia of Mr. Paul's serious mental illness which have been obvious since before his trial, this Court has refused every reasonable effort on the part of Mr. Paul's attorneys to conduct a competent assessment of his condition. Where competency issues arise as they have in this case, in the context of a capital prisoner expressing a desire to die at the government 's hand, "there is a presumption that psychiatric and other medical examinations will be included in the decision making process." Mata v. Johnson, 210 F.3d 324, 327 (5th Cir. 2000). Because reasonable

jurists would differ with this Court's decision to deny Mr. Paul's 2255 Motion without permitting an investigation into these issues, the Court must grant a COA.

**XXX. Whether this Court abused its discretion in denying Mr. Paul's Motion to Permit Mental Health Experts to have access to him at the U.S. Penitentiary in Terre Haute, IN, to determine whether he suffers from a mental disorder in order to address legal and factual issues in the case, including:**

**A) Whether Mr. Paul suffers from a mental illness;**

**B) Whether Mr. Paul was competent to proceed during his trial and capital sentencing proceeding;**

**C) Whether the failure of Mr. Paul's trial counsel to investigate their client's deteriorating mental condition during trial violated Mr. Paul's Sixth Amendment right to the effective assistance of counsel;**

**D) Whether Mr. Paul's is presently competent to comprehend proceedings and assist counsel.**

During the course of these proceedings, Mr. Paul attempted to commit suicide by hanging himself in his cell. Counsel advised the Court that they had spoken with a corrections officer who had found Mr. Paul and cut him down. Mr. Paul had placed a towel across his door to obstruct the view into his cell, tied a ligature around his neck, fastened the other end to the grate covering his window, and suspended himself by his neck until he lost consciousness. When he was found by a corrections officer, Mr. Paul's face was blue, he was not breathing, and his feet were dangling above the floor. He was revived after extraordinary measures on the part of the prison staff.

Counsel for Mr. Paul reported to the Court that he has been and still is engaging in bizarre behaviors, communication with him is extremely difficult, and that he is no longer able to assist in his representation or act in his own best interest. Experts brought into the case by counsel, psychologist Karen Froming and psychiatrist Seymour Halleck, submitted affidavits with this Court expressing concerns that Mr. Paul may be suffering from a serious mental disorder, and explained that it would be necessary to see him in person to arrive at a reliable conclusion. This Court denied all reasonable requests to facilitate a competent assessment of the situation.

This Court's decision is inconsistent with applicable statutory and constitutional principles that apply to mentally disturbed prisoners in Mr. Paul's circumstances. In recognition of the need for adequate resources to ensure fair and reliable postconviction adjudications in complex capital cases, Congress requires that courts authorize funds that are reasonably necessary to issues cognizable under 28 U.S.C. § 2255:

> In any post conviction proceeding under section 2254 or 2255 of title 28 seeking to vacate or set aside a death sentence, any defendant who is or becomes financially unable to obtain adequate representation or investigative, expert, or other reasonably necessary services *shall be entitled* to the appointment of one or more attorneys *and the furnishing of such other services* in accordance with paragraphs (5), (6), (7), (8), and (9).

21 U.S.C. § 848 (q)(4)(B) (emphasis added). In determining Congressional intent of this section, the Supreme Court found that the services of investigators and experts

may be critical in researching and identifying possible claims for relief in habeas corpus proceedings challenging a sentence of death. McFarland v. Scott, 512 U.S. 849, 855 (1994). Other courts have observed that "it makes little sense to force [prisoners] to first try to make a good faith claim of a constitutional violation before supplying him with the resources to investigate [the] claim' s factual basis and validity." Patterson v. Johnson, 2000 U.S. Dist. Ct. LEXIS 12694 at *5-*6 (N.D. Tex., Aug. 31, 2000), relying on McFarland v. Scott, *supra*. "[E]stablished habeas corpus and death penalty precedent suggests that Congress intended to provide prisoners with 'all resources needed to discover, plead, develop, and present evidence determinative of their "colorable" constitutional claims.'" Patrick v. Johnson, 48 F. Supp. 2d 645, 646 (N.D. Tex., 1999). The policies favoring provision of financial services are even stronger in capital cases because the nature and finality of death dramatically increases the need for reliability. Woodson v. North Carolina, 428 U.S. 280, 305 (1976). Principles of fundamental fairness guaranteed under the Due Process Clause entitle indigent defendants to the assistance of government-funded experts "to present their claims fairly in an adversary system." Ake v. Oklahoma, 470 U.S. 68, 77 (1985).

Because reasonable jurists would differ with this Court's decision to deny Mr. Paul's claims relating to his mental health without permitted him to be seen by a qualified expert, this Court should issue a COA.

**XXXI. Whether this Court applied an erroneous standard of review when it relied on the Abuse of the Writ standard enunciated in McCleskey v. Zant, 499 U.S. 467, 489 (1991), to reject Mr. Paul's first postconviction motion.**

This Court should grant a COA to allow the Court of Appeals to review its decision to rely on McCleskey v. Zant, 499 U.S. 467 (1991), to hold that Mr. Paul is not entitled to relief on his section 2255 motion, and he is not entitled to discovery of evidence, because trial counsel failed to use due diligence. McCleskey is inapplicable to Mr. Paul 's case because this is Mr. Paul's first postconviction motion challenging his conviction and sentence. McCleskey dealt with a habeas petitioner who was attempting to obtain a second bite at the apple through a second habeas corpus petition after having filed and lost an initial petition. The issue involved the application of the abuse of the writ doctrine, which "defines the circumstances in which federal courts decline to entertain a claim presented for the first time in a *second or subsequent petition* for a writ of habeas corpus." 499 U.S. 470 (emphasis added). The doctrine of Abuse of the Writ has no application to initial petitions such as Mr. Paul's. Lonchar v. Thomas, 517 U.S. 314, 330 (1996). Indeed, as recently emphasized by the 8th Circuit Court of Appeals, post-conviction claims that require the production of evidence outside the scope of the trial record, such as claims of ineffective assistance of counsel, are not cognizable at trial or on appeal, and instead can only be considered in a motion filed pursuant to 28 U.S.C. § 2255. United States v. Lee, 374 F.3d 637

(8th Cir. 2004).

Divorcing McCleskey from its procedural context, this Court relied upon that decision to deny petitioner's request for discovery, noting "several similarities between this case and McCleskey," and denied relief on several claims because of trial counsel's failure to object. *See*, Order, page 19. Specifically, the court suggests that petitioner was obliged to object at trial to the testimony of Kris Rogers on the basis of his "having been promised payment or for whatever other reason." Order, page 21. The flaw in that decision is that trial counsel did not know of the reward because of the government's deception; the prosecution knew that Rogers was going to receive a reward for his testimony, but affirmatively represented to the Court, the parties and the jury, both in written responses to defense pre-trial discovery requests specifically asking about rewards or consideration to witnesses, see Docket Item #66, as well as during trial in representations made to the jury, see T. 905-06, argument of Assistant U.S. Attorney Webb, that no such rewards had been paid or promised to any witness.

A COA should issue because reasonable jurists could conclude that McCleskey does not bar a postconviction claim based on exculpatory or impeaching information that was in the possession of the government at the time of trial. In Strickler v. Greene, 527 U.S. 263 (1999), Justice Stevens, writing for the court, noted that "in the context of a Brady claim, a defendant cannot conduct the 'reasonable and diligent investigation'

mandated by McCleskey to preclude a finding of procedural default when the evidence is in the hands of the state." Mr. Paul's trial counsel had no reason to suspect that they were being misled by the government's representations, and trial counsel's shortcomings, whether real or imagined, do not absolve the government of responsibility for its misconduct. The only way for defense counsel to know whether the witnesses had an expectation of receiving a monetary reward was to ask the government, and rely on its response.

The other flaw in the Court's decision to apply McCleskey here is the conundrum created by a rule that would allow an ineffective trial attorney to preclude postconviction review of his ineffectiveness by failing to use due diligence. All claims of ineffective assistance of trial counsel would be unreachable in postconviction proceedings. The Supreme Court most certainly did not intend such a result. Because reasonable jurists would differ with the Court on this issue, the Court should grant a COA.

**XXXII. Whether evidence and affidavits tendered by petitioner, including affidavits describing the Court's pre-trial comments expressing inappropriate opinions adverse to Mr. Paul, were sufficiently indicative of judicial bias to warrant further proceedings, including discovery and a hearing, into issues arising from judicial bias, including:**

**A) Whether Mr. Paul at the time of his trial was deprived of a fair and impartial judge, as guaranteed by the Due Process Clause of the Fifth Amendment;**

**B) Whether this Court should have been recused from deciding Mr. Paul's Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence, and for Relief from Judgment, made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.**

**C) Whether there should have been a hearing on issues arising from the Court's expressions of bias against Mr. Paul.**

Mr. Paul has filed a Second Renewed Motion to Disqualify the Honorable Jimm Larry Hendren because of new developments that add to the weight of previously submitted declarations and circumstances which would cause a reasonable litigant to suspect that this Court is biased against Mr. Paul. In this motion and in each of the preceding motions, counsel for Mr. Paul requested an investigation, discovery, and an opportunity to be heard on his motion after all the facts could be ascertained, and those requests were denied. The Court instead adopted the most innocuous interpretation of contested facts and circumstances without conducting any adversarial hearing on the issue. Given the affidavits of attorneys indicating that the Court made judicial and extrajudicial statements expressing anger and strong disapproval of the government's intention to waive the death penalty, followed by a series of discretionary rulings restricting the defense voir dire, denigrating the defense mitigation case by urging defense counsel, in the presence of the jury, to hurry along the mitigation testimony of

Mr. Paul's mother, and the Court's subsequent decisions denying mental health evaluations, discovery and investigative resources, and thereafter denying Mr. Paul's motions for relief from his conviction and sentence, a reasonable litigant would conclude that he is biased against Mr. Paul. As this motion is being prepared, the Department of Justice has requested that the Court grant an interview for purposes of investigating improper ex parte communications between the prosecution and the Court's staff. Mr. Paul's Motion to Recuse the Honorable Jimm Larry Hendren, his Renewed Motion to Recuse the Honorable Jimm Larry Hendren, and his Second Renewed Motion to Recuse the Honorable Jimm Larry Hendren, and the memoranda of law in support thereof, are incorporated herein by reference.

Reasonable jurists would conclude that the Court's decision not to recuse itself was wrong, and inconsistent with statutory standards found in 28 U.S.C. §§ 144 and 455, which require recusal where a court's "impartiality might reasonably be questioned..." Liljeberg v. Health Services Acquisition Corp., 486 U.S. 847 (1988). "The guiding consideration is that the administration of justice should reasonably appear to be disinterested as well as be so in fact." Id. at 869-870, citing, Public Utilities Comm'n of D. C. v. Pollak, 343 U.S. 451, 466-467 (1952) (Frankfurter, J., in chambers). *Also see*, Liteky v. United States, 510 U.S. 540, 560 (1994). This Court's summary denial of Mr. Paul's recusal motions is also inconsistent with the rule in this

circuit, which states, "It is the appearance of bias or partiality that matters here, not actual bias." United States v. Tucker, 78 F.3d 1313, 1324 (8th Cir. 1996), *citing* United States v. Poludniak, 657 F.2d 948, 954 (8th Cir. 1981), *cert. denied*, 455 U.S. 940 (1982). Therefore a COA should issue to determine whether this Court was biased against Mr. Paul at the time of his trial, and whether this Court should have been disqualified from adjudicating that and other issues as requested by Mr. Paul during the postconviction proceedings.

**XXXIII. Whether, because many, if not all, of the above issues turn on questions of fact, this Court should have heard evidence prior to denying Mr. Paul's Motion for a New Trial and to Vacate, Set Aside and Correct Conviction and Death Sentence, and for Relief from Judgment, made pursuant to 28 U.S.C. § 2255 and Rule 33 of the Federal Rules of Criminal Procedure.**

At a conference in this matter conducted in August of 2003, a transcript of which has not yet been made available to the undersigned, counsel for Mr. Paul urged this Court to grant an evidentiary hearing in support of his claims. Counsel recalls that counsel for the Government acknowledged the advisability of conducting a hearing, at least with respect to Mr. Paul's claim of ineffective assistance of trial counsel. The denial of relief in this matter without giving Mr. Paul reasonably necessary resources or an opportunity for an evidentiary hearing or other factual development is inconsistent with the law of this Circuit. *See* Jamison v. Lockhart, 975 F.2d 1377 (8th Cir. Sept. 24, 1992); Houston v. Lockhart, 982 F.2d 1246 (8th Cir. 1992) (en banc). Also see, Meeks

v. Singletary, 963 F.2d 316 (11th Cir. 1992). The Court's decision is also inconsistent with the United States Supreme Court's directive that a federal habeas corpus petitioner is "'entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts.'" Harris v. Nelson, 394 U.S. 286, 298 (1969).

This Court denied relief without making a reliable determination of any issues of fact underlying Mr. Paul's claims for relief. Mr. Paul has alleged a number of constitutional violations that are supported by documents, evidence and declarations of witnesses. Psychologist Karen Froming and psychiatrist Seymour Halleck have seen Mr. Paul, and have submitted affidavits expressing concerns for his mental health, and requesting face-to-face contact with him for purposes of conducting a reliable assessment. Psychologist Anthony Semone has submitted a declaration indicating that he had the same concerns at that time of Mr. Paul's trial. Mr. Paul has a family history of mental illness–his father very clearly has a serious mental illness, and a maternal uncle has a history of involuntary commitment for treatment of mental disorders, and there are numerous instances of alcoholism, suicide and attempted suicide in his family tree.

Although these factors are very important to a reliable assessment of a patient's mental condition, they were mostly unknown to pretrial examiners because counsel

terminated the investigation into Jeffrey Paul's life history well before it was completed. Mr. Paul's mental condition visibly deteriorated during the trial, and he continues to display symptoms of a serious psychosis. Experts have warned this Court that this young man may be insane, yet no hearing of any kind has been held on the question of Mr. Paul's mental condition even though it is at the heart of many issues in this case, including whether Mr. Paul is guilty of premeditated murder, whether a jury would spare his life because of mitigating factors based on his mental impairments, whether he was competent to understand the charges against him and assist in his defense, and whether he is competent to participate or make decisions in his capital 2255 proceedings. The facts surrounding Mr. Paul' s mental illness control whether or not his conviction and sentence are constitutional under the Supreme Court's holdings in Drope v. Missouri, 420 U.S. 162 (1975), Lockett v. Ohio, 438 U.S. 586 (1978), Williams v. Taylor, 529 U.S. 362 (2000), and Wiggins v. Smith, 539 U.S. 510, 534 (2003), yet the Court refused to grant a hearing to allow Mr. Paul's counsel to establish the truth of these facts.

Likewise, a number of friends and family have submitted declarations indicating that Mr. Paul was severely abused and neglected, that he experienced unthinkable trauma at the hands of his father, including having a knife plunged so deeply into his face that hundreds of stitches were required to prepare the external and internal damage.

Friends and relatives saw that he was exhibiting signs of mental illness in the jail before trial, and well before he witnessed Trinity Ingle murder Sherman Williams. They also witnessed his emotional distress resulting from his father's abuse. Zach Dryden could have told the jury about running away from home with Jeff, and the consequences Jeff suffered when Dennis Paul came to get them in Memphis, Tennessee.

Friends of Jeffrey Paul would have testified that in spite of his handicaps and environmental pressures, they knew Jeff to be a kind and compassionate boy. He often rescued injured animals and nursed them back to health. On one occasion he rescued a baby racoon whose mother had been hit by a car, and after nursing it back to health made a gift of the animal to a friend. On another occasion, a friend watched him jump into a frozen lake to rescue ducks that were trapped in the ice. He had a special bond with the family pet, a crippled dog he had taken in. People who know him well believe that Jeff is incapable of the actions attributed to him on the side of Hot Springs Mountain when Trinity Ingle killed Sherman Williams.

Trial counsel also made no attempt to speak to Trinity Ingle, even though he had already been taken to trial, found guilty, and sentenced to life two weeks before the commencement of Jeffrey Paul's trial. Ingle gave this Court a declaration explaining what happened the day Mr. Williams was killed. Ingle's declaration matches Mr. Paul's statement to the FBI, the physical evidence, and the testimony of the government

informants who testified against Ingle at his trial. If Ingle had testified at Mr. Paul's trial, and the jury credited his testimony, it would have to acquit Jeffrey Paul of any capital crime, raising serious questions about the competence of trial counsel and the fairness of Mr. Paul' s conviction. Herrera v. Collins, 506 U.S. 390 (1993). Any member of the jury who credited any of the above evidence would be required to give it mitigating effect. Penry v. Lynaugh, 492 U.S. 302, 319 (1989); Lockett v. Ohio, 438 U.S. 586 (1978).

A federal habeas corpus petitioner is "'entitled to careful consideration and plenary processing of [his claims,] including full opportunity for presentation of the relevant facts.'" Harris v. Nelson, 394 U.S. 286, 298 (1969); *see also* Blackledge v. Allison, 431 U.S. 63, 82-83 (1977). The law in the Eighth Circuit is that a habeas petition may not be dismissed without a full and fair hearing unless the factual allegations are "palpably incredible" or "patently frivolous or false." Houston v. Lockhart, 982 F.2d 1246, 1250 (8th Cir. en banc 1993). Reasonable jurists would differ with this Court's decision rejecting Mr. Paul's motion without permitting development of the facts supporting his claims.

**XXXIV. Whether the Court deprived Mr. Paul of a full and fair habeas corpus proceeding when it withheld ruling on a number of pending matters noted above, and then in one instance, ruled simultaneously upon all of these pending matters, *as well as* the entire 2255 motion, and a pending request by the Government to suspend the proceedings so as to allow Mr. Paul to withdraw his motion and**

**proceed to execution?**

Counsel for Mr. Paul have presented compelling reasons to set aside his conviction and sentence, and grant him a new trial. Unfortunately, Mr. Paul was denied full and fair habeas corpus proceedings by this Court's decision denying Mr. Paul's petition without first deciding a number of preliminary issues in the case that directly affected appointed counsel's ability to consult with their client and discover, develop and present evidence in support of his claims. On the same day that the Court denied Mr. Paul's section 2255 motion, this Court denied his Ex Parte Motion for Access to Mr. Paul by Mental Health Experts and his Motion to Allow Funds for a Mitigation Specialist. The Court had previously denied Mr. Paul's Motion to Authorize Discovery of documents and evidence in possession of the government. Also pending was the government's request to conduct further inquiry into Mr. Paul's vacillating requests to terminate his appeals and proceed to execution. Counsel for Mr. Paul had repeatedly asked this Court to allow them to investigate their client's history and mental health, which lay at the heart of these issues.

The Court's reluctance to allow Mr. Paul to present his case was apparent very early in the process, when the Court denied Mr. McGlasson's request for co-counsel which he had filed on May 14, 2002. Mr. McGlasson explained the need for co-counsel in this case, which included the volume of the record, the complexity of the

issues and the amount of time necessary to investigate, research and present Mr. Paul's case. This Court denied Mr. McGlasson's repeated requests until finally relenting on September 15, 2003, only because Mr. McGlasson was afflicted by a severe disease which left him bedridden and totally disabled for an entire month.

Two months after Mr. O'Brien entered the case, Mr. Paul experienced what was apparently a severe psychotic episode in the United States Penitentiary. Corrections officers intervened in a nearly-successful suicide attempt in which Mr. Paul hung himself by the neck in his cell. At the time of that episode, counsel for Mr. Paul were in Arkansas searching for witnesses and preparing for an oral argument to this Court on their pending discovery motion and on the government's motion to unseal the ex parte filings in the trial court record. Counsel obtained leave of court to proceed *ex parte* on a motion to allow mental health experts to visit Mr. Paul in person and conduct an evaluation of his mental condition. Counsel advised the Court the little information they had been able to glean from prison officials and limited phone contact with their client about the suicide attempt and about Mr. Paul's impaired mental condition. Counsel explained that the event created an urgent necessity to inquire into Mr. Paul's condition because of implications of his psychosis on his ability to assist counsel as well as its materiality to several issues in the case, including competence to proceed at the time of trial and whether his attorneys performed competently in the

investigation of his mental and emotional health. This Court on December 2, 2003, granted that motion, finding good cause for counsel' s request.

The Court two days later, December 4, 2003, faxed counsel a letter which in effect withdrew the order, attaching a letter it had received from Mr. Paul asking that he be allowed to dismiss his motion so that he could immediately be executed. Counsel on December 9, 2003, replied to the Court, advising that Mr. Paul did indeed wish to pursue his appeals, attaching a document signed by Mr. Paul attesting to that fact. That letter was accompanied by a Notice of Defendant's Withdrawal of Uncounseled Expression of His Desire to Waive His Appeal signed by Mr. Paul. Counsel respectfully suggested to this Court that Mr. Paul's letter increased rather than decreased the need for a mental health evaluation, and urged the Court to reinstate its order granting the necessary access by mental health professionals for purposes of evaluation. The Court ignored that request. In spite of Mr. Paul's withdrawal of his attempt to be executed, the Court ordered briefing from both sides on the question of the impact of Mr. Paul's attempted "waiver."

Mr. Paul continued to experience mental health problems. He was continually in administrative segregation in the prison because of bizarre behaviors. He continued to engaged in self-mutilation in the prison, and counsel's attempts to effectively communicate with him were not successful. Mr. Paul was paranoid, and expressed

bizarre ideas and beliefs about his case, his family and his counsel. As counsel were awaiting the Court's ruling on the request to reinstate its order granting Dr. Froming and Dr. Halleck access to their client, the Court on June 21, 2004, entered its order denying Mr. Paul's request for discovery. The very next day the Court received a letter from Mr. Paul again suggesting that he would like to waive his appeals. Again, the Court requested briefing on the issue and scheduled a hearing for August 6, 2004, denying the request of Mr. Paul's counsel for additional time to consult with their client. Counsel on August 5 filed a Motion to Terminate Scheduled Hearing, and to Refrain From Holding Any Hearing Pending Factual Development, and Pending Ruling on Other Motions. Counsel suggested that the Court should remove the barriers to a competent mental health assessment prior to conducting a hearing or attempting to take testimony from Mr. Paul. Counsel also reminded this Court that mental health issues permeate the merits of Mr. Paul's claims for relief. The Court denied the motion.

Although the previous request for expert access was still pending and as yet un-ruled upon, counsel for Mr. Paul filed on August 8, 2004 a renewed motion to allow access to their client by mental health experts, and also requested funds for a mitigation specialist to investigate Mr. Paul's history, pointing out that such investigation would aid in the accurate assessment of Mr. Paul's mental condition which would have to be

determined as part of any waiver proceeding.[22] Counsel pointed out that such investigations are time intensive, and that it would be cost-effective to engage a mitigation specialist who would do the work more efficiently and effectively than counsel and at a lower hourly rate. Counsel also pointed out the difficulty they were having getting information from the Bureau of Prisons about their client's present condition, and about his attempted suicide. In their Response to court-ordered briefing on the effect of Mr. Paul's pro se letters, counsel advised the Court:

> Jeffrey Paul is incarcerated at the United States Penitentiary at Terre Haute, Indiana. As the Court and the parties are aware, Mr. Paul attempted to end his own life by hanging himself by his neck in his cell on the 17th or 18th of November, 2003. The Bureau of Prisons has declined the requests of Mr. Paul's counsel for documents relating to Mr. Paul's attempted suicide and subsequent treatment, but counsel have spoken informally to corrections officers who witnessed the event. Based on those conversations, counsel understands that an officer making his routine rounds observed that Mr. Paul had obstructed the window in the door of his cell by hanging a towel over it; that the officer was nevertheless able to see that Mr. Paul was hanging by his neck in his cell so that his feet could not reach the floor, and he appeared dead or unconscious. The officer called for back-up, and three other officers responded. They fumbled for a key to Mr. Paul's cell and succeeded in opening the door. The officers rushed in, and one supported Mr. Paul's weight while another removed the cloth that was tied around his neck. Mr. Paul was not breathing, and his face was a deep shade of purple. An officer hit him sharply in the back in an attempt to restore breathing; on the third attempt Mr. Paul gasped for breath, and resumed breathing. He

[22] Counsel also moved on that day to disqualify the Court and opposing counsel based on ex parte communications that the prosecution initiated with the Court's staff which was intended to put Mr. Paul in a bad light.

> was taken to the infirmary and placed in an observation cell, where apparently he has remained ever since.

Defendant's Response to Court's Order of August 6, 2004, p. 2.

On August 19, 2004, Mr. Paul and his counsel moved to terminate the proceedings on Mr. Paul's pro se letters, advising the Court that Mr. Paul wished to pursue his remedies. Counsel attached a signed statement from Mr. Paul verifying his wishes.

On January 31, 2005, this Court filed its Memorandum and Order denying relief on Mr. Paul's Motion for New Trial, and contemporaneously filed orders denying access to Mr. Paul, denying funds for investigation, and denying counsel's motion to authorize funds for travel related to investigation in the case.

The Court's method of dealing with the issues in this case foreclosed any possibility of a full, fair and reliable determination of the issues, particularly those relating to Mr. Paul's deteriorating mental health. Counsel's time was effectively filibustered by the Court's insistence on briefing waiver issues without the benefit of mental health experts. Furthermore, Mr. Paul's severely impaired mental condition presented a substantial obstacle to counsel's ability to investigate the merits of the case. Finally, the Court's decision to deny all pending motions and the entire case in one fell swoop precluded counsel from exercising the option of conducting their own investigation, which they would have done voluntarily and on their own without the aid

of investigators, mitigation specialists, and/or experts, had they known the Court intended to deny them more economical means to get the job done. Consequently, the facts and circumstances set forth in support of Mr. Paul's motion are not as complete or persuasive as they would have been had the Court given them a fair opportunity to investigate the case, develop the record, and enlist the assistance of a competent client in the preparation and presentation of his claims for relief.

The summary disposition of Mr. Paul's claims for relief, without resources, without discovery, without a hearing or any other opportunity for factual development, presents the issue of whether this Court fulfilled its duty of giving Mr. Paul's motion for relief plenary consideration, as required by law:

> The whole history of the writ -- its unique development -- refutes a construction of the federal courts' habeas corpus powers that would assimilate their task to that of courts of appellate review. The function on habeas is different. It is to test by way of an original civil proceeding, independent of the normal channels of review of criminal judgments, the very gravest allegations. . . . The language of Congress, the history of the writ, the decisions of this Court, all make clear that the power of inquiry on federal habeas corpus is plenary. Therefore, where an applicant for a writ of habeas corpus alleges facts which, if proved, would entitle him to relief, the federal court to which the application is made has the power to receive evidence and try the facts anew.

Kauffman v. United States, 394 U.S. 217, 223-224 (1969). Because reasonable jurists would conclude that this Court did not give Mr. Paul's claims full and fair plenary review, this Court should grant a COA on this issue.

WHEREFORE, petitioner moves this Court to issue a COA on each of the above-referenced claims, and to grant such further relief as the Court deems appropriate.

Respectfully submitted,

/s/ Sean D. O'Brien
SEAN D. O'BRIEN
Mo. Bar #30116
Public Interest Litigation Clinic
305 East 63rd Street
Kansas City, MO 64113
816-363-2795 • Fax 816-363-2799

ROBERT L. MCGLASSON
Ga. Bar #492638
Federal Defender Program, Inc.
100 Peachtree St. NW, Suite 200
Atlanta, Georgia 30303
404-688-7530

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1ST day of September, 2005, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system which will send a notice of electronic filing to:

Mr. Steven N. Snyder, Esq.
Assistant U.S. Attorney
P.O. Box 1524
Fort Smith, AR 72901

Ms. Margaret P. Griffey, Esq.
Chief, Capital Case Unit, Criminal Division
U.S. Department of Justice
Room 6140, Patrick Henry Bldg.
601 D. Street, N.W.
Washington, D.C. 20530

/s/ Sean D. O'Brien