U.S. DISTRICT COURT
WESTERN DISTRICT ARKANSAS
FILED
SEP 01 2004
CHRIS R. JOHNSON, CLERK
BY
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HOT SPRINGS DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 96-CR-60022-001 |
| | ) | |
| VS. | ) | AUGUST 6, 2004 |
| | ) | |
| JEFFERY WILLIAM PAUL, | ) | 3:15 P.M. |
| | ) | |
| Defendant. | ) | |

VIDEO TELECONFERENCE
BEFORE THE HONORABLE JIMM LARRY HENDREN
UNITED STATES DISTRICT JUDGE
FAYETTEVILLE, ARKANSAS

APPEARANCES

MR. WILLIAM MARTIN CROMWELL — FOR THE PLAINTIFF
Acting United States Attorney
MR. STEVEN N. SNYDER
Assistant U. S. Attorney
MR. MARK WEBB
Assistant U. S. Attorney
30 South Sixth Street, Room 216
Fort Smith, AR 72901

MR. ROBERT L. McGLASSON — FOR THE DEFENDANT
Federal Defender Program, Inc.
100 Peachtree, Suite 200
Decatur, GA 30303

MR. SEAN D. O'BRIEN — FOR THE DEFENDANT
Attorney at Law
305 East 63rd Street
Kansas City, MO 64113

Prepared by:
Theresa Sawyer
Certified Court Reporter
P. O. Box 3487
Fayetteville, AR 72702
479-444-7876

(Proceedings recorded by Stenomask, transcript produced from dictation)

AUGUST 6, 2004

THE COURT: Ladies and gentlemen, good afternoon. This is Jimm Larry Hendren, a U. S. District Judge down here in the Western District of Arkansas.

I have set a hearing by teleconference today pursuant to an Order that the Court entered a few days back. I believe it was -- let me find my Order here -- July the 27th of 2004, at which time the Court said that this matter would be set for a hearing on Friday, August the 6th at 2:00 o'clock p.m. via video teleconference, and the Court's Order indicated that the following parties would be participating at Terre Haute, Indiana: Mr. Paul, Jeffery William Paul, who I see is present. Mr. Paul, good afternoon.

THE DEFENDANT: Good afternoon.

THE COURT: I also see that we have Mr. Robert L. McGlasson. Mr. McGlasson, are you present, sir?

MR. McGLASSON: Yes, I am.

THE COURT: Good afternoon. How are you hearing me, sir?

MR. McGLASSON: Fine.

THE COURT: All right, sir. And also Mr. Sean D. O'Brien. Mr. O'Brien, are you present?

MR. O'BRIEN: Yes, sir.

THE COURT: And how are you hearing me, sir?

MR. O'BRIEN: Fine, sir.

THE COURT: The Court's Order also indicated that the following parties would be participating in the video teleconference here in the Fayetteville location: myself, the presiding judge, Jimm Larry Hendren, and also Mr. Steve Snyder, the Assistant United States Attorney for the Western District of Arkansas, and Mr. Snyder is here present in court in this hearing. Mr. Snyder, would you identify yourself, please, sir?

MR. SNYDER: Steve Snyder, Assistant United States Attorney, Your Honor.

THE COURT: All right, gentlemen, did you hear him? Mr. McGlasson?

MR. McGLASSON: Yes, we could hear him.

MR. O'BRIEN: Yes, sir.

THE COURT: All right, and as and when Mr. Snyder may speak, I think we can arrange or you can arrange to -- to get him on camera. He is seated here at the table.

Now, let the record also show that I have with me my court reporter, Ms. Theresa Sawyer, who is making a verbatim record of what is being said. I also have with me our information technology expert, Mr. Dale Wellman, who is operating the camera and the video conferencing equipment from this end, and also at my request is making a videotape of the proceedings shown on your end. I'm principally interested in seeing to it that Mr. Paul is videotaped as and when he speaks or is spoken

to.

So, Mr. Wellman, is that in place, and are you trying to get that done for us? Mr. Dale Wellman?

MR. WELLMAN: Yes, it's recording at this time, sir.

THE COURT: All right, gentlemen, we have that recording, and certainly we'll make a copy of it available to all interested parties as and when necessary.

Let the record also show that here seated with me at my table is my lawyer, Courtney Gilbert, who is my law clerk with me in this case. I also have my courtroom deputy, Ms. Gail Garner, who is here with me and helping to arrange this tele-conference.

Now, finally you will note that another U. S. attorney that is on the pleadings in this case, Ms. Margaret Griffey, is not present here in this room. It was not anticipated by the Court that she would be. I had understood that she had a con-flict and that she would not be present, so she is not here. In her stead, we have Mr. Bill Cromwell, who is the Acting United States Attorney for the Western District of Arkansas, and Mr. Mark Webb, who is an Assistant United States Attorney for the Western District of Arkansas.

Now, Mr. Cromwell and Mr. Webb, I do not understand that you will be speaking. I do understand that Mr. Snyder will be speaking on behalf of the Government. I'll ask, is that correct, Mr. Cromwell?

MR. CROMWELL: Yes, Your Honor.

THE COURT: Now, gentlemen, if that changes, then I'll certainly ask that you clear it with Mr. Snyder. The Court will be looking to Mr. Snyder as the attorney responsible for the Government's part in this hearing.

Now, ladies and gentlemen, I called this hearing because I have received correspondence from Mr. Jeff Paul that has been documented in previous pleadings. I have heard from Mr. Paul back in December of 2003, and that communication was received by the Court on or about, I believe, December the 6th. Thereafter, the -- I may be wrong about that. Let me make sure and check my date. Actually, I got it about December the 4th, I believe.

Then on or about December the 8th, I got a further communication from Mr. Paul and his attorneys, basically repudiating the certain requests that he had made in his December 4 communication. Thereafter, I heard from Mr. Paul in May, two letters. One postmarked, I believe, May 13 and the other May 14, or mailed on those dates. They were made available to the parties.

There were responses by the parties thereafter in June of '04, of this year. June 21, the Court entered its Order denying a discovery request that had been pending, and in connection with that denial, noted Mr. Paul's most recent communications and chose not to act on certain requests that he had

made in those communications in light of the ruling that was being made in that Order of June 21, and Mr. Paul was sent a copy of that Order, as were his attorneys.

Thereafter, by letters mailed July 12 and July 13, the Court again heard from Mr. Paul in connection with this matter, making certain requests, and the Court made those letters available to the attorneys. Mr. Paul had not copied those -- the attorneys, either his or the government attorneys, with his letters, so the Court made them available and gave opportunity to the parties to respond to the Court's perception that Mr. Paul was requesting that he have a hearing on the question of his competency to waive further proceedings in connection with his conviction and to request that the sentence that had been imposed upon him be carried out without further delay.

The defense counsels responded to that invitation by the Court, suggesting that time -- they should have time to do certain things and to get prepared for such a hearing. The Government responded to the Court's invitation by stating it believed that the hearing should go forward, and they objected to the defense counsels' request that the matter be delayed and not heard straightaway. The Court then entered its Order denying the defense Motion for Delay and setting this hearing by the Order that I have -- that I mentioned earlier on. The matter was set down for hearing here at 2:00 o'clock. It is now after 3:00 o'clock due to technical difficulties that made it

impossible for us to go forward at that time.

Now, I have made a rather short and cursory review because I want to get to the matter that has occasioned this hearing, and so I will state on this record that to the extent that I am mistaken on the dates, or whatever that I have mentioned, I stand corrected by what the record will show, but it's the Court's understanding that Mr. Paul had requested that we have a hearing bearing on the question of whether his proceedings should continue, and the Court believed, as intimated in its Order of June 21st, that if Mr. Paul chose to make a request again, after he had done so previously, that he was entitled to be heard on it, and the Court believes that's the case, and therefore this hearing has been set.

Now, the Court was favored with several motions filed by defense counsel that came in late last night and while the Court was not even here, or no one was here I suppose, but they came on the Court's desk this morning, and there are a total of five such motions that have been filed on behalf of Mr. Paul, and I'll briefly allude to them.

The first is the motion that is now Document Number 311 in the clerk's file. It's the motion to disqualify Mr. Snyder and Mrs. Griffey as a result of an ex parte communication made to the Court's staff.

The second motion that the Court has before it is identified now as Document Number 312, and that is a motion to

terminate this hearing, to schedule -- or the scheduled hearing, and to refrain from going forward with it pending factual development and rulings on other motions.

The third motion is identified now as Document Number 313, and it is the Renewed Motion to Disqualify the Honorable Jimm Larry Hendren, being myself.

Those -- and finally the fourth motion is a Motion to Proceed Ex Parte on Request for Access to Mr. Paul and for Funds to Investigate. That is now Document 314.

The four motions I've just mentioned showed Certificates of Mailing indicating they had been supplied to the United States Attorney involved in the case.

The fifth motion that the Court has received is filed under seal. It is not -- it does not have any such Certificate of Mailing, and it is simply a motion that's under seal that is before the Court, and I will defer discussion of that motion until a later time. I do not intend to get into that, and very well may not get into the fourth motion, being the ex parte Motion to Proceed on Request for Access to Mr. Paul and for Funds to Investigate. Now, that motion was copied to the United States attorney, as were the first three. The fifth one under seal was not.

I will inquire, Mr. Snyder, did you in fact get copies of at least the four motions that were certified to having been sent to you?

MR. SNYDER: Yes, we did, Your Honor.

THE COURT: When did you get them?

MR. SNYDER: This morning.

THE COURT: All right, and you noted, or I received a letter from one of your associates, Mr. Webb, indicating that you had in fact got them, and you requested that there be a conference with all attorneys prior to this scheduled hearing at 2:00 o'clock to determine how the Court would want to proceed.

Mr. McGlasson, did you and Mr. O'Brien get a copy of that letter?

MR. McGLASSON: No, we did not, Your Honor.

THE COURT: Well, it -- I'll hold it up. You can't read it, but it's just a letter that arrived by fax to the Court, and it says this: "Dear Judge Hendren. This office received by fax four motions in the above case after the close of business on Thursday, August 5, 2004. As a result, we have not had time to prepare a written response to said motions. We would request that the Court have a telephone conference with all attorneys prior to the scheduled hearing at 2:00 o'clock p.m. in order to determine how the Court wants to proceed. Sincerely, William C. Cromwell, Acting U. S. Attorney, by Mark Webb, Assistant U. S. Attorney," and it showed copies to Mr. McGlasson and Mr. O'Brien.

Now, Mr. Webb, you're in the room. Did you in fact send copies to McGlasson and O'Brien?

MR. WEBB: Your Honor, yes. I sent it to the fax number that was on the cover sheet of the documents that we received. There is a typographical error. It was the one in Kansas City for Mr. O'Brien who was sent them. It should be 36, but it did go through, and I also sent it to Mr. McGlasson's office --

THE COURT: All right. Well --

MR. WEBB: -- which are the only two fax numbers we had.

THE COURT: All right. Well, gentlemen, Mr. McGlasson and Mr. O'Brien obviously are in Terre Haute, so I presume that may be one of the reasons that you didn't get it. But, gentlemen, did you understand as I read it? I know I read it rather fast, but I gather you understand the import of the letter request that I got. Mr. McGlasson?

MR. McGLASSON: Yeah, we -- we heard -- we heard you read it, and we understand what it says.

THE COURT: All right. Now, the Court has not acted on that letter. I'll just note for the record that I received it, and there was not time for the Court to review the documents that it had and to get prepared for this hearing, so the Court has not noticed it or acted upon it, and obviously there has been no such telephone conference call between the Court and the attorneys prior to this hearing, and there's been no discussion between the Court and these U. S. attorneys who happen to be

here in the room with -- with the Court during this conference call.

Am I correct on that, Mr. Snyder? The Court has made no discussion of this letter with you; is that correct?

MR. SNYDER: That's correct, Your Honor.

THE COURT: Mr. Cromwell?

MR. CROMWELL: That is correct, Your Honor.

THE COURT: And Mr. Webb?

MR. WEBB: That is correct, Your Honor.

THE COURT: All right. Gentlemen, I want -- and Mr. Paul, I don't mean to be ignoring you, sir, but I need to take care -- I need to address these motions before I come back to you, but I will ask you now, if you please, to raise your right hand and be sworn, and my courtroom deputy will administer the oath. Can you hear her, sir? Gail?

MS. GARNER: Do you swear or affirm that the testimony you're about to give will be the truth, the whole truth, and nothing but the truth, so help you God?

THE DEFENDANT: I do.

MS. GARNER: Thank you.

THE COURT: All right, Mr. Paul, did you hear her? Did you hear her properly, sir?

THE DEFENDANT: I believe I did.

THE COURT: All right, sir. Can you hear --

THE DEFENDANT: Do I swear to tell --

THE COURT: Yes, sir.

THE DEFENDANT: Do I swear to tell the truth, which I do.

THE COURT: All right, sir. Mr. Paul, can you hear me?

THE DEFENDANT: Yes, sir.

THE COURT: Now, sir, you are flanked by your attorneys.

THE DEFENDANT: (Nods his head.)

THE COURT: And let me say to you that as and when this heating -- this hearing proceeds, if I ask you a question or if you are asked a question, you certainly may confer with your attorneys, if you choose to do so, before you answer. And, frankly, I think that would be a good idea, and I want you to know that you have the right to do that. And if you want to do that, I will ask the camera operator, whenever that occurs, to turn the camera off of you and turn off the audio so that we cannot hear what is being said between you and your attorneys. Do you understand that, sir?

THE DEFENDANT: I do understand, and I will keep that in mind.

THE COURT: All right, sir. And again, I just want to be sure you understand, you certainly may consult with them at any time.

And Mr. McGlasson, Mr. O'Brien, you've heard what I

said. If you feel it necessary to confer, then you'll need to just let me know you need a moment off camera and off audio, and we'll arrange that you can do that. Is that fair? Mr. McGlasson?

MR. McGLASSON: Yes, Your Honor.

THE COURT: All right. Now then, Mr. Paul, I'll, as I said, come back in a moment, but let me now briefly address the motions that have been filed as a preamble to proceeding further.

The first I think that I need to take up is the one that I mentioned first. This is a Motion to Disqualify Mr. Snyder and Ms. Griffey. In light of the fact that the United States only got these written motions this morning and has had no chance to respond in writing, I think it only fair to give Mr. Snyder a brief moment to state his position with respect to the motion.

And Mr. Snyder, again, in the interest of time, I will ask you to keep it reasonably brief. Mr. Snyder.

MR. SNYDER: Your Honor, since I'm the subject of the Motion to Disqualify, Mr. Cromwell would respond to that motion.

THE COURT: All right. Mr. Cromwell, you may proceed.

MR. CROMWELL: Thank you, Your Honor.

First, Your Honor, we -- we don't believe that based on the Court's letter that there's been any showing of prejudice to the Defendant. We don't believe Mr. Snyder's actions were

intended to in any way color the Court's opinion of Mr. Paul, but were rather directed at advising the court staff of the activities of a third party, and we concur in the Court's finding that any -- any actions by Mr. Snyder have not in any way prejudiced the Defendant.

As to Ms. Griffey, if I need to speak to her since she's included in the motion, she has no connection whatsoever with the communication to the Court, directly or indirectly, and there's been no showing whatsoever of any activity on her part which would allow a showing of a disqualification from further proceeding.

THE COURT: All right. Mr. McGlasson or Mr. O'Brien, I know you have filed your paperwork, and I think I understand your position, but again, as a courtesy, I will certainly give you a brief moment to respond if you like.

MR. O'BRIEN: Yes, Your Honor. We believe that --

THE COURT: Excuse me. Is that Mr. McGlasson?

MR. O'BRIEN: -- we'd resolved this issue before -- I'm sorry?

THE COURT: Is that Mr. McGlasson?

MR. O'BRIEN: No, this is Mr. O'Brien. I'm sorry, Your Honor.

THE COURT: All right. Please identify for our court reporter. Mr. O'Brien, please.

MR. O'BRIEN: Yes. This is Sean O'Brien.

THE COURT: All right.

MR. O'BRIEN: We believe that this motion should be resolved prior to proceeding any further in the case because they do, as the Court's letter indicates, address the merits of issues that are before the Court. It is difficult for us to ascertain a benign purpose for this information being passed to the Court in ex parte communications rather than in open court when we have an opportunity to conduct appropriate discovery and test the relevance and credibility of the information that the Court is receiving.

We feel that to proceed further with this proceeding is kind of putting the cart before the horse, that we need to explore this issue further before proceeding to put Mr. Paul in a position of having to respond to the Court's inquiry on the record. It does go to the merits of the case, and it goes to Mr. Paul's mental condition which is a -- an issue not only today, but also in the substantive 2255 pleading as well.

THE COURT: All right, Mr. O'Brien, thank you, and Mr. Cromwell, thank you.

I think, Mr. O'Brien, you have stated essentially what you had in your papers. I assume that you and Mr. McGlasson had a chance to read those papers. I noticed they were signed for you by someone else, but I gather that you are very familiar with what's in those papers. Is that right, Mr. O'Brien?

MR. O'BRIEN: Yes, sir. We prepared those papers

while we were here in Terre Haute, sent them by e-mail to my office where they were printed and signed by an associate in my law firm, Mr. Bill Odle.

THE COURT: All right. All right, let me make this comment. I have noticed, as I said, the arguments that have been made, and I have these observations.

First, the communication was ex parte, as was noted, and this Court acted immediately when it came to the Court's attention to make sure that the defense counsels knew of this ex parte communication. Whether they shared it with Mr. Paul is not the Court's business, but it -- the Court made sure that these attorneys knew of this communication.

The Court also instantly stated that it would not in any way consider whatever it was that Mr. Snyder had related to the Court's law clerk, nor would it take into account and consider whatever it was that Mr. Brad Shoemaker, who I understand is the caseworker there in the prison, may have communicated to the Court's courtroom deputy with respect to the same matter. That, in the Court's view, was, and is, the entirely appropriate way to deal with that matter.

The Court, as you know as trial attorneys, finds itself many times having to instruct a juror and juries that they will not consider, and place out of their minds, certain evidence that is inappropriate for them to consider, and that procedure has been approved repeatedly by appellate courts as

being appropriate under the circumstances. There have been cases in which the Court has given that instruction, and the attorneys have argued that there might be reason to suspect that a jury would not follow such an admonition, but failing some evidence to indicate that the jury would not, and could not, follow such an admonition, that admonition has been upheld, and I -- I believe would routinely be upheld by the appellate court.

In this case, if you will, I have given myself that instruction and I can assure you and Mr. Paul that the Court has absolutely no indication that it will not follow its own admonition, and that it will not take into account whatever it was that was communicated.

And let the record show I did not speak with Mr. Snyder about this. I did not speak with Mr. Shoemaker about this. I only received a report from my staff, and I tried, as best I could, to faithfully incorporate into the letter notifying you about it what they had indicated to me had been said. But as I said, I will, and have, totally disregarded it and will not take it into account.

Therefore, the suggestion that there should be additional discovery and that the Court should delay a ruling until that discovery is completed is not attractive to the Court. Since the Court has stated, and is stating, that it will not consider the matter, it seems to me that ends it. So I will deny the motion to disqualify the attorneys. I've already

stated in the letter that such ex parte communications are inappropriate, and that they should be carefully avoided.

You attorneys will know, and Mr. Paul, you're hearing this as well, you will know that I have mentioned -- hold it one second. The court reporter has come unplugged.

All right, now, Mr. Paul, you will recall -- Mr. Paul, you will recall that I've cautioned you a couple of times about writing me directly. You have done so, and that's one of the reasons we're having this hearing. I'm sorry?

THE DEFENDANT: Did you just -- did you just actually say that you're not having to qualify the attorneys?

THE COURT: That's -- that's correct.

THE DEFENDANT: Okay.

THE COURT: I -- I --

THE DEFENDANT: That's what I thought you did.

THE COURT: Okay. I think -- I think -- Mr. Paul?

THE DEFENDANT: Yes, sir?

THE COURT: I think -- I think there is a delay in the communication between us, so I will not -- I'll try to be careful and not speak when you're trying to talk to me. I think that's what's happened.

THE DEFENDANT: Yes, sir. That's why I think I lost a little something on the -- I heard most of what you said about the disqualification.

THE COURT: All right. I will deny, and am denying,

the motion to disqualify the attorneys because, as I've stated, the Court will not take into account and consider what was -- what was communicated. Whatever that was, it's, in the Court's view, is irrelevant to this matter under consideration. If I were to take it into account, I think that would be unfair.

Mr. Paul has asked me two or three times to -- to give him this hearing. He's entitled to it, and I intend to give it to him, and I intend to consider in connection with this matter only those things that are properly before me. So that motion, as I've stated, is denied for the reasons that I have mentioned.

The next motion that I would talk about has to do with the motion to terminate this scheduled hearing and to refrain from holding any hearing pending, quote, "a factual development" and pending motions -- pending ruling on other motions. Again, Mr. Snyder did not have a chance to respond.

Briefly, Mr. Snyder, I'll allow you to say your position on that if you wish.

MR. SNYDER: Your Honor, we don't see any reason to stay the proceedings. They've been scheduled for some time. Mr. Paul has written numerous letters to the Court expressing certain desires. We don't feel that, after having briefly reviewed the Defendant's pleadings, that there is any legitimate reason for not going forward and giving Mr. Paul his -- his hearing.

THE COURT: Mr. Snyder, thank you. Mr. O'Brien, Mr.

McGlasson, I -- I've seen -- I've read your paperwork here, but do you have, briefly, anything else you wish to add?

MR. O'BRIEN: Yes, Your Honor. One of the motions that we think is particularly critical to address before we go any further is the ex parte motion for access that we have filed, and the Motion for Leave to Proceed Ex Parte with respect to that.

The Court will recall that when we were present in person before the Court last November, that the Court granted us permission to address the Court ex parte with respect to this very issue of whether we should have access to Mr. Paul for the purpose of having him seen by mental health experts. You had found that there was good cause to both proceed ex parte, and you'd entered an Order allowing that access. That Order was withdrawn when Mr. Paul wrote a pro se letter, and Mr. Paul subsequently, on December the 8th withdrew that pro se request to dismiss his appeal. Simultaneously with that, we requested that the Court reinstate that Order allowing us to have access, and the Court has not yet acted on that request that we have access.

There are issues that we believe are preliminary to proceeding today, and we believe that the motion would assist us in developing information, both with respect to revisiting the issue that the Court has just ruled on, the Motion to Disqualify the U. S. Attorney and the Department of Justice, because of the misconduct involved in ex parte communications with the Court.

The influence, the actual influence on the Court, is only half of the formula. The other half has to do with the conduct of the parties and whether or not additional information would be helpful in allowing us to demonstrate to the Court that they should not continue to represent the Government in this case.

But secondly, the access to Mr. Paul is necessary because there are similar issues involved in the 2255 motion, substantive issues involving Mr. Paul's mental health, and there are mental health issues related to the current matter that the Court's convening the hearing on today, and there are impediments to resolving the issues now that we believe the ex parte motion will address. First of all, Your Honor --

THE COURT: Well, let -- let me ask you, Mr. O'Brien, please keep it brief. So far, you're saying what's in your paperwork, and I don't -- I don't know there's a necessity to go over that again. Do you have anything new and different you want to tell me?

MR. O'BRIEN: Yes, I do, Your Honor. I was just getting to that part.

THE COURT: Please do.

MR. O'BRIEN: The -- first of all, there have been several suicide attempts by Mr. Paul in the Bureau of Prisons, in the U. S. penitentiary here. We have attempted to get information about those suicide attempts, information from medical

staff, mental health staff, whether he's on medication, what that medication has been, his response to medication, and we have not yet been able to obtain those records, and we were just advised this morning that we couldn't get them.

The other issue, Your Honor, is attorney-client privilege. There are substantial questions that we have, Mr. McGlasson and I, about the competence of any decision that Mr. Paul might make at the present time, about his mental condition and about his reasoning process, but we are under explicit directives from Mr. Paul to maintain that attorney-client privilege, and we're in a bit of a conundrum here because we have evidence, information, that we believe is relevant to the Court's decision on this, so we're under directives from our client not to share that information with the Court. We're in a situation where we need to know for ourselves what our obligation is, and the requests that we have made of the Court --

THE DEFENDANT: Your Honor, I would like -- Your Honor, can you hear me?

THE COURT: Yes, sir, I can.

THE DEFENDANT: I would like to -- my attorneys are emotionally close to me in this case, and -- and I love them dearly, but I'm -- I'm fully competent to make this decision on my own. Although I'm not going to sit up here and try to speak legalese with you, the decision that I've made is to forego the habeas 2255 petition, waive it, and I would like to proceed

forward with an execution date before November, as per the judgment rendered against me by the jury in your court and upheld by you through your rulings on my direct appeal and the rulings, the concurrent rulings, of the Eighth Circuit. That's what I want to do.

And I do appreciate the work that my attorneys have done for me. I -- if you have any questions about my psychiatric stability at the moment, the Justice Department's psychiatrist team here in the prison, as well as North Carolina, have all declared me competent, and you can -- I'm sure they could fax you copies of any report or whatnot that you would need. I am competent, and I would like to secure an execution date before November, if possible, and if you will work with me on that, I'd appreciate it. That's what I want to do.

THE COURT: All right. Mr. Paul, I -- I heard --

THE DEFENDANT: Yeah.

THE COURT: -- what you said, and if I may, as a courtesy, I would like to -- to hear the rest of what Mr. O'Brien had to say. Can you agree to that, sir?

THE DEFENDANT: Yes, sir.

THE COURT: All right. Mr. O'Brien, please.

MR. O'BRIEN: Your Honor, there are many things that we feel would be important to share with the Court, but we also feel that we can't violate Mr. Paul's directive at the present time unless Mr. McGlasson and I are allowed to conduct the

investigation that we feel we need to conduct in order to know whether he is competent to make this decision and whether it's a knowing and voluntary and intelligent one.

With respect to the attorney-client privilege and the directives that he's given us, we're in kind of an ethical dilemma here because if he is competent, then we're required to abide by his directives to maintain the privilege. On the other hand, we have reason to believe that -- that he's not competent to do that. There have been -- and I'm -- it's difficult for me to know, Your Honor, how far I can -- how close I can go to the line here, but frankly, there have been some very bizarre and irrational things that our client has discussed with us, and also an inability to understand important legal and factual concepts about his situation now.

We feel that it is essential that we have access by Dr. -- by Dr. Seymour Halleck and Karen Throming to conduct a reliable and thorough assessment of Mr. Paul's mental condition. And so for the record, Your Honor, we object to any questions being asked of Mr. Paul at the present time, and we renew our request that the hearing be continued pending the discovery issues that we have raised, our access to Mr. Paul by qualified mental health professionals, and that -- and if the Court chooses to go forward in spite of our objection, we would ask that the record reflect a continuing objection to any inquiry of Mr. Paul at the present time.

THE COURT: All right, thank you, Mr. O'Brien, thank you, Mr. Snyder, and thank you, Mr. Paul.

Now, the matter before the Court is the defense motion to suspend or delay this hearing so that the Defendant, as the Court understood it, could -- the defense counsel, rather -- could do some investigation concerning the ex parte communication and also concerning the defense counsels' concerns that Mr. Paul may not be competent to proceed and to speak his mind.

Now, Mr. Paul has spoken up, and he has his lawyers by his side. He was complimentary to both of you. He impressed me with his understanding that he was probably speaking when you would rather that he not, but I thought he very eloquently told me what was on his mind, and frankly, that was -- Mr. Paul, I think you and I understand at least, was the purpose of this hearing in the first place, to give you a chance to say something and to be heard.

THE DEFENDANT: Right.

THE COURT: And so, Mr. O'Brien, I will deny your motion for delay. I will say that, as you've mentioned, there was an earlier matter that the Court had before it with respect to Mr. Paul's Petition for Writ of Habeas Corpus that had to do with access to him for -- by medical professionals. I have chosen not to rule on that at this time because Mr. Paul asked for this hearing. I think he's entitled to get it, and so we have set it. So the denial of your motion as made is without

prejudice to the Court later considering that motion if it becomes appropriate and necessary. So I will deny that motion.

Now, are you with me, Mr. Paul? I've denied that motion. You understand that, sir?

THE DEFENDANT: Yes, sir. Thank you very much.

THE COURT: All right. The third motion that I will address -- and let me say, too, I still believe, Mr. O'Brien, despite your arguments, that the two ex parte motions are matters that I should decide at a later time, and I will do that. I will defer deciding those motions until, at the very least, after this hearing is concluded.

The third motion is the one I mentioned, a renewed motion to disqualify myself, the Honorable Jimm Larry Hendren. As I read it, it is essentially a request to -- to re-argue the motion that the Court denied back by its Order of June the 21st, and I think the only new thing was the contention that the way the Court handled the ex parte communication was a further reason to -- to disqualify the Court. With respect, I obviously do not agree. I think the Court handled it in a responsible fashion. I acted on it as expeditiously as I could and made sure that you attorneys were properly informed.

And, Mr. Snyder, I don't want to be rude, but I suspect you may be against that motion, and I don't know that I need to spend much more time with it, but for reasons that I had stated back in the Court's Order denying the earlier recusal

request -- and I believe that Order was dated June 21 of 2004 -- the Court denies the motion that it recuse itself, and I further state that I don't believe anything that has since occurred, whether it related to the ex parte motion or any other matter, that would necessitate or make appropriate the Court recusing itself from proceeding in this -- in this case. So that motion is likewise denied.

As I have mentioned -- did you follow me there, Mr. Paul?

THE DEFENDANT: Yes, sir.

THE COURT: So the other two motions that I've mentioned I will defer ruling on for a later time.

Now, Mr. Paul?

THE DEFENDANT: You were talking about the -- the short motion he wrote requesting that he get off this hearing right here because of the communication between staff and clerk's offices in -- in Arkansas?

THE COURT: Well, I think, Mr. Paul, it was that, plus a restatement that for reasons that were mentioned earlier that I should recuse. I think it was a restatement of the --

THE DEFENDANT: Right.

THE COURT: All right, sir.

THE DEFENDANT: Okay. I'm following you.

THE COURT: All right, sir.

THE DEFENDANT: It's a little -- it's a little cold

here, so we keep fidgeting around.

THE COURT: All right, sir.

THE DEFENDANT: Sorry.

THE COURT: Well, I don't know if they can do anything.

THE DEFENDANT: No, that's all right. We'll move right on along. It's all right.

THE COURT: All right. Now, Mr. Paul, you have already spoken to me, but I'll remind you that I -- what I said earlier. If you don't want to answer my questions, you don't have to. You can be guided by your attorneys. They are objecting to me asking you any questions at all, but in light of the fact that you asked for this hearing, I think you're entitled to have it, and in light of what you've already said to me, I think you can answer my questions if you want to.

I will overrule your counsels' objection, subject to it being renewed, if you object, or you tell them to object. Is that fair?

THE DEFENDANT: That's fair. I understand.

THE COURT: All right.

MR. O'BRIEN: Your Honor, may the -- Your Honor, may the record reflect that the objection is a continuing objection?

THE COURT: No, sir, it may not. Because of the attitude that Mr. Paul has, I think it's fair to him that if he wants an objection to be made, or you want to try to make it for

him, you can make it at any time, but I think to grant you a continuing objection would emasculate or make very difficult for Mr. Paul to speak freely if he wants to speak freely, so I will not grant a continuing objection. You will have to make it as and when you wish to do so.

All right, Mr. Paul, are you with me?

MR. McGLASSON: Then, Your Honor, for the record, we object to that question.

THE COURT: Objection is overruled.

Mr. Paul, are you with me?

THE DEFENDANT: I -- I -- I am with you. I'm following the conversation and am ready to proceed with what's the matter at hand whenever you're ready.

THE COURT: All right. Mr. Paul, I think I know the answer, but -- and bear with me, but do you know in fact who you are? You are Jeffery William Paul?

MR. McGLASSON: Objection, Your Honor. Just for the record. Just for the record, Your Honor. The objection is based on the Fourth, Fifth, Sixth, Eighth and Fourteenth Amendments to the U. S. Constitution and all the bases raised in all prior pleadings filed in this case, including the round of motions we've been discussing at this hearing.

THE COURT: All right, Mr. McGlasson, your objection is overruled, and I don't need you to make me a speech. Just stating that you object will be sufficient for reasons that are

shown in the record.

All right, Mr. Paul, would you --

THE DEFENDANT: Your Honor, can we just speak on this matter at hand?

(To his attorneys) Please don't try that again.

THE COURT: All right, Mr. Paul, did you -- did you hear my question?

THE DEFENDANT: Yes, I do know who I am. I'm Jeffery William Paul, and the Social Security number and all that, yes, sir.

THE COURT: All right. Where are you, Mr. Paul?

THE DEFENDANT: I know you. Sir?

THE COURT: Go ahead.

THE DEFENDANT: I -- I know who you are as well. You don't look like you've aged a day --

THE COURT: Well --

THE DEFENDANT: -- by the way.

THE COURT: Mr. Paul, thank you. Do you know where you are?

MR. McGLASSON: Objection, Your Honor.

THE DEFENDANT: Yes, I do. I'm -- I'm in jail in Indiana.

He wants to object. He objects underneath the same thing he probably already said before, and that's on the court -- the court record. He wants to object.

THE COURT: All right.

THE DEFENDANT: McGlasson, Robert McGlasson, wants to object. Will you please note that?

THE COURT: I note that. Objection is overruled.

Mr. McGlasson, I -- I see no reason for this. Are you suggesting to me that every question I ask, you want to make a long objection unless you get a continuing one?

MR. McGLASSON: That's correct, Your Honor. I want to make the record that we -- we want to either be granted the continued objection based on the reasons we've already put in the record, or we feel in order to preserve the record, as you've just indicated, we must object to every instance in which that we find objectionable.

THE COURT: Well, I --

MR. McGLASSON: We can do it either way. I would prefer it to do it as a continuing objection.

THE COURT: All right.

MR. McGLASSON: I think it would --

THE COURT: Mr. McGlasson, may I make a suggestion to you? I will grant you a continuing objection to any question that I ask if you will grant a continuing showing on the record that your client doesn't want you to object. Do you agree to that?

MR. McGLASSON: I'm not stipulating to anything about what my client wants or thinks at this time.

THE COURT: All right.

THE DEFENDANT: These are basic mundane questions. They have no pertinence to -- to evidence or -- or to anything whatsoever. It's just a question, okay? Like "What's up?"

THE COURT: Mr. McGlasson, I'm going to grant the continuing objection, not because I think it's appropriate, but simply to save time.

All right, now, Mr. Paul, are you with me?

THE DEFENDANT: Yes, sir.

THE COURT: Do you understand that your attorneys are objecting to every question that I ask of you? Do you understand that, sir?

THE DEFENDANT: I -- I comprehend that, and, yes, I do.

THE COURT: And you understand if you, at any point, agree and don't want to answer, you don't have to. You understand that, sir?

THE DEFENDANT: Yes.

THE COURT: All right. I believe we said you know where you are. You're at Terre Haute?

THE DEFENDANT: Yes, sir.

THE COURT: And you heard me say earlier that you had written me two or three times earlier. Is that right?

THE DEFENDANT: Yes, sir. I've written you three letters.

THE COURT: I'm curious as to why you didn't copy your attorneys. Can you tell me that?

THE DEFENDANT: Why I didn't copy them, for my attorneys?

THE COURT: Yes. Why -- why didn't you send them copies of your letter?

THE DEFENDANT: Because they -- well, obviously, they're not going to agree with the -- with the content, so it's pretty irrelevant, and I wanted to send them directly to you because you're the one that's ruling on the case.

THE COURT: All right, and do you recall that -- I believe I answered you. I remember one time I told you I was going to have a ruling quicker than I got to it. Do you remember that?

THE DEFENDANT: Yes, sir. You said that you expected a ruling on -- in possibly two weeks.

THE COURT: And I was wrong.

THE DEFENDANT: You -- you were ambitious, maybe, yeah.

THE COURT: Well, I didn't get it in two weeks. I didn't get it in two weeks. You remember that?

THE DEFENDANT: Yes, sir.

THE COURT: Now, in this latest letter that you have written to me -- I don't -- do you have it there?

THE DEFENDANT: I don't have a copy of it, but --

THE COURT: Did you write it yourself?

THE DEFENDANT: Absolutely. You have -- I believe you have a typewritten letter from me and two handwritten letters from me at your disposal. I wrote all three of those letters, and I did not proofread them. I just wrote it down and sent them to you, and I haven't changed my mind.

THE COURT: Okay. Do you recall in one of your letters you -- you mentioned to me a case that you wanted me to take into account? Do you remember that?

THE DEFENDANT: It'd be Bracey versus Bryant decision, and I -- I actually got a hold of that summary again and re-read it, and I -- I think that the -- there was a little article on it in the Criminal Law Review or one of those things like that, and it really didn't sum up the case as far as the history that was regarded.

Anyway, I -- I thought that case sort of reaffirmed the Brady issues, which -- which we have raised in -- in the petition, and I wanted to include it. I had mentioned it to counsel and during a phone conversation, but I had wanted to insure that you got it, just in case you hadn't read the cite, so that you would consider it on reviewing that, the Brady issues, because obviously on the direct appeal, the Apprendi case was actually pending, and shortly after it was denied by the Eighth Circuit, it came out and possibly could have applied to my case because another prisoner had gotten some kind of a

hearing on a Apprendi issue after that.

THE COURT: All right. It was Dretke-Banks. Yeah, you have a good memory.

THE DEFENDANT: That's as I remember the cite.

THE COURT: Okay, and you got -- did you get the Order of June the 21st? I discussed that briefly about the Dretke case.

THE DEFENDANT: I did. I -- I did, and it I got it -- I'm going to be -- personally, on it, I might sound like a little bit more educated than I was, but I do not follow this legalese too well. What I -- basically, what I do is, I read the summaries in plain English in the legal journals, news-letters, and things like that, but your -- your vocabulary is a lot more encompassing than mine, and I -- I think you ruled on it, and that's all that matters to me. I don't really --

THE COURT: Mr. Paul, one of the things I -- one of the things I need to know from you, and I'm obliged, as you know, to try to -- to rule correctly as best I possibly can, and I need -- I need to know as much as I can that -- that I'm on the right track, or at least that you and I are on the right track, and I -- I want to ask you, do you understand that if your waiver goes through and there's an execution date set, that you would be put to death? You understand that?

THE DEFENDANT: I do understand that.

THE COURT: And do you understand you're flanked by

very thorough lawyers, and they've raised some issues. I haven't agreed with them, as you know, but there's a possibility always, I suppose, that they could -- that I could be wrong, they could be right, and they could get relief for you, and that you might not be put to death? Do you understand that?

THE DEFENDANT: I -- I hear what you're saying and understand the thought behind it, yes, sir. It's an idea. It's a concept. I get it.

THE COURT: All right. Now, they -- they've said, your lawyers have said for you, that they think you've been doing crazy things and funny things, that they're -- they have a serious question that you really know what you're doing, that you're in there. Is there any reason they should think that?

THE DEFENDANT: Well, obviously they think so, but that's not the issue I'm speaking with you, and if -- if that's what you think, then feel free to question me on it and let me consider the questions that -- specifically, in specific, that you have about that. I --

THE COURT: All right.

THE DEFENDANT: As far as the staff here is concerned, are concerned, I have report after report saying that my affect is normal and that my behavior, with the exception of a couple of disciplinary problems, is fine, competent.

THE COURT: But would you agree with me that if a person doesn't know for sure where he is or he's hallucinating,

hears voices, or maybe tries to take his own life, there might be a question that he's okay?

THE DEFENDANT: I agree. I agree. Yeah, I agree wholeheartedly with what you're saying, and -- and I don't believe that train of thought really applies to me. I know where I'm at.

I hear voices when people are talking to me, but -- and as far as taking my own life, I have a death sentence. I didn't -- I don't have to, you know, so -- I'm not hearing any voices that aren't speaking to me.

THE COURT: Is anybody trying to convince you that you ought to give up the ship and just let it happen, or is this something you are trying to decide or deciding on your own?

THE DEFENDANT: Well, the -- are you -- are you speaking of -- basically, what you're implying is are there some kind of a undue influence on me? No, not that --

THE COURT: Well, I asked the --

THE DEFENDANT: -- not that I --

THE COURT: Go ahead.

THE DEFENDANT: This is not -- this is -- this is the decision that I'm making after having been convicted of aiding and abetting murder and having my direct appeal denied and being sentenced to death. I didn't make this decision for myself. I was convicted by a jury of my peers, which is what you know for a fact is the truth. I was convicted. I was sentenced to death.

This decision was taken out of my hands. What I'm asking you, Your Honor, and would basically be appreciative, or I hope so, is that -- is that we forego this pro forma appellate review, and if you could help me facilitate an execution date for some closure before November, that's all I'm asking.

THE COURT: Can you tell me why before November, Mr. Paul?

THE DEFENDANT: Why before November?

THE COURT: Yes, sir.

THE DEFENDANT: Well, obviously -- well, November's -- that's the election and, you know, Kerry's very liberal. He's publicly stated that -- that he would abolish the death penalty.

I can't come home. It's not torture being in prison, obviously. They feed you. You can have mail and television. You know there are things that -- privileges that you can have, but, like, for instance right now, I wish you would open the prison so that I could go back to my home. That's my home. If I can't be there, I'd rather die, you know? I mean, as man-to-man, that's -- that's the truth. I don't want this liberal getting into office and then sticking me with -- with his compassion. His compassion or liberalism. Not that -- you know, not that he's a bad guy. It would be -- whatever. I don't care.

THE COURT: Do you understand, Mr. Paul, that one of the things I have to try to gauge and evaluate is whether you

really know what you're doing or whether you're just not in there, and do you understand the problem that faces me? It's being suggested, and it may be so, that there should be further psychiatric evaluation of you by doctors. I wanted to talk to you man-to-man, as you put it, and I'm looking you straight in the eye, and I know that you are -- are you seeing me? I don't know where the camera is on me.

THE DEFENDANT: Yes, sir. I'm looking right at you.

THE COURT: But I -- I want you to -- to understand as clearly as I can convey it to you that this matter is of great concern to me, that I be able to read you correctly and fairly. It's a heavy responsibility. I -- I think if our positions were reversed, based on what you said, I'd like to think you'd feel the same way if -- if I were where you are and you're where I am. So please understand, I am trying my best to be sure that I understand what you're saying to me, and that nobody is forcing you or that you're not out of your mind or anything, but that you're just laying it out and saying it man-to-man how you feel about it. Is that what you're doing?

THE DEFENDANT: Well, I -- no one -- no one is forcing me to speak right now, and -- and as far as some personal insight, I'm ready, and that's a -- you know, that's all there is to it. I'm ready. I'm -- I'm not a -- a -- a rambling moron. I -- I can't presume to know what will happen after a man dies, and so obviously there's some -- some trepidation

about that, but it's inevitable, and there you go. I mean, I have to face it. I have to face it. I don't want to be, you know, on this yo-yo any longer, and, you know, on a personal level, I -- I wish that you would understand that, and if -- I do want to say that -- and, you know, obviously, I feel favorably about my counsel. If they have to be released from -- from -- from appointment in order to facilitate this before November, then please consider this a verbal request to do so. I -- I regret everything that's happened, but I'm ready.

THE COURT: Gentlemen, counsel, this conversation is essentially between Mr. Paul and myself. I know the defense counsel has a continuing objection here. I don't know if they have anything they want to say.

Mr. Snyder, do you have anything? Any question you want to ask?

MR. SNYDER: No, Your Honor.

THE COURT: Mr. Paul?

THE DEFENDANT: Yes, sir?

THE COURT: I know it's chilly where you are, and this has been a long hearing, it was delayed, but I want to not close it without being sure that you've had every opportunity to say anything and everything you want to say to me about the matters you wrote to me in your letter. You said you wanted to waive it and to stop it and to go ahead and have the execution date set. Do you have anything else you want to say?

THE DEFENDANT: Yes, Your Honor. I -- I'm not -- I don't agree to mutilation, such as an autopsy or any kind of extraneous procedures or whatever that could occur through -- although if they have to use a cut-down procedure, then -- I think that's unnecessary, obviously, that kind of thing, but if they have to, then they have to. But I -- I'm not going to agree to any mutilation. I would ask that you help facilitate and assure that that won't happen. It's on the record here that I'm against an autopsy.

When Timothy McVay raised that issue with the local -- local -- local coroner -- obviously, there's just no question of how an executed prisoner has died, and no need for that. I don't want that and have placed that on my file with the prison, and would like for you to help me out with that.

And other than that, not really, just it sucks to be me, and I -- I would appreciate it if you would help me, as much as possible, try to just get this thing over with.

THE COURT: Mr. Paul, I thank you for what you've had to say.

Mr. O'Brien, Mr. McGlasson, do you have anything further you wish to add before I close the hearing?

MR. McGLASSON: We do, Your Honor, but we would first like a brief recess so we can confer.

THE COURT: All right, very well. I don't know how they will arrange that on that end, but can we turn off the

video or -- or at least misdirect the camera and cut off the audio?

MR. McGLASSON: Judge, we asked about this earlier, and they said we could hit the mute button, and Mr. O'Brien and I could step outside the door right next to us here.

THE COURT: Is that agreeable?

MR. O'BRIEN: Fine with me.

MR. McGLASSON: Yes, sir.

THE COURT: All right, then certainly. Go ahead.

(A recess was taken, after which the following proceedings were held:)

MR. O'BRIEN: Can you hear us, Judge?

THE COURT: Yes.

MR. O'BRIEN: Okay. Your Honor, in terms of what we would like to add to the record, we -- we continue to represent to the Court that we have information that is of an attorney-client privilege nature that would bear directly on his competence to make this decision.

He's -- he has had some episodes in the prison that the Court is aware of. He does not have a realistic sense of the legal or factual issues in his case. He expressed to the Court a sense of hopelessness about his case that his attorneys don't share. We believe that he has a strong case to present to the Court, that he has a strong likelihood that if he were to pursue his 2255 motion that he would prevail, that he could get

relief from his conviction and sentence, that he did not get a fair trial, that further proceedings would result in relief, and he is not open to hearing about it. He's not considering all of his options. He's not consulted with family or loved ones or anyone about this decision, that there -- there are many things about his circumstances that reflect that what he is doing is not the product of a competent individual making a knowing and voluntary and intelligent decision.

We feel that the Motion for Access is critical to proceeding further on this issue, that the question and answer session that just occurred is not adequate to get into the kinds of issues and the kinds of things that we've been seeing with respect to Mr. Paul's communications and behaviors that give us a very strong feeling that he doesn't know what he's doing, that this is not a voluntary and rational decision on his part.

THE DEFENDANT: I disagree.

THE COURT: All right. Mr. O'Brien, let me ask whether, in light of what you've said -- and I -- I did not have a chance to study the fifth motion that you filed under seal, but I wonder, in light of what you said, is there any reason for that to remain sealed and not given to the United States so that they can respond?

MR. O'BRIEN: Yes, Your Honor, I believe it should remain sealed.

THE COURT: Well, I --

MR. O'BRIEN: I think the Court should -- I think the Court should review it and act on our motion for the request --

THE COURT: Okay.

MR. O'BRIEN: -- that's being made.

THE COURT: I agree. Just some of the things that you've said seem to me might have been in that, but I can't make a judgment because I did not have time to study that prior to this hearing, and I've stated before that it is a matter that I will take up after these proceedings are closed.

All right, anything further?

MR. O'BRIEN: What I've told you today, Your Honor, are very broad generalities. There are many specifics that justify --

THE COURT: Well, I, again --

MR. O'BRIEN: -- what I've just said, and so --

THE COURT: I'll read your motion.

MR. O'BRIEN: Yes.

THE COURT: All right. All right, then Mr. McGlasson, anything further?

MR. McGLASSON: Not from me, Your Honor. Thanks.

THE COURT: Mr. Snyder?

MR. SNYDER: No, Your Honor.

THE COURT: Or gentlemen?

(No response.)

THE COURT: All right. Mr. Paul?

THE DEFENDANT: Yes, sir.

THE COURT: I will say -- I will say to you that I have tried to listen carefully to what you've said. I have and will consider what has been argued and everything about it. I have a video-tape made of this. I will make a copy of it available, Mr. O'Brien and Mr. McGlasson, when we get it, if you want to see it. I assume you will. And Mr. --

MR. McGLASSON: Yes, Your Honor, we'd like a copy. Excuse me, I'm sorry. Just for the record, we'd like a copy of that and the transcript as soon as it's convenient to get it to us, if that's all right.

THE COURT: Well, I don't know that we'll be making a transcript, but what --

MR. CROMWELL: When you're ready, may I put something on the record?

THE COURT: Yeah, I want to come back to you in just a moment.

Let me say this. I don't know that I would make a transcript, Mr. McGlasson. I just don't know. It may very well be that I'll need to, and if I do, you certainly may have a copy, okay? All right, Mr. --

MR. McGLASSON: Well, just for the record, we -- we'd like a copy. I mean, we'd like to request that the Court order a transcript of these proceedings, as well as the production of any videotape that's been made as soon as they are available.

THE COURT: Well, okay. I've already said I'll do that with the videotape, and I think maybe you're right, it would be a good idea to have the transcript typed, so I will direct that it be done, and I'll certainly make copies available.

Now, Mr. Cromwell, you said you had something on the record?

MR. CROMWELL: Yes, Your Honor. Mr. Paul and counsel of record, this is Bill Cromwell. I am the Acting United States Attorney for the Western District of Arkansas. I wanted you to be aware that Mr. Snyder self-reported to me his receipt of the letter from Judge Hendren, making a finding that there was an ex parte communication. I -- I did not have to learn that from other sources than Mr. Snyder.

As a result of that communication, what I have done is made copies of the motions which we received after close of business yesterday, and I have forwarded those motions, along with a copy of Judge Hendren's letter, to our Office of Professional Responsibility at EOUSA in Washington, D. C.. So the matter, for the record, was self-reported by Mr. Snyder, and we have taken the step of sending this in to our Office of Professional Responsibility.

THE DEFENDANT: Thank you.

THE COURT: All right. Anything further?

MR. CROMWELL: No, Your Honor.

THE DEFENDANT: Your Honor?

THE COURT: Yes, sir.

THE DEFENDANT: Could I also -- could I also say one more thing?

THE COURT: Yes, sir.

THE DEFENDANT: What -- I'd like to really stress that -- that I'm not waiving the -- I want to waive the decision to secure an execution date before November. I am confident that they have evaluated me over and over again to the inth degree of paperwork saying that I'm competent. I really want to -- I want to reassure you that the incidents that they're referring to, I was written up for self-mutilation for busting a window with my hand. Suicide attempts -- well, self-mutilation, that's in disciplinary. You can read it, and I'm perfectly competent. Please help me do this. I -- I do not --

(To his attorney) No, you should not. You should not -- you should not. Listen. Listen. Just shut up for a minute. I mean, don't -- I mean --

MR. O'BRIEN: Well, what he just turned -- what he just turned to say, Your Honor, was --

THE DEFENDANT: It was something else. Your Honor, listen. Your Honor, I am so sorry. Listen, I -- I want -- I don't want to waive the decision if I can. I really need you to do anything possible you can to facilitate this before November, because I -- I -- you know, I really, really need them on my

side here. It's a battle.

THE COURT: Well --

MR. O'BRIEN: Your Honor, what we started to say before when Mr. Paul hit the --

THE DEFENDANT: No.

MR. O'BRIEN: -- mute button --

THE DEFENDANT: I -- I was given a disciplinary, and I've -- I've -- I've done my segregation time for it and paid for the window, okay?

MR. O'BRIEN: The correction officer who checked us in this morning --

(To Mr. McGlasson) Do you remember his name, Robert?

MR. McGLASSON: Purdue.

MR. O'BRIEN: Officer Purdue.

THE DEFENDANT: He's not saying anything -- anything that --

MR. O'BRIEN: He was outside the door of Mr. Paul's cell in November of last year when Mr. Paul had hung a towel over the window of his door so no one could see inside, and he hung himself --

THE DEFENDANT: No.

MR. O'BRIEN: -- from a window.

THE DEFENDANT: No, no, no, no, no.

MR. O'BRIEN: -- and was hanging with his feet --

THE DEFENDANT: No.

MR. O'BRIEN: -- off of the floor, and he was completely unconscious and motionless and had to be revived.

(The Defendant pressed the mute button, and an off-the-record discussion was held between the Defendant and his counsel.)

MR. O'BRIEN: Well, Your Honor, what the officer told us is not privileged.

THE DEFENDANT: The officers that -- the officers that he's referring to -- Your Honor, this is irrelevant. Please, I've been evaluated over and over again. Will you please release these -- these -- these guys from -- they're tying my shoes, and -- and -- but I'm fully prepared to proceed. I've been contemplating and thinking about this for months and months and months. I'm not being influenced by anyone else, and you know that I've been contemplating that because I wrote you that -- that letter in December. I wrote you a letter in December, but I didn't waive the petition, but it's obvious from the tone and context of the letter that I was contemplating getting this thing over with, now.

I was -- obviously, I'm not suicidal because I want to be released and go home somewhere. Maybe not home, because I don't want to bother any of you people. I want to leave and run off in the woods and just, you know. Obviously, that's not going to happen. I'm not scared of dying, and I've had many, many many friends be taken out and killed since I've been placed on

death row. I'm not worried about what's going to happen, but whatever.

Legally speaking, I'm competent. Your own psychiatrists say that. They're going to tell you all kinds of things, but you can read in the report yourself. Please, I'm -- I'm asking you to facilitate this before November. I do not want to waive my petition if I'm going to be in here when Kerry gets in office, period, because I know that there are issues that you could -- you -- you -- it's -- it's your discretion. Your discretion is -- is omnipotent almost as far as interpreting the law goes. I've seen that, and -- and you can deny it, but I know that that's the truth. You are a federal district judge. You could release me from this penitentiary, if you decided to, on the merits of these Brady issues alone, regardless.

I was convicted of aiding and abetting. I never actually killed the man, but according to the findings of the jury that you polled -- or that my own attorneys polled and that you approved of, I was found guilty. Bam. That's done. It's done. It's not a moral issue. It's not a competency issue. It's your decision. I'm -- I'm asking you to act on this decision that was suggested to you by the jury that you upheld and rendered against me, and I'm asking you, man-to-man, to please do it before November.

THE COURT: All right, gentlemen.

THE DEFENDANT: Help me facilitate that.

THE COURT: Well --

THE DEFENDANT: And I'm asking, can you do that?

THE COURT: All right, gentlemen, I will note that part of your discussion we did not hear because I think, Mr. Paul, you had pushed the mute button, but I did hear what you have just said, and let me say this to you. I serve in a position that is not my own personal thing to do with as I please. You have referred man-to-man, and I understand why you -- why you do that, but I must tell you that I am obliged by the oath that I took to serve as United States District Judge to try to make a correct ruling in the case based upon the law and the evidence.

I can't allow my personal feelings, whether they would be good or bad, either way, with a person involved, to affect how I rule. That would be inappropriate, and I would properly have to recuse myself, so I can't respond to what I hear being a personal appeal from you to me, man-to-man, to, as you put it, help you out. I can't respond to that. I will commit this to you. I intend to make my ruling with respect to your request as soon as I properly can, and I'll do my best to rule as correctly as I know how. That's all I can do, and I hope you understand that.

I cannot make a personal promise to help you or -- no more than I would make a personal promise to try to hurt you. That would be totally improper. I must simply make the best and

most proper ruling I can, and I will tell you that, sir, I will do my best to do that, and I will try to do it quickly. Is that fair?

THE DEFENDANT: I -- I -- I understand that, and that would be fair if you're going to do that. And I also know that -- that you are -- that your office is an obligation to the laws and rules that have been set forth by legislators and -- and the constitution, and you already -- you denied the Order, the Motion for Discovery. You can -- I do know from other rulings that you can facilitate this in a actually immensely quick way if -- if all the checks and balances have already been gone through, and what I'm saying is, as opposed to sort of paying lip service to the defense motions that were -- that are going to drag all the way out, you can choose, through jurisprudence, to take the Justice Department's reports at face value, as was done during my trial and -- and during the sentencing phase, and get it over with. You can. The law allows for that. I know that much, and I know that you -- you know that, too, and I'm -- I'm asking -- and I'm asking you to if that's -- if that's the -- you know, that can happen.

I don't know if -- if they have to be kicked out of the car or not to do it, but please, I -- I -- I don't want your attention to be taken up by all this "But -- but what about --" You know, it's -- it's done. It is done. I was sentenced. I was convicted. I know in my mind what I'm thinking, and I'm

competent. I'm jaded and -- and angry, but I'm -- I'm at peace with -- with God, period, and I want you to go on this, Your Honor, if you'll do that.

THE COURT: All right. Mr. Paul, thank you.

THE DEFENDANT: Yeah.

THE COURT: I will close the hearing now and advise you that I will --

MR. O'BRIEN: Excuse me, Your Honor. This is Mr. O'Brien. I would like to just clarify the record because the mute button was on when I was trying to explain some things to the Court.

THE DEFENDANT: Your Honor, I -- I would like to object to -- to -- to any further contact during this hearing or any filings that -- that conjugate the findings of competency by the Justice Department's own fine psychiatric team. I'm not crazy. I was pissed off in planning this, pardon the vernacular, and that's -- that's the truth. I am -- I'm competent, and you -- you're intelligent, and you can tell that I know what's going on, and we are -- we are struggling right now. They are going to use what -- the aggravation that comes inherently with being confined against me to bring about more of the same situation, and so --

THE COURT: All right, Mr. Paul, thank you. But as a courtesy, I want to give Mr. O'Brien a chance to make a brief statement.

Please make it brief, Mr. O'Brien.

MR. O'BRIEN: I will make it brief, Your Honor.

As I've said, we feel somewhat bound by attorney-client privilege, but I also have a duty of integrity to the Court and not to let my client mislead the Court about what's happened with respect to him in the prison, and whether or not these things that are happening are bona fide suicide attempts or not.

He tried to -- he muted the microphone when I was explaining to you what the corrections officer who cut him down from his attempt to hang himself explained to us. He had succeeded in hanging himself from the window of his cell. His feet were not touching the floor. His face was -- was completely red, almost blue, and he had lost consciousness. He was cut down, and he had to be revived, and he had put a towel up against the door of his cell so that he wouldn't be seen in that attempt. So it was a bona fide attempt to end his own life.

There are other things -- and he didn't want me to tell you that. He muted the button so I couldn't. There are other things of that nature that the Court does not know because -- I can share that with you because it came from an officer, not from Mr. Paul.

We also know that the word -- that the diagnosis schizophrenia appears --

THE DEFENDANT: No.

MR. O'BRIEN: -- in his --

THE DEFENDANT: I -- hold on. I object to that.

MR. O'BRIEN: -- in his prison file.

THE DEFENDANT: I was given some medication for sleep, and in the description of the medication, it says it is commonly used for schizophrenia as well, but I was given ten milligrams of something called Lozapine for irregular sleep patterns.

As far as the hanging incident goes, what do you think I'm -- what do you think I'm doing right now? I was just trying to -- I was trying to save money. It cost Eighty Dollars for the -- for that (inaudible).

THE COURT: All right, gentlemen, I -- I -- I think we're -- I think we're not doing anything useful right now. I believe the purposes of the hearing have been met, and so I intend to close it, and explain to you that I will issue a written ruling as soon as I can possibly get to it. All right, anything --

MR. McGLASSON: Judge, just for the record, I know you've closed it, but I think there are other things that need to be said before you close it, so I'd like to make that record now.

THE COURT: Well, what is it that you need to say, Mr. McGlasson?

MR. McGLASSON: Well, Judge, one of the things that I wanted to point out about what you just witnessed when Mr. Paul

hit the mute button was that when I asked Mr. Paul why he misrepresented himself to the Court, he acknowledged that he'd done so and said that you can't talk about that, attorney client privilege. So I just feel -- I feel, Your Honor, the need to make that record.

One of the things Mr. O'Brien has said is that we do not feel this colloquy that's occurred here today is in any way adequate to cover the issues that apparently Your Honor feels are facing him at this time, and that's one of the examples of what we think is inadequate. That things that have been said by Mr. Paul to Your Honor, that based on attorney-client privileged information, I understand to be false, and when I confronted Mr. Paul with that during the time when the mute button was on, he instructed me not to share that with the Court because it was attorney-client privilege.

THE COURT: Why is that not privileged? Mr. McGlasson, why is that, in and of itself, not privileged?

MR. McGLASSON: Well, it could be. I feel the need --

THE COURT: Well, I think it might be.

MR. McGLASSON: -- to make this record.

THE COURT: I think it might be if he's telling you specifically not to disclose it and you do it. My question is why?

MR. McGLASSON: I did not disclose what we -- what --

THE DEFENDANT: What he's doing is implying there's

more to the story, Your Honor, that he doesn't want you to know, and you'd better consider that so we can drag this out further. I'm going to tell you, Your Honor, that's exactly what's happening here, and this is typical defense jargon.

And when you're -- when -- when you're close to death, death is inevitable, I -- I -- I tried to familiarize myself with what might be possible. I have read in many, many magazines and things like that that lethal injection is similar to drowning or strangulation, and actually, it's not pleasant, but it's inevitable, and I'm familiarizing myself a little bit with that feeling. Not all the way, obviously, or I wouldn't be sitting here talking to you. It's not suicidal, it's a dry run, because I'm sitting on death row. It would be different if I was playing football in high school and, you know, wrapping stuff around my neck.

I've been convicted of murder. My appeals have been denied. The Order -- the Motion for Discovery has been denied. Every day I wake up, I'm on death row. I have a death sentence. I should really start, you know, contemplating the fact that I'm going to die. That's it.

THE COURT: All right.

THE DEFENDANT: That's common sense.

THE COURT: All right. Mr. McGlasson, anything further?

MR. McGLASSON: Not from me, Your Honor. Thank you.

THE COURT: Mr. O'Brien?

MR. O'BRIEN: No, sir.

THE COURT: All right. Mr. Snyder?

MR. SNYDER: No, Your Honor.

THE COURT: All right. Ladies and gentlemen, this will close the hearing. I date the time -- it's approximately twenty minutes till five. Thank you, gentlemen, and this hearing is concluded.

(Wherein the telephone video conference was concluded.)

## COURT REPORTER'S CERTIFICATE

I, THERESA SAWYER, certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

Theresa Sawyer
THERESA SAWYER
Certified Court Reporter, #235
Transcriber

August 16, 2004
Date

Official Seal
THERESA SAWYER
Notary Public-Arkansas
BENTON COUNTY LS NO. 235
My Commission Expires 1-6-2010